# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS E. PROCTOR HEIRS TRUST and the MARGARET PROCTOR TRUST,<br><br>Defendants. | CASE NO. 1:12-CV-1567<br><br>Hon. Christopher C. Conner<br>United States District Judge<br><br>Hon. Susan E. Schwab<br>United States Magistrate Judge |

## DEFENDANTS' AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO THE SECOND AMENDED COMPLAINT WITH COUNTERCLAIMS

Defendants Charles Rice Kendall and Ann P. Hochberg, Trustees of the Thomas E. Proctor Heirs Trust, and Bank of America, N.A. and John J. Slocum, Jr., Trustees of the Margaret O.F. Proctor Trust (collectively the "Proctor Trusts"), for their Amended Answer and Affirmative Defenses to the Second Amended Complaint ("Complaint") of Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission") and Counterclaims, state the following:

### The Parties

1.      The Proctor Trusts admits that the Commonwealth of Pennsylvania, Pennsylvania Game Commission has initiated this lawsuit.  After reasonable

1

investigation, the Proctor Trusts are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1 and they therefore are denied.

2.     Admitted in part and denied in part.  It is admitted that the Proctor Heirs Trust (the "PHT") holds a 15/16 or 93.75% interest in the subsurface estate, right and interests reserved by Thomas E. Proctor, Sr. and Emma H. Proctor and also specifically conveyed to Emma H. Proctor and her heirs ("the Proctor Subsurface Estate") for the benefit of certain heirs of Thomas E. Proctor, Sr. and Emma H. Proctor.  It is further admitted that the Margaret O.F. Proctor Trust (the "MPT") holds a 1/16 or 6.25% interest in the Proctor Subsurface Estate for the benefit of certain heirs of Thomas E. Proctor, Sr. and Emma H. Proctor.   The Proctor Trusts believe, assert, and in fact, do, collectively hold 100% of the Proctor Subsurface Estate for the benefit of the heirs of Thomas E. Proctor, Sr. and Emma H. Proctor.  The MPT denies that its mailing address is c/o McGuireWoods LLP, EQT Plaza, 625 Liberty Avenue, 23rd Floor, Pittsburgh, Pennsylvania, 15222-3142.  After reasonable investigation, the Proctor Trusts are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 and they therefore are denied.

**Jurisdiction**

3.     Admitted in part and denied in part.  The Proctor Trusts admit: (1) that the Proctor Trusts were formed under the laws of Massachusetts and (2) that none of the Proctor Trusts' beneficiaries are Pennsylvania citizens.  By way of further response, none of the Proctor Trusts' trustees – the entities whose citizenship is in fact relevant to the existence of federal jurisdiction – are Pennsylvania citizens, but instead are citizens of Maine, Massachusetts, Rhode Island and North Carolina. After reasonable investigation, the Proctor Trusts are without knowledge or information sufficient to form a belief as to the truth of the remaining factual allegations of this Paragraph and they therefore are denied.  The remaining allegations in Paragraph 3 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts admit that this Court has jurisdiction over the parties' dispute, but denies any remaining allegations contained in Paragraph 3.

**Applicable Law**

4.     The Proctor Trusts admit only that the dispute set forth in the Complaint involves title to real property located in Sullivan County, Pennsylvania. The remaining allegations in Paragraph 4 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the remaining allegations in Paragraph 4.

3

**The Premises**

5.      Admitted upon information and belief.

6.      The allegations in Paragraph 6 are characterizations of written documents, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the documents, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the documents.

7.      The allegations in Paragraph 7 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 7. Furthermore, the allegations in Paragraph 7 are characterizations of written documents, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the documents, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the documents.  The Proctor Trusts specifically deny that the Game Commission acquired the Proctor Subsurface Estate in the property at issue.

8.      After reasonable investigation, the Proctor Trusts are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and they therefore are denied.

## The Titles

9.      The allegations in Paragraph 9 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 9. Furthermore, the allegations in Paragraph 9 are characterizations of written documents, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the documents, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the documents.  The Proctor Trusts specifically deny that the Game Commission acquired the Proctor Subsurface Estate in the property at issue.

