# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | : : : : : | CIVIL ACTION NO. 1:12-CV-01567 |
| Plaintiff, | : : | |
| v. | : : | (Chief Judge Conner) |
| THOMAS E. PROCTOR HEIRS TRUST, and the MARGARET PROCTOR TRUST, | : : : : | (Chief Magistrate Judge Schwab) |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

This action involves a property dispute between the plaintiff, the Pennsylvania Game Commission ("Game Commission"), and the defendants, the Thomas E. Proctor Heirs Trust and the Margaret Proctor Trust ("Proctor Trusts"), which are trusts held in benefit for the heirs of Thomas E. Proctor, Sr. ("Mr. Proctor") and his wife, Emma H. Proctor ("Mrs. Proctor").[1] Mr. Proctor, who was born in South Danvers (now Peabody), Massachusetts on August 29, 1834, was introduced at an early age to the tanning industry by his father Abel Proctor, who

---

[1] *See doc. 40* at ¶ 2; *doc. 66* at ¶ 2.

was a tanner and leather merchant.[2]  By 1853, Abel made his son a partner at Abel

Proctor & Son and, in the ensuing years, Mr. Proctor gained undisputed control of

the tanning industry.[3]   In particular, he obtained a number of properties in

Pennsylvania, where hemlock timber, a key ingredient that was used in tanning

leather, was abundant.[4]   Some of those Pennsylvania properties, which are

presently located in Bradford County and Sullivan County, serve as the disputed

properties in this action.

In the counterclaim, the Proctor Trusts contend that, in 1894, Mr. and Mrs.

Proctor conveyed the rights to the surface estates of the disputed properties to a

tanning company, while reserving for themselves, their heirs, and assigns, the

rights to the subsurface estates of those same properties. The Proctor Trusts further

contend that nine years later, in 1903, the tanning company then conveyed its

surface rights to a lumber company.  And, in 1908, when the lumber company did

not pay its taxes, the Proctor Trusts contend that the surface estates of the disputed

properties were sold at tax sales, where an agent of the lumber company bought the

---

[2] HOUSE OF PROCTOR GENEALOGY, THOMAS EMERSON PROCTOR SR.,
http://www.houseofproctor.org/genealogy/getperson.php?personID=I21408&tree=
hop (last visited July 31, 2017).

[3] *See id*.; *see also* HENRY HALL, 2 AMERICA'S SUCCESSFUL MEN OF AFFAIRS: THE
UNITED STATES AT LARGE, AN ENCYCLOPEDIA OF CONTEMPORANEOUS BIOGRAPHY
647 (The New York Tribune 1896), available at https://books.google.com/books.

[4] *See* HALL, *supra* note 3.

properties and conveyed them back to the company two years later. The Proctor Trusts finally contend that, between 1924 and 1930, the lumber company sold its surface rights to the Game Commission, which now claims ownership of the entirety of the disputed properties, not just the surface estates thereof.

Thus, at the core of the parties' present dispute is whether the 1908 tax sales resulted in a transfer of the entirety of the disputed properties or merely the surface estates thereof. The Proctor Trusts, who contend that the 1908 tax sales only conveyed the surface estates of the disputed properties, filed a counterclaim against the Game Commission to, among other things, quiet title. The Game Commission, who is proceeding *via* its second amended complaint in this action, also seeks quiet title to the property, asserting that the 1908 tax sales conveyed both the surface and subsurface estates. Presently before the Court is the Game Commission's motion to dismiss the Proctor Trusts' counterclaim. For the reasons set forth below, we recommend denying that motion in its entirety.

## II. Background and Procedural History.

On August 10, 2012, in the United States District Court for the Middle District of Pennsylvania, the plaintiff, Pennsylvania Game Commission ("Game Commission"), filed a complaint against the defendant, Thomas E. Proctor Heirs Trust ("Thomas Proctor Trust"), a Massachusetts trust, its successors and assigns, to quiet title to real property located in Sullivan County, Pennsylvania. *See doc.* 1.

The Thomas Proctor Trust filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (*doc. 6*), which United States District Court Chief Judge Conner ("Chief Judge Conner") referred to the undersigned United States Magistrate Judge (*doc. 10*).

Upon consideration of that motion, the undersigned recommended that the complaint be dismissed for failure to state a claim upon which relief could be granted. *Doc. 11*. The undersigned also recommended, however, that the Game Commission be granted leave to file an amended complaint. *Id*. But, before these recommendations were considered by Chief Judge Conner, the Game Commission filed an amended complaint. *See doc. 12*.

Then, on July 18, 2013, Chief Judge Conner adopted the undersigned's recommendations, granted the motion to dismiss, and directed the Thomas Proctor Trust to respond to the already-filed amended complaint. *See doc. 13*. In accordance with this directive, the Thomas Proctor Trust filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6), and, in the alternative, a motion for a more definite statement pursuant to Rule 12(e) (*see doc. 14*), which Chief Judge Conner also referred to the undersigned (*see doc. 21*).

Upon consideration of these motions, the undersigned recommended granting the Rule 12(b)(6) motion to the extent that it sought dismissal of the Game Commission's claim to quiet title under Pennsylvania Rule of Civil

Procedure 1061(b)(1), but denying it to the extent that it sought dismissal of that claim under Rule 1061(b)(3) and (4). *See doc. 24*. The undersigned also recommended denying the Rule 12(e) motion for a more definite statement. *See id.* On July 24, 2014, Chief Judge Conner adopted these recommendations and remanded the matter to the undersigned for pretrial management. *See doc. 28*.

Following remand, the Game Commission filed an unopposed motion for leave to file a second amended complaint. *See doc. 35*. That motion was granted (*doc. 36*), and on December 24, 2014, the Game Commission filed its second amended complaint, with exhibits properly attached. *See docs. 37*, *39*, *40*. The second amended complaint, unlike the original and amended complaints, names an additional defendant, specifically, the Margaret Proctor Trust ("Margaret Trust")— a trust which is held in benefit for the heirs of Thomas E. Proctor ("Mr. Proctor") and Emma H. Proctor. *See doc. 40* at 8, ¶ 2(b).

Then, on March 12, 2015, the parties filed a joint motion to stay this matter, pending a decision from the Pennsylvania Supreme Court in *Herder Springs Hunting Club v. Harry Keller, et al.*, 5 MAP 2015 (Pennsylvania Supreme Court January 27, 2015). *See doc. 46*. The parties alleged that while the issues presented in *Herder Springs* were not identical to the issues presented in the instant matter, the Supreme Court's ruling would, at a minimum, shape the parties' discovery and

possibly the filing of dispositive motions.  *Id.* at ¶ 14. That motion was granted (*doc. 47*), and the stay remained in effect until October 4, 2016.  *See doc. 60*.

After the stay was lifted, the Proctor Trusts filed an unopposed motion for leave to file an amended answer and affirmative defenses to the second amended complaint with counterclaims.  *See doc. 64*.  That motion was granted (*doc. 65*), and the amended answer and affirmative defenses with counterclaims was filed on December 1, 2016 (*see doc. 66*).  Since then, the Game Commission has filed the instant motion to dismiss the counterclaim, raising a number of arguments in support thereof.  *See doc. 67*.  That motion, which has been briefed, is ripe for disposition.

