# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:12-CV-1567 |
| THOMAS E. PROCTOR HEIRS TRUST and the MARGARET O.F. PROCTOR TRUST, | Chief Judge Conner / Chief Magistrate Judge Schwab |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Paul K. Stockman (admitted *pro hac vice*)
   Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

Laura A. Lange
   Pa. ID No. 310733
MCGUIREWOODS LLP
260 Forbes Avenue, Suite 1800
Pittsburgh, PA  15222
llange@mcguirewoods.com

May 9, 2018

1

# TABLE OF CONTENTS

Table of Contents ...................................................................................i

Table of Authorities ............................................................................ iii

Introduction and Summary: ..................................................................1

Undisputed Material Facts: ...................................................................3

    I.     Thomas E. Proctor's Interest in the Property. .......................3

    II.    Conveyance of the Property from Proctor and Hill to Union Tanning. ..................................................................................4

    III.   CPLC's Acquisition of and Extraction of Resources from the Property. ...............................................................................5

    IV.   Calvin H. McCauley, Jr.'s 1908 Tax Sale "Purchase" of the Property. ...............................................................................6

    V.    PGC's Acquisition of the Property. ......................................8

Argument:  Judgment Should Be Entered in the Trusts' Favor, Quieting the Trusts' Title to the Josiah Haines Warrant's Subsurface Interests ...............10

    I.     The 1908 Tax Sale, If It Expropriated Severed Subsurface Interests, Deprived the Trusts of Property Without Due Process of Law ...............................................................................10

    II.    At the Time of the 1908 Tax Sale, the Property Was in Fact "Seated" Land, and Its Sale as "Unseated Land" Is Void. ..................14

    III.   Because Calvin McCauley, Jr. Was an Agent of CPLC, the 1908 Tax Sale Was Effectively a Redemption That Restored the *Status Quo Ante*. ...................................................................15

    IV.   Because Mr. Proctor, Union Tanning and CPLC Properly Declared Their Interests in the Property to the County Commissioners, the 1908 Tax Sale Did Not Convey the Severed Subsurface Interests ...........................................................18

i

V.      CPLC and Its Successors Are Bound by Reservations in the
        Chain of Title Confirming the Trusts' Ownership of Subsurface
        Rights..................................................................................................20

VI.     If CPLC Did Not Properly Report Its Interest in the Property or
        Pay Taxes When Due, It Is Estopped from Benefiting from Its
        Failure to Comply with the Law. ......................................................22

Conclusion: .................................................................................................24

Certificate of Compliance:..........................................................................25

Certificate of Service: .................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases:**

*In re Asbestos Litig.*, 829 F.2d 1233 (3d Cir. 1987) .................................................12

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ............................................................11

*Burton v. Martin Oil Serv., Inc.*, 295 F.2d 679 (7th Cir. 1961) ...............................13

*City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293 (1953) ...............12

*Covey v. Town of Somers*, 351 U.S. 141 (1956) .....................................................12

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ..............................................11

*Greene v. Lindsey,* 456 U.S. 444 (1982) ..................................................................11

*Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993) .....................................13

*Jones v. Flowers,* 547 U.S. 220 (2006) ....................................................................11

*Lamborn v. County Comm'rs,* 97 U.S. 181 (1877) ..................................................16

*Mennonite Board of Missions v. Adams*, 462 U.S. 791 (1983) ...................11, 12, 13

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ...............10, 11, 13

*Rust v. Johnson*, 597 F.2d 174, 176 (9th Cir. 1979) ................................................13

*Schroeder v. City of New York*, 371 U.S. 208, 212–13 (1962) ................................11

*Surrick v. Killion*, 449 F.3d 520 (3d Cir. 2006) ......................................................12

*Walker v. City of Hutchinson, Kan.*, 352 U.S. 112, 116 (1956) ..............................12

**State Cases:**

*Alexander v. Ellis,* 16 A. 770 (Pa. 1889) ....................................................16

*Appeal of Central Pa. Lumber Co.,* 81 A. 204 (Pa. 1911)..........................6

*Appeal of Waters*, 35 Pa. 523 (1860) .........................................................21

*Bartholomew v. Leach,* 7 Watts 472 (Pa. 1838) .........................................15

*City of Phila. v. Miller,* 126 A.2d 812 (Pa. Super. 1956) ..........................16

*Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Tr.*,
    158 A.3d 148 (Pa. Super. 2017) .........................................12, 15, 20

*Coxe v. Wolcott,* 27 Pa. 154 (1856) ...........................................................16

*Day v. Swanson,* 84 A. 958 (Pa. 1912) ..................................................14, 15

*Elliott v. Moffett*, 74 A.2d 164 (Pa. 1950).................................................21

*F.H. Rockwell & Co. v. Warren County,* 77 A. 665 (Pa. 1910) ...............20

*George v. Messinger,* 73 Pa. 418 (1873) ...................................................14

*Herder Spring Hunting Club v. Keller,*
    143 A.3d 358 (Pa. 2016)....................................... 3, 12, 13, 19, 20, 21, 23, 24

*Huzzard v. Trego,* 35 Pa. 9, 11 (1859) .......................................................16

*Irwin v Trego,* 22 Pa. 368 (1853)................................................................16

*Kean v. Kinnear*, 33 A. 325 (Pa. 1895).......................................................15

*Kennedy v. Daily*, 6 Watts 269 (Pa. 1837)..............................................14, 15

*Knupp v. Syms,* 50 A. 210 (Pa. 1901) .....................................................16, 17

*Powell v. Lantzy,* 34 A. 450 (Pa. 1898) .................................16, 19, 23, 24

*Reese v. Moshannon Coal Co.*, 8 Pa. D. & C.3d 743 (C.C.P. 1977), *aff'd,*
    396 A.2d 842 (Pa. Super. 1978) ........................................................15

