# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | : CIVIL ACTION – LAW<br>:<br>: CASE NO. 1:12-CV-1567<br>: |
| Plaintiff, | : JUDGE: Christopher C. Conner<br>: |
| v. | :<br>: |
| THOMAS E. PROCTOR HEIRS TRUST and the MARGARET O.F. PROCTOR TRUST, | :<br>:<br>: |
| Defendants. | : [Electronically Filed] |

## BRIEF IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Bradley C. Bechtel, Chief Counsel
PA No. 49681
W. Creigh Martson, Assistant Counsel
PA No. 94759
2001 Elmerton Ave.
Harrisburg, PA 17110-9797
(717) 783-6530
brbechtel@pa.gov
wmartson@pa.gov
*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

I.      Introduction…………………………………………………………1

II.     Counterstatement of Facts………………………………………..3

III.    Argument……………………………………………………………5

        A. The Proctor Trusts' Due Process Assertions Fail As A Matter of Law
        …………………………………………………………………...5

            1.  The Proctor Trusts are Collaterally Estopped from Asserting their
                Due Process Claim…………………………………………...7

            2.  Due Process is Not Actionable by the Proctor Trusts or has been
                Waived……………………………………………………….8

            3.  Mullane and Mennonite Cannot be Applied Retroactively to
                Invalidate a 1908 Tax Sale for Lack of Adequate notice………...11

            4.  Due Process was Afforded the Proctor Trusts…………………...12

        B.  The Josiah Haines Warrant was Properly Assessed as Unseated Land
            for the Years 1893-1908………………………………………….....19

        C.  There is Nothing in the Public Record Establishing that Calvin H.
            McCauley, Jr. was an Agent of CPLC at the Time of the 1908 Tax
            Sale………………………………………………………………..23

        D.  There is No Evidence that Proctor Trusts' Predecessors in Title
            Notified the County Commissioners of the 1894 Severance such that
            the Surface and Subsurface were Separately Assessed Prior to the
            1908 Tax Sale………………………………………………..…26

        E.  There is Not Estoppel by Deed………………………………...30

        F.  The Proctor Trusts' Estoppel Arguments as to CPLC Fail as a Matter
            of Law……………………………………………………………....32

IV.   Conclusion………………………………………………………………33

# TABLE OF AUTHORITIES

## CASES

*Bd. of Trs. of Trucking Emps. of North Jersey Welfare Fund, Inc. Pension Fund v. Centra, 983 F.2d 495, 505 (3d Cir. 1992)* ............................................................23

*Aarco Oil and Gas Company v. EOG Resources, Inc., 20 So.3d 662 (Miss. 2009*) ................................................................................................. 17, 18, 19

*Bannard v. New York State Natural Gas Corp., 293 A.2d 41 (Pa. 1972)* ..............20

*Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n Valley View Downs, 926 A.2d 908, 923 (Pa. 2007)* ...............................................................9

*Broadrick v. Oklahoma, 413 U.S. 601, 610-11 (1973)* ........................................8

*Burns v. Baumgardner, 449 A.2d 590, 593 (Pa. Super. 1982)* ...............................31

*Carey v. Piphus, 435 U.S. 247, 266-67 (1978)* .....................................................8

*Cobb v. Barclay, 9 (Pa.) Super. (573) 576.* ..........................................................25

*Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust, 158 A.3d 148 (Pa. Super. 2017), appeal denied by, 172 A.3d 594 (Pa. 2017), cert denied, 138 S.Ct. 1698 (2018)* ...................................................................... 2, 7, 12, 30

*Coxe v. Gibson, 27 Pa. 160 (Pa. 1856)* .................................................................25

*D.H Overmyer Co. v. Frick Co., 405 U.S. 174, 175 (1972)* ..................................9

*Davis Oil Company v. Mills, 873 F.2d 774 (5th Cir. 1989)* ............... 15, 16, 17 18

*Everhart v. Dolph, 19 A. 431, 432 (Pa. 1890)* ......................................................20

*George v. Messinger, 73 Pa. 418 (Pa. 1873)* ........................................................22

*Harper. et al. v. Virginia Department of Taxation, 509 U.S. 86, 97 (1993)* .....11

*Herder Spring Hunting Club v. Keller, 143 A.3d 358 (Pa. 2016)* ....................................................................... 2, 6, 19, 27, 28, 29, 30

*Hubley v. Keyser, 2 Pen. & W. 496, 1831 Pa. LEXIS 32, at *15 (Pa. June 1831)* .12

*Hulin v. Fibreboard Corp., 178 F.3d 316, 323 (5th Cir. 1999)* ...........................11

*Hutchinson v. Kline*, 49 A. 312 (Pa. 1901) ....................................................... 15, 29

*In re Cicchetti*, 560 Pa. 183, 743 A.2d 431, 443 n.1 (Pa. 2000) .........................9

*James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 541 (1991) ...................11

*Knupp v. Syms*, 50 A. 210 (Pa. 1901) ........................................................25

*Machipongo Land & Coal Co., Inc. v. Commonwealth*, 799 A.2d 751, 761-63 (Pa. 2002)..............................................................................................................10

*McGowan v. Maryland*, 366 U.S. 420, 429 (1961) ................................................9

*Mennonite Bd. of Missions v. Adams*, 462 U.S. 791 (1983) .............................. 5, 14

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ......... 5, 13, 15

*NCAA v. Corbett*, 79 F. Supp.3d 536 (M.D. Pa. 2013) ............................................7

*Neill v. Lacy*, 110 Pa. 294 (1 A. 325) (Pa. 1885). ....................................................25

*Northumberland County v. Phila. & Reading Coal & Iron Co.*, 131 F.2d 562 (3rd Cir. 1942) ............................................................................................... 20, 21, 22

*Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001) ............................................10

*Pennsylvania v. Thomas E. Proctor Heirs Trust*, 2017 U.S. Dist. LEXIS 128888, at *37, n.19 (M.D. Pa. Aug. 11, 2017).....................................................................30

*Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 662 (2003) ....................6

*Powell v. Lantzy*, 173 Pa. (543) 548 (34 A. 450) (Pa. 1896) .................... 25, 29, 32

*Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958) , aff'd, 265 F.2d 196 (3d. Cir. 1959) .................................................. 2, 23, 24, 25, 28, 32

*Quantum Resources Management, LLC v. Pirate Lake Oil Corp*, 112 So.3d 209 (La. 2013), cert. denied, 134 S.Ct. 197 (2013).................................................12

*Re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Properties*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998)............................... 31, 32

*Reinboth v. Zerbe Run Improvement Co.*, 29 Pa. 139 (Pa. 1858). .........................25

*Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995)............................11

*San Remo Hotel, L.P. v. City and County of San Francisco, California, et al, 545 U.S. 323 (2005)* ..........................................................................................7

