# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION | : CIVIL ACTION – LAW :  : CASE NO. 1:12-CV-1567 |
| Plaintiff, | : |
| | : JUDGE: Christopher C. Conner |
| v. | : |
| THOMAS E. PROCTOR HEIRS TRUST and the MARGARET O.F. PROCTOR TRUST, | : : |
| Defendants. | : : |
| | : [Electronically Filed] |

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Bradley C. Bechtel, Chief Counsel
PA No. 49681
W. Creigh Martson, Assistant Counsel
PA No. 94759
PENNSYLVANIA GAME COMMISSION
2001 Elmerton Ave.
Harrisburg, PA 17110-9797
(717) 783-6530
brbechtel@pa.gov
wmartson@pa.gov
*Attorneys for Plaintiff*

July 2, 2018

# **TABLE OF CONTENTS**

I.    Introduction………………………………………………………………………1

II.   Factual and Procedural History..........................................................................2

III.  Issues Presented…………………………………………………………….…...6

IV.   Law and Discussion………………………………………………………….…6

    A.    Summary Judgment Standard…………………………………………...6

    B.    The Commission is Entitled to Partial Summary Judgment………….7

V.    Conclusion…………………………………………………………………….15

Attachments – Cited Unpublished Decisions

# **TABLE OF AUTHORITIES**

## Federal Cases:

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006)………………7

*Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002)……………………...7

*Jones v. UPS*, 214 F.3d 402 (3d Cir. 2000)……………………………………….7

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993)……………………………………………………………………...……7

*Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959)……………………………………………………..11

*Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir. 1989)……..……...7

## State Cases:

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016)…………..6, 8-15

*Kaiser Energy, Inc. v. Com., Dep't of Envtl. Res.*, 535 A.2d 1255 (Pa. Cmwlth. 1988)……………………………………………………………………………7

*Morton v. Harris*, 9 Watts 319 (Pa. 1840)………………….…………………..11

*Woodhouse Hunting Club, Inc. v. Hoyt*, 2018 Pa. Super. LEXIS 287 (Pa. Super. March 29, 2018)…………………………………………………….………..7

## Statutes & Rules:

72 P.S. § 6091………………………………………………..….………………15

Act of 1804, April 3, P.L. 517, 4 Sm. L. 201……………….....……………9, 11-12

Act of 1806, March 28, P.L. 644, 4 Sm. L. 346………………………..9, 10, 12-13

Act of 1815, March 13, P.L. 177, 6 Sm. L. 299…………………………9, 11-12, 14

Act of 1947, July 7, P.L. 1368, No. 542, 72 P.S. § 5860.801……………………….12

Fed. R. Civ. P. 56(c)……………………………………………………….…1, 6-7

I. **<u>Introduction.</u>**

This is an action by the Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Commission") against the Thomas E. Proctor Heirs Trust and Margaret O.F. Proctor Trust (the "Proctor Trusts") to quiet title relief with respect to oil, gas, and minerals in, on and under properties comprising State Game Lands No. 12, 13, and 36 in Bradford County and Sullivan County. The Proctor Trusts have filed counterclaims against the Commission, wherein they seek similar relief. The parties have stipulated as to the dozens of properties encompassed in the present litigation for which they seek resolution as to the ownership of the oil, gas and mineral rights. *See* Stipulation (Doc. No. 89).

On April 17, 2018, the Proctor Trusts, given the number of properties involved, filed a motion for partial summary judgment as to one "bellwether," or test case, property, the Josiah Haines Warrant (the "Property"), asking that the Court quiet title in their favor. *See* Proctor Trusts' Motion (Doc. No. 94). The Commission, by its motion, likewise seeks summary judgment in its favor with respect to the Property (and what is a test case that will establish the law of the case for the remaining properties involved in the litigation). *See* Commission's Motion (Doc. No. 123).[1]

---

[1] The Commission has separately responded in opposition to the Proctor Trusts' motion for partial summary judgment. *See* Commission's Response (Doc. Nos. 119-122).

The Commission, which acquired the Property in 1920, asserts, for the reasons herein, that it owns in fee simple and possesses, including, but not limited to, the surface estate and the oil, gas, and minerals in, on and under the Property. It seeks to quiet title to the oil, gas, and minerals in, on and under the Property to remove any cloud on its title to the Property that has been created by the Proctor Trusts' actions.

