# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,

     Plaintiff,

    v.

THOMAS E. PROCTOR HEIRS TRUST and
the MARGARET O.F. PROCTOR TRUST,

     Defendants.

Case No. 1:12-CV-1567

Chief Judge Conner /
Chief Magistrate Judge Schwab

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Paul K. Stockman (admitted *pro hac vice*)
  Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

Laura A. Lange
  Pa. ID No. 310733
MCGUIREWOODS LLP
260 Forbes Avenue, Suite 1800
Pittsburgh, PA  15222
llange@mcguirewoods.com

August 3, 2018

# TABLE OF CONTENTS

Table of Contents ..............................................................................................i

Table of Authorities ......................................................................................iii

Introduction and Summary: ...........................................................................1

Factual Background: .......................................................................................6

    I.     Thomas E. Proctor's Interest in the Property. ......................................6

    II.    Conveyance of the Property from Proctor and Hill to Union Tanning. ..............................................................................................7

    III.   CPLC's Acquisition of and Extraction of Resources from the Property. ..............................................................................................8

    IV.   Calvin H. McCauley, Jr.'s 1908 Tax Sale "Purchase" of the Property. ..............................................................................................9

    V.    PGC's Acquisition of the Property. ...................................................11

Argument:  The PGC's Motion for Partial Summary Judgment Lacks Merit. .......13

    I.     Under the Act of 1806, Only a Person "Becoming" a Holder of Unseated Lands Was Required to Report It for Taxation; Once a Severance or Partial Transfer Is Reported, the Separate Estates Must Be Assessed and Taxed Separately. .............................13

    II.    The Evidence Demonstrates that the 1908 Tax Sale Did Not Affect the Proctor Interests, Because the Severed Proctor Subsurface Estate Was Properly Reported. ........................................15

Conclusion: ...................................................................................................18

Certificate of Compliance: ...........................................................................19

Certificate of Service: ...................................................................................19

i

# TABLE OF AUTHORITIES

**Cases:**

*Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Tr.*,
    158 A.3d 148 (Pa. Super. 2017) ......................................................................5

*F.H. Rockwell & Co. v. Warren County*, 77 A. 665 (Pa. 1910) .............................14

*Herder Spring Hunting Club v. Keller*,
    143 A.3d 358 (Pa. 2016)........................................................1, 3, 4, 13, 14, 15

*Independent Oil & Gas Ass'n v. Bd. of Assessment Appeals*,
    814 A.2d 180 (Pa. 2002)...............................................................................13

*Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898) ......................................................6, 17

*Wilson v. A. Cook Sons Co.*, 148 A. 63 (Pa. 1929)..................................................14

**Statutes and Court Rules:**

Act of March 28, 1806, P.L. 644 .......................................................................6, 13

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**Introduction and Summary:**

Reduced to its essentials, the PGC's[1] motion for partial summary judgment rests solely, and incompletely, upon the fact that the Property was subject to a tax sale in 1908. That tax sale, the PGC contend, is *ipso facto* sufficient to divest Thomas E. Proctor's and Jonathan A. Hill's prior exception and reservation of the subsurface oil, gas and mineral interests.

This argument rests upon a misunderstanding of governing law, as stated in more than 200 years of binding precedent, and reflects a fatally incomplete view of the evidence. Simply put, a talismanic invocation of *Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016), will not suffice.

Initially, this Court can quickly dispose of the PGC's motion because the chain of title upon which the PGC relies shows that the Trusts retain all right, title and interest in the subsurface estate. Following the 1908 tax sales, CPLC explicitly recognized Thomas E. Proctor's reservation of the subsurface estate in the deed conveying the Property to the PGC. Under well-recognized Pennsylvania precedent, reaffirmed in *Herder Spring*, these admissions by CPLC bar its successor, the PGC, from claiming an interest in the subsurface estate.

