# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>THOMAS E. PROCTOR HEIRS TRUST and the MARGARET O.F. PROCTOR TRUST,<br><br>    Defendants. | Case No. 1:12-CV-1567<br><br>Chief Judge Conner /<br>Chief Magistrate Judge Schwab |

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Paul K. Stockman (admitted *pro hac vice*)
   Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

Laura A. Lange
   Pa. ID No. 310733
MCGUIREWOODS LLP
260 Forbes Avenue, Suite 1800
Pittsburgh, PA  15222
llange@mcguirewoods.com

August 3, 2018

# TABLE OF CONTENTS

Table of Contents ....................................................................................i

Table of Authorities ............................................................................ iii

Introduction and Summary: ...................................................................1

Argument:  Judgment Should Be Entered in the Trusts' Favor, Quieting the
    Trusts' Title to the Josiah Haines Warrant's Subsurface Interests.................2

I.    The 1908 Tax Sale, If It Expropriated Severed Subsurface
    Interests, Deprived the Trusts of Property Without Due Process
    of Law.........................................................................................2

    A.    The Proctor Trusts Are Not Collaterally Estopped from
    Challenging the Violation of Their Due Process Rights. ...........3

    B.    The Trusts May Assert the Tax Sale's
    Unconstitutionality.......................................................................5

    C.    *Mullane* and *Mennonite* Apply Retroactively and
    Invalidate the Tax Sale Scheme to the Extent It Purports
    to Encompass the Proctor Subsurface Estate.............................9

    D.    The Published Notice Here Was Not "Reasonably
    Calculated" to Apprise the Trusts That Their Property
    Was in Jeopardy. ......................................................................10

II.    At the Time of the 1908 Tax Sale, the Property Was in Fact
    "Seated" Land, and Its Sale as "Unseated Land" Is Void..................15

III.    The Evidence Establishes that Calvin McCauley, Jr. Was an
    Agent of CPLC, Rendering the 1908 Tax Sale a Redemption. ..........16

IV.    The Evidence Demonstrates that the Proctor Interests Were
    Reported. ..........................................................................................21

i

V.    CPLC and Its Successors Are Bound by Reservations in the Chain of Title Confirming the Trusts' Ownership of Subsurface Rights..................................................................................25

Conclusion: ..................................................................................27

Certificate of Compliance: ...........................................................28

Certificate of Service: ..................................................................28

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Allen v. McCurry*, 449 U.S. 90 (1980)....................................................................17

*Bartholomew v. Leach,* 7 Watts 472 (Pa. 1838) .....................................................19

*Benoit v. Panthaky*, 780 F.2d 336 (3d Cir. 1985) ..............................................10, 14

*Brookback v. Benedum-Trees Oil Co.,* 131 A.2d 103 (Pa. 1957)............................27

*Burns v. Baumgardner*, 449 A.2d 590 (Pa. Super 1982)........................................25

*Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) .........................................14

*City of N.Y. v. N.Y., New Haven & Hartford R.R. Co.,*
    344 U.S. 293 (1953)..........................................................................................3

*City of Philadelphia v. Miller,* 49 Pa. 440 (Pa. 1865) .............................................4

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999)..........................................................................................8

*In re Condemnation by County of Allegheny of Certain Coal, Oil,*
    *Gas, Limestone and Mineral Properties,*
    719 A.2d 1 (Pa. Cmwlth. 1998)..................................................................26, 27

*Cornwall Mountain Investments, L.P. v. Thomas E. Proctor*
    *Heirs Tr.,* 158 A.3d 148 (Pa. 2017)........................................................3, 4, 5

*Coxe v. Gibson*, 27 Pa. 160 (1856) .......................................................................20

*Davis Oil Co. v. Mills*, 873 F.2d 774 (5th Cir. 1989) ........................................11, 12

*Day v. Swanson*, 236 Pa. 493 (1912) ....................................................................16

*D. H. Overmyer Co. Inc., of Ohio v. Frick Co.,* 405 U.S. 174 (1972)......................8

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59 (1978)................5

*Elliott v. Moffett*, 74 A.2d 164 (Pa. 1950)...................................................25, 26, 27

*F.H. Rockwell & Co. v. Warren County,* 77 A. 665 (Pa. 1910) ........................13, 23

*Fish v. Brown*, 5 Watts 441 (Pa. 1836) .......................................................16

*Foehl v. United States*, 238 F.3d 474 (3d Cir. 2001)..............................9, 10, 13, 14

*George v. Messinger,* 73 Pa. 418 (1873) .....................................................16

*Harper v. Virginia Dep't of Taxation,* 509 U.S. 86 (1993).......................................9

*Herder Spring Hunting Club v. Keller,*
    143 A.3d 358 (Pa. 2016).............................................4, 12, 21, 22, 24

*Independent Oil & Gas Ass'n v. Bd. of Assessment Appeals,*
    814 A.2d 180 (Pa. 2002)....................................................................13

*James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529 (1991) .........................9, 10

*Jedlicka v. Clemmer*, 677 A.2d 1232 (Pa. Super. 1996)..........................................26

*Kennedy v. Daily*, 6 Watts 269 (Pa. 1837).................................................16

*Knupp v. Syms,* 50 A. 210 (Pa. 1901) .......................................................18, 19, 21

*McKenna v. Ortho Pharm. Corp.,* 622 F.2d 657 (3d Cir. 1982) ............................27

*Mennonite Board of Missions v. Adams*, 462 U.S. 791 (1983) .............2, 4, 9, 10, 12

*Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306 (1950)...............2, 4, 9, 10

*Murphy v. Karnek,* 160 A.3d 850 (Pa. Super. 2017) ...............................................27

*Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio,*
    301 U.S. 292 (1937)..........................................................................8

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)...................................................6, 7

*Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896) ...............................................19, 20, 24

*Proctor v. Sagamore Big Game Club*,
    166 F. Supp. 465 (W.D. Pa. 1958) ........................................................17, 18

*Reinboth v. Zerbe Run Imp. Co.,* 29 Pa. 139 (1858)................................................20

*Schroeder v. City of N.Y.,* 371 U.S. 208 (1962).....................................................2

