# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,   :   CIVIL ACTION – LAW
PENNSYLVANIA GAME COMMISSION,   :

            :   CASE NO. 1:12-CV-1567

            Plaintiff,   :

            :   JUDGE: Christopher C. Conner

            v.   :
            :

THOMAS E. PROCTOR HEIRS TRUST and   :
the MARGARET O.F. PROCTOR TRUST,   :
            :

            Defendants.   :

            :   [Electronically Filed]

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Bradley C. Bechtel, Chief Counsel
PA No. 49681
W. Creigh Martson, Assistant Counsel
PA No. 94759
2001 Elmerton Ave
Harrisburg, PA 17110-9797
(717) 783-6530
brbechtel@pa.gov
wmartson@pa.gov
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………………1

ARGUMENT…………………………………………………………………….2

I.    The Trusts' Assertion That They Had No Duty To Report The Severance And Proctor Reservation Is A Red Herring…………………..2

II.    There Is No Competent Evidence Of Record Establishing That The Severance Was Reported……………………………………………………5

III.    The Severed Mineral Estate Was Assessable And Taxable……………...8

IV.    The Trusts' Subsidiary Arguments Lack Merit………………………...10

    A. The Contemporaneous Parties' Alleged "Understanding" That The 1908 Tax Sale Had No Impact On The Subsurface Is Legally Irrelevant………………………………………………………10

    B. It Is Legally Irrelevant That Calvin H. McCauley, Jr., Was Purportedly An Agent Of CPLC At The Time Of The 1908 Tax Sale……………………………………………………………..11

        1. An Owner Of Unseated Land May Purchase The Land At Tax Sale To The Same Extent As A Stranger To The Property………………………………………………..12

        2. The Public Records Controls…………………………16

    C. The Commission Is Not Estopped from Claiming Title To The Subsurface………………………………………………...18

    D. The Trusts Fail To Meet Their Burden Of Establishing That The Property Was "Seated" At The Time Of The 1908 Tax Sale……………………………………………………..22

    E. The Trusts' Estoppel Arguments As To CPLC Fail As A Matter Of Law……………………………………………………..26

    F. The Trusts Have No Due Process Claim…………………………27

        1. Collateral Estoppel Bars The Trusts' Due Process Claim………………………………………………..28

        2. The Trusts Cannot Assert A 14th Amendment Due Process Challenge To A Tax Sale…………………………………...30

        3. Any Due Process Challenge To The 1908 Tax Sale Is Time Barred……………………………………………………33

        4. Constitutionally Adequate Due Process Was Provided…….35

CONCLUSION……………………………………………………....…37

i

**TABLE OF AUTHORITIES**

## CASES

*Aarco Oil and Gas Company v. EOG Resources, Inc.*, 20 So.3d 662 (Miss. 2009) .................................................................................................36

*Agnew v. United Leasing Corp.*, 680 Fed. Appx. 149 (4th Cir. 2017) ...................34

*Arthurs v. King*, 95 Pa. 167 (Pa. 1880) ...................................................13

*Bannard v. New York State Natural Gas Corp.*, 293 A.2d 41 (Pa. 1972) ..............24

*Bd. of Trs. of Trucking Emps. of North Jersey Welfare Fund, Inc. Pension Fund v. Centra*, 983 F.2d 495 (3d Cir. 1992) ...................................................12

*Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n Valley View Downs*, 926 A.2d 908 (Pa. 2007)...........................................................31

*Branco v. Norwest Bank Minnesota*, 381 F. Supp.2d 1274 (D. Haw. 2005)...........34

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...........................................31

*Burlington N. R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227 (3d. Cir. 1995).........................................................28

*Burns v. Baumgardner*, 449 A.2d 590 (Pa. Super. 1982)......................................21

*Carey v. Piphus*, 435 U.S. 247 (1978) ...................................................31

*City of St. Paul v. Evans*, 344 F.3d 1029 (9th Cir. 2003) .........................................34

*Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017)...........................................................4, 6

*Coxe v. Hathaway*, 27 Pa. 160 (1856) .................................................12

*Coxe v. Sartwell*, 21 Pa. 480 (Pa. 1853) .................................................14

*Coxe v. Wolcott*, 27 Pa. 154 (Pa. 1856) ......................................... 13, 14

*D.H Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972) ...........................................31

*Davis Oil Company v. Mills*, 873 F.2d 774 (5th Cir. 1989) ....................................36

*Davis v. 24 Hour Fitness Worldwide, Inc.*, 75 F. Supp.3d 635 (D. Del. 2014).......34

*Elliott v. Moffett*, 74 A.2d, 164 (Pa. 1950)..................................................................19

*Everhart v. Dolph*, 19 A. 431 (Pa. 1890)...................................................................24

*F.H. Rockwell & Co. v. Warren County*, 77 A. 665 (Pa. 1910) ...............................9

*George v. Messinger*, 73 Pa. 418 (Pa. 1873) ..................................................... 25, 26

*Herder Spring v. Keller*, 93 A.3d 465 (Pa. Super. 2014)…………………………19

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016)………………………….*passim*

*Hutchinson v. Kline*, 49 A. 312 (Pa. 1901)……………………………………………8

*In re Cicchetti*, 743 A.2d 431 (Pa. 2000)..................................................................31

*In Re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Properties*, 719 A.2d 1 (Pa. Cmwlth. 1998)...........................22

*Knupp v. Syms*, 50 A. 210 (Pa. 1901) .......................................................................15

*Lewicki v. Washington County*, 431 Fed. Appx. 205 (3d Cir. 2011)......................35

*Machipongo Land & Coal Co., Inc. v. Commonwealth*, 799 A.2d 751 (Pa. 2002) ...........................................................................................32

*McGowan v. Maryland*, 366 U.S. 420 (1961) ..........................................................31

*Montana v. United States*, 440 U.S. 147 (1979)......................................................28

*Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 Fed. Appx. 251 (3d Cir. 2016) ............................................................................................................................29

*NCAA v. Corbett*, 79 F. Supp.3d 536 (M.D. Pa. 2013)............................................29

*Neill v. Lacy*, 110 Pa. 294 (Pa. 1885) .....................................................................12

*Northumberland County v. Phila. & Reading Coal & Iron Co.*,

131 F.2d 562 (3rd Cir. 1942) .......................................................... 24, 25

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) .....................................31

*Pennsylvania v. Thomas E. Proctor Heirs Trust*, 2017 U.S. Dist. LEXIS 128888 (M.D. Pa. Aug. 11, 2017) ........................................................................6

*Philadelphia v. Miller*, 192 Pa. Super. 239 (Pa. Super. 1956) ........................ 14, 15

*Powell v. Lancy*, 173 Pa. 543 (Pa. 1896)……………………………….…………12

*Powell v. Lantzy*, 34 A. 450 (Pa. 1896) .......................................... 8, 27

*Proctor v. Sagamore Big Game Club,* 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959)................................................ *passim*

*Quantum Resources Management, LLC v. Pirate Lake Oil Corp.*, 112 So.3d 209, *cert. denied*, 134 S.Ct. 197 (La. 2013)...................................................35

*Rogers v. Johnson*, 70 Pa. 224 (Pa. 1871) ...........................................13

*Senseing v. Pa. R.R. Co.*, 78 A. 91 (Pa. 1910)......................................31

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ..............................................31

*Stoetzel v. Jackson*, 105 Pa. 562 (1884)............................................24

*Strauch v. Shoemaker*, 1 Watts & Serg. 166 (Pa. 1841) ............................8

*United States v. Clarke*, 445 U.S. 253 (1980).....................................32

*United States v. Dickinson*, 331 U.S. 745 (1947) ..................................32

