UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF | : | CIVIL NO: 1:12-CV-01567 |
| PENNSYLVANIA, PENNSYLVANIA | : | |
| GAME COMMISSION, | : | (Chief Judge Conner) |
| | : | |
| Plaintiff | : | (Chief Magistrate Judge Schwab) |
| | : | |
| THOMAS E. PROCTOR HEIRS | : | |
| TRUST and the MARGARET | : | |
| PROCTOR TRUST, | : | |
| | : | |
| Defendants | : | |
| | : | |

## REPORT AND RECOMMENDATION

## I. Introduction.

This action involves property disputes between the plaintiff, the

Pennsylvania Game Commission ("Game Commission"), and the defendants, the

Thomas E. Proctor Heirs Trust and the Margaret Proctor Trust ("Proctor Trusts").

The parties dispute the title to numerous tracts of land in Sullivan and Bradford

Counties.  Presently before the court are cross-motions for partial summary

judgment as to one tract of land in Bradford County.  Also before the Court is a

motion of the Proctor Trusts to strike an expert report filed by the Game

Commission.  For the reasons, discussed below, we recommend that the Court

grant in part and deny in part the Proctor Trusts' motion to strike.  We also

recommend that the Court deny both motions for partial summary judgment.

## II.  Background and Procedural History.

### A.  The Second Amended Complaint.

In August of 2012, the Game Commission began this action by filing a complaint against the Thomas E. Proctor Heirs Trust, a Massachusetts trust, its successors and assigns to quiet title to real property located in Sullivan County, Pennsylvania.  In July of 2013, the Game Commission filed an amended complaint again naming the Thomas E. Proctor Heirs Trust as the defendant.  And in December of 2014, the Game Commission filed the now operative complaint—a second amended complaint that again names the Thomas E. Proctor Heirs Trust and that adds as a defendant the Margaret Proctor Trust, a trust that it is alleged is held for the benefit of the heirs of Thomas E. Proctor and Emma H. Proctor.

Asserting that the court has diversity jurisdiction, the Game Commission seeks to quiet title to approximately 2,481 acres of land in Sullivan County, comprised of six warrants.[1]  The Game Commission alleges that it acquired ownership of this property by way of a deed dated December 31, 1924, from the

---

[1]  *See Herder Spring v. Keller*, 143 A.3d 358, 360 n.3 (Pa. 2016) (explaining the historical context of Pennsylvania's early land law, and specifically: a person who sought to purchase land would submit an application to the Land Office; the secretary would issue a warrant that would describe the land, the property adjoining the land, the purchaser, the purchase price, and the terms of the sale; the issuance of this warrant would trigger a survey of the land; and after the survey was completed and returned, a patent would be issued providing clear title from the state or the proprietor to the original purchaser of the property).

Central Pennsylvania Lumber Company ("CPLC").  This property is part of the State Game Lands.

The Game Commission alleges that it named the Proctor Trusts as defendants because the Proctor Trusts have asserted an interest in the property based on a 1894 deed from Thomas E. Proctor and Emma H. Proctor ("the Proctors") to the Union Tanning Company that reserved "all the minerals, coal, oil, gas or petroleum found in or under the surface of the land," and a 1897 quitclaim deed from O.B. and Sarah Grant to Emma H. Proctor and Thomas E. Proctor's heirs ("the Proctor heirs") that quitclaimed "all the right, title, interest, and estate" that the Grants acquired in 1896 through treasurer deeds from the Treasurer of Sullivan County "of, in and in to the minerals, coal, oil, gas or petroleum found on or under the surface of the lands described in said Treasurer's deeds." *Doc. 40* at ¶ 11.[2]  The property was later sold by the Sullivan County Treasurer at a 1908 tax sale to C.H. McCauley, Jr. ("McCauley").  The Game Commission alleges that at the time of the 1908 tax sale, the property was unseated and the Proctor heirs did not have the oil, gas, and mineral estates separately assessed.  According to the

---

[2]  By way of legal background, Pennsylvania recognizes three estates in land: (1) the surface estate; (2) the mineral (or subsurface) estate; and (3) the support estate. *See Smith v. Glen Alden Coal Co*., 32 A.2d 227, 234–35 (Pa. 1943); *United States v. 3,218.9 Acres of Land, More or Less, Situated in Warren Cty., State of Pa.*, 619 F.2d 288, 291 (3d Cir. 1980).  "Because these estates are severable, different owners may hold title to separate and distinct estates in the same land." *Hetrick v. Apollo Gas Co.*, 608 A.2d 1074, 1077 (Pa. Super. Ct. 1992).

Game Commission, the 1908 tax sale resulted in passing "all title to the real estate fairly chargeable with the taxes and not separately assessed." *Id*. at ¶ 19. McCauley, along with his wife, later conveyed the property to CPLC.  The Game Commission alleges that it acquired its interest in the property from CPLC and that it acquired all the interests in the property including the previously reserved mineral and gas rights.[3]

The Game Commission seeks to quiet title to the property to itself under Pa.R.Civ.P. 1061(b)(3) and 1061(b)(4).

## B.  The Stay Pending the Pennsylvania Supreme Court's Decision in *Herder Spring*.

In March of 2015, the parties filed a joint motion to stay this matter pending a decision from the Pennsylvania Supreme Court in *Herder Spring Hunting Club v. Keller*, 631 Pa. 205, 205 (2015) (granting petition for allowance of appeal and setting forth the issues that will be considered on appeal).  The parties alleged that while the issues presented in *Herder Spring* were not identical to the issues presented in our case, the Pennsylvania Supreme Court's ruling would, at a minimum, shape the parties' discovery and possibly the filing of dispositive

---

[3]  In other words, although the Game Commission does not use the term "title wash" in the second amended complaint, it alleges that the 1908 tax sale resulted in a "title wash" whereby the previously reserved mineral estate and surface estate were rejoined through the tax sale.  Later, we discuss in more detail the concept of title washing.

motions.  We granted the motion to stay, and the stay remained in effect until October of 2016.

### C.  The *Herder Spring* Decision.

In *Herder Spring*, the Pennsylvania Supreme Court addressed the concept of title washing.  *Herder Spring* and the concept of title washing are central to this case: the Game Commission relies on *Herder Spring*, and the Proctor Trusts contend that *Herder Spring* is not applicable for various reasons.  Thus, we recount in some detail the decision in *Herder Spring*.

In 1894, Harry and Anna Keller ("the Kellers") bought property at a tax sale in Centre County, Pennsylvania. *Herder Spring*, 143 A.3d at 360.  Then, in 1899, the Kellers sold the surface rights of that property to Isaac Beck, Isaiah Beck, and James Fisher ("Becks"), but reserved the subsurface rights to themselves "through an extensive reservation that indisputably covered the natural gas at issue[.]" *Id.* As explained by the *Herder Spring* Court, however, there was no evidence in the record that the Becks had complied with the Act of 1806, which required anyone becoming a holder of unseated land[4] to provide notice to the county commissioners

---

[4] "Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land." *Id.* at 363 (footnote omitted).  "Seated land was property that had been developed with residential structures, had personal property upon it that could be 'levied upon for the tax due', or was producing regular profit through cultivation,

of the transfer of ownership. *Id.*  There was also no evidence in the record that the Kellers had informed the county commissioners of their reservation of subsurface rights. *Id.*[5]

Following other transfers not relevant to the Pennsylvania Supreme Court's decision, Ralph Smith eventually acquired the surface rights to the disputed property. *Id.*  But then, in 1935, because of unpaid taxes, the county commissioners acquired the property at a treasurer's sale. *Id.*  Following that sale, the county commissioners held the property until 1941, at which time they sold the property to Max Herr, whose widow then sold the property to the Herder Spring Hunting Club ("Hunting Club") in 1959. *Id.* at 361.[6]

After acquiring the property, the Hunting Club entered into several oil and gas leases, and eventually it filed a complaint to quiet title in August of 2008

---

lumbering, or mining." *Id.*  In contrast, unseated land was "wild" land, which included "any land that did not meet the requirements of being seated." *Id.*

[5]  The Act of 1806 did not impose a duty on the Kellers to report their reservation of subsurface rights. *Id.* at 372.  As explained by the *Herder Spring* Court, the relevant portion of the Act of 1806 imposed a reporting duty only on a party becoming a holder of unseated land. *Id.*  Thus, given their prior ownership of the entire property, the Kellers did not become a holder of unseated land when they sold the surface estate and reserved the subsurface estate of such property. *Id.*

[6]  During the title search, the Hunting Club's attorney noticed the Kellers' prior subsurface reservation and recommended that language be added to the deed to reflect that reservation. *Id.* at 361.  The deed described the property, but only "generically provided [that the] 'conveyance [was] subject to all exceptions and reservations as [were] contained in the chain of title,' without specifying the Keller reservation." *Id.*

against the heirs of the Kellers ("Keller heirs"), "presumably as a result of the

discovery of Marcellus Shale on the property." *Id.*  Per the Hunting Club, the 1935

tax sale had extinguished the Kellers' 1899 reservation of subsurface rights. *Id.*  In

support, the Hunting Club argued that because the county commissioners had not

been alerted to the Kellers' reservation, the taxes were assessed against the entire

property, and the subsequent tax sale of that property resulted in the transfer of

both the surface and subsurface estates. *Id.*  The Keller heirs, on the other hand,

maintained that the 1935 tax sale only resulted in the transfer of the surface rights

to the disputed property. *Id.* at 362.

Following an extensive review of the historical law regarding tax sales of

unseated property in Pennsylvania, the *Herder Spring* Court ultimately concluded

that the 1935 tax sale conveyed the entire disputed property, including both the

surface and subsurface estates. *Id.* at 375.  The Court explained that although the

disputed property had been severed into surface and subsurface estates, neither

party had reported that severance to the county commissioners. *Id.* at 372.  Thus,

absent proof to the contrary, the Supreme Court could presume that, because the

severance was never reported, the entire disputed property continued to be

assessed, taxed, and sold. *Id.* (citing *Heft v. Gephart*, 65 Pa. 510, 516 (Pa. 1870)

for the proposition that "the tax system relating to unseated land . . . treated [such]

unseated land 'entirely in reference to the original warrants when not otherwise

directed by the owners.'"").  The Pennsylvania Supreme Court observed that the documents relating to the pertinent tax sale provided "no indication" that the assessment and taxation occurred on anything other than the entire disputed property since those documents "provide[d] no reference to the surface estate or the reserved subsurface estate." *Id.* at 375.  As a result, the 1935 tax sale conveyed the entire disputed property. *Id.*  Thus, when neither the Kellers, nor the surface owners, challenged the assessment or tax sale and failed to redeem the property within the requisite redemption period, the Kellers' title was extinguished, thereby allowing the entire property to be purchased in 1941 by Mr. Herr, from whom the Hunting Club derived its title. *Id.*

In reaching this conclusion, the Pennsylvania Supreme Court observed that its decision only "applies to a very limited subset of cases involving quiet title actions for formerly unseated land sold at a tax sale prior to 1947." *Id.* at 378.  And, within this very limited subset of cases, the Court further instructed that its decision "would not govern those tax sales which specified whether the assessment involved the surface or the mineral rights." *Id.* at 378–79.

### D.  Proceedings after the stay was lifted.

After the stay was lifted and with leave of court, the Proctor Trusts filed an amended answer and affirmative defenses with counterclaims.  In the

counterclaims, the Proctor Trusts seek to quiet title to the oil and gas rights to the same property at issue in the Game Commission's second amended complaint as well as the oil and gas rights to numerous other properties in Sullivan and Bradford Counties, many of which also went through tax sales in 1908 and that also now form part of the State Game Lands.  The Proctor Trusts, however, contend that for various reasons, the tax sales did not result in a "title wash," and they seek a determination that the oil and gas rights to the properties are vested in them.  They also raise counterclaims of conversion and unjust enrichment, and they seek compensatory and punitive damages.

After the Court denied the Game Commission's motion to dismiss the counterclaims, the Game Commission filed a document titled "Reply of the Commonwealth of Pennsylvania, Pennsylvania Game Commission, to Defendants' Amended Answer and Affirmative Defenses to the Second Amended Complaint with Counterclaim." *Doc. 82*.  This document is, in part, an answer to the Proctor Trusts' counterclaims.  It also contains a counterclaim against the Proctor Trusts claiming that the Proctor Trusts tortiously interfered with the Game Commission's contractual relations with a third party by filing its counterclaims drawing into dispute the whole of State Game Lands 12, 13, and 36.  The Proctor Trusts then filed an answer to that counterclaim.  Thereafter, the parties filed a stipulation narrowing the properties at issue. *See Doc. 89*.

On April 17, 2018, the Proctor Trusts filed a motion for partial summary judgment as to one warrant—the Josiah Haines Warrant.  The Josiah Haines Warrant was selected as a bellwether tract for the dozens of tracts of land at issue in this case.  After a conference with the parties, except for one deposition, we stayed all further discovery and case management deadlines pending final resolution of the Proctor Trusts' motion for partial summary judgment.  Thereafter, the Game Commission also filed a motion for partial summary judgment as to the Josiah Haines Warrant.[7]  The parties have fully briefed the cross motions for partial summary judgment.  Before we address those motions, however, we address the Proctor Trusts' motion to strike the declaration and title opinion of the Game Commission's expert.

---

[7]  In the second amended complaint, the Game Commission seeks to quiet title to warrants in Sullivan County Pennsylvania, but the Josiah Haines Warrant at issue in the motions for partial summary judgment is in Bradford County.  The Proctor Trusts sought in their counterclaims to quiet title to the Josiah Haines Warrant among others.  Although the Game Commission filed a counterclaim against the Proctor Trusts for tortious interference, it did not specifically file a counterclaim to quiet title to the warrants named in the Proctor Trusts' counterclaims. Nevertheless, in its response to the Proctor Trusts' counterclaims, the Game Commission did request that "the Court enter judgment that the [Game Commission] has title with respect to the oil, gas, and minerals where the law and facts show as vested in the [Game Commission]." *Doc. 82* at 31, 32.  Thus, we construe the Game Commission's motion for partial summary judgment as seeking summary judgment quieting title to the Josiah Haines Warrant in the Game Commission.

### III.  Motion to Strike.

In support of its motion for partial summary judgment and in opposition to the Proctor Trusts' motion for partial summary judgment, the Game Commission submitted a declaration from J.C. Wilkinson, III. *See Doc. 122-1*.  Wilkinson describes himself as an attorney with "extensive experience with respect to oil and natural gas title issues in Pennsylvania" and who has "rendered numerous oil and gas title opinions for properties throughout the Commonwealth." *Id*. at 2, ¶ 2.

As to the Josiah Haines Warrant, Wilkinson asserts that "[b]ased on [his] education, training and experience it is [his] opinion, with a reasonable degree of professional certainty, that: (1) the Proctor Trusts do not have an interest in the Subsurface Estate; and (2) the [Game] Commission has title to the Subsurface Estate." *Id*. at 3, ¶ 5.  He sets forth the documents that he relied upon in forming that opinion as well as his grounds for that opinion. *Id*. at 2–7, ¶¶ 3–7.

Wilkinson attached to his declaration a copy of his "Oil, Gas and Mineral Title Opinion" as of July 8, 2016, as to the Josiah Haines Warrant. *Id*. at 122-1 at 13–31.  In that title opinion, Wilkinson describes the subject land, and he states that his examination was limited to: (1) an Abstract of Title, dated July 14, 2016, by Percheron LLC ("Percheron Abstract"); (2) an Abstract of Title, dated November 22, 1920, by John E. Potter, Esq. ("Potter Abstract"); (3) "Unseated Land Records from the Bradford County Historical Society as photographed and

obtained by Gregory S. Gass, a consultant of the" Proctor Trusts ("Gass Exhibits");

and (4) maps and plats of the lands as referenced in the above documents. *Id*. at

14–18.  Wilkinson asserts that 100% of both the surface estate and the oil, gas, and

mineral estate is vested in the Commonwealth of Pennsylvania. *Id*. at 18.

In his title opinion, Wilkinson provides a history of the title and information

regarding assessments and tax sales. *Id*. at 20–24.  The title opinion also contains

several comments including one titled "1908 Unseated Tax Sale—'Title Wash,'"

which includes a brief discussion of the Pennsylvania Supreme Court's decision in

*Herder Spring* and a chart of the "Title Wash" of the land as a result of the 1908

tax sale. *Id*. at 26–27.  In addition, Wilkinson includes an analysis of the 1920 deed

from CPLC to the Commonwealth. *Id*. at 28–29.  And he concludes that the deed

"does not contain clear language of reservation in favor of CPL" and that because

of the 1908 "Title Wash," the prior reservation of oil, gas, and mineral rights in the

land was extinguished. *Id*. at 29.

Contending that Wilkinson's declaration "is an improper and inadmissible

legal opinion on matters exclusively reserved to the Court," *doc. 136* at 2, the

Proctor Trusts move to strike the declaration of Wilkinson and the title opinion

attached to his declaration as well as any references in the Game Commission's

briefs to the declaration or title opinion.  The parties have fully briefed the motion

to strike.  For the reasons discussed below, we recommend that the motion to strike

be granted in part and denied in part.

