## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,

     Plaintiff,

  v.

THOMAS E. PROCTOR HEIRS TRUST and
the MARGARET O.F. PROCTOR TRUST,

     Defendants.

Case No. 1:12-CV-1567

Chief Judge Conner /
Chief Magistrate Judge Schwab

## DEFENDANTS' OBJECTIONS TO THE REPORT AND RECOMMENDATION ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Laura A. Lange
  Pa. ID No. 310733
MCGUIREWOODS LLP
260 Forbes Avenue, Suite 1800
Pittsburgh, PA  15222
llange@mcguirewoods.com

Paul K. Stockman
  Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

***Counsel for Defendants***

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

PROCEDURAL HISTORY......................................................................3

BACKGROUND:  The Law Relating To Unseated Lands. ....................4

STANDARD OF REVIEW .....................................................................7

ARGUMENT .........................................................................................7

    I.     The Report and Recommendation Improperly Held that CPLC Could Steal the Subsurface Estate Through Its Own Neglect of Duty. ...................................................................................7

    II.    No Separate Assessment of the Subsurface Estate Is Required (Nor Could Have Been Obtained) To Avoid a Title Wash................11

    III.   The Report and Recommendation Improperly Held that McCauley's Purchase Did Not Operate as a Redemption. ................14

    IV.   The Post-Tax Sale Deed Evinces the Contemporaneous Understanding that the Tax Sale Had No Effect on the Subsurface Estate and Binds the PGC. ............................................20

    V.    The 1908 Tax Sale, If It Expropriated Severed Subsurface Interests, Deprived the Trusts of Premises Without Due Process of Law.................................................................................25

CONCLUSION ....................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Ellis,*
   16 A. 770 (Pa. 1889), The PGC ............................................................... 19

*Armstrong v. Black Fox Min. & Develop. Corp.,*
   15 Pa. D. & C.3d 757 (Pa. Com. Pl. 1980) ........................................... 12

*Bartholomew v. Leach,*
   7 Watts 472 (Pa. 1838) ................................................................... 2, 18

*Benoit v. Panthaky,*
   780 F.2d 336 (3d Cir. 1985) ................................................................. 27

*Brookback v. Benedum-Trees Oil Co.,*
   131 A.2d 103 (Pa. 1957) ..................................................................... 23

*Brown v. Astrue,*
   649 F.3d 193 (3d Cir. 2011) ................................................................... 7

*Burd v. Ramsay,*
   9 Serg. & Rawle 109 (Pa. 1822) .......................................................... 16

*Burns v. Baumgardner,*
   449 A.2d 590 (Pa. Super 1982) .......................................................... 24

*Chemetron Corp. v. Jones,*
   72 F.3d 341 (3d Cir. 1995) .................................................................. 27

*City of Philadelphia v. Miller,*
   49 Pa. 440 (1865) ......................................................................... 16, 17

*City of Philadelphia v. Schaefer,*
   112 A. 864 (Pa. 1921) ........................................................................ 16

*In re Condemnation by County of Allegheny of Certain Coal, Oil,
   Gas, Limestone and Mineral Properties,*
   719 A.2d 1 (Pa. Cmwlth. 1998) ......................................................... 22

*Coxe v. Gibson*,
  27 Pa. 160 (1856) ............................................................................................20

*Coxe v. Wolcott*,
  27 Pa. 154 (1856) .......................................................................................*passim*

*Elliott v. Moffett*,
  74 A.2d 164 (Pa. 1950) .................................................................................3, 21

*Equal Employment Opportunity Comm'n v. City of Long Branch*,
  866 F.3d 93 (3d Cir. 2017) ....................................................................................7

*F.H. Rockwell & Co. v. Warren County*,
  77 A. 665 (Pa. 1910) ...............................................................................4, 5, 12, 13

*Foehl v. United States*,
  238 F.3d 474 (3d Cir. 2001) ...........................................................................26, 27

*H. B. Powell et al. v. John Lantzy & The Bluebaker Coal Co..*,
  No. 136., 1895 WL 4135 (Pa. Com. Pl. June 3, 1895) ...........................................9

*Herder Spring Hunting Club v. Keller*,
  143 A.3d 358 (Pa. 2016) ..............................................................................*passim*

*Hess v. Westerwick*,
  76 A.2d 745 (Pa. 1950) .........................................................................................7

*Huzzard v. Trego*,
  35 Pa. 9 (1859) .............................................................................................17, 18

*Knupp v. Syms*,
  50 A. 210 (Pa. 1901) ..............................................................................2, 5, 18, 19

*Laird v. Hiester*,
  24 Pa. 452 (1855) .................................................................................................7

*Lamborn v. County Comm'rs*,
  97 U.S. 181 (1877) ..............................................................................................18

*Levick v. Brotherline*,
  74 Pa. 149 (1874) .................................................................................................5

*McBride v. Hoey*,
2 Watts 436 (Pa. 1834) .......................................................................15, 18

*Mennonite Board of Missions v. Adams*,
462 U.S. 791 (1983)........................................................................................26

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)...................................................................................25, 26

*New Charter Coal Co. v. McKee*,
191 A.2d 830 (Pa. 1963)...............................................................................24

*New York State Nat. Gas Corp. v. Swan-Finch Gas Dev. Corp.*,
173 F. Supp. 184 (W.D. Pa. 1959), *aff'd,* 278 F.2d 577 (3d Cir.
1960) ...............................................................................................................12, 14

*New York State Nat. Gas Corp. v. Swan-Finch Gas Dev. Corp.*,
278 F.2d 577 (3d Cir. 1960) ...................................................................11, 12, 22

*Patterson v. Brindle*,
9 Watts 98 (Pa. 1839) ...................................................................................17

*Powell v. Lantzy*,
34 A. 450 (Pa. 1898).................................................................................*passim*

*Reinboth v. Zerbe Run Imp. Co.*,
29 Pa. 139 (1858).............................................................................................20

*Sanderson v. City of Scranton*,
105 Pa. 469 (1888)...........................................................................................11

*Shearer v. Woodburn*,
10 Pa. 511 (1849)......................................................................................16, 17

*Starling v. Lake Meade Prop. Owners Ass'n, Inc.*,
162 A.3d 327 (Pa. 2017)................................................................................23