10.     The allegations in Paragraph 10 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 10.  The Proctor Trusts specifically deny that the Game Commission acquired the Proctor Subsurface Estate in the property at issue.

11.     The allegations in Paragraph 11 and each of its subparts are legal conclusions, to which no response is required.  To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 11.  Furthermore, the allegations in Paragraph 11 are characterizations of written documents, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the documents, or that are rendered

inaccurate, incomplete or misleading based on a reading of the complete text of the documents.

12.     The allegations in Paragraph 12 and each of its subparts are legal conclusions to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 12.  Furthermore, the allegations in Paragraph 12 are characterizations of written documents, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the documents, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the documents.  By way of further response, The Proctor Trusts specifically deny that the tax deeds resulting from the 1908 tax sales conveyed any right, title or interest in or to the Proctor Subsurface Estate in the property at issue.

13.     The allegations in Paragraph 13 are legal conclusions, to which no response is required. To the extent that a response is necessary, the Proctor Trusts deny the allegations in Paragraph 13.  Furthermore, the allegations in Paragraph 13 are characterizations of a written document, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the document, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the document. By way of further response, The Proctor Trusts specifically deny that the

referenced deed conveyed any right, title or interest in or to the Proctor Subsurface Estate in the property at issue.

14.     The allegations in Paragraph 14 are characterizations of a written document, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the document, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the document.

15.     The allegations in Paragraph 15 are characterizations of a written document, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the document, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the document.

16.     The allegations in Paragraph 16 are characterizations of a written document, the terms of which speak for themselves, and the Proctor Trusts deny as stated any allegations that are inconsistent with the text of the document, or that are rendered inaccurate, incomplete or misleading based on a reading of the complete text of the document.  By way of further answer, the PHT owns and holds title to 93.75% of the Proctor Subsurface Estate in the property at issue, while the MPT owns and holds title to 6.25% of the Proctor Subsurface Estate.

17.     The allegations in Paragraph 17 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 17. By way of further answer, upon information and belief, the appropriate taxing authorities were notified and/or aware of the Proctor Subsurface Estate, but no basis to assess the severed Proctor Subsurface Estate existed as no oil, gas or minerals were being produced under or in the neighboring vicinity of the property at issue.  Responding further, upon information and belief, Thomas E. Proctor, Sr. and Emma H. Proctor and/or their assigns, agents or heirs, notified the appropriate authorities of and registered their property in accordance with all applicable laws and paid any and all assessed taxes.

18.     The allegations in Paragraph 18 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 18.

19.     The allegations in Paragraph 19 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 19.

20.     The allegations in Paragraph 20 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 20.

21.     The allegations in Paragraph 21 are legal conclusions, to which no response is required. To the extent a response is required, after reasonable investigation, the Proctor Trusts are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21, and they therefore are denied.  By way of further response, The Proctor Trusts specifically deny that the tax deeds resulting from the 1908 tax sales conveyed any right, title or interest in or to the Proctor Subsurface Estate in the property at issue.

22.     The Proctor Trusts deny the allegations of Paragraph 22.

23.     The allegations in Paragraph 23 are legal conclusions, to which no response is required. To the extent a response is required, the Proctor Trusts deny the allegations in Paragraph 23.

24.     Admitted in part and denied in part.  The Proctor Trusts admit that they have and are asserting the right, title and interest in the Proctor Subsurface Estate.  It is admitted that the Proctor Subsurface Estate in the properties at issue, in whole or in part, has been leased to third parties.  The Proctor Trusts expressly deny any implication that they do not hold the right, title and interest in the Proctor Subsurface Estate in the properties at issue.  The Proctor Trusts further deny any implication that they do not have the ability or right to lease, convey, or otherwise alienate the Proctor Subsurface Estate in the properties at issue.

9

## AFFIRMATIVE DEFENSES

Without conceding any applicable burden of proof, the Proctor Trusts allege the following as defenses to the claims in the Second Amended Complaint:

25.     The Second Amended Complaint fails to state a claim upon which relief can be granted.

26.     The Game Commission fails to establish prima facie title to the Proctor Subsurface Estate in the properties at issue.