## III. The Counterclaim.

### A.  The Disputed Properties.

By 1893, Mr. Proctor had obtained title in fee to several properties located in Bradford and Sullivan Counties, Pennsylvania. *See doc. 66* at ¶¶ 2-4.  More specifically, in 1887, he and Jonathan A. Hill ("Mr. Hill") obtained title in fee to property, comprising of 3 warrants[5] located in Bradford County in the Warrantee

---

[5] *See Herder Spring v. Keller*, 143 A.3d 358, 360 n.3 Pa. 2016) (explaining the historical context of Pennsylvania's early land law, and specifically: a person who sought to purchase land would submit an application to the Land Office; the secretary would issue a warrant that would describe the land, the property adjoining the land, the purchaser, the purchase price, and the terms of the sale; the issuance of this warrant would trigger a survey of the land; and after the survey

names of 3 individuals[6] and comprising of the tract of lands subsequently referred to by the Game Commission as State Game Lands No. 36. *Id.* at ¶ 4. Similarly, between 1883 and 1893, Mr. Proctor and Mr. Hill obtained title in fee to property comprising of, among other things, all or portions of 23 warrants located in Bradford and Sullivan Counties in the Warrantee names of 23 individuals,[7] and comprising of the tract of lands subsequently referred to by the Game Commission as State Game Lands No. 12. *Id.* at ¶ 3. Then, in 1893, Mr. Proctor obtained title in fee to property comprising of, among other things, all or portions of 39 warrants located in Sullivan County in the Warrantee names of 39 individuals[8] and

---

was completed and returned, a patent would be issued providing clear title from the state or the proprietor to the original purchaser of the property).

[6] Peter Seeley, Jonathan Hampton, and "the west part of George Castator." *Id.* at ¶ 4.

[7] John Betz, James Betz, Samuel Fritz, John Fritz, Jonathan Seeley, James Hardy, Robert Hiltzheimer, Jacob Hiltzheimer, James Collins, George Eckhart, William M. Biddle, George Glenworth, Richard (Robert) Erwin, Richard Fullerton, John Baker, Henry Cooley, Aaron Fritz, Samuel Bryson, Robert Comely, Richard Fullerton, John Patton, James Shoemaker, and Thomas Hiltzheimer. *See id.* at ¶ 3.

[8] Robert Irwin, Francis Nichols, John Brady, Thomas Hamilton, Charles Irwin, William Meylert #2, Henry Epple, Richard Parker, Thomas Rees, Charles Williamson, William Steadman, Elizabeth Colt, Nathanial Colt, George Gearhart, Mary Gearhart, Henry Lebo, James Tower, Jonathan Walker, Daniel Smith, Samuel Young, Thomas Grant, Andrew Epple, Anthony Gearhart, William Gearhart, Josiah Haines, Alexander Hunter, Levi James, Michael Meylert #1, Ann F. Meylert, Michael Meylert #2, Willaim Meyert #1, Michael Meylert #3, Michael Meylert #4, Isaac Kirk, Thomas Woodside, Mary Giffin, John James, Ezekial Yarnall, and Archibald Evans. *See id.* at ¶ 2.

comprising of the tract of lands subsequently referred to by the Game Commission as State Game Lands No. 13. *Id.* at ¶ 2. These tracts of lands—i.e., State Game Lands No. 12, 13, and 36—are the disputed properties in this action (hereinafter, "Disputed Properties"). *Id.* at ¶¶ 1, 5.

**B. The Proctors' Reservation of Subsurface Rights.**

Mr. Proctor, along with several other entrepreneurs, formed the United States Leather Company in the late 1800s. *Id.* at ¶ 6. They acquired large tracts of hemlock forest in north-central Pennsylvania, and elsewhere, in order to secure hemlock bark, a necessary tanning leather ingredient. *Id.* Mr. Proctor and the other entrepreneurs and their heirs—the so-called, tanning families—conveyed the surface of the acquired land to subsidiaries of the United States Leather Company, including Elk Tanning Company and Union Tanning Company, but reserved the oil, gas, and minerals to themselves and their heirs. *Id.* More specifically, prior to his death in 1894, Mr. Proctor and his wife conveyed the surface estate of State Game Lands No. 13 to the Union Tanning Company, excepting and reserving unto themselves, their heirs and assigns (the "Proctor Heirs") "all the minerals, coal, oil, gas or petroleum found on or under the surface of the land."[9] *Id.* at ¶ 7. Likewise,

---

[9] By way of legal background, Pennsylvania recognizes three estates in land: (1) the surface estate; (2) the mineral (or subsurface) estate; and (3) the support estate. *See Smith v. Glen Alden Coal Co*., 32 A.2d 227, 234-35 (Pa. 1943); *accord United States v. 3,218.9 Acres of Land, More or Less, Situated in Warren Cty., State of Pa.*, 619 F.2d 288, 291 (3d Cir. 1980). Since "these estates are severable, different

in 1894, Mr. Proctor, his wife, and Mr. Hill conveyed the surface estates of State Game Lands Nos. 12 and 36 to the Union Tanning Company, excepting and reserving unto themselves, their heirs and assigns "all the minerals, coal, oil, gas or petroleum found now or hereafter, on or under the surface of any or all of the lands described." *Id.* at ¶ 8.[10]

Then, in 1896, following a tax sale of portions of State Game Lands No. 13,[11] the tax sale purchaser, O.B. Grant, who was an officer of Union Tanning Company, conveyed the subsurface estate of those portions to the Proctor Heirs and the surface estate of those portions to the Union Tanning Company. *Id.* at ¶ 10. Because O.B. Grant was an officer of the Union Tanning Company, and because he conveyed any purported interests in the property back to the Proctor Heirs prior to the two-year redemption period, the tax sale purchase operated as a redemption, thereby returning all interests as they were prior to the tax sale. *Id.* at ¶ 12. By the following year, 1897, the Proctor Heirs had title to the subsurface

---

owners may hold title to separate and distinct estates in the same land." *Hetrick v. Apollo Gas Co.*, 608 A.2d 1074, 1077 (Pa. Super. Ct. 1992) (citation omitted).

[10] The minerals, coal, oil, gas, or petroleum on or under the lands of the Disputed Properties are considered the subsurface estate(s). *See id.* at ¶ 9. And, the Proctors' reservations of rights to those subsurface estates constitute a reservation of subsurface rights. *Id.*

[11] Upon information and belief of the Proctor Trusts, the tax sale was the result of a purported failure to pay the pre-severance taxes assessed against the entire property. *Id.* at ¶ 11.

estates of the Disputed Properties. *Id.* at ¶ 13. The County taxing authorities were given notice of the Proctors' reservation and the Proctor Heirs' ownership of the subsurface estates. *Id.* at ¶ 14.

In 1903, Union Tanning Company conveyed its ownership interest in the surface estates of the Disputed Properties to the Central Pennsylvania Lumber Company ("CPLC"), a subsidiary of Central Leather Company that was later merged into U.S. Leather. *Id.* at ¶ 15. The 1903 Deed excepted and reserved the bark rights of the Disputed Properties in favor of the Union Tanning Company. *Id.* at ¶ 16. Upon information and belief of the Proctor Trusts, pursuant to the Act of March 28, 1806, CPLC properly reported to the taxing authorities its interest only in the surface estates of the Disputed Properties. *Id.* at ¶ 17.