*Weaver v. Meadville Lumber Co.,* 61 Pa. Super. 167 (1915) ...................................15

*Wheeler v. Knupp,* 55 A. 979 (Pa. 1903) .....................................................................16

*Wilson v. A. Cook Sons. Co.,* 148 A. 63 (Pa. 1929)....................................................19

*Yocum v Zahner,* 29 A. 778 (Pa. 1894)..............................................................16, 18

## Statutes and Court Rules:

Act of March 28, 1806, P.L. 644 ..............................................................2, 4, 18, 23

Act of June 3, 1885, P.L., 71, §1 ..............................................................................15

FED. R. EVID. 406 .....................................................................................................18

## Other Authorities:

Annotation, *Admissibility of Evidence of Habit or Routine Practice Under
    Rule 406,* 53 A.L.R. FED. 703, §2 (1981)........................................................18

Thomas M. Cooley, A TREATISE ON THE LAW OF TAXATION 346 (1876) ..............16

32A C.J.S. *Evidence* §1032 (2018)..........................................................................19

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**Introduction and Summary:**

While this lawsuit involves dozens of tracts, the same questions recur:

- Could a failure to pay property taxes by Central Pennsylvania Lumber Company ("CPLC") – through whom Plaintiff ("PGC") claims title – allow CPLC to obtain valid title, following tax sales to its agent, to property it never owned and to which it otherwise had no right?

- Could tax sales divest Thomas E. Proctor's heirs of previously-reserved rights, even though Mr. Proctor complied with all laws, and even though any default was caused by someone else?

- Could the Proctor heirs be deprived of property rights even though taxing authorities failed to undertake even minimal efforts to provide personal notice of the tax sale that would divest those rights?

The answer to all these questions is "no." Permitting the tax sales at issue to convey previously-severed subsurface rights would reward deliberate non-compliance with the law, and would punish innocent property owners who were never apprised that their property could be seized because of another's default.

This motion asks the Court to resolve these issues as to one "bellwether" tract, the Josiah Haines Warrant (the "Property"), and asks the Court to quiet title in favor of Defendants (the "Trusts"), declaring that the Trusts have an interest in the oil, gas and mineral interests beneath the Property (the "Subsurface Estate"), notwithstanding a June 8, 1908 tax sale, for a number of reasons:

1

- Taxing authorities made no attempt to provide Mr. Proctor or his heirs with personal notice prior to the tax sale, even though their interests were plainly shown by deeds recorded in the same courthouse where those officials worked.  Consequently, any effort to expropriate property at the tax sale unconstitutionally deprived the Trusts of property without due process of law.

- Timber and tanbark were harvested from the Property before the 1908 tax sale, thereby "seating" the Property, and rendering its sale as "unseated land" void.

- Because Calvin H. McCauley, Jr., the tax sale purchaser, was an officer, attorney and agent of CPLC, the sale effected a "redemption," restoring the *status quo ante,* including the Proctor heirs' ownership of the Subsurface Estate.  (CPLC agreed as much, treating the Property as its own even when McCauley held record title, and referencing the Proctor reservation in subsequent deeds.)

- Because Mr. Proctor and his successors all reported their interests to the county commissioners pursuant to the Act of March 28, 1806, P.L. 644, the 1908 tax sale did not convey the Subsurface Estate.

- CPLC and its successors, including PGC, are bound by reservations in favor of Mr. Proctor and his heirs in the chain of title, and are thereby estopped from claiming title to the Subsurface Estate.

- If the Court finds that CPLC did not report its interest in the Property, or falsely reported that it owned both the surface and Subsurface

2

Estate, CPLC's successors cannot benefit from this failure to comply with the law.

- Finally, because CPLC was legally obliged to pay taxes when due on its properties, CPLC and its successors cannot profit from that breach, using CPLC's deliberate non-compliance to acquire property to which they have no rightful claim.

For these reasons, which largely have not been addressed in recent Pennsylvania case law (including *Herder Spring Hunting Club v. Keller,* 143 A.3d 358 (Pa. 2016), or its progeny), the Court should enter a partial summary judgment quieting the Trusts' title and holding that the Trusts remain the owners of their portion of the Subsurface Estate.

**Undisputed Material Facts:**

**I.      Thomas E. Proctor's Interest in the Property.**

Through their Counterclaim, the Trusts seek to quiet title to the subsurface estates associated with certain tracts in Bradford and Sullivan Counties, including the Property.  *See* Amended Answer (ECF No. 66); ¶¶1-3.[1]  The surface of the Property is now owned by the PGC and is a part of State Game Land No. 12.  ¶37.

---

[1] Paragraph references are to the Proctor Trusts' Statement of Undisputed Material Facts (ECF No. 95), and exhibit references are to the accompanying Appendix (ECF Nos. 96-110).

Thomas E. Proctor and Jonathan A. Hill acquired the Property in fee in June 1893 from Schrader Mining & Manufacturing Co.  ¶¶4-5.[2]

Upon acquiring the Property, Mr. Proctor – following his routine practice – notified the Bradford County Commissioners of his acquisition, as required by the Act of March 28, 1806, P.L. 644.  ¶¶6-7; *see also* ¶12.  County and township assessment records show as much, ¶6.a-c, and there was detailed testimony in a subsequent case, *Gamble & Green v. CPLC,* about Mr. Proctor's and USLC subsidiaries' business practices, ¶6.d.[3]  For example, Mr. Proctor's attorney B.S. Bentley testified that he looked after Mr. Proctor's unseated lands, and dealt personally with county treasurers to ensure that lands were properly enrolled. ¶6.d(4)-(6).