*Senseing v. Pa. R.R. Co., 78 A. 91 (Pa. 1910)* .......................................................8

*Smith v. Second Church of Christ, Scientist, 351 P.2d 1104, 1109 (Ariz. 1960)* ....31

*Stoetzel v. Jackson, 105 Pa. 562, 567 (1884)* ...........................................................20

*Strauch v. Shoemaker, 1 Watts & Serg. 166 (Pa. 1841)* ..........................................29

*Tracy v. County of Chester Tax Claim Bureau, 489 A.2d 1334, 1338 (Pa. 1985)* ...........................................................................................................14

*Tulsa Professional Collection Services v. Joanne Pope, 485 U.S. 478, 484 (1988)* ................................................................................................................14

*United States v. Clarke, 445 U.S. 253, 258 (1980)* ...................................................10

*United States v. Dickinson, 331 U.S. 745, 751 (1947)* .........................................9,10

*United States v. Dow, 357 U.S. 17, 20 (1958)* ..................................................9, 10

*United States v. Estate of Donnelly, 397 U.S. 286 (1969)* .................................11

*Wilson v. A. Cook Sons Co., 148 A. 63 (Pa. 1929)* ...................................................29

*Woodhouse Hunting Club, Inc. v. Hoyt, 2018 Pa. Super. Unpub. LEXIS 319 (Pa. Super. Feb. 2, 2018)* ..............................................................................................2

## Statutes

*72 P.S. §§ 5860.101* .................................................................................................6

## Acts

*1806 Act, § 1* ...........................................................................................................27

*Act of April 3, 1804* ...............................................................................................12

*Act of March 28, 1806, P.L. 644* ....................................................................... 14, 26

# I.    INTRODUCTION

This is an action by the Commonwealth of Pennsylvania, Pennsylvania Game Commission ("PGC") against the Thomas E. Proctor Heirs Trust and Margaret O.F. Proctor Trust (the "Proctor Trusts") to quiet title relief with respect to oil, gas, and minerals in, on and under properties comprising State Game Lands No. 12, 13, and 36 in Bradford County and Sullivan County.   The Proctor Trusts have filed counterclaims against the PGC, wherein they seek similar relief.   The parties have stipulated as to the dozens of properties encompassed in the present litigation for which they seek resolution as to the ownership of the oil, gas and mineral rights.  *See* Stipulation (Doc. No. 89).

On April 17, 2018, the Proctor Trusts, given the number of properties involved, filed a motion for partial summary judgment as to one "bellwether," or test case, property, the Josiah Haines Warrant (the "Property"), asking that the Court quiet title in their favor.   The PGC, by separately-filed motion, likewise seeks summary judgment in its favor with respect to the Property (and what is a test case that will establish the law of the case for the remaining properties involved in the litigation).

The Proctor Trusts' motion for partial summary judgment is a house of cards. Its foundation consists of flawed inferences and insinuation, rather than facts of public record, which the Proctor Trusts then build upon with an equally-flawed

1

application of the law.  The issues raised by the Proctor Trusts' motion, including its flawed due process argument, have been addressed and repeatedly rejected by the courts in this Commonwealth.  *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016); *Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017); *Woodhouse Hunting Club, Inc. v. Hoyt*, 2018 Pa. Super. Unpub. LEXIS 319 (Pa. Super. Feb. 2, 2018); *Proctor v. Sagamore Big Game Club,* 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959).

To summarize, there are two salient points.  First, the public record, confirmed by multiple title reports, establishes that the PGC has title to the oil, gas, and minerals in, on and under Josiah Haines Warrant.  *See* Proctor Trusts Exs. 1 and 2; See Declaration of Jay Wilkinson, PGC Ex. A.[1]  Second, based on these undisputed facts, the Proctor Trusts' motion must be denied.  *Herder Spring* and its progeny establish Pennsylvania law that when the owner of unseated land loses his interest at a tax sale, any prior unassessed mineral interests pass to the grantee at the sale, even though a prior severance may have occurred.  While the Proctor Trusts offer up several arguments as to why the PGC does not have title to the oil, gas, and minerals in, on and under Josiah Haines Warrant – *e.g.*, due process, agency, estoppel by deed,

---

[1]     References herein to "Proctor Trusts Ex." are to the exhibits submitted by Defendants, the Proctor Trusts in support of their motion for partial summary judgment.  References herein to "PGC Ex." are to the exhibits submitted by the PGC in opposition the Proctor Trusts' motion, which are included in the PGC's appendix filed concurrently with this response.

etc. – none have merit.

## II.   COUNTERSTATEMENT OF FACTS.[2]

The facts that appear of record with respect to the Josiah Haines Warrant are as follows.  The Josiah Haines Warrant was originally warranted in 1793, and patented to Daniel Broadhead in 1794.  Thomas E. Proctor and Jonathan A. Hill acquired large tracts of land throughout Pennsylvania in several counties.   In particular, they acquired the Josiah Haines Warrant in fee in June of 1893.  There is no indication in the record the Josiah Haines Warrant was ever assessed as other than unseated at that time.  There is no evidence that the Josiah Haines Warrant was ever associated with the names of Thomas E. Proctor or Jonathan A. Hill, or that Thomas E. Proctor or Jonathan A. Hill ever paid taxes or reported an interest in the Josiah Haines Warrant.  However, in 1895, Thomas E. Proctor, Jonathan A. Hill and their wives, transferred their individual interests in a large amount of property, including the Josiah Haines Warrant to Union Tanning Company.  After 1895, the name of Union Tanning Company was associated with the Warrant until it was transferred to

---

[2]     This Counterstatement of Facts is supported by the PGC's Response to the Statement of Undisputed Material Facts In Support of Defendants' Motion for Partial Summary Judgment ("PGC's Response to Facts"), which was filed concurrently with this brief in opposition.  Included with the PGC's response and supporting appendix is a Declaration of Jay Wilkinson, which includes his title opinion.  *See* PGC Ex. A.  Mr. Wilkinson opines, with a reasonable degree of professional certainty, that the PGC has title to the oil, gas, and minerals in, on and under Josiah Haines Warrant.

Central Pennsylvania Lumber Company ("CPLC") in 1907.

The taxes for 1907 were assessed against the unseated Josiah Haines Warrant, and remained unpaid. Pursuant to the Act of 1815, the assessment was charged to and the taxes assessed against the land itself. Also pursuant to the Act of 1815, a tax sale was held at the regular time and place, and advertised in advance, so that anyone with an interest in the unseated land to be sold could come forward and make a claim. No claim was made and the unseated Josiah Haines Warrant was sold in June of 1908 at a regular tax sale to Calvin H. McCauley, Jr. There is no Trust Document or Agency document with regard to the Josiah Haines Warrant.