## II. Factual and Procedural History.[2]

### A. Pertinent Facts.

The Property is approximately 407.75 acres of land, being all of the Josiah Haines Warrant situated in Leroy Township, Bradford County, Pennsylvania. SMF at ¶ 1. The Property is a portion of the lands described in a deed, dated December 14, 1920, from the Central Pennsylvania Lumber Company to the Commission, recorded in Book 342, Page 376, in the official records of the Office of Recorder of Deeds of Bradford County. SMF at ¶ 2.

As set forth in the Oil, Gas and Mineral Title Opinion submitted by the Commission's expert, Jay Wilkinson of Wilkinson Law LLP, the history of the Commission's title of the Property is as follows:

---

[2] References to "SMF" are to the Commission's Statement of Material Facts in Support of Motion for Partial Summary Judgment. Documents referenced in the SMF and this brief are contained in: (1) the separate Appendix to the Commission's Statement of Material Facts; or (2) in appendix filed with the Proctor Trusts' pending motion for partial summary judgment.

- The early title in and to the Property traces via mesne conveyances from the Commonwealth of Pennsylvania to Robert Barclay of London England and then via specific devise in his will to his son Charles Barclay.

- By deed, dated October 5, 1853, Charles Barclay conveys a large tract of land containing over 20,000 acres, including the Property, to Edward Overton, *et al*.

- By a series of deeds, in April of 1854 Edward Overton, *et al*., convey partial interests, (1/40 interests) in the Property and other lands to various parties.

- By deed, dated April 20,1855, Edward Overton et al convey a large tract of land containing over 18,000 acres, including the Property, to Charles W. Beresford.

- By deed, dated April 21, 1855, Charles W. Beresford conveys the same large tract of land containing over 18,000 acres, including the Property, to Joseph Oat, *et al*., trustees for "The Schrader Land Company".

- By deed, dated March 2, 1868, the trustees for the Schrader Land Company convey the same large tract of land containing over 18,000 acres, including the Property, to the Schrader Mining and Manufacturing Co.

- By deed, dated June 5, 1893, the Schrader Mining and Manufacturing Co. conveys a large tract of land containing over 15,000 acres, including the Property, to Thomas E. Proctor and Jonathan A. Hill.

- By deed, dated October 27, 1894, Thomas E. Proctor and Jonathan E. Hill, joined by their spouses, convey a large tract of land stated to contain 14,200 Acres, including the Property, to the Union Tanning Company, reserving the oil, gas and minerals from the surface and reserving the oil, gas and mineral estate for themselves, their heirs and assigns (the "Proctor Reservation").

- By deed, dated May 25, 1903, the Union Tanning Company conveys the surface of a large tract of land, stated to contain 16,350.3 Acres, including the Property, to the Central Pennsylvania Lumber Company

- By Treasurer deed, dated June 8, 1908, A.C. Blackwell the Deputy Treasurer of Bradford County conveys the Property described as "410 Acres of unseated

3

land in Leroy Township, assessed in the warrantee name of Josiah Haines" to Calvin H. McCauley, Jr.

- By deed, dated December 6, 1910, Calvin H. McCauley, Jr. and wife, Florence M. McCauley convey 45 tracts of land, including the Property, to the Central Pennsylvania Lumber Company.

- By deed, dated December 14, 1920, the Central Pennsylvania Lumber Company conveys a tract of land stated to contain 7,492.9 Acres, including the Property, to the Commonwealth of Pennsylvania.

SMF at ¶¶ 3 – 14.

Despite the Proctor Reservation, neither Thomas E. Proctor nor his successors had the oil, gas and minerals separately assessed for tax purposes. SMF at ¶ 15.

As reflected in the foregoing title history, the Property was exposed to tax sale in 1908. SMF at ¶¶ 12 and 17 – 18. At the time of the tax sale, the Property was classified as "unseated" land by the officials of Bradford County for tax purposes. SMF at ¶ 16. Central Pennsylvania Lumber Company did not pay the taxes due and owing against the Property in 1907 and the Property was, thus, advertised to be sold, pursuant to the then-applicable statute, on the second Monday in June of the following year – June 8, 1908. SMF at ¶ 17.