Beyond that, the PGC's claim defies common sense. In order to adopt its position, the Court has to assume all of the following:

---

[1] Defined terms here have the same meanings given them in the Trusts' initial brief.

1

- that Proctor and Hill did not report their interests to the Bradford County taxing authorities;

- that Union Tanning did not report its interest in the surface estate;

- that CPLC did not report its interest in the surface estate;

- that Bradford County would assess reported severed subsurface estates absent any basis to value such an estate, even though that exercise was forbidden under the law as it was in effect at the time;

- that CPLC inadvertently allowed hundreds of its properties – its only assets – to go to tax sales over a period of twelve years;

- that Calvin H. McCauley, Jr., CPLC's officer, real estate agent, and attorney, purchased all of these properties on his own accord (purportedly in the hopes of obtaining the Proctor subsurface); and

- that CPLC believed it obtained the Proctor subsurface from McCauley, but clearly and expressly stated just the opposite when it later conveyed the surface estates explicitly subject to the Proctor reservation.

In short, the Court must presume that one of America's largest industrial companies,[2] and its subsidiaries and founding family, were fundamentally incompetent at some of the most basic property management tasks, and lackadaisically allowed their principal assets to be lost for non-payment of taxes.

---

[2] The U.S. Leather Company was one of the original companies comprising the Dow Jones Industrial Index.

2

Such speculation requires the Court to abdicate its basic sensibilities, and more importantly is contradicted by the evidence at every turn:

**First**, the evidence shows that the interest excepted and reserved by Proctor and Hill in the October 1894 deed was reported to Bradford County:

- Bradford County records reflect that Proctor and Hill paid the taxes on the properties subject to the Union Tanning Deed;

- Bradford County records reflect that Proctor & Hill were assessed for coal operations on the *seated* list in 1903;

- Contemporaneous testimony from Proctor's attorney in 1905 stated that Proctor's interests were reported;

- Neighboring county records show that these reports referred to the underlying deed (which in Lycoming County specifically referred to all mineral rights reserved in "Recorders Office of Lycoming County in Deed Book 144 page 398");

- Neighboring county records also show that the Proctor subsurface estate was assessed for properties in townships where there was actual development of subsurface rights in the area, and thus a basis to derive an assessed value; and

- Contemporaneous business records demonstrate that the Proctor estate monitored and paid all taxes assessed against the estate's severed subsurface rights.

The law, as reiterated in *Herder Spring*, only requires ***reporting*** of an owner's interest in order to protect it from a "wash" sale. 143 A.3d at 360. The

3

fact that there was "no evidence" of reporting in ***that case*** does ***not*** mean that there is an irrefutable presumption to that effect in every other case.  Nor is there anything in *Herder Spring* to require a separate assessment of subsurface rights in order to preserve those rights, so long as those interests were reported when their owners "became" holders of unseated property.  Put otherwise, because the evidence establishes that the Proctor and Hill interest was reported to Bradford County officials, the PGC cannot claim title to the subsurface via the tax sales.

**Second**, all contemporaneous parties – including the PGC – understood (and acknowledged) that the 1908 tax sale had no impact on the subsurface estate:

- CPLC sold and the PGC purchased the surface, expressly subject to the Proctor subsurface reservation, ***after*** the tax sale;

- Between 1907 and 1921, James Proctor, one of Thomas E. Proctor's sons and a trustee of his testamentary trust, corresponded directly with CPLC (and McCauley in particular) regarding the Proctor subsurface estate, after it purportedly was lost to tax sale and acquired by McCauley; and

- In 1920, McCauley and CPLC attempted to purchase coal rights associated with Bradford County property that had gone through a 1908 tax sale and McCauley purchase.

Thus, CPLC, McCauley, the Proctor heirs, ***and the PGC*** all recognized that the 1908 tax sale had no impact on the Proctor subsurface estate.  Only modern players, whose predecessors expressly disclaimed any ownership of the Proctor

4

interest, seek to go back more than 100 years, rewrite history, and claim that the 1908 tax sales allowed CPLC to steal the Proctor subsurface estate.