*Sheaffer v. McKabe*, 2 Watts 421 (Pa. 1834)..........................................................16

*Strayer v. Johnson*, 1 A. 222 (Pa. 1885)...............................................................27

*United States v. Dickinson,* 331 U.S. 745 (1947) ....................................................6

*United States v. Dow*, 357 U.S. 17 (1958)...............................................................6

*United States v. One Toshiba Color Television,*
    213 F.3d 147 (3d Cir. 2000) ....................................................................13, 14

*USX Corp. v. Champlin*, 992 F.2d 1380 (5th Cir. 1993) .........................................11

*Verba v. Ohio Cas. Ins. Co.*, 851 F.2d 811 (6th Cir. 1988)....................................14

*Walker v. City of Hutchinson, Kan.,* 352 U.S. 112 (1956) ........................................3

*Wheeler v. Knupp,* 55 A. 979 (Pa. 1903) ...............................................................18

## Statutes and Court Rules:

FED. R. EVID. 803(16) ............................................................................................15

Act of March 28, 1806, P.L. 644 ......................................................................12, 21

## Other Authorities:

RESTATEMENT (SECOND) OF JUDGMENTS §29(2)........................................................5

RESTATEMENT (SECOND) OF JUDGMENTS §29(7)........................................................5

18 Charles A. Wright, *et al.,* FEDERAL PRAC. & PROC. §4425 (3d ed. 2018)............3

## REPLY BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**Introduction and Summary:**

The PGC's[1] approach, in opposing the Trusts' motion for partial summary judgment, is revealing:  It devotes almost no effort to challenging the Trusts' facts, which remain at heart undisputed, or to suggesting that there are competing reasonable inferences that can be drawn from those facts.  Instead, the PGC attempts to fling meritless procedural obstacles in the Trusts' path, in an unavailing effort to keep this Court from addressing the issues on the merits.  Whatever points the PGC may score for creativity, none of its efforts are sufficient to distract from or undo the outcome required on the record before the Court.

First, the tax sale at issue – which admittedly took place without any effort at personal notice to affected parties – clearly deprived the Trusts of their property without due process under generations of binding United States Supreme Court precedent.  An alternative holding in a Pennsylvania Superior Court decision, involving different property and a different plaintiff, cannot prevent the Court from reaching this decision.  Nor can inapposite and non-binding decisions from other courts excuse what otherwise is a flagrant constitutional violation.

Beyond that, the PGC's response simply seeks to avoid the inevitable consequence of the undisputed facts and governing Pennsylvania law.  That evidence and law dictate that the 1908 tax sale had no effect on the severed subsurface estate because (i) the land was seated at the time; (ii) Calvin H.

---

[1] Defined terms have the same meanings given them in the Trusts' initial brief.

1

McCauley, Jr.'s status as a CPLC agent meant that his involvement in the purchase simply restored the *status quo ante*; (3) the relevant parties reported the severed subsurface estate; and (4) the exception and reservation in favor of Proctor and Hill in the deed that the PGC accepted prevents the PGC from now claiming title to the subsurface estate.

If the Court decides any one of these issues in the Trusts' favor – as it should, given the law and the undisputed facts of record – the only permissible outcome is a summary judgment declaring that the Trusts remain the owners of their portion of the Subsurface Estate beneath the Josiah Haines Warrant.

**Argument:  Judgment Should Be Entered in the Trusts' Favor, Quieting the Trusts' Title to the Josiah Haines Warrant's Subsurface Interests.**

**I.     The 1908 Tax Sale, If It Expropriated Severed Subsurface Interests, Deprived the Trusts of Property Without Due Process of Law.**

Here, Bradford County's only attempt to provide notice of the June 1908 tax sale was an advertisement in two local newspapers, ¶24, even though interested parties were identifiable from public records maintained in the same courthouse, ¶¶8, 13.  This method of "notice" is one that the Supreme Court and courts across the country have time and again found constitutionally inadequate.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *Mennonite Board of Missions v. Adams*, 462 U.S. 791 (1983); *see also Schroeder v. City of N.Y.,* 371 U.S. 208, 211, 212-13 (1962) (notice by posting and publication is insufficient where the property owner's identity was "readily ascertainable" from deed records); *Walker v. City of Hutchinson, Kan.*, 352 U.S. 112, 116 (1956) (notice

only by publication is insufficient where the property owners were listed in official records); *City of N.Y. v. N.Y., New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296 (1953) ("Notice by publication is a poor and sometimes a hopeless substitute for actual service of notice."). That alone is dispositive of this dispute, and mandates entry of judgment in the Trusts' favor.

In a transparent attempt to avoid having this Court address squarely the deprivation of the Proctor Trusts' constitutional rights, the PGC raises procedural arguments, which the Court can quickly discard.

### A.     The Proctor Trusts Are Not Collaterally Estopped from Challenging the Violation of Their Due Process Rights.

The PGC first attempts – in something of a "throwaway" argument – to claim that the Trusts are collaterally estopped from raising the due process violation because of the decision in *Cornwall Mountain Investments, L.P. v. Thomas E. Proctor Heirs Tr.*, 158 A.3d 148 (Pa. 2017). Collateral estoppel, however, has no application here.

Initially, that is because the issue which the PGC seeks to preclude this Court from considering is a pure question of law: does procedural due process permit a state to seize property for non-payment of taxes without personal notice to the owner, when the owner's identity is readily available in public records? It is axiomatic that collateral estoppel simply "does not attach to abstract rulings of law unmixed with any particular set of facts." 18 Charles A. Wright, *et al.,* FEDERAL PRAC. & PROC. §4425 (3d ed. 2018).

But even if collateral estoppel ***could*** apply here, it does not.  After all, *Cornwall* involved a different plaintiff, a different parcel in a different county, a different tax sale (24 years after the one at issue here), a different assessment (specifically for "mineral rights" and specifically naming "Thomas E. Proctor & heirs"), and – most importantly – a fundamentally different form of pre-sale notice (identifying Proctor as the owner).  158 A.3d at 158.[2]  Under those circumstances, it simply cannot be said that this case presents the "same issue" decided in *Cornwall,* such that the Trusts can no longer advance their due process claims in any subsequent proceeding.