*United States v. Dow*, 357 U.S. 17 (1958)..........................................32

*United States v. Stauffer Chemical Co.*, 464 U.S. 165 (1984).................... 28, 29, 30

*Wilson v. A. Cook Sons Co.*, 148 A. 63 (Pa. 1929)..................................8

*Woodhouse Hunting Club, Inc. v. Hoyt*, 2018 Pa. Super. Unpub. LEXIS 319 (Pa. Super. Feb. 2, 2018)..........................................................................4, 5

*Yocum v. Zahner*, 162 Pa. 468 (Pa. 1894)................................................................13

## Other Authorities

Act of 1806 …………………………………………………………………….3-8, 37

Act of 1815 ……………………………………………………*passim*

**INTRODUCTION**

The Trusts' approach, in opposing the Commission's motion for partial summary judgment, is revealing: they devote almost no effort in challenging the *material* facts regarding the Commission's asserted chain of title. *See* Defendant's Response to Plaintiff's Statement of Undisputed Material Facts (Doc. No. 129) at ¶¶ 1-19. Thus, if the Commission is correct regarding its application of the law, including *Herder Spring*, to its asserted chain of title, then the host of *non*-material, purported "facts" and unreasonable and improper inferences permeating the Trusts' response to the Commission's motion, and the Trusts' own motion for partial summary judgment, quickly fall away.

The Trusts' response to the Commission's motion for summary judgment incorporates by reference the Trusts' reply and opening briefs in support of the Trusts' motion for partial summary judgment. *See* Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 135) ("Trusts' Opposition Brief") at 13, n. 8.[1] As such, the Commission herein, is compelled to

---

[1]    Defendant's Response to Plaintiff's Statement of Undisputed Material Facts (Doc. No. 129) further compounds this problem by repeatedly referencing, and incorporating by reference each and every paragraph of, the Trusts' Statement of Undisputed Material Fact in Support of Defendants' Motion for Partial Summary Judgment (Doc. No. 95). The Commission, for its part, previously filed an extensive response to that statement. *See* Plaintiff's Response to Statement of Undisputed Material Fact in Support of Defendants' Motion for Partial Summary Judgment

address certain arguments raised by the Trusts' incorporated briefs.[2]

As addressed below, and in an effort to separate the legal and factual wheat from all of the Trusts' asserted chaff, the record and applicable case law demonstrate that the Proctor Reservation has been extinguished by the 1908 tax sale and that the Trusts have been divested of any interest in the oil, gas, and minerals in the Property. The *Trusts* bear the burden of overcoming the presumption of regularity associated with the 1908 tax sale and to otherwise defeat the Commission's *prima facie* showing of a valid, final tax sale based on the public record. *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 365 (Pa. 2016) (following the 1815 Act, tax sales of unseated land were presumed to be rightly done). The Trusts have failed to meet that burden.

## ARGUMENT

I.    **The Trusts' Assertion That They Had No Duty To Report The Severance And Proctor Reservation Is A Red Herring.**

---

(Doc. No. 121). As such, the Trusts' assertion that the Commission devotes almost no effort to challenging the Trusts' facts is baseless.

[2]    The Trusts' incorporation by reference here was in no doubt a deliberate attempt by the Trusts to preclude the Commission from responding to new arguments and new facts raised for the very first time in the Trusts' reply brief. The Court should not countenance the Trusts' summary judgment-by-ambush tactics, including a multi-volume "reply" appendix replete with material that was no doubt available to the Trusts when they filed their motion for summary judgment but not included.

The Trusts erroneously conflate duty with consequence. The Trusts are correct that they had no "affirmative duty" under the Act of 1806, as interpreted by *Herder Spring*, to inform the Bradford County Commissioners of the 1894 severance to allow the separate assessment of the surface and subsurface estates in the Property. *See Herder Spring*, 143 A.3d at 372. But the Trusts ignore the *consequence* of their, or the grantee's, failure to report that severance.

*Herder Spring* makes clear that the failure to report a severance of unseated land, as occurred here, "had the practical effect of having the property assessed and taxed as a whole, given that the assessors were not required to determine the sometimes-elusive current ownership." *Id*. at 370. Thus, if neither the Trusts' predecessors-in-interest nor the purchaser of the surface rights reported the severance to the Bradford County Commissioners, then the commissioners would have assessed and taxed the Property *in its entirety*. *Id*. at 370, 372. That is because, as explained by *Herder Spring*, "the tax system relating to unseated land, including the Acts of 1806 and 1815, treated unseated land ***entirely in reference to the original warrants when not otherwise directed by the owners***." *Id*. at 372 (emphasis added). As ownership of unseated land was not easily ascertainable, the county commissioners "were *not tasked with searching deed records* to determine the present ownership of unseated land." *Id*. (emphasis added). Thus, that the Proctor Reservation appeared *in a deed* recorded with the County is not enough. Because

3

the Property was unseated, the failure to report the severance to the county commissioners results in the commissioners assessing and taxing the Property in its entirety.

Thus, the Trusts' contentions that the Commission "overlooks" a critical step and is attempting to "place (inappropriately)" on the Trusts a burden it did not have must be rejected. The Commission's arguments do not go beyond *Herder Spring*, contravene the statutory text, or disregard the controlling law at the time. To the contrary, the Commission's argument is that, as expressly held by *Herder Spring*, the *consequence* of the failure to report the severance resulted in the Property being assessed and taxed as a whole. That is, the failure of the Trusts' predecessors-in-title to report the severance and ownership of the subsurface rights in the Property to the Bradford County Commissioners, such that they could be separately assessed and taxed, extinguished the Proctor Reservation and allowed the entire estate to be sold in the 1908 tax sale.

While the Trusts may deny that the tax sale had any effect on their subsurface interests, the case law is clear that the 1908 tax sale extinguished the Proctor Reservation in the Property and divested the Trusts' predecessors-in-title of any interest they may have had in the oil, gas, and minerals in, on and under the subject portions of the Property. *See Herder Spring*, *supra*; *Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017); *Woodhouse*

4

*Hunting Club, Inc. v. Hoyt*, 2018 Pa. Super. Unpub. LEXIS 319 (Pa. Super. Feb. 2, 2018); *Proctor v. Sagamore Big Game Club,* 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959).

Although the subsurface rights in the Property may have been severed from the surface estate via the Proctor Reservation, those rights were not separately assessed by the Bradford County Commissioners and there is no evidence establishing that the severance was ever reported. There is no evidence establishing that the Trusts' predecessors-in-title ever requested that the county commissioners separately assess the severed subsurface rights in and under the Property prior to the 1908 tax sale. There is no evidence establishing that the county commissioners ever assessed the subsurface rights in and under the Property separately from the surface estate prior to the 1908 tax sale. Further, though the 1806 Act did not, according to *Herder Spring*, impose a duty on the Trusts' predecessors in title report the severance, the *consequence* of their failure to report the severance ultimately caused the land to be continually taxes and assessed as a whole, and consequently, sold as a whole at the 1908 tax sale. *See Herder Spring*, 143 A.3d at 370, 372.

## II.    There Is No Competent Evidence Of Record Establishing That The Severance Was Reported.

The Trusts assert that Thomas E. Proctor, and subsequently Union Tanning Company and Central Pennsylvania Lumber Company ("CPLC"), "reported" their respective "interest" in the Josiah Haines warrant to the Bradford County

Commissioners. They did this "reporting," if one reads between the lines of the Trusts' filings with the Court, solely by recording deeds with the County. *See* Trusts' Opposition Brief at 6-8. But what is **legally** relevant here, under the 1806 Act as interpreted by *Herder Spring*, is whether Thomas E. Proctor separately reported the 1894 *severance* to the Bradford County Commissioners such that the subsurface estate should have been separately assessed and taxed prior to the 1908 tax sale.