Federal Rule of Evidence 702, which governs the admissibility of expert

testimony, provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence
> or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and
> methods; and
>
> **(d)** the expert has reliably applied the principles and methods to
> the facts of the case.

"Rule 702 has three major requirements: (1) the proffered witness must be an

expert, i.e., must be qualified; (2) the expert must testify about matters requiring

scientific, technical or specialized knowledge; and (3) the expert's testimony must

assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir.

2008).  The third requirement, the one at issue here, relates to fit—"the expert

testimony must fit the issues in the case." *Schneider ex rel. Estate of Schneider v.

Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  "In other words, the expert's testimony

must be relevant for the purposes of the case and must assist the trier of fact." *Id.*

13

Federal Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  "Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (quoting Fed. R. Evid. 704(a), as then worded).  Rule 704 must "be read in conjunction with Rule 702, which requires opinion evidence to be helpful" to the factfinder. *Collie v. Wal-Mart Stores E., L.P.*, No. 1:16-CV-227, 2017 WL 2264351, at *1 (M.D. Pa. May 24, 2017).  "The District Court has discretion to determine whether expert testimony will help the trier of fact." *Berckeley*, 455 F.3d at 217.

Although "[t]he boundaries of Rule 704 are often hazy," *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013), "[i]n attempting to clarify when an expert runs afoul of the Federal Rules of Evidence when offering ultimate opinions, the Advisory Committee Notes to Rule 704 offer the following helpful example":

> Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

*Orner v. Nat'l Beef Packaging Co., LLC*, No. 4:13-CV-0837, 2015 WL 8334544, at *7 (M.D. Pa. Dec. 9, 2015) (quoting Advisory Committee's Notes to Fed. R. Evid. 704). "An expert, based on his experience, can testify about industry customs and practices but cannot give his opinion as to the legal duties arising from industry custom or whether a party complied with the law." *English v. Crown Equip. Corp.*, No. CV 3:13-0978, 2016 WL 614680, at *8 (M.D. Pa. Feb. 16, 2016).

Testimony about the governing law and testimony that amounts to legal conclusions are not helpful to the court or the factfinder.[8] "Thus, when an expert purports to testify as to the ultimate *legal* issue, that testimony is not admissible and should not be considered on summary judgment." *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, No. CIV.A. 05-281, 2011 WL 204619, at *13 (E.D. Pa. Jan. 20, 2011) (italics in original).

---

[8] The Game Commission suggests that Wilkinson's declaration and title opinion are admissible because the Court is the trier of fact. *See Doc. 142* at 4 ("Neither Wilkinson's declaration nor his accompanying title opinion report (collectively, the 'Declaration') usurp the role of the trier of fact (here, this Court) and, accordingly, the Proctor Trusts' motion to strike should be denied."); at 8 ("That the Declaration touches on the ultimate issue in this case is a faux danger where *this Court* is the trier of fact.") (emphasis in original); at 13 ("The Declaration does not usurp the role of the Court where, as here, the Court is acting as the trier of fact."). But here the Court is considering cross motions for summary judgment. At the summary-judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, here the Court is **not** acting as the trier of fact.

Turning to the case at hand and considering the above standards, we recommend that the Court strike Wilkinson's discussion of the Supreme Court's decision in *Herder Spring* because "[s]uch testimony pertaining to 'the governing law' is indisputably inadmissible." *Jordan v. Temple Health Sys., Inc.*, No. CV 16-5561, 2018 WL 3649019, at *2 (E.D. Pa. Aug. 1, 2018) (quoting *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991)).  We also recommend that the Court strike Wilkinson's legal conclusions: (1) that the Proctor Trusts do not have an interest in the Subsurface Estate; (2) that the Commonwealth has title to the Subsurface Estate, (3) that 100% of both the surface estate and the oil, gas, and mineral estate is vested in the Commonwealth; (4) that the 1908 tax sale resulted in a "Title Wash" that extinguished the prior reservation of oil, gas, and mineral rights; and (5) that the 1920 deed from CPLC to the Commonwealth does not contain clear language of reservation in favor of CPLC.  These are legal issues in this case for the Court to decide.  Opinion testimony on such legal issues is not helpful, and allowing such would allow Wilkinson to usurp the role of the Court in this case.

Although the Proctor Trusts contend that Wilkinson's Declaration "consists wholly of inadmissible legal opinions," *doc. 137* at 1, that assertion is without merit.  As discussed above, some of the declaration and accompanying title opinion discuss the governing law and opine on legal issues, and we will not consider such in connection with the pending summary judgment motions.  But

16

Wilkinson's declaration and accompanying title opinion also contains numerous other assertions, and the Trusts have not addressed those assertions.[9]  Thus, there is no basis to strike those assertions.

## IV.  Summary Judgment Motions.

### A.  Summary Judgment Standards.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of

---

[9]  In its brief in opposition to the motion to strike, the Game Commission asserts, in passing, that Wilkinson's declaration is proper under Fed. R. Evid. 1006 as a summary of the Percheron Abstract, the Potter Abstract, and public records. Without elaboration, the Proctor Trusts respond that Rule 1006 is not applicable because the Game Commission is not the proponent of the underlying exhibits.  As discussed above, Wilkinson's discussion of the governing law and his legal opinions are not admissible under Fed.R.Civ.P. 702 and 704.  But as to the other assertions made by Wilkinson in his declaration and title opinion, there has been no showing or argument that the Percheron Abstract, the Potter Abstract, and the public records upon which Wilkinson relied are not the type of documents upon which experts in this area rely. *See* Fed.R.Evid. 703 (setting forth the facts and data upon which an expert may rely).  Thus, even if Wilkinson's declaration and title opinion do not qualify as a summary under Rule 1006, his assertions are admissible.  The Proctor Trusts further contend, however, that the foundational facts that Wilkinson sets forth are not in dispute and the deeds and public records reviewed by Wilkinson have been submitted into evidence.  But such does not render the assertions set forth in the declaration and title opinion inadmissible.

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the

moving party has met its burden, the nonmoving party may not rest upon the mere

allegations or denials of its pleading; rather, the nonmoving party must show a

genuine dispute by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" or "showing that the

materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ.

P. 56(c).

The substantive law identifies which facts are material, and "[o]nly disputes

over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if

there is sufficient evidence that would allow a reasonable fact finder to return a

verdict for the non-moving party. *Id.* at 248–49.

"Courts are permitted to resolve cross-motions for summary judgment

concurrently." *UHS of Delaware, Inc. v. United Health Servs., Inc.*, 227 F. Supp.

3d 381, 390 (M.D. Pa. 2016).  But "[w]hen doing so, the court is bound to view the

evidence in the light most favorable to the non-moving party with respect to each

motion." *Id.*

### B. Material Facts.

A party who seeks to resist a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Under this Rule, the failure to follow these instructions and appropriately challenge the material facts tendered by the moving party means that those facts are deemed admitted. Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner— whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.*

Here, the Proctor Trusts filed a statement of material facts in support of their motion for partial summary, and the Game Commission filed a response. Also, the Game Commission filed a statement of material facts in support of its motion for partial summary judgment, and the Proctor Trusts filed a response. We set forth

here the basic undisputed facts.  We discuss other facts in connection with discrete issues.

### 1.  The Josiah Haines Warrant.

By warrant dated January 22, 1793, the Commonwealth of Pennsylvania warranted a tract of land then located in Northumberland County to Josiah Haines (the "Josiah Haines Warrant"). *Doc. 95* (The Proctor Trusts' statement of material facts) at ¶ 1 and *Doc. 121* (the Game Commission's response to the Proctor Trusts' statement of material facts) at ¶ 1.  By patent dated June 27, 1794, the Commonwealth subsequently conveyed the Josiah Haines Warrant (also known as "Trap"), patented at 407¾ acres, to Daniel Brodhead. *Id*. at ¶ 2.  The Josiah Haines Warrant is located in what is now LeRoy Township, Bradford County. *Id*. at ¶ 3.

Through a series of conveyances, Schrader Mining & Manufacturing Co. acquired ownership of the Josiah Haines Warrant. *Id*. at ¶ 4.  And by a deed dated June 5, 1893, Schrader Mining & Manufacturing Co. conveyed the Josiah Haines Warrant to Thomas E. Proctor and Jonathan A. Hill. *Id*. at ¶ 5.

### 2.  Proctor's Reservation of Subsurface Rights.

By deed dated October 27, 1894 (the "Union Tanning Deed"), Thomas E. Proctor, his wife Emma H. Proctor, Jonathan A. Hill, and his wife Lucy M. Hill conveyed certain interests with respect to the Josiah Haines Warrant to Union

Tanning Company. *Id*. at ¶ 8.  But Thomas E. Proctor and Jonathan Hill reserved

the subsurface estate. *Id*. at ¶ 9.  The Union Tanning Deed provides:

> And the same grantors herein Thomas E. Proctor and Jonathan
> A. Hill hereby expressly reserve, and save to themselves their
> heirs and assigns, all the minerals, coal, oil, gas, or petroleum
> found now or hereafter, on or under the surface of any or all of
> the lands described in each of the above mentioned parts or
> divisions, and conveyed by this Indenture, together with the
> right and privilege of ingress, egress, and regress upon said
> lands for the purpose of operating or developing, working, or
> removing the same.

*Id*. at ¶ 9.


### 3.  The Transfer to the Central Pennsylvania Lumber Company.

By a May 1903 deed (the "Union Tanning-CPLC Deed"), the Union

Tanning Company conveyed certain interests with respect to the Josiah Haines

Warrant to the CPLC. *Id*. at ¶ 13.  The Union Tanning-CPLC Deed reserved

certain rights as to bark and timber:

> Reserving and excepting, nonetheless, unto the party of the first
> part, its successors, and assigns, all the hemlock bark, rock oak
> bark and chestnut oak bark upon said lands, timber and trees,
> with the rights of ingress, egress and regress for the purpose of
> cutting, peeling, curing, piling, storing and removing said bark
> in the usual and ordinary manner at any and all times within the
> period of twenty-five (25) years from the date hereof . . . .

*Id*. at ¶ 14.  The Union Tanning-CPLC Deed further provides:

> This deed is made, executed, delivered, and accepted for the
> purpose of vesting in the party of the second part, its successors
> and assigns, all the right, title, interest and estate but no greater

than is now held and owned by the Union Tanning Company
of, in, and to the lands hereinbefore mentioned and the timber,
trees and wood thereon, subject to all the exceptions,
reservations, covenants, stipulations, agreements and conditions
continued in the recent deeds hereinbefore recited, and subject
also to all the exceptions, reservations, covenants, stipulations,
agreements and conditions hereinbefore stated. . . .

*Id*. at ¶ 15.

### 4. The 1908 Tax Sale.

For the year 1907, Bradford County assessed the Josiah Haines Warrant as

unseated land with a value of $2,460. *Id*. at ¶ 21.  The following taxes were

assessed against the Josiah Haines Warrant for 1907: county tax of $14.76, poor

tax of $4.92, school tax of $8.61, road tax of $9.84, and township tax of $6.15. *Id*.

Taxes assessed against the Josiah Haines Warrant for 1907 were not paid prior to

June 8, 1908. *Id*. at ¶ 22.

On June 8, 1908, the Treasurer of Bradford County sold the Josiah Haines

Warrant at a tax sale to recover the unpaid 1907 taxes. *Id*. at ¶ 23.  Prior to the June

8, 1908 tax sale, notice that the property was to be sold for unpaid taxes was

provided by advertisements, which did not identify current or former owners, in

Bradford County newspapers. *Id*. at ¶ 24.

At the June 8, 1908 tax sale, McCauley purchased the Josiah Haines

Warrant. *Id*. at ¶ 25.  On December 17, 1908, the Treasurer's deed for the tax sale

of the property to McCauley was acknowledged in open court by the Deputy

Treasurer of Bradford County. *Doc. 125* (The Game Commission's statement of material facts) at ¶ 18 and *Doc. 129* (the Proctor Trusts' response to the Game Commission's statement of material facts) at ¶ 18.

### 5. Transactions After the Tax Sales.

Bradford County assessment records contain entries indicating that 1908, 1909, and 1910 taxes on parcels purchased by McCauley at the 1908 tax sale, including the Josiah Haines Warrant, were paid by "C.P.L. Co." or "Central Pa. Lumber Co." *Doc. 95* (The Proctor Trusts' statement of material facts) at ¶ 32(a) and *Doc. 121* (the Game Commission's response to the Proctor Trusts' statement of material facts) at ¶ 32(a).

By deed dated December 6, 1910, McCauley and his wife, in consideration of a payment of $1.00, "grant[ed], remise[d], release[d] and quit-claim[ed]" to CPLC "[a]ll their right, title, interest and estate of, in, and to" forty-five parcels, including the Josiah Haines Warrant. *Id*. at ¶ 31.

In April of 1916, CPLC leased certain tracts of land, including the Josiah Haines Warrant, to the Commonwealth of Pennsylvania for a state game reserve. *Id*. at ¶ 33.  On or about March 24, 1920, CPLC and the Commonwealth of Pennsylvania entered into a contract for the sale of certain properties, including the Josiah Haines Warrant, from CPLC to the Commonwealth. *Id*. at ¶ 34.

By deed dated December 14, 1920 (the "CPLC-Commonwealth Deed"),

CPLC conveyed to the Commonwealth 7,492.9 acres of land, including the Josiah

Haines Warrant. *Id*. at ¶ 37.  The CPLC-Commonwealth Deed provides as follows:

> This conveyance is made subject to all the minerals, coal, oil,
> gas or petroleum found now or hereafter on, or under the
> surface of any or all of the lands above described in each of the
> above mentioned parts or divisions; together with the right and
> privilege o[f] ingress, egress and regress upon said lands for the
> purpose of prospecting for, or developing, working or removing
> the same, as fully as the said minerals and rights were excepted
> and reserved in deed dated Oct. 27, 1894 from Thomas E.
> Proctor et al to the Union Tanning Company, recorded in the
> office for recording deeds in Bradford County in deed book
> Vol. 205, page 436.
>
> Also subject to all the reservations, exceptions, covenants and
> stipulations contained in said recited deed from Thomas E.
> Proctor et al to the Union Tanning Company, and in deed from
> the Union Tanning Company to the Central Pennsylvania
> Lumber Company, above recited, dated May 25, 1903, of
> record as aforesaid in deed book Vol. 251 page 520.

*Id*. at ¶ 38.

By deed dated December 30, 1924, Elk Tanning Company, as successor-by-

merger to Union Tanning Company, quitclaimed all its rights in the Josiah Haines

warrant, as reserved in the Union Tanning-CPLC Deed, to CPLC. *Id*. at ¶ 45.

The Proctor Trusts are the heirs of Thomas E. Proctor. *Id*. at ¶ 46.  In 1980,

the heirs of Thomas E. Proctor executed a lease of the Josiah Haines Warrant for

oil and gas development with the Exxon Corporation. *Id*. at ¶ 47 and *Doc. 110-6*.

## C. Discussion.

Here, both parties are seeking to quiet title to the subsurface estate of the Josiah Haines Warrant.  The plaintiff in a quiet title action "has the burden of proof and must recover on the strength of its own title." *Herder Spring*, 143 A.3d at 372.

The Game Commission contends that the 1908 tax sale of the Josiah Haines Warrant from the Treasurer of Bradford County to McCauley resulted in a title wash that reunited the surface and subsurface estates, and the Commonwealth later purchased both the surface and subsurface estates from CPLC in 1920.  The Proctor Trusts, on the other hand, contend that because the owners of the Josiah Haines Warrant were not provided with notice of the sale that satisfied due process and because the circumstances in this case differ in several respects from the circumstances in *Herder Spring*, the 1908 tax sale of the Josiah Haines Warrant did not result in a title wash.  They also contend that the Commonwealth did not obtain the subsurface estate through the 1920 sale.

We turn first to whether the 1908 tax sale resulted in a title wash.  Because there is a material factual dispute about whether the Josiah Haines Warrant was seated or unseated, we cannot conclude as a matter law whether there was a title wash.  But to assist Chief Judge Conner should he disagree with that conclusion, we will address the parties' other arguments that bear on whether the 1908 tax sale resulted in a title wash.  In that regard, we will address whether the notice of the

tax sale complied with the requirements of due process.  We then we address whether there was a redemption, and then whether the Josiah Haines Warrant was assessed as a whole for tax purposes.  After we finish with the issues relating to whether there was a title wash, we conclude by discussing the effect of the 1920 sale from CPLC to the Commonwealth.