*Strayer v. Johnson*,
1 A. 222 (Pa. 1885).........................................................................................22

*Trexler v. Africa*,
33 Pa. Super. 395 (1907) ................................................................................5

*Trizechahn Gateway LLC v. Titus*,
    976 A.2d 474 (Pa. 2009) ................................................................23

*United States v. One Toshiba Color Television*,
    213 F.3d 147 (3d Cir. 2000) (*en banc*) ......................................26, 27

*Verba v. Ohio Cas. Ins. Co.*,
    851 F.2d 811 (6th Cir. 1988) ........................................................27

*Yocum v Zahner*,
    29 A. 778 (Pa. 1894) ...................................................................19

## Statutes

28 U.S.C. § 636(b)(1)...........................................................................7

Act of 1806 .........................................................................................9

Act of 1815, March 13, P.L. 177, 6 Sm. L. 299, 72 P.S. § 6091 ...........15

Act of Mar. 13, 1815, Sec. 1 ..............................................................19

Act of March 28, 1806, P.L. 644 ......................................................4, 12

Federal Magistrates Act of 1979..........................................................7

## Other Authorities

Fed. R. Civ. P. 72(b)(3)........................................................................7

**INTRODUCTION**

Prior to 1894, entrepreneur Thomas E. Proctor and Jonathan A. Hill acquired substantial tracts of land in Bradford County, Pennsylvania, including the Josiah Haines Warrant (the "Premises"). In October 1894, Proctor & Hill sold the surface of the Premises to a subsidiary of the company founded by Proctor, the U.S. Leather Company, excepting and reserving unto themselves and their heirs the oil, gas and mineral rights (the "Subsurface Estate") – rights that are now owned by the Thomas E. Proctor Heirs Trusts and the Margaret O. F. Proctor Trust (the "Trusts").

Now, over a century later, the Pennsylvania Game Commission (the "PGC") is attempting to take the Trusts' subsurface rights through this quiet title action, claiming that tax sales of the surface estate, following defaults by another U.S. Leather subsidiary, the Central Pennsylvania Lumber Company ("CPLC"), divested the Trusts' subsurface rights. Critically, these tax sales were not *bona fide* transactions: (1) CPLC allowed hundreds of properties to go to sale by failing to pay taxes, (2) CPLC's officer and attorney, Calvin H. McCauley, Jr., purchased CPLC's properties at tax sale, and (3) McCauley then quitclaimed the properties back to CPLC two years later for $1.

In denying the cross-motions for summary judgment, Magistrate Judge Schwab made legal determinations in the Report and Recommendation ("Report") that are contrary to Pennsylvania law; under Pennsylvania precedent, the Court should enter summary judgment in favor of the Trusts.

**First**, because CPLC owed the duty to report its surface-only ownership interest in the Premises and to pay the assessed taxes, its failure to comply with those duties precludes it from acquiring the Subsurface Estate at a tax sale.  Indeed, "one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty…."  *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898); *see also Coxe v. Wolcott*, 27 Pa. 154, 159 (1856).

**Second**, as CPLC's officer and attorney, McCauley's tax sale purchase operated as a redemption, restoring title to the *status quo ante.  See Knupp v. Syms,* 50 A. 210, 212 (Pa. 1901); *Bartholomew v. Leach,* 7 Watts 472, 473-74 (Pa. 1838). This is true whether he was acting at the direction of CPLC or on his own account. Indeed, the PGC's own title examiner acknowledged that CPLC's "practice… to let its land go to tax sale and have the lands bid in at tax sale by persons…I know to be the attorneys and Counsellors-at-Law for the said Corporation" would render the tax sale a redemption, "***in which case the title to the oil, gas and minerals would not be divested***…."

**Third**, the post-tax sale deed is expressly subject to the Proctor Reservation and states the source of title derives from the Proctor deed.  This confirms the universal understanding of all contemporaneous parties (including the PGC) that the 1908 tax sale did not encompass the reserved Subsurface Estate (either because the severance was reported or McCauley's "purchase" constituted a redemption or, more likely, both).  In addition, the recited reservation in the PGC's deed estops the PGC from claiming title to the Subsurface Estate.  *See Herder Spring Hunting*

2

*Club v. Keller*, 143 A.3d 358, 378 (Pa. 2016); *Elliott v. Moffett*, 74 A.2d 164, 167 (Pa. 1950).

***Finally***, if the tax sale is deemed to encompass the Subsurface Estate, the absence of any effort to provide personal notice to affected parties deprived the Trusts of their property without due process under binding United States Supreme Court precedent.

Under these circumstances, every legal and equitable principle that can apply here commands that CPLC and its successors cannot obtain title to the Subsurface Estate. For these reasons, the Court should modify the Report, and enter an order granting the Trusts' motion for summary judgment.

## PROCEDURAL HISTORY[1]

In August 2012, the PGC initiated this action by filing a quiet title claim against the Trusts seeking title to the oil, gas and minerals in and under certain lands now owned by the PGC. (ECF No. 1). Following a stay, the Trusts filed an amended answer and counterclaims seeking to quiet title to additional lands the PGC acquired from CPLC in Sullivan and Braford Counties. (ECF No. 66). On April 17, 2018, the Trusts filed a motion for partial summary judgment as to one property – the Josiah Haines Warrant – as a bellwether tract for the properties at issue in the case. (ECF No. 94). The PGC filed a cross-motion for partial summary judgment with respect to the Josiah Haines Warrant on July 2, 2018. (ECF No. 123). On February 21, 2019, Magistrate Judge Schwab entered a report

---

[1] The Factual Background is omitted as the detailed facts are set out in the Trusts' Concise Statement of Material Facts. (ECF No. 95).

and recommendation denying both cross-motions for summary judgment.  (ECF
No. 155).

### BACKGROUND:  The Law Relating To Unseated Lands.

Under the Act of March 28, 1806, P.L. 644, any person "becoming a holder
of unseated land" was required to provide the county commissioners a "statement,
together with the date of the conveyance to such holder, and the name of the
grantor, within one year, from and after such conveyance." *See Herder Spring
Hunting Club v. Keller*, 143 A.3d 358, 368 (Pa. 2016).  Where a conveyance
contains an exception or reservation of interests in favor of the grantor, the ***duty*** to
report the severance fell upon the grantee.  *Id.* at 368.  After a severance is
reported, the county must assess and tax the severed estates separately.  *Id.* at 355-
356 (quoting *Wilson v. A. Cook Sons Co*., 148 A. 63, 64 (Pa. 1929) ("where there is
divided ownership of the land there ought to be a divided taxation")).