27.     The claims asserted in the Second Amended Complaint are barred by the doctrine of estoppel.

28.     The claims asserted in the Second Amended Complaint are barred by the doctrine of laches.

29.     The claims asserted in the Second Amended Complaint are barred by the doctrine of waiver.

30.     The MPT and the PHT hold 100% title, right and interest in and to the oil, gas and minerals, known as the Proctor Subsurface Estate, in the properties at issue.

31.     The alleged 1908 tax sales and 1908 treasurer's deeds did not divest the heirs of Thomas E. and Emma H. Proctor of their ownership of and title to the Proctor Subsurface Estate in the properties at issue.

32.     The alleged 1908 tax sales and 1908 treasurer's deeds did not include the Proctor Subsurface Estate, as the Proctor Subsurface Estate was severed from the surface estate approximately 14 years before the purported tax sales and treasurer's deeds, and as such, only the surface estate was assessed and sold.

33.     Sullivan County only assessed and taxed oil, gas and mineral rights between approximately 1956 and 1987 and, even then, the County only assessed such rights in a severed estate and where production or a valid basis to assess existed.  Therefore, there was no assessment of the severed Proctor Subsurface Estate and it could not have been included in the tax assessment of the property owned by CPLC.

34.     The alleged 1908 tax sales and 1908 treasurer's deeds did not pass title to the Proctor Subsurface Estate, because the taxing authorities were duly notified and/or aware of the severance of these rights from the surface estate and because the County lacked a sufficient basis to value, assess, or tax the coal, oil, gas, petroleum, and mineral rights; therefore, the Proctor Subsurface Estate was not and could not be assessed for taxes and, instead, only the surface estate was assessed and sold.  Upon information and belief, such notice may not be of record, because the County failed to keep records of unseated-land registration and/or the records have been lost or destroyed due to flood, fire, natural disaster, theft, or negligence.

35.     The tax sales at issue were void and without effect, because the purchaser at the purported tax sale, C.H. McCauley, Jr., as an agent of the defaulting party, the Central Pennsylvania Lumber Company (CPLC), had a legal and moral obligation to pay the taxes for CPLC, and therefore, his purchase of the property at the June 8, 1908 tax sales served as payment of the deficient taxes and/or a redemption.

36.     The 1908 tax deeds were never delivered to C.H. McCauley, Jr., and he failed to record the 1908 tax deeds or register any interest with the tax assessor. As such, C.H. McCauley, Jr. and his successors and assigns are estopped from claiming that the 1908 tax sales and tax deeds conveyed any right, title or interest in or to the Proctor Subsurface Estate in the property at issue.

37.     C.H. McCauley, Jr. failed to ensure that the 1908 tax deeds were recognized in open court; therefore, the purported deeds are void or invalid and no changes in ownership to Proctor Subsurface Estate were effectuated by the 1908 tax sales and 1908 treasurer's deeds.

38.     Following the 1908 tax sale and tax deeds, the taxes for the property continued to be assessed in the name of CPLC, demonstrating that the tax sales and deeds had no impact on the ownership of the property.

39.     CPLC made tax payments on taxes associated with the subject property in December 1980 and 1909, and these payments operated as a

redemption and/or otherwise demonstrate CPLC's continued ownership of the property and that the tax sales and deeds had no impact on the title to the property or the Proctor Subsurface Estate.

40.     CPLC, McCauley, Jr., and anyone claiming to be a successor to their interests are estopped from acquiring a greater interest in the property as a result of CPLC's own failure to register its ownership of the surface estate to the taxing authorities and failure to pay the assessed taxes.

41.     CPLC, McCauley, Jr., and anyone claiming to be a successor to their interests are estopped from acquiring a greater interest in the property by later claiming CPLC fraudulently registered more than its actual ownership of the surface estate to the taxing authorities and failure to pay the assessed taxes.

42.     CPLC, and all of its successors in interest, are estopped from claiming that the assessment of taxes included the Proctor Subsurface Estate, as CPLC had not met its obligation to register its ownership of the surface property, which *de facto* did not include the Proctor Subsurface Estate.

43.     Because CPLC and McCauley, Jr. as its agent were not bona fide purchasers at the time of the tax sale and subsequent quit-claim deed, they and any parties who claim through them, could not acquire a greater interest in the property as a result of CPLC's own failure to pay the assessed taxes.