Following the 1903 Deed, the taxes of the surface estates of the Disputed Properties were assessed in the name of CPLC, thus demonstrating that CPLC had informed the taxing authorities of its ownership of the surface estates of the Disputed Properties, and further, that the registration and assessments were rightly done. *Id.* at ¶ 18. Taxes were never assessed against the subsurface estates of the Disputed Properties. *Id.* at ¶ 19.

Between 1896 and 1908, there was no production of oil or gas from the Disputed Properties. *Id.* at ¶ 20. Upon information and belief of the Proctor Trusts, there was no production or development of oil or gas from lands neighboring the

Disputed Properties. *Id.* at ¶ 21. Further, prior to 1956, Sullivan County did not assess or tax oil, gas, or other mineral rights (*id.* at ¶ 22), and, upon information and belief of the Proctor Trusts, Bradford County did not assess or tax oil, gas, or other mineral rights between 1906 and 1910 (*id.* at ¶ 23).

### C. The Tax Sales.

In 1906, the various warrants of the Disputed Properties were assessed in the name of CPLC. *Id.* at ¶ 24. Upon information and belief of the Proctor Trusts, in 1907, CPLC was reorganizing and, in an effort to keep certain properties off its books, it purposefully did not pay taxes on those properties, thereby allowing them to go to tax sales. *Id.* at ¶ 25. In an apparent effort, however, to maintain ownership of the properties, CPLC had its agent Calvin H. McCauley, Jr. ("Mr. McCauley") purchase the properties at subsequent tax sales. *Id.* at ¶ 26.

On June 8, 1908, CPLC's interests in the Disputed Properties were purportedly purchased by Mr. McCauley at tax sales in Sullivan and Bradford Counties. *Id.* at ¶ 27. During this time period, Mr. McCauley served as an attorney and a real estate agent for CPLC. *Id.* at ¶ 28. Upon information and belief of the Proctor Trusts, Mr. McCauley never previously and explicitly renounced his agency prior to any tax sale purchase of CPLC's interests. *Id.* at ¶ 29. Mr. McCauley also never gave notice of his purported interests or recorded any tax deeds associated with the Disputed Properties. *Id.* at ¶ 30. In addition, despite the

requirement of acknowledgement of tax deeds in open court in order to effect any conveyance, all but two of the tax sale deeds for State Game Lands Nos. 12 and 36 were not acknowledged in open court, even though many other tax sales deeds of other properties were acknowledged in open court. *Id.* at ¶ 31. Upon information and belief of the Proctor Trusts, the tax sale deeds for State Game Lands No. 13 were not acknowledged in open court. *Id.* at ¶ 32.

In December 1908, after the tax sales, CPLC paid the taxes on the surface estates of the Disputed Properties. *Id.* at ¶ 33. Similarly, in 1909, CPLC paid the taxes on the surface estates of the Disputed Properties. *Id.* at ¶ 34. Upon information and belief of the Proctor Trusts, the tax payments made by CPLC exceeded the amount necessary to redeem the Disputed Properties. *Id.* at ¶ 35. After the two-year period for redemption ran, Mr. McCauley re-conveyed the very same interests back to CPLC *via* quit-claim deeds in 1910. *Id.* at ¶ 36.

Between the tax sales in June of 1908 and the quit-claim deeds of 1910, the Sullivan County and Bradford County taxing authorities continued to assess and return the Disputed Properties in the name of CPLC. *Id.* at ¶ 37.

**D. Transactions After the Tax Sales.**

CPLC did not believe that it acquired the subsurface estates of the Disputed Properties as a result of the 1908 tax sales and/or the 1910 quit-claim deeds from Mr. McCauley. *Id.* at ¶ 38. In fact, in 1930, when CPLC went on to sell the

surface estate of State Game Lands No. 12 to the Game Commission, it do so expressly subject to the Proctors' reservation of the subsurface estate. *Id.* More specifically, the deed from CPLC to the Game Commission provided that:

> [The] conveyance is made under and subject to the exception and reservation of all minerals, coal, oil, gas or petroleum found now or hereafter on or under the surface of any or all of the lands above described…as fully as the said minerals and rights were excepted and reserved in the three following deeds, viz: (a) Deed from Thomas E. Proctor and others to the Union Tanning Company, dated October 27, A.D. 1894, recorded in said Bradford County in Deed Book 205, page 436 and in said Sullivan County in Deed Book 24, page 59.

*Id.* at ¶ 39.  Similarly, the deed from CPLC to the Game Commission, conveying State Game Lands No. 36, excepted and reserved "unto the proper owners thereof all oil, gas, coal and other minerals in, under and upon the two tracts herein described as excepted and reserved in prior deeds of record . . . ." *Id.* at ¶ 40. Furthermore, "the evidence" reveals that CPLC did not believe that the 1908 tax sale had any effect on either the Proctors' reservation of subsurface rights or the Union Tanning Company's 1903 reservation of bark rights. *Id.* at ¶ 41.

In 1921, Elk Tanning, Union Tanning Company's successor through merger, deeded over the previously reserved bark rights for State Game Lands No. 13, presumably to CPLC, so that CPLC could convey the entire surface estate to the Game Commission.  *Id.* at ¶ 42.  Then, in 1924, CPLC conveyed its interests in State Game Land No. 13 to the Game Commission.  *Id.* at ¶ 43.  Likewise, in 1924,

Elk Tanning, conveyed the previously reserved bark rights for State Game Lands Nos. 12 and 36 to CPLC. *Id.* at ¶ 44. And, in 1930, CPLC conveyed its interests in State Game Land Nos. 12 and 36 to the Game Commission. *Id.* at ¶ 45.

In addition, the Game Commission has openly acknowledged that it does not own the oil, gas, and mineral rights associated with the bulk of the Pennsylvania State Game Lands due to the severance of the subsurface estates. *Id.* at ¶ 46. Upon information and belief of the Proctor Trusts, the Game Commission has only recently asserted a claim to "title washing" of the subsurface estates. *Id.* at ¶ 47. In fact, the Game Commission recently entered into a lease to permit the drilling of wells in State Game Lands Nos. 12 and 36, thereby prompting the Proctor Trusts' instant counterclaim. *Id.* at ¶ 48.

## IV. Discussion.

On the basis of these allegations, the Proctor Trusts assert three counts in their counterclaim: (1) quiet title to the oil and gas rights of the Disputed Properties in order to remove any cloud on their title to such Property, which has allegedly been created by the actions of the Game Commission (*see doc. 66* at ¶¶ 49-65); (2) conversion for the Game Commission allegedly permitting or enabling the unauthorized production and sale of natural gas from the Disputed Properties (*see id.* at ¶¶ 66-69); and (3) unjust enrichment since the Game Commission has allegedly received benefits or compensation in connection with the extraction of

natural gas from the Disputed Properties, which rightfully belong to the Proctor Trusts (*see id.* at ¶¶ 70-74). The Game Commission, as discussed above, has filed a motion to dismiss the counterclaim, raising several grounds in support. We address each of those grounds below.