## II.    Conveyance of the Property from Proctor and Hill to Union Tanning.

In October 1894, Messrs. Proctor and Hill and their wives conveyed certain interests in the Property to USLC subsidiary Union Tanning Company, excepting and reserving "all the minerals, coal, oil, gas, or petroleum."  ¶¶8-9.

---

[2] Mr. Proctor also owned Schrader Mining & Manufacturing, and transferred the property as part of his establishment of the United States Leather Company ("USLC"), the so-called "Leather Trust," which consolidated various participants in the leather tanning industry.  The other entities involved here, CPLC and Union Tanning Company, were USLC subsidiaries.  *See* Ex. 4 & 5.

[3] Because no notices (from anyone, for any tract) can be located in the office of the Recorder of Deeds, the Bradford County Historical Society or the Pennsylvania State Archives, *see* ¶7.d, and because the PGC's own records and County assessment records demonstrate that the PGC provided such notices, *see* ¶7.a-c, the only reasonable inference is that these notices were discarded after the information was recorded.

Union Tanning followed its routine practice and notified the Bradford County Commissioners that it had acquired rights in the Property, as confirmed by assessment records and as discussed in testimony in *Gamble & Green*.  ¶¶10; *see also* ¶¶6-7, 12, 16.  There is no evidence that Union Tanning incorrectly reported that it owned all estates associated with the Property, including the Subsurface Estate.  ¶11.  Indeed, the Commonwealth stipulated, in another case, that the Proctor subsurface reservation was properly reported to Lycoming County officials.  ¶12.

## III.   CPLC's Acquisition of and Extraction of Resources from the Property.

In May 1903, as part of a USLC reorganization, Union Tanning conveyed its interest in the Property to CPLC.  ¶13.  That deed reserved to Union Tanning, for 25 years, the rights to certain bark on the Property.  ¶14.  It also stated that it conveyed an estate "no greater than is now held and owned by the Union Tanning Company," and was explicitly "subject to all the exceptions, reservations, covenants, stipulations, agreements and conditions continued in the recent deeds hereinbefore recited, and subject also to all the exceptions, reservations, covenants, stipulations, agreements and conditions… stated" in the specifically-identified deed from Proctor and Hill.  ¶15.

Again, Bradford County records show that CPLC notified the county commissioners of its acquisition, and paid taxes assessed against the Property.  ¶16; *see also* ¶¶6-7, 10, 12.  This was consistent with its routine practice of actively managing tax assessments and payments related to its land holdings (as shown in court proceedings).  ¶16.d; *see also* ¶6.d.  Indeed, in connection with the

5

PGC's purchase of similar tracts, CPLC's president swore that CPLC "regularly and continuously paid all taxes assessed and payable" upon the tract at issue. ¶16.e.  There is no evidence that CPLC incorrectly reported that it owned all estates associated with the Property, including the severed Subsurface Estate.  ¶17.

Thereafter, CPLC logged and peeled tanbark from the Property over the three-year period from 1905 to 1907, taking 1,405,200 net tons of bark and 189,500 feet of hemlock lumber.  ¶¶18-20.  Nonetheless, for 1907 Bradford County assessed CPLC's interest in the Property as unseated land.  ¶21.

## IV.    Calvin H. McCauley, Jr.'s 1908 Tax Sale "Purchase" of the Property.

Despite CPLC's active management of its land holdings, it did not pay 1907 taxes on the Property (and other of its holdings),[4] and on June 8, 1908 the Property was sold at tax sale.  ¶¶22-23.  The only advance notice of the tax sale given to any persons claiming an interest in the tract was newspaper advertisements that did not identify current or former owners.  ¶24.

At the June 1908 tax sale, the purchaser was Calvin H. McCauley, Jr.  ¶25. At the time, McCauley was CPLC's agent and attorney.  He was CPLC's original treasurer at its 1903 incorporation, ¶26.a-b, and thereafter served as "Real Estate Agent" and "Assistant General Solicitor."  ¶26.c-.g, .i, .k, .p-.r; *see also* ¶26.h, .n, .t.  McCauley also appeared as counsel for CPLC in several lawsuits related to

---

[4] The reason for non-payment remains unclear, given CPLC's systematic management of its properties, but it may have been an effort to compel reassessments after timbering lowered property values.  CPLC (represented by Calvin H. McCauley, Jr.) was otherwise unsuccessful in having assessments reduced outside the statutory triennial assessment cycle.  *See Appeal of Central Pa. Lumber Co.,* 81 A. 204 (Pa. 1911).

property tax matters.  ¶26.j, .l-.m, .o.  There is no evidence that McCauley ever renounced his status as CPLC's agent prior to the 1908 tax sale.  ¶28.

This transaction was not a "one-off": from 1904 to 1916, McCauley purchased more than 100 CPLC tracts at tax sales, ¶27, plainly as CPLC's agent. Indeed, in November 1914, McCauley swore, as to his purchase of CPLC properties in Elk County, that the consideration he paid "was and is the proper money of [CPLC]," that "my name in the said deeds is used only in trust for it, the said [CPLC], its successors and assigns, and for no other uses, trusts or purposes whatsoever," and that he would upon CPLC's request "assign by good and sufficient assignment the said deeds for the said premises, together with all my right, title and interest therein, free from all incumbrances."  ¶ 26.o; Ex. 43.[5]

Following this "purchase," McCauley never recorded a treasurer's deed, ¶30, and two years later quitclaimed the Property (with 44 others) back to CPLC for the nominal price of only $1.  ¶31.  This pattern of reconveyances led the PGC's own abstractors to conclude that McCauley was acting for CPLC.  ¶26.s.