The Josiah Haines Warrant was subject to redemption for two years after the sale, or until June of 1910. There was no redemption within that period and no challenge appears of record to the assessment or the tax sale. Thereafter, in December of 1910, Calvin H. McCauley, Jr. and his wife conveyed their individual interest to CPLC. Under Pennsylvania law, that interest was a full fee simple interest.

CPLC conveyed its interest in a larger tract, which included the Josiah Haines Warrant and other tracts which did not go through a tax sale such as the William Wilson Warrant, in 1920. CPLC did not reserve any interests to itself. Therefore, the PGC acquired all interests of CPLC in the Josiah Haines Warrant.

For the next 98 years, the title remained undisturbed. There is no evidence

4

that Thomas E. Proctor or Jonathan A. Hill, or any of their successors, ever sought to quiet title or seek control of the Josiah Haines Warrant, or any interest therein. The Proctor Trusts mention that various heirs executed a lease with regard to the Josiah Haines Warrant, but there is also no evidence that any entity operated under the authority of that lease. It was, essentially, a piece of paper. The only title searches of record indicate that the PGC is the owner of the fee simple interest. The PGC filed suit (in a pre-*Herder Spring* environment) to clear any cloud on its title.

## III.   ARGUMENT

### A.   The Proctor Trusts' Due Process Assertions Fail as a Matter of Law.

The Proctor Trusts assert that the 1908 tax "deprived the Trusts of property without due process of law, in violation of the Fourteenth Amendment." They contend, citing the U.S. Supreme Court's modern-era due process decisions of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) and *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791 (1983), that notice purely by newspaper publication, which was the notice afforded to the owners of unassessed mineral estates in connection tax sales of unseated land by the Acts of 1804 and 1815, is not constitutionally sufficient. The Proctor Trusts assert, therefore, and notwithstanding the Pennsylvania Supreme Court's decision in *Herder Spring*, that tax sale at issue here, and by extension innumerable tax sales of unseated land like it, violated elementary and fundamental principles of due process owed to their predecessors

and cannot be given effect.  In short, the Proctor Trusts assert that U.S. Supreme Court's modern-era due process decisions requiring, in certain circumstances, notice beyond only publication must be retroactively applied to undo tax sales of unseated land that the Pennsylvania Supreme Court, in *Herder Spring*, determined were perfectly legal at the time.[3]

The due process arguments raised by the Proctor Trusts should, as explained further below, be rejected for several reasons.  First, the Proctor Trusts are collaterally estopped from asserting this claim, which was decided against the Proctor Trusts in the *Cornwall* case.  Second, the issue is with process (primarily, notice) afforded at the time of tax sales that occurred between 1804 and 1947.  Such claims are not alive.  They did not run with the land and pass to descendants.  The claims were not held in a form of legal suspense for decades until the discover of natural gas in the Marcellus Shale encouraged opportunistic litigants to discover that their ancestors may have been denied due process at some point between 1804 and

---

[3]     The Proctor Trusts are not only asking this Court to overrule *Herder Spring's* due process conclusions but are, at bottom, challenging the constitutionality of the assessment and tax sale regime for unseated lands established by the 1804 and 1815 Acts.  Those Acts, which governed, with supplements and amendments along the way, until 1947, when the General Assembly substantially rewrote most of the Commonwealth's real estate tax sale law and removed the distinction between seated and unseated lands, see 72 P.S. §§ 5860.101 *et seq.*, *expressly provided for notice by publication.  See Herder Spring*, 143 A.3d at 376-78.  In that regard, a state statute is presumed valid under the United States Constitution until such time that a challenger to the law "shoulder[s] the burden of overcoming that presumption." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 662 (2003).

1947.   Instead, such claims are long-barred by applicable statutes of limitation and repose.  Finally, even if modern due process concepts are applied retroactively to a since-abandoned statutory system and long-closed tax sales of unseated land, constitutionally adequate due process was provided.

### 1.    The Proctor Trusts are Collaterally Estopped from Asserting their Due Process Claim.

An ***identical*** 14th Amendment due process claim was raised by the Proctor Trusts, fully litigated, and decided against them.  *See Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017), *appeal denied by*, 172 A.3d 594 (Pa. 2017), *cert. denied*, 138 S.Ct. 1698 (2018); *see also* Proctor Trusts' Petition for Writ of Certiorari and Appendix, PGC Ex. B.   Both the Pennsylvania Supreme Court and the United States Supreme Court *declined* to review the trial court's and intermediate appellate court's rejection of the Proctor Trusts' 14th Amendment due process claim.  *Id*.  The *Cornwall* proceedings easily satisfy the minimum standards of the law of issue preclusion, and as such are entitled to preclusive effect.  *See NCAA v. Corbett*, 79 F. Supp.3d 536 (M.D. Pa. 2013).  This Court should, accordingly, give the decisions in the *Cornwall* proceeding full faith and credit and decline consideration of the Proctor Trusts' rejected constitutional claims. *Id.*; *see also San Remo Hotel, L.P. v. City and County of San Francisco, California, et al*, 545 U.S. 323 (2005) (full faith and credit statute precluded further litigation of issues that had been adjudicated by California courts).

**2.    Due Process is Not Actionable by the Proctor Trusts or has been Waived.**

If the Proctor Trusts are not collaterally estopped from asserting their 14th Amendment due process claim, then they still cannot assert the claim. Any procedural due process deprivation occurred, if at all, at the time of the relevant tax sale of unseated lands, here in 1908. The holder of that claim, moreover, would be the owner of the unseated lands *at the time of the tax sale,* and not the owner's heirs or successors in interest. Given the era in which the challenged tax sale, and others like it, of unseated land occurred, it would be the exceedingly rare case where there is a proper party who can assert an alleged deprivation of procedural due process.

The alleged deprivation of procedural due process in connection with a tax sale of unseated land is, in effect, a claimed constitutional tort. *See Carey v. Piphus,* 435 U.S. 247, 266-67 (1978) (deprivation of procedural due process is an independent constitutional tort, actionable under § 1983 with or without proof of actual injury). Such claims would have ripened at the time of the tax sale, are personal to the injured party, do not run with the land and can be waived. *See*, *e.g.*, *Senseing v. Pa. R.R. Co.*, 78 A. 91 (Pa. 1910) ("A right of action strictly personal is not assignable and the general doctrine is, both in law and equity, that a right of action for pure tort is not the subject of assignment."); *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973) ("Embedded in the traditional rules

governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously.") (internal citations omitted); *McGowan v. Maryland*, 366 U.S. 420, 429 (1961) (general rule is that a litigant may only assert his own constitutional rights or immunities); *D.H Overmyer Co. v. Frick Co.*, 405 U.S. 174, 175 (1972) (due process rights can be waived if the waiver is knowing and voluntary); *Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n Valley View Downs*, 926 A.2d 908, 923 (Pa. 2007) *(per curiam)* (finding a due process argument waived when it was not raised before the administrative agency); *In re Cicchetti*, 560 Pa. 183, 743 A.2d 431, 443 n.1 (Pa. 2000) (acknowledging that a due process claim can be waived for failure to raise it in a timely fashion).