The Property was purchased at the June 8, 1908 tax sale by Calvin H. McCauley, Jr. SMF at ¶ 12. On December 17, 1908, the Treasurer's deed for the tax sale of the Property to McCauley was acknowledged by A.C. Blackwell, the Deputy Treasurer of Bradford County, in open court. SMF at ¶ 18. On December

4

6, 1910, more than two years after his purchase of the Property, McCauley, along with his wife, conveyed the Property and other lands to Central Pennsylvania Lumber Company. SMF at ¶ 19.

Graphically, the Commission's chain of title is as follows:



**B.    Procedural History.**

The Commission commenced this action on August 12, 2012 (Doc 1). The pleadings are now closed (Doc. 86). In March 2015, the case was stayed on joint

5

motion of the parties pending the Pennsylvania Supreme Court's decision in *Herder Spring Hunting Club v. Keller*, which was issued in July 2016. *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016) (Doc. 47). The stay was lifted in October 2016 (Doc. No. 81) and, thereafter, the parties stipulated to the properties at issue in the litigation (Doc. No. 89). The Proctor Trusts filed their motion for partial summary judgment on April 17, 2018 (Doc. No. 94), to which the Commission responded on July 2, 2018 (Doc Nos. 119-122). The Commission filed its motion for partial summary judgment on July 2, 2018 (Doc. No. 123). All discovery and all other case management deadlines are stayed pending the final resolution of the Proctor Trusts' motion for partial summary judgment (and, presumably, the Commission's motion for partial summary judgment) (Doc. No. 115).

### III. <u>Issues Presented.</u>

A. Whether the Court should quiet title in the Property in favor of the Commission and declare that the Commission owns in fee simple and possesses, including, but not limited to, the surface estate and the oil, gas, and minerals in, on and under the Property? [Suggested answer: Yes.]

### IV. <u>Law and Discussion.</u>

A. **Summary Judgment Standard.**

6

A court may grant summary judgment when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Allegations made without evidentiary support may be disregarded. *See Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). "Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002). Hearsay testimony contained in affidavits or statements that would be inadmissible at trial may not be included in an affidavit to oppose summary judgment. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Comp.*, 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

**B.   The Commission is Entitled to Partial Summary Judgment.**

The Commission is entitled to summary judgment because, it has established superior title to the oil, gas and mineral rights in the Property by a fair preponderance of the evidence. *See Kaiser Energy, Inc. v. Com., Dep't of Envtl. Res.*, 535 A.2d

7

1255, 1257-59 (Pa. Cmwlth. 1988); *Woodhouse Hunting Club, Inc. v. Hoyt*, 2018 Pa. Super. LEXIS 287 (Pa. Super. March 29, 2018).

The record and applicable case law demonstrates that the Proctor Reservation has been extinguished by 1908 tax sale and that the Proctor Trusts have been divested of any interest in the oil, gas, and minerals in the Property. Because there are no issues of material fact related to the effect of the 1908 tax sale to extinguish the Proctor Reservation, the Commission is entitled to summary judgment in its favor as a matter of law.

### 1. The Doctrine of "Title Washing".

Prior to 1947, land was generally assessed as "seated" or "unseated." "Seated land" was land that had been developed or improved land where as "unseated land" was wild and undeveloped. *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 363-64 (Pa. 2016). The determination of whether land was seated or unseated land was entirely based upon the "eye of the assessor," who would traverse the county determining whether land was being developed and then "return" the land to the county commissioners to assess the property for taxation. *Id*. at 364.

The classification of land as "seated" or "unseated" had tax consequences. *Id*. If the assessor determined that the land was seated, the land was taxed to the landowner, who was personally responsible for the payment of the taxes which could be collected against the landowner's personal property. *Id*. The owner of unseated

8

land, however, was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original warrant had been issued. *Id*.

The concept known as "title washing" effectively began with the Act of April 3, 1804, entitled "An Act Directing the Mode of Selling Unseated Lands for Taxes," which established the pertinent statutory framework for the assessment, taxation and tax sales of unseated lands. *See* Act of 1804, April 3, P.L. 517, 4 Sm. L. 201 (the "1804 Act"). *See also Herder Spring*, 143 A.3d at 366.