**Third**, the evidence is clear that CPLC and McCauley orchestrated the tax sales for some corporate purpose ***other than*** expropriation of previously-reserved subsurface interests. From 1904 through 1916, CPLC let many of its properties go to tax sales, at which they were purchased by McCauley, and McCauley then quitclaimed them back to CPLC for nominal consideration. Throughout this time, McCauley was a real estate agent, officer and attorney for CPLC. He was responsible for keeping track of all of CPLC's properties, transactions and tax payments. His purchase at the tax sales thus operated as a redemption under governing law, returning the property to the *status quo ante*. CPLC knew this at the time and even cited the principle in its arguments before the Pennsylvania Supreme Court in 1907. Simply put, neither McCauley nor CPLC were attempting to acquire the Proctor subsurface estate. If that were the case, they would not have recognized and reiterated the Proctor reservation in subsequent deeds; nor, if CPLC had acquired the subsurface, would CPLC and McCauley have negotiated with the Proctor heirs regarding those same rights, rights that they purportedly already owned.

Furthermore, the Court need not even wade into the details of "unseated" land taxation in order to deny summary judgment, because contemporaneous records demonstrate that the lands at issue were in fact "seated" by the production of timber and tanbark from 1903 through 1909. As the Superior Court reiterated just last year, an "unseated" tax sale of land that was in fact "seated" is void, and

5

does not change the underlying title.  *See Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Tr.*, 158 A.3d 148, 160 (Pa. Super. 2017).

Finally, every legal and equitable principle that can apply to this case commands that CPLC and its successors cannot obtain title to the Proctor subsurface estate.  CPLC had the duty to report its interest in the surface only. CPLC had the duty to pay the taxes.  "[O]ne cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty…."  *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898).  Consequently, if the tax sales at issue could convey previously-severed subsurface rights, that would reward deliberate non-compliance with legal obligations and punish innocent landowners who followed the law.

For these reasons, the Court should deny the PGC's motion for partial summary judgment.

**Factual Background:**

## I.    Thomas E. Proctor's Interest in the Property.

Thomas E. Proctor and Jonathan A. Hill acquired the Josiah Haines Warrant (the "Property") in fee in June 1893 from Schrader Mining & Manufacturing Co. ¶¶4-5. [3]  Upon acquiring the Property, Mr. Proctor – following his routine practice – notified the Bradford County Commissioners of his acquisition, as required by the Act of March 28, 1806, P.L. 644.  ¶¶6-7; *see also* ¶12.  County and township

---

[3] Paragraph references without further attribution are to the Proctor Trusts' Statement of Undisputed Material Facts (ECF No. 95), and exhibit references without further attribution are to the accompanying Appendix (ECF Nos. 96-110).

6

assessment records show as much, ¶6.a-c, and there was detailed testimony in a subsequent case, *Gamble & Green v. CPLC,* about Mr. Proctor's and USLC subsidiaries' business practices, ¶6.d.[4]  For example, Mr. Proctor's attorney B.S. Bentley testified that he looked after Mr. Proctor's unseated lands, and dealt personally with county treasurers to ensure that lands were properly enrolled. ¶6.d(4)-(6).

## II.    Conveyance of the Property from Proctor and Hill to Union Tanning.

In October 1894, Messrs. Proctor and Hill and their wives conveyed certain interests in the Property to USLC subsidiary Union Tanning Company, excepting and reserving "all the minerals, coal, oil, gas, or petroleum."  ¶¶8-9.

Union Tanning followed its routine practice and notified the Bradford County Commissioners that it had acquired rights in the Property, as confirmed by assessment records and as discussed in testimony in *Gamble & Green*.  ¶¶10; *see also* ¶¶6-7, 12, 16.  There is no evidence that Union Tanning incorrectly reported that it owned all of the Property's estates, including the subsurface.  ¶11.