Moreover, the court in *Cornwall* did not even address the applicable federal constitutional law principles squarely, but instead was compelled to apply *Herder Spring Hunting Club v. Keller,* 143 A.3d 358 (Pa. 2016) – a case that came down while *Cornwall* was on appeal, and after *Cornwall* had been argued.  And *Herder Spring,* for its part, failed to apply U.S. Supreme Court precedents, relying instead upon an antiquated Pennsylvania Supreme Court decision upholding notice by publication that predated the adoption of the Fourteenth Amendment.  143 A.3d at 376-78 (citing *City of Philadelphia v. Miller*, 49 Pa. 440 (Pa. 1865)).

Here, the decisions that bind the Court are *Mullane*, *Mennonite*, and their progeny, not *Herder Spring*.  Because this is a question of federal law that this Court can consider afresh, without the constraint of the binding state court

---

[2] If anything, *Cornwall* stands for the proposition that severed subsurface estate owners would expect to see their names in a published pre-sale notice.

4

precedent that *Cornwall* faced, this proceeding "affords… procedural opportunities in the presentation and determination of the issue that were not available in the first action" that render application of non-mutual collateral estoppel inappropriate. RESTATEMENT (SECOND) OF JUDGMENTS §29(2).  Further, non-mutual collateral estoppel is also unwarranted because "treating" this Fourteenth Amendment question of law "as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based."  ID. §29(7).[3]

Thus, the PGC's attempt to have this Court avoid addressing the deprivation of the Trusts' constitutional rights, through an excessively-broad application of principles of collateral estoppel, cannot carry the day.

### B.    The Trusts May Assert the Tax Sale's Unconstitutionality.

The PGC next attempts to claim that the Trusts cannot assert (or have waived) any argument that the tax sale scheme violated their due process rights. Initially, the PGC appears to claim that the Proctor Trusts lack standing to assert that application of the tax sale to expropriate their subsurface property violates constitutional due process rights.  Simply to state that proposition is to show its infirmity.  Standing to assert a constitutional violation requires only "a personal stake in the outcome of the controversy."  *Duke Power Co. v. Carolina Envtl.*

---

[3] If such an outcome were permissible, this Court would be "foreclosed from an opportunity to reconsider the applicable rule, and thus to perform its function of developing the law," a consideration that "is especially pertinent when there is a difference in the forums in which the two actions are to be determined."  ID. §29 cmt. i.

5

*Study Grp., Inc.*, 438 U.S. 59, 72 (1978).  Here, the heirs of Thomas E. Proctor were owners of the subsurface estate at the time of the 1908 tax sale, and the Trusts undisputedly have succeeded to those heirs' property rights, giving them an unquestionable personal stake in challenging any attempt to deprive them of their own property.

The PGC fails to cite any case supporting its standing argument.  Instead, the PGC attempts to rely upon cases involving federal condemnations, which hold that only the owner at the time of the taking (not subsequent owners) is entitled to compensation.  This principle, the PGC suggests, should also extend to notice violations under the due process clause.  Plaintiff's reliance on these takings cases is misplaced.[4]

Other of the decisions PGC cites actually support the Trusts' position, by making clear that a constitutional violation does not accrue until an ownership dispute actually arises.  *See United States v. Dickinson*, 331 U.S. 745, 748-49 (1947) (rejecting the government's claim that the taking was barred by the statute of limitations and noting that "[t]he Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die."); *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001) (rejecting the state's attempt to prohibit a new owner from asserting a takings claim).  In

---

[4] For instance, *United States v. Dow*, 357 U.S. 17, 20–21 (1958), considered the statutory language of the Assignment of Claims Act, which provided that only the owner at the time of the taking was entitled to compensation.

*Palazzolo*, the state's regulatory scheme deprived the property of its economic use, but the state claimed it was not a taking because the owner took title to the property after the enactment of the regulatory scheme.  533 U.S. at 614-15.  The Supreme Court rejected the state's attempt to hold that "the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable," explaining it would "in effect… put an expiration date on the Takings Clause."  *Id.*  The Court explained that "[f]uture generations, too, have a right to challenge unreasonable limitations on the use and value of land."  *Id.*  "It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner."  *Id.* at 628.

The Trusts are similarly situated.  In each of those cases, the takings claim ripened only ***after*** the new owner was put on notice of the loss of property rights.  Here, the constitutional deficiency stems from the ***lack of notice***.  It is illogical to contend that the Trusts' right to challenge a due process violation could lapse wholly in silence, in the absence of any effort at direct notice either of the tax sale or of the PGC's ensuing undisclosed belief that the tax sale conveyed the subsurface estate.

Because there is no precedent supporting its position, the PGC attempts to convert the Trusts' claim that the tax sale was void and could not convey valid title (a classic common law quiet title claim) into an affirmative claim under Section 1983 (something that it is not), and then contending that any such claim has been

7

waived.  Regardless, as the PGC concedes, any purported "waiver" could only

occur if it was voluntarily, knowingly, and intelligently made.  (ECF No. 120, at 15

(citing *D. H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 185 (1972).)

And the Supreme Court "do[es] not presume acquiescence in the loss of

fundamental rights."  *Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 301

U.S. 292, 307 (1937).

Simply put, the Trusts simply could not have voluntarily, knowingly or

intelligently waived a due process claim of which they had no knowledge.  Until

the genesis of this dispute, all interested parties (***including the PGC***) recognized

that the tax sale did ***not*** divest the Proctor heirs of their subsurface rights in the

Josiah Haines Warrant.  Indeed, McCauley subsequently represented the Proctor

heirs in their negotiations to sell portions of the Josiah Haines Warrant's coal rights

that ***he*** purportedly purchased at tax sales.  And CPLC specifically referenced the

subsisting Proctor subsurface estate in both its board approval of sale and the deed

transferring the surface estate to the PGC.  There simply was no reason to

challenge the tax sale or the deprivation of due process at the time, because

everyone believed that the title remained in the Proctor heirs.  Now, 110 years

later, the PGC for the first time is claiming that the tax sale encompassed the

Proctor subsurface estate, and thus, deprived the heirs of their property without

notice.  Thus, there was no "intentional relinquishment or abandonment of a

known right or privilege" – the constitutional right to notice that the Trusts'

property purportedly would be taken.  *Coll. Sav. Bank v. Fla. Prepaid*

*Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999) ("Courts indulge

8

every reasonable presumption against waiver of fundamental constitutional rights.") (internal quotations omitted).  The passage of time does not erase the constitutional invalidity of the tax sale.  *Foehl v. United States*, 238 F.3d 474, 480 (3d Cir. 2001) (rejecting laches argument because "judgment of forfeiture obtained without proper notice to a claimant is void, and that the passage of time could not transmute this nullity into a binding judgment.")