As a threshold matter, the Trusts, by directing the Court to purported "facts" that Thomas E. Proctor, *et al.*, reported their interest in the Josiah Haines Warrant to the Bradford County Commissions pursuant to the 1806 Act, are *really* arguing that the assessment of the subject property was somehow not accurate – *i.e.*, they are challenging the *propriety* of the assessment. But such arguments regarding the propriety of the assessment of the Josiah Haines Warrant are long barred by the applicable statute of limitations. *See Herder Spring*, 143 A.3d at 374. *See also Cornwall*, 158 A.3d at 160; *Commonwealth v. Thomas E. Proctor Heirs Trust*, 2017 U.S. Dist. LEXIS 128888, at *37, n.19 (M.D. Pa. Aug. 11, 2017).

Regardless, the Trusts, despite the claimed sophistication of their predecessors and extensive land holdings in the Commonwealth, and despite bombarding the Court with mountains of irrelevant documents from which they ask the Court draw improper inferences, fail to supply the Court with a single documented example of

any such notice ever being provided to any county commissioner by their predecessors-in-title, yet claim it was their routine practice. *See* Defendant's Response to Plaintiff's Statement of Undisputed Material Facts (Doc. No. 129).

The 1806 Act, as explained above, did not impose any duty on county commissioners to obtain information regarding unseated land or to scour through *deed books* to discover whether lands had changed hands or whether a severance of surface and subsurface rights had occurred. *See Herder Spring*, 143 A.3d at 369-370. Thus, irrespective of whether the Trusts' predecessors-in-title purportedly notified the county of the *conveyance* of the Josiah Haines Warrant to them, there is no probative, admissible evidence of record that the Trusts' predecessors-in-title subsequently notified the Bradford County Commissioners that, in 1894, the unseated land had been divided into surface and subsurface estates, such that they should be assessed and taxed separately. By deed, dated October 27, 1894, the Trusts' predecessors-in-title conveyed a large tract of land, including the Josiah Haines Warrant, to the Union Tanning Company, severing the oil, gas and minerals from the surface and reserving the oil, gas and mineral estate for themselves, their heirs and assigns. *See* Proctor Trusts Exs. 1 and 2; PGC Ex. A.[3] There is no

---

[3] References herein to "Proctor Trusts Ex." are to the exhibits submitted by the Trusts (Doc. Nos. 96-110) in support of their motion for partial summary judgment. References herein to "PGC Ex." are to the exhibits submitted by the Commission in opposition the Trusts' motion, which are included in the Commission's appendix (Doc. No. 122) filed concurrently with its response.

probative, admissible evidence of record that that the Trusts' predecessors-in-title reported this *severance* to the Bradford County Commissioners, as required by the 1806 Act.  *Id*.  Thus, the surface and subsurface were assessed together and not separately prior to the 1908 tax sale of the lands for delinquent taxes on the entire property.  *Id*.

The result here – that an unassessed mineral estate coexisting with an unseated surface estate is subject to extinguishment by the occurrence of a tax sale of the servient surface estate – was neither unjust nor inequitable ***at the time***.  *See Herder Spring*, *supra*; *Wilson v. A. Cook Sons Co.*, 148 A. 63 (Pa. 1929); *Hutchinson v. Kline*, 49 A. 312 (Pa. 1901); *Powell v. Lantzy*, 34 A. 450 (Pa. 1896); *Strauch v. Shoemaker*, 1 Watts & Serg. 166 (Pa. 1841).  Any injury suffered by the holder of any severed mineral interests as a result of a tax sale of the servient surface estate was entirely self-inflicted, because the holder could have easily protected himself by disclosing and seeking a separate assessment of the reserved interest or by redeeming the land at the tax sale.  *See Herder Spring*, 143 A.3d at 369-70.  If minerals or other reserved rights *were separately assessed* and taxes are paid, then those interests would neither have been conveyed nor extinguished by a subsequent tax sale of the surface.  *Id.*

## III.    The Severed Mineral Estate Was Assessable And Taxable.

The Trusts ask the Court not to draw any negative inferences from their failure to offer any proof of a separate assessment of the severed subsurface estate. They contend that the reason the severed subsurface estate was not separately assessed by the county commissioners was because there was *no production or development* of the subsurface rights during the relevant time period and, consequently, no basis on which to assess the property. *See* Trust's Opposition Brief at 2, 14, 16-17, citing *F.H. Rockwell & Co. v. Warren County*, 77 A. 665, 666 (Pa. 1910). In other words, the Trusts argue that because the oil and gas was beneath the surface, and not in production, it had no taxable value. *Id*. In support, they point to assessment records purportedly showing the absence of separate assessments of oil, gas or mineral rights in two townships (LeRoy and Barclay) in Bradford County during the relevant time period. *Id*.[4]

This argument by the Trusts – that the reserved subsurface rights had no assessable value as of the 1908 tax sale – was flatly rejected by the Pennsylvania

---

[4]    The Trusts offer the Declaration of Gregory Gass regarding these township assessment records. In his declaration, Mr. Gass states that he examined assessment records for unseated land from the relevant time period and was unable to find any records regarding separate assessments for severed oil, gas, mineral or coal rights in two townships (LeRoy and Barclay Townships). Glaringly absent from Mr. Gass's declaration is any statement that he was unable to find *any* records regarding separate assessments for severed oil, gas, mineral or coal rights in any assessment records for *Bradford County*. In other words, that the assessment records for two townships in Bradford County do not reflect separate assessments for severed oil, gas, mineral or coal rights does not mean that there are no such records for any township in Bradford County.

Supreme Court in *Herder Spring* and, subsequently, by the Superior Court in *Cornwall*, a case in which the Trusts made the very same argument. *See Herder Spring*, 143 A.3d at 373-74; *Cornwall*, 158 A.3d at 156-57.

## IV. The Trusts Subsidiary Arguments Lack Merit.

The public record, confirmed by multiple title reports, establishes that the Commission has title to the oil, gas, and minerals in, on and under Josiah Haines Warrant. *See* Proctor Trusts Exs. 1 and 2; PGC Ex. A. Based on these undisputed facts, the Commission's motion must be granted and Trusts' motion must be denied. *Herder Spring* and its progeny establish Pennsylvania law that when the owner of unseated land loses his interest at a tax sale, any prior unassessed mineral interests pass to the grantee at the sale, even though a prior severance may have occurred.

While the Trusts offer up several subsidiary arguments as to why the Commission does not have title to the oil, gas, and minerals in, on and under Josiah Haines Warrant – *e.g.*, agency, estoppel by deed, due process, etc. – none have merit.

### A. The Contemporaneous Parties' Alleged "Understanding" That The 1908 Tax Sale Had No Impact On The Subsurface Is Legally Irrelevant.

The Trusts contend that because CPLC, McCauley and the Proctor heirs purportedly took actions inconsistent with the 1908 tax sale that such actions somehow nullify the legal effect of that sale. *See* Trusts' Opposition Brief at 4, 10-11 (describing the actions).

10

Whatever the contemporaneous parties purportedly, and incorrectly, understood, however, cannot overcome the ***legal*** effect of the 1908 tax sale. Because, as explained above, the severance was never reported, the subsequent treasurer's 1908 tax sale "washed" the title of the severance and vested the tax sale purchaser with all right, title and interest in both the surface and the subsurface rights, as if the severance had never occurred.  *See Herder Spring*, 143 A.3d at 366-67; *Proctor*, 166 F. Supp. at 470-71.   No amount of ***mis***understanding by the contemporaneous parties can undo the legal effect of the 1908 tax sale.