### 1.  Seated vs. Unseated.

The Proctor Trusts contend that the 1908 tax sale did not result in a title wash because the Josiah Haines Warrant was seated, rather than unseated.  More specifically, they argue that although the Josiah Haines Warrant was sold at the 1908 tax sale as unseated land, the property was, in fact, seated, and as such, its sale as unseated land is void.  In support of their contention that the property was seated, the Proctor Trusts contend that timber and tanbark were harvested from the property from 1905 to 1907.  More specifically, they contend that: (1) in 1905, tanbark was harvested from 60 acres of the Josiah Haines Warrant, yielding 300,900 net tons of bark, utilizing the services of Laquin Lumber Co. as bark jobber, and this yielded 189,500 feet of hemlock lumber, which was sent to Schrader Mill; (2) in 1906, tanbark was harvested from 201 acres of the Josiah Haines Warrant, yielding 1,000,000 net tons of bark, utilizing the services of Laquin Lumber Co. as bark jobber; and (3) in 1907, tanbark was harvested from 149½ acres of the Josiah Haines Warrant, yielding 104,300 net tons of bark,

utilizing the services of Laquin Lumber Co. as bark jobber. *Doc. 95* at ¶¶ 18–20.
In support of these contentions, they point to one page from a ledger folio of CPLC
that under a section titled "Peeling Record" lists, among other things, acres and net
tons for the years 1905, 1906, and 1907, and one page of a plat drawing of the
Josiah Haines' warrant that contains notations as to acres peeled in 1905, 1906, and
1907. *See Doc 104-6* (Proctor Trusts Exhibit 12) and *Doc. 104-7* (Proctor Trusts
Exhibit 13).

The Game Commission contends that the Josiah Haines Warrant was
unseated at the time of the assessment for the 1907 taxes, the nonpayment of which
led to the 1908 tax sale.  And the Game Commission contends documents that the
Proctor Trusts rely on to assert otherwise are "unauthenticated, inadmissible
hearsay supported by nothing other than a declaration of the Proctor Trusts'
counsel, who lacks any personal knowledge regarding the records, what they
purport to show, or what CPCL did or did not do." *See Doc. 121* at ¶¶ 18–20.  We
conclude that the documents are not unauthenticated hearsay.

Federal Rule of Evidence 803(16) deals with statements in ancient
documents and provides that "[a] statement in a document that was prepared before
January 1, 1998, and whose authenticity is established" is not excluded by the
hearsay rule.  "To satisfy the requirement of authenticating or identifying an item
of evidence, the proponent must produce evidence sufficient to support a finding

27

that the item is what the proponent claims it is." Fed.R.Evid. 901(a). "'[T]he

burden of proof for authentication is slight."' *Lexington Ins. Co. v. W.*

*Pennsylvania Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005) (quoting *McQueeney v.*

*Wilmington Trust Co.,* 779 F.2d 916, 928 (3d Cir.1985)).  Rule 901 provides a

nonexclusive list of methods by which a document may be authenticated, and

Fed.R.Evid. 901(b)(8), which deals with authenticating ancient documents and data

compilations, provides that such can be done by evidence that the document or

data complication:

> (A) is in a condition that creates no suspicion about its
> authenticity;
>
> (B) was in a place where, if authentic, it would likely be; and
>
> (C) is a least 20 years old when offered.

Here, Paul K. Stockman, one of the attorneys for the Proctor Trusts, states in

his declaration that the documents at issue are true and correct copies of documents

produced by International Development Corporation in discovery in a lawsuit

pending in the Court of Common Pleas of Lycoming County, Pennsylvania

captioned *Keta Gas & Oil Co., et al. v. Proctor, et al.* No. 571 of December Term,

1950. *Doc. 96-10* at ¶¶ 8–9.  Stockman also asserts that these documents were

authenticated by Charles David Rainey, during a February 12, 2018 deposition in

the *Keta Gas* case. *Id.* at ¶ 21.  During that deposition, Rainey testified that he

obtained from an abstractor—Lauri Sekarak—with the Warren County Historical

Society "plats and stripping records of . . . everything that Central Pennsylvania Lumber Company ever had . . . ." *Doc. 96-7* at 4 (Rainey Dep. at 84).  Stockman further asserts "on information and belief" that Sekarak obtained the original, bound land-record books of CPLC from a law firm when that firm was dissolving, and the exhibits at issue here were bound in those books. *Doc. 96-10* at ¶ 21. There is nothing about the documents that create suspicion about their authenticity; they were found in a place where, if authentic, such documents would likely be found; and they are more than 20 years old.  Because the evidence submitted by the Proctor Trusts is sufficient to show that the documents are what they are purported to be, the authentication requirement is satisfied.  Thus, under Fed.R.Evid. 803(16), the documents are not inadmissible under the hearsay rule.

Having rejected the Game Commission's hearsay objection, we turn to whether from the evidence submitted by the Proctor Trusts, a reasonable trier of fact could conclude that at the time of the assessment for the 1907 taxes, the Josiah Haines Warrant was seated land.  We begin with a brief discussion of the historical difference under Pennsylvania law between how seated and how unseated land was taxed and the reasons for such a difference.

Before 1947, there was a distinction in Pennsylvania for tax purposes between seated and unseated lands. *Herder Spring*, 143 A.3d at 363.  If the land was seated, the owner was personally responsible for the payment of the property

taxes. *Id*. at 364. But if the land was unseated, the taxes were imposed on the land

itself and the owner was not personally responsible for those taxes. *Id*. After

examining the early Pennsylvania statutes dealing with the taxation of land and

summarizing the history of the distinction between that taxation of seated land and

unseated land, the Third Circuit explained why this distinction made sense:

> In the case of seated lands the owners mostly resided on the
> lands and they or their tenants nearly always had goods or
> chattels thereon. Under these circumstances collection from the
> owner was indicated and it was the method adopted. In the case
> of unseated lands, however, there were never on the lands
> goods or chattels subject to distraint. The owners were very
> frequently nonresidents of the county and often land speculators
> residing in other states. The land was thus the only reasonably
> certain and tangible security for the tax and its sale was the
> logical method of collection.

*Northumberland Cty. v. Philadelphia & Reading Coal & Iron Co.*, 131 F.2d 562,

565–66 (3d Cir. 1942) (footnote omitted). In sum, "[i]f the assessor determined

that the land was seated, the land was taxed to the land owner, who was personally

responsible for the payment of the taxes which could be collected against his or her

personal property." *Herder Spring*, 143 A.3d at 364. "The owner of unseated land,

however, was not personally responsible for the payment of taxes, which were

instead imposed on the land itself, in the name of the person to whom the original

warrant had been issued." *Id*.

"Seated land was property that had been developed with residential

structures, had personal property upon it that could be 'levied upon for the tax

due', or was producing regular profit through cultivation, lumbering, or mining."

*Id.* at 363 (quoting Robert Grey Bushong, *Pennsylvania Land Law,* Vol. 1,

§ 469(II) at 500–501 (1938)).  On the other hand, "[u]nseated land is best

understood as 'wild' land but included any land that did not meet the requirements

of being seated." *Id*. (quoting *Pennsylvania Land Law,* Vol. 1, § 469(IV) at 501).

"[W]hether a tract of land is seated or unseated depends altogether upon what has

been, or is being done upon it; upon the appearance which it may present to the eye

of the assessor." *Stoetzel v. Jackson*, 105 Pa. 562, 567 (Pa. 1884); *see also Dolph v.*

*Everhart*, 19 A. 431, 432 (Pa. 1890) ("Whether a tract of land is seated or unseated

depends altogether upon the appearance it presents to the assessor at the time of the

assessment.").  If, at that time of the assessment, the land "has been or is being

improved by clearing or cultivation, or by the erection of a building upon it, or if

the property shows such permanent improvements as indicate a personal

responsibility for the taxes, it is the assessor's duty to enter it upon the seated list."

*Dolph*, 19 A. at 432.  "On the other hand, if there be no such improvements he

must return it as unseated." *Stoetzel*, 105 Pa. at 567.

Running a business, including a lumber business, on the land may make the

land seated. *See Watson v. Davidson*, 87 Pa. 270, 274 (Pa. 1878) ("In the legal

aspect of the case, the question was whether a tract of land can be seated for

*lumbering* purposes.  The negative means that land cannot be seated except for

agricultural purposes.  It would have been error to so hold." (italics in original));

*George v. Messinger*, 73 Pa. 418, 423 (1873) ("[I]t is not necessary that the value

of the land must be enhanced, for the removal of the coal, as well as the removal of

the timber, may lessen its value.  Yet the act of doing such work upon the land may

seat it.").  But "[i]t is not the business which gives [the land this] character, but the

permanent occupancy and possession with the means afforded thereon for the

collection of the taxes." *Watson*, 87 Pa. at 274.

Here, although the land was sold at the 1908 tax sale as unseated land, the

assessor's classification of the land as unseated is not necessarily determinative.  It

is "the actual character of the land rather than its classification by the assessor" that

"determines the way in which taxes on it are to be collected . . . ." *Northumberland

Cty.* 131 F.2d at 567.  "The assessor is to determine whether the land is seated or

unseated from its condition and appearance, when he comes to assess the tax."

*Dolph*, 19 A. at 433.  "If unseated, then, a subsequent occupation of it within the

same year will not affect the validity of the sale." *Id.*  Further, the Act of June 3,

1885, in effect at the time of the tax sale here,[10] provides:

---

[10]   In a footnote, the Proctor Trusts assert among other things that the 1885
Act was repealed by the Act of June 4, 1901, P.L. 364.  We do not address this
argument in depth as it was raised only in a footnote. *See John Wyeth & Brother
Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1076 n.6 (3d Cir.1997) ("arguments
raised in passing (such as, in a footnote), but not squarely argued, are considered
waived."); *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 457 n.14
(E.D. Pa. 2012) ("An argument made only in a footnote is not worthy of credence

> All sales of seated or unseated lands within this commonwealth
> which shall hereafter be made for arrearages of taxes due
> thereon, shall be held, deemed and taken to be valid and
> effective irrespective of the fact whether such lands were seated
> or unseated at the time of the assessment of such taxes.
> Provided, That nothing in this act contained shall validate or
> authorize the sale of any land which was in fact seated at the
> time of the assessment of the taxes thereon, in any case where
> there was sufficient personal property on the premises to pay all
> the taxes assessed thereon, liable under the laws of this
> commonwealth to have been seized therefor.

72 Pa. Stat. Ann. § 5933.  "[T]his act, while validating sales of lands as seated or

unseated which were not so in fact, made it clear that the validation did not extend

to lands which were in fact seated if there was sufficient personal property on the

premises liable to pay the taxes." *Northumberland Cty.* 131 F.2d at 567.  "The act

thus clearly contemplated that the true character of land as seated should always be

open to inquiry in determining the validity of proceedings taken to collect the taxes

upon it." *Id.*

---

(other than to be rejected by footnote).").  We do note, however, that the case that
the Proctor Trusts rely on to support their assertion that the Act of 1885 was
repealed by the Act of 1901—*Day v. Swanson*, 84 A. 958 (Pa. 1912)—does not so
hold.  In *Day*, the Pennsylvania Supreme Court held that the Act of 1901 repealed
a different Act—the Act of April 29, 1884. *Id*. at 959.  The court in *Day* did not
even mention the Act of 1885, much less hold that it was repealed. *Id*.  And later,
the Pennsylvania Supreme Court held that the Act of 1885 had not been repealed.
*See Scott v. Bell*, 25 A.2d 308, 310–11 (Pa. 1942) ("We therefore now hold that the
act of 1885 has not been repealed just as we held in effect in *Hare v. South Penn.
Oil Co.*, 256 Pa. 119, 100 A. 542, that it was not repealed by the acts of 1901,
supra, and 1903, supra.").

Thus, the question here is whether the Josiah Haines Warrant was seated at the time the assessment for the 1907 taxes was made.  Recall that the Proctor Trusts have presented evidence that: (1) in 1905, tanbark was harvested from 60 acres of the Josiah Haines Warrant, yielding 300,900 net tons of bark, utilizing the services of Laquin Lumber Co. as bark jobber, and this yielded 189,500 feet of hemlock lumber, which was sent to Schrader Mill; (2) in 1906, tanbark was harvested from 201 acres of the Josiah Haines Warrant, yielding 1,000,000 net tons of bark, utilizing the services of Laquin Lumber Co. as bark jobber; and (3) in 1907, tanbark was harvested from 149½ acres of the Josiah Haines Warrant, yielding 104,300 net tons of bark, utilizing the services of Laquin Lumber Co. as bark jobber. *Doc. 95* at ¶¶ 18–20.  This evidence shows that there was peeling and tan bark harvesting on the land from 1905–1907, which presumably would have been the time frame in which the assessment for the 1907 taxes would have been made.[11]  The Proctor Trusts, however, have not presented any evidence about how the land would have appeared at the time of the assessment, and they have presented no evidence about how long or what was involved with harvesting the tanbark.

---

[11]  The parties have not indicated on what date or even what year the assessment for the 1907 taxes would have taken place.  But they also have not suggested that it would not have been between 1905-1907.

34

But regardless of the assessor's determination, the evidence the Proctor Trusts provided, however thin, casts doubt on the true character of the land. Moreover, there are too many missing facts—what was present on the land, the date of the 1907 assessment—that bear on the actual character of the land for us to say as a matter of law that at the time of the 1907 assessment, the land was seated or unseated. Rather, it is a question of fact for the factfinder to determine whether, contrary to the assessor's determination that the property was unseated, the property was, in fact, seated at the time of the assessment and there was sufficient personal property on the premises to pay the taxes. Thus, for purposes of the motions for summary judgment, we conclude that there is a genuine factual dispute about whether the property was seated or unseated.

For the 1908 tax sale to have resulted in a title wash, the Josiah Haines Warrant must have been unseated. *Herder Spring*, 143 A.3d at 378 ("We observe that the holding in this case applies to a very limited subset of cases involving quiet title actions for formerly unseated land sold at a tax sale prior to 1947."). Thus, given our conclusion that there is a genuine factual dispute about whether the land was seated or unseated, we cannot conclude as a matter of law whether the 1908 tax sale resulted in a title wash.

Further, because we have concluded that there is a genuine factual dispute about whether the land was seated or unseated, we need not discuss that parties'

other arguments for why the 1908 tax sale did or did not result in a title wash. Nevertheless, we will do so in the event the Court disagrees with our conclusion.

We turn next to whether the notice of the 1908 tax sale satisfied due process. Then, we turn to whether there was a redemption of the Josiah Haines Warrant, and after that, we address whether the Josiah Haines Warrant was assessed as whole. After we address those issues, which bear on whether the 1908 tax sale resulted in a title wash, we turn to the effect of the 1920 sale from CPLC to the Commonwealth.

### 2. Due Process.

The Proctor Trusts also contend that the 1908 tax sale did not result in a title wash because notice of the tax sale did not comply with due process. More specifically, they argue that the 1908 tax sale did not convey title to the mineral estate because there was no attempt to provide personal notice to those claiming an interest in the property, and, thus, the sale was void because it violated due process. Before determining whether the notice provided in this case comports with due process, we address the Game Commission's contentions that the Proctor Trusts' due-process argument is barred by collateral estoppel and by the statute of limitations.

### a.  Collateral Estoppel.

The Game Commission argues that the Proctor Trusts are collaterally

estopped from asserting their due process claim based on the denial of the due

process claim in *Cornwall Mountain Investments, L.P. v. Thomas E. Proctor Heirs*

*Tr.*, 158 A.3d 148 (Pa. Super. Ct. 2017), *petition for allowance of appeal denied*,

172 A.3d 594 (Pa. 2017).  Because the Superior Court in *Cornwall Mountain* based

its due process decision on the Pennsylvania Supreme Court's decision in *Herder*

*Spring*, we begin with a brief analysis of how *Herder Spring* decided the due

process issue.

### (i)  *Herder Spring*'s due-process analysis.

The Pennsylvania Supreme Court in *Herder Spring* addressed the issue of

whether notice by publication of an early Twentieth Century tax sale satisfied due

process as to the owners of a reservation of subsurface rights.  There, as here, the

deed reserving the subsurface rights was recorded. *Herder Spring*, 143 A.3d at

376.  In that case, the Keller Heirs suggested that because the deed was recorded,

the county officials should have provided them with actual notice of the tax sale.

*Id*.  Recognizing that notice by publication even for *in rem* actions is "generally

disfavored," the *Herder Spring* Court observed that notice by publication is

sufficient "'where it is not reasonably possible or practicable to give more

adequate warning,'" and "the government is not required to make extraordinary

efforts." *Id*. at 377 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 317 (1950)).  And it concluded "that what is 'reasonably possible or practicable' and what would constitute an 'extraordinary effort' requires consideration of the constraints of the era." *Id*.