Importantly, however, the reporting of a severed subsurface estate would not
automatically result in an assessment of the subsurface because "[a] mere naked
reservation of oil and gas in a deed without any other facts to base a valuation upon
is not sufficient to warrant the assessment of taxes." *F.H. Rockwell & Co. v.
Warren County*, 77 A. 665, 666 (Pa. 1910), *overruled on other grounds by
Independent Oil & Gas Ass'n of Pa. v. Bd. of Assessment Appeals*, 814 A.2d 180,
182 (Pa. 2002).  Generally speaking, a basis to value subsurface rights required
production from the land or neighboring lands.  *Id.*  While the separate assessment
of subsurface rights in areas where a basis to assess existed is necessarily
conclusive proof that the transaction was reported, the ***absence*** of a separate

assessment does not prove the opposite – *i.e.*, that the transaction was not reported. *Rockwell*, 77 A. at 666.

Thus, following *Herder Spring*, in order to claim title to a tax deed of unseated lands, a purchaser must establish the following facts: "that the land was unseated at the time of the assessment; that a tax appears to have been, and was in fact assessed upon it by the proper assessing officers, and that the tax had been due for one whole year, and remains unpaid." *Trexler v. Africa*, 33 Pa. Super. 395, 410 (1907). In addition, a tax sale will operate as a redemption where the tax sale purchaser is the assessed owner or agent of the assessed owner, *Knupp v. Syms,* 50 A. 210, 212 (Pa. 1901), where the purchaser returns the property to the owner, *Coxe v. Wolcott*, 27 Pa. 154, 159 (1856), or where the owner pays the taxes during the two year redemption period, *Levick v. Brotherline*, 74 Pa. 149, 149 (1874). Finally, where the post-tax sale deed "specifically mention[s] the name of the person who had a claim upon the land," the grantee is thereafter estopped from claiming title to that reserved interest. *Herder Spring*, 143 A.3d at 378.

Thus, before a tax sale can lead to the unduly "harsh" result of divesting previously-severed oil, gas and mineral rights, *Herder Spring*, 143 A.3d at 375, the party making that claim must correctly surmount a number of obstacles, as shown in the following schematic:



## STANDARD OF REVIEW

The Federal Magistrates Act of 1979, as amended, provides that "a district court shall make a de novo determination of those portions of the report or specific proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3); *Equal Employment Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

## ARGUMENT

## I.     The Report and Recommendation Improperly Held that CPLC Could Steal the Subsurface Estate Through Its Own Neglect of Duty.

The PGC's claim rests on the supposition that (i) CPLC failed to report its ownership interest, (ii) failed to pay its taxes, and (iii) had its straw man purchase and almost immediately quitclaim the defaulted Premises back, all so it could seize the previously-reserved Subsurface Estate. The law does not countenance, and cannot reward, such misdeeds. The legislative grant of authority to seize and sell property for unpaid taxes was intended to enforce payment of taxes, not to allow the theft of property through an owner's deliberate neglect of duty. *Hess v. Westerwick*, 76 A.2d 745, 748 (Pa. 1950) ("the purpose of tax sales is not to strip the taxpayer of his property but to insure the collection of taxes"); *Laird v. Hiester*, 24 Pa. 452, 464 (1855) ("The unseated land laws are intended to enforce the payment of taxes"). After all, "one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty...." *Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898).

The Report, however, incorrectly held that CPLC's duties to report its ownership and to pay taxes were not relevant if the land was unseated.  (ECF No. 155, at 68-70) ("whether the land was seated or unseated is material to whether CPLC had a duty to pay the taxes); *id.* at 77-78 ("the pertinent question in determining whether there was a title wash as a result of a tax sale of unseated land is not who was responsible for reporting the reservation of the subsurface estate or even whether such reservation was reported at all").  This statement is contrary to the holding in *Herder Spring*, which expressly held that reporting "***is relevant*** to this case because the county commissioners were tasked with assessing unseated property for taxation purposes ***based on what was reported by the owners***." *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 360 (2016) (emphasis added).

Instead, the Report appears to rest its reasoning solely on the *outcome* in *Herder Spring* where the tax sale purchaser ***did not have*** the duty to report or the duty to pay the assessed taxes.  143 A.3d at 360-61.  The tax sale purchaser in *Herder Spring* was a bona fide third-party who had no connection to the property prior to the tax sale.  *Id.* at 361.  The purchaser was not the assessed owner, did not have any duty to report his ownership interest, did not have any duty to pay the assessed tax resulting in the sale, and had no prior knowledge of the reserved subsurface interest (which had occurred 36 years prior to the tax assessment and sale to the county and over 40 years prior to the his purchase from the county commissioners).  *Id.* at 360-61.  In contrast, CPLC had the duty to report its ownership interest in the surface estate only, had the duty to pay taxes, and had

8

knowledge of the Proctor Reservation.  McCauley, personally and as CPLC's agent, had knowledge of the Proctor Reservation.

The present case is so factually distinguishable from *Herder Spring* that the only relevant piece of that Court's holding is that the ***duty to report*** the severance under the Act of 1806 fell on the grantee of the severed estate – here, Union and CPLC.  CPLC's deliberate failure to pay taxes on the Premises, as required by law, estops it and its successors from benefiting from that default.  "[O]ne cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state… acquire a better title, or a title adverse to that of other parties in interest," when that party was "in possession of the land when the tax was assessed, and upon that ground was chargeable with its payment."  *Powell,* 34 A. at 451.[2]  Here, CPLC was "in possession of the land when the tax was assessed, and upon that ground was chargeable with its payment."  *Id.*   As such, it is precluded from acquiring title at a tax sale and the "purchase operates as a payment only." *Id.*

---

[2] That principle did not apply in *Powell,* because the taxes were assessed prior to the severance and Lantzy acquired the property after the taxes were assessed, and thus was under no legal or moral obligation to pay them.  *Id.* at 451; *H. B. Powell et al. v. John Lantzy & The Bluebaker Coal Co..*, No. 136., 1895 WL 4135, at *1 (Pa. Com. Pl. June 3, 1895) (factual finding that "the taxes for which the property was sold were assessed while the Flynns owned and ***held the whole property***.") (emphasis added).  In contrast, here, the assessment was made well after the severance of the surface and subsurface estates and CPLC, as the owner of the unseated land, had the legal and moral obligation to pay them.  34 A. at 451 (holding that in the context of an assessment of taxes against unseated lands the party in possession of the land when the tax was assessed is chargeable with its payment).