44.     Those contemporaneous parties familiar with the regular procedures of unseated land assessments and taxation, including C.H. McCauley, Jr. and other agents and affiliates of CPLC, made no claims of "title washing" against the Proctor heirs and assigns or other owners of excepted-and-reserved coal, oil, gas, petroleum, and mineral estates, so laches bars the Game Commission from attempting to apply this "title-washing" theory *post facto* more than 106 years later.

45.     The alleged 1908 tax sales and 1908 treasurer's deeds were void, invalid, and passed no title to the Proctor Subsurface Estate, because the notice provisions of the Act of 1815, on their face or as applied, violate the due process rights of the heirs of Thomas E. Proctor and Emma H. Proctor as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

46.     The alleged 1908 tax sales and 1908 treasurer's deeds are void, invalid, and passed no title to the Proctor Subsurface Estate, because the description of the property assessed and sold was legally deficient, in that it failed to disclose and properly describe the nature and extent of the property involved.

WHEREFORE, the MPT requests that the Court enter judgment in its favor and against the Game Commission, enter an order declaring that the heirs of Thomas E. Proctor are the rightful owners of the Proctor Subsurface Estate, and

award the MPT attorneys' fees and costs, and any other relief that it deems just and appropriate.

## COUNTERCLAIM

1.      A dispute exists between the Proctor Trusts and the Game Commission as to the ownership of the oil, gas and mineral rights associated with certain properties located in Sullivan and Bradford Counties.

2.      In 1893, Thomas E. Proctor obtained title in fee to certain property comprised, *inter alia*, of all or portions of thirty-nine warrants in the Warrantee names of Robert Irwin, Francis Nichols, John Brady, Thomas Hamilton, Charles Irwin, William Meylert #2, Henry Epple, Richard Parker, Thomas Rees, Charles Williamson, William Steadman, Elizabeth Colt, Nathanial Colt, George Gearhart, Mary Gearhart, Henry Lebo, James Tower, Jonathan Walker, Daniel Smith, Samuel Young, Thomas Grant, Andrew Epple, Anthony Gearhart, William Gearhart, Josiah Haines, Alexander Hunter, Levi James, Michael Meylert #1, Ann F. Meylert, Michael Meylert #2, Willaim Meyert #1, Michael Meylert #3, Michael Meylert #4, Isaac Kirk, Thomas Woodside, Mary Giffin, John James, Ezekial Yarnall, and Archibald Evans and comprising the tract of lands subsequently referred to by the Game Commission as State Game Lands No. 13.  *See* Sullivan County Deed Book 21, page 375.

3.      Similarly, between 1883 and 1893, Thomas E. Proctor and Jonathan A. Hill obtained title in fee to land comprised, *inter alia*, of all or portions of twenty-three warrants located in Bradford and Sullivan Counties in the Warrantee names of John Betz, James Betz, Samuel Fritz, John Fritz, Jonathan Seeley, James Hardy, Robert Hiltzheimer, Jacob Hiltzheimer, James Collins, George Eckhart, William M. Biddle, George Glenworth, Richard (Robert) Erwin, Richard Fullerton, John Baker, Henry Cooley, Aaron Fritz, Samuel Bryson, Robert Comely, Richard Fullerton, John Patton, James Shoemaker, and Thomas Hiltzheimer, and subsequently referred to by the Game Commission as State Game Lands No. 12. *See* Bradford County Deed Book 152, page 291, Deed Book 169, page 326, Deed Book 197, page 270; Sullivan County Deed Book 14, page 230, Deed Book 14, page 233, Deed Book 14, page 658, Deed Book 17, page 463.

4.      Similarly, in 1887, Thomas E. Proctor and Jonathan A. Hill obtained title in fee to land comprised of three warrants located in Bradford County in the Warrantee names of Peter Seeley, Jonathan Hampton and the west part of George Castator, and subsequently referred to by the Game Commission as State Game Lands No. 36.  *See* Bradford County Deed Book 172, page 99.