## A. Rule 12(b)(1) Motion for Lack of Subject-Matter Jurisdiction.

In moving for dismissal of the counterclaim, the Game Commission first cites to Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits dismissal for lack of subject-matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1). Challenges to subject-matter jurisdiction under this Rule may be "facial" or "factual." *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). "A facial attack, as the adjective indicates, is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present." *Id.* at 358. Thus, when there is a facial attack, "we apply the same standard as on review of a motion to dismiss under Rule 12(b)(6)." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (citation omitted)); *see also Aichele*, 757 F.3d at 358 (instructing that the district court, in reviewing a facial attack, "must only consider the allegations of the complaint and documents

referenced therein and attached thereto, in the light most favorable to the plaintiff."
(citation and quotation marks omitted)). In contrast, "[a] factual attack . . . is an
argument that there is no subject matter jurisdiction because the facts of the case . .
. do not support the asserted jurisdiction." *Aichele*, 757 F.3d at 358. Thus, when
there is a factual attack, we "may consider and weigh evidence outside the
pleadings to determine if [the Court] has jurisdiction." *Gould Electronics, Inc. v.
U.S.*, 220 F.3d 169, 178 (3d Cir. 2000); *see also Aichele*, 757 F.3d at 358
(explaining that the "District Court may look beyond the pleadings" when
considering a factual attack).

In connection with this Rule, the Game Commission raises two arguments:[12]
first, that as an independent administrative commission of the Commonwealth of
Pennsylvania, it is entitled to sovereign immunity; and second, that because the
Proctor Trusts' counterclaim against the Game Commission involves the title to

---

[12] The Game Commission has not explained whether its Rule 12(b)(1) motion is a
facial or factual attack on the Court's subject matter jurisdiction. Having reviewed
the motion, however, we conclude that its Rule 12(b)(1) motion is a facial attack
because the Commonwealth has not presented any competing facts. *See Int'l Ass'n
of Machinists & Aerospace Workers v. Nw. Airlines, Inc*., 673 F.2d 700, 711 (3d
Cir. 1982) ("[Defendant's] motion was supported by a sworn statement of facts. It
therefore must be construed as a factual, rather than a facial attack on the court's
subject matter jurisdiction under FED. R. CIV. P. 12(b)(1)."); *Mortensen v. First
Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("Because at issue in a
factual 12(b)(1) motion is the trial court's jurisdiction[,] its very power to hear the
case[,] there is substantial authority that the trial court is free to weigh the evidence
and satisfy itself as to the existence of its power to hear the case."). Thus, we will
consider the allegations of the counterclaim and the documents referenced therein
and attached thereto, in the light most favorable to the Proctor Trusts.

land, the exclusive jurisdiction of their counterclaim is vested exclusively in the Board of Property, not this Court. *See doc. 68* at 3-4. The Proctor Trusts counter, however, that while both of these arguments are generally true, they do not apply here. *Doc. 71* at 9. In support, the Proctor Trusts contend that the Game Commission has waived sovereign immunity, and the jurisdiction of the Board of Property, by voluntarily invoking federal court jurisdiction. *Id.* at 9-12. We agree.

### 1. Eleventh Amendment Sovereign Immunity.

"The Eleventh Amendment provides that the 'Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the . . . States' by citizens of another State, U.S. Const., Amdt. 11, and (as interpreted) by its own citizens." *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 618 (2002) (quoting *Hans v. Louisiana*, 134 U.S. 1 (1890)). "A State remains free to waive its Eleventh Amendment immunity from suit in a federal court." *Id.* (citing *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 (1985)). Thus, the issue here is whether the Game Commission has waived its Eleventh Amendment sovereign immunity by voluntarily appearing in this federal court; we conclude that it has.

More than a century ago, the United States Supreme Court "indicated that a State's *voluntary* appearance in federal court amount[s] to a waiver of its Eleventh Amendment immunity." *Lapides*, 535 U.S. at 619 (emphasis added) (quoting

*Clark v. Barnard*, 108 U.S. 436, 447 (1883) for the proposition that a "State's '*voluntary* appearance' in federal court as an intervenor avoids Eleventh Amendment inquiry") (emphasis added).  "The [United States Supreme] Court has long accepted this statement of the law as valid, often citing with approval the cases embodying that principle."  *Lapides*, 535 U.S. at 619 (collecting Supreme Court jurisprudence); *see also Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284 (1906) (holding that, "where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment.") (emphasis added); *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947) (holding, in the context of a bankruptcy claim, that a State "waives any immunity . . . respecting the adjudication of" a "claim" that it *voluntarily* files in federal court); *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (reaffirming the principle that a State waives its sovereign immunity by *voluntarily* invoking the jurisdiction of the federal courts) (emphasis added); *Lapides*, 535 U.S. at 619-20 (reaffirming the rule of law in *Gunter*, that where a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it is bound thereby and cannot escape the ultimate results of that cause by invoking the Eleventh Amendment).  The United States

Supreme Court has offered a number of reasons for its acceptance of this statement of the law:

> [A]n interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of "immunity" to achieve litigation advantages. *See Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 393, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (KENNEDY, J., concurring). The relevant "clarity" here must focus on the litigation act the State takes that creates the waiver.

*Lapides*, 535 U.S. at 620.

Here, the Game Commission was not haled into this federal court as an unwilling participant; it *voluntarily* appeared by filing a complaint against the Proctor Trusts on the basis of diversity jurisdiction. As such, we conclude that the Game Commission has waived its Eleventh Amendment sovereign immunity and consented to the determinations of this Court not only on its own claims, but also on the three counts contained in the Proctor Trusts' counterclaim, since those counts are compulsory in nature and thus lie well-within the scope of the Game Commission's waiver of immunity.[13]  *See Clark*, 108 U.S. at 448 (finding waiver

---

[13] The three counts in the Proctor Trusts' counterclaim, i.e., (1) quiet title, (2) conversion, and (3) unjust enrichment, are compulsory because they arise from the same series of transactions or occurrences that give rise to the Game Commission's claims in the second amended complaint.  *See* FED. R. CIV. P. 13(a) (defining a compulsory counterclaim as one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and . . . does not require

of immunity as to a "complete determination" of the litigation since the State voluntarily intervened in that litigation); *Gunter*, 200 U.S. at 289 (finding waiver of immunity where State voluntarily became a party to the suit); *Gardner*, 329 U.S. at 574 (finding, in the context of a bankruptcy dispute, that when a State becomes the actor and voluntarily files a claim in federal court, it "waives any immunity" regarding adjudication of that claim); *Lapides*, 535 U.S. at 620 (finding waiver of immunity where the State voluntarily removed the case to federal court).

Our conclusion is consistent with other Circuit Courts of Appeals that have analyzed sovereign immunity issues with similar procedural circumstances and ultimately recognized that when a State voluntarily commences an action in federal court, that State waives its Eleventh Amendment immunity as to any compulsory counterclaims that are asserted against it. *Bd. Of Regents of Univ. Of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 469 (7th Cir. 2011) ("*Phoenix*") (observing, in detail, the holdings of its sister Circuits "that a waiver of sovereign immunity encompasses all compulsory counterclaims"). Among the reasoning of those Circuits, unfair results could be generated if a State was permitted to file a lawsuit in federal court but, at the same time, claim immunity against the

---

adding another party over whom the Court cannot acquire jurisdiction"). Notably, the Game Commission has not disputed, or otherwise challenged, the Proctor Trusts' characterization that the three counts in the counterclaim arise "from the same series of transactions [and] raises the same legal questions that will already be decided by this Court[.]" *Doc. 71* at 11.

counterclaims arising from the very same transactions or occurrences alleged in the State's lawsuit. *See, e.g.*, *Phoenix*, 653 F.3d at 470 (explaining that it would be "manifestly unfair" if the State was allowed to "enjoy the advantages of the district court while using sovereign immunity to avoid the disadvantages."); *Regents Of Univ. Of New Mexico v. Knight*, 321 F.3d 1111, 1125-26 (Fed. Cir. 2003) (explaining that seriously unfair results could be obtained if a State was permitted to file suit in federal court, seeking to enforce a right arising from certain contractual agreements and conduct, while, at the same time, claiming immunity from liability for any compensation arising from those same agreements and conduct; and further explaining that because a State, as plaintiff, can anticipate that a defendant will have to file any compulsory counterclaims or be barred from doing so, it is not unreasonable to view the state as having consented to such compulsory counterclaims). And, we believe that their reasoning is consistent with that of the United States Supreme Court. *See Lapides*, 535 U.S. at 619 ("It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand. And a Constitution that permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results.").