Any doubt is dispelled by CPLC's actions when McCauley ostensibly "owned" the Property.  During that time, CPLC acted as though it still owned the Property, paying property taxes, ¶32.a, and affirming in an identical context that it retained "exclusive possession" of its property from 1903 forward and that

---

[5] CPLC knew at the time that an agent's purchase at a tax sale did not convey a true title, and in fact constituted a redemption.  ¶29.

"possession thereof was never questioned, attacked or threatened by any one,"

¶32.b.[6]

## V.    PGC's Acquisition of the Property.

After leasing the Property starting in 1916, ¶33, the PGC in March 1920

entered into a contract to purchase the Property (and other tracts) from CPLC, ¶34.

The contract for sale specifically:

> RESERV[ED] AND SAV[ED] unto Thomas E. Proctor
> and Jonathan A. Hill, their heirs and assigns, all the
> minerals, coal, oil gas or petroleum…, as fully as the said
> minerals and rights were excepted and reserved in deed
> dated Oct. 27, 1894 from Thomas E. Proctor et al to the
> Union Tanning Company…."

¶35.  It also provided that the ensuing deed "would be subject to all the

reservations, exceptions, covenants and stipulations" in the deeds from Proctor to

Union Tanning and from Union to CPLC.  ¶35.  The following month, CPLC's

directors approved the sale, authorizing execution of a deed containing "all

exceptions, reservations, covenants and stipulations," including the reservation in

favor of Proctor and Hill.  ¶36.

As agreed, CPLC conveyed 7,492.9 acres of land to the Commonwealth,

including the Property, by deed dated December 14, 1920.  ¶37.  The deed,

consistent with the sale agreement, provided that:

> This conveyance is made subject to all the
> minerals, coal, oil, gas or petroleum found now or

---

[6] To conclude otherwise – that CPLC intended to regain ownership of the
Proctor Subsurface Estate – is to assume that USLC entities intended to
expropriate property belonging to its founder's widow and children.

> hereafter on, or under the surface of any or all of the lands above described… as fully as the said minerals and rights were excepted and reserved in deed dated Oct. 27, 1894 from Thomas E. Proctor et al to the Union Tanning Company, recorded in the office for recording deeds in Bradford County in deed book Vol. 205, page 436.
>
> Also subject to all the reservations, exceptions, covenants and stipulations contained in said recited deed from Thomas E. Proctor et al to the Union Tanning Company, and in deed from the Union Tanning Company to [CPLC], above recited, dated May 25, 1903, of record as aforesaid in deed book Vol. 251 page 520.

¶38.

The PGC's pre-closing title examination accepted that the Proctor Subsurface Estate reservation remained effective. ¶¶39-40, 43.[7] This examination also conceded that the 1908 tax sale did not alter ownership, by requiring CPLC to prove that pre-1908 contracts relating to the properties had terminated, ¶41-42, an unnecessary step if the tax sale extinguished prior rights. Similarly, in 1924 Elk Tanning Company, successor to Union Tanning, quitclaimed its 1903 reservation of bark rights, ¶45 – again, an unnecessary measure if the tax sale extinguished prior reservations.

The Trusts, which were established by the heirs of Thomas E. Proctor, ¶46, have succeeded to his rights in the Property. Until recently, their title was not in question; indeed, the Proctor heirs have been leasing the Subsurface Estate since at

---

[7] The PGC has attempted to conceal this fact, by withholding the letter from its production, but the Trusts were able to obtain it through a record request. *Compare* Ex. 2 *to* Ex. 49.

least 1980, ¶47.  The PGC's current claim is purely a product of an anticipated boon from Marcellus Shale drilling.

**Argument:  Judgment Should Be Entered in the Trusts' Favor, Quieting the Trusts' Title to the Josiah Haines Warrant's Subsurface Interests.**

**I.    The 1908 Tax Sale, If It Expropriated Severed Subsurface Interests, Deprived the Trusts of Property Without Due Process of Law.**

Initially, although the 1908 tax sale did not convey title to the Subsurface Estate for many reasons, this case need not turn on the nuances of early 20th-century property taxation.  Those issues aside, the 1908 tax sale conveys no title because there was no attempt to provide any personal notice to those claiming an interest in the Property, as identified in recorded instruments.  Consequently, any confiscation of property at the tax sale deprived the Trusts of property without due process of law, in violation of the Fourteenth Amendment.

It has been the law for generations that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Here, however, Bradford County's only attempt to provide notice of the June 1908 tax sale was an advertisement in two local newspapers, ¶24, even though potentially-interested parties were identifiable from public records maintained in the same courthouse, ¶¶ 8, 13.  This method of "notice" is one that the Supreme Court and courts across the country have found laughably meager,

10

and the ensuing surreptitious confiscation of property rights is exactly what the Fourteenth Amendment's due process clause was intended to prevent.

As *Mullane* made clear, "[t]he fundamental requisite of due process of law is the opportunity to be heard," but "[t]his right… has little reality or worth unless one is informed that the matter is pending." 339 U.S. at 314. Notice must be more than a "mere gesture" and instead be "reasonably calculated to reach interested parties." *Id.* at 315; 318. Where the identities of the affected parties are ascertainable, publication notice alone does not satisfy due process:

> Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed. … In weighing its sufficiency on the basis of equivalence with actual notice we are unable to regard this as more than a feint.

*Id.* at 315.