By way of analogy, a property owner can maintain a physical taking claim only if she owned the property as of the date of the alleged taking. The right to compensation is ***not*** passed to a subsequent purchaser. *See United States v. Dow*, 357 U.S. 17, 20 (1958) ("The owner at the time the Government takes possession rather than the owner at an earlier or later date, is the one who has the claim [for a taking] and is to receive payment."); *United States v. Dickinson,* 331 U.S. 745, 751

(1947) ("[T]he land was taken when it was taken and an obligation to pay for it then arose."); *United States v. Clarke,* 445 U.S. 253, 258 (1980) ("[T]he usual rule is that the time of the invasion constitutes the act of taking, and "[i]t is that event which gives rise to the claim for compensation…'") (quoting *Dow*, 357 U.S. at 22).[4]

The same rule would necessarily apply to the Proctor Trusts' due process claims in this context. Any claim of deprivation of procedural due process rights ripened, if at all, upon conclusion of the tax sale of the unseated land. That claim belonged to the owner of the unseated land at the time of the sale, not its successor in interest. A successor could not complain about the lack of particular process in an alleged tax sale because they would lack standing to assert any claim for the deprivation of procedural due process. No process at all, as it relates to the tax sale, was owed to the successor in interest.

In short, any complaint regarding deprivation of procedural due process resulting from the tax sale would need to be lodged, if at all, by the owner at the

---

[4]     *Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001), noted that in contrast with direct condemnations and physical occupations, a regulatory scheme's impact on a parcel may not be immediately apparent. Thus, an as-applied regulatory taking claim may not ripen – as when a permit application is denied or administrative remedies are exhausted – until the parcel is in different ownership than when the regulatory scheme was enacted. In this circumstance, it does little violence to the owner-as-of-date-of-taking rule to allow the subsequent owner to bring a regulatory taking claim. *See*, *e.g.*, *Machipongo Land & Coal Co., Inc. v. Commonwealth*, 799 A.2d 751, 761-63 (Pa. 2002) (designation of property as unsuitable for surface mining could be challenged by trust acquiring property after designation).

time of the sale and not by a successor in interest.

3.   ***Mullane*** **and *Mennonite* Cannot be Applied Retroactively to Invalidate a 1908 Tax Sale for Lack of Adequate Notice.**

Under the U.S. Supreme Court's retroactivity jurisprudence, a new rule of constitutional law announced by the Court applies to all future cases and cases pending on direct review on the date the Court's decision is rendered.   *See Harper. et al. v. Virginia Department of Taxation*, 509 U.S. 86, 97 (1993). Further, retroactivity is limited by the doctrines of *res judicata* and statutes of limitations or repose.   *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 541 (1991); *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995) (finality limits the principle of retroactivity); *United States v. Estate of Donnelly*, 397 U.S. 286 (1969) (Harlan, J., concurring) (rights of parties should be considered frozen when transaction is beyond challenge because statute or limitations has run or rights have been fixed by *res judicata)*; *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 323 (5th Cir. 1999) ("[i]t is well established that the effect of even a fully retroactive jurisprudential decision is limited by certain independent overriding legal principles," such as *res judicata* and statutes of limitation).

The Proctor Trusts' challenge to the constitutionality of the underlying tax sale was not pending on direct review at the time the *Mullane* and *Mennonite* cases were decided.  Any suit to annul the 1908 tax sale, moreover, was ***time-barred*** in 1913 by operation of the five-year statute of repose in the 1804 Act.

11

*See* Act of April 3, 1804, at § 3; *see also Cornwall*, 158 A.3d at 160 ("We agree with the trial court that Trustees are time-barred from challenging procedural irregularities in *the notice*, assessment, and tax sale process. Those procedural irregularities, had they been timely challenged after the tax sale, may have been sufficient to upset the sale.") (emphasis added).[5]

For these reasons, the notice requirements of *Mullane* and *Mennonite* cannot apply retroactively to invalidate the 1908 tax sale, or other similarly situated tax sales of unseated land. *See Quantum Resources Management, LLC v. Pirate Lake Oil Corp,* 112 So.3d 209 (La. 2013) (refusing to apply *Mennonite* retroactively to invalidate 1925 tax sale for lack of notice where case was not pending on direct review at the time *Mennonite* was decided and suit to annul tax sale was preempted 53 years before *Mennonite*), *cert. denied*, 134 S.Ct. 197 (2013).

### 4.  Due process was Afforded the Proctor Trusts.

Even if *Mullane* and *Mennonite* were to be applied retroactively, the

---

[5]     As recognized by *Cornwall*, there are fundamental, jurisdictional requirements, without which a tax sale is void and can be challenged at any time. *See Cornwall*, 158 A.3d at 160-61 (identifying cases illustrating facts that will render a tax sale void).  On the other hand, all other alleged irregularities – *including an alleged lack of proper notice* – are subject to the redemption period and statutes of limitation or repose. *Id.*  "Any other construction renders the act of 1815 a dead letter." *Hubley v. Keyser*, 2 Pen. & W. 496, 1831 Pa. LEXIS 32, at *15 (Pa. June 1831).

publication notice of tax sales afforded by the 1804 and 1815 Acts, as amended, was sufficient to satisfy the due process rights of owners severed, unassessed mineral estates in unseated lands.

> The seminal announcement in _Mullane_ is well known:
>
> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

_Mullane,_ 339 U.S. at 314.  Applying its "reasonably calculated" standard, the Supreme Court ruled that for those trust beneficiaries whose names and addresses were "at hand," for whom the "trustee has on its books the names and addresses," publication notice was not sufficient, and notice by mail was a reasonable requirement.  _Id._ at 318. The Supreme Court explained, however, that the standard was flexible and did _not_ require actual notice to all persons whose interests might be affected.  _Id_. at 317.  The Supreme Court, applying the "reasonably calculated" standard, further explained that publication notice was not unreasonable for beneficiaries who might be discovered by investigation, but "do not _in due course of business_ come to the knowledge" of the trustee.  _Id._ (emphasis added).  Indeed, the Supreme Court concluded, "we have no doubt that _such impracticable and extended searches are not required_ in the name of due process."  _Id._ at 317-18 (emphasis added).

Since *Mullane,* the Supreme Court has adhered to the principles, balancing the "interest of the State" and "the individual interest sought to be protected by the Fourteenth Amendment." *Tulsa Professional Collection Services v. Joanne Pope*, 485 U.S. 478, 484 (1988). "The focus is on the reasonableness of the balance, and, as *Mullane* itself made clear, whether a particular method of notice is reasonable *depends on the particular circumstances*." *Id.* (emphasis added).