The 1804 Act, as supplemented by the Act of 1815 (*see infra*), provided that the sale of unseated land conducted pursuant to the Act vested in the purchaser of the lands sold all the estate and interest of the property – *i.e.*, the tax sale extinguished all previous titles and excluded all other claimants to the land of a prior date. *See* 1804 Act, at § 5. *See also Herder Spring*, 143 A.3d at 366-67.

In 1806, the General Assembly passed an act entitled "A Supplement to the Act, Entitled, 'An Act Enjoining Certain Duties, on the Holders of Warrants Not Executed, and on the Holders of Unseated Lands,'" which set forth a reporting requirement for those who acquired unseated lands. *See* Act of 1806, March 28, P.L. 644, 4 Sm. L. 346 (the "1806 Act"). *See also Herder Spring*, 143 A.3d at 367.

The 1806 Act provided that it was "the duty of every holder of unseated lands" to provide the county commissioners with a signed statement describing the tract of

land and "the name of the persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title." 1806 Act, § 1. To address future transfers, the 1806 Act provided:

> [I]t shall be the duty of every person thereafter becoming a holder of unseated land, by gift, grant, or other conveyance to furnish a like statement, together with the date of the conveyance to such holder, and the name of the grantor, with in one year, from and after such conveyance.

*Id.* *See also Herder Spring*, 143 A.3d at 368.

The 1806 Act did not impose any duty on county commissioners to obtain information regarding unseated land or to search through deed books to discover whether lands had changed hands or whether a severance of surface and subsurface rights had occurred. *See Herder Spring*, 143 A.3d at 369-370.

Because assessors treated unseated lands entirely in reference to the original warrants rather than the current owners when not otherwise directed, a failure to report a severance would have the practical effect of having the property continually assessed and taxed as a whole, "given that the assessors were not required to determine sometimes elusive current ownership." *See Herder Spring*, 143 A.3d at 370.

Consequently, if a severance was never reported, a subsequent treasurer's tax sale would effectively "wash" the title of the severance and vest the tax sale purchaser with all right, title and interest in both the surface and the subsurface

rights, as if the severance had never occurred. *See Herder Spring*, 143 A.3d at 366-67; *Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 470-71 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959).

The General Assembly, in 1815, amended the 1804 Act by, *inter alia*, amending the timing of, and public notice requirements for, tax sales of unseated lands, lowering the burden of proof regarding the procedural regularity of tax sales, and establishing a two-year period during which the owner of unseated land sold for taxes could redeem the land (i.e., nullify the tax sale) by payment of the taxes, costs and penalties. *See* Act of 1815, March 13, P.L. 177, 6 Sm.L. 299 (the "1815 Act").

Following the 1815 Act, tax sales of unseated land were presumed to be rightly done. *See Herder Spring*, 143 A.3d at 365. The purchaser needed only to prove that "the land was unseated, and that a tax was charged by the commissioners, regularly or irregularly[, and] that the tax was unpaid and the land sole and not redeemed within two years." *Id*. (citing *Morton v. Harris*, 9 Watts 319, 324 (Pa. 1840)).

Further, to protect delinquent owners, the General Assembly provided a two-year redemption prior; however, after that two-year redemption period, the 1815 Act specified:

> In no other case and on no other plea, shall an action be sustained . . . [and] no alleged irregularity in the assessment or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.

11

*Herder Spring*, 143 A.3d at 466, quoting 1815 Act, § 4.

The 1806 and 1815 Act, which amended the 1804 Act, were repealed in large part in 1947. *See* Act of 1947, July 7, P.L. 1368, No. 542, 72 P.S. § 5860.801. Nevertheless, the Acts were in force during the 1908 tax sale at issue in this case. *See Herder Spring*, 143 A.3d 365 n.8. Importantly, countless sales of "unseated" lands have been conducted in Pennsylvania pursuant to the 1804, 1806 and 1815 Acts, and such tax sales have been held to convey good and legal title recognized throughout Pennsylvania. *See Herder Spring*, 143 A.3d at 368.

### 2. Effect of the 1908 Tax Sales on the Proctor Reservation.

Pursuant to the Pennsylvania Supreme Court's decision in *Herder Spring*, which upheld the practice of "title washing" of unseated, or unimproved, land in Pennsylvania, the Proctor Reservation was divested by the 1908 tax sales due to the failure of Thomas E. Proctor or his successors to have the oil and gas estate separately assessed.