Indeed, the Commonwealth stipulated, in another case, that the Proctor subsurface reservation was properly reported to Lycoming County officials, ¶12, and assessment records at the time (in townships where there was production that provided a basis for assessment) show separate assessments of the Proctor heirs'

---

[4] Because no notices (from anyone, for any tract) can be located in the office of the Recorder of Deeds, the Bradford County Historical Society or the Pennsylvania State Archives, *see* ¶7.d, and because the PGC's own records and County assessment records demonstrate that the PGC provided such notices, *see* ¶7.a-c, the only inference is that these notices were discarded after the information was recorded.

subsurface estate, *see* Response to Statement of Undisputed Material Facts ("RSOF") (ECF No. 129), ¶56.

### III.    CPLC's Acquisition of and Extraction of Resources from the Property.

In May 1903, Union Tanning conveyed its interest in the Property to CPLC. ¶13.  That deed reserved to Union Tanning, for 25 years, the rights to bark on the Property.  ¶14.  It also stated that it conveyed an estate "no greater than is now held and owned by the Union Tanning Company," and was "subject to all the exceptions, reservations, covenants, stipulations, agreements and conditions continued in the recent deeds hereinbefore recited, and subject also to all the exceptions, reservations, covenants, stipulations, agreements and conditions… stated" in the specifically-identified deed from Proctor and Hill.  ¶15.

Again, Bradford County records show that CPLC notified the county commissioners of its acquisition, and paid taxes assessed against the Property. ¶16; *see also* ¶¶6-7, 10, 12.  This was consistent with its routine practice of actively managing tax assessments and payments related to its land holdings (as shown in court proceedings).  ¶16.d; *see also* ¶6.d.  Indeed, in connection with the PGC's purchase of similar tracts, CPLC's president swore that CPLC "regularly and continuously paid all taxes assessed and payable" upon the tract at issue. ¶16.e.  There is no evidence that CPLC incorrectly reported that it owned all estates associated with the Property, including the severed subsurface estate.  ¶17.

Thereafter, CPLC logged and peeled tanbark from the Property over the three-year period from 1905 to 1907, taking 1,405,200 net tons of bark and

189,500 feet of hemlock lumber.  ¶¶18-20.  Nonetheless, for 1907 Bradford

County incorrectly assessed CPLC's interest in the Property as "unseated."  ¶21.

## IV.    Calvin H. McCauley, Jr.'s 1908 Tax Sale "Purchase" of the Property.

Despite CPLC's active management of its land holdings, it did not pay 1907

taxes on the Property (and other of its holdings),[5] and on June 8, 1908 the Property

was sold at tax sale.  ¶¶22-23.  The only advance notice of the tax sale given to any

persons claiming an interest in the tract was newspaper advertisements that did not

identify current or former owners.  ¶24.

At the June 1908 tax sale, the purchaser was Calvin H. McCauley, Jr.  ¶25.

At the time, McCauley was CPLC's agent and attorney.  He was CPLC's original

treasurer at its incorporation, ¶26.a-b, and thereafter served as "Real Estate Agent"

and "Assistant General Solicitor."  ¶26.c-.g, -.i, -.k, -.p-.r; *see also* ¶26.h, -.n, -.t.

McCauley also appeared as counsel for CPLC in several lawsuits related to

property tax matters.  ¶26.j, -.l-.m, -.o.  There is no evidence that McCauley ever

renounced his status as CPLC's agent prior to the 1908 tax sale.  ¶28.