As such, the Trusts' constitutional challenge to the tax sale – as a ground for quieting title in the Trusts' favor – is ripe for this Court's decision.

### C.    *Mullane* and *Mennonite* Apply Retroactively and Invalidate the Tax Sale Scheme to the Extent It Purports to Encompass the Proctor Subsurface Estate.

Next, the PGC appears to contend that *Mullane* and *Mennonite* do not apply to this action because it was not "pending" in 1950 or 1983, the years in which those decisions came down.  This is grounded upon a misapprehension of *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993), which of course held that when the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."  The PGC's argument ignores the seemingly unremarkable (and self-evident) rule of law that Supreme Court decisions always apply ***prospectively***, to cases that are filed after the decisions are rendered.  *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 535 (1991) (explaining "the traditional function of the

courts to decide cases before them based upon their best *current understanding* of the law.") (emphasis added).

The law on retroactivity makes clear that the "current understanding of the law" applies to **conduct** that predates the decision so long as the action is not otherwise precluded. *Id.* As noted, there is no judgment predating either *Mullane* or *Mennonite* that could be preclusive here. Nor can any statute of limitations protect a constitutionally void tax sale. *Benoit v. Panthaky*, 780 F.2d 336, 338–39 (3d Cir. 1985) (statutes of limitations and repose "are ineffective to preclude a claim of voidness based on 'jurisdictional' defects in a tax foreclosure proceeding," and "Constitutionally inadequate notice to the owner of the property sold at a tax foreclosure is a jurisdictional defect." (citations omitted)). Indeed, as the Third Circuit has explained, "forfeiture obtained without proper notice to a claimant is void, and that the passage of time could not transmute this nullity into a binding judgment." *Foehl*, 238 F.3d at 480. As such, *Mullane* and *Mennonite* apply to the 1908 tax sale and those decisions render the tax sale void.

**D.  The Published Notice Here Was Not "Reasonably Calculated" to Apprise the Trusts That Their Property Was in Jeopardy.**

The PGC does not turn to the substantive constitutional issue until the twelfth page of its brief, and even then makes only a cursory and unpersuasive argument: the PGC contends that it would be somehow unreasonable for county tax officials, before selling a property for non-payment of taxes, to review deed records to identify property owners and make some effort at individual notice.

10

That argument is simply unpersuasive: as noted, it would not even have required county officials to leave the building to identify interested parties.

In support of its argument, the PGC relies principally on *Davis Oil Co. v. Mills*, 873 F.2d 774 (5th Cir. 1989), a mortgage foreclosure case, to contend that notice by publication was reasonable. In *Davis Oil*, however, the court focused on "the nature of the property interest at stake" in holding that an inferior and later-arising ***leasehold*** interest was not sufficient to warrant more stringent due process protections. *See Davis Oil*, 873 F.2d at 790; *see id* at 782 (explaining that "Louisiana law ranks property interests chronologically, according to the date that an interest is recorded and provides clearly that subordinate property interests will be canceled by a superior creditor's foreclosure on the property").[5] The timing of the acquired interests in *Davis* were critical there, because the lessee was on notice of the prior mortgage interest, and conversely the mortgage company had no actual knowledge of the leasehold interest. More importantly, the mortgage company had no way to reasonably ascertain the leaseholder's identity, because the original recorded lease was in the name of a third-party who then assigned the lease to the plaintiff. *Id.* at 789; *see also USX Corp. v. Champlin*, 992 F.2d 1380, 1384–85 (5th Cir. 1993) (distinguishing *Davis Oil* because of the status of the inferior and superior liens).

---

[5] Notably, the majority of the opinion in *Davis Oil* was focused on whether the leasehold interest was a sufficient property right even to warrant due process protection. *Id.* at 782-787.

Critically, in holding that the individualized notice was not reasonable under the circumstances in that case, the court in *Davis Oil* relied upon a statutory provision in which an interest holder could ***request*** direct notice of an impending sale in order to protect its interests. *Davis Oil*, 873 F.2d at 791. The court found this provision "was curative of any constitutional deficiency in Louisiana's constructive notice provisions." *Id.* at 787. The court explained that "[t]he act of requesting notice under the statute does not, moreover, impose a burden of constant vigilence on the property owner. Rather, it allows one whose identity as an interest holder may not otherwise be readily ascertainable to protect his or her interest in the subject property through a single, simple act." *Id.* at 791. The court concluded that its "reliance" on the statute did not "run[] afoul of *Mennonite*." *Id.*

Here, the Proctor interest is a freehold interest in the subsurface estate, not a contingent leasehold. In addition, although it would still be inadequate under *Mennonite*, the Pennsylvania statute did not have any "curative" provision.[6] Under the Act of 1806, the party "becoming" a holder of land had to report his interest. In this case, Proctor and Hill reported their interests prior to 1894 – the only thing that the law required them to do. After they sold the surface estate to Union Tanning, retaining the subsurface, it was then Union Tanning who had the obligation to report its ownership of the surface estate only. *Herder Spring*, 143

---

[6] Even if the reporting structure could be deemed to enable a property owner to "safeguard its interests," the Supreme Court has held that such steps cannot "relieve the State of its constitutional obligation." *Mennonite,* 462 U.S. at 799.