**B.     It Is Legally Irrelevant That Calvin H. McCauley, Jr. Was Purportedly An Agent Of CPLC At The Time Of The 1908 Tax Sale.**

The Trusts continue to press the notion that Calvin H. McCauley, Jr. was purportedly acting as an agent for CPLC when he purchased the Property at the 1908 tax sale.  *See* Trusts' Opposition Brief at 5.  The Trusts' theory is that if McCauley was CPLC's agent, then the tax sale necessarily constituted a redemption.  The Trusts are wrong.[5]

---

[5]     As a threshold matter, as explained in the Commission's response in opposition to the Trusts' motion for summary judgment, this very same  argument – *i.e.*, that McCauley was an agent of CPLC with respect to the tax sale at issue – was raised by Thomas E. Proctor, *et al.*, decades ago and was flatly rejected by the district court.  *See Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 479-80 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959).  Indeed, the district court had before it the very same type of evidence that the Trusts now offer this Court, including the very stipulation relied upon by Trusts (Proctor Trusts Ex. 48).  *See Proctor*, 166 F.

1.    **An Owner Of Unseated Land May Purchase The Land At Tax Sale To The Same Extent As A Stranger To The Property.**

Even if the Court were to conclude that Calvin H. McCauley, Jr. was an agent, the law does not support the Trusts' argument. Under applicable Pennsylvania law, even ***an owner*** of unseated land may purchase the land at a tax sale and obtain a treasurers deed conveying a fee simple interest in the land to the same extent as a stranger to the property. *See Neill v. Lacy*, 110 Pa. 294 (Pa. 1885); *Powell v. Lancy*, 173 Pa. 543 (Pa. 1896); *Proctor*, 166 F. Supp. at 479. This is because "the land being unseated, *there was no personal obligation on the owner for the payment of taxes.*" *Proctor*, 166 F. Supp. at 479 (emphasis added). In other words, for purposes of tax sales of unseated land, the law treated the owner of unseated land as having an interest therein equivalent to a stranger.

Moreover, the owner of unseated land need not purchase the land directly from the county treasurer. To the contrary, historical records regarding the accepted, and legal, practice of "title washing" suggest the land typically was purchased by a third party who takes title to the property with a washed title and later conveys it to

---

Supp. at 479-80. Because the Trusts claim to be the heirs of Thomas E. Proctor, collateral estoppel should apply to bar re-litigation of an issue definitively decided against the Trusts' predecessors-in-title decades ago. *See Bd. of Trs. of Trucking Emps. of North Jersey Welfare Fund, Inc. Pension Fund v. Centra*, 983 F.2d 495, 505 (3d Cir. 1992).

the owner.  *See Coxe v. Hathaway*, 27 Pa. 160 (1856).  Alternatively, the owner may, at some point after the tax sale, elect to purchase the property, with a washed title, from the purchaser at the tax sale.  *See Arthurs v. King*, 95 Pa. 167 (Pa. 1880).

Of course, it was also possible for the owner of unseated property to "redeem" the *existing* title to the land rather than purchase the land at, or following, a tax sale with the washed title.  *See Rogers v. Johnson*, 70 Pa. 224 (Pa. 1871).  Pursuant to the 1815 Act, the landowner had two years from the date of the tax sale to redeem title. Until the redemption period passes, the purchaser at the tax sale held an inchoate title which was subject to nullification by redemption. The material difference between a redemption and purchase by the landowner is that a redemption nullifies the tax sale and restores the landowner's title as it existed prior to the tax sale thus saving preexisting reservations of rights that would have otherwise been washed off by the tax sale. *See Yocum v. Zahner*, 162 Pa. 468, 475 (Pa. 1894) ("Redemption operated to set aside or annul the sale, and left the title precisely as though the sale had not been made.").

The Trusts contend that the because McCauley was purportedly an agent of CPLC at the time of the 1908 tax sale that the sale *must be* treated as a redemption by CPLC rather than a purchase by McCauley.  There are material flaws with the Trusts' contention.  First, the Trusts appear to be relying upon a rule that governs when the person who acquires the property at the tax sale had a pre-existing

13

obligation to pay the delinquent taxes. *See*, *e.g.*, *Coxe v. Wolcott*, 27 Pa. 154 (Pa. 1856). This might be the case if, for example, the purchaser at the tax sale *had promised* the landowner that he would pay the taxes and protect the land from a tax sale. *Id*.

There is, of course, no evidence that McCauley promised CPLC that he would pay the taxes and protect the land from tax sale. The foregoing rule, more importantly, does not apply to a person – including the owner or third party associated with the owner – who purchases unseated lands at a tax sale if the purchaser has not otherwise obligated herself to pay the taxes. *Id*. That is because the "taxes under which the sale was made in this case were on unseated land, and there was no responsibility on the owner therefore; the land alone was liable." *Id*. In this case, the Trusts have provided no evidence to suggest that McCauley had a legal or moral obligation to pay taxes on unseated land owned by CPLC (which is identified in the public record as a Pennsylvania corporation).

Second, the Trusts appear to be suggesting a dispositive rule of law – *e.g.*, that when a purported agent of a property owner buys unseated land at a tax sale that the sale *must* be treated as a redemption by the property owner. But, in the cases in which a redemption has been found, the evidence before the court established a redemption as a matter of fact, not as a matter of law. *See*, *e.g.*, *Coxe v. Sartwell*, 21 Pa. 480, 486-87 (Pa. 1853) ("The money was paid and received [by the tax sale

purchaser] under a claim of [a] right to redeem"); *Philadelphia v. Miller*, 192 Pa. Super. 239, 242 (Pa. Super. 1956) ("the lower court decided this matter in reliance upon … sworn admissions of a redemption").

Here, neither the public record at the time of the 1908 tax sale, nor the multitude of documents that the Trusts have dumped on this Court, provide any basis for inferring that McCauley intended to, or did, redeem the Property for CPLC. Calvin H. McCauley, Jr. did not "redeem" the Josiah Haines Warrant: he purchased it, as an individual, at a public tax sale at which anyone, including Thomas E. Proctor, could have outbid him. *See* PGC Ex. A. Further, on December 6, 1910, McCauley did not assign to CPLC his interest in the Josiah Haines Warrant. Instead, on December 6, 1910, Calvin H. McCauley, Jr., joined by his wife, conveyed their interest in the Josiah Haines Warrant to CPLC. *Id.* There is, in sum, a complete lack of evidence necessary to overcome the presumption of regularity associated with, and the admissible facts recited in, the treasurer's deed to McCauley or to otherwise defeat a *prima facie* showing of a valid, final tax sale based on the public record. *See Herder Spring*, 143 A.3d at 365 (following the 1815 Act, tax sales of unseated land were presumed to be rightly done).

The case of *Knupp v. Syms*, 50 A. 210 (Pa. 1901), relied upon by the Trusts, is distinguishable. In that case, it appeared from entries in books in the treasurer's office – *i.e.*, the public record – that H., to whom lands were sold in 1848 for taxes,

acted as agent of the owners for the lands from 1840 to 1852, and that thereafter, before expiration of time for redemption, H. paid and the treasurer received the defaulted taxes on which the treasurer's deed to H. was based. It was presumed, based on those public records, that he purchased in trust for his principals, and his payment was deemed a redemption.

Quite unlike *Knupp*, the purported and tenuous relationship of McCauley to CPLC is not proven by probative evidence, is belied by what evidence exists in the public record, and does not change the nature of the transactions. There is no basis for asserting, and the Trusts have provided no evidence to suggest, that McCauley had a preexisting obligation to pay the delinquent taxes, or legal or moral obligation to pay taxes on the subject *unseated* land owned by CPLC (a corporate entity). McCauley, Jr. clearly was not an agent for Thomas E. Proctor or Jonathan A. Hill. And, whether McCauley, Jr. purchased the Josiah Haines Warrant on his own or at the behest of CPLC, the legal effect is the same. The *whole* of the unseated Josiah Haines Warrant was sold, including any reserved interest not separately assessed.