Then, the *Herder Spring* Court "look[ed] to decisions from the relevant time to guide [its] determination of whether due process required personal or constructive notice for a 1935 tax sale of unseated land." *Id*.  Specifically, it looked to it 1865 decision in *City of Philadelphia v. Miller*, 49 Pa. 440 (Pa. 1865).  In *City of Philadelphia*, the Pennsylvania Supreme Court held that "a party did not receive proper notice of a tax sale where the assessment was made in a name entirely unrelated to the unseated land due to a transcription error . . . ." *Herder Spring*, 143 A.3d at 377.  But the *City of Philadelphia* Court nonetheless "explained why notice by publication was proper notice in most cases involving unseated land." *Id*. Relying on that explanation and asserting that "a government entity is not 'required to undertake extraordinary efforts' in providing notice," *id*. at 377–78 (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983)), the *Herder Spring* Court concluded that the constructive notice by publication provided in that case satisfied due process:

> As this Court has found the notice provision of the Act of 1815 to be reasonable given the difficulties of ascertaining ownership information relating to unseated landowners and the protection provided by the redemption period, we will not upset that

38

conclusion based on preconceived notions of what is reasonable in the age of the Internet.

*Id.* at 378.

### (ii) *Cornwall Mountain* does not collaterally estop the due process argument.

The Superior Court of Pennsylvania in *Cornwall Mountain,* 158 A.3d at 148,[12] also addressed a contention that a tax sale was not valid because of lack of notice that satisfied due process.  In that case, Cornwall Mountain brought an action against the Proctor Trusts to quiet title to the subsurface estate beneath 3000 acres in Lycoming County. *Id.* at 150–51.  There, as here, the Proctors conveyed the property to the Elk Tanning Company but reserved the subsurface estate, and the Elk Tanning Company later conveyed the surface estate to CPLC, which later still conveyed it to others. *Id.*  But unlike in our case, in *Cornwall Mountain*, there were separate assessments of the surface and subsurface estates. *Id.* at 151.  Those separate assessments began in 1930, and the subsurface estate "was identified as belonging to "Thomas E. Proctor & Heirs.'" *Id.*  In 1932, however, the subsurface estate was sold to the surface owner at a tax sale. *Id.*  Cornwall Mountain claimed title to both the surface and the subsurface estates based on the 1932 tax sale. *Id.*

---

[12]  Although in the cited case, the Superior Court addressed the appeal of the Margaret O. F. Proctor Trust, the Thomas E. Proctor Heirs Trust filed an appeal raising the same issues, and the Superior Court affirmed the trial court based on its decision in the cited case. *See Cornwall Mountain Investments, L.P. v. Thomas E. Proctor Heirs Tr.*, 2017 WL 1057490, 168 A.3d 332 (Table) (Pa. Super. Ct. Mar. 21, 2017), *petition for allowance of appeal denied*, 172 A.3d 593 (Pa. 2017), *cert. denied*, 138 S.Ct. 1698 (2018).

The Proctor Trusts, however, claimed that the 1932 tax sale was not valid, and they claimed they retained ownership of the subsurface estate. *Id*. at 152.

One of the Proctor Trusts' arguments in *Cornwall Mountain* was that the tax sale was void because constitutionally sufficient notice of the tax sale was not provided. *Id*. at 158.  They argued "that notice by publication alone does not satisfy the mandates of due process, and hence, such notice of the 1932 tax sale was so constitutionally deficient as to render the sale void." *Id*.  They further asserted "that since the assessments reference[d] 'Thomas E. Proctor & Heirs' as the mineral rights owners, the officials in Lycoming County knew the heirs had an interest in the property and could have provided notice to the Proctor heirs with reasonable effort." *Id*.  Relying on *Herder Spring*, the Superior Court rejected the Proctor Trusts' due process argument. *Id.*

Here, the Game Commission argues that the Proctor Trusts are collaterally estopped from asserting their due process argument based on the denial of the due process claim in *Cornwall Mountain*.

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  Claim preclusion and issue preclusion "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."

*Allen v. McCurry*, 449 U.S. 90, 94 (1980).  When applied by a federal court to give preclusive effect to a state court judgment, claim preclusion and issue preclusion also promote "the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Id.* at 96.

"Allowing the same issue to be decided more than once wastes litigants' resources and adjudicators' time, and it encourages parties who lose before one tribunal to shop around for another." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1298–99 (2015).  "The doctrine of collateral estoppel or issue preclusion is designed to prevent this from occurring." *Id.*  Collateral estoppel "simply means that when an issue of law, evidentiary fact, or ultimate fact has been determined by a valid and final judgment, that issue cannot be litigated again between the same parties in any future lawsuit." *Com. v. Holder*, 805 A.2d 499, 502 (Pa. 2002) (footnotes omitted).

Additionally, the Full Faith and Credit Statute provides that state judicial proceedings are entitled to the "same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738.  In accordance with that statute, a federal court looks to state law to determine the preclusive effect of a prior state judgment. *Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n*, 767 F.3d 335, 350-51 (3d Cir. 2014).  Here, because we are called upon to determine the preclusive effect of

a judgment of a Pennsylvania court, namely the Pennsylvania Superior Court's

judgment in *Cornwall Mountain*, Pennsylvania preclusion law applies.

Under Pennsylvania law, we use a five-prong test to determine whether issue

preclusion, also known as collateral estoppel, applies. *Skotnicki v. Ins. Dep't*, 175

A.3d 239, 247 (Pa. 2017).  Issue preclusion applies when:

> (1) the issue decided in the prior case is identical to the one
> presented in the later action; (2) there was a final adjudication
> on the merits; (3) the party against whom the plea is asserted
> was a party or in privity with a party in the prior case; (4) the
> party or person privy to the party against whom the doctrine is
> asserted had a full and fair opportunity to litigate the issue in
> the prior proceeding; and (5) the determination in the prior
> proceeding was essential to the judgment.

*Id*.  The party asserting issue preclusion bears the burden of proving each of these

elements. *Dommel Properties, LLC v. Jonestown Bank & Trust Co.*, No. 1:11-CV-

02316, 2014 WL 3385100, at *15 (M.D. Pa. July 9, 2014).

The Game Commission summarily asserts that "[t]he *Cornwall* proceedings

easily satisfy the minimum standards of the law of issue preclusion, and as such are

entitled to preclusive effect." *Doc. 120* at 13 (citing *Nat'l Collegiate Athletic Ass'n

v. Corbett*, 79 F. Supp. 3d 536, 537 (M.D. Pa. 2015)).  The Proctor Trusts respond

that collateral estoppel does not apply because the due process issue is one of law

and because *Cornwall Mountain* involved a different plaintiff, a different parcel of

land in a different county, a different tax sale, a different assessment, and a

different form of pre-sale notice (identifying Proctor as the owner).  The Proctor

Trusts also contend that although the court in *Cornwall Mountain* was bound by the *Herder Spring* decision as to the due process issue, this Court is not bound by the *Herder Spring's* determination of the due process issue, which is a federal issue.  Thus, according to the Proctor Trusts, this case '"affords . . . procedural opportunities in the presentation and determination of the issue that were not available in the first action' that render application of non-mutual collateral estoppel inappropriate." *Doc. 138* at 11 (quoting Restatement (Second) of Judgments § 29).  The Game Commission replies that collateral estoppel may apply to questions of law and that for collateral estoppel to apply, the facts need not be identical as long as any factual differences have no legal significance. *See Doc. 144* at 34–35.

Unlike in this case, *Cornwall Mountain* involved separate assessments as to the surface estate and the mineral estate.  Further, in *Cornwall Mountain* the mineral rights were "identified as belonging to 'Thomas E. Proctor & Heirs'" on the tax rolls, whereas in this case there is no evidence that the mineral estate was identified on the tax rolls as belonging to the Proctor heirs.  Given these significant differences, the Game Commission's summary assertion that collateral estoppel applies fails to satisfy the Game Commission's burden of showing that collateral estoppel applies.

43

### b. Statute of Limitations.

The Game Commission also contends that the Proctor Trusts' due process

argument is barred by the statute of limitations.  The Game Commission suggests

that the time limit set forth in the Act of 1815[13] to redeem the property after the tax

sale bars the Proctor Trusts' due process argument.  The Proctor Trusts respond

that the tax sale was void because notice that satisfied due process was not

provided, and thus, they contend, their due process argument is not time barred.

As the *Herder Spring* Court explained, the Act of 1815 contained a time

limit to redeem property after a tax sale:

> To protect the delinquent owner while also providing finality
> for the purchaser, the legislature provided a two year
> redemption period. Act of 1815, § 4, set forth at 72 P.S. § 6091;
> *see generally* Bushong, § 473(V) at 507.  If the owner paid the
> taxes and costs plus twenty-five percent (later reduced to fifteen
> percent), then the "owner or owners shall be entitled to recover
> the [lands sold] by due course of law." *Id.*  The Act of 1815,
> however, specified that after the two-year period:
>
>> in no other case and on no other plea, shall an action
>> be sustained . . . [and] no alleged irregularity in the
>> assessment, or in the process or otherwise, shall be
>> construed or taken to affect the title of the purchaser,
>> but the same shall be declared to be good and legal.
>
> *Id.;* Bushong, § 473(V) at 507.
>
> If no purchaser bid a price sufficient to pay the outstanding
> taxes, the Act of 1815 required the county commissioners to

---

[13]  The Game Commission actually cites to the Act of 1804, P.L. 517, 4 Sm.L. 201, which as the *Herder Spring* Court noted, was amended by the Act of 1815, which itself was amended by the act of 1847. *Herder Spring*, 143 A.3d at 365 n. 8.

purchase the property, as occurred in regard to the Eleanor
Siddons Warrant. Act of 1815, § 5, set forth at 72 P.S. § 6131;
*see also* Bushong, § 473(V) at 507–08.  In the event of a
purchase by the county commissioner, the owner had a period
of five years (rather than two years) to redeem the property
upon payment of all taxes and interest. Act of 1815, § 6, set
forth at 72 P.S. § 6132; *see also* Bushong, § 473(V) at 507–09.
If the property was not redeemed by the owner during the five
years, the commissioners could sell the land. Act of 1815, § 7,
set forth at 72 P.S. §§ 6134, 6135.  Section 9 of the Act of 1815
further specified the wording of the deed from the treasurer to
the commissioners, which was used in the case at bar. 72 P.S.
§ 6136.

While this Court noted that "some of the enactments in the law
of 1815 would appear harsh and severe on the original owner,"
the act was considered necessary to address the evil that existed
prior to it where "[t]he purchaser at a sale for taxes dare not
spend money or labor on the land he bought." *Morton,* 9 Watts
at 323.  . . . We have repeatedly noted that any contests to the
tax assessment must be brought within the statutory period and
"cannot be collaterally attacked fifty years later." *Bannard,* 293
A.2d at 49; *see also Wilson,* 148 A. at 65.

*Herder Spring*, 143 A.3d at 366.

As discussed above, *Cornwall Mountain* rejected a claim by the Proctor

Trusts that the tax sale at issue there was void because of constitutionally

insufficient notice of the tax sale.  In addition, *Cornwall Mountain* held that the

Proctor Trusts were time-barred from challenging "procedural irregularities in the

notice, assessment, and tax sale process." 158 A.3d at 159–162.  In so doing, the

court noted a distinction between irregularities as to the tax assessment that would

render the sale void and irregularities that would rendered the sale voidable:

> Although the pleadings raise disputed issues of fact
> regarding irregularities in the assessment process, the critical
> question is whether such irregularities in the assessment would,
> as a matter of law, render the tax sale void and legally
> insufficient to convey title to the oil and gas.  If the answer is in
> the affirmative, judgment on the pleadings would not be proper.
> If such irregularities only rendered the sale voidable within the
> period for challenging the tax sale, a time that has long since
> expired, they would not provide a basis to deny judgment on
> the pleadings.

*Id*. at 159.  The *Cornwall Mountain* court concluded that the trustees in that case

were "time-barred from challenging procedural irregularities in the notice,

assessment, and tax sale process." *Id*. at 160.  Despite explaining that "[t]hose

procedural irregularities, had they been timely challenged after the tax sale, may

have been sufficient to upset the sale," the court nevertheless concluded "that

statutes of limitation and repose do not preclude one from defending a quiet title

action on the basis that a tax sale was void, *i.e.*, where there were jurisdictional

defects." *Id*.  The court reasoned that the time limitation of the redemption statute

"'will not breathe life into a void tax title.'" *Id*. at 160 (quoting *Trexler v. Africa*,

33 Pa. Super. 395, 410 (Pa. Super. Ct. 1907)).

Cornwall Mountain* also identified the following as rendering a tax sale

void: "where seated property was improperly treated as unseated"; "where

unseated property was not correctly identified"; "where the deed was forged"; or

"where the treasurer lacked the authority to conduct the sale at the time." *Id*. at

160–61 (citations omitted).  Importantly for our purposes here, although *Cornwall*

*Mountain* did not list lack of notice in violation of the Due Process Clause as one of the procedural irregularities that will render a tax sale void, it had addressed the due process argument in a prior section of the discussion, and in doing so, it implicitly recognized that such a due process violation would render the sale void. *See id.* at 158, 160–61.

Further, the Third Circuit has recognized that "[a]lthough courts in some jurisdictions have held that statutes of limitations . . . are effective where a tax sale is void because of fundamental defects, in most jurisdictions courts have held that such statutes are ineffective to preclude a claim of voidness based on 'jurisdictional' defects in a tax foreclosure proceeding." *Benoit v. Panthaky*, 780 F.2d 336, 338–39 (3d Cir. 1985) (holding that the district court did not err in adopting the majority rule as the law of the Virgin Islands). And "[c]onstitutionally inadequate notice to the owner of the property sold at a tax foreclosure is a jurisdictional defect." *Id.* at 339; *see also Jordan v. Jensen*, 391 P.3d 183, 186 (Utah 2017) (holding that because Utah's four-year statute of limitation for challenging the validity of a tax title was triggered by the county's tax sale, which had been conducted in violation of the Due Process Clause of the Fourteenth Amendment, that statute of limitations could not be applied to bar a mineral interest owner's suit challenging the tax title and concluding that "because in Utah a failure to provide notice to an interested party of a tax sale also serves as

a jurisdictional defect," "the county failed to obtain jurisdiction over the mineral interest at issue, thereby preventing that property interest from passing at the tax sale"); *Cf Poffenberger v. Goldstein*, 776 A.2d 1037, 1042 (Pa. Commw. Ct. 2001) (concluding that as to certain acreage, the statute of limitations to challenge a tax sale had run but concluding as to other acreage because "the upset sale of a portion of the acreage described in the recorded Stricker deed is void *ab initio*," "[t]he fact that a petition to set aside the tax sale was not filed within the applicable statute of limitations does not command a finding in Goldstein's favor").

Thus, given that constitutionally insufficient notice is a jurisdictional defect that renders a tax sale void, we reject the Game Commission's suggestion that the two-year time limit to redeem the property after the tax sale set forth in the Act of 1815 bars the Proctor Trusts' argument that the tax sale was void because notice that satisfied due process was not provided.

Further, although the Game Commission suggests that the two-year statute of limitations applicable to 42 U.S.C. § 1983 claims bars this action, the Proctor Trusts are not presenting a 42 U.S.C. § 1983 due process claim.  Rather, they are presenting a quiet title claim based, in part, on their assertion that that the tax sale was void (and, therefore, did not divest their predecessors of their mineral rights) because notice that satisfied due process was not provided to their predecessors. And the Game Commission has not pointed to a statute of limitations that applies

48

to such a quiet title action. *See Kendall v. Lancaster Expl. & Dev. Co., LLC*, 323 F. Supp. 3d 664, 681 (M.D. Pa. 2018) ("Under Pennsylvania law, an action to quiet title cannot be subject to a statute of limitations.").

In sum, we conclude that the statute of limitations does not bar the Proctor Trusts' due-process argument.

### c. Under the circumstances of this case, we cannot say that the notice by publication violated due process.

Finally, we turn to the merits of the Proctor Trusts' due process argument. The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, §1. The Due Process Clause has both substantive and procedural components. *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011). As to the procedural component of due process, which is at issue here, the Court must first determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). If the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it." *Id.*

Here, the Proctor Trusts assert an interest in the mineral estate to the property. Such a property interest is protected by the Due Process Clause, and the

49

Game Commission does not argue otherwise.  Thus, the issue is what process was due to protect that interest.

In contending that their predecessors were not provided adequate notice of the 1908 tax sale, the Proctor Trusts rely primarily on *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 317-18 (1950) (holding that notice by publication only to beneficiaries of a pooled trust of the judicial settlement of accounts by the trustee was constitutionally sufficient as to beneficiaries "whose interests or whereabouts could not with due diligence be ascertained" but was constitutionally insufficient "[a]s to known present beneficiaries of known place of residence"); and *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 792, 800 (1983) (holding that notice by publication and posting did not provide a "mortgagee of real property with adequate notice of a proceeding to sell the mortgaged property for nonpayment of taxes").

In *Mullane*, the Court identified "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" as "[a]n elementary and fundamental requirement of due process." 339 U.S. at 314.  After pointing out the problems with notice only by publication, the Court noted that "[p]ublication may theoretically be available for all the world to see, but it is too much in our day to suppose that each or any individual beneficiary does or could examine all that is

50

published to see if something may be tucked away in it that affects his property

interests." *Id*. at 315, 320.