Indeed, the Pennsylvania Supreme Court held that a similar fraudulent scheme would be treated as a redemption. *See Coxe v. Wolcott*, 27 Pa. 154, 159 (1856). In *Wolcott*, the plaintiff had sold property to an individual named Freeman under a mortgage agreement obligating Freeman to pay the taxes. *Id.* at 154. Freeman allowed the property to go to an unseated land tax sale and the property was purchased by a third party. *Id.* Freeman then directed yet another party, Oviatt, to purchase the land from the tax sale purchaser after the two year period for redemption, and then sell it to Freeman's partners. *Id.* at 155. The Court held that such a scheme would operate as a permissive redemption even though Oviatt's purchase was beyond the two-year redemption period and the tax sale purchaser was not an agent of Freeman. *Id.* at 158-59. The Court explained that

> Freeman could not, with a good conscience, take back [the] title in any other manner [other than redemption], for he was under an express promise to [the plaintiff] to pay the taxes, and it would be a gross fraud in him to suffer the land to be sold for the very taxes he had bound himself to pay, lie by two years till the day of redemption was gone, and then buy in at the price of a redemption the title of the purchaser and set it up against that which he had undertaken to guard.

*Id.* at 159. Similarly, CPLC could not allow its property to be sold, have its agent purchase it, lie in wait, and then take it back in an attempt to deprive the Proctor heirs of their Subsurface Estate.

To simply discard CPLC's neglect of its duties, as the Report does, misreads *Herder Spring*, effectively overrules the holding in *Coxe*, undermines *Powell's* admonition, nullifies hundreds of years of caselaw relating to unseated lands, and rewards deliberate non-compliance with legal obligations.

## II.    No Separate Assessment of the Subsurface Estate Is Required (Nor Could Have Been Obtained) To Avoid a Title Wash.

The Report went beyond the holding in *Herder Spring* and held that a separate assessment of the severed Subsurface Estate was required to avoid a "title wash."  (ECF No. 155, at 77-79) (requiring evidence of "separate assessment of the surface and subsurface estates").  But, as set forth above, the assessment would be based on ***what CPLC reported*** to the County regarding its ownership.

> Where the surface of lands and the minerals in place thereunder have been severed by the agreement or conveyance of the owner, and the respective divisions have become vested in different owners, the municipal authorities are bound to levy their taxes according to the ownership and value of these divisions. And each owner can be made responsible only for the tax on his interest, whether underlying strata or surface.

*Sanderson v. City of Scranton*, 105 Pa. 469, 469 (1888).

The evidence shows that the tax sales could, at most, convey only CPLC's surface interest because CPLC ***did report*** its interests in the Premises to the Bradford County Commissioners.  *See Herder Spring*, 143 A.3d at 360; *New York State Nat. Gas Corp. v. Swan-Finch Gas Dev. Corp.*, 278 F.2d 577, 579 (3d Cir. 1960) ("a tax deed conveys only such interest as was actually assessed to the defaulting taxpayer.").  The assessment records confirm that Union Tanning and CPLC notified the Bradford County Commissioners when they acquired their respective rights in the Premises.  ¶¶ 10, 16[3] (identifying Union Tanning and

---

[3] Paragraph references are to the Trusts' Statement of Undisputed Material Facts (ECF No. 95), Counter-Statement of Facts ("CSOF") (ECF No. 129) and Supplemental Statement of Facts ("SSOF") (ECF No. 153), and exhibit references are to the accompanying Appendix (ECF Nos. 96-110).

CPLC as "owners" of the Premises). The 1907 assessment record for the Josiah Haines warrant identified "C.P.L. Co." as the "owner" – demonstrating that CPLC reported and that only *its interest* in the Premises was assessed. ¶ 10.b. Furthermore, the county commissioners were required to assess a tax four times greater than the regular amount where the owner failed to report his ownership. *See* Act of March 28, 1806, P.L. 644. Between 1894 and 1908, the Premises were never assessed a four-fold tax, demonstrating that Proctor, Union Tanning and CPLC reported their respective ownerships of the Premises. Ex. 3.

Critically, the absence of a separate assessment of subsurface rights is not evidence that reporting did not occur, and is not dispositive of the scope of an ensuing assessment, as recognized by the Third Circuit. *Swan-Finch.*, 278 F.2d at 579–80. That is because "[a] mere naked reservation of oil and gas in a deed without any other facts to base a valuation upon is not sufficient to warrant the assessment of taxes." *Rockwell*, 77 A. at 666. While the separate assessment of subsurface rights in areas where a basis to assess existed is necessarily conclusive proof that the transaction was reported, the *absence* of a separate assessment does not prove the opposite – *i.e.*, that the transaction was not reported. *Rockwell*, 77 A. at 666; *New York State Nat. Gas Corp. v. Swan-Finch Gas Dev. Corp.*, 173 F. Supp. 184, 193 (W.D. Pa. 1959), *aff'd,* 278 F.2d 577 (3d Cir. 1960) ("In any event, an owner does not lose title by virtue of failure to have his gas assessed. Any failure to have property assessed might be the subject of contention between the taxing authorities and the owner, but does not assist a stranger to the title claiming ownership."); *see also Armstrong v. Black Fox Min. & Develop. Corp.*, 15 Pa. D.

& C.3d 757, 762–63 (Pa. Com. Pl. 1980) ("Even if the coal were not separately assessed, as Black Fox alleges, this does not in any way vest title in the Duppstadts…If the coal rights in the 54 acre tract were not separately assessed, this is a matter between the taxing authorities and the owner of the coal estate. A purchaser at a tax sale of the surface estate would not be able to rely on this to claim he purchased the coal estate as well.") (citing *Swan-Finch*, 173 F. Supp. 184).