5.      State Game Lands Nos. 12, 13 and 36 are collectively referred to as the "Disputed Property."

A.   **The Proctor Reservation**

6.      Thomas E. Proctor, along with several other entrepreneurs, formed the United States Leather Company in the late 1800s.  They acquired large tracts of hemlock forest in north-central Pennsylvania and elsewhere, hemlock bark being a key ingredient used in tanning leather.  Proctor and the other entrepreneurs and their heirs (the so-called "tanning families") conveyed the surface of the acquired land in Pennsylvania to subsidiaries of the United States Leather Company, including Elk Tanning Company and Union Tanning Company, and reserved the oil, gas and minerals to themselves and their heirs.

7.      In 1894, prior to his death, Thomas E. Proctor and his wife conveyed the surface estate of State Game Lands No. 13 to the Union Tanning Company, excepting and reserving unto themselves, their heirs and assigns (the "Proctor Heirs") "all the minerals, coal, oil, gas or petroleum found on or under the surface of the land." October 30, 1894 Deed, recorded in Sullivan County Deed Book 24 at page 53 (see page 57 for the Proctor Reservation).

8.      Likewise, in 1894, Thomas E. Proctor, his wife, and Jonathan A. Hill conveyed the surface estate of State Game Lands Nos. 12 and 36 to the Union Tanning Company, excepting and reserving unto themselves, their heirs and assigns "all the minerals, coal, oil, gas or petroleum found now or hereafter, on or under the surface of any or all of the lands described." October 27, 1894 Deed,

recorded in Bradford County Deed Book 205, at page 436 (see page 448 for the Proctor Reservation).

9.     The minerals, coal, oil, gas or petroleum on or under the lands of the Disputed Property are referred to as the "Proctor Subsurface Estate."  The reservations of the Proctor Subsurface Estate for the Bradford County and Sullivan County Properties are collectively referred to as the "Proctor Reservation."

10.     Following a tax sale of portions of State Game Lands No. 13 in 1896 the tax sale purchaser, O.B. Grant, who was an officer of Union Tanning Company, conveyed the Proctor Subsurface Estate of those portions of State Game Lands No. 13 to the Proctor Heirs and conveyed the surface estate of the property to Union Tanning Company.

11.     Upon information and belief, the 1896 tax sale was due to the purported failure to pay the pre-severance taxes assessed against the entire property.

12.     Because O.B. Grant was an officer of Union Tanning and he conveyed any purported interests in the property back to the Proctor Heirs prior to the two-year redemption period, the tax sale purchase operated as a redemption, returning all interests as they were prior to the tax sale.

13.     By 1897, the Proctor Heirs had title to the Proctor Subsurface Estate of the Disputed Property.

18

14.     The County taxing authorities were given notice of the Proctor Reservation and the Proctor Heirs' ownership of the Proctor Subsurface Estate.

15.     In 1903, Union Tanning Company conveyed its ownership interest in the surface estates of the Disputed Property to the Central Pennsylvania Lumber Company ("CPLC"), a subsidiary of Central Leather Company that was later merged into U.S. Leather.  May 25, 1903 Deed, recorded in Sullivan County Deed Book 29 at page 613; May 25, 1903 Deed, recorded in Bradford County Deed Book 251 at page 520.

16.     The 1903 Deeds excepted and reserved the bark rights of the Disputed Property in favor of Union Tanning Company.  *See* Sullivan County Deed Book 29, at page 620; Bradford County Deed Book 251 at page 523.

17.     Upon information and belief, pursuant to the Act of March 28, 1806, CPLC properly reported its interest *in the surface estate only* of the Disputed Property to the taxing authorities.

18.     Following the 1903 Deed, the taxes of the surface estate of the Disputed Property were assessed in the name of CPLC, demonstrating that CPLC informed the taxing authorities of its ownership of the surface estate of the Disputed Property and that the registration and assessments were rightly done.

19.     Taxes were *never* assessed against the Proctor Subsurface Estate of the Disputed Property.

20.     Between 1896 and 1908, there was no production of oil or gas from the Disputed Property.

21.     Upon information and belief, there was no production or development of oil or gas from lands neighboring the Disputed Property.

22.     Prior to 1956, Sullivan County did not assess or tax oil, gas or other mineral rights.

23.     Upon information and belief, Bradford County did not assess or tax oil, gas or other mineral rights between 1906 and 1910.