Accordingly, unless the Game Commission can provide the Court with a reason that would justify culling this case out from under the United States Supreme Court's statement of law, we will not abandon the principles set forth above.

## 2. The Board of Property and Exclusive Jurisdiction.

In addition to arguing that it enjoys Eleventh Amendment sovereign immunity, the Game Commission also argues that the exclusive jurisdiction of cases involving title to land that is occupied or claimed by the Commonwealth are vested in the Board of Property, not this Court. *See doc. 68* at 4. In support it cites to § 1207 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 337. *See id.* That section provides that:

> The Board of Property shall, subject to any inconsistent provisions in this act contained, continue to exercise the powers and perform the duties by law vested in and imposed upon the said board.
>
> It shall hear and determine, in all cases of controversy on caveats, in all matters of difficulty or irregularity touching escheats, warrants on escheats, warrants to agree, rights of preemption, promises, imperfect titles, or otherwise, which heretofore have or hereafter may arise in transacting the business of the Land Office in the Department of Community Affairs: Provided, however, That no determination of the Board of Property shall be deemed, taken and construed to prevent either of the parties from bringing their action at the common law, either for the recovery of possession or determining damages for waste or trespass.
>
> The Board of Property shall also have jurisdiction to hear and determine cases involving the title to land or interest therein brought by persons who claim an interest in the title to lands occupied or claimed by the Commonwealth.

> The board shall make its determination within thirty (30) days after the final hearing on any of the above matters.

71 PA. STAT. ANN. § 337 (footnote omitted). The Game Commission also cites to *Stair v. Pennsylvania Game Commission*, 368 A.2d 1347 (Pa. Cmwlth. 1977). *See doc. 68* at 4. There, the alleged owners of culm banks, which were located on land acquired by the Commonwealth of Pennsylvania, for the use of the Game Commission, filed a petition with the Board of Property, seeking to remove their culm banks. *Id.* at 1347-48. The owners also sought reimbursement for any part thereof that had been appropriated by the Commonwealth. *Id.* at 1348. The Board of Property dismissed the petition, finding that the issue raised therein involved appropriation of personal property (i.e., the culm banks), over which the Board had no jurisdiction. *Id.* On appeal, the Commonwealth Court concluded that the Board did have jurisdiction to determine the ownership of the culm banks. *Id.* In support of its conclusion, the Commonwealth Court explained that the case presented "a controversy 'involving the title to land or interest therein' within the meaning of Section 1207[,]" because, if the alleged owners could prove title to the culm banks, then they would have an easement to enter the land and remove their property. *Id.* Although the Board may have had to initially determine title to the culm banks, this did not preclude the Board's jurisdiction since such a determination was necessary to decide whether an interest in land existed. *Id.*

Although the Game Commission has cited *Stair* for the proposition that the Board of Property has "exclusive jurisdiction" over cases involving title to land that is occupied or claimed by the Commonwealth (*doc. 68* at 4), we observe that neither *Stair* nor the statute itself (71 Pa. Stat. Ann. § 337) explicitly states that the Board of Property has "exclusive" jurisdiction over cases involving title to such land. *See Bannard v. N.Y. State Nat. Gas Corp.*, 172 A.2d 306, 311 (Pa. 1961) (writing that "there is nothing" in the Act of July 29, 1953, P.L. 1023, § 1, 71 P.S. § 337 (Supp. 1953) amending section 1207 of the Act of April 9, 1929, P.L. 177, 71 P.S. § 337, that grants "the Board [of Property] *exclusive* jurisdiction. The statute states the Board 'shall have jurisdiction to hear and determine cases' not that the Board shall have *exclusive* jurisdiction nor even jurisdiction to hear *all* cases.") (emphasis in original); *compare* 71 Pa. Stat. Ann. § 337 (stating that the Board of Property shall have "*jurisdiction*") (emphasis added) *with* 62 Pa. Cons. Stat. Ann. § 1724 (stating that the Board of Claims shall have "*exclusive jurisdiction*") (emphasis added).

Even assuming that *Stair* could be construed to interpret the statute in such a way,[14] we still conclude that *Stair* is distinguishable from both the facts and

---

[14] As recently as April 26, 2017, the Commonwealth Court observed that the "Board [of Property] has exclusive jurisdiction to decide the ownership of title to the mineral estate in a quiet title action where the Commonwealth has asserted an ownership interest." *McCready v. Pa. Tpk. Comm'n*, No. 1762 C.D. 2016, 2017 WL 1493099, at *4 (Pa. Commw. Ct. Apr. 26, 2017) (citing *International Dev.*

arguments presented here. More specifically, the *Stair* Court, unlike this Court, was neither presented with, nor discussed, the issue of sovereign immunity or whether the Commonwealth had waived such immunity. Furthermore, *Stair*, unlike this case, was initiated by the individual party, not by the Commonwealth of Pennsylvania. And, finally, also unlike this case, the individual who initiated the action in *Stair* did so with the Board of Property, not with a federal court.

In light of these glaring distinctions, the Game Commission has failed to cite to any authority supporting its argument that the Board of Property retains "exclusive" jurisdiction over this suit, despite the fact that it was the Game Commission who voluntarily elected to bring this suit in federal court, and not with the Board of Property. *Cf. Com., Dep't of Gen. Servs. v. Frank Briscoe Co.*, 466 A.2d 1336, 1340 (1983) (explaining that the defendant, who was entitled to bring suit against the Commonwealth of Pennsylvania for damages flowing from an alleged breach of contract, would have had to initiate such a suit in the Board of Claims, not with the Commonwealth Court; and further explaining that since the suit was initiated in the Commonwealth Court by the Commonwealth of Pennsylvania, the Commonwealth Court had jurisdiction over the suit, including jurisdiction to decide the defendant's counterclaims, which arose from the same

---

*Corp. v. Davidge*, 26 A.3d 1234, 1238–39 (Pa. Commw. Ct. 2011); *Kister v. Pa. Fish Comm'n*, 465 A.2d 1333, 1334–35 (Pa. Commw. Ct. 1983)). None of these actions, however, were brought by the Commonwealth.

underlying transaction). Consequently, we conclude that the Game Commission has not provided us with a reason that would justify culling this case out from under the general statement of law discussed above. As such, we recommend denying its Rule 12(b)(1) motion on the basis that it has waived its Eleventh Amendment sovereign immunity, as well as the jurisdiction of the Board of Property, by voluntarily invoking the jurisdiction of this federal court.