The Court has repeatedly reaffirmed and extended *Mullane*. In *Mennonite Board of Missions v. Adams*, 462 U.S. 791 (1983), the Court held that when a mortgagee "is identified in a mortgage that is publicly recorded, constructive notice" of a tax sale "by publication must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service." *Id.* at 798. Mere "notice by publication" alone does not qualify. *Id.* at 799.[8]

---

[8] The Court reached the same holding in at least eight other cases. *See Jones v. Flowers,* 547 U.S. 220, 232 (2006); *Greene v. Lindsey,* 456 U.S. 444 (1982); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974); *Armstrong v. Manzo*, 380 U.S. 545, 549–50 (1965); *Schroeder v. City of New York*, 371 U.S. 208, 212–13

The only departure from this overwhelming precedent is the aberrant decision in *Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016), reiterated by lower court decisions bound to apply it, *see e.g.*, *Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Tr.*, 158 A.3d 148 (Pa. Super. 2017).  This Court of course is not bound by these decisions.  A "federal district court … takes as its authority on federal constitutional issues decisions of the United States Courts of Appeals and the United States Supreme Court, rather than those of the state supreme court."  *In re Asbestos Litig.*, 829 F.2d 1233, 1237 (3d Cir. 1987); *Surrick v. Killion*, 449 F.3d 520, 535 (3d Cir. 2006) ("decisions of the Pennsylvania Supreme Court do not bind this Court with respect to federal law").

Nor is *Herder Spring* persuasive: the court mistakenly seized upon a footnoted *caveat* in *Mennonite,* observing that officials are not required to undertake "extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record."  462 U.S. at 798 n.4.  But this passage followed a more complete discussion explaining that, when the identity **is in the public record,** an attempt at mailed notice remains constitutionally required.  *Id*.

Ignoring that context, the Pennsylvania court found that the "pre-internet age" of the 1935 tax sale, its compliance with an 1815 state statute, and the owner's ability to redeem the property all justified a departure from

---

(1962); *Walker v. City of Hutchinson, Kan.*, 352 U.S. 112, 116 (1956); *Covey v. Town of Somers*, 351 U.S. 141, 144 (1956); *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953).

constitutionally-mandated personal notice in favor of "notice" by publication alone.  But essentially all applicable Supreme Court precedent on this issue also hails from from "the pre-internet age."  *Herder Spring* did not apply this controlling precedent, and instead relied on a statute and case law that predated even the Fourteenth Amendment itself.  *Mullane* in fact controls as to the 1908 tax sale.  *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993) (*Mullane* applies retroactively).  And the Supreme Court has held that an entity's ability to "safeguard its interests" cannot "relieve the State of its constitutional obligation." *Mennonite,* 462 U.S. at 799.

In sum, the Supreme Court and federal courts unanimously make clear that constructive notice by publication is constitutionally deficient when the identity of the affected party is known.  Here, Bradford County officials clearly knew that Mr. Proctor claimed an interest in the Property, because of his publicly-recorded reservation of the Subsurface Estate.  Nevertheless, Bradford County made no effort to provide any personal notice before the 1908 tax sale.  Therefore, any tax sale that purports to include the Subsurface Estate would be an unconstitutional deprivation of property without due process of law.

When a tax sale is unconstitutional, the sale is void and title should be quieted in the name of the pre-tax sale owner.  *See, e.g., Rust v. Johnson*, 597 F.2d 174, 176 (9th Cir. 1979); *Burton v. Martin Oil Serv., Inc.*, 295 F.2d 679, 681 (7th Cir. 1961).  This Court should hold likewise, and conclude that any purported confiscation of the Subsurface Estate violated the Proctor heirs' right to due process and is void.

**II.  At the Time of the 1908 Tax Sale, the Property Was in Fact "Seated" Land, and Its Sale as "Unseated Land" Is Void.**

Even if the 1908 tax sale passed constitutional muster, it remains ineffective to convey the Subsurface Estate.  Notably, because timber and tanbark were harvested from the Property from 1905 to 1907, prior to the tax sale, ¶¶18-20; Ex. 13, the Property was thereby "seated," and the tax sale, purporting to sell "unseated land," is void.

To be "seated" means the land has either been occupied as a residence or cultivated in some way, including for timber.  *See George v. Messinger,* 73 Pa. 418, 422 (1873).  "[R]esidence without cultivation, or cultivation without residence," seats property, and renders it "exempt from the operation of the acts which regulate the sale of unseated lands."  *Kennedy v. Daily*, 6 Watts 269, 273 (Pa. 1837).  The value of the land or amount of profit does not matter, as the court held in *George v. Messinger*: "it is not necessary that the value of the land must be enhanced, for the removal of the coal, as well as the removal of the timber, may lessen its value.  Yet the act of doing such work upon the land may seat it."  73 Pa. at 422.  Long-term development is also not necessary to seat the land.  *See id.* at 423 (it does not "matter that these improvements… were designed only to enable the occupant to cut the timber off the land, and to be abandoned when they had served that purpose").

Therefore, the harvesting of tanbark and lumber from the Property in 1905-1907 rendered that land seated at the time of the 1908 tax sale, and an unseated tax sale of lands that were in fact seated is automatically void.  *See Day v. Swanson*, 84

A. 958, 959 (Pa. 1912); *Kennedy v. Daily*, 6 Watts at 272; *Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Tr.*, 158 A.3d 148, 160 (Pa. Super. 2017); *Weaver v. Meadville Lumber Co.,* 61 Pa. Super. 167 (1915)).[9] In short, the Proctor heirs continued to own the Subsurface Estate after 1908, and the Trusts now own that estate today.

## III.   Because Calvin McCauley, Jr. Was an Agent of CPLC, the 1908 Tax Sale Was Effectively a Redemption That Restored the *Status Quo Ante*.

Moreover, because McCauley clearly was an agent of CPLC at the time of the June 1908 tax sale, his "purchase" was instead, under settled law, a redemption, restoring the *status quo ante* and the Proctor heirs' continued ownership of the Subsurface Estate.