In *Mennonite,* the Supreme Court held that a mortgagee was entitled to actual notice that property was to be sold for the mortgagor's failure to pay taxes. The Supreme Court followed the analysis of *Mullane,* requiring actual notice when the interested party was *reasonably identifiable. See Mennonite,* 462 U.S. at 798. Specifically, the Supreme Court concluded that "constructive notice must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service." *Id.* "[U]nless the mortgagee is not *reasonably identifiable,* constructive notice alone does not satisfy the mandate of *Mullane*." *Id.* (emphasis added). *See also Tracy v. County of Chester Tax Claim Bureau,* 489 A.2d 1334, 1338 (Pa. 1985) (under *Mennonite,* governmental body is not required to make extraordinary efforts to discover the identity and address of a person whose property interests are likely to be significantly affected by a tax sale, but only *reasonable efforts).*

Under the Act of March 28, 1806, P.L. 644, persons who owned severed

mineral rights separately from the surface of unseated land in 1908 (the date of the tax sale in this case) had a statutory duty to identify their separately owned minerals to the tax assessor for separate assessment. If such mineral owners failed to do so, their identities were not reasonably ascertainable by the county tax assessor. Absent separate assessment, the only way the tax assessor could know that mineral interests had been severed from the surface of unseated land would be to conduct a thorough search of the county land records (assuming the conveyance had been duly recorded). Since the tax assessor would have to conduct such a search for every assessed tract of land in the county subject to sale for taxes, such a requirement would effectively make the tax assessor a full time title abstractor. That would be "impracticable and extended searches ... not required in the name of due process." *See Mullane,* at 317; *see also Hutchinson v. Kline*, 49 A. 312, 313 (Pa. 1901) ("The record of the deed creating a separate estate in the minerals would not be notice to the assessor or the commissioners *as they were not bound to search or examine the records.") (emphasis added).

Other courts have agreed that a search of the conveyance records to identify parties with mineral interests would be unduly burdensome and is a task beyond the routine examination of land records that was involved in *Mennonite.*

In *Davis Oil Company v. Mills,* 873 F.2d 774 (5th Cir. 1989), the U.S. Court of Appeals for the Fifth Circuit was confronted with a situation similar to the

one before this Court.  That case concerned the foreclosure of property on which the plaintiff held a mineral lease which was recorded in the parish conveyance records.  The plaintiff was not given actual notice of the foreclosure.  The Fifth Circuit found that constructive notice was sufficient in that case because the plaintiffs interest in the property was not reasonably available to the seizing creditor. In finding that constructive notice was sufficient as to the plaintiff, the court stated, "[W]e do not construe *Mennonite* as requiring actual notice to every party who has a publicly recorded interest in the subject property."  The court stated, "Accordingly, the reasonableness of constructive notice in a particular case may turn on the nature of the property interest at stake and the relative ease or difficulty of identifying such interest holders from the land records and also the existence of alternative means of insuring the receipt of notice." The court concluded that "a search of the conveyance records to identify parties with mineral interests would be unduly burdensome and is a task beyond routine examination of land records that was involved in *Mennonite*." *Id.* at 789.  The court noted, moreover, that the lessee easily could have assured actual notice of the sale had he paid a nominal fee and placed his name and address on file in the mortgage records. *Id.* at 790-91. While the lessee did not waive his due process rights by failing to place his name and address on file, the availability of a means to protect his property interest was a factor to be considered when determining

16

whether his identity was reasonably ascertainable. *Id.* at 789-90.

More recently, in *Aarco Oil and Gas Company v. EOG Resources, Inc.,* 20 So.3d 662 (Miss. 2009), the Mississippi Supreme Court, applying *Mennonite* retroactively; concluded that publication and notice to the surface owners only in connection with a 1942 tax sale did not violate the mineral owners' due process rights. The system in place in Mississippi in 1942 bears resemblance to that in Pennsylvania, at the time, with respect to tax sales of unseated land. In Mississippi, prior to 1946, severed minerals could be separately assessed for ad valorem taxes. Failure to separately assess a severed mineral estate would cause it to be sold or forfeited for taxes in the event the surface estate was sold or was forfeited for ad valorem taxes.

In *Aarco Oil,* the mineral estate had been conveyed to the plaintiffs but was not separately assessed. In 1942 the land, including plaintiffs' mineral estate, was sold for unpaid taxes. Following the sale, a portion of the mineral estate was conveyed to the defendants. When plaintiffs filed suit in 2007, one of the defendants had completed a gas well on the land and was drilling another.

Plaintiffs attacked the validity of the 1942 tax sale contending, *inter alia,* that the sale was invalid because the county did not provide notice to the then-mineral owners, either by mail or personal service, in violation of federal and state due process requirements. *Id.* at 667. The plaintiffs contended that the

17

statutorily-required newspaper notices of the sale and notice to the surface owners was insufficient to satisfy the due process rights of the mineral owners. *Id.* at 668.

The Mississippi Supreme Court acknowledged the holdings in *Mullane* and *Mennonite*, but pointed out that the Supreme Court did not require actual notice in every instance, explaining that a governmental body is not obligated to undertake extraordinary efforts to discover the identity and whereabouts of interested parties to the sale. *Id.* at 669. The court also discussed the Fifth Circuit's decision in *Davis Oil. Id.* at 669-70. The court noted that plaintiffs' predecessors in title could have protected their interests by causing their severed mineral interest to be separately assessed for taxes. The court concluded that the tax assessor was not required to search the public records to determine the ownership of the mineral interests. The court affirmed judgment against the plaintiffs stating:

> The plaintiffs' arguments, though well presented, are without merit. Ad valorem taxes were assessed for 1935 in compliance with applicable law, and the board of supervisors was under no obligation, either by statute or constitution, to equalize the land roll in that year. In addition, because the identity and whereabouts of the owners of the severed mineral interests were not readily ascertainable, publication and notice to the surface owners were sufficient to satisfy due process.

> For the foregoing reasons, the judgment of the Covington County Chancery Court is hereby affirmed.

18

*Id.* at 670.

The conclusions reached by *Davis Oil* and *Aarco,* that publication notice afforded adequate due process post-*Mennonite,* are equally applicable to the tax sale in this case, and all others like it.  Here, the owner of the mineral estate at the time of the tax sale easily could have assured actual notice of the sale by complying with the duty imposed by the 1806 Act to inform the county commissioners or appropriate tax board of the severance, thereby allowing both portions of the property to be independently valued and assessed for taxes.  The tax assessor was, moreover, under no obligation to comb the county records to identify individuals who might appear to have an interest in the unseated land's minerals.

Under these circumstances, publication and notice to the surface owners only did not violate the mineral owner's due process rights.  *See Herder Spring*, 143 A.3d at 376-78.

### B.     The Josiah Haines Warrant as Properly Assessed as Unseated Land for the Years 1893-1908.

The evidence in the public record unequivocally shows the Josiah Haines Warrant was assessed as "unseated" at the time of the 1908 tax sale.  *See* PGC Ex. A.