The Proctor Trusts, from their filings in this case, apparently dispute what effect, if any, the 1908 tax sale had on the subsurface rights in the Property that had previously been excepted and reserved in the Proctor Reservation. The effect of the 1908 tax sale is not a factual issue, but a legal one for this Court to decide.

The public records establish that when the 1908 tax sale occurred, the Property was assessed and taxed as unseated. While the Proctor Trusts may deny that the tax

12

sale had any effect on their subsurface interests, the case law is clear that the 1908 tax sale extinguished the Proctor Reservation in the Property and divested the Proctor Trusts' predecessors in title of any interest they may have had in the oil, gas, and minerals in, on and under the subject portions of the Property. Although the subsurface rights in the Property may have been severed from the surface estate via the Proctor Reservation, those rights were <u>not</u> separately assessed by the county commissioners and there are no facts in evidence that the Proctors' forebearers reported the severed interest in the Property. There is no evidence establishing that the Proctor Trusts' predecessors in title ever requested that the county commissioners separately assess the severed subsurface rights in and under the Property prior to the 1908 tax sale. There is no evidence establishing that the county commissioners ever assessed the subsurface rights in and under the Property separately from the surface estate prior to the 1908 tax sale. Further, though the 1806 Act did not, according to *Herder Spring*, require that the Proctor Trusts' predecessors in title report the severance, their failure to report the severance ultimately caused the land to be continually taxes and assessed as a whole, and consequently, sold as a whole. *See Herder Spring*, 143 A.3d at 370.

Thus, the failure of the Proctor Trusts' predecessors in title to report ownership of the subsurface rights in the Property to the county commissioners

13

extinguished the Proctor Reservation and the allowed the entire estate to be sold in the 1908 tax sale.

Further, there is a presumption that a tax sale involving unseated land was "done rightly." *Herder Spring*, 143 A.3d at 365. There is no record of any challenge to the 1908 tax sale and, further, no record of any attempt to redeem the land sold. Per the 1815 Act, the Proctor Trusts' predecessors in title had only two years from the date that title from the 1908 tax was delivered by the Treasurer of Bradford County to make known their claim. *See Herder Spring*, 143 A.3d at 366. The two-year redemption statute provided that, once the redemption period had passed, no alleged irregularity in the assessment or in the process would be construed or taken to affect the title of the purchaser, but that title would be declared good and legal. *See Herder Spring*, 143 A.3d at 366; 72 P.S. § 6091. Thus, title to the Property, including the subsurface rights, which were acquired at the 1908 tax sale, and which went unchallenged for over a century, remains valid and effective.

Additionally, the subsequent conveyances beginning with Calvin H. McCauley, Jr. to Central Pennsylvania Lumber Company in 1910 and continuing through to the Commission in 1920 were also valid and effective. Any interest the Proctor Trusts had in the subsurface of the Property through the Proctor Reservation has been extinguished by the 1908 tax sales.

14

The Commission, for all of the foregoing reasons, has superior title to the oil, gas and minerals in, on and under the Property.

## V. Conclusion.

For the reasons above, the Commission respectfully requests that the Court grant its motion and enter partial summary judgment in its favor.

                                        Respectfully submitted,

                                        PENNSYLVANIA GAME COMMISSION

DATE: July 2, 2018                s/Bradley C. Bechtel
                                        Bradley C. Bechtel, Chief Counsel
                                        PA No. 49681
                                        W. Creigh Martson, Assistant Counsel
                                        PA No. 94759
                                        2001 Elmerton Ave.
                                        Harrisburg, PA 17110-9797
                                        (717) 783-6530
                                        brbechtel@pa.gov
                                        wmartson@pa.gov
                                        *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.8(b)(2), I hereby certify that this Brief contains less than 5,000 words as calculated by the word count feature on the word processing program used to prepare this Brief and, therefore, complies with L.R. 7.8(b)(2).

s/Bradley C. Bechtel<br>
Bradley C. Bechtel

## CERTIFICATE OF SERVICE

I certify that on July 2, 2018, I filed the attached document with the Court's ECF system such that all counsel of record will be served automatically.

s/Bradley C. Bechtel<br>
Bradley C. Bechtel