This was not a "one-off": from 1904 to 1916, McCauley purchased more

than 100 CPLC tracts at tax sales, ¶27, plainly as CPLC's agent.  Indeed, in

November 1914, McCauley swore, as to his purchase of CPLC properties in Elk

County, that the consideration he paid "was and is the proper money of [CPLC],"

that "my name in the said deeds is used only in trust for it, the said [CPLC], its

---

[5] The reason for CPLC's pattern of non-payment, tax sale, and ensuing
reacquisition remains unclear, given CPLC's systematic management of its
properties.

successors and assigns, and for no other uses, trusts or purposes whatsoever," and that he would upon CPLC's request "assign by good and sufficient assignment the said deeds for the said premises, together with all my right, title and interest therein, free from all incumbrances." ¶ 26.o; Ex. 43.[6]

Following this "purchase," McCauley never recorded a treasurer's deed, ¶30, and two years later quitclaimed the Property (and 44 others) back to CPLC for the nominal price of $1. ¶31. This pattern of reconveyances led the PGC's own abstractors to conclude that McCauley was acting for CPLC. ¶26.s.

Any doubt as to CPLC's continued interest in the Property is dispelled by CPLC's actions when McCauley ostensibly "owned" the Property. During that time, CPLC acted as though it still owned the Property, paying property taxes, ¶32.a, and affirming in an identical context that it retained "exclusive possession" of its property from 1903 forward and that "possession thereof was never questioned, attacked or threatened by any one," ¶32.b.[7]

Following McCauley's "purchase" of the Property, it is clear that both he and CPLC understood that the tax sale had no impact on the Proctor subsurface. Between 1907 and 1921, McCauley corresponded with the Proctor estate regarding subsurface rights owned by the Proctor estate (even paying mineral rights taxes on the estate's behalf). RSOF ¶¶ 59-60, 61.g, -.i. Indeed, in 1920, McCauley had

---

[6] CPLC knew at the time that an agent's purchase at a tax sale did not convey a true title, and in fact constituted a redemption. ¶29.

[7] To conclude otherwise – that CPLC intended to regain ownership of the Proctor subsurface estate – is to assume that USLC entities intended to acquire surreptitiously property belonging to its founder's widow and children.

discussions with the Proctor estate about CPLC's potential purchase of the Proctor

mineral interests for the "Schrader Lands" in Bradford County, which **included the**

***Josiah Haines Warrant*** and other properties that also went through tax sales in

1908, and that were also purchased by McCauley and later quitclaimed back to

CPLC.   RSOF ¶60.   Clearly, McCauley would not have been party to those

discussions if he had acquired the subsurface rights and conveyed them to CPLC.

## V.    PGC's Acquisition of the Property.

After leasing the Property starting in 1916, ¶33, the PGC in March 1920

entered into a contract to purchase the Property (and other tracts) from CPLC, ¶34.

The contract for sale specifically:

> RESERV[ED] AND SAV[ED] unto Thomas E. Proctor
> and Jonathan A. Hill, their heirs and assigns, all the
> minerals, coal, oil gas or petroleum…, as fully as the said
> minerals and rights were excepted and reserved in deed
> dated Oct. 27, 1894 from Thomas E. Proctor et al to the
> Union Tanning Company…."

¶35.  It also provided that the ensuing deed "would be subject to all the

reservations, exceptions, covenants and stipulations" in the deeds from Proctor to

Union Tanning and from Union to CPLC.  ¶35.  The following month, CPLC's

directors approved the sale, authorizing execution of a deed containing "all

exceptions, reservations, covenants and stipulations," including the reservation in

favor of Proctor and Hill.  ¶36.

As agreed, CPLC conveyed 7,492.9 acres of land to the Commonwealth,

including the Property, by deed dated December 14, 1920.  ¶37.  The deed,

consistent with the sale agreement, provided that:

11

> This conveyance is made subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface of any or all of the lands above described… as fully as the said minerals and rights were excepted and reserved in deed dated Oct. 27, 1894 from Thomas E. Proctor et al to the Union Tanning Company, recorded in the office for recording deeds in Bradford County in deed book Vol. 205, page 436.

> Also subject to all the reservations, exceptions, covenants and stipulations contained in said recited deed from Thomas E. Proctor et al to the Union Tanning Company, and in deed from the Union Tanning Company to [CPLC], above recited, dated May 25, 1903, of record as aforesaid in deed book Vol. 251 page 520.