A.3d at 368.  Following Union Tanning's transfer to CPLC, *CPLC* then had the duty to report its surface only interest.  *Id.*[7]

Indeed, Proctor and Hill could ***not*** have obtained a separate assessment of the subsurface rights even had they asked.  Pennsylvania law prohibited the assessment of severed subsurface rights where there was no basis to value the oil, gas or minerals.  *F.H. Rockwell & Co. v. Warren County*, 77 A. 665, 666 (Pa. 1910), *overruled on other grounds by Independent Oil & Gas Ass'n v. Bd. of Assessment Appeals*, 814 A.2d 180, 182 (Pa. 2002).   The evidence demonstrates that Proctor's interests were separately assessed where there was a basis to assess the value (e.g., production from the area).  Defendants' Response to Plaintiff's Statement of Undisputed Material Facts ("RSOF") (ECF No. 129), ¶¶55-56.  In LeRoy Township, the township in which the Josiah Haines Warrant sits, there was not an unseated land assessment of severed oil, gas or mineral rights for ***any*** property between 1894 and 1931.  RSOF ¶¶49-50.

Moreover, the Third Circuit does not share the Fifth Circuit's willingness to excuse lackluster compliance with due process notice requirements.  *See, e.g., United States v. One Toshiba Color Television*, 213 F.3d 147, 153 (3d Cir. 2000) (*en banc*) (rejecting a per se rule that service by mail meets due process requirements); *Foehl*, 238 F.3d at 480 (holding that the government did not satisfy due process by mailing notice to the plaintiff's former address, which he had

---

[7] As an aside, the fact that the Proctor heirs could be divested of their property, after they had done all that the law requires, because of defaults solely on the part of their successors-in-title, further highlights the due process violation.

previously provided, where further investigation would have revealed his current address); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346–47 (3d Cir. 1995) (explaining that the "reasonably ascertainable" standard requires a "diligent search" of the books and records); *Benoit*, 780 F.2d at 338 (invalidating tax sale where the property owner's information was available at the offices of the Recorder of Deeds); *see also Verba v. Ohio Cas. Ins. Co.*, 851 F.2d 811, 816 (6th Cir. 1988) (holding that because the defendant recorded its interest with the county recorder, it was a matter of public record and due process required more than constructive notice).

Notably, the Third Circuit has emphasized that the "focus" on the due process inquiry "has always been on the ***procedures*** in place to effect notice." *Toshiba*, 213 F.3d at 155 (emphasis added). Where the government chooses to rely on less than actual notice, "it bears the burden of demonstrating the existence of procedures that are reasonably calculated to ensure that such notice will be given." *Toshiba*, 213 F.3d at 155. Here, there is no question that the only procedure employed was notice by publication, without any attempt to name the impacted property owners, notify the property owners, or even to determine who they were. ¶24. Such a "glaring lack of effort" on the part of the County dictates that constitutional due process was not met. *See Foehl*, 238 F.3d at 480 (holding that the government's failure to check with four obvious sources of information was unreasonable and violated the claimant's due process rights). "The constitutional mandate of adequate notice cannot be treated as empty ritual." *Id.*

14

Accordingly, any tax sale that purports to include the Subsurface Estate would be an unconstitutional deprivation of property without due process of law.[8]

## II.    At the Time of the 1908 Tax Sale, the Property Was in Fact "Seated" Land, and Its Sale as "Unseated Land" Is Void.

Setting aside the glaring constitutional violation at the heart of this case, the PGC's claim to the Josiah Haines Warrant's subsurface is also defective because of the application of clear principles of historical Pennsylvania property tax law, which provide the Trust with many ways to win. For example, the only evidence in this case that addresses the nature of the property at the time of the assessment establishes that the land was in fact "seated," which renders any tax sale of the Property as "unseated" void *ab initio.*

The PGC seeks to prevent the Court from reviewing this evidence, claiming that it is unauthenticated, inadmissible hearsay. However, Evidence Rule 803(16) provides that "[a] statement in a document that was prepared before January 1, 1998, and whose authenticity is established" is admissible. Here, CPLC's ledger books relating to its property holdings in the early 1900s clearly were prepared prior to 1998. Moreover, the authenticity is established as the records were produced in discovery by CPLC's successor in interest, International Development Corporation, and that entity's president authenticated the records under oath. *See* App. Ex. G (ECF No. 96-7). Thus, the PGC cannot simply ignore CPLC's land

---

[8] The Court need not consider what due process would be required for surface owners, who presumably would be aware that taxes would be assessed and payable annually (in contrast to the owners of subsurface property rights that were assessable and taxable only when there was actual production in the vicinity, *see supra* at 13).

records, which establish that it was harvesting timber from the property prior to and during the assessment year, rendering the land seated. *See George v. Messinger,* 73 Pa. 418, 422 (1873) ("removal of the timber" from a tract "may seat it."); *Kennedy v. Daily*, 6 Watts 269, 273 (Pa. 1837).

Because the PGC cannot contradict CPLC's own land records, the PGC contends that the assessor's characterization of the land as "unseated" is conclusive. That is not the case, however, or none of the many decisions overturning "unseated" tax sales of "seated" would exist. *See, e.g., George v. Messinger,* 73 Pa. at 422; *Kennedy v. Daily*, 6 Watts at 272; *Fish v. Brown*, 5 Watts 441, 441 (Pa. 1836); *Sheaffer v. McKabe*, 2 Watts 421, 423 (Pa. 1834); *Day v. Swanson*, 236 Pa. 493, 495 (1912).

Here, the only evidence presented to the Court demonstrates that CPLC harvested tanbark and lumber from the Property between 1905 and 1907. This cultivation rendered the Property seated at the time of the tax assessment, and an unseated tax sale of lands that were in fact seated is automatically void. *See Day v. Swanson*, 84 A. at 959.[9]

## III.  The Evidence Establishes that Calvin McCauley, Jr. Was an Agent of CPLC, Rendering the 1908 Tax Sale a Redemption.

It is equally clear from the record that Calvin H. McCauley, Jr., at the time he purchased the Property at the 1908 Tax Sale, was an agent of CPLC, rendering

---

[9] Of note, the PGC itself was aware that it could only obtain valid title if the property was in fact unseated, in that it sought affidavits attesting to that proposition for property where CPLC was not active, corroborating that the land was undeveloped. RSOF ¶62.

his purchase the functional equivalent of a redemption that restores the status quo, including the Proctor subsurface reservation. The PGC has nothing to say as to the substance of these arguments, and must instead rely upon diversionary tactics.