### 2. The Public Record Controls.

For the reasons above, it is legally irrelevant that Calvin H. McCauley, Jr. was purportedly an agent of CPLC at the time of the 1908 tax sale. Regardless, none of the "evidence" offered by the Trusts establishes that McCauley was an agent for CPLC for purposes of the 1908 tax sale of the Josiah Haines Warrant in Bradford

16

County.  *See* Commission's Response to Facts at  ¶¶ 26-28.  The Trusts do not, and cannot, establish that any of the cited materials are, or were, *in the public record of Bradford County*, such that an examiner of such records could acquire any knowledge as to the purported relationship between Calvin H. McCauley, Jr. and CPLC.  *See Proctor*, 166 F. Supp. at 479-480.    The public record controls.  *Id.* (concluding that the public records of the county could not be impeached by the facts offered in evidence).

The Trusts argue that the Commission's attempt to limit the evidence to the public record in Bradford County at the time of the 1908 tax sale is misguided and the Court should, instead, look to other materials, including materials post-dating the sale, to determine whether McCauley was, in fact, CPLC's agent.  But it is the Trusts who are misguided, not the Commission.  What the Trusts are effectively arguing is that the presumption of regularity associated with, and the admissible facts recited in, the 1908 treasurer's deed to McCauley, and the *prima facie* showing of a valid, final tax sale to McCauley as an individual, based on the public record, can be overcome, in 2018, by "evidence" outside of the Bradford County public record at the time of the 1908 tax sale, including "evidence" that did not even exist at the time.

But, despite the Trusts' best efforts to limit *Proctor* (no pun intended), the district court in that case flatly rejected the same pitch by the Trusts' predecessor-in-interest that the Trusts' attempt to make here – that the Court should conclude,

17

based on documents existing *outside* of the Bradford County public records, that McCauley was an agent for CPLC. Indeed, the Trusts' predecessor-in-interest *conceded* in *Proctor* the county's public records must control:

> From the public records of Elk County, C. H. McCauley, Jr. appears as a complete stranger to the title. His tax deed was not assigned to Central Pennsylvania Lumber Company, but his conveyance was direct to the grantees of the Central Pennsylvania Lumber Company, that is, the Eisenhuths, Excerpt 15. As this court understands it, the only attack plaintiffs [*i.e.*, Proctor] made against the sale of 1914 is that McCauley was the attorney and land agent for the Central Pennsylvania Lumber Company, therefore, in some way an estoppel is sought to be raised because there exists, but not of record, a declaration of trust executed by McCauley wherein any lands he purchased were to be held in behalf of his employer, the Central Pennsylvania Lumber Company. ***However, no title examiner from the public record could acquire such knowledge as to the relationship between McCauley and his employer. This court understands that counsel for the plaintiffs [i.e., Proctor] concedes that the public records control***. Mr. Carroll [i.e., Proctor's attorney] stated to the court, 'We say that one examining the title to this tract of land in Elk County is not obliged under any circumstances to go beyond what might appear on the public records of the several offices in Elk County.

*Proctor*, 166 F. Supp. at 479-480 (emphasis added, bracketed material added).

Based on the public records of Bradford County at the time of the 1908 tax sale, which is the only relevant record, there is simply no basis on which to infer that McCauley intended to, or did, redeem the Property for CPLC.

## C. The Commission Is Not Estopped From Claiming Title To The Subsurface.

The Trusts assert that the Court can "quickly dispose" of the Commission's motion because, after the 1908 tax sale, CPLC sold and the Commission purchased

the Property "subject to" the Proctor Reservation. *See* Trusts' Opposition Brief at 1, 4, 11-12. The Trusts, citing *Herder Spring*, claim that this "subject to" language is a recognition that the 1908 tax sale had no impact on the Proctor Reservation and, consequently, that the Commission is estopped from claiming otherwise. *Id.* This argument lacks merit for several reasons.

First, the Trusts misread *Herder Spring*, which flatly rejected this very argument, being advanced anew by the Trusts here, as "meritless." *Herder Spring*, 143 A.3d at 378. In that case, the Keller Heirs asserted, as the Trusts do here, that a deed providing that the conveyance was made "subject to" a prior reservation of the subsurface rights estopped Herder Spring from asserting a claim to the subsurface rights. *Id.* The Pennsylvania Supreme Court, however, after acknowledging the general rule that "one claiming under a deed is bound by any recognition it contains of title in another," rejected its application where the cited reservation had been "extinguished" by the 1935 tax sale. *Id.* (rejecting application of the general rule in *Elliott v. Moffett*, 365 Pa. 247, 74 A.2d, 164 (Pa. 1950), where tax sale of unseated land had extinguished the subject reservation). In other words, our Supreme Court *agreed* with the Superior Court's conclusion that the proposition that such general language acknowledging the possibility of exceptions or reservation serves to re-sever that which had been united by a valid tax sale. *Id. See also Herder Spring v. Keller*, 93 A.3d 465, 473 (Pa. Super. 2014) (although deed made mention of the

conveyance being subject to all exceptions and reservations as are contained in the chain of title, there were no active exceptions or reservations in the chain of title, the horizontal severance having been extinguished by tax sale more than one decade earlier).

Here, as in *Herder Spring*, at the time of the 1920 deed from CPLC to the Commission, there was no Proctor Reservation contained in the title because the 1908 tax sale extinguished the prior reservation of the subsurface estate. *See Herder Spring*, 143 A.3d at 378. Thus, that the 1920 CPLC general warranty deed to the Commission states that the property is "subject to" the extinguished Proctor Reservation is not binding on the Commission because no such reservation was legally in existence at the time of the conveyance. That is, the provision in the CPLC's deed to the Commission to does not operate to undo the effect of the 1908 tax sale on the Proctor Reservation or to "revive" that extinguished reservation as to the property conveyed. *Id*. *See also Proctor*, 166 F. Supp. at 476-477 (rejecting Proctor's "estoppel" argument where deed was made "subject to" prior reservation extinguished by tax sale of unseated land and contained no separate reservation).

Second, the 1920 CPLC deed does not contain any language of reservation in favor of CPLC. If CPLC had desired to reserve the oil and gas in the 1920 deed it could have by employing standard reservation language as follows: "EXCEPTING and RESERVING unto the grantor, its successors and assigns, all minerals, oil and

gas in and under the above conveyed land."  CPLC did not do so, and instead conveyed "subject to" prior reservations, including the prior Proctor Reservation, which was extinguished by the 1908 tax sale. *See Herder Spring*, *supra*.  When one considers that the 1920 CPLC to the Commission was a general *warranty* deed, the inclusion of the "subject to" language served a very practical and precautionary, not "estopping," purpose.  *See Burns v. Baumgardner*, 449 A.2d 590, 593 (Pa. Super. 1982).  While the Trusts attempt to distinguish *Burns* on its facts, they wholly fail to address the court's explanation that while conveyances "subject to" restrictions give notice that such restrictions are of record, they are not an acknowledgement of the *validity* of such restrictions.  *Id*.  Reference to restrictions in a "subject to" clause will not, without more, make such restrictions applicable to the deeded property if, as a matter of law or fact, they are otherwise inapplicable.  *Id*.  Indeed, as recognized by the court in *Burns*, it is not at all unusual for *warranty* conveyances (like the CPLC deed here) to be made subject to all recorded covenants, easements and restrictions, without specific enumeration, and it would be inappropriate, to say the least, to infer restrictions because it may subsequently turn out that none then applied to the property.