Explaining "that notice by publication was not reasonably calculated to

provide actual notice of the pending proceeding and was therefore inadequate to

inform those who could be notified by more effective means such as personal

service or mailed notice," "the Court [in *Mullane*] held that published notice of an

action to settle the accounts of a common trust fund was not sufficient to inform

beneficiaries of the trust whose names and addresses were known." *Mennonite*,

462 U.S. at 795.  But the Court also noted that it "has not hesitated to approve of

resort to publication as a customary substitute . . . where it is not reasonably

possible or practicable to give more adequate warning." *Mullane*, 339 U.S. at 317.

It "recognized that, in the case of persons missing or unknown, employment of an

indirect and even a probably futile means of notification is all that the situation

permits and creates no constitutional bar to a final decree foreclosing their rights."

*Id*.  And the Court concluded that "[t]hose beneficiaries . . . whose interests or

whereabouts could not with due diligence be ascertained come clearly within this

category" such that as to them notice by publication was sufficient. *Id*.  It also did

not "consider it unreasonable for the State to dispense with more certain notice to

those beneficiaries whose interests are either conjectural or future or, although they

could be discovered upon investigation, do not in due course of business come to

51

knowledge of the common trustee." *Id.* Accordingly, the Court "overrule[d] . . . [the] constitutional objections to published notice insofar as they are urged on behalf of any beneficiaries whose interests or addresses are unknown to the trustee." *Id.* at 318.

The *Mullane* Court also "rejected one of the premises underlying th[e] Court's previous decisions concerning the requirements of notice in judicial proceedings: that due process rights may vary depending on whether actions are *in rem* or *in personam." Mennonite,* 462 U.S. at 796 n.3. As the Court in *Mennonite* later explained, personal service or service by mail, rather than constructive notice, was historically required when an action was "*in personam*." *Id.* But "constructive notice to nonresidents was traditionally understood to satisfy the requirements of due process" in *in rem* or *quasi in rem* actions. *Id.* Yet, individuals "who resided within the State and whose identities were reasonably ascertainable," "were generally provided personal service" "[e]ven in actions *in rem." Id.* "Where the identity of interested residents could not be ascertained after a reasonably diligent inquiry, however, their interests in property could be affected by a proceeding *in rem* as long as constructive notice was provided." *Id.*

> Beginning with *Mullane,* this Court has recognized, contrary to the earlier line of cases, "that an adverse judgment *in rem* directly affects the property owner by divesting him of his rights in the property before the court." *Shaffer v. Heitner, supra,* 433 U.S., at 206, 97 S.Ct., at 2580. In rejecting the traditional justification for distinguishing between residents and

> nonresidents and between *in rem* and *in personam* actions, the
> Court has not left all interested claimants to the vagaries of
> indirect notice.  Our cases have required the State to make
> efforts to provide actual notice to all interested parties
> comparable to the efforts that were previously required only in
> *in personam* actions. See *infra,* at 2714–2715.

*Id.*

In *Mennonite*, the Court noted that it "has adhered unwaveringly to the

principle announced in *Mullane.*" 462 U.S. at 797 (citing numerous case where it

held that notice by publication, by posting notice on the property, or by both

publication and posting did not satisfy due process).  Relying on *Mullane*, the

Court in *Mennonite,* which dealt with a tax sale, held that when a "mortgagee is

identified in a mortgage that is publicly recorded, constructive notice by

publication must be supplemented by notice mailed to the mortgagee's last known

available address, or by personal service." *Id.* at 798.  "[U]nless the mortgagee is

not reasonably identifiable, constructive notice alone does not satisfy the mandate

of *Mullane.*" *Id.* (footnote omitted).  The Court noted, however, that although the

mortgage as recorded "identified the mortgagee only as "MENNONITE BOARD

OF MISSIONS a corporation, of Wayne County, in the State of Ohio," its holding

assumed that "the mortgagee's address could have been ascertained by reasonably

diligent efforts." *Id.* at 798 n.4.  But it further noted that "a governmental body is

[not] required to undertake extraordinary efforts to discover the identity and

whereabouts of a mortgagee whose identity is not in the public record." *Id.*

Concluding that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable," the Court held that the notice by publication and posting provided to the mortgagee in that case did not satisfy the requirements of due process. *Id.* at 800 (italics in original).

In sum "[b]efore a State may take property and sell it for unpaid taxes, the Due Process Clause of the Fourteenth Amendment requires the government to provide the owner 'notice and opportunity for hearing appropriate to the nature of the case.'" *Jones v. Flowers*, 547 U.S. 220, 223 (2006) (quoting *Mullane,* 339 U.S. at 313).

Here, there is no evidence that notice other than by publication was provided to the Proctor heirs, and given the statutory scheme at that time, there is no basis to reasonably infer that notice other than by publication would have been provided.[14] So the question is whether that notice satisfied due process.

---

[14]  Citing the advertisements of the tax sale, the Proctor Trusts contend that the only notice of the tax sale provided "were advertisements in Bradford County newspapers that did not identify current or former owners." *Doc. 95* at ¶ 24.  The Game Commission responds by denying that statement "as stated," and contending that the cited advertisements "do not establish, and it cannot be inferred, that the 'only' notice given . . . were advertisements in Bradford County newspapers." *Doc. 121* at ¶ 24.  It is true that the advertisements of the tax sale do not rule out that

"When analyzing whether a particular notice comports with due process, claimants are divided into those 'known and unknown.'" *Tech v. United States*, 935 F. Supp. 2d 802, 806 (M.D. Pa. 2013), *appeal dismissed*, No. 13-2503, slip order at *1(3d Cir. June 13, 2013).  "A 'known' claimant 'is one whose identity is either known or reasonably ascertainable by the [notifying party].'" *Id*. (quoting *Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3d Cir.1995)).  "'Actual notice must be given to those whose identity could be ascertained with reasonable effort.'" *Id*. (quoting *Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 (3d Cir.1973)). But "in the cases of persons missing or unknown, employment of an indirect and even probably futile means of notification, such as notice by publication, is all that the situation permits." *Id*. (citing *Mullane,* 339 U.S. at 317).  "[W]hether adequate notice has been provided depends on the circumstances of a particular case." *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012).

The Game Commission suggests that *Mullane* and *Mennonite* cannot be applied retroactively to invalidate the 1908 tax sale at issue in this case.  But "[w]hen [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events,

---

another type of notice was also provided.  But there is no evidence of any other type of notice being provided in this case.  And there is no reasonable basis to infer that any other type of notice was provided.  Thus, we proceed on the understanding that the only notice provided was by publication.

regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993). Both *Mullane* and *Mennonite* applied their due process rulings to the parties in those cases. Thus, *Mullane* and *Mennonite* provide the due-process analysis applicable to the tax sale here. *See Spigelmyer v. Colony*, No. 1602 MDA 2015, 2016 WL 4876216, at *3 (Pa. Super. Ct. July 26, 2016) (concluding that retroactive application of *Mullane* and *Mennonite* (as well as *Jones*, 547 U.S. 220) was appropriate regardless of the timing of the tax sale).

As set forth above, the Pennsylvania Supreme Court in *Herder Spring* rejected the argument that notice of the tax sale by publication in that case violated due process. The Proctor Trusts contend that *Herder Spring* is not persuasive as to the due process issue. More specifically, they criticize *Herder Spring*'s reliance on the 1815 statute and on the Pennsylvania Supreme Court's earlier decision in *City of Philadelphia v. Miller*, 49 Pa. 440 (1865), upholding notice by publication. They also criticize *Herder Spring*'s statement: "As this Court has found the notice provision of the Act of 1815 to be reasonable given the difficulties of ascertaining ownership information relating to unseated landowners and the protection provided by the redemption period, we will not upset that conclusion based on preconceived notions of what is reasonable in the age of the Internet." *Herder Spring*, 143 A.3d at 377–78.

56

The Proctor Trusts' criticism of *Herder Spring*'s reference to the age of the internet is well taken given that both *Mullane* and *Mennonite* were also decided before the age of the internet.  Similarly, *Herder Spring*'s reliance on *Miller* is also suspect because *Miller* predates *Mullane* and *Mennonite,*.  Nevertheless, we agree with *Herder Spring*'s conclusion that "what is 'reasonably possible or practicable' and what would constitute an 'extraordinary effort' requires consideration of the constraints of the era." *Id*. at 377.  And whether notice by publication satisfies due process depends on whether under the circumstances of the case, the identity and addresses of those with an interest in the property could be ascertained with reasonable effort. *See generally Wright*, 679 F.3d at 108 ("[W]hether adequate notice has been provided depends on the circumstances of a particular case."); *Tech*, 935 F. Supp. 2d at 806 ("Actual notice must be given to those whose identity could be ascertained with reasonable effort."  But "in the cases of persons missing or unknown, employment of an indirect and even probably futile means of notification, such as notice by publication, is all that the situation permits." (internal citations omitted)); *see also Davis Oil Co. v. Mills,* 873 F.2d 774, 787–91 (5th Cir. 1989) (holding that under the circumstances in that case, the district court did not err in concluding that the identity of the holder of mineral rights was not reasonably ascertainable to a seizing creditor and, thus, "constructive notice of the

seizure and sale of the subject property was sufficient to satisfy the requirements of due process").

Here, although Thomas Proctor and his heirs were named in the deed reserving the mineral rights, Thomas Proctor "died testate and a resident of Boston, Massachusetts on or about December 7, 1894." *Doc. 40-5* at 3, ¶3. "He was survived by his widow, Emma Howe Proctor and four children . . . ." *Id.* The parties have not presented evidence as to whether Mrs. Proctor was alive at the time of the 1908 tax sale, and if she were alive at that time, whether tax authorities knew her address or could have reasonably ascertained her address. Similarly, no evidence has been presented as to whether the tax authorities knew or could have reasonably ascertained the names and addresses of the Proctor heirs at the time of the 1908 tax sale. Given the lack of information as to these issues, we cannot say that Mrs. Proctor and/or the Proctor heirs were known and ascertainable claimants such that the notice by publication was constitutionally insufficient. Thus, we cannot conclude, as the Proctor Trusts request, that the tax sale was void because the tax authority provided notice of the tax sale by publication only.

### 3. Redemption.

The Proctor Trusts further contend that the 1908 tax sale did not result in a title wash because there was a redemption. A redemption of property after a tax sale operates to annul the sale and to leave the parties in the position they were in

before the sale. *Yocum v. Zahner*, 29 A. 778, 779 (Pa. 1894) ("Redemption operated to set aside or annul the sale, and left the title precisely as though the sale had not been made.").

The Proctor Trusts contend that McCauley was an agent of CPLC at the time of the 1908 tax sale at issue here, and the sale to him was effectively a redemption of the property on behalf of CPLC. The Proctor Trusts present evidence that McCauley was CPLC's agent and attorney generally. *See doc. 95* at ¶ 26. The Game Commission disputes some of the evidence cited by the Proctor Trusts, and it specifically disputes that McCauley was an agent of CPLC with respect to the 1908 tax sale. *See doc. 121* at ¶ 26.

In support of their contention that McCauley was acting as CPLC's agent for the 1908 tax sale, the Proctor Trusts cite evidence that from 1904–1916, McCauley purchased at tax sales more than 100 properties, which by quitclaim deeds he later transferred to CPLC. *Doc. 95* at ¶ 27 and *Doc. 121* at ¶ 27. The Proctor Trusts also present evidence that in 1914, McCauley executed a declaration stating that he was acting in trust for CPLC as to his purchase of certain property in Elk County. *Id.* at ¶ 26(o). They contend that there is no evidence to suggest that such a declaration was prepared solely for properties in Elk County sold in 1914, and the only reasonable inference is that McCauley prepared similar declarations for each CPLC property he purchased at a tax sale. *Id.* at ¶ 26(o)(1)-(2). The Proctor Trusts

further point to a 1937 affidavit by R.G. Brownell, who according to the Proctor

Trusts was CPLC's president, in which Brownell states that as to a tract of land in

Lycoming County, during the period from 1903 to 1924, CPLC exercised

exclusive possession of that tract and paid the taxes on that tract. *See Doc. 95* at

¶ 32 (a)-(b).  The Proctor Trusts also contend that CPLC acted as the true owner of

the property after the tax sale by paying the 1908, 1909, and 1910 taxes on parcels

purchased by McCauley at the tax sale, including the Josiah Haines Warrant. *See

Doc. 95* at ¶ 32.[15]

Based on the evidence presented by the Proctor Trusts, a reasonable trier of

fact could conclude that McCauley was acting as CPLC's agent at the 1908 tax

sale.  The Game Commission, however, asserts that the Proctor Trusts are

---

[15] The Proctor Trusts further point to correspondence between the Proctor heirs and others, including McCauley, which they contend show that McCauley and CPLC did not believe that the 1908 tax sale resulted in a title wash. *See Docs. 133-2* to *133-24*.  According to the Proctor Trusts, this correspondence shows that the Proctor Estate engaged McCauley to sell or lease coal rights as to properties that had gone through tax sales and engaged him to pay taxes assessed against the Estate's subsurface rights. *See Doc. 129* at ¶ 59.  But none of the letters provided by the Proctor Trusts reference the Josiah Haines Warrant, and none set forth McCauley or CPLC's view as to the 1908 tax sale.  Moreover, only one of the letters provided by the Proctor Trusts is dated before the date of the deed from McCauley to CPLC, *see doc. 133-2*, and the Proctor Trusts characterize that letter as a letter from one of the Proctor heirs to McCauley's father, C.H. McCauley, Sr. *See Doc. 129* at ¶ 59(a).  Further, the Proctor Trusts fail to articulate how McCauley or CPLC's beliefs in years after the tax sale and after the redemption period expired could change the legal effect of the tax sale from a sale to a redemption.

collaterally estopped from arguing that McCauley was CPLC's agent because the

United States District Court for the Western District of Pennsylvania rejected a

challenge to a 1914 tax sale based in part on McCauley's declaration that he

purchased the property at the tax sale on behalf of CPLC. *See Proctor v. Sagamore*

*Big Game Club*, 166 F. Supp. 465, 479 (W.D. Pa. 1958), *aff'd on other grounds*,

265 F.2d 196 (3d Cir. 1959).  The district court in *Sagamore Big Game Club*,

concluded that because of an 1894 tax sale, Thomas Proctor did not own the

mineral rights to the property at issue in that case. 166 F. Supp. at 478.  But the

court went on to conclude that even if there were some defects in the title

following the 1894 tax sale, a later tax sale in 1914, where McCauley was the

purchaser, cured any such defects. *Id.* at 479.  The court stated that "[f]rom the

public records of Elk County, C.H. McCauley, Jr. appears as a complete stranger to

the title." *Id.*  The Court then addressed the declaration of McCauley that he was

acting on behalf of CPLC:

> As this court understands it, the only attack plaintiffs made
> against the sale of 1914 is that McCauley was the attorney and
> land agent for the Central Pennsylvania Lumber Company,
> therefore, in some way an estoppel is sought to be raised
> because there exists, but not of record, a declaration of trust
> executed by McCauley wherein any lands he purchased were to
> be held in behalf of his employer, the Central Pennsylvania
> Lumber Company.  However, no title examiner from the public
> record could acquire such knowledge as to the relationship
> between McCauley and his employer.  This court understands
> that counsel for the plaintiffs concedes that the public records
> control.

*Id.* The court ruled in favor of the defendants, who traced their title back to McCauley and the tax sale. *Id.* at 479–80.

The Game Commission contends that collateral estoppel requires us to reject the Proctor Trusts' contention that based on McCauley's 1914 declaration, he was acting on behalf of CPLC.  But the Game Commission has made no effort to explain how collateral estoppel applies here given that one of the requirements for such is that "the determination in the prior proceeding was essential to the judgment," *Skotnicki*, 175 A.3d at 247, and the Third Circuit in affirming the district court in *Sagamore Big Game Club*, confined its analysis to the earlier 1894 tax sale and "found it unnecessary . . . to consider the other arguments advanced by the parties." *Sagamore Big Game Club*, 265 F.2d at 202–03.  In sum, the district court's determinations in *Sagamore Big Game Club* regarding the 1914 tax sale and McCauley were not essential to the judgment.  Thus, collateral estoppel does not apply.

Although collateral estoppel does not apply, we conclude that there is a genuine factual dispute about whether McCauley was acting as an agent of CPLC for the 1908 tax sale of the Josiah Haines Warrant.  As set forth above, based on the evidence cited by the Proctor Trusts, including the 1914 declaration, a reasonable trier of fact could conclude that McCauley was acting as CPLC's agent.  But there is also evidence from which a reasonable trier of fact could conclude that

McCauley was not acting as CPLC's agent for the 1908 tax sale, namely that the deed from the Treasurer of Bradford County was to McCauley, not CPLC, and that the 1910 deed back to CPLC was from McCauley and his wife. In sum, there is a genuine factual dispute about whether McCauley was acting as CPLC's agent for the 1908 tax sale.