The Report improperly concluded that *Herder Spring* rejected *Rockwell* and the notion that an assessment of subsurface rights can occur only where there was a basis for valuation.  (ECF No. 155 at 81-82).  But *Herder Spring* did not confront this issue; instead, the argument there was that the subsurface rights ***could never be sold*** where they had no taxable value.   143 A.3d at 373.  In rejecting that argument, the court explained that if the land was assessed as a whole (i.e. the severance was not reported), the value of the entirety of the tract justified the assessment and sale.  *Id.*  Stated otherwise, a tax sale of undivided land in its entirety conveys (unremarkably) the un-severed subsurface rights.  *Id.* Importantly, *Herder Spring* did not overrule *Rockwell*, and left undisturbed *Rockwell's* requirement that an assessment of a ***severed subsurface estate*** can occur only where there is a basis to value it.  Thus, the application of *Herder Spring* and *Rockwell* simply dictate that the absence of a separate assessment has no determinative evidentiary value.

Indeed, there were no separate assessments for severed oil, gas, mineral or coal rights for ***any property*** located in LeRoy Township or Barclay Townships

13

between 1894 and 1931.  CSOF ¶ 49.  The assessment book did not even identify oil, gas, mineral or coal rights as taxable items.  CSOF ¶ 50.  Instead, the evidence demonstrated that properties with a basis to value the subsurface rights (i.e., actual production of coal) were assessed on the *seated lands* section of the assessment books.  CSOF ¶ 55.  This makes sense as the Pennsylvania Supreme Court had forbidden the assessment of severed subsurface rights where there was no basis to value the rights (which required production from the land or the neighboring land).  And, here, there was no production from the Josiah Haines warrant or neighboring lands prior to the 1907 assessment which would have allowed a *separate assessment*.  At a very minimum, the Court erred by concluding that the assessment encompassed the Subsurface Estate as a matter of law.  "What estate was assessed is a question of fact."  *Swan-Finch*, 173 F. Supp. at 192 (citing *Harper v. McKeehan*, 3 Watts & Serg. 238, 246 (Pa. 1842)).

## III.    The Report and Recommendation Improperly Held that McCauley's Purchase Did Not Operate as a Redemption.

As the PGC's own title examiner acknowledged, McCauley was CPLC's agent at the time of the 1908 tax sale, and therefore his "purchase" was, under settled law, equivalent to a redemption, restoring the *status quo* and the Proctor heirs' continued ownership of the Subsurface Estate.  SSOF ¶ 63 & Ex. 84 (stating that CPLC's tax sales utilizing its attorneys and officers would not ***"have any greater effect than that of redemption, in which case the title to the oil, gas and minerals would not be divested***…") (emphasis added).  This is true whether

14

McCauley was acting on behalf of CPLC or attempting to purchase "on his own account."

The Report found that "a reasonable trier of fact could conclude that McCauley was acting as CPLC's agent at the 1908 tax sale" but ultimately held that this fact "would not be material" if the land was unseated. (ECF No. 155 at 60, 63). This statement highlights the fundamental misunderstanding of the legal issues in this case. If the land was "seated" at the time of the tax sale, ***the tax sale is void*** and McCauley's agency would not come into play. By contrast, if the land was unseated, McCauley's agency is relevant in determining the ***effect*** of the tax sale (i.e. that it operated as a redemption).

The Report takes a bold (and legally unsupported) position that there could never be a redemption of unseated lands because "the land itself…was liable for the tax." (ECF No. 155, at 68; *id.* ("if [the property] was unseated, CPLC was not responsible for the taxes.").

First, this is contrary to the unseated land statute which explicitly grants the right of redemption "to the owner or owners" of the "unseated" lands. Act of 1815, March 13, P.L. 177, 6 Sm. L. 299, 72 P.S. § 6091; *McBride v. Hoey*, 2 Watts 436, 442-43 (Pa. 1834) (explaining that the Act of 1815 gives the right of redemption to the "owner or owners of the land" and "whoever is invested with it must be considered the owner of the land"). Countless cases have explained who qualifies as the "owner" of unseated land:

- "whoever is invested with it must be considered the owner of the land." *McBride*, 2 Watts at 442-43;

15

- whoever has "a power to take care of land carries with it a power to pay the assessed taxes, or to redeem if it be sold as unseated by the treasurer." *Shearer v. Woodburn*, 10 Pa. 511, 513 (1849);

- the person in whose name the property is assessed, *City of Philadelphia v. Miller*, 49 Pa. 440, 449 (1865);

- the party "in possession of the land when the tax was assessed, and upon that ground was chargeable with its payment." *Powell,* 34 A. at 451;

- anyone who has "[a]ny right which, in law or equity, amounts to an ownership in the land, any right of entry upon it, to its possession session or enjoyment, or any part of it, which can be deemed an estate in it, makes the party an owner so far as it is necessary to give him the right to redeem." *City of Philadelphia v. Schaefer*, 112 A. 864, 864–65 (Pa. 1921).

Here, CPLC undoubtedly was an "owner" of the Premises. CPLC was identified as the "owner" in the tax assessments, it was in possession of the land at the time of the assessment, and it had legal title to the surface of the land through its deed from Union Tanning. Thus, CPLC was the party "in possession of the land when the tax was assessed, and upon that ground ***was chargeable with its payment***." *Powell,* 34 A. at 451 (emphasis added); *Shearer*, 10 Pa. at 513 ("power to take care of land [which] carries with it ***a power to pay the assessed taxes***, ***or to redeem if it be sold as unseated*** by the treasurer") (emphasis added).

The quote that the Report relied upon came from the context of holding that the county could not hold the owner *personally liable* for the taxes, either by demanding payment in court or through the seizure of personal property. *Burd v.*

*Ramsay*, 9 Serg. & Rawle 109, 114 (Pa. 1822) (explaining that "taxes on unseated lands, have never I believe been considered a charge on the person of the owner, who may abandon them whenever they are not worth the taxes; there is no other means of obtaining taxes due on these, than a sale under the act of assembly"). But that does not mean there is no owner who owes the duty to pay the taxes. Indeed, the Pennsylvania Supreme Court explained that "[l]and is taxed, not as inanimate matter, which is insensate, and cannot respond to duty, but as property, to whose owner the law allows both time and place to respond, before his property shall be sold from him." *Miller*, 49 Pa. at 448. Thus, although the treasurer could not seek to enforce the taxes assessed to CPLC through the courts (if the land was unseated), it does not negate that CPLC, as the owner, "was chargeable with its payment," *Powell,* 34 A. at 451, and could "redeem" the Premises. *Shearer*, 10 Pa. at 513.