**B.     The Tax Sales**

24.     In 1906, the various warrants of the Disputed Property were assessed in the name of CPLC.

25.     Upon information and belief, in 1907, CPLC was reorganizing and, in an effort to keep certain properties off its books, it purposefully did not pay taxes on those certain properties and allowed them to go to tax sales.[1]

26.     In an apparent effort to maintain ownership of these properties, CPLC had its agent Calvin H. McCauley, Jr. ("McCauley") purchase the properties at the tax sales.

---

[1] Several of the warrants constituting the Disputed Property did not go through any tax sale, including warrants in the name of the following warrantees: Jonathan Seeley, Robert Hiltzheimer, James Collins, George Eckhart, George Glenworth, and John Baker.

20

27.     On June 8, 1908, CPLC's interests in the Disputed Property were purportedly purchased by McCauley at tax sales in Sullivan County and Bradford County.

28.     During the relevant time period, McCauley served as an attorney and a real estate agent for CPLC.

29.     Upon information and belief, McCauley never previously and explicitly renounced his agency prior to any tax sale purchase of CPLC's interests.

30.     McCauley never gave notice of his purported interests or recorded any tax deeds associated with the Disputed Property.

31.     In addition, despite the requirement of acknowledgement of tax deeds in open court in order to effect any conveyance, all but two of the tax sale deeds for State Game Lands Nos. 12 and 36 were not acknowledged in open court, even though many other tax sales deeds of different properties were acknowledged in court.

32.     Upon information and belief, the tax sale deeds for State Game Lands No. 13 were not acknowledged in open court.

33.     In December 1908, after the purported tax sales, CPLC paid the taxes on the surface estate of the Disputed Property.

34.     Similarly, in 1909, CPLC paid the taxes on the surface estate of the Disputed Property.

35.     Upon information and belief, the tax payments made by CPLC exceeded the amount necessary to redeem the Disputed Property.

36.     After the two-year period for redemption ran, McCauley re-conveyed the very same interests back to CPLC via quit-claim deeds in 1910.

37.     Between the tax sales in June 1908 and the 1910 quit-claim deeds, the Sullivan County and Bradford County taxing authorities continued to assess and return the Disputed Property in the name of CPLC.

**C.     Post-Tax Sale Transactions Demonstrate that CPLC and the Game Commission Did Not Believe that the Tax Sales "Washed" the Proctor Subsurface Estate**

38.     CPLC did not believe that it acquired the Proctor Subsurface Estate as a result of the 1908 tax sales and/or the 1910 quit-claim deeds from McCauley.  In fact, in 1930 CPLC went on to sell the surface estate of State Game Lands No. 12 expressly subject to the Proctor Reservation.

39.     Specifically, the deed from CPLC to the Game Commission conveying the surface estate of State Game Lands No. 12 was expressly subject to the Proctor Reservation:

> conveyance is made under and subject to the exception and reservation of all minerals, coal, oil, gas or petroleum found now or hereafter on or under the surface of any or all of the lands above described…as fully as the said minerals and rights were excepted and reserved in the three following deeds, viz: (a) Deed from Thomas E. Proctor and others to the Union Tanning Company, dated October 27, A.D. 1894, recorded in said Bradford County in Deed Book 205, page 436 and in said Sullivan County in Deed Book 24, page 59.

22

September 23, 1930 Deed recorded at Bradford County Deed Book 376, page 99.

40.     Similarly, the deed from CPLC to the Game Commission conveying State Game Lands No. 36 in 1930 excepted and reserved "unto the proper owners thereof all oil, gas, coal and other minerals in, under and upon the two tracts herein described as excepted and reserved in prior deeds of record…."  December 17, 1930 Deed recorded at Bradford County Deed Book 377, at page 211.

41.     In addition, the evidence reveals that CPLC did not believe that the 1908 tax sale had any effect on either the Proctor Reservation or Union Tanning's 1903 reservation of bark rights.

42.     In 1921, Elk Tanning, Union Tanning's successor through merger, deeded over the previously reserved bark rights for State Game Lands No. 13 so that CPLC could convey the entire surface estate to the Game Commission.  *See* January 26, 1921 Deed recorded at Sullivan County Deed Book 41, page 28.