### B. Rule 12(b)(6) Motion Failure to State a Claim.

In moving for dismissal of the counterclaim, the Game Commission also cites to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which permits the Court to dismiss claims that fail to assert a basis upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss, pursuant to Rule 12(b)(6), we must accept all of the non-moving party's factual allegations as true, construe the complaint or counterclaim in the light most favorable to the non-moving party, and determine whether, under any reasonable reading of the complaint or counterclaim, the non-moving party may be entitled to relief. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In connection with these standards, the Game Commission raises two separate arguments. We address each in turn.

## 1. Barred as a Collateral Attack.

First, the Game Commission argues that the Proctor Trusts' counterclaim is time-barred. *See doc. 68* at 5-6. In support, the Game Commission explains that "[a]ll claims or discussions or objections to the form or manner of the tax sales are outside the [s]tatute of [l]imitations set forth in the Act of March 28, 1806, the various Acts ratifying the sales, or the general current law with regard to challenges to tax sales." *Id.* at 5. In further support, the Game Commission cites to the Pennsylvania Supreme Court's decision in *Herder Spring* and argues that the Proctor Trusts' contest to the tax assessment should have been brought within the statutory period and cannot now be collaterally attacked over a hundred years later. *See id.* at 6 (citing *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 366 (Pa. 2016) ("*Herder Spring*")).

The Proctor Trusts sharply dispute this argument, alleging that their counterclaim is not a time-barred collateral attack on the relevant tax sales. *Doc. 71* at 13-14. Instead, they argue that their counterclaim, and specifically, Count I—Quiet Title, is an appropriate vehicle for testing the validity of titles obtained at tax sales. *See id.* at 13. In support, they point to allegations in their counterclaim that their ownership of the subsurface estates to the Disputed Properties was reported and known to the taxing authorities (*see id.* (citing *doc. 66* at ¶ 14)), and as such, the assessments of the surface estates resulted in a tax sale of *only* those

27

surface estates and had no legal impact, therefore, on their ownership of the subsurface estates. *See id.* (citing *Herder Spring*, 143 A.3d at 368).

Because the parties dispute whether the Supreme Court's decision in *Herder Spring* effectively bars the counterclaim, we find it appropriate to recount that decision here.

### a. *Herder Spring*.

In 1894, Harry and Anna Keller ("Kellers") bought property at a tax sale in Centre County, Pennsylvania. *Herder Spring*, 143 A.3d at 360. Then, in 1899, the Kellers sold the surface rights of that property to Isaac Beck, Isaiah Beck, and James Fisher ("Becks"), but reserved the subsurface rights to themselves "through an extensive reservation that indisputably covered the natural gas at issue[.]" *Id.* As explained by the *Herder Spring* Court, however, there was no evidence in the record that the Becks had complied with the Act of 1806, which required anyone becoming a holder of unseated land[15] to provide notice to the county commissioners of the transfer of ownership. *Id.* There was also no evidence in the

---

[15] "Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land." *Id.* at 363. "Seated land was property that had been developed with residential structures, had personal property upon it that could be 'levied upon for the tax due', or was producing regular profit through cultivation, lumbering, or mining." *Id.* (citation omitted). In contrast, unseated land was "wild" land, which included any land that did not meet the requirements of being seated land. *Id.* (citation and quotation marks omitted). Notably, the parties in this action seemingly agree that the Disputed Properties constituted unseated land during the relevant time period.

record that the Kellers had informed the county commissioners of their reservation of subsurface rights.[16] *Id.*

Following other transfers not relevant to the Supreme Court's decision, Ralph Smith eventually acquired the surface rights to the disputed property. *Id.* But then, in 1935, as a result of unpaid taxes, the county commissioners acquired the property at a treasurer's sale. *Id.* Following that sale, the county commissioners held the property until 1941, at which point in time the property was sold to Max Herr ("Mr. Herr"), whose widow then sold the property to the Herder Spring Hunting Club ("Hunting Club") in 1959.[17] *Id.* at 361.

After acquiring the property, the Hunting Club entered into several oil and gas leases and eventually filed a complaint to quiet title in August of 2008 against the Kellers, "presumably as a result of the discovery of Marcellus Shale on the property." *Id.* Per the Hunting Club, the 1935 tax sale had extinguished the

---

[16] Although, the Kellers were under no duty to report their reservation of subsurface rights. *Id.* at 372. As explained by the *Herder Spring* Court, the relevant portion of the Act of 1806 imposed a reporting duty only on a party becoming a holder of unseated land. *Id.* Thus, given their prior ownership of the entire property, the Kellers did not become a holder of unseated land when they sold the surface estate and reserved the subsurface estate of such property. *Id.*

[17] During the title search, the Hunting Club's attorney noticed the Keller's prior subsurface reservation and recommended that language be added to the deed to reflect that reservation. *Id.* at 361. The deed, described the property, once again, but only "generically provided [that the] 'conveyance [was] subject to all exceptions and reservations as [were] contained in the chain of title,' without specifying the Keller reservation." *Id.*

Kellers' 1899 reservation of subsurface rights. *Id.* In support, the Hunting Club argued that because the county commissioners had not been alerted to the Kellers' reservation, the taxes were assessed against the entire property, and the subsequent sale of that property, as a result of delinquent taxes, resulted in the transfer of both the surface and subsurface estates. *Id.* The Kellers, of course, maintained that the 1935 tax sale only resulted in the transfer of the surface rights to the disputed property. *Id.* at 362.

Following an extensive review of the historical law regarding tax sales of unseated property in Pennsylvania, the *Herder Spring* Court ultimately concluded that the 1935 tax sale conveyed the entire disputed property, including both the surface and subsurface estates. *Id.* at 375. In support, the Court explained that although the disputed property had been severed into surface and subsurface estates, neither party had reported that severance to the county commissioners. *See id.* at 372. Thus, absent proof to the contrary, the Supreme Court could presume that, because the severance was never reported, the entire disputed property continued to be assessed, taxed, and sold. *Id.* (citing *Heft v. Gephart*, 65 Pa. 510, 516 (Pa. 1870) for the proposition that "the tax system relating to unseated land . . . treated [such] unseated land 'entirely in reference to the original warrants when not otherwise directed by the owners.'"). In support, the Supreme Court observed that the documents relating to the pertinent tax sale provided "no indication" that the

assessment and taxation occurred on anything other than the *entire* disputed property since those documents "provide[d] no reference to the surface estate or the reserved subsurface estate." *Id.* at 375. As a result, the 1935 tax sale conveyed the entire disputed property. *Id.* Thus, when neither the Kellers, nor the surface owners, challenged the assessment or tax sale, and failed to redeem the property within the requisite redemption period, the Kellers' title was extinguished, thereby allowing the entire property to be purchased in 1941 by Mr. Herr, from whom the Hunting Club derived its title. *Id.*

In reaching this conclusion, the Supreme Court carefully instructed that its decision only "applies to a very limited subset of cases involving quiet title actions for formerly unseated land sold at a tax sale prior to 1947." *Id.* at 378. And, within this very limited subset of cases, the Court further instructed that its decision "would not govern those tax sales which specified whether the assessment involved the surface or the mineral rights." *Id.* at 378-79.