After all, it has been the law of Pennsylvania for 180 years that before an agent can act "as a purchaser on his own account" at a tax sale "he must have explicitly resigned his trust"; "there must be an unambiguous relinquishment of his agency before he can acquire a personal interest…." *Bartholomew v. Leach,* 7

---

[9] The Act of June 3, 1885, P.L., 71, §1, which purported to excuse sales of seated land at unseated tax sales, does not provide otherwise. ***First,*** this statute was repealed by the Act of June 4, 1901, P.L. 364, which barred all tax sales of seated lands and repealed all other enactments on the subject. *See Day v. Swanson,* 84 A. at 959. ***Second,*** the statute by its terms still voided sales of seated land "where there was sufficient personal property on the premises to pay all the taxes assessed thereon." *See Reese v. Moshannon Coal Co.*, 8 Pa. D. & C.3d 743, 746 (C.C.P. 1977), *aff'd,* 396 A.2d 842 (Pa. Super. 1978).  Thus, the Act of 1885 excused a mistake only if the county treasurer satisfied the preconditions for a sale of seated lands, looking to "the personal property on the premises" and then making a "demand on the owner individually"; a tax sale was permissible "only on the failure to collect by either of the first two methods." *Kean v. Kinnear*, 33 A. 325, 325 (Pa. 1895).

Watts 472, 473-74 (Pa. 1838).  This is part of agents' broader fiduciary obligation, which requires "[t]he most open, ingenuous and disinterested dealing." *Id.* at 473.[10]

Accordingly, when an agent of the defaulting taxpayer purports to purchase property at a tax sale, Pennsylvania law treats it as a payment of overdue tax on the principal's behalf, and thus as "equivalent to a redemption." *Knupp v. Syms,* 50 A. 210, 212 (Pa. 1901), *reaffirmed by Wheeler v. Knupp,* 55 A. 979 (Pa. 1903).  In that event, the purchase restores the status quo, "operat[ing] to set aside or annul the sale," and leaving "the title precisely as though the sale had not been made." *Yocum v Zahner,* 29 A. 778, 779 (Pa. 1894).  *See also City of Phila. v. Miller,* 126 A.2d 812, 814 (Pa. Super. 1956) ("[T]he effect of redemption is to place all parties in the position they occupied before the sale."); *Alexander v. Ellis,* 16 A. 770, 771-72 (Pa. 1889).

Here, McCauley undoubtedly was an agent of CPLC at the time of the June 8, 1908 tax sale.  He was an officer of and attorney for CPLC before, during and after the 1908 period, subject to all the fiduciary obligations owed by corporate

---

[10] *See also Lamborn v. County Comm'rs,* 97 U.S. 181, 184 (1877) ("'There is a general principle applicable to such cases, that a purchase made by one whose duty it was to pay the taxes shall operate as payment only: he shall acquire no rights, as against a third party, by a neglect of the duty which he owed to such party.'" (quoting Thomas M. Cooley, A TREATISE ON THE LAW OF TAXATION 346 (1876))); *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898) ("[O]ne cannot, by a purchase at a tax sale caused by his failure to pay taxes which he… was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest…."); *Huzzard v. Trego,* 35 Pa. 9, 11 (1859); *Coxe v. Wolcott,* 27 Pa. 154, 159 (1856); *Irwin v Trego,* 22 Pa. 368, 376 (1853).

officers and lawyers.  ¶26.  Further, McCauley was explicitly involved in CPLC's activities with respect to unseated property taxes.  ¶27.  There is no evidence that McCauley renounced agency prior to the June 1908 tax sale.  ¶28.  The fact that McCauley never recorded a treasurer's deed conveying the Property, ¶30, and quitclaimed the property back to CPLC, along with 44 other tracts, for only $1, ¶31, confirms that McCauley was effectively redeeming the property, as the PGC's own title abstractors concluded, ¶26.s.

CPLC agreed.  CPLC knew that "[a] tax title cannot be sustained where… an agent of the owners of unseated land bought in the land at tax sale," given that it argued as much to the Pennsylvania Supreme Court.  ¶29 (quoting *Knupp v. Syms*). And CPLC's conduct reflected this understanding: CPLC acted as though it remained the property's true owner throughout the time that record title was nominally vested in McCauley, by (for example) paying taxes on the property, ¶32.a, and swore elsewhere (in connection with other McCauley tax sale "purchases") that it retained "exclusive possession" of its property from 1903 forward and that the "possession thereof was never questioned, attacked or threatened by any one," ¶32.b.  Moreover, CPLC's explicit recognition of the continuing vitality of the Proctor Subsurface Estate reservation (and reserved bark rights) in ensuing contracts and deeds, ¶¶35-38, is strong evidence that it understood that McCauley's purchase was in fact a redemption.[11]

---

[11] The fact that CPLC and the PGC were concerned about clearing certain other pre-1908 claims as part of the Commonwealth's purchase of the Property, ¶¶39-42, also demonstrates that both CPLC and the PGC believed that the pre-1908 reservations remained in effect following McCauley's redemption.

In consequence, McCauley's purchase left title to the Property "precisely as though the sale had not been made," *Yocum,* 29 A. at 779, including the Proctor reservation, and the PGC's attempt to claim ownership of the Subsurface Estate is unavailing.