The sole purported "evidence" offered by the Proctor Trusts to contend the land was seated – alleged CPLC bark peeling records (Proctor Trusts Ex. 12) – is

unauthenticated, inadmissible hearsay supported by nothing other than a declaration of the Proctor Trusts' counsel, who lacks any personal knowledge regarding the records, what they purport to show, or what CPLC did or did not do.

Regardless, the Proctor Trusts' proffered "evidence" of occasional bark peeling does not establish land was "seated":

> Whether a tract of land is seated or unseated depends altogether upon what has been, or is being done upon it:  upon the appearance which it may present to the eye of the assessor.  …The assessor has nothing to do with the misapprehensions or mistakes of the occupant; it is his business to return the land as seated if he finds upon it such permanent improvements as indicate a personal responsibility for its taxes.  On the other hands, if there be no such improvements he must return it as unseated.  Neither is it the business of the assessor to inquire how the improver holds the property…for the question is but how the taxes shall be collected:  if seated, then from some person; but if unseated, from the land itself.

*Bannard v. New York State Natural Gas Corp.*, 293 A.2d 41 (Pa. 1972), quoting *Stoetzel v. Jackson*, 105 Pa. 562, 567 (1884);  *see also Everhart v. Dolph*, 19 A. 431, 432 (Pa. 1890) ("whether a tract of land is seated or unseated depends altogether upon the appearance it presents to the assessor at the time of the assessment.  If it has been or is being improved by clearing or cultivation, or by the erection of a building upon it, or if the property shows such permanent improvements as indicate a personal responsibility for the taxes, it is the assessors duty to enter it upon the seated list.").

As explained by the Third Circuit in *Northumberland County v. Phila. &*

*Reading Coal & Iron Co.*, 131 F.2d 562 (3rd Cir. 1942), the difference in the then-legislative treatment of the problems of delinquent tax collection involved in the two types of land "is quite understandable." *Id*. at 565.   In the case of seated lands, the owners mostly resided on the lands and they or their tenants nearly always had goods or chattels thereon.   *Id*.   Under those circumstances collection from the owner was feasible and it was the method adopted.   *Id*.   In the case of unseated lands, however, there were never goods or chattels on the lands "subject to distraint." *Id*.   The owners were very frequently nonresidents of the county and often land speculators. *Id*.   The land was, thus, the only reasonably certain and tangible security for the tax and its sale was the logical method of collection.   *Id*. at 566.   "The rule thus laid down is that the question whether land is seated or unseated depends altogether upon what has been or is being done upon it, the court indicating that personal liability for taxes arises as a direct consequence of the improvement itself." *Id*.

Here, the Proctor Trusts offer no evidence that an assessor looking at the subject property would have seen any evidence of buildings, other permanent improvements or "cultivation" – *i.e.*, clearing, tilling and growing crops.   The Proctor Trusts proffered inadmissible and unauthenticated hearsay evidence establishes, at best, the occasional, intermittent and temporary activity of bark stripping.   That is not evidence that would tend to establish that there was, at the time of the 1908 tax sale, "on the lands goods or chattels subject to distraint," such

that the land should have been assessed as seated. *See Northumberland County*, 131 F.2d at 565-66.

The case relied upon by Proctors, *George v. Messinger*, 73 Pa. 418 (Pa. 1873), is clearly distinguishable on its facts. In *Messinger*, the sale of the land for taxes was as unseated. The landowner claimed that there was a residence upon the tract and that there was also cultivation, which made it seated and invalidated the purchase. On review, the Pennsylvania Supreme Court reversed, finding that the land was seated based on extensive evidence that there was an abundance of personal property upon the land out of which the taxes could have been collected. Indeed, quite the opposite of the facts in this case, the facts in *Messinger* established that:

> Dilworth was the owner of the land. In the autumn of 1859, he set men to work upon it. They built two houses and a barn. During the winter, one of the men remained upon it. In each year thereafter some land was cleared, and potatoes, hay, oats, rye and vegetables were raised thereon. Two or three more houses were erected thereon. So that in 1864 there were four houses standing upon it, and from three to four acres of improved land. During all these years, several families continued to reside upon the land. Most of the time several teams, sleds, wagons and chains were kept there. The personal property kept on the land in 1863 and in 1864, was worth from $ 500 to $ 600, besides the logs cut thereon, which were worth from $ 400 to $ 500 more. In 1865 the log barn was torn down, and a framed barn built.

*Messinger*, 73 Pa. at 422-23.

Additionally, nobody in the chain of title, ever challenged the designation of the Josiah Haines Warrant as "unseated," despite it being listed as such on assessment books as such for over a decade before the 1908 tax sale. The Proctor

Trusts claim, without any public record evidence, that CPLC, *et al*., diligently monitored assessment and payment of taxes on their land holdings. If the parcel was not "unseated," then the appropriate actions would have been to notify the county commissioners, have the assessment changed, and pay taxes within the applicable periods for the statue of repose.

### C. There Is Nothing in the Public Record Establishing that Calvin H. McCauley, Jr. was an Agent of CPLC at the time of the 1908 Tax Sale.

The Proctor Trusts assert that the 1908 tax sale was a redemption because Calvin H. McCauley, Jr. was purportedly acting as an agent for CPLC when he purchased property.

This Court's sister court, in *Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959), had the very same type of evidence offered by Proctor Trusts before it, ***including the very stipulation relied upon by Proctor Trusts*** (Proctor Trusts Ex. 48), and flatly rejected the argument by Thomas E. Proctor, *et al*., that McCauley was an agent of CPLC with respect to the tax sale at issue. *See Proctor*, 166 F. Supp. at 479-80. Because the Proctor Trusts claim to be the heirs of Thomas E. Proctor, collateral estoppel should apply to bar re-litigation of an issue definitively decided against the Proctor Trusts' predecessors in title decades ago. *See Bd. of Trs. of Trucking Emps. of North Jersey Welfare Fund, Inc. Pension Fund v. Centra*, 983 F.2d 495, 505 (3d Cir. 1992) (A party may

successfully assert the narrower res judicata concept of issue preclusion "when: (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or *in privity with a party* to the prior adjudication; and (4) the party against whom the bar is asserted has had a full and fair opportunity to litigate the issue in question.") (emphasis added).