¶38.

The PGC's pre-closing title examination accepted that the Proctor subsurface estate reservation remained effective. ¶¶39-40, 43. This examination also conceded that the 1908 tax sale did not alter ownership, by requiring CPLC to prove the termination of pre-1908 contracts relating to the properties, ¶41-42, an unnecessary step if the tax sale extinguished prior rights. Similarly, in 1924 Elk Tanning Company, successor to Union Tanning, quitclaimed the 1903 reservation of bark rights, ¶45 – again, an unnecessary step if the tax sale extinguished prior reservations.

The Trusts, as the heirs of Thomas E. Proctor, ¶46, have succeeded to his rights in the Property.

**Argument:  The PGC's Motion for Partial Summary Judgment Lacks Merit.**[8]

I.    **Under the Act of 1806, Only a Person "Becoming" a Holder of Unseated Lands Was Required to Report It for Taxation; Once a Severance or Partial Transfer Is Reported, the Separate Estates Must Be Assessed and Taxed Separately.**

Under the Act of March 28, 1806, P.L. 644, any person becoming a holder of unseated lands was required to provide the county commissioners a "statement, together with the date of the conveyance to such holder, and the name of the grantor, within one year, from and after such conveyance."  *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 368 (Pa. 2016).  Based on this statute, the Supreme Court held that in the context of a conveyance containing an exception or reservation of interests in favor of the grantor, the grantee was the party "becoming a holder."  *Id.* at 368 ("We conclude that the Keller Heirs are correct that the relevant portion of the Act of 1806 imposed a reporting duty *only* on a party 'becoming a holder of unseated land,' and that, given their prior ownership of the entire Warrant, the Kellers did not 'become' a holder of unseated land by selling the surface estate and reserving the mineral estate.") (emphasis added).

In *Herder Spring*, there was "no evidence" that the property transfer in 1899 was reported by the purchaser or by anyone else.  *Id.* at 353, 369.  Because there

---

[8] The PGC's motion fails for all of the reasons set forth in the Trusts' memorandum and reply memorandum in support of their Motion for Partial Summary Judgment (ECF Nos. 118 and 136), which is incorporated by reference. In an effort to avoid reiterating identical arguments, this submission focuses on the specific arguments raised in the PGC's affirmative motion (namely, whether the Proctor & Hill interest was reported and assessed), as those issues alone warrant denial of the PGC's motion.  The Trusts request that the Court consider all issues raised in the Trusts' motion, to the extent necessary to deny the present motion.

was no such evidence, the Court concluded that the county commissioners there "would have assessed and taxed the [property at issue] in its entire[t]y." *Id.* at 369.

However, where a transaction severing the estates in a tract is reported, the county must assess and tax the severed estates separately. *Id.* at 355-356 (quoting *Wilson v. A. Cook Sons Co.*, 148 A. 63, 64 (Pa. 1929) ("where there is divided ownership of the land there ought to be a divided taxation")). "[T]he right to tax" in turn "depends upon the valuation and assessment of a definite estate in land." *F.H. Rockwell & Co. v. Warren County*, 77 A. 665, 666 (Pa. 1910), *overruled on other grounds by Independent Oil & Gas Ass'n v. Bd. of Assessment Appeals*, 814 A.2d 180, 182 (Pa. 2002). "A mere naked reservation of oil and gas in a deed without any other facts to base a valuation upon is not sufficient to warrant the assessment of taxes." *Id.* Instead, it is the assessor's "duty to make a valuation upon information or knowledge which will furnish some definite fixed basis of valuation." *Id.* Generally speaking, a basis to value subsurface rights required production from the land or neighboring lands. *Id.*

Thus, following *Herder Spring*, the owner of a severed subsurface estate need only show that the transaction effecting the severance was reported to the county commissioners. While the separate assessment of subsurface rights, where such a basis to assess existed, is necessarily conclusive proof of reporting, the ***absence*** of a separate assessment does not prove that the transaction was ***not*** reported. *Rockwell*, 77 A. at 666.