**First,** the PGC attempts (without citation to any supporting authority) to impose an arbitrary limitation on the evidence that the Court can consider, contending that the Court can look only to documents that were publicly recorded in Bradford County. There is no such limitation in the rules of evidence, or in the jurisprudence surrounding quiet title actions. The PGC cannot simply ignore the evidence that establishes McCauley as an agent of CPLC at the time of the tax sale. The evidence is overwhelming and undisputed.

Further, even if the PGC's argument had any substance, several of the documents cited as evidence in fact ***are*** public records, including corporate records filed with the Commonwealth, and court records showing McCauley's legal representation of CPLC in various court cases. The publicly-recorded quitclaim deeds themselves embody McCauley's agency relationship, given that no stranger would purchase tens of thousands of acres of CPLC property over a ten-year period, for real money, simply to return them to CPLC for only $1. ¶¶25, 27, 31.

**Second,** the PGC again attempts to misapply collateral estoppel. For collateral estoppel to apply, however, the issue must be "necessary to [the] judgment." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The decision in *Proctor v. Sagamore* has no collateral estoppel effect on the Trusts' challenges here, because that court there clearly held that McCauley's agency had no relevancy to the outcome there. *Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 468, 477-

17

78 (W.D. Pa. 1958). *Sagamore* involved an 1894 tax sale, based upon a ***pre-severance*** 1892 assessment of the whole tract. *Id.* at 468 ("At the time Thomas E. Proctor, Sr. got his title…, the 1892 taxes were due and unpaid and were a lien on the land comprising the warrant."). As such, the court ruled that Proctor's post-assessment purchase from the defaulting taxpayer did not transfer any title. *Id.* at 477–78. Because Proctor never owned the property, due to the earlier tax sale, he could not have validly excepted and reserved the subsurface, and thus McCauley's 1914 tax sale purchase for CPLC could not alter the outcome. *Id.* at 479. In addition, in that instance McCauley sold the property to a third party, ***not CPLC,*** following the tax sale – a fact the court found significant. *Id.*[10] Moreover, the deed to Sagamore did not contain any exceptions and reservations (presumably because Proctor never held title to the property, so as to reserve the subsurface). In short, *Sagamore* simply has no impact on this case.

Accordingly, the PGC cannot escape the fact that McCauley was an agent of CPLC, and as such, under controlling law, his purchase operates as a redemption. *Knupp v. Syms,* 50 A. 210, 212 (Pa. 1901), *reaffirmed by Wheeler v. Knupp,* 55 A. 979 (Pa. 1903) (treating an agent's purchase at a tax sale as a payment of overdue tax on the principal's behalf, and thus as "equivalent to a redemption"). The Trusts agree with the PGC that "[w]hether Calvin H. McCauley, Jr. purchased the Josiah

---

[10] Although the court noted that McCauley's relationship with CPLC was not of public record, any significance to that statement is attributed to the fact that the plaintiffs argued only constructive notice of his agency. *Id.* at 479-80 ("This court understands that counsel for plaintiffs concedes that the public records control."). As set forth above, the PGC's attempt to limit the evidence to the "public record" in Bradford County is misguided.

Haines Warrant on his own or at the behest of CPLC, the legal effect remains the same." (ECF No. 120 at 26.) Regardless of whether McCauley purchased the property "personally" or as part of some concerted plan on behalf of CPLC, McCauley, as an officer and agent of CPLC, owed CPLC a fiduciary obligation that prevented him from affecting CPLC's preexisting title to the property. *Bartholomew v. Leach,* 7 Watts 472, 473-74 (Pa. 1838) ("there must be an unambiguous relinquishment of his agency before he can acquire a personal interest…."); *Knupp,* 50 A. at 212; *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896) ("The rule which applies to a trustee, or to one occupying a fiduciary relation, is stated…to be this: 'Whenever one person is placed in such relations to another, by the act or consent of that other, or by the act of a third person or of the law, that he becomes interested for him, or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated.'").

Furthermore, McCauley corresponded directly with Proctor heirs throughout this time period regarding subsurface rights owned by the Proctor heirs (even paying mineral rights taxes on their behalf), compelling the conclusion that the McCauley tax sales had no impact on the Proctor rights. RSOF ¶59.[11] Indeed, in

---

[11] It goes without saying that the Proctor heirs would not do business with the very person who purportedly stole their property – further circumstantial evidence that all relevant parties at the time understood that the 1908 tax sale had no effect on the Proctor heirs' subsurface estate, which in turn is further circumstantial evidence that McCauley's purchase effected a *de facto* redemption or, at most, a sale and purchase of the surface only.

1920, McCauley (in whom the Proctor heirs had "great confidence," RSOF ¶61.g) was negotiating on behalf of CPLC to potentially purchase the Proctor and Hill subsurface interests in the properties in Bradford County that are subject to this lawsuit, *properties that also went through tax sales in 1908, and that were also purchased by McCauley and later quitclaimed back to CPLC*. RSOF ¶60. McCauley sent the Proctor heirs a map with his mark-ups of the coal lands where the Proctor and Hill heirs had leased their interests.  RSOF ¶60.a-b.  Clearly, McCauley and CPLC would not be entering into such negotiations had they believed that CPLC acquired the subsurface rights under the 1908 tax sale, or had they believed that these rights had been conveyed to the PGC in 1920.

The PGC has not presented any evidence to dispute McCauley's agency. The cases that the PGC claims permit an owner of land to purchase his own property at a tax sale relate to current owners whose property went to tax sale based on *pre-ownership* assessments (where the current owner of course had no legal obligation to pay).  *See, e.g., Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898) (current owner purchased property at tax sale based on pre-ownership assessment); *Coxe v. Gibson*, 27 Pa. 160, 165 (1856) (explaining that because the defendant was not bound to pay the taxes assessed because they were assessed before he became the owner and he was "in no privity with, and owed no allegiance to" and stood "in no relation of trust" with the pre-assessment owner, he could perfect his title that was tainted with a defect of prior fraud); *Reinboth v. Zerbe Run Imp. Co.*, 29 Pa. 139, 144 (1858) ("the [tax sale] purchaser (Staples) coming in as a stranger, there being no privity between him and the former owners, his title was absolute").