Finally, any claim by the Trusts that the title-washed 1894 Proctor Reservation was somehow "revived" via estoppel would run afoul of the common law rule against reservations in favor of strangers to the conveyance.  That common

law rule – *i.e.*, that in a deed, neither a reservation nor an exception in favor of a stranger to the instrument can, by force of ordinary words of exception or reservation, create in the stranger any title, right, or interest in or respecting the land conveyed – was reaffirmed by the Commonwealth Court in *In Re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Properties*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998) ("We agree that the common law rule is that generally a reservation/exception of rights in a stranger to a deed is ineffective to transfer any interests to the stranger."). In that case, the Commonwealth Court held that a reservation of mineral rights to a non-party to the deed was void.

The Trusts attempt to side step application of the common law rule by contending that Proctor was not a "stranger" because he was in the chain of title. But that argument fails, as Proctor was clearly a "stranger" to the 1920 CPLC conveyance of the Property to the Commission, as he was not a party to the deed and the Proctor Reservation had been extinguished over a decade prior by the 1908 tax sale.

### D. The Trusts Fail To Meet Their Burden Of Establishing That The Property Was "Seated" At The Time Of The 1908 Tax Sale.

The Trusts assert that the Court need not "wade into the details of 'unseated'" land taxation because contemporaneous records purportedly demonstrate that the Property was in fact "seated" by the production of timber and tanbark from 1903

22

through 1909, thus rendering the 1908 tax sale was void. There is no merit to this argument.

First, the evidence in the public record unequivocally shows the Josiah Haines Warrant was assessed as "unseated" at the time of the 1908 tax sale. *See* PGC Ex. A. This is the only admissible, probative evidence regarding the status of the property at the time of the tax sale.

Second, the sole "evidence" offered by the Trusts to contend the land was seated in 1908 consists of a single-page, purported CPLC record (Proctor Trusts Ex. 12) that the Trusts argue shows occasional bark peeling and timbering on the Property during the assessment year. But that record is unsupported by anything other than a declaration of the Trusts' *counsel*, who cannot himself authenticate the record[6] and lacks any personal knowledge regarding the record, what it purports to show, and what CPLC did or did not do in the early 1900s.

Third, and most importantly, even if the Trusts' proffered "evidence" of occasional bark peeling is considered, it does not establish that the land was seated during the assessment year. Whether a tract of land is seated or unseated depended altogether upon the appearance it presented to the assessor *at the time of the assessment*. If it had been or was being improved by clearing or cultivation, or by

---

[6]    The Trusts claim that the record is somehow authenticated because it was produced in discovery by another entity in another case.

the erection of a building upon it, or if the property showed such permanent improvements as indicate a personal responsibility for the taxes, it was the assessor's duty to enter it upon the seated list. *See Bannard v. New York State Natural Gas Corp.*, 293 A.2d 41 (Pa. 1972); *Stoetzel v. Jackson*, 105 Pa. 562, 567 (1884); *Everhart v. Dolph*, 19 A. 431, 432 (Pa. 1890).

As explained by the Third Circuit in *Northumberland County v. Phila. & Reading Coal & Iron Co.*, 131 F.2d 562 (3rd Cir. 1942), the difference in the then-legislative treatment of the problems of delinquent tax collection involved in the two types of land "is quite understandable." *Id*. at 565. In the case of seated lands, the owners mostly resided on the lands and they or their tenants nearly always had goods or chattels thereon. *Id*. Under those circumstances collection from the owner was feasible and it was the method adopted. *Id*. In the case of unseated lands, however, there were never goods or chattels on the lands "subject to distraint." *Id*. The owners were very frequently nonresidents of the county and often land speculators. *Id*. The land was, thus, the only reasonably certain and tangible security for the tax and its sale was the logical method of collection. *Id*. at 566. "The rule thus laid down is that the question whether land is seated or unseated depends altogether upon what has been or is being done upon it, the court indicating that personal liability for taxes arises as a direct consequence of the improvement itself." *Id*. at 566.

Here, the Trusts offer no evidence that an assessor looking at the subject property would have seen any evidence of buildings, other permanent improvements or "cultivation" – *i.e.*, clearing, tilling and growing crops. Instead, the Trusts have proffered a single piece of paper, consisting of unauthenticated hearsay, that establishes, at best, the occasional, intermittent and temporary activity of bark stripping. That is not evidence that would tend to establish that there was, at the time of the 1908 tax sale, "on the lands goods or chattels subject to distraint," such that the land should have been assessed as seated. *See Northumberland County*, 131 F.2d at 565-66.

*George v. Messinger*, 73 Pa. 418 (Pa. 1873), the case relied upon by the Trusts in support of their argument that the Property was seated, is distinguishable on its facts and, moreover, demonstrates why the Trusts' argument fails. In *Messinger*, the sale of the land for taxes was as unseated. The landowner claimed that there was a residence upon the tract and that there was also cultivation, which made it seated and invalidated the purchase. On review, the Pennsylvania Supreme Court reversed, finding that the land was seated based on *extensive evidence that there was an abundance of personal property upon the land out of which the taxes could have been collected*. Indeed, quite the opposite of the facts in this case, the facts in *Messigner* established that:

> Dilworth was the owner of the land. In the autumn of 1859, he set men to work upon it. They built two houses and a barn. During the winter,

25

one of the men remained upon it. In each year thereafter some land was cleared, and potatoes, hay, oats, rye and vegetables were raised thereon. Two or three more houses were erected thereon. So that in 1864 there were four houses standing upon it, and from three to four acres of improved land. During all these years, several families continued to reside upon the land.  Most of the time several teams, sleds, wagons and chains were kept there. The personal property kept on the land in 1863 and in 1864, was worth from $ 500 to $ 600, besides the logs cut thereon, which were worth from $ 400 to $ 500 more.  In 1865 the log barn was torn down, and a framed barn built.

*Messinger*, 73 Pa. at 422-23.  The Trusts' "evidence" is nothing like that in *Messinger* and the case demonstrates why the Trusts fail to meet their evidentiary burden to overcome the public record supporting the 1908 tax sale of the Property as unseated.

Finally, nobody in the chain of title, ever challenged the designation of the Josiah Haines Warrant as "unseated," despite it being listed as such on assessment books as such for over a decade before the 1908 tax sale.  The Trusts claim, without any public record evidence, that CPLC, *et al*., diligently monitored assessment and payment of taxes on their land holdings.  If the parcel was not "unseated," then the appropriate actions would have been to notify the county commissioners, have the assessment changed, and pay taxes within the applicable periods for the statue of repose.

###    E.    The Trusts' Estoppel Arguments As To CPLC Fail As A Matter Of Law.

Relying on *Powell v. Lantzy*, the Trusts' contend that CPLC cannot benefit from title acquired upon neglect of a duty to report (or falsely reporting) or neglect of a duty to pay taxes. *See* Trusts' Opposition Brief at 6. This argument can be readily disposed of. As to a purported duty to report, there was none. The Trusts are, as detailed above, conflating duty with *consequences*. When CPLC took title to the surface in 1903, it had no affirmative duty to report the prior severance and Proctor Reservation to the Bradford County Commissioners. There is, moreover, nothing in the record establishing that CPLC reported anything falsely, as the Trusts imply without citation to a shred of evidence.

With respect to paying taxes, CPLC was not obligated to pay tax on unseated land, as the tax was imposed on land itself. *See Herder Spring*, 143 A.3d at 367 (citing *Powell*); *Proctor*, 166 F. Supp. at 479 (citing *Powell*). As such, the Trusts cannot contend, as a matter of law, that CPLC neglected a duty to pay taxes.