As discussed in a prior section of this Report and Recommendation, there is also a genuine factual dispute about whether the Josiah Haines Warrant was seated or unseated. As we explain below, if the land was seated, whether McCauley was CPLC's agent for the 1908 tax sale would be material to whether there was a redemption. But if the land was unseated, whether McCauley was CPLC's agent would not be material given that a surface owner may purchase both the surface estate and the mineral estate where the land was unseated at the time of the tax sale and the surface and subsurface estates were not separately assessed.[16]

Citing *Bartholomew v. Leech*, 7 Watts 472, 473 (Pa. 1838) (stating that before an "agent" of the property owner and "curator of the land" may purchase the property at a tax sale "on his own account, he must have explicitly resigned his trust"), the Proctor Trusts reason that an agent of the owner of land cannot purchase the land at a tax sale on his own account without first explicitly resigning

---

[16] Whether the Josiah Haines Warrant was assessed as a whole or whether the surface and subsurface estates were separately assessed is addressed in the next section of this Report and Recommendation.

his trust.  And here, according to the Proctor Trusts, there is no evidence that McCauley renounced his agency before the 1908 sale.  Thus, the Proctor Trusts assert, McCauley did not purchase the property at the tax sale, but rather, he redeemed the property.  *Bartholomew* and its progeny, however, deal with the situation where the agent acquires title hostile to that of his principal. *See Miller v. O'Boyle*, 89 F. 140, 142 (W.D. Pa. 1898) (quoting *Bartholomew* as to the "incapacity of a confidential agent to acquire title in hostility to his principal"). There is no evidence in this case that McCauley was acting in hostility to CPLC. Thus, the *Bartholomew* line of cases does not apply.

The Proctor Trusts also cite *Knupp v. Syms*, 50 A. 210, 212 (Pa. 1901), for the proposition that "when an agent for a defaulting taxpayer purports to purchase property at a tax sale, Pennsylvania law treats it as a payment of overdue tax on the principal's behalf, and thus, as 'equivalent to a redemption.'" *Doc. 118* at 22.  In *Knupp*, after the tax sale, the purchaser/agent "paid in full, and the treasurer received as in full, the very defaulted taxes on which the treasurer's deed [was] based," and this is what the court "deemed equivalent to a redemption." *Id.* at 212. The court presumed that the agent's purchase of the property "was in trust for his principals; and when he paid the taxes in full in December, 1848, long before the time for redemption had expired, he, by the consent of the purchaser,—himself being the purchaser,—did for his principals all they were bound to do to save their

64

land." *Id.*  More specifically, the court reasoned that when the agent "after the deed had been acknowledged and delivered to him, should go to the county treasurer, and pay in full the very taxes on the nonpayment of which his title depended, is wholly incredible, and is reconcilable with no other theory than the one that he was acting throughout for his principals . . . ." *Id.*  Thus, the court determined that there was a redemption. *Id.*

Here, unlike in *Knupp*, there is no evidence that after the tax sale and deed to McCauley, McCauley paid the taxes on which the tax sale was based, i.e., the taxes assessed for 1907.  Rather, the evidence shows that here McCauley took a deed to the property, and more than two years after the tax sale, conveyed, along with his wife, the property to CPLC.  Thus, *Knupp* is distinguishable.[17]

In a footnote, the Proctor Trusts cite to the general rule "that a purchase made by one whose duty it was to pay the taxes shall operate as payment only: he shall acquire no rights, as against a third party, by a neglect of the duty which he

---

[17]  In support of their argument that there was a redemption here, rather than a tax sale of the property, the Proctor Trusts also point to a "Paper Book" filed by CPLC and Elk Tanning Company in the Pennsylvania Supreme Court in *Gamble v. Central Pennsylvania Lumber Co.*, No. 345 January Term, 1907, in which CPLC quoting from *Knupp* stated: "A tax title cannot be sustained where it appears by the books of the Treasurer and by other records that an agent of the owners of unseated land bought in the land at tax sale, that the taxes had been regularly assessed, and that the agent before the maturity of the deed paid the taxes, and that these had been accepted by the Treasurer." *Doc. 95* at ¶ 29 (quoting *Doc. 103-3* at 31).  As stated above, *Knupp* is distinguishable, and we do not consider the argument in the "Paper Book" to be probative of the issues in this case.

owed to such party." *Lamborn v. Dickinson Cty. Comm'rs*, 97 U.S. 181, 184 (1877) (applying Kansas law) (citation omitted). "The rule that one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest, rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty." *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896). When the rule applies, "[t]he purchase operates as a payment only." *Id*. But according to the Pennsylvania Supreme Court, "[t]he rule . . . should be restricted to cases where it was the duty of the purchaser to pay the tax." *Id*.

Here, if the land was seated, CPLC had a duty to pay the taxes. And if the land was seated and McCauley was acting as CPLC's agent at the tax sale, the "rule that one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest," applies, and McCauley's purchase operated as a payment only, i.e. a redemption. *See Powell,* 34 A. at 451. But if the land was unseated, as discussed below, the rule does not apply and there was no redemption even if McCauley was CPLC's agent for the 1908 tax sale.

66

In *Powell*, the Pennsylvania Supreme Court addressed the question whether a surface owner who purchased unseated land a tax sale acquired title to the mineral estate as well as the surface estate. *Id*. at 451.  In that case, the unpaid taxes that resulted in the tax sale were assessed before the mineral estate was severed from the surface estate. *Id*.  The Pennsylvania Supreme Court held that the surface owner was not forbidden from acquiring title to both the surface estate and the mineral estate at the tax sale. *Id*. at 451–52.  In so holding, the court observed:

> . . .  In speaking of taxes on unseated lands, which were not a charge against the owner, it is said, in *Coxe v. Gibson*, 27 Pa. St. 160, that 'there was nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale.'  The taxes under which the sale was made in this case were on unseated lands, and there was no personal responsibility on the owner therefor.  The land alone was liable.

*Id*. at 451 (citations omitted).  Observing that "the owner of mineral rights holding by virtue of a reservation in a deed is neither a tenant in common nor a joint tenant with the owner of the surface," the Pennsylvania Supreme Court in *Powell* also concluded that there was no "community of interest which gave rise to a duty, or anything in the relation of the parties which made the purchase by [the surface owner] inequitable." *Id*. at 451–52; *see also Hutchinson v. Kline*, 199 Pa. 564 (1901) ("Nor is there such a fiduciary relation existing between the owner of the mineral rights and the owner of the surface rights which will prevent one from buying the estate of the other at a tax sale.").

Based on *Powell*, if the Josiah Haines Warrant was unseated, CPLC was not responsible for the taxes.  And even if McCauley was CPLC's agent for the tax sale, CPLC was not barred from acquiring both the surface and subsurface estates at the tax sale.

The Proctor Trusts seek to avoid the above conclusion by attempting to distinguish *Powell* based on the timing of the tax assessment relative to the severance of the surface and subsurface estates in that case.  It is true, as the Proctor Trusts assert, that in *Powell*, the assessment for the taxes that resulted in the tax sale was made before the mineral estate and surface estate were severed. *See Powell*, 34 A. at 451.  But, as we read *Powell*, the basis for the court's conclusion was the fact that the property was unseated and therefore the land, rather than the owners, was responsible for the tax. *See id*.  The surface owner did not have a duty to pay the tax. *Id*.  And that fact was the reason why the "rule that one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest" did not apply. *Id*.

The court in *Herder Spring* also read *Powell* as based on the fact that the land was unseated, and therefore, it was the land itself that was liable for the tax. *Herder Spring*, 143 A.3d at 367.  And, although *Herder Spring* did not involve a question regarding redemption, it rejected the "attempt to distinguish the caselaw

relating to title-washing by emphasizing that the cited cases, such as *Powell v. Lantzy*, address situations where the severance occurred after the imposition of taxes, whereas the severance" in *Herder Spring* occurred before the assessment that led to the tax sale:

> As discussed, tax on unseated land was the liability of the land rather than the owners.  Therefore, if the property was assessed as a whole property and none of the owners paid the tax, then the property would be sold as a whole to satisfy that tax.  As cogently set forth in *Powell v. Lantzy*, "[a]ny moral obligation to agree and jointly pay the tax, each contributing his just share, rested equally upon the owners of the different parts; but there was no legal duty on either to do this.  It was their separate, not their joint, interests which were in peril." *Id.* at 550, 34 A. 450; *see also Proctor,* 166 F.Supp. at 475 ("[w]hen there is no separate assessment of the minerals, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals"); *Hutchinson,* 49 A. 312.  We find no distinction based upon the timing of the severance.

*Id*. at 374–75.

Thus, if the land was unseated, even if McCauley was acting as agent for CPLC at the tax sale, McCauley's purchase did not act as a redemption.[18]

The Proctor Trusts also contend that if CPLC did not properly report its interest in the surface estate of the Josiah Haines Warrant and did not pay taxes,

---

[18]  The Proctor Trusts point to statements made in 1931 by John E. Potter, who examined land titles for the Board of Game Commissioners, that where the property as tax sales was made by CPLC agents with funds from CPLC, there is a redemption, rather than a sale. *See Doc. 153* at ¶¶ 63, 65 and *Docs. 153-2* and *153-4*.  But whatever Potter's opinion, for the reasons discussed above, if the land was unseated and not separately assessed, we conclude otherwise.

when due, the Game Commission who claims title through CPLC is estopped from benefiting from such.  Their argument is based on *Powell*, 34 A. 450.  Again, they cite *Powell* for the proposition that "one cannot profit from his own wrong doing, and build up or acquire a title founded upon his own neglect of duty . . . ." *Doc. 118* at 29 (quoting *Powell*, 34 A. at 451).  But *Powell* actually concluded that that principle did not apply in that case. *Id.* at 451.  And we have rejected the Proctor Trusts' attempt to distinguish *Powell*.  Again, as discussed above, there is a genuine factual dispute about whether the Josiah Haines Warrant was seated or unseated.  And whether the land was seated or unseated is material to whether CPLC had a duty to pay the taxes.  Thus, we cannot accept the Proctor Trusts' argument that the Game Commission is estopped from claiming title to the subsurface estate of the Josiah Haines Warrant based on the CPLC's failure to pay the taxes on that warrant.

### 4. The 1907 tax assessment.

The Proctor Trusts also contend that the 1908 tax sale did not result in a title wash because Thomas Proctor, Union Tanning, and CPLC all reported their interests in the property to the Bradford County Commissioners pursuant to the Act of 1806.  Thus, they suggest that the taxes were, or should have been, separately assessed on the surface and subsurface estates of the Josiah Haines Warrant.

70

As an initial matter, the Proctor Trusts contend that it was Thomas Proctor and Proctor & Hill's routine practice to notify county commissioners when they became holders of unseated land.  In support of this assertion, the Proctor Trusts point to Bradford County and LeRoy Township assessment records that list Proctor in connection with tracts of land other than the Josiah Haines Warrant.[19]  The Proctor Trusts also point to evidence that Thomas Proctor's attorney reported Proctor's interests with respect to land in Lycoming county.  And they point to evidence that as to certain tracts of land in Lycoming County taxes were assessed to Emma Proctor and the Proctor heirs for subsurface estates.  Despite the foregoing evidence, the Proctor Trusts point to no evidence that Proctor or his heirs reported their interest in the Josiah Haines Warrant, and more particularly, they point to no evidence that they reported their interest after the 1894 deed that

---

[19]  The Proctor Trusts assert that after "the Act of March 30, 1897, P.L. 11, which required tax sale notices beginning January 1, 1898 to identify 'the names of the owners if known,' Bradford County assessment records started to include a notation as to the owner of unseated lands [and] [a]s a result, starting in 1889, properties still owned at the time by Messrs. Proctor and Hill, including properties included in the deed from Schrader Mining & Manufacturing Co., were identified with the penciled notation "P+H' or "P+Hill." *Doc. 95* at ¶ 6(b).  But the Proctor Trusts do not assert, and the evidence they cite does not show, that the "P+H' or "P+Hill" notation appears in the assessment books next to the listings for the Josiah Haines Warrant.

conveyed the surface estate to Union Tanning and reserved the subsurface estate to

Proctor and Hill and their heirs.[20]

The Proctor Trusts further contend that Union Tanning and CPLC also both

reported their interests in the property to the Bradford County Commissioners

pursuant to the Act of 1806.  In support of this contention, they cite to evidence

that Union Tanning paid taxes on the Josiah Haines Warrant from 1894 to 1902,

and that CPLC paid taxes on the Josiah Haines Warrant from 1903-1906 and from

1908-1910. *See Doc. 95* at ¶¶ 10–16.  And the Proctor Trusts contend that there is

no evidence that Union Tanning or CPLC incorrectly reported that they owned all

---

[20]  The Proctor Trusts have presented letters that the Proctor heirs wrote to officials
in Lycoming and Elk County as to their reserved subsurface estates. *See Doc. 129*
at ¶58, *Doc. 133-1*.  But they have not presented any such letters to either the
Bradford County tax officials or the LeRoy Township tax officials, and they have
not presented any such letters that pertain to the Josiah Haines Warrant.  The
Proctor Trusts intimate that any such letters may have been lost or discarded. *See
Doc. 95* at ¶ 7 ("The fact that correspondence notifying the Bradford County
commissioners of interests in unseated land appears to have been lost or discarded,
is not evidence that there were not such notifications provided by persons
becoming owners of unseated land.").  But they have not provided any evidence
that their records or the records of the tax authorities "were ever subject to flood,
fire, or some other calamity or negligence such that it might be presumed that
relevant records were lost of destroyed." *Herder Spring Hunting Club v. Keller*, 93
A.3d 465, 472–73 (Pa. Super. Ct. 2014), *aff'd*, 143 A.3d 358 (Pa. 2016).  Further,
although the Proctor Trusts contend that "[t]he prevailing practice was to record
notified changes in ownership given to the County commissioners in assessment
records, and to discard the correspondence reflecting such changes," *doc. 95* at ¶ 7,
they have not pointed to any notation in either the Bradford County or LeRoy
Township tax assessment records as to a separate assessment of the subsurface
estate as to the Josiah Haines Warrant.

estates, including the subsurface estate, to the tax officials.  Further, they assert that

Thomas Proctor's reservation of the subsurface estate as to certain property in

Lycoming County was reported to Lycoming County officials,[21] and, according to

the Proctor Trusts, "there is no basis to believe that this was not also the case in

Bradford County." *Doc. 118* at 25.[22]

---

[21]  In this regard, the Proctor Trusts point to a stipulation in *Moore v. Commonwealth*, 1309 C.D. 1988 (Pa. Commw. Ct.), in which the Commonwealth stipulated:

> For each of the relevant years, 1908 through 1926, during which the tax sales of the surface estates took place, the Lycoming County Tax Assessor's records for McIntyre Township (Exhibits H through Z inclusive) contained a written statement by the Tax Assessor acknowledging the reservation of all minerals in Proctor Deed 144/398 in the following general form:
>> For a description of reserve of all minerals refer to Recorders office of Lycoming County in Deed Book 144 page 398."

*See Doc. 95* at ¶ 12 and *Doc. 104-2* at 5-6 (Stipulation 19).  But this stipulation does not reveal how the taxing authorities in that case became aware of the reservation.

[22] Pointing to the Brownell declaration as well as other evidence that relates to property in Lycoming and Potter counties, the Proctor Trusts also contend that "contemporaneous court records show that CPLC actively monitored tax assessments and payments related to its land holdings, and CPLC's president attested, as part of the [Game Commission]'s purchase of other tracts, that CPLC 'regularly and continuously paid all taxes assessed and payable." *Doc. 118* at 25 (citations to the record omitted).  In contradiction to this, the Proctor Trusts also assert that more than 100 of CPLC's properties were sold at tax sales from 1904-1916. *See Doc. 95* at ¶ 27.  And the Proctor Trust do not dispute that CPLC failed to timely pay the taxes assessed for 1907 on the Josiah Haines Warrant, which resulted in the 1908 tax sale. *Id*. at ¶¶ 22–23.

In a footnote, the Proctor Trusts contend that testimony as to the routine practice of Thomas Proctor, Union Tanning, and CPLC is evidence that their actions as to the Josiah Haines Warrant conformed with their routine practices. *See Doc. 118* at 24 n. 13.  Such evidence is governed by Fed.R.Evid. 406, which provides that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."

Under the Rule, "[h]abit . . . describes one's regular response to a repeated specific situation." Advisory Committee Note to Fed.R.Evid. 406.  "A habit . . . is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving." *Id.*  "The doing of the habitual acts may become semi-automatic." *Id.* Similarly, "[t]he routine practice of an organization is defined as 'the regular practice of responding to a particular kind of situation with a specific type of conduct.'" *York Int'l Corp. v. Liberty Mut. Ins. Co.*, 140 F. Supp. 3d 357, 361–62 (M.D. Pa. 2015) (quoting *Argentieri v. First Veh. Servs., Inc.,* Civ. No. 10–cv–2086, 2011 WL 710485, *9 (E.D. Pa. Feb. 28, 2011)).  To establish a

habit, "a party 'must produce evidence establishing a degree of specificity and frequency of uniform response that ensures more than a mere tendency to act in a given manner, but rather, conduct that is semi-automatic in nature.'" *Id.* (quoting *In re Giquinto,* 388 B.R. 152, 168 (Bankr.E.D.Pa.2008) (some internal quotation marks omitted).