Second, the Pennsylvania Supreme Court has explained that "[a] law… authorizing the redemption of lands sold for taxes, ought to receive a liberal and benign construction in favor of those whose estates will be otherwise divested." *Patterson v. Brindle*, 9 Watts 98, 101 (Pa. 1839) (internal quotations and citation omitted). In *Patterson*, the Court held that the agent of the deceased principal, by purchasing the title from the tax sale purchaser, redeemed the unseated land "for the benefit of all having title" – the heirs of the principal. *Id.* at 101. And, the Court held that in the context of unseated lands the "act of the agent in redeeming" is "deemed the act of the owner, by whom he was employed, if he ratified it." *Id.* at 100-01; *see also Huzzard v. Trego*, 35 Pa. 9, 9 (1859) (holding that "where an

17

agent employed by the owners of land to pay the taxes thereon, procures from the purchaser at a treasurer's sale, a conveyance in his own name, but professedly for the owners," the land is redeemed in favor of the owners); *McBride*, 2 Watts at 443 ("the owner having the right to redeem may do it either himself in person or he may do it by another."). Thus, the purchase at a tax sale by an agent of the owner operates as a redemption. *See Huzzard*, 35 Pa. at 11 (explaining that redemption requires but slight evidence to show an authority to redeem a tax sale for the owner).

This is true whether the agent was acting for or against his principal. In *Wolcott*, the agent who purchased the unseated lands from the tax sale purchaser (even after the redemption period ran) did so at the direction of the reputed owner, and thus, the Pennsylvania Supreme Court held this purchase operated as a redemption. 27 Pa. at 158-59. And the law uniformly holds that an agent cannot purchase land adverse to his principal. *Bartholomew v. Leach,* 7 Watts 472, 473-74 (Pa. 1838); *Powell*, 34 A. at 451; *see also Lamborn v. County Comm'rs,* 97 U.S. 181, 184 (1877) ("'There is a general principle applicable to such cases, that a purchase made by one whose duty it was to pay the taxes shall operate as payment only: he shall acquire no rights, as against a third party, by a neglect of the duty which he owed to such party.'" (quoting Thomas M. Cooley, A TREATISE ON THE LAW OF TAXATION 346 (1876))).

Accordingly, when an agent of the defaulting taxpayer purports to purchase property at an unseated tax sale, Pennsylvania law treats it as a payment of overdue tax on the principal's behalf, and thus as "equivalent to a redemption." *Knupp v.*

18

*Syms,* 50 A. 210, 212 (Pa. 1901), *reaffirmed by Wheeler v. Knupp,* 55 A. 979 (Pa. 1903). CPLC agreed. CPLC by its own statement demonstrated that it knew at the time that "[a] tax title cannot be sustained where… an agent of the owners of unseated land bought in the land at tax sale," given that it argued as much to the Pennsylvania Supreme Court in 1907. ¶ 29. (quoting *Knupp v. Syms*).

The Report sought to distinguish *Knupp v. Syms,* 50 A. 210, 212 (Pa. 1901), by claiming that there was no evidence that after the tax sale McCauley paid the taxes on which the sale was based – but that is exactly what his purchase was. The purchase price at a tax sale constitutes payment of the unpaid tax plus the "costs necessarily accruing by reason of such delinquency." Act of Mar. 13, 1815, P.L. 177, Sec. 1.[4]

Thus, because McCauley was CPLC's agent at the time of the 1908 tax sale (and the PGC has not submitted any evidence to the contrary), his purchase (whether adverse to or at the direction of CPLC) operated as a redemption, restoring the status quo and leaving "the title precisely as though the sale had not been made." *Yocum v Zahner,* 29 A. 778, 779 (Pa. 1894); *Alexander v. Ellis,* 16 A. 770, 771-72 (Pa. 1889).[5]

---

[4] The commissioners' public records reflect that the unpaid tax amounted to $44.36 and McCauley paid $49.36, which included the unpaid tax and the costs for the sale. Although these records were not submitted at summary judgment because it was undisputed that McCauley's payment at the tax sale constituted payment of the assessed taxes, the Trusts can provide these records to the Court (and would request leave to do so) if the Court views them as necessary to resolve this case.

[5] The PGC claims that the law allows an owner of land to purchase his own property at a tax sale, but every case permitting an "owner" to purchase involve current owners whose property went to sale based on *pre-ownership* assessments

## IV. The Post-Tax Sale Deed Evinces the Contemporaneous Understanding that the Tax Sale Had No Effect on the Subsurface Estate and Binds the PGC.

The Report here is also infirm because the PGC is bound by the reservations set out in its deed conveying the Premises, specifically recognizing the pre-1908 reservation in favor of Proctor and his heirs. At every step in the contract process, CPLC and the PGC acknowledged the subsurface reservation:

---

(where the current owner of course had no legal obligation to pay). *See, e.g., Powell v. Lantzy,* 34 A. 450, 451 (Pa. 1898) (current owner purchased property at tax sale based on pre-ownership assessment); *Coxe v. Gibson*, 27 Pa. 160, 165 (1856) (explaining that because the defendant was not bound to pay the taxes assessed because they were assessed before he became the owner and he was "in no privity with, and owed no allegiance to" and stood "in no relation of trust" with the pre-assessment owner, he could perfect his title that was tainted with a defect of prior fraud); *Reinboth v. Zerbe Run Imp. Co.*, 29 Pa. 139, 144 (1858) ("the [tax sale] purchaser (Staples) coming in as a stranger, there being no privity between him and the former owners, his title was absolute"). None of these cases permit an agent to purchase an owner's property. More importantly, none of these cases permit an owner to default strategically on his own taxes in order to acquire *another's* separate property.