43.     In 1924, CPLC conveyed its interests in State Game Land No. 13 to the Game Commission.  *See* December 31, 1924 Deed recorded at Sullivan County Deed Book 42, at page 538.

44.     Likewise, in 1924, Elk Tanning, conveyed the previously reserved bark rights for State Game Lands Nos. 12 and 36 to CPLC.  *See* December 30, 1924 Deed recorded at Bradford County Deed Book 365, page 165.

45.     In 1930, CPLC conveyed its interests in State Game Land Nos. 12 and 36 to the Game Commission.  *See* September 23, 1930 Deed recorded at Bradford County Deed Book 376, page 99 (State Game Land No. 12); December 17, 1930 Deed recorded at Bradford County Deed Book 377, at page 208 (State Game Land No. 36).

46.     In addition, the Game Commission has openly acknowledged that it does not own the oil, gas and mineral rights associated with the bulk of the Pennsylvania State Game Lands due to the severance of the subsurface rights.

47.     Upon information and belief, the Game Commission has only recently asserted any claim to title washing of the Proctor Subsurface Estate.

48.     In fact, the Game Commission recently entered into a lease to permit the drilling of wells in State Game Lands Nos. 12 and 36, prompting this counterclaim.

## COUNT I – QUIET TITLE

49.     The Proctor Trusts hereby incorporate by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

50.     The Proctor Trusts seek to quiet title to the oil and gas rights of the Disputed Property to remove any cloud on their title to the Disputed Property that has been created by the Game Commission's actions.

51.     The Proctor Trusts hold title to the natural gas and oil contained in the Disputed Property as set forth above.

52.     There is a cloud on the Proctor Trusts' title to the oil and gas rights in the Disputed Property due to the actions taken by the Game Commission.

53.     The Game Commission has made claims to ownership or has attempted to convey interests in the oil and gas associated with the Disputed Property.

54.     The 1908 tax sales and tax deeds did not affect the title of the Proctor Heirs (including the Trusts) because the alleged outstanding taxes on the subject properties were paid by an agent of CPLC, which effectuates a legal "redemption" confirming ownership of the Proctor Subsurface Estate by the Proctor Heirs.

55.     The 1908 tax sales and tax deeds did not affect the title of the Proctor Heirs (including the Trusts) because the Proctor Heirs did not receive notice and an opportunity to be heard.

56.     The 1908 tax sales and tax deeds did not affect the title of the Proctor Heirs (including the Trusts) because the Tax Deeds were the product of fraud.

57.     The 1908 tax sales and tax deeds did not affect the title of the Proctor Heirs (including the Trusts) because the County lacked a sufficient basis to value, assess, or tax the natural gas or oil rights, since upon information and belief, at no time prior to the purported tax sales commenced was natural gas or oil produced

from the subject property or from properties in the nearby area nor was natural gas or oil known to exist in commercially significant quantities in the subject property or in properties in the nearby area.

58.    The 1908 tax sales and tax deeds did not affect the title of the Proctor Heirs (including the Trusts) because the interest, right and title of the heirs of Thomas E. Proctor was severed approximately fourteen years prior to the 1908 Tax Sales and reported to the assessor.

59.    Neither CPLC nor McCauley believed the transactions "washed" the Subsurface Estate and vested the separate Subsurface Estate of its shareholders in CPLC.   In fact, the quit claim deeds to CPLC do not reference having acquired any additional subsurface interests and the deed conveying the surface of the Bradford County Property to the Game Commission is made expressly subject to the Proctor Reservation.

60.    CPLC and its successors in title, including the Game Commission, are bound by the prior reservations in the chain of title, and are estopped from claiming title to the Proctor Subsurface Estate.

61.    CPLC and McCauley, Jr. are estopped from acquiring a greater interest in the property as a result of CPLC's own failure to register its ownership of the surface estate to the taxing authorities and failure to pay the assessed taxes.

62.     CPLC, and all of its successors in interest, are estopped from claiming that the assessment of taxes included the Proctor Subsurface Estate as CPLC had the obligation to register its ownership of the property less the Proctor Subsurface Estate.