### b. Application of *Herder Spring*.

Having reviewed the Supreme Court's decision in *Herder Spring*, we now turn to the Game Commission's argument—that the Proctor Trusts' contest to the tax assessment should have been brought within the statutory period and cannot now be collaterally attacked over a hundred years later. *See doc. 68* at 5-6. Although the Game Commission avers that "[t]his type of collateral attack was

specifically discussed in [*Herder Spring*]" (*id.* at 5), the Game Commission has only recited the *Herder Spring* Court's review of the legal principles underlying the Act of 1815—i.e., the Act that "provided specific instructions regarding the process of selling unseated land to collect unpaid taxes" (*Herder Spring*, 143 A.3d at 365). *Compare Herder Spring*, 143 A.3d at 366 *with doc. 68* at 5-6. It has not, however, set forth its own discussion, on the facts of this case, as to why those legal principles illustrate that the Proctor Trusts' alleged collateral attack constitutes the "type" discussed in *Herder Spring*. Instead, the Game Commission has only broadly asserted that the Proctor Trusts' counterclaim is "inextricably intertwined with challenges to the validity of the underlying assessments or tax sales[,]" such that they are time barred and cannot, therefore, state a cause of action.[18] *Doc. 68* at 6.

Despite this argument being underdeveloped, we have reviewed the allegations in the counterclaim, and taking those allegations as true—as we must— we conclude that the Proctor Trusts are not collaterally attacking the underlying assessment or tax sales from 1908; rather, they are merely challenging the legal effect of those sales, and specifically, whether those sales resulted in a conveyance of the entire Disputed Properties, including both the surface and subsurface estates, or whether those sales only resulted in a conveyance of the surface estates. We

---

[18] The Game Commission, however, has not cited to a single allegation in the counterclaim to support this assertion.

find this challenge particularly appropriate since the factual allegations of the instant counterclaim are distinguishable from those set forth in *Herder Spring*.

There, the Pennsylvania Supreme Court observed that although the disputed property had been severed into surface and subsurface estates, neither party had reported that severance to the county commissioners and the documents relating to the relevant tax sale provided no indication that the assessment and taxation occurred on anything other than the entire property. Thus, the Supreme Court concluded that the tax sale conveyed the entire property. Accordingly, when neither the Kellers nor the surface owners challenged the assessment or tax sale and when neither redeemed the property, the Kellers' title was extinguished, allowing the entire property to be purchased.

In this case, however, the Proctor Trusts have alleged not only that the appropriate taxing authorities were informed of the fact that the Disputed Properties had been severed into surface and subsurface estates by the 1894 deed (*see, e.g., doc. 66* at 19 ¶ 14, 22-23), but also that the surface estates had been separately assessed prior to the 1908 tax sales (*see id.* at 19 ¶¶ 7, 18-19, 22-23). The Proctor Trusts have also alleged, unlike the Kellers in *Herder Spring*, that after the 1908 tax sales, CPLC paid the taxes on the surface estates, thereby redeeming the Disputed Properties within the two-year redemption period. *See id.* at ¶¶ 33-37. Accordingly, we reject the Game Commission's argument that the Proctor

Trusts' counterclaim is a collateral attack on the assessment and tax sales of 1908. Rather, we conclude, at this stage of the litigation,[19] that the Proctor Trusts' counterclaim is merely challenging the legal effects of those sales. As such, we recommend denying the Game Commission's motion to dismiss, pursuant to Rule 12(b)(6), on this basis.

## 2. Inadequate Description of the Disputed Properties.

Next, the Game Commission argues that the counterclaim provides an inadequate description of the Disputed Properties for the following two reasons: it does not identify the warrants "by County, Township, acreage, Patent book, metes and bounds, or any other reasonable method[,]" (*doc. 68* at 6), and it does not identify the exact portions of State Game Lands No. 12, 13, and 36 (*see id.* at 6-7). Given this inadequate description, the Game Commission contends that the Proctor Trusts' counterclaim should be dismissed as it fails to allege title, a necessary element to their counterclaim. *Id.* In the alternative, the Game Commission contends that the Proctor Trusts should be required, pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, to provide a more definite statement of the

---

[19] If, however, it becomes apparent to this Court, as the litigation progresses, that the Proctor Trusts are, in fact, challenging the propriety of the assessments or tax sales, then the Court will, at that time, entertain arguments from the Game Commission on collateral attacks. *See Herder Spring*, 143 A.3d at 374 (explaining that a dispute as to the propriety of the assessment and/or tax sale must be brought within the two-year redemption period).

property or portions thereof, with, at least, a chain of title identifying the actual warrants involved.  *Id.* at 7.

In response, the Proctor Trusts argue that their counterclaim complies with the requisite pleading standard set out in Rule 8 of the Federal Rules of Civil Procedure—i.e., that their counterclaim set forth "'a short and plain statement'" of their claims, showing that they are entitled to relief.  *Doc. 71* at 15 (quoting FED. R. CIV. P. 8).  In support, the Proctor Trusts explain that Rule 8 simply does not require the details that the Game Commission demands—i.e., County, Township, acreage, Patent book, or metes and bounds.  *Id.*  The Proctor Trusts further explain that their counterclaim already provides sufficient information, which adequately identifies the Disputed Properties.  *Id.* (citing *doc. 66* at ¶¶ 1-5, 7-8, 15, 43, and 45).  Thus, per the Proctor Trusts, their counterclaim is more than sufficient to meet Rule 8's pleading standards, especially considering that the Game Commission has not cited to any authority for its assertion that more is, nevertheless, required.  *Id.* at 15-16.  We agree.

The counterclaim, while not a model of flawless legal prose, satisfies Rule 8 of the Federal Rules of Civil Procedure.  More specifically, it includes warrantee names, counties, the deeds through which the Proctor Trusts claim an interest in the subsurface estates, the chain of deeds through which the Game Commission acquired an interest in the surface estates, and the associated State Game Lands in

which the Disputed Properties are situated. Accordingly, we recommend denying the Game Commission's motion to dismiss on this basis.

### C. Rule 12(f) Motion to Strike.

In the alternative, the Game Commission cites to Rule 12(b)(f) and Rule 11(b)(3) of the Federal Rules of Civil Procedure, which permits the Court to strike from the pleadings "any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The Court may either invoke Rule 12(f) on the timely motion of a party or on its own initiative. *See* FED. R. CIV. P. 12(f)(1), (2). Motions to strike, nevertheless, "generally are viewed with disfavor and rarely are granted." *Am. Standard Life and Accident Ins. Co. v. U.R. L., Inc*., 701 F. Supp. 527, 531 (M.D. Pa. 1988) (citation omitted). In fact, they "will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *River Rd. Dev. Corp. v. Carlson Corp.-Ne.*, No. 89–7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990) (citation omitted). Thus, striking matters from the record "is a drastic remedy to be resorted to only when required for the purposes of justice." *United States v. Consolidation Coal Co*., No. 89–2124, 1991 WL 333694, at *1 (W.D. Pa. July 5, 1991); *see also Krisa v. Equitable Life Assurance Soc.*, 109 F. Supp. 2d 316, 319 (M.D. Pa 2000) (quoting *River Rd.*, 1990 WL 69085, at *2) (explaining that "[a] court 'possesses considerable discretion in disposing of a

motion to strike under Rule 12(f)'" (quoting *River Rd. Dev. Corp.*, 1990 WL 69085, at \*2)).