**IV.    Because Mr. Proctor, Union Tanning and CPLC Properly Declared Their Interests in the Property to the County Commissioners, the 1908 Tax Sale Did Not Convey the Severed Subsurface Interests.**

The evidence shows that Mr. Proctor, Union Tanning Company and CPLC all reported their interests in the Property to the Bradford County Commissioners pursuant to the Act of March 28, 1806, P.L. 644.[12]  For example, county and township assessment records expressly reflect Mr. Proctor's interests in various tracts.  ¶6.a-c.  More probative still is detailed testimony relating to the routine practices of Mr. Proctor and USLC subsidiaries, which showed *inter alia* that Mr. Proctor's personal attorney looked after Mr. Proctor's unseated lands, dealing personally with county treasurers to ensure enrollment and payment of taxes. ¶6.d(4)-(6).[13]

---

[12] As relevant, the Act of March 28, 1806 required "every person hereafter becoming a holder of unseated lands" to furnish to the county commissioners, within one year, a signed statement "containing a description of each and every tract so held, the name of the person or persons to whom the original title from the commonwealth passed, and the nature, number and date of such original title," as well as "the date of the conveyance… and the name of the grantor."

[13] This testimony as to the routine practice of Mr. Proctor and USLC's subsidiaries is properly considered as evidence that their actions conformed with that practice.  *See* FED. R. EVID. 406.  This type of evidence is "generally agreed to be highly persuasive proof of conduct on a particular occasion," Annotation, *Admissibility of Evidence of Habit or Routine Practice Under Rule 406,* 53 A.L.R.

The evidence similarly confirms that Union Tanning and CPLC also notified county commissioners when they acquired rights in the Property.  ¶¶10, 16.  Indeed, contemporaneous court records show that CPLC actively monitored tax assessments and payments related to its land holdings, ¶¶6.d, 16.d, and CPLC's president attested, as part of the PGC's purchase of other tracts, that CPLC "regularly and continuously paid all taxes assessed and payable," ¶16.e.  There is no evidence that either Union Tanning or CPLC incorrectly reported that they owned all estates associated with the Property, including the Subsurface Estate.  *See* ¶¶11, 17.  Indeed, the Commonwealth has stipulated that Mr. Proctor's exception and reservation of subsurface interests was properly reported to Lycoming County officials, ¶12, and there is no basis to believe that this was not also the case in Bradford County.

Once these interests were reported, they were required to be assessed and taxed separately.  "After the severance of the surface from the minerals by a conveyance, they form separate estates.  And each is separately the subject of taxation."  *Powell v. Lantzy,* 34 A. 450, 452 (Pa. 1898).  "[W]here there is divided ownership of the land" known to the assessors, "there should be a divided taxation."  *Herder Spring*, 143 A.3d at 364 (quoting *Wilson v. A. Cook Sons. Co.,* 148 A. 63, 64 (Pa. 1929)).  And indeed, "[t]here is ample evidence… indicating the

---

FED. 703, §2 (1981), "because such practices… are derived from concerted planning activities driven by economic concerns… which are of necessity more regimented than individual conduct," 32A C.J.S. *Evidence* §1032 (2018).  It is particularly probative when combined with the other evidence, discussed above, showing that their property interests were known to taxing officials.

assessment and sale of mineral estates separate from the surface," when there was a basis for such an assessment. *Id.* As the Pennsylvania Supreme Court has held:

> Where there is a divided ownership in unseated lands, the surface being owned by one party and the minerals by another party, the surface is subject to assessment for taxes as unseated land and a tax deed would convey the title to the surface only if the tax was assessed against the surface only, and the minerals when severed are subject to separate assessment in the same manner as the surface and a tax title to the minerals when properly assessed and sold for the payment of taxes would convey a good title to the minerals.

*F.H. Rockwell & Co. v. Warren County,* 77 A. 665, 666 (Pa. 1910).[14]

Accordingly, because Thomas E. Proctor's holding was properly reported, the property could not be assessed and taxed as a whole, and the June 8, 1908 tax sale could not convey the reserved Subsurface Estate.

## V.    CPLC and Its Successors Are Bound by Reservations in the Chain of Title Confirming the Trusts' Ownership of Subsurface Rights.

Further, the reservation in CPLC's deed to the Commonwealth, echoing prior post-tax-sale reservations, estops the PGC from claiming title to the Subsurface Estate. After all, the law binds parties to the statements contained in

---

[14] Indeed, certain Proctor subsurface rights were assessed separately, demonstrating that it was the consistent practice of Mr. Proctor and his successors to reported their interests for taxation. *See, e.g., Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Tr.*, 158 A.3d 148 (Pa. Super. 2017) (assessment of "Mineral Rights Only").

In *Herder Spring,* by contrast, there was no evidence that anyone reported their interests to the county commissioners, whether the surface estate or reserved subsurface rights. Consequently, the only permissible conclusion on the record there was that the assessment and ensuing sale covered all estates in the tract.

their property deeds, and prevents them from denying anything stated therein, including reservations or exceptions. *Elliott v. Moffett*, 74 A.2d 164, 167 (Pa. 1950). Every relevant deed referenced the reservation of the Subsurface Estate, including the 1920 deed from CPLC to the Commonwealth. Indeed, the contract for sale, as approved by CPLC's Board of Directors, clearly stated that the reservation of the Subsurface Estate was "***unto*** Thomas E. Proctor and Jonathan A. Hill." ¶¶35-36 (emphasis added).[15] Simply put, CPLC did not intend to transfer the Subsurface Estate to the Commonwealth, the Commonwealth did not intend to receive it, and the PGC is estopped from claiming ownership over that estate.

"It is a well established principle that one claiming under a deed is bound by any recognition it contains of title in another." *Elliott*, 74 A.2d at 167. Whenever a "deed specifically mention[s] the name of the person who had a claim upon the land," as with every relevant deed here, the grantee is thereafter estopped from claiming title to that reserved interest. *Herder Spring*, 143 A.3d at 378. This principle binds not only the grantor and grantee, but also their successors and privies. *See Appeal of Waters*, 35 Pa. 523, 523 (1860).

Here, the Proctor reservation of the Subsurface Estate is reiterated in each link in the chain of title:

- The 1894 deed from the Proctors to Union Tanning excepted and reserved "all the minerals, coal, oil, gas, or petroleum." ¶9.