Regardless of whether collateral estoppel applies, from the public record, Calvin H. McCauley, Jr. purchased the subject property as an individual and was a complete stranger to the title. *See* PGC Ex. A.  Further, on December 6, 1910 Calvin H. McCauley, Jr. did not assign to CPLC his interest in the Josiah Haines Warrant. Instead, on December 6, 1910, Calvin H. McCauley, Jr., *joined by his wife*, conveyed their interest in the Josiah Haines Warrant to CPLC.  *Id*.  None of the "evidence" offered by the Proctors establishes that Calvin H. McCauley, Jr. was an agent for CPLC for purposes of the 1908 tax sale of the Josiah Haines Warrant in Bradford County.  *See* PGC's Response to Facts at ¶¶ 26 and 28.  The Proctor Trusts do not, and cannot, establish that ***any*** of the cited materials are, or were, in the public record of Bradford County, such that an examiner of such records could acquire any knowledge as to the purported relationship between Calvin H. McCauley, Jr. and CPLC.  *See Proctor*, 166 F. Supp. at 479-480.   The public record controls.  *Id*. (concluding that the public records of the county could not be impeached by the facts

offered in evidence).

Even assuming, moreover, that Calvin H. McCauley, Jr. was an agent, the law does not support the Proctor Trusts' argument.   Calvin H. McCauley, Jr. did not redeem the Josiah Haines Warrant: he purchased it, as an individual, at a public tax sale at which *anyone*, including Thomas E. Proctor, could have outbid him.   If McCauley was an agent, it is well settled law that:

> …It has been said, however, that 'there is nothing in reason or law to prevent a man who holds a defective title from purchasing a better at a treasurer's sale for taxes.' (*Coxe v. Gibson*, 27 Pa. 160) Again, it was held that where one purchases lands at tax sales, and he has any doubt as to the sufficiency of the title, he can perfect it by purchase of the land at a subsequent tax sale. (*Reinboth v. Zerbe Run Improvement Co*., 29 Pa. 139.) It was said of these cases that the land being unseated, there was no personal obligation on the owner for the payment of the taxes. (*Powell v. Lantzy*, 173 Pa. (543) 548 (34 A. 450)); (*Cobb v. Barclay*, 9 (Pa.) Super. (573) 576.) It is held in another case that the owner of unseated land may purchase the land at treasurer's sale the same as may be done by an entire stranger to the title; and the reason given is that the owner is not personally responsible for the payment of the taxes. (*Neill v. Lacy*, 110 Pa. 294 (1 A. 325)).

*Proctor*, 166 F. Supp. at 479.   The agent simply could do what the principal could do.

The case of *Knupp v. Syms*, 50 A. 210 (Pa. 1901), relied upon by the Proctor Trusts, is distinguishable.   In that case, it appeared from entries in books in the treasurer's office – *i.e.*, the public record – that H., to whom lands were sold in 1848 for taxes, acted as agent of the owners for the lands from 1840 to 1852, and that thereafter, before expiration of time for redemption, H. paid and the treasurer received the defaulted taxes on which the treasurer's deed to H. was based.   It was

25

presumed, based on those public records, that he paid the taxes in trust *for his principals*, and his payment was deemed a redemption.

Quite unlike *Knupp*, the purported and tenuous relationship of Calvin H. McCauley, Jr. to CPLC is not proven by probative evidence, is belied by what evidence exists in the public record, and does not change the nature of the transactions. There is no basis for asserting, and the Proctor Trusts have provided no evidence to suggest, that McCauley had a preexisting obligation to pay the delinquent taxes, or legal or moral obligation to pay taxes on the subject unseated land owned by CPLC (a corporate entity). Calvin H. McCauley, Jr. clearly was not an agent for Thomas E. Proctor or Jonathan A. Hill. Whether Calvin H. McCauley, Jr. *purchased* the Josiah Haines Warrant on his own or at the behest of CPLC, the legal effect is the same. The whole of the unseated Josiah Haines Warrant was sold, including any reserved interest not separately assessed.

> **D.    There Is No Evidence that the Proctor Trusts' Predecessors in Titled Notified the County Commissioners of the 1894 Severance such that the Surface and Subsurface were Separately Assessed Prior to the 1908 Tax Sale.**

The Proctor Trusts assert that evidence shows that Thomas E. Proctor, Union Tanning Company and CPLC all reported their interest in the Josiah Haines warrant to the Bradford County Commissions pursuant to the Act of March 28, 1806, P.L. 644. But what is ***legally*** relevant here is whether Thomas E. Proctor reported the 1894 *severance* to County Commissioners and *sought a separate assessment of the reserved interest*.

As explained in *Herder Spring*, the 1806 Act provided that it was "the duty of every holder of unseated lands" to provide the county commissioners with a signed statement describing the tract of land and "the name of the persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title."   1806 Act, § 1.   To address future transfers, the 1806 Act provided:

> [I]t shall be the duty of every person thereafter becoming a holder of unseated land, by gift, grant, or other conveyance to furnish a like statement, together with the date of the conveyance to such holder, and the name of the grantor, with in one year, from and after such conveyance.

*Id*.  *See also Herder Spring*, 143 A.3d at 368.

The 1806 Act did not impose any duty on county commissioners to obtain information regarding unseated land or to search through deed books to discover whether lands had changed hands or whether a severance of surface and subsurface rights had occurred.  *See Herder Spring*, 143 A.3d at 369-370.

Because assessors treated unseated lands entirely in reference to the original warrants rather than the current owners when not otherwise directed, a failure to report a severance would have the practical effect of having the property continually assessed and taxed as a whole, "given that the assessors were not required to determine sometimes elusive current ownership."  *See Herder Spring*, 143 A.3d at 370.

Consequently, if a severance was never reported, a subsequent treasurer's tax sale would effectively "wash" the title of the severance and vest the tax sale purchaser with all right, title and interest in both the surface and the subsurface rights, as if the severance had never occurred. *See Herder Spring*, 143 A.3d at 366-67; *Proctor*, 166 F. Supp. at 470-71.

The Proctor Trusts, despite their claimed extensive land holdings in the Commonwealth, fail to supply the Court with a single documented example of any such notice ever being provided to any county commissioner by their predecessors in title, yet claim it was their "routine practice." *See* PGC's Response to Facts at ¶¶ 6-7.

Irrespective of whether the Proctor Trusts' predecessors in title purportedly notified the county commissioners of the conveyance of the Josiah Haines Warrant to them, there is no probative, admissible evidence of record that the Proctor Trusts' predecessors in title subsequently notified the county commissioners that, in 1894, the unseated land had been divided into surface and subsurface estates. By deed, dated October 27, 1894, the Proctor Trusts' predecessors in title conveyed a large tract of land, including the Josiah Haines Warrant, to the Union Tanning Company, severing the oil, gas and minerals from the surface and reserving the oil, gas and mineral estate for themselves, their heirs and assigns. *See* Proctor Trusts Exs. 1 and 2; *see also* PGC Ex. A. There is no probative, admissible evidence of record that

28

the Proctor Trusts' predecessors in title reported this *severance* to the county commissioners, as required by the 1806 Act.   The surface and subsurface were assessed together and not separately prior to the 1908 tax sale of the lands for delinquent taxes on the entire property.   *See* Proctor Trusts Exs. 1 and 2; *see also* PGC Ex. A.