14

**II.    The Evidence Demonstrates that the 1908 Tax Sale Did Not Affect the Proctor Interests, Because the Severed Proctor Subsurface Estate Was Properly Reported.**

The PGC's position relies entirely upon a misunderstanding of the requirements of the Act of 1806, in claiming that ***Proctor*** had a duty to report "the severance" to the county commissioners.  *Herder Spring* flatly rejected that position.  143 A.3d at 368 (concluding, based on the statute, that in the context of a conveyance containing an exception or reservation of interests in favor of the grantor, ***the grantee*** was the party "becoming a holder.").  Thus, under the law, Proctor and Hill were only required to report their pre-severance interests.  Union Tanning, as the grantee in the transaction severing the surface and subsurface, had the duty to report ***its interest*** (in the surface estate only).  Similarly, CPLC was then obliged to report ***its*** surface ownership.

The PGC overlooks this critical step.  Here, the PGC attempts to place (inappropriately) on Proctor not only the burden to report the severance, but also an additional burden (unfounded in the law) to seek a separate assessment of the subsurface estate.  This goes beyond *Herder Spring*, contravenes the statutory text, and disregards the controlling law at the time.

Regardless, the evidence demonstrates that Proctor, Union Tanning and CPLC ***all*** reported their respective interests to the County (or, at a minimum, creates genuine issues of material fact on the subject that prevent judgment in favor of the PGC).  Township and county assessment records reflect that Proctor & Hill reported their interests and paid taxes.  ¶6.a-c.  Subsequently, these records reflect that Union Tanning became the owner, followed by CPLC.  ¶¶10, 16.  Clearly, the

15

relevant parties were notifying the taxing authorities in accordance with the Act. In addition, the testimony in the *Gamble* case explained exactly how Proctor and U.S. Leather Company subsidiaries all reported their interests.  ¶6.d(4)-(6).

Proctor's, Union Tanning's and CPLC's routine practice of reporting their interests for assessment is clear from assessment records in those townships in which subsurface interests were taxable – *i.e.* where development and production of the oil, gas or minerals actually occurred.  For example, assessment records for McIntyre Township in Lycoming County beginning as early as 1905 – after CPLC acquired the properties – recognize the Proctor reservation for twenty-two tracts of land and demonstrate that the assessors were specifically referred to the severance of all minerals in "Recorders Office of Lycoming County in Deed Book 144 page 398" – the Proctor deed that severed and reserved subsurface rights.  RSOF ¶56.a; ¶12.  In addition, Barclay Township assessment records demonstrate that Bradford County assessors assessed severed subsurface interests as "seated" when development and production actually occurred; specifically, Barclay Township in 1903 assessed "Proctor & Hill" on the ***seated*** list for properties involved in coal production.  This establishes that the transaction severing the subsurface (the 1894 Deed, which included the Property) was reported.  Critically, the only difference between the assessed tracts and the Property at issue here is that coal production on the former provided a basis for a subsurface assessment.  RSOF ¶ 55.

In fact, between 1894 and 1930, there are ***no assessments*** of oil, gas or mineral rights in all of LeRoy Township, the township in which the Josiah Haines warrant sits, and the assessment books do not even identify oil, gas or minerals as

16

taxable interests.  RSOF ¶¶49-50.  In short, as noted above, while the separate assessment of subsurface rights necessarily proves that the transaction was reported, the ***absence*** of a separate assessment does not prove the opposite.  Instead, the absence of a separate assessment of Proctor subsurface interests simply demonstrates that there was no basis on which to assess the property.