20

None of these cases permit an agent to purchase an owner's property. More importantly, none of these cases permit an owner to default strategically on his own taxes in order to acquire ***another's*** separate property.

In sum, because there is no genuine dispute as to the fact that McCauley was an agent of CPLC in 1908, his tax sale purchase operated as a redemption under the law, returning the title as it existed prior to the tax sale. *Knupp,* 50 A. at 212.

## IV.    The Evidence Demonstrates that the Proctor Interests Were Reported.

Moreover, the 1908 tax sale could ***not*** have conveyed the subsurface in any event, because the Proctor heirs' interest was properly reported pursuant to the Act of 1806. The PGC's position misapprehends the Act of 1806 in claiming that Proctor had the duty to report "the severance" to the county commissioners. The Pennsylvania Supreme Court rejected the PGC's interpretation in *Herder Spring*. 143 A.3d at 368 (concluding, based on the statute, that in the context of a conveyance containing an exception or reservation of interests in favor of the grantor, ***the grantee*** was the party "becoming a holder."). Thus, under the law, Proctor & Hill were only required to report their pre-severance interests. Union Tanning, as the grantee in the transaction severing the surface and subsurface, had the duty to report ***its interest in the surface estate only***. Similarly, CPLC was then obliged to report ***its surface interest only***.

The PGC overlooks this critical step. Here, the PGC attempts to place (inappropriately) on Proctor not only the burden to report the severance, but also an additional burden (unfounded in the law) to seek a separate assessment of the

subsurface estate.  This goes beyond *Herder Spring*, contravenes the statutory text, and disregards the controlling law at the time.

Regardless, the evidence demonstrates that Proctor, Union Tanning and CPLC all reported their respective interests to the County.  The township and county assessment records reflect that Proctor & Hill reported their interests and paid taxes.  ¶6.a-c.  Subsequently, the records reflect that Union Tanning became the owner followed by CPLC.  ¶¶10, 16.  Clearly, the relevant parties were notifying the taxing authorities in accordance with the Act.  In addition, the testimony in the *Gamble* case explained exactly how Proctor and U.S. Leather Company's subsidiaries reported their interests.  ¶6.d(4)-(6).  This reporting is clear from assessment records in townships in which subsurface interests were taxable – *i.e.,* where development and production of oil, gas or minerals actually occurred.  For example, the assessment records for McIntyre Township in Lycoming County beginning as early as 1905 – after CPLC acquired the properties – recognize the Proctor reservation for twenty-two tracts of land and demonstrate that the assessors were specifically referred to the severance of all minerals in "Recorders Office of Lycoming County in Deed Book 144 page 398" – the Proctor deed that severed the land.  RSOF ¶¶56.a-d; *see also* ¶12.  The only difference between those tracts and the Property at issue here is that production of coal in McIntyre Township at the time provided a basis for the assessment of the subsurface estate.  RSOF ¶¶56.e-f.  In fact, between 1894 and 1930, there are ***no assessments*** of oil, gas or mineral rights in all of LeRoy Township, the township in which the Josiah Haines warrant sits, and assessment books for those years do not

22

even identify oil, gas or minerals as taxable interests.  RSOF ¶¶49-50.  Thus, while the separate assessment of subsurface rights, in areas where a basis to assess existed, is necessarily conclusive proof that the transaction was reported, the *absence* of a separate assessment does not prove the opposite – *i.e*., that the transaction was not reported.  *Rockwell*, 77 A. at 666.  Instead, the absence of a separate assessment of the Proctor subsurface interests demonstrates nothing more than that there was no basis to assess the property.

The PGC seems to believe that if CPLC had reported its surface only interest, the assessment records would state "surface only," or something of the sort.  McIntyre Township records (and every other assessment of severed oil, gas and mineral rights) demonstrates that this is not the case.  Instead, the warrants appear twice, once under the general unseated list and then again as an assessment of "mineral rights" or "oil, gas and minerals." RSOF ¶57 & Reply Ex. 53 (McIntyre Township assessment listing the John Singer Warrant's owner as "Central Pa. Lbr. Co." on the unseated list, and listing the John Singer Warrant a second time as a separate assessment of the Proctor subsurface estate).

In reality, the PGC's entire claim rests on the supposition that *CPLC* failed to report *its* ownership interest in the surface estate.  After all, if CPLC properly reported its interest in the surface, then the law is clear that the tax assessment would only encompass the surface estate, leaving the subsurface estate untouched. The assessment could have included both the surface and subsurface *only* if CPLC incorrectly reported that it owned both estates.  Regardless of whether such a false report might be relevant when a tax sale purchaser is an unrelated *bona fide* third-

23

party purchaser, as in *Herder Spring*, the law does not permit CPLC (and its successors) to "profit by [their] own wrong," or "build up or acquire a title founded upon [their] own neglect of duty." *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898).

The PGC's only response is that there is "no evidence that CPLC failed any reporting duty or reported 'falsely.'" (ECF No. 120 at 38.) The PGC cannot have it both ways. If the PGC wants to concede that CPLC accurately reported its interest, then the assessment could have only encompassed the surface estate. However, if the PGC contends that the assessment encompassed both the surface and subsurface estates, then it was due to CPLC's failure (or falsehood), because under *Herder Spring* (and the statute's clear language) the burden of making an accurate report rested solely with CPLC.

The burden to pay the assessed taxes also rested with CPLC. PGC claims that the land itself, and not CPLC, had the obligation to pay the taxes. Aside from this misplaced logic, the very case the PGC references states that the party "in possession of the land when the tax was assessed" is "chargeable with its payment." *Powell,* 34 A. at 451. Where that party has failed to pay taxes, he "cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state... acquire a better title, or a title adverse to that of other parties in interest." *Id.* CPLC was unquestionably the party in possession of the land at the time of the assessments. It could not from its own neglect (or intentional default) acquire a subsurface interest that it did not own.