### F.    The Trusts Have No Due Process Claim.

The Trusts, as explained in the Commission's opposition brief (Doc. No. 120), have no viable due process challenge to the 1908 tax sale. As a threshold matter, the Trusts are collaterally estopped from asserting this claim, which was definitively decided against them in the *Cornwall* case. Even if not estopped, however, the issue is with process (primarily, notice) afforded at the time of tax sales that occurred between 1804 and 1947. Such claims are not alive. They did not run with the land

and pass to descendants. The claims were not held in a form of legal suspense for decades until the discovery of natural gas in the Marcellus Shale encouraged opportunistic litigants to discover that their ancestors had been denied due process at some point between 1804 and 1947. Instead, such claims are long-barred by applicable statutes of limitation and repose. Finally, even if modern due process concepts are applied retroactively to a since-abandoned statutory system and long-closed tax sales of unseated land, constitutionally adequate due process was provided.

### 1.     Collateral Estoppel Bars The Trusts' Due Process Claim.

The Trusts argument that collateral estoppel is not applicable because the "due process" issue is a pure question of law fails. While the Supreme Court has recognized an "exception to the applicability of the principles of collateral estoppel for 'unmixed questions of law,'" that exception only applies to "'successive actions involving *unrelated* subject matter.'" *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 171 (1984) (emphasis added) (quoting *Montana v. United States*, 440 U.S. 147, 162 (1979). Thus, the Supreme Court has severely limited the unmixed question of law exception, requiring a determination that the "issue of law" arises in a successive case that is so unrelated to the prior case that re-litigation of the issue is warranted. *Id. See also Burlington N. R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1237 (3d. 1995). But the subject matter at issue in this case is the same

as the subject matter previously litigated in the *Cornwall* action. Indeed, the Court

need only look to the Trusts' rejected petition for certiorari to the U.S. Supreme

Court to conclude that the due process question presented by the Trusts in *Cornwall*

is very same question that the Trusts seek to re-litigate here:

> Does the Pennsylvania court's refusal to apply "preconceived notions
> of what is reasonable in the age of the Internet," in the context of a 1932
> tax sale where the only notice given to a known owner was by
> publication in local newspapers, justify the categorical disregard of this
> Court's decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339
> U.S. 306 (1950), which also preceded the "age of the Internet" by
> decades yet held notice by publication was inadequate where the
> identity of the property owner was known?

*See* PGC Ex. B. *Cornwall* encompasses, and finally decided, the very due process

issue now before this Court for decision and that the Trusts had a full and fair

opportunity to litigate the issue in the *Cornwall* action. The facts of the two cases

do not need to be identical so long as any factual differences have no legal

significance in resolving the issues presented in both cases. *See Stauffer Chem. Co.*,

464 U.S. at 172; *Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 Fed. Appx.

251, 256 (3d Cir. 2016). Here, any factual differences between this case and

*Cornwall* have no legal significance in resolving the due process question presented

by the Trusts – *i.e.*, whether notice of a tax sale by publication provided

constitutionally sufficient due process under the Fourteenth Amendment. There is

no good reason why collateral estoppel should not be applied. *See NCAA v. Corbett*,

79 F. Supp.3d 536 (M.D. Pa. 2013).

29

The Trusts make the remarkable argument that even if collateral estoppel could apply, it does not, because *Cornwall* involved s different plaintiff, a different parcel in a different county, and a different assessment.   That the *Cornwall* case involved different plaintiffs, parcels or assessments is a red herring – the plaintiffs in *Cornwall* were the Trusts, who asserted the same due process argument they assert here, based on the same type of notice (publication) and the same type of tax sale (unseated land), and lost.   *See* PGC Ex. B.   There is, as the question presented in the *Cornwall* certiorari petition confirms, no meaningful difference between the facts and circumstances of the *Cornwall* case as it pertains the Trusts' due process claim.  *See Stauffer Chem. Co.*, *supra*.[7]

## 2.    The Trusts Cannot Assert A 14th Amendment Due Process Challenge To The Tax Sale.

The Trusts assert that they can challenge the 1908 tax sale based on alleged 14th Amendment due process violations that were visited upon their predecessors-in-interest at the time of the 1908 tax sale.   The Trusts claim that because they have succeeded to their predecessors' *property rights* in the subsurface estate, they have a sufficiently personal stake in challenging the tax sale on due process grounds.

---

[7]    Moreover, if as the Trusts now claim because it suits them, the Court should focus on the particular facts and circumstances of the tax sale at issue, then the Court should reject the mountains of purported and irrelevant "evidence" from other tax sales, in other counties, that the Trusts have offered to this Court.

But, the Trusts cannot escape the fact that any alleged deprivation of due process was not visited upon the subject property, but on the Trusts' predecessors-in-interest themselves.    The Supreme Court has recognized that Fourteenth Amendment rights are *personal* in nature, and cannot be asserted vicariously.  *See Shelley v. Kraemer*, 334 U.S. 1, 22 (1948).  Any alleged deprivation of procedural due process in connection with a tax sale of unseated land in 1908 is a claimed constitutional tort.   *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978). Constitutional torts are *personal* in nature and can only follow *personal* involvement in the alleged wrongful conduct.  Any such "due process" claims related to the tax sale, therefore, were personal to the Trusts' predecessors-in-title, would have ripened at the time of the tax sale, do not run with the land, and can be waived. *See*, *e.g.*, *Senseing v. Pa. R.R. Co.*, 78 A. 91 (Pa. 1910); *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973); *McGowan v. Maryland*, 366 U.S. 420, 429 (1961); *D.H Overmyer Co. v. Frick Co.*, 405 U.S. 174, 175 (1972); *Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n Valley View Downs*, 926 A.2d 908, 923 (Pa. 2007) (*per curiam*); *In re Cicchetti*, 743 A.2d 431, 443 n.1 (Pa. 2000).

The Trusts' attempt to equate its procedural due process claim with *regulatory* taking cases is misguided.  In *Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001), the Supreme Court noted that, *in contrast with direct condemnations and physical occupations*, a regulatory scheme's impact on a parcel may not be immediately

31

apparent.  Thus, an as-applied regulatory taking claim may not ripen – as when a permit application is denied or administrative remedies are exhausted – until the parcel is in different ownership than when the regulatory scheme was enacted.  In this circumstance, it does little violence to the owner-as-of-date-of-taking rule to allow the subsequent owner to bring a regulatory taking claim.  *See*, *e.g.*, *Machipongo Land & Coal Co., Inc. v. Commonwealth*, 569 Pa. 3, 799 A.2d 751, 761-63 (2002) (designation of property as unsuitable for surface mining could be challenged by trust acquiring property after designation).

On the other hand, a property owner can maintain a physical taking claim *only* if she owned the property as of the date of the alleged taking.  The right to compensation is *not* passed to a subsequent purchaser.  *United States v. Dow*, 357 U.S. 17, 20 (1958) ("The owner at the time the Government takes possession rather than the owner at an earlier or later date, is the one who has the claim [for a taking] and is to receive payment."); *United States v. Dickinson*, 331 U.S. 745, 751 (1947) ("[T]he land was taken when it was taken and an obligation to pay for it then arose."); *United States v. Clarke*, 445 U.S. 253, 258 (1980) ("[T]he usual rule is that the time of the invasion constitutes the act of taking, and '[i]t is that event which gives rise to the claim for compensation. . . .'") (quoting *Dow*, 357 U.S. at 22).