"Generally, '[h]abit evidence is never to be lightly established, and evidence of examples, for purposes of establishing such habit, is to be carefully scrutinized before admission.'" *Id.* (quoting *Dover–Hymon v. Southland Corp.,* Civ. No. 91–cv–1246, 1993 WL 419705, *4 (E.D. Pa. Sept. 27, 1993) (some internal quotation marks omitted). "Such care in establishing conduct as habit is especially important when dealing with the routine practice of business organizations because 'evidence of their routine practice is particularly persuasive.'" *Id.* (quoting *Hancock v. Am. Tel. & Tel. Co., Inc.,* 701 F.3d 1248, 1262 (10th Cir. 2012) (some internal quotation marks omitted).

Here, the Proctor Trusts are seeking to establish that Thomas Proctor, Union Tanning, and/or CPLC reported the ownership of the subsurface estate as to the Josiah Haines Warrant to the tax authorities in Bradford County and/or LeRoy Township. But although the evidence shows that Proctor & Hill paid taxes on certain tracts of land other than the Josiah Haines Warrant, which leads to a reasonable inference that they reported their ownership of such tracts, the evidence

does not show that Thomas Proctor reported that he owned only the subsurface

estates in any tracts in Bradford County and LeRoy Township.  And the testimony

as to CPLC's practices in Lycoming County, "is not the sort of semi-automatic,

situation-specific conduct admitted under" Rule 406, *Becker v. ARCO Chem. Co.*,

207 F.3d 176, 204 (3d Cir. 2000), that is sufficient to show that CPLC had a

routine practice of reporting reservations of subsurface estates to taxing authorities

in other counties, especially where those subsurface estates were not actively in

production (as with the Josiah Haines Warrant) given that the Proctor Trusts

acknowledge that the tracts in Lycoming County as to which the ownership of the

subsurface estates were noted by taxing authorities were producing coal. *See doc.

138* ("The only difference between those tracts and the Property at issue here is

that production of coal in McIntyre Township at the time provided a basis for the

assessment of the subsurface estate.").

In sum, the Proctor Trusts have not provided evidence from which it can

reasonably be inferred that the reservation of the subsurface estate as to the Josiah

Haines Warrant was reported to Bradford County or LeRoy Township tax officials.

The Proctor Trusts chide the Game Commission for suggesting that Thomas

Proctor or his heirs were required by the Act of 1806 to report to the taxing

officials the reservation of the subsurface estate.  It is true, as the Proctor Trusts

assert, that the Pennsylvania Supreme Court concluded in *Herder Spring* that "the

relevant portion of the Act of 1806 imposed a reporting duty only on a party 'becoming a holder of unseated land,' and that given their prior ownership of the entire Warrant, the Kellers did not 'become' a holder of unseated land by selling the surface estate and reserving the mineral estate." *Herder Spring*, 143 A.3d at 372 (quoting the Act of 1806) (footnote omitted).  But even though the court in *Herder Spring* concluded that the owners of the reserved subsurface estate were not required by the Act of 1806 to notify the taxing authorities of the reservation, it concluded that "the lack of reporting . . . is relevant . . . because the county commissioners were tasked with assessing unseated property for taxation purposes based on what was reported by the owners." *Id*. at 360.  In other words, because unless "otherwise directed by the owners," unseated land was treated "'entirely in reference to the original warrants,'" the court concluded that "if neither the Kellers nor the purchaser of the surface rights in 1899 reported the transfer, then the Centre County Commissioners would have assessed and taxed the Eleanor Siddons Warrants in its entirely [sic]." *Id*. at 372 (quoting *Heft v. Gephart*, 65 Pa. 510, 516 (1879)).

To avoid a title wash, the Proctor Trusts construe *Herder Spring* as requiring only "the reporting, not separate assessment, of the severed interests." *Doc. 129* at ¶ 15.  But, we think, the pertinent question in determining whether there was a title wash as result of a tax sale of unseated land is not who was responsible for

reporting the reservation of the subsurface estate or even whether such reservation was reported at all, but whether the assessment and taxation was based on the entire warrant. *Herder Spring*, 143 A.3d at 368 ("Factually, the issues in this case turn on whether the taxes assessed and not paid in 1935 were assessed on the Eleanor Siddons Warrant as a whole or merely upon the surface estate.").  As the Pennsylvania Supreme Court stated in *Herder Spring*, because "tax on unseated land was the liability of the land rather than the owners," "if the property was assessed as a whole property and none of the owners paid the tax, then the property would be sold as a whole to satisfy that tax." *Id*. at 375 (citing among other cases, *Proctor*, 166 F. Supp. at 475 ("[w]hen there is no separate assessment of the minerals, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals").  In other words, "the tax sale conveys the property covered by the assessment." *Id*.

In this case, as in *Herder Spring*, "the documents relating to the . . . tax sale provide no indication that the assessment and taxation occurred on anything other than the entire . . . Warrant, as they provide no reference to the surface estate or a reserved subsurface estate." *Herder Spring*, 143 A.3d at 375.  Here, the Bradford County tax assessment record for the 1907 assessment of the Josiah Haines Warrant does not contain any notation that the taxes were assessed on the anything other than the entire warrant.  Those records contain lists of properties in rows with

the following columns across the top: "Acres," "Warantee Names," "LeRoy

Township,"[23] "Valuation," seven columns for different taxes, "When Paid," and

"By Whom." *See Doc. 102-1* at 6.  For the Josiah Haines Warrant, the record lists

"410" under the column for acres, "Haines Josiah" under the column for

"Warantee Names," "2460" under the column for "Valuation," and single numbers

under five of the seven columns for taxes. *Id.*  In addition, the record includes the

notation "Sold," and under the "When Paid" and "By Whom" columns, the record

provides "June 8, 1908 to Calvin H. M$^{c}$ Cawley Jr." *Id.*  There is nothing in that

record, or the Bradford County tax assessment records submitted for other years,

that would lead to a reasonable inference that the assessment of the Josiah Haines

Warrant was on anything other than the entire warrant. *See Docs. 99-1*, *100-1*,

*101-1*, *102-1*, *& 104-1.*  Nor is there anything in the LeRoy Township land books

that the Proctor Trusts submitted as evidence that shows a separate assessment of

the surface and subsurface estates of the Josiah Haines Warrant. *See Doc. 97-1* at

91-118.[24]

---

[23]  This column heading is, in fact, blank, but directly under the column heading is
"LeRoy Township." *See Doc. 102-1* at 6.

[24]  The LeRoy Township land books do list property assessed to Proctor and Hill,
but the Josiah Haines Warrant is not so listed. *See Doc. 97-1* at 91-118.  Citing
evidence from McIntyre Township in Lycoming County, the Proctor Trusts
suggest that any separate assessment of the subsurface estate would not be listed in
the general unseated list, but such separate assessment would be listed in a

The parties have not pointed the Court to the actual 1908 tax sale deed to McCauley.[25]  But the Percheron Abstract lists the following as to the deed from W.J. Waters, Treasurer to Calvin H McCauley Jr.:

> Dec. 17, 1908, A.C. Blackwell Deputy Treasurer of Bradford County came into open Court and in due form of law acknowledged a deed to Calvin H. McCauley Jr. dated June 8, 1908, in consideration of Forty nine and $36/100$ Dollars for 410 acres of unseated land in LeRoy Township, assessed in the warrantee name of Josiah Haines
>
> Sold June 8, 1908.

*Doc. 97-1* at 74.  Again, there is nothing here from which it can reasonably be inferred that the sale was of anything less than the entire Josiah Haines Warrant.

Even if, as the Proctor Trusts suggest, the reservation of the subsurface estate of the Josiah Haines Warrant was reported to Bradford County tax officials, there is no evidence that the tax officials separately assessed the surface and subsurface estates.  The Proctor Trusts contend that there were no separate

---

different location or later in the unseated list.  But they have not presented any evidence of a separate listing of the subsurface estate of the Josiah Haines Warrant.

[25]  Although the Proctor Trusts assert that McCauley did not record the treasurer's deed for the Josiah Haines Warrant, and the Game Commission admits that the deed was not recorded in the recorder of deed's office, *see doc. 95* at ¶ 30 and *doc. 121* at ¶ 30, there is no dispute that the Treasurer of Bradford County acknowledged the deed in open court, as was the requirement at the time. *See Woodhouse Hunting Club, Inc. v. Hoyt*, 183 A.3d 453, 458 (Pa. Super. Ct. 2018) ("At the time of the 1902 tax sale, our Supreme Court noted that there was no legislation requiring the purchaser to record the deed or make an official record of his purchase, other than the acknowledgment of the deed by the treasurer in open court.").

assessments of any subsurface estates in LeRoy Township at the time.  And they

state, "Proctor and Hill could ***not*** have obtained a separate assessment of the

subsurface rights even had they asked" because, according to the Proctor Trusts,

"Pennsylvania law prohibited the assessment of severed subsurface rights where

there was no basis to value the oil, gas or minerals." *Doc. 138* at 19 (italics and

bold in original) (citing *F. H. Rockwell & Co. v. Warren Cty.*, 77 A. 665, 666

(Pa.1910) (superseded by statute as noted in *Coolspring Stone Supply, Inc. v. Cty.*

*of Fayette*, 929 A.2d 1150, 1157 n.9 (Pa. 2007)).  But that does not support the

Proctor Trusts' claim to title to the subsurface estate.  In *Herder Spring*, the

Pennsylvania Supreme Court addressed and rejected a contention that the potential

value, or lack thereof, of the minerals in the subsurface estate was relevant to

whether the tax assessment was of the entire warrant:

> The Keller Heirs next contend that the 1935 tax sale
> should not be deemed to encompass the reserved mineral rights
> because those rights did not have taxable value in 1935.  The
> Keller Heirs rely upon language in *Rockwell* acknowledging
> that a subsurface estate can only be subject to tax if it is
> demonstrated that mineral or other rights have actual value
> either through current production or an evaluation of
> neighboring properties. *Rockwell,* 77 A. at 665.  They claim
> that the reserved rights in this case had no value as of the tax
> sale in 1935.  The Keller Heirs, however, fail to recognize that
> the potential assessable value of the minerals is irrelevant to
> whether the 1935 assessment addressed the Warrant as a whole
> or merely the surface estate.  Indeed, their theory could lead to a
> windfall for fee simple owners, who years after the tax sale of
> the entire property could claim that the prior tax sale should be
> deemed to have exempted specific mineral rights that at the

> time of the sale had no value, but today are coveted, with
> Marcellus Shale being an obvious example.  Such a theory
> would result in chaos whereby courts today would be required
> to determine whether certain minerals or other subsurface rights
> would have had taxable value in the late 1800s. *See Bannard,*
> 293 A.2d at 49.

143 A.3d at 373 (footnote omitted).  The *Herder Spring* Court also concluded that

"if the Kellers disputed the County Commissioners' failure to assess their

subsurface estate separately from the surface estate, they should have contested the

assessment and tax sale within the initial two-year redemption period." *Id*. at 374.

The court reasoned that "[a]fter the expiration of that redemption period, a

challenge to the propriety of the tax sale would not be heard under Section 4 of the

Act of 1815: 'no alleged irregularity in the assessment, or in the process or

otherwise, shall be construed or taken to affect the title of the purchaser, but the

same shall be declared to be good and legal.'" *Id*. (quoting 72 P.S. § 6091).

Here, there is no evidence that the Proctor heirs (or anyone else) challenged

the lack of separate assessments of the surface and the subsurface estates of the

Josiah Haines Warrant during the redemption period.  And whether someone was

at fault for the lack of such separate assessments does not change the fact that there

were not separate assessments.

In sum, because there were not separate assessments of the surface and

subsurface estates, we conclude based on *Herder Spring*, that the 1908 tax sale of

the Josiah Haines Warrant was a sale of the entire property, including the

subsurface estate.  Accordingly, if the land was unseated, there was a title wash, whereby the subsurface estate was reunited with the surface estate.  Of course, as stated above, if the land was seated, then there was not a title wash.

## 5.  The 1920 Deed.

In addition to arguing that the 1908 tax sale did not result in a title wash, the Proctor Trusts contend that the Game Commission did not obtain title to the subsurface estate of the Josiah Haines Warrant through the 1920 deed from CPLC to the Commonwealth.  More specifically, the Proctor Trusts contend that the reservation in CPLC's deed to the Commonwealth estops the Game Commission from claiming title to the subsurface estate.

As set forth above, by deed dated December 14, 1920, CPLC conveyed to the Commonwealth 7,492.9 acres of land, including the Josiah Haines Warrant. *Id.* at ¶ 37.  The CPLC-Commonwealth Deed provides as follows:

> This conveyance is made subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface of any or all of the lands above described in each of the above mentioned parts or divisions; together with the right and privilege o[f] ingress, egress and regress upon said lands for the purpose of prospecting for, or developing, working or removing the same, as fully as the said minerals and rights were excepted and reserved in deed dated Oct. 27, 1894 from Thomas E. Proctor et al to the Union Tanning Company, recorded in the office for recording deeds in Bradford County in deed book Vol. 205, page 436.

> Also subject to all the reservations, exceptions, covenants and
> stipulations contained in said recited deed from Thomas E.
> Proctor et al to the Union Tanning Company, and in deed from
> the Union Tanning Company to the Central Pennsylvania
> Lumber Company, above recited, dated May 25, 1903, of
> record as aforesaid in deed book Vol. 251 page 520.

*Id*. at ¶ 38.

Also, as detailed above, there is are genuine factual disputes about whether the 1908 tax sale of the Josiah Haines Warrant resulted in a title wash.  If there was no title wash, then CPLC did not own the subsurface estate and could not have transferred that subsurface estate to the Commonwealth by the 1920 Deed.  On the other hand, if the 1908 tax sale did result in a title wash, which extinguished prior reservations, McCauley, as the purchaser at that tax sale, became the "first link in a new chain of title." *Herder Spring*, 143 A.3d at 378.  The issue is then whether the 1920 CPLC-Commonwealth Deed conveyed both the surface and subsurface estate to the Commonwealth.  The remaining discussion assumes that the 1908 tax sale resulted in a title wash.

The Proctor Trusts rely on *Elliott v. Moffett*, 74 A.2d 164 (Pa. 1950), in support of their argument that based on the CPLC-Commonwealth Deed, the Game Commission is estopped from claiming that it owns the subsurface estate of the Josiah Haines Warrant.  *Elliott* involved the "relative rights and duties of a mortgagor and a mortgagee in possession under a long continued and unchallenged occupancy." *Id*. at 165.  More specifically, an issue in the case was whether the

those claiming title under the mortgagor, who had not challenged the possession of the property by the mortgagee, were barred by laches from redeeming the property. *Id*. at 166.  In that regard, the Pennsylvania Supreme Court concluded that generally a mortgagor loses his right of redemption after the mortgagee has been in possession of the property for 20 years "without accounting or without admitting that he possesses a mortgage title only." *Id*. at 167.  But the court concluded that "such a result would not follow if, during the twenty years, the mortgagee admitted that he possessed a mortgage title only." *Id*.  In this context, the court in *Elliott* stated: "It is a well established principle that one claiming under a deed is bound by any recognition it contains of title in another." *Id*.  And the court concluded that given that a later deed of assignment of the mortgage recognized the mortgagor's right of redemption, those claiming under the mortgagor were not barred by laches. *Id*.

The situation in the instant case, however, differs from the situation in *Elliott.*  In this case, the Proctor Trusts are seeking to use the language in the deed not to show that a mortgagee acknowledged that he held a mortgage title only, but rather to estop the Game Commission from claiming title to the subsurface estate. *Elliott* is a slender reed on which to base such an argument.  This is particularly so because if the 1908 tax sale resulted in a title wash, at the time of the 1920 CPLC-Commonwealth Deed, the Proctor heirs were strangers to the property and to the

CPLC-Commonwealth Deed. *See generally Miller v. Holman*, 1855 WL 6987, at

*2 (Pa. 1855) ("The argument that the recitals are to have the effect of an estoppel,

is conclusively answered by the fact that Holman, the defendant, was neither a

party nor a privy to the deed, and none others can take advantage of an estoppel.").

The Proctor Trusts also rely on *Herder Spring,* 143 A.3d at 378, which cited

*Elliott* in connection with an estoppel argument similar to the one raised by the

Proctor Trusts here.  In *Herder Spring*, the deed to the Hunting Club after the tax

sale provided "'[t]his conveyance is subject to all exceptions and reservations as

are contained in the chain of title,' without specifying the Keller reservation." *Id*. at

361.  There, invoking the doctrine of estoppel by deed, the Keller Heirs argued that

that language reinvigorated their pre-tax sale reservation of the subsurface estate.