Although the Report and Recommendation did not specifically address these arguments, it touched upon the timing of the assessment that is not an accurate reflection of the law. In *Herder Spring*, the argument was that ***no*** post-severance assessment could ***ever*** encompass the previously severed subsurface. And the Court rejected that argument and held that if no reporting of the severance occurred, the assessor would still assess the whole. 143 A.3d 374-75. But with regard to *who* could purchase at a tax sale and whether that purchase would operate a redemption, the parties' respective moral and legal obligations do matter. *Wolcott*, 27 Pa. at 158-59. In particular, CPLC ***was in privity*** with the Proctor heirs as it had obtained title expressly subject to their reserved interest prior to any assessment. *Cf. Reinboth*, 29 Pa. at 144 ("the [tax sale] purchaser (Staples) coming in as a stranger, there being no privity between him and the former owners, his title was absolute").

20

- The contract for sale approved by the CPLC Board clearly stated that the reservation of subsurface rights was "***unto*** Thomas E. Proctor and Jonathan A. Hill."  ¶35 (emphasis added).

- The December 1920 deed from CPLC to the Commonwealth was "subject to all the reservations, exceptions, covenants and stipulations contained in [the] deed from Thomas E. Proctor et al to the Union Tanning Company, and in deed from the Union Tanning Company to the Central Pennsylvania Lumber Company," which reserved "all the minerals, coal, oil, gas or petroleum…."  ¶38.

This reservation is not only circumstantial evidence of what CPLC and the PGC understood that CPLC actually owned and could convey, but also have independent legal significance.  Under controlling Pennsylvania law, as reaffirmed in *Herder Spring,* the recognition of the Proctor Reservation in the deed estops the PGC from claiming title to the Subsurface Estate.  Whenever a "deed specifically mention[s] the name of the person who had a claim upon the land," as with the deed here, the grantee is thereafter estopped from claiming title to that reserved interest.  *Herder Spring*, 143 A.3d at 378.  After all, the law binds parties to the statements contained in their property deeds, and prevents them from denying anything stated therein, including reservations or exceptions.  *Elliott v. Moffett*, 74 A.2d 164, 167 (Pa. 1950).

Simply put, CPLC did not intend to transfer the Subsurface Estate to the Commonwealth, the Commonwealth did not intend to receive it, and the PGC is estopped from claiming ownership over that estate. *Elliott*, 74 A.2d at 167.

21

The Report disregarded the deed's clear and unequivocal language, which expressly states that the Proctor and Hill reservation continued in force, and this well-established rule of law.  Instead, the Court determined that if the tax sale washed the subsurface then the Proctor heirs were strangers to title who could not acquire title under the reservation.  The Court based this ruling on the statement in *Herder Spring* that the tax sale is "the first link in a new chain of title," 143 A.3d at 378.  But this dictum is not even supported under Pennsylvania law; *Herder Spring* cites to a 1934 manual on title searching.  Further, it is limited to the context where there was no recited chain of title nor any specific reservation in the deed.  The recited title in the deed at issue in *Herder Spring* **started with** the tax sale.  Here, the recited chain of title cites its source as the 1903 deed from Union Tanning and specifically references the Proctor deed, which created the reserved Subsurface Estate and was recited in the Union Tanning deed.   Thus, the Proctor heirs were *not* strangers to the title as they are claimed as the **source** of title.

Indeed, the only Pennsylvania case that has applied the stranger to title "rule" involved a **new** exception and reservation made in favor of a party who had **never** owned the reserved interest or any interest in the property.   *In re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone and Mineral Properties*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998).   In this case, however, Proctor is in the recited chain of title as the owner of the subsurface rights and "a purchaser at treasurer's sale is in privity to the title, if any, that is divested by the sale and passes to him."  *Strayer v. Johnson*, 1 A. 222, 225 (Pa. 1885).  Thus, "stranger to title" has no application here.  And indeed, such a "'rule'" does

22

violence to a much more deeply rooted principle of Pennsylvania law – namely, that the Court should "ascertain and effectuate what the parties intended," and "effect must be given to **all** the language of the instrument and no part shall be rejected if it can be given a meaning…." *Brookback v. Benedum-Trees Oil Co.,* 131 A.2d 103, 107 & n.6 (Pa. 1957) (emphasis in original). The deed makes clear that CPLC did not intend to transfer the Subsurface Estate to the Commonwealth, and the Commonwealth did not intend to receive it.

Next, the Report disregards the contract giving rise to the PGC deed, claiming that it is extrinsic evidence. However, the deed itself specifically incorporates by reference the resolution of the Board of Directors of the Central Pennsylvania Lumber Company at a meeting held on April 6, 1920, which authorized the sale of the land. *Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 341 (Pa. 2017) (where a deed incorporates a document by reference, it becomes a "material and essential part of the conveyance, and is to have the same force and effect as if it was incorporated into or copied into a deed."). And that resolution approved the form of the contract and the specific reservation language set forth in that contract. At a minimum, this creates a patent ambiguity in the deed, and supports consideration of extrinsic evidence to show the parties' intent – an intent that is clear on the record here.

Furthermore, the court's interpretation of the deed demonstrates that the language is ambiguous. "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009). It is clearly a

23

reasonable interpretation of the deed that the reservation means what it says – that the Subsurface Estate is subsisting.  Additionally, "[w]here a deed or agreement or reservation therein is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the **entire written instrument** there in question, but also from a consideration of the subject matter and of the surrounding circumstances."  *New Charter Coal Co. v. McKee*, 191 A.2d 830, 834 (Pa. 1963) (emphasis in original).  More critically, in reaching its "interpretation" that the "subject to" language simply limited the warranty, the court relied upon a single, superior court case, that claimed "it was not unusual for conveyances to be made subject to all recorded covenants, easements and restrictions, ***without specific enumeration***."  (ECF No. 155, at 95) (citing *Burns v. Baumgardner*, 449 A.2d 590, 593 (Pa. Super 1982)) (emphasis added).  That reasoning has no application here because the recitation of the Proctor Reservation was not some generic "subject to all recorded reservations."  It specifically ***enumerated*** the Proctor Reservation and provided the recorded deed reference.  It was not simply a protection against the warranty.  Moreover, the restriction at issue in *Burns **never*** applied to the tract.  *Burns*, 449 A.2d at 593 ("The provision, however, was merely an acknowledgement that building restrictions existed with respect to a portion of the tract. It did not create new restrictions or expand existing restrictions to unencumbered portions of the tract.").  Thus, the reasoning from that case has no application here.