63.     Because CPLC and McCauley, as its agent, were not bona fide purchasers at the time of the tax sale and subsequent quit-claim deed, they and any parties who claim through them, could not acquire a greater interest in the property as a result of CPLC's own failure to pay the assessed taxes.

64.     The alleged 1908 tax sales and 1908 treasurer's deeds were void, invalid, and passed no title to the Proctor Subsurface Estate, because the notice provisions of the Act of 1815, on their face or as applied, violate the due process rights of the Proctor Heirs as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

65.     The Proctor Trusts seek a determination that title to the oil and gas rights of the Disputed Property is vested in them.

## COUNT II - CONVERSION

66.     The Proctor Trusts incorporate by reference the foregoing paragraphs as though fully set forth herein.

67.     Upon information and belief, the Game Commission has intentionally deprived the Proctor Trusts of their right to the natural gas underlying the Disputed Property through the production and sale of gas from the Disputed Property.

68.     The Game Commission has permitted or enabled the production of natural gas from the Disputed Property without the Proctor Trusts' consent and without lawful justification.

69.     The Proctor Trusts have suffered damages as a result of the unauthorized production and sale of natural gas from the Disputed Property in an amount to be determined at trial.

## COUNT III - UNJUST ENRICHMENT

70.     The Proctor Trusts incorporate by reference the foregoing paragraphs as though fully set forth herein.

71.     The Game Commission have been unjustly enriched as a result of benefits appropriated from the Proctor Trusts.

72.     The Game Commission has received benefits or compensation in connection with the extraction of natural gas from the Disputed Property.

73.     The Game Commission has appreciated and been enriched by such benefits that rightfully belong to the Proctor Trusts.

74.     The retention of such benefits by the Game Commission is inequitable and unjust and has substantially damaged the Proctor Trusts.

## PRAYER FOR RELIEF

WHEREFORE, the Proctor Trusts demand judgment in their favor and against the Game Commission as follows:

(i)     That the Court enter an order declaring that the Proctor Trusts are the rightful owners of all the natural gas, coal, oil, petroleum, marble and all minerals of every kind and character in, upon, or under the Disputed Property;

(ii)    That the Court enter judgment against the Game Commission and in favor of the Proctor Trusts for all compensatory and punitive damages incurred as a result of the Game Commission's actions, including, without limitation, the total amount of all benefits which have accrued to the Game Commission and/or which inured in any manner to the Game Commission as a result of the production of gas from the Disputed Property;

(iii)   That the Court enter judgment against the Game Commission for prejudgment interest and costs; and

(iv)    That the Court grant such other relief as it shall deem just and equitable under the circumstances.

The Proctor Trusts demand a jury trial on all claims so triable.


Dated:  December 1, 2016                    Respectfully submitted,


                                            */s/ Laura A. Lange*
                                            Laura A. Lange
                                            Pa. Id. No. 310733
                                            Paul K. Stockman *(pro hac vice)*
                                            Pa. Id. No. 66951
                                            McGuireWoods LLP
                                            625 Liberty Avenue, 23rd Floor

Pittsburgh, PA 15222
llange@mcguirewoods.com
pstockman@mcguirewoods.com

*Attorneys for Defendants/Counter-Claimants Charles Rice Kendall and Ann P. Hochberg, Trustees of the Thomas E. Proctor Heirs Trust and Bank of America, N.A. and John J. Slocum, Jr., Trustees of the Margaret O.F. Proctor Trust*

Thomas Waffenschmidt, Esq.
THE WAFFENSCHMIDT LAW FIRM, LLC
811 S. Market Street
South Williamsport, PA 17702
tom@waffenlaw.com

*Attorney for Defendants/Counter-Claimants Charles Rice Kendall and Ann P. Hochberg, Trustees of the Thomas E. Proctor Heirs Trust*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the

foregoing document has been served upon the following via the Court's CM/ECF

system, this 1st day of December 2016:

Bradley C. Bechtel, Esq.
2001 Elmerton Avenue
Harrisburg, PA 17110-9797
Harrisburg, PA 17110
brbechtel@pa.gov

/s/ *Laura A. Lange*