In connection with its Rule 12(f) motion, the Game Commission requests the Court to strike certain paragraphs in the counterclaim as immaterial, insufficient, and impertinent—specifically, paragraphs 38-48, 56, 59, 60-62. *Doc. 68* at 8-11. In support, the Game Commission argues: that ¶¶ 38-48 and ¶ 59 should be stricken as allegations pled on "belief;" that ¶ 56 should be stricken as an unsubstantiated allegation of fraud; and that ¶¶ 60-62 should be stricken as the Proctor Trusts have misapplied the doctrine estoppel as a matter of fact and law. *See id.* at 8-9.

In response, the Proctor Trusts contend that the challenged paragraphs are material, sufficient, and pertinent to this action and should not be stricken. *See doc. 71* at 16. With respect to ¶¶ 38-48 and ¶ 59, the Proctor Trusts argue that if either the CPLC or the Game Commission acknowledged the Proctor Heirs' continuing ownership of the subsurface rights after the tax sales, then such an acknowledgement would weigh heavily in favor of the Proctor Trusts' counterclaim. *See id.* at 16-17. Further, with respect to ¶ 56, the Proctor Trusts argue that they have neither alleged fraud on the part of the Game Commission, nor have sought to bring a claim sounding in fraud. *Id.* at 17-18. Rather, they are merely alleging fraud as alternative basis for recovery—i.e., if, as the Game

Commission contends, CPLC failed to report its ownership interest properly, then CPLC could not acquire title to the subsurface rights because: (1) McCauley, as an agent of CPLC, had a legal and moral obligation to pay taxes for CPLC, and thus, his purchase of the property at the tax sales served as payment of the deficient taxes and/or a redemption; (2) CPLC would have been estopped from acquiring a greater interest in the property as a result of its own failure to properly register its ownership and pay the assessed taxes; and (3) the notice provisions of the Act of 1815 violate the due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. *Id.* at 18-19. Finally, with respect to ¶¶ 60-62, the Proctor Trusts argue that the Pennsylvania Supreme Court has held that only a party becoming a holder of unseated land has a duty to report its ownership interest, and thus, if CPLC, the party who had the legal obligation to report such interest, reported that it owned both the surface and subsurface estates, as opposed to only the surface estates, then CPLC would not be permitted to benefit from such wrongful conduct, and the Game Commission would only be able to claim title as good as its predecessor, CPLC. *Id.* at 19-20.

Here, we conclude that none of the paragraphs, to which the Game Commission has cited, are "redundant," "immaterial," "impertinent," or "scandalous." *See* Fed. R. Civ. P. 12(f). In the interest of judicial economy, we will not parse out the materiality of the paragraphs because we do not find that the

Game Commission is prejudiced in any way by them. Accordingly, we recommend denying the Game Commission's motion on this basis.

### D. Rule 12(b)(7) Motion for Failure to Join Indispensable Parties.

Also in the alternative, the Game Commission cites to Rule 12(b)(7), which provides for dismissal of a claim for "failure to join a party under Rule 19." FED. R. CIV. P. 12(b)(7). Rule 19, which specifies the circumstances in which the joinder of a particular party is mandatory, embodies a two-step analysis. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007); *accord Culinary Serv. of Delaware Valley, Inc. v. Borough of Yardley, Pa*, 385 F. App'x 135, 145 (3d Cir. 2010) (observing that the analysis under Rule 19 is a "two-step process.") (citing *Gen. Refractories Co.*, 500 F.3d at 312)). First, we must determine whether the absent party should be joined as a compulsory party under Rule 19(a), and second, if that absent party is compulsory, but his or her joinder is not feasible inasmuch as it would defeat diversity of citizenship, then we must next determine whether that absent party is "indispensable" under Rule 19(b). *Gen. Refractories Co.*, 500 F.3d at 312. "[A] holding that joinder is compulsory under Rule 19(a) is a necessary predicate to a district court's discretionary determination under Rule 19(b) that it must dismiss a case because joinder is not feasible (i.e., will defeat diversity) and the party is indispensable to the just resolution of the controversy." *Id.* at 313.

In connection with Rule 12(b)(7), the Game Commission argues that the counterclaim should be dismissed since the Proctor Trusts have not joined all persons who may have an interest in the named warrants from CPLC. *Doc. 68* at 11. In support, the Game Commission contends that the Proctor Trusts have failed to join: (1) "other entities" who purchased lands within the named warrants from CPLC; (2) the "Lessee" of state game lands No. 12 and 36; and (3) the "other Lessors" of the above-referenced, but unnamed Lessees. *Id.* Per the Game Commission, unless these potential defendants would defeat diversity, they are indispensable because the counterclaim seeks to affect their interests. *Id.*

The Proctor Trusts argue, however, that if an independent basis of liability is not asserted by, or against, the party seeking to be joined, and the remaining parties may obtain complete relief without that other party's presence, and they would not otherwise suffer any prejudice, then the other party is not "indispensable" within the meaning of Rule 19 of the Federal Rules of Civil Procedure. *Doc. 71* at 21. In applying this principle here, they assert that neither they, nor the Game Commission, alleges that a third party has a claim of title to the subsurface rights or otherwise seeks a judgment that would impair their rights or the rights of the Game Commission. *Id.* at 22. They further assert that the Game Commission's conclusory assertions that unnamed third parties would be impacted, or that there is a risk of inconsistent obligations, do not suffice to demonstrate that those unnamed

40

parties are indispensable. *Id.* Finally, the Proctor Trusts argue that when Pennsylvania courts have been presented with similar quiet title actions involving subsurface rights, they have held that lessees to oil and gas rights are not indispensable parties. *Id.* (citing Pennsylvania Superior Court cases).

Simply stated, the Game Commission has failed to meet its burden of showing the Court that dismissal of the Proctor Trusts' counterclaim is warranted under Rule 12(b)(7). Despite invoking the Rule, and broadly citing to *General Refactories Co.*, the Game Commission has not substantiated its basis for dismissal, in any meaningful way, on the specific facts of this case. For instance, the Game Commission has neither set forth the requisite two-part analysis under Rule 19, nor cited to any case law that would support granting its motion on the specific facts of this case. *See doc. 68* at 11-12 (merely setting forth legal conclusions without applying the law to the facts). Consequently, we recommend denying the Game Commission's motion on this basis. *See also Nat'l Specialty Ins. Co. v. Tunkhannock Auto Mart, Inc.*, No. 3:16-CV-00268, 2017 WL 2021510, at *5 (M.D. Pa. May 12, 2017) (denying a Rule 12(b)(7) motion where the moving party did not support its motion by citing to pertinent case law or undertaking the requisite analysis of Rule 19); *see also id.* (citing *Lombardi v. Allstate Ins. Co.*, No. 08-949, 2009 WL 1811540, at *4 n.3 (W.D. Pa. June 23, 2009) for the proposition

that "[a]rguments lacking any substantive or meaningful analysis are deemed to be undeveloped and wholly inadequate and may be disregarded by the court.").

## V. Recommendations.

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that the pending motion (*doc. 67*) be **DENIED** in its entirety.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this **11th** day of **August, 2017**.

*S/ Susan E. Schwab*
Susan E. Schwab
United States Chief Magistrate Judge