---

[15] As set forth above, CPLC's admissions in its contract and deed reservation further show that the tax sale had no effect on the underlying Subsurface Estate, either because the severed Subsurface Estate had been reported, or because McCauley's purchase operated as a redemption, or (more likely) both.

- The 1903 deed to CPLC stated the conveyance was "subject to all the exceptions, reservations, covenants, stipulations, agreements and conditions" set forth in the deed from Proctor and Hill.  ¶15.

- The December 1920 deed from CPLC to the Commonwealth was "subject to all the reservations, exceptions, covenants and stipulations contained in [the] deed from Thomas E. Proctor et al to the Union Tanning Company, and in deed from the Union Tanning Company to the Central Pennsylvania Lumber Company," which reserved "all the minerals, coal, oil, gas or petroleum,,,."  ¶38.[16]

Accordingly, PGC is estopped from asserting that it owns the Subsurface Estate. The Court should reject an attempt to rewrite the history books to show, inaccurately, that CPLC conspired to deprive Mr. Proctor's widow and children of their Subsurface Estate.

## VI.   If CPLC Did Not Properly Report Its Interest in the Property or Pay Taxes When Due, It Is Estopped from Benefiting from Its Failure to Comply with the Law.

The PGC's claim rests on the supposition that CPLC failed to report its ownership interest properly, deliberately failed to pay its taxes, and then had its straw man purchase and subsequently quitclaim the defaulted Property back, all so that it could acquire the Subsurface Estate.[17]  However, the law does not

---

[16] The sale agreement and authorizing CPLC board resolution also excluded the Subsurface Estate.  ¶¶35-36.

[17] As set forth above, the PGC's theory is undercut by CPLC's continued acknowledgement of the Proctor reservation in subsequent transactions.

countenance (and certainly cannot reward) such misdeeds.  If CPLC reported falsely to the county commissioners that it owned the Property's surface and Subsurface Estate (or failed to provide notice of its ownership at all), CPLC and its successors, including the PGC, are estopped from benefiting from that misstatement.  After all, "one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty…." *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898).

The Act of March 28, 1806, P.L. 644, required anyone "becoming a holder of unseated lands," to report the conveyance to the county commissioners, including "a description of each and every tract." *See Herder Spring*, 143 A.3d at 372 (explaining that the duty to report fell upon the grantee of the severed estate, not the grantor who reserved certain rights).  Here, the obligation fell upon CPLC to report its interest in the property, and to do so accurately.  If CPLC failed to report its interest in the surface estate (*i.e.,* that it had "becom[e] a holder of unseated lands") or incorrectly reported that it owned the Property *in toto* (despite its obligation to furnish an accurate "description of each and every tract") it violated the law.  And if Bradford County assessed and sold the Property in its entirety because of CPLC's failure to report or inaccurate reporting, neither CPLC nor those claiming through CPLC can obtain a benefit from that violation of law.

Similarly, CPLC's deliberate failure[18] to pay taxes on the Property, as required by law, also estops its successors from benefiting from that default.

---

[18] This is clear, given that CPLC in 1907 paid taxes on certain Bradford County properties while defaulting on others.  *See* Ex. 3 at 284-92.

"[O]ne cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state… acquire a better title, or a title adverse to that of other parties in interest," when that party was "in possession of the land when the tax was assessed, and upon that ground was chargeable with its payment." *Powell,* 34 A. at 451.[19]  Unlike *Herder Spring,* this case involves no innocent third party purchaser; CPLC and its agent, McCauley, were fully aware of the Proctor reservation prior to the tax sale and they, and their successors, cannot benefit from their failures to comply with Pennsylvania law (whether innocent or deliberate) in order to deprive the Trusts of their property.

Accordingly, CPLC and its successors, including the PGC, cannot use CPLC's failure to comply with the law to confiscate the Subsurface Estate.

**Conclusion:**

For the foregoing reasons, the Trusts ask the Court to enter a partial summary judgment on Count I of their Counterclaim, declaring that the Trusts are the rightful owners of their portion of the minerals, coal, oil, gas, or petroleum in, upon, or under the Josiah Haines Warrant.

---

[19] That principle did not apply in *Powell,* because Lantzy acquired the property after the taxes were assessed, and thus was under no legal or moral obligation to pay them.  *Id.* at 451.

24

Dated: May 9, 2018                     Respectfully submitted,

                                       /s/ *Paul K. Stockman*
                                       Paul K. Stockman (admitted *pro hac vice*)
                                            Pa. ID No. 66951
                                       KAZMAREK MOWREY CLOUD LASETER LLP
                                       One PPG Place, Suite 3100
                                       Pittsburgh, PA 15222
                                       pstockman@kmcllaw.com

                                       Laura A. Lange
                                            Pa. ID No. 310733
                                       MCGUIREWOODS LLP
                                       260 Forbes Avenue, Suite 1800
                                       Pittsburgh, PA  15222
                                       llange@mcguirewoods.com

## CERTIFICATE OF COMPLIANCE:

I hereby certify that the foregoing brief complies with the 10,000-word word-count limit allowed by the Court by order dated May 4, 2018 (ECF No. 117), in that it contains 6,655 words, computed using the word count feature of Microsoft Word.

Dated:  May 9, 2018                    /s/ *Paul K. Stockman*

## CERTIFICATE OF SERVICE:

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court today via the Court's CM/ECF, and that, pursuant to Local Civil Rule 5.7, participants in the case who are registered ECF users will be served by the ECF system. Any persons so designated on the ECF receipt will be served by first class mail.

Dated:  May 9, 2018                    /s/ *Paul K. Stockman*