The result here – that an unassessed mineral estate coexisting with an unseated surface estate is subject to extinguishment by the occurrence of a tax sale of the servient surface estate – was neither unjust nor inequitable at the time.   *See Herder Spring*, *supra*; *Wilson v. A. Cook Sons Co.*, 148 A. 63 (Pa. 1929); *Hutchinson v. Kline*, 49 A. 312 (Pa. 1901); *Powell v. Lantzy*, 34 A. 450 (Pa. 1896); *Strauch v. Shoemaker*, 1 Watts & Serg. 166 (Pa. 1841);   Any injury suffered by the holder of any severed mineral interests as a result of a tax sale of the servient surface estate was entirely self-inflicted, because the holder could have easily protected himself by disclosing and seeking a separate assessment of the reserved interest or by redeeming the land at the tax sale.   *See Herder Spring*, 143 A.3d at 369-70.   If minerals or other reserved rights *were separately assessed* and taxes were paid, then those interests would neither have been conveyed nor extinguished by a subsequent tax sale of the surface.   *Id.*

Finally, but perhaps most importantly, the Proctor Trusts, by directing the Court to purported "facts" that Thomas E. Proctor, *et al.*, reported their interest in

the Josiah Haines warrant to the Bradford County Commissions pursuant to the 1806 Act, are *really* arguing that the assessment of the subject property was somehow not accurate – *i.e.*, they are challenging the propriety of the assessment.   But such arguments regarding the propriety of the assessment of the Josiah Haines Warrant are long barred by the applicable statute of limitations.  *See Cornwall*, 158 A.3d at 160;  *Pennsylvania v. Thomas E. Proctor Heirs Trust*, 2017 U.S. Dist. LEXIS 128888, at *37, n.19 (M.D. Pa. Aug. 11, 2017).

### E.   There is No Estoppel by Deed.

The Proctor Trusts contend that because the 1920 CPLC deed to the PGC was made "subject to" the 1894 reservation to Thomas E. Proctor and Jonathan A. Hill, the PGC is estopped from asserting that has title to the oil, gas, and minerals in, on and under Josiah Haines Warrant.

This argument by the Proctor Trusts must be rejected as a matter of law.  No estoppel by deed applies, as the 1894 reservation was extinguished by the 1908 tax sale as a matter of law. *See Herder Spring*, *supra*.  Moreover, the reservation in deed by CPLC to the PGC did not contain reservations of the oil, gas and minerals *in favor of* CPLC.   CPLC, instead, conveyed subject to prior reservations, which were washed by tax sale. *See* PGC Ex. A.

Here, the "subject to" clause in the 1920 CPLC general warranty deed to the PGC served a practical and precautionary, not "estopping," purpose. As the Pennsylvania Superior Court described the "subject to" clause:

> Although such reference [i.e. 'subject to'] does not impose new restrictions on the land, it nonetheless serves a very necessary and desirable purpose for the grantor. When property is conveyed by warranty deeds... it is in the interest of the grantors that the conveyance be made subject to every restriction or encumbrance which not only does apply to such property but also *may* apply. The inclusion of restrictions in the 'subject to' clause may thus express a wise precaution on the part of the grantor. It would indeed be foolhardy for a grantor who is delivering a warranty deed to fail to refer to a restriction which may at some time in the future be held to apply to his property, merely to avoid the criticism of excess wordiness. Thus, it is not unusual for conveyances to be made subject to all recorded covenants, easements and restrictions, without specific enumeration. . . .

*Burns v. Baumgardner*, 449 A.2d 590, 593 (Pa. Super. 1982) (quoting *Smith v. Second Church of Christ, Scientist*, 351 P.2d 1104, 1109 (Ariz. 1960)) (italics in original) (citations omitted). Thus, that the 1920 CPLC general warranty deed to the PGC states that the property is "subject to" the 1894 reservation is not binding on the PGC. Nor does the provision operate to undo the effect of the 1908 tax sale on the 1894 reservation or "revive" that reservation as to the property conveyed.

Also, any claim by the Proctor Trusts that the title-washed 1894 Proctor reservation was somehow "revived" via estoppel would run afoul of the rule against reservations in favor of strangers to the conveyance. That rule was affirmed by the Commonwealth Court in *Re Condemnation by County of Allegheny of Certain Coal,*

*Oil, Gas, Limestone, Mineral Properties*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998) ("We agree that the common law rule is that generally a reservation/exception of rights in a stranger to a deed is ineffective to transfer any interests to the stranger.")

The Proctor Trusts also pull statements from the PGC titles that are out of context and argue they somehow show "proof" that the PGC did not acquire the subsurface interests in the Josiah Haines Warrant. *See* Proctor Trust's Brief at 21. These are not competent evidence regarding title in the Josiah Haines Warrant. It was the intention and practice of the PGC to acquire all interests of their grantors, indicating that any rights which had passed to CPLC were to be granted to the PGC. *See* Proctor Trusts Ex 49 (Letter from Potter to Seth E. Gordon, Jan. 11, 1921, title to be vested in CPLC in fee simple); *See* the Declaration of Martha Smith, PGC Ex. C.

**F.    The Proctor Trusts' Estoppel Arguments As To CPLC Fail As A Matter Of Law.**

Relying on *Powell v. Lantzy*, the Proctor Trusts' final argument is CPLC cannot benefit from title acquired upon neglect of a duty to report or pay taxes. There is, however, no evidence that CPLC failed any reporting duty or reported "falsely". With respect to paying taxes, CPLC was not obligated to pay tax on unseated land, as the tax was imposed on land itself. *See Proctor*, 166 F. Supp. at 479 (citing *Powell*).

## IV.   CONCLUSION.

For the reasons herein, the Proctor Trusts' motion for partial summary judgment must be denied.  Partial summary judgment should, instead, be granted to the PGC for the reasons set forth in the PGC's separately-filed motion for partial summary judgment.

Respectfully submitted,

PENNSYLVANIA GAME COMMISSION

DATE:  July 2, 2018

s/Bradley C. Bechtel
Bradley C. Bechtel, Chief Counsel
PA No. 49681
W. Creigh Martson, Assistant Counsel
PA No. 94759
2001 Elmerton Ave.
Harrisburg, PA 17110-9797
(717) 783-6530
brbechtel@pa.gov
wmartson@pa.gov
*Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's May 4, 2018 Order, I hereby certify that this Brief contains less than 10,000 words as calculated by the word count feature on the word processing program used to prepare this Brief and, therefore, complies with the Court's May 4, 2018 Order.

s/Bradley C. Bechtel
Bradley C. Bechtel

## **CERTIFICATE OF SERVICE**

I certify that on July 2, 2018, I filed the attached document with the Court's ECF system such that all counsel of record will be served automatically.

s/Bradley C. Bechtel
Bradley C. Bechtel