The PGC seems to believe that if CPLC had reported its surface only interest, the assessment records would state "surface only."  McIntyre Township's records (and every other assessment of severed oil, gas and mineral rights) demonstrates that this is not the case.  Instead, the warrants appear twice, once on the general unseated list and then again as a "mineral rights" or "oil, gas and minerals" assessment.  ¶57 (listing the John Singer Warrant owner as "Central Pa. Lbr. Co." on the unseated list and again under a separate subsurface assessment).

In reality, the PGC's entire claim rests on the supposition that ***CPLC*** failed to report ***its*** ownership of the surface.  After all, if CPLC properly reported its interest in the surface, then the law is clear that the tax assessment would only encompass the surface estate, leaving the subsurface estate untouched.  Only if CPLC falsely reported could the assessment have included both the surface and subsurface.  If that were the case, the outcome is the same, because the law does not permit CPLC (and its successors) to "profit by [their] own wrong, and build up or acquire a title founded upon [their] own neglect of duty."  *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898).

The PGC wants this Court to decide this case in a vacuum, but the facts are critical, and the evidence establishes that ***all parties*** (McCauley, CPLC, the Proctor

17

estate **and the PGC**) understood at the relevant time that the 1908 tax sale had **no**

**impact** on the subsurface estate.  For example, in 1920, McCauley and the Proctor

heirs were corresponding with regard to the Proctor and Hill coal rights in the same

properties.  RSOF ¶61.[9]  In 1920, CPLC sold the surface estate expressly subject to

the reservation in favor of Proctor and Hill.  ¶¶37-38.  It is only now, 100 years

later, after all percipient witnesses have died, relevant county records have been

destroyed and (perhaps most importantly) the subsurface interests have become

valuable, that the PGC attempts to claim ownership of the subsurface.

Accordingly, whether CPLC properly or improperly reported its interests in

the surface estate, the tax sale could not convey the reserved subsurface estate.


**Conclusion:**

For the foregoing reasons, and as set forth in the Trusts' Motion for Partial

Summary Judgment, incorporated by reference herein, the Trusts respectfully

request that the Court enter an order (i) denying the PGC's Motion for Partial

Summary Judgment, (ii) granting the Trusts' Motion for Partial Summary

Judgment, (iii) declaring that the Trusts are the rightful owners of their portion of

the minerals, coal, oil, gas, or petroleum in, upon, or under the Josiah Haines

Warrant, and (iv) granting such further relief that the Court deems just and proper.

---

[9] The correspondence reflects that the Proctor heirs "have done considerable business" with McCauley and "ha[d] great confidence" in him.  RSOF ¶61.g.  It goes without saying that the Proctor heirs would not do business with the very person who purportedly stole their property.

18

Dated: August 3, 2018                    Respectfully submitted,

                                         /s/ Paul K. Stockman
                                         Paul K. Stockman (admitted *pro hac vice*)
                                             Pa. ID No. 66951
                                         KAZMAREK MOWREY CLOUD LASETER LLP
                                         One PPG Place, Suite 3100
                                         Pittsburgh, PA 15222
                                         pstockman@kmcllaw.com

                                         Laura A. Lange
                                             Pa. ID No. 310733
                                         MCGUIREWOODS LLP
                                         260 Forbes Avenue, Suite 1800
                                         Pittsburgh, PA  15222
                                         llange@mcguirewoods.com

## CERTIFICATE OF COMPLIANCE:

I hereby certify that the foregoing brief complies with the word-count limit set out in Local Civil Rule 7.8(b)(2), in that it contains 4,730 words, computed using the word count feature of Microsoft Word.

Dated:  August 3, 2018                   /s/ Paul K. Stockman


## CERTIFICATE OF SERVICE:

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court today via the Court's CM/ECF, and that, pursuant to Local Civil Rule 5.7, participants in the case who are registered ECF users will be served by the ECF system. Any persons so designated on the ECF receipt will be served by first class mail.

Dated:  August 3, 2018                   /s/ Paul K. Stockman