Accordingly, whether CPLC properly or improperly reported its interests in the surface estate, the tax sale could not convey the reserved subsurface estate.

24

## V.    CPLC and Its Successors Are Bound by Reservations in the Chain of Title Confirming the Trusts' Ownership of Subsurface Rights.

Finally, the PGC asks this court to disregard the unambiguous language in its deed, which expressly states that the Proctor and Hill reservation continued in force.  The PGC does not address (or event mention) the cases that bind parties to a deed to the statements made within the deed.  *See, e.g., Elliott v. Moffett*, 74 A.2d 164, 167 (Pa. 1950).  Instead, the PGC attempts to claim that use of the "subject to" language is meaningless and was done only as a "precautionary" measure. Again, the PGC's logic is flawed.

The PGC mistakenly relies upon a decision which held that a restrictive covenant contained in a subdivision plan that ***never*** applied to a portion of a tract would not apply to that portion, simply because the deed was made subject to the restriction.  *Burns v. Baumgardner*, 449 A.2d 590, 593 (Pa. Super 1982) ("The provision, however, was merely an acknowledgement that building restrictions existed with respect to a portion of the tract. It did not create new restrictions or expand existing restrictions to unencumbered portions of the tract.").

 In contrast, here, the reservation applied to the property from its onset in 1894 through the PGC's purchase.  At every step in the process, CPLC and the PGC acknowledged the subsurface reservation:

- The contract for sale approved by the CPLC Board clearly stated that the reservation of subsurface rights was "***unto*** Thomas E. Proctor and Jonathan A. Hill."  ¶35 (emphasis added).

- The December 1920 deed from CPLC to the Commonwealth was "subject to all the reservations, exceptions, covenants and stipulations contained in [the] deed from Thomas E. Proctor et al to the Union Tanning Company, and in deed from the Union Tanning Company to the Central Pennsylvania Lumber Company," which reserved "all the minerals, coal, oil, gas or petroleum…." ¶38.

Simply put, CPLC did not intend to transfer the Subsurface Estate to the Commonwealth, the Commonwealth did not intend to receive it, and the PGC is precluded from claiming ownership over that estate. *Elliott*, 74 A.2d at 167 (It is a well established principle that one claiming under a deed is bound by any recognition it contains of title in another."); *Jedlicka v. Clemmer*, 677 A.2d 1232, 1234–35 (Pa. Super. 1996) ("one who claims title to property through another… is bound by earlier acts or declarations of his predecessor and takes the title *cum onere*.").

Plaintiffs' reliance upon *In re Condemnation* is also misguided, because Proctor was not a "stranger" to the transaction, as the chain of title in the subject deed recites his ownership and (as discussed above) the tax sale had no impact on his heirs' title. In that case, the exception at issue was made in favor of a party who had ***never*** owned the reserved interest. *In re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone and Mineral Properties*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998). Here, by contrast, Proctor is in the chain of title as the owner of the subsurface rights. "[A] purchaser at treasurer's sale is in privity to

26

the title, if any, that is divested by the sale and passes to him." *Strayer v. Johnson*, 1 A. 222, 225 (Pa. 1885).  Thus, *In re Condemnation* has no application here.[12]

In short, the clear language in its deed bars the PGC from now asserting title to the subsurface estate.  Clearly, the parties to the transaction had the most pertinent and relevant knowledge of the respective rights and obligations of Proctor and Hill, CPLC and the PGC.  Their conduct and language demonstrate unambiguously that title to the subsurface estate remained in Proctor and Hill, and was intended to remain with them.  The PGC cannot now change course, 100 years later, and asserting that it owns the Subsurface Estate, when it previously acknowledged that it did not.

**Conclusion:**

For the foregoing reasons, the Trusts ask the Court to enter a partial summary judgment on Count I of their Counterclaim, declaring that the Trusts are

---

[12] Of course, *In re Condemnation* is neither "conclusive" nor "controlling" here, *see, e.g., McKenna v. Ortho Pharm. Corp.,* 622 F.2d 657, 662-63 (3d Cir. 1982), and there is good reason to doubt its soundness, since it is (at best) only thinly rooted in Pennsylvania jurisprudence.  The Commonwealth Court cites only West Virginia and Arkansas cases, and the Superior Court has expressed skepticism as to whether or not the so-called "stranger in title" doctrine is even a "'rule'" of Pennsylvania law.  *Murphy v. Karnek,* 160 A.3d 850, 859-60 & n.10 (Pa. Super. 2017) (quotation marks in original).  Indeed, such a "rule" does violence to more deeply rooted principles of Pennsylvania law – including the rule set down in *Elliott v. Moffett* and the overarching principles that the Court should "ascertain and effectuate what the parties intended," and that "effect must be given to *all* the language of the instrument and no part shall be rejected if it can be given a meaning…."  *Brookback v. Benedum-Trees Oil Co.,* 131 A.2d 103, 107 & n.6 (Pa. 1957) (emphasis in original).

the rightful owners of their portion of the minerals, coal, oil, gas, or petroleum in, upon, or under the Josiah Haines Warrant.

Dated: August 3, 2018                    Respectfully submitted,

/s/ *Paul K. Stockman*
Paul K. Stockman (admitted *pro hac vice*)
    Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

Laura A. Lange
    Pa. ID No. 310733
MCGUIREWOODS LLP
260 Forbes Avenue, Suite 1800
Pittsburgh, PA  15222
llange@mcguirewoods.com

## CERTIFICATE OF COMPLIANCE:

I hereby certify that the foregoing brief complies with the 10,000-word word-count limit allowed by the Court by order dated May 4, 2018 (ECF No. 117), in that it contains 7,642 words, computed using the word count feature of Microsoft Word.

Dated:  August 3, 2018                    /s/ *Paul K. Stockman*

## CERTIFICATE OF SERVICE:

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court today via the Court's CM/ECF, and that, pursuant to Local Civil Rule 5.7, participants in the case who are registered ECF users will be served by the ECF system. Any persons so designated on the ECF receipt will be served by first class mail.

Dated:  August 3, 2018                    /s/ *Paul K. Stockman*

28