The same rule would necessarily apply to the Trusts' due process claims in this context.  Any claim of deprivation of procedural due process rights ripened, if

at all, upon conclusion of the 1908 unseated land tax sale.  That claim belonged to the owner of the unseated land at the time of the sale, not its successor-in-interest. A successor could not complain about the lack of particular process in an alleged tax sale because they would lack standing to assert any claim for the deprivation of procedural due process.  No process at all, as it relates to the tax sale, was owed to the successor-in-interest.[8]

In short, any complaint regarding deprivation of procedural due process resulting from the tax sale would need to be lodged, if at all, by the owner at the time of the sale and not by a successor-in-interest.

### 3. Any Due Process Challenge To The 1908 Tax Sale Is Time Barred.

Assuming, *arguendo*, the Trusts can "borrow" their predecessors' personal due process rights, any such claim is long-barred by applicable statutes of limitation and repose.  The 1908 tax sale occurred and is presumed valid.  *See Herder Spring*, 143 A.3d at 365 (following the 1815 Act, tax sales of unseated land were presumed to be rightly done).  And the Trusts were certainly on notice of allegedly defective tax sales in their chains of title *decades ago* when they litigated the very same "title washing" issues before the federal district court.  *See Proctor v. Sagamore Big Game*

---

[8]   And any such "due process" claim would be against the governmental entity that sold the property at the tax sale (*i.e.*, the County), and not against the person or entity that purchased the property at the tax sale.

*Club*, 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959).  Where, as here, the Trusts' due process "defense" is mirror image of an actual due process claim they could have asserted themselves, they cannot avoid statutes of limitations and repose by sitting on their due process claim and waiting for someone else to seek to quiet title.

In *City of St. Paul v. Evans*, 344 F.3d 1029 (9th Cir. 2003), the court addressed the issue of whether the City could assert a time-barred claim as an affirmative defense to defendant's counterclaim.  While recognizing that courts generally allow time-barred claims to be asserted as counterclaims, it noted that courts have not allowed plaintiffs to revive time-barred claims in response to a defendant's counterclaims. In support of this rule, the court noted that "[a] plaintiff cannot engage in a subterfuge to characterize a claim as a defense [to] avoid a temporal bar." *Id*. at 1035.  Other courts have applied the rule articulated in *City of St. Paul*. *See*, *e.g.*, *Agnew v. United Leasing Corp.*, 680 Fed. Appx. 149 (4th Cir. 2017); *Davis v. 24 Hour Fitness Worldwide, Inc.*, 75 F. Supp.3d 635 (D. Del. 2014); *Branco v. Norwest Bank Minnesota*, 381 F. Supp.2d 1274 (D. Haw. 2005).

Here, the Trusts, the parties asserting the purported "defense," seek *affirmative recovery* from the Commission on an identical quiet title *counterclaim*. In doing so, they "abandoned [their] right to seek solace in the status of a defendant."

*City of St. Paul*, 344 F.3d at 1036. Their time-barred due process claim cannot be resuscitated by any rule allowing such claims to be raised as affirmative defenses.

Moreover, the Trusts were not deprived of their purported "due process" rights by the Commission. If a due process violation occurred at all, it occurred in 1908. The defendant would be *the County*, not the Commission. Clearly, the Trusts, assuming they can borrow their predecessors' due process rights, cannot sue the County for an alleged procedural due process violation that occurred over 100 years ago. *See Lewicki v. Washington County*, 431 Fed. Appx. 205 (3d Cir. 2011) (Pennsylvania's two-year statute of limitations for personal injury actions applied to former property owners' § 1983 action against county alleging that tax sale violated owners' constitutional rights).[9] The Trusts should, therefore, be precluded from getting functionally equivalent relief against the Commission in the context of a quiet title action.

### 4.   Constitutionally Adequate Due Process Was Provided.

---

[9]   The Trusts cannot, with any semblance of a straight face, assert they only just "discovered" that their property was sold at a tax sale in 1908 when they were served with a copy of the Commission's complaint in this case. The Trusts have been actively litigating "title washing" cases for over a decade and were on notice of allegedly defective tax sales in their chains of title *decades before* the Commission commenced this action. *See Proctor*, *supra*.

Even if modern due process concepts are applied retroactively[10] to a since-abandoned statutory system and hundreds (if not thousands) of long-closed tax sales of unseated land, constitutionally adequate due process was, for the reasons explained by the Pennsylvania Supreme Court in *Herder Spring*, provided.  While the Trusts may dislike the outcome in *Herder Spring*, they fail to offer this Court any sound reasons as to why *Herder Spring's* rejection of their due process claim should not be followed.  Under *Mullane* and *Mennonite*, constructive service of process by publication satisfies due process if the names and addresses of the persons to be served are not "reasonably ascertainable."  And, courts, in addition to *Herder Spring*, have agreed that a search of the conveyance records to identify parties with mineral interests would be unduly burdensome and is a task beyond the routine examination of land records that was involved in *Mennonite*.  *See Davis Oil Company v. Mills*, 873 F.2d 774 (5th Cir. 1989); *Aarco Oil and Gas Company v. EOG Resources, Inc.*, 20 So.3d 662 (Miss. 2009).  While the Trusts endeavor to distinguish *Davis* and *Aarco* on their facts, the conclusions reached by those cases – *i.e.*, that publication

---

[10]    For reasons explained in the Commission's brief in response to the Trusts' motion for partial summary judgment, the notice requirements of *Mullane* and *Mennonite* cannot apply retroactively to invalidate the 1908 tax sale, or other similarly situated tax sales of unseated land.  *See Quantum Resources Management, LLC v. Pirate Lake Oil Corp.*, 112 So.3d 209 (La. 2013) (refusing to apply *Mennonite* retroactively to invalidate 1925 tax sale for lack of notice where case was not pending on direct review at the time Mennonite was decided and suit to annul tax sale was pre-empted 53 years before *Mennonite*), *cert. denied*, 134 S.Ct. 197 (2013).

notice afforded adequate due process post-*Mennonite* – are equally applicable to the 1908 tax sale in this case, and all others like it.  *See Herder Spring*.  Here, the owner of the mineral estate at the time of the 1908 tax sale easily could have assured actual notice of the sale by, per the 1806 Act, informing the county commissioners of the severance, thereby allowing both portions of the property to be independently valued and assessed for taxes.  The tax assessor was, moreover, under no obligation to comb the county records to identify individuals who might appear to have an interest in the unseated land's minerals.  Under these circumstances, publication and notice to the surface owners only did not violate the mineral owner's due process rights.

Refunds would be owed in *thousands* of transactions for tax sales "voided" on due process grounds if this Court, effectively, overrules *Herder Spring*.  The Trusts, moreover, would be obligated to pay any back taxes owed (with interest and penalties).

## CONCLUSION

For the foregoing reasons, the Commission asks the Court to enter a partial summary judgment in its favor and declare that the Commission is the rightful owner of the whole of the Josiah Haines Warrant in fee simple.


Respectfully submitted,

PENNSYLVANIA GAME COMMISSION

37

DATE:  September 14, 2018             s/Bradley C. Bechtel
                                              Bradley C. Bechtel, Chief Counsel
                                            PA No. 49681
                                            W. Creigh Martson, Assistant Counsel
                                            PA No. 94759
                                            2001 Elmerton Ave
                                            Harrisburg, PA 17110-9797
                                            (717) 783-6530
                                            brbechtel@pa.gov
                                            wmartson@pa.gov
                                            *Attorneys for Plaintiff*

38

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the 10,000-word word-count limit allowed by the Court by order dated May 4, 2018 (Doc. No. 117), in that it contains 9,764 words, computed using the word count feature of Microsoft Word.

s/Bradley C. Bechtel
Bradley C. Bechtel

## **CERTIFICATE OF SERVICE**

I certify that on September 14, 2018, I filed the attached document with the Court's ECF system such that all counsel of record will be served automatically.

s/Bradley C. Bechtel
Bradley C. Bechtel