*Id*. at 362.  The Pennsylvania Supreme Court rejected that argument:

> As the Keller Heirs recognize, "[i]t is a well established
> principle that one claiming under a deed is bound by any
> recognition it contains of title in another." *Elliott,* 365 Pa. at
> 252, 74 A.2d 164.  However, in that case, the deed specifically
> mentioned the name of the person who had a claim upon the
> land, in contrast to the deed in the case at bar which generically
> stated that the deed was subject to any reservations "contained
> in the chain of title." *Elliott,* 365 Pa. at 252–53, 74 A.2d 164.
>
> We conclude that at the time of the 1959 Deed to Herder
> Spring, there was no reservation "contained in the title" because
> the 1935 tax sale extinguished the prior reservation of the
> subsurface estate.  Notably, a manual from the time of the 1935
> tax sale, remarked that because "the land itself is responsible
> for the taxes regardless of who is the owner, a purchaser at a tax
> sale becomes the first link in a new chain of title and he need

not prove the title back of the same." William W. Hall, *A Manual on Title Searches and Passing Titles in Pennsylvania,* § 138 (1934).  Accordingly, we find this issue meritless.

*Id.* at 378.

Here, unlike in *Herder Spring*, the deed at issue does specifically mention the Proctor reservation of the subsurface estate.  Thus, the question is whether that warrants a result different from the result in *Herder Spring*.  For the reasons discussed below, we conclude not.

If the 1908 tax sale resulted in a title wash, after the tax sale, there was no longer a reservation of the subsurface estate.  The language of the 1920 deed did not then revive such a reservation. *See generally Sagamore Big Game Club*, 265 F.3d at 201 ("The reservation [in Proctor's deed to the Elk Tanning Company after the tax sale] could not revive in Proctor the legal title which he had lost by the earlier tax sale.").  The Game Commission argues that after the tax sale, the Proctor heirs were strangers to the title, and as such the stranger-to-the-title rule renders the relevant provision of the 1920 deed ineffective to vest title in the Proctor Trusts.

Under the stranger-to-the-title rule, "a reservation/exception of rights in a stranger to a deed is ineffective to transfer any interests to the stranger." *In re Condemnation by Cty. of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Properties*, 719 A.2d 1, 3–4 (Pa. Commw. Ct. 1998) ("*Allegheny*") (agreeing "that

the common law rule is that generally a reservation/exception of rights in a

stranger to a deed is ineffective to transfer any interests to the stranger" and

concluding that the interest attempted to be reserved/except in favor of a stranger

to the deed remained in the grantor of the deed); *see also Miller*, 1855 WL 6987, at

*3 (stating that recitals in a deed standing by themselves do not establish an

outstanding title in a stranger to the deed).

The Proctor Trusts respond that Thomas Proctor and the Proctor heirs were

not strangers to the title.  They cite *Strayer v. Johnson*, 1 A. 222, 223 (Pa. 1885), a

case in which the purchaser of property at a tax sale claimed the he was entitled to

damages for timber cut from the land.  There was in that case, however, a dispute

as to the location of the property that had been determined by a prior court case

against the individual who had owned the property before the tax sale. *Id*. at 223–

24.  In concluding that the purchaser at the tax sale could not relitigate the issue as

to the location that had been decided before he purchased the property, the court

stated that "a purchaser at [a] treasurer's sale is in privity to the title, if any, that is

divested by the sale and passes to him." *Id*. at 225.  But, as set forth above, *Herder

Spring* concluded that where there is a title wash, a purchaser at a tax sale is "'the

first link in a new chain of title.'" 143 A.3d at 378 (quoting William W. Hall, *A

Manual on Title Searches and Passing Titles in Pennsylvania,* § 138 (1934)).

Thus, if the tax sale here resulted in a title wash extinguishing the Proctor

reservation, McCauley became the first link in a new chain of title, and Thomas Proctor and the Proctor heirs were strangers to the CPLC-Commonwealth Deed. Thus, under the stranger-to-the-title rule, the CPLC-Commonwealth Deed was ineffective in reserving the subsurface estate to the Proctor heirs.

In a footnote, the Proctor Trusts correctly assert that *Allegheny*, as a decision of the Commonwealth Court, is not "conclusive" or "controlling" as to whether the stranger-to-the-title rule is part of the law of Pennsylvania. *Doc. 138* at 33 n.12. And they assert that there is good reason to doubt the soundness of *Allegheny* "since it is (at best) only thinly rooted in Pennsylvania jurisprudence." *Id.* In this regard, they note that *Allegheny* cites only West Virginia and Arkansas cases in support of the stranger-to-the-title rule. *Id.* Further, the Proctor Trusts assert that the Pennsylvania Superior Court in *Murphy v. Karnek*, 160 A.3d 850, 859 (Pa. Super. Ct. 2017), expressed skepticism as to whether the stranger-to-the-title rule is even a rule of Pennsylvania law. *Id.* But *Karnek* did not express skepticism as to the rule. Rather, *Karnek* cited *Allegheny* as follows: "'The common law rule is that generally a reservation/exception of rights in a stranger to a deed is ineffective to transfer any interests to the stranger.'" *Karnek*, 160 A.3d at 859 (quoting *Allegheny,* 719 A.2d at 3). But in *Karnek,* the Superior Court determined that the rule did not apply in that case. *Id.* at 859–60.

89

The Proctor Trusts further assert that the stranger-to-the-title rule "does violence to more deeply rooted principles of Pennsylvania law—including the rule set down in *Elliott v. Moffett* and the overarching principles that the Court should 'ascertain and effectuate what the parties intended,' and that 'effect must be given to ***all*** the language of the instrument and no part shall be rejected if it can be given a meaning . . . .'" *Doc. 138* at 33 n.12 (emphasis in original) (quoting *Brookbank v. Benedum-Trees Oil Co.*, 131 A.2d 103, 107, 107 n.6 (Pa. 1957)). The Proctor Trusts, however, do not explicitly argue that the stranger-to-the-title rule is not a part of Pennsylvania law.

We need not, however, rest our decision on the stranger-to-the-title rule because the language of the deed does not express the intent to create a new reservation or exception of subsurface estate in favor of the Proctor heirs or to reserve the subsurface estate to CPLC. The following principles apply to the interpretation of a deed:

> The same principles that apply to the interpretation of a contract apply to the interpretation of a deed. The nature and quantity of the interest conveyed by a deed must be ascertained from the instrument itself. . . . [W]e seek to ascertain not what the parties may have intended by the language but what is the meaning of the words, . . . Thus, the language of the deed shall be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed. If the deed is ambiguous, then all of the attending circumstances existing at the time of the execution of the instrument should be considered to aid in determining the apparent object of the parties. When parol evidence is

admissible, it must generally have a foundation in pre-existing
evidence of fraud, accident or mistake, except when it is
introduced not to contradict or vary, but to explain the contract,
as when something is omitted . . . so as to qualify the tribunal
passing upon the writing to interpret it truly according to the
intent of the parties.

*Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 341 (Pa. 2017)

(internal citations, quotations marks, and italics omitted).

The Proctor Trusts contend that CPLC did not intend to transfer the

subsurface estate to the Commonwealth and the Commonwealth did not intend to

receive it.  Before turning to the relevant language of the deed, we note that the

Proctor Trusts cite to evidence outside the deed to support their argument

regarding the intent of the parties.  This evidence includes that the agreement of

sale from CPLC to the Commonwealth, which provided that the sale was "subject

to the following exceptions, reservations and conveyances:

> RESERVING AND SAVING unto Thomas E. Proctor
> and Jonathan A. Hill, their heirs and assigns, all the minerals,
> coal, oil gas or petroleum found now or hereafter on, or under
> the surface of any or all of the lands described in each of the
> above mentioned parts or divisions; together with the right and
> privilege of ingress, egress and regress upon said lands for the
> purpose of prospecting for, or developing, working or removing
> the same, as fully as the said minerals and rights were excepted
> and reserved in deed dated Oct. 27, 1894 from Thomas E.
> Proctor et al to the Union Tanning Company, recorded in the
> office for recording deeds in Bradford County in deed book
> Vol. 205, page 436.

> The deed would be subject to all the reservations,
> exceptions, covenants and stipulations contained in said recited

91

> deed from Thos. E. Proctor, et al to the Union Tanning
> Company, and in deed from the Union Tanning Company to the
> Central Pennsylvania Lumber Company dated May 25, 1903,
> recorded in the office for recording deeds in Bradford County in
> Deed Book 251, page 520, on June 11, 1913.

*Doc. 95* at ¶ 35.  The Proctor Trusts also observe that CPLC's Board of Directors, by resolution dated April 6, 1920, approved the sale of property to the Commonwealth, including the Josiah Haines Warrant, and the execution of a special warranty deed for the subject properties containing "a complete description of said lands together with all exceptions, reservations, covenants and stipulations to be embodied in said deed as follows," including the Proctor and Hill reservation. *Id*. at ¶ 36.

Further, in connection with the 1920 purchase of properties from CPLC, including the Josiah Haines Warrant, the Board of Game Commissioners retained John E. Potter to examine the titles of the properties in advance of the conveyance. *Id*. at ¶ 39.  By letter dated November 22, 1920, Mr. Potter sent a letter to CPLC reporting on his title examination. *Id*. at ¶ 40.  After reciting the exceptions and reservations quoted above, as set forth in the agreement for sale, Mr. Potter stated that "[i]n the preparation of this report, therefore, no references are made to any exceptions, reservations or adverse conveyances which are included in the above exceptions contained in the agreement for sale." *Id*.  Mr. Potter signed his letter as "Examiner of Titles to the Board of Game Commissioners." *Id*.  Also, on January

11, 1921, Mr. Potter wrote to Seth E. Gordon, Secretary of the Board of Game Commissioners, stating that "I hereby certify that I have made a careful examination of the record title of the Central Pennsylvania Lumber Company to a certain tract of land," including the Josiah Haines Warrant, "and find the same to be now vested in the said Central Pennsylvania Lumber Company in fee simple, free and clear of all encumbrances of record, except the reservations expressly set forth in the Agreement for sale in this case." *Id.* at ¶ 43.[26]

Although the Proctor Trusts point to the above evidence in support of their contention that CPLC did not intend to transfer the subsurface estate to the Commonwealth and the Commonwealth did not intend to receive it, as the Proctor Trusts do not allege fraud, accident, or mistake in connection with the deed, such parol evidence is only admissible if the deed in question in ambiguous  *See Starling*, 162 A.3d at 341.  Yet the Proctor Trusts assert the that the deed is "unambiguous." *Doc. 138* at 31.

As neither party contends, and we do not find, that the language of the deed is ambiguous, we limit our consideration to the language of the deed.  We agree with the Game Commission that the wording of the deed does not show an intent to

---

[26]  The Game Commission asserts that it disputes this statement, but it does not contend that the letter does not say what the Proctor Trusts assert it says.  Rather, it appears that the Game Commission disputes the relevance of this letter; it asserts that this letter "indicates only that the quality of title was such that it could be acquired, and does not reinvigorate long lost exceptions or reservations which were extinguished in some instances and effective in others." *Doc. 121* at ¶ 43.

reserve the mineral rights to the Proctor heirs.  The Game Commission suggests

that the "subject to" provisions of the CPLC-Commonwealth Deed do not impose

new restrictions on the property, but rather, were meant as a precautionary measure

to protect CPLC from liability for any restrictions that may apply the property.  In

support, the Game Commission cites *Burns v. Baumgardner*, 449 A.2d 590, 593

(Pa. Super. Ct. 1982), in which the Pennsylvania Superior Court concluded that a

"subject to" clause in a deed restriction did not create new restrictions or expand

existing restrictions but was "merely an acknowledgment that building restrictions

existed with respect to a portion of the tract."  The court reasoned:

> [T]he fact that a conveyance is made 'subject to' restrictions set
> forth in some other deed or instrument referred to will not,
> without more, make the restrictions applicable to the property
> conveyed, if in fact the restrictions do not otherwise apply
> thereto.  If the 'subject to' language of the instrument in
> question refers to restrictions which in fact do not exist at all, it
> does not operate to impose the supposed restrictions on the
> granted land." 20 Am.Jur.2d Covenants, Conditions, and
> Restrictions, § 169, at 728. See also: *De Sanno v. Earle*, 273 Pa.
> 265, 117 A. 200 (1922); *Smith v. Second Church of Christ,
> Scientist*, 87 Ariz. 400, 351 P.2d 1104 (1960); *Procacci v.
> Zacco*, Fla.App., 324 So.2d 180 (1975); *Wiley v. Schorr*,
> Tex.Civ.App., 594 S.W.2d 484 (1979); Annotation, 84
> A.L.R.2d 780 (1962).  "Although such reference [i.e., 'subject
> to'] does not impose new restrictions on the land, it nonetheless
> serves a very necessary and desirable purpose for the grantor.
> When property is conveyed by warranty deeds . . . it is in the
> interest of the grantors that the conveyance be made subject to
> every restriction or encumbrance which not only does apply to
> such property but also *may* apply.  The inclusion of restrictions
> in the 'subject to' clause may thus express a wise precaution on
> the part of the grantor (*cf. Donahoe v. Turner*, 204 Mass. 274,

90 N.E. 549 [1910] ).  It would indeed be foolhardy for a
grantor who is delivering a warranty deed to fail to refer to a
restriction which may at some time in the future be held to
apply to his property, merely to avoid the criticism of excess
wordiness.  Thus, it is not unusual for conveyances to be made
subject to all recorded covenants, easements and restrictions,
without specific enumeration, and it would be inappropriate, to
say the least, to infer restrictions because it may subsequently
turn out that none then applied to the property." *Smith v. Second
Church of Christ, Scientist, supra*, 87 Ariz. at 408, 351 P.2d at
1109.

*Id.*

The Proctor Trusts seek to distinguish *Burns* on the basis that whereas the

restriction at issue in *Burns* never applied to the portion of the tract at issue, here

the "reservation" applied to the Josiah Haines Warrant "from its onset in 1894

through the [Game Commission]'s purchase." *Doc. 138* at 31.  But as discussed

above, if the 1908 tax sale resulted in a title wash, it is not true that the Proctor

reservation was in existence in 1920 at the time of the CPLC-Commonwealth

Deed.

In accordance with *Burns*, "in general, the principal function of a subject-to

clause in a deed is to protect a grantor against a claim for breach of warranty when

some mineral interest is already outstanding." *Wenske v. Ealy*, 521 S.W.3d 791,

796 (Tex. 2017); *see also PA Energy Vision, LLC v. S. Avis Realty, Inc.*, 120 A.3d

1008, 1016 (Pa. Super. Ct. 2015) (stating that the purpose of the "subject to" clause

in the deed there was "to note specifically any encumbrances, limitations or

reservations that might affect the interest conveyed by Conrail").  But a "subject

to" clause can be used for other purposes as well. *Wenske*, 521 S.W.3d at 796–98.

And the intent of such a clause must be based on the deed in its entirety. *Id*. at 798;

*see also Rubel v. Johnson*, 101 N.E.3d 1092, 1103 (Ohio Ct. App. 2017) ("Even if

the bare phrase 'subject to' does not denote the creation of affirmative rights,

affirmative rights can be created due to the words used in conjunction with the

phrase.").

Here, the Proctor Trusts have not pointed to any other language in the deed

that would lead to a reasonable inference that the "subject to" clause was intended

to serve a purpose other than its usual purpose of limiting the warranty.  And the

"subject to" clause in the CPLC-Commonwealth Deed does not contain any

language indicating that it was to operate as a new reservation or exception, but

clauses that follow the "subject to" clause do contain such language, *see doc. 97-1*

at 85 ("Also excepting and reserving unto the grantor, its successors and assigns . .

. ").  Thus, we conclude that the "subject to" clause was intended to operate as a

limitation on the warranty of the CPLC.  Accordingly, assuming the 1908 tax sale

resulted in a title wash, the CPLC-Commonwealth Deed does not provide a basis

for holding that the subsurface estate is vested in the Proctor Trusts rather than the

Game Commission.

## V.  Recommendations.

Based on the foregoing, we recommend that the Court grant in part and deny in part the Proctor Trusts' motion (doc. 136) to strike the Wilkinson declaration. More specifically, we recommend that the Court strike Wilkinson's discussion of the Supreme Court's decision in *Herder Spring,* and Wilkinson's legal conclusions: (1) that the Proctor Trusts do not have an interest in the Subsurface Estate; (2) that the Commonwealth has title to the Subsurface Estate, (3) that 100% of both the surface estate and the oil, gas, and mineral estate is vested in the Commonwealth; (4) that the 1908 tax sale resulted in a "Title Wash" that extinguished the prior reservation of oil, gas, and mineral rights; and (5) that the 1920 deed from CPLC to the Commonwealth does not contain clear language of reservation in favor of CPLC.

We also recommend that the Court deny the parties' motions (docs. 94 & 123) for partial summary judgment.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to

which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 21st day of February, 2019.

*S/Susan E. Schwab*
Susan E. Schwab
Chief United States Magistrate Judge