    At bottom, the reservation language in the post-tax sale deeds is irrefutable evidence that the tax sale ***did not*** encompass the Subsurface Estate.  To give the

language in the deeds any effect, which the law requires, the reservation

establishes that CPLC understood that (1) the taxes assessed only its surface

interest in the Premises, and (2) McCauley's "purchase" at the tax sale operated as

a redemption.[6]

## V.    The 1908 Tax Sale, If It Expropriated Severed Subsurface Interests, Deprived the Trusts of Premises Without Due Process of Law.

Although the Report concluded that a question of fact existed as to whether

the tax sale scheme deprived the Proctor heirs of their constitutional due process,

the Trusts contend that the law is clear that notice by publication only to out-of-

state owners is insufficient.  "An elementary and fundamental requirement of due

process in any proceeding which is to be accorded finality is notice reasonably

calculated, under all the circumstances, to apprise interested parties of the

pendency of the action and afford them an opportunity to present their objections."

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Here,

however, Bradford County's only attempt to provide notice of the June 1908 tax

sale was an advertisement in two local newspapers, ¶24, even though potentially-

interested parties were identifiable from public records maintained in the same

courthouse, ¶¶ 8, 13.  This method of "notice" is one that the Supreme Court has

found insufficient, and the ensuing surreptitious confiscation of property rights is

---

[6] The continued recognition of the reservation by CPLC also instilled reliance by the Proctor heirs that their interest in the Premises remained untouched. Indeed, the heirs were leasing the coal rights of this tract during the same timeframe of the PGC's purchase of the land.  A claim through tax title would have alerted the heirs and allowed them to challenge the tax sales with contemporaneous witnesses and evidence.

exactly what the Fourteenth Amendment's due process clause was intended to prevent.

As *Mullane* made clear, "[t]he fundamental requisite of due process of law is the opportunity to be heard," but "[t]his right… has little reality or worth unless one is informed that the matter is pending." 339 U.S. at 314. Notice must be more than a "mere gesture" and instead be "reasonably calculated to reach interested parties." *Id.* at 315; 318. Where the identities of the affected parties are ascertainable, publication notice alone does not satisfy due process. *Id.* at 315 ("Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper…."). The Court has repeatedly reaffirmed and extended *Mullane*. In *Mennonite Board of Missions v. Adams*, 462 U.S. 791 (1983), the Court held that when a mortgagee "is identified in a mortgage that is publicly recorded, constructive notice by publication must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service." *Id.* at 798. Mere "notice by publication" does not qualify. *Id.* at 799.

The tax scheme did not provide any means of personal notice to interested parties. The Third Circuit has held that greater attempts at notice violate the constitution. *See, e.g., United States v. One Toshiba Color Television*, 213 F.3d 147, 153 (3d Cir. 2000) (*en banc*) (rejecting a per se rule that service by mail meets due process requirements); *Foehl v. United States*, 238 F.3d 474, 480 (3d Cir. 2001) (holding that the government did not satisfy due process by mailing notice to the plaintiff's former address, which he had previously provided, where further

26

investigation would have revealed his current address); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346–47 (3d Cir. 1995) (explaining that the "reasonably ascertainable" standard requires a "diligent search" of the books and records); *Benoit v. Panthaky*, 780 F.2d 336, 338 (3d Cir. 1985) (invalidating tax sale where the property owner's information was available at the offices of the Recorder of Deeds); *see also Verba v. Ohio Cas. Ins. Co.*, 851 F.2d 811, 816 (6th Cir. 1988) (holding that because the defendant recorded its interest with the county recorder, it was a matter of public record and due process required more than constructive notice).

Notably, the Third Circuit has emphasized that the "focus" on the due process inquiry "has always been on the ***procedures*** in place to effect notice." *Toshiba*, 213 F.3d at 155 (emphasis added). Where the government chooses to rely on less than actual notice, "it bears the burden of demonstrating the existence of procedures that are reasonably calculated to ensure that such notice will be given." *Toshiba*, 213 F.3d at 155. Here, there is no question that the only procedure employed was notice by publication, without any attempt to name the impacted property owners, notify the property owners, or even to determine who they were. ¶24. Such a "glaring lack of effort" on the part of the County dictates that constitutional due process was not met. *See Foehl*, 238 F.3d at 480 (finding the government's failure to check with four obvious sources of information was unreasonable and violated the claimant's due process rights). "The constitutional mandate of adequate notice cannot be treated as empty ritual." *Id.*

27

Accordingly, any tax sale that purports to include the Subsurface Estate would be an unconstitutional deprivation of property without due process of law. [7]

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Trusts' Motion for Partial Summary Judgment, which is incorporated by reference herein, the Trusts respectfully request that the Court enter an order modifying the Report and Recommendation insofar as it denies the Trusts' Motion for Partial Summary Judgment and enter summary judgment in the Trusts' favor.

Dated: March 7, 2019                         Respectfully submitted,

                                             /s/ *Laura A. Lange*
                                             Laura A. Lange
                                                Pa. ID No. 310733
                                             MCGUIREWOODS LLP
                                             260 Forbes Avenue, Suite 1800
                                             Pittsburgh, PA  15222
                                             llange@mcguirewoods.com

                                             Paul K. Stockman
                                                Pa. ID No. 66951

---

[7] The Report and Recommendation skips this important initial step, asking instead whether Bradford County officials would *in fact* have been able to determine the identities and whereabouts of the Proctor heirs.  While the Trusts can make such a showing (given that Thomas E. Proctor's will was recorded, and his representatives were in regular direct contact with local officials), the law does not require that level of proof in the absence of *any* effort at personal notice.  Put otherwise, that question would only come into play if – for example – Bradford County officials had attempted unsuccessfully to notify Thomas E. Proctor as record owner of the reserved Subsurface Estate, but could not because he was deceased; only then would it matter whether his heirs were known and could reasonably be located.

28

KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

## CERTIFICATE OF COMPLIANCE:

I hereby certify that the foregoing brief complies with the 10,000-word word-count limit allowed by the Court by order dated March 7, 2019 (ECF No. 159), in that it contains 7,920 words, computed using the word count feature of Microsoft Word.

Dated:  March 7, 2019                    /s/ *Laura A. Lange*