## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, : CIVIL ACTION – LAW
PENNSYLVANIA GAME COMMISSION, :
                              : CASE NO. 1:12-CV-1567
           Plaintiff, :
                              : JUDGE: Christopher C. Conner
       v. :
                              :
THOMAS E. PROCTOR HEIRS TRUST and :
the MARGARET O.F. PROCTOR TRUST, :
                              :
           Defendants. :
                              : [Electronically Filed]

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATION

PENNSYLVANIA GAME COMMISSION

DATE: March 21, 2019          s/Bradley C. Bechtel
                                 Bradley C. Bechtel, Chief Counsel
                                 PA No. 49681
                                 W. Creigh Martson, Assistant Counsel
                                 PA No. 94759
                                 2001 Elmerton Ave
                                 Harrisburg, PA 17110-9797
                                 (717) 783-6530
                                 brbechtel@pa.gov
                                 wmartson@pa.gov
                                 *Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................1

II.   ARGUMENT ..........................................................................................4

      A.    The Trusts' Objections Should Be Deemed Withdrawn ...............4

      B.    Background: The *Actual* Law Relating To Unseated Lands ........4

      C.    The Report Did Not Conclude That CPLC Could Steal The
            Subsurface Estate Through Its Own Neglect Of Duty ..................6

      D.    The Absence Of A Separate Assessment Of The Severed
            Subsurface Estate In The Property Is Fatal To The Trusts' Claim ....7

      E.    The Report Properly Held That McCauley's Purchase At The
            Tax Sale Did Not Operate As A Redemption ...............................8

      F.    The Commission Is Not Estopped From Claiming Title To The
            Subsurface ................................................................................14

      G.    The 1908 Tax Sale Did Not Deprive the Trusts of Due Process ....19

III.  CONCLUSION ......................................................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958),
*aff'd*, 265 F.2d 196 (3d. Cir. 1959) ............................................................ *passim*

## State Cases

*Arthurs v. King*, 95 Pa. 167 (Pa. 1880) ....................................................... 10

*Bartholomew v. Leach*, 7 Watts 472 (Pa. 1938) .......................................... 11

*Burns v. Baumgardner,* 449 A.2d 590 (Pa. Super. 1982) ....................... 17, 18

*Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust*,
158 A.3d 148 (Pa. Super. 2017) .................................................................. 6, 8

*Coxe v. Hathaway*, 27 Pa. 160 (Pa. 1856) ................................................. 9, 11

*Coxe v. Sartwell*, 21 Pa. 480 (Pa. 1853) ...................................................... 12

*Coxe v. Wolcott*, 27 Pa. 154 (Pa. 1856) ....................................................... 10

*Elliott v. Moffett*, 74 A.2d, 164 (Pa. 1950) .................................................. 14

*F.H. Rockwell & Co. v. Warren County*, 77 A. 665 (Pa. 1910) ...................... 8

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016) ........... *passim*

*Herder Spring v. Keller*, 93 A.3d 465 (Pa. Super. 2014) .............................. 15

*Hutchinson v. Kline*, 49 A. 312 (Pa. 1901) .................................................... 3

*In Re Condemnation by County of Allegheny of Certain Coal, Oil, Gas,
Limestone, Mineral Properties*, 719 A.2d 1 (Pa. Cmwlth. 1998) ................. 16

*Knupp v. Syms*, 50 A. 210 (Pa. 1901) ........................................................... 13

*Neill v. Lacy*, 110 Pa. 294 (Pa. 1885) ............................................................ 8

*Philadelphia v. Miller*, 192 Pa. Super. 239 (Pa. Super. 1956) .................................... 12

*Powell v. Lantzy*, 34 A. 450 (Pa. 1896) .................................... 6, 7, 9, 11

*Rogers v. Johnson*, 70 Pa. 224 (Pa. 1871) .................................... 10

*Woodhouse Hunting Club, Inc. v. Hoyt*, 183 A.3d 453
(Pa. Super. 2018) .................................... 6, 8

*Yocum v. Zahner*, 162 Pa. 468 (Pa. 1894) .................................... 10

## Statutes & Rules

Act of 1806, March 28, P.L. 644, 4 Sm. L. 346 .................................... 5, 6

Act of 1815, March 13, P.L. 177, 6 Sm. L. 299 .................................... 5, 10

M.D. Pa. Local Rule 72.2 .................................... 4

M.D. Pa. Local Rule 72.3 .................................... 4

## Other Authorities

PA Bar Assn. Quarterly 106 (July 2014) .................................... 3

44 Cong. Record 3522 (June 19, 1909) .................................... 3

## I.    INTRODUCTION

The Report correctly rejects the Trusts' attempt to rewrite both history and the law in an effort to undo tax sales that occurred more than 100 years ago. Numerous courts, including the United States Court of Appeals for the Third Circuit and the Pennsylvania Supreme Court, have consistently concluded that the Trusts are not entitled to the windfall that would result if tax sales conducted in the early 1900s are undone. This is a just and equitable result, given that the tax sales the Trusts seek to undo were the linchpin of a monopolistic business model and tax avoidance scheme employed by the wealthy families whose assets are now held by the Trusts. To appreciate the equity of (and irony inherent in) the result here, some historical context is required. This context can be found in a 2014 article appearing in the Pennsylvania Bar Association Quarterly. Because the article provides illuminating insight into wealth and tax avoidance in the early 1900s, it is quoted at length below:

> [In the late 1800s and early 1900s a] large portion of the bark and lumber lands [in Pennsylvania] were owned by a few families including ***Proctor***, Thorne, Davidge, Stevens, and Hoyt. In 1893, they consolidated their land holdings and created the U.S. Leather Company, one of the first twelve Dow Jones companies. Their goal was to corner the hemlock bark market, and the cattle-hide tanning market along with it. They succeeded. The result became known as the Leather Combine or the Leather Trust. …
>
> The general scheme involved each of the families conveying their lands to the Leather Trust's three operating subsidiaries, which were Elk Tanning, Co., Union Tanning, Co., and Penn Tanning, Co. When the families sold their lands to one or another of these tanning companies, they excepted and reserved title to the oil, gas, and, minerals.

1

Circa 1903, the lumber products became more valuable than the bark used in the tanning process, and the tanning companies began having problems securing raw hides. *U.S. Leather formed a new company, the Central Pennsylvania Lumber Co. ("CPL"). Elk, Union, and Penn Tanning conveyed all their lands to CPL, reciting their principals' prior severance of title to the oil, gas, and minerals*.

The result was hundreds of thousands of acres all across the Northern Tier with severed oil, gas, and mineral interests owned by absentee owners, *who were not paying taxes* or making a productive use of the severed oil, gas, or minerals, with poor records of the identities and whereabouts of the respective owners. These lands overlay a large portion of the Marcellus Shale. …

The owners of the severed oil, gas, and minerals were required by the 1806 Act to report those mineral interests for assessment, even though they had no personal liability for the taxes.   Failure to report the conveyance meant that the back taxes would be quadrupled as a penalty.  *But few reported. They preferred to save the tax money and take a chance that the subsurface rights would not be sold at a tax sale or that the surface would not be sold and bring the subsurface with it.* By not reporting their subsurface rights for assessment and taxation, they knew they were taking a risk, just like the risk taken when one delays recording a deed. *Business decisions were made.*

On the other hand, the local taxing authorities needed the tax income. The surface owners wanted to improve their title and make the lands productive. The Commonwealth wanted settlement, productive lands, and clear title. The Commonwealth consequently adopted policies that sought to reunite the severed interests, make them productive, and allow the local authorities to tax them.

*In the early 1900s and through the First World War, CPL engaged a regime of systematic title washing by causing or allowing its unseated lands to be assessed for taxes, refusing or neglecting to pay the taxes assessed, and allowing the surface to be sold for unpaid taxes*. A strawman for CPL (frequently C.H. McCauley) would buy the unified title to the land at the tax sale. The strawman would sit on the deed for two years during the two-year redemption period, then quitclaim or

convey the land back to CPL, frequently without recording the treasurer's deeds which issued out of the tax sale. ***By operation of the tax sale law and the reconveyance by the strawman, CPL acquired title not just to the surface but the oil, gas, and minerals as well***.

It is necessary to keep in mind that the ***CPL was owned by U.S. Leather, which was itself owned by the families (Proctor***, Goodyear, etc.) who created it and had reserved those mineral rights in the first place. ***Though it is impossible to know for certain, it is entirely reasonable to surmise that this system was designed in conjunction with the mineral owners to avoid paying back taxes, particularly those subject to the quadruple penalty imposed by the 1806 Act, rather than one intended to deprive unsuspecting mineral owners of their interests***.

CPL was the master of this scheme (at one time owning about 500,000 acres). …

The title wash scheme employed by the CPL . . . received the stamp of approval of the Pennsylvania Supreme Court in *Hutchinson v. Kline* and other cases of that era.

*An Historical Perspective Of The Pennsylvania Title Wash*, 85 PA Bar Assn. Quarterly 106 (July 2014) (emphasis added). *See also Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d. Cir. 1959); Trusts' Counterclaim (Doc. 66 at ¶¶ 6-15); 44 Cong. Record at 3522 (June 19, 1909) (excerpt attached).

Contrary to the revisionist history the Trusts are now peddling, the record and applicable case law demonstrates that the Proctor Reservation was extinguished by the 1908 tax sale and that the Trusts do not hold an interest in the oil, gas, and minerals in the Property.

3

The Trusts' objections to the Report repackage several arguments that the Commission does not have title to the oil, gas, and minerals in, on and under the Property – *e.g.*, estoppel, agency, due process, etc.  The Report, based on well-established Pennsylvania law, rejected each of these arguments.  The public record, confirmed by the Commission's expert, establishes that the Commission has superior title.

## II.    ARGUMENT

### A.    The Trusts' Objections Should Be Deemed Withdrawn.

As a threshold matter, the Court's rules require a brief in support of objections to a magistrate judge's report and recommendation.  *See* Local Rules 72.2, 72.3.  The Trusts, despite moving the Court for leave to file a brief in excess of 5,000 words (Doc. 156), filed their objections without a supporting brief.  The Trusts' objections should, accordingly, be deemed withdrawn.  *See* Local Rules 7.5, 72.3.

### B.    Background: The *Actual* Law Relating To Unseated Lands.

The Pennsylvania Supreme Court's decision in *Herder Spring* makes clear that failure to report a severance of unseated land, as occurred here, "had the practical effect of having the property assessed and taxed as a whole, given that the assessors were not required to determine the sometimes elusive current ownership."  *See Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 370 (Pa. 2016).  Thus, if neither the Trusts' predecessors-in-interest nor the purchaser of the surface rights

4

reported the *severance* to the county commissioners, then the commissioners would have assessed and taxed the Property in its entirety. *Id*. at 370, 372. *See also* Doc. 155 at 76-79 & 82-83. That is because "the tax system relating to unseated land, including the Acts of 1806 and 1815, treated unseated land *entirely in reference to the original warrants when not otherwise directed by the owners*." *Herder Spring*, 143 A.3d at 372 (emphasis added). As ownership of unseated land was not easily ascertainable, the county commissioners "*were not tasked with searching deed records* to determine the present ownership of unseated land." *Id*. (emphasis added). Thus, that the Proctor Reservation appeared *in a deed* recorded with the county is not enough. Because the Property was unseated, the failure to report the severance to the county commissioners resulted in the commissioners assessing and taxing the Property in its entirety. *Herder Spring*, 143 A.3d at 370; Doc. 155 at 76-79 & 82-83.

Although the subsurface rights in the Property may have been severed from the surface estate via the Proctor Reservation, those rights were not separately assessed by the county commissioners and there is no evidence establishing that the severance was ever reported. As found by the Report, there is no evidence establishing that the Trusts' predecessors-in-title ever requested that the county commissioners separately assess the severed subsurface rights prior to the 1908 tax sale. There is no evidence establishing that the county commissioners ever assessed

5

the subsurface rights separately from the surface estate prior to the 1908 tax sale. Further, though the 1806 Act did not, according to *Herder Spring*, impose a duty on the Trusts' predecessors in title report the severance, the **consequence** of their failure to report the severance ultimately caused the land to be continually taxed and assessed as a whole, and consequently, sold as a whole at the 1908 tax sale. *See Herder Spring*, 143 A.3d at 370, 372; Doc. 155 at 76-79 & 82-83.

While the Trusts may deny that the 1908 tax sale had any effect on their subsurface interests, the case law is clear that the sale extinguished the Proctor Reservation in the Property and divested the Trusts' predecessors-in-title of any interest they may have had in the Property's oil, gas, and minerals. *See Herder Spring*, *supra*; *See also Cornwall Mt. Invs., L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017); *Woodhouse Hunting Club, Inc. v. Hoyt*, 183 A.3d 453 (Pa. Super. 2018); *Proctor*, 265 F.2d at 200-201.[1]

### C.    The Report Did Not Conclude That CPLC Could Steal The Subsurface Estate Through Its Own Neglect Of Duty.

Relying on *Powell v. Lantzy*, 34 A. 450 (Pa. 1896), the Trusts contend that the Report erred by allowing CPLC to benefit from title acquired upon neglect of a duty to report (or falsely reporting) or neglect of a duty to pay taxes. *See* Doc. 160 at 7.

---

[1]    The Trusts were parties in both the *Cornwall* and *Proctor* cases. In both cases, as well as in *Herder Spring* and *Woodhouse*, the courts rejected many of the very same arguments being advanced by the Trusts in this case.

But the Report correctly rejected these "estoppel" arguments by the Trusts. As to a purported duty to report, there was none. The Trusts are, as detailed above, conflating duty with *consequences*. When CPLC took title to the surface, it had no affirmative duty to report the prior severance and Proctor Reservation to the county commissioners. *See Herder Spring*, 143 A.3d at 370, 372; Doc. 155 at 76-79 & 82-83. There is, moreover, nothing in the record establishing that CPLC reported anything falsely, as the Trusts imply without citation to a shred of evidence.

With respect to paying taxes, CPLC was not obligated to pay tax on unseated land, as the tax was imposed on land itself. *See Herder Spring*, 143 A.3d at 367, 375 (citing *Powell*); *Proctor*, 166 F. Supp. at 479 (same). As such, the Trusts cannot contend that CPLC neglected a duty to pay taxes because it had no such duty. Indeed, the Trusts' contention that that CPLC, as the owner of unseated land, had "the legal and moral obligation" to pay taxes assessed on the land is just plain wrong. *See Herder Spring*, 143 A.3d at 367, 375 (citing *Powell*); *Proctor*, 166 F. Supp. at 479 (same). *See also* Doc. 155 at 69-70 (rejecting estoppel arguments).

### D.    The Absence Of A Separate Assessment Of The Severed Subsurface Estate In The Property Is Fatal To The Trusts' Claim.

The Trusts ask the Court not to draw any negative inferences from their failure to offer any *actual proof* of a separate assessment of the severed subsurface estate in the Property. They contend that the reason the severed subsurface estate in the Property was not separately assessed by the county commissioners was because

there was no production or development of the subsurface rights during the relevant time period and, consequently, no basis on which to assess the property. *See* Doc. 160 at 4 & 12 citing *F.H. Rockwell & Co. v. Warren County*, 77 A. 665 (Pa. 1910). In other words, the Trusts argue that because the oil and gas was beneath the surface of the Property, and not in production, it had no taxable value. *Id.*

This argument by the Trusts – that the reserved subsurface rights had no assessable value as of the 1908 tax sale – was flatly rejected by the Pennsylvania Supreme Court in *Herder Spring* and, subsequently, by the Superior Court in *Cornwall*, a case in which the Trusts made (and lost) the very same argument. *See Herder Spring*, 143 A.3d at 373-74; *Cornwall*, 158 A.3d at 156-57. *See also Woodhouse*, 183 A.3d at 461. The Report properly rejected, again, that same argument here. *See* Doc. 155 at 81-82.

### E. The Report Properly Held That McCauley's Purchase At The Tax Sale Did Not Operate As A Redemption.

The Trusts contend that if McCauley was CPLC's agent, then the 1908 tax sale necessarily constituted a redemption. The Report, based on well-established Pennsylvania law, correctly rejected that argument. Doc. 155 at 66-69.

Under Pennsylvania law, even ***an owner*** of unseated land may purchase the land at a tax sale and obtain a treasurer's deed conveying a fee simple interest in the land to the same extent as a stranger to the property. *See Neill v. Lacy*, 110 Pa. 294

(Pa. 1885); *Powell*, 34 A. at 451;[2] *Proctor*, 166 F. Supp. at 479. CPLC was not responsible for the taxes and, consequently, even if McCauley was CPLC's agent for the tax sale, CPLC was not barred from acquiring both the surface and subsurface estates at the tax sale. This is because "the land being unseated, *there was no personal obligation on the owner for the payment of taxes*." *Proctor*, 166 F. Supp. at 479 (emphasis added). In other words, for purposes of tax sales of unseated land, the law treated the owner of unseated land as having an interest therein equivalent to a stranger.

Moreover, the owner of unseated land need not purchase the land directly from the county treasurer. To the contrary, historical records regarding the accepted, and legal, practice of "title washing" suggest the land typically was purchased by a third party who takes title to the property with a washed title and later conveys it to the owner. *See Coxe v. Hathaway*, 27 Pa. 160 (Pa. 1856). Alternatively, the owner

---

[2]    The Trusts, citing *Powell*, assert that because CPLC was "in possession of the land when the tax was assessed, and upon that ground was chargeable with its payment," it was precluded from acquiring better title at a tax sale and the purchase by its purported agents operated as a payment of the taxes only. *See* Doc. 160 at 16, quoting *Powell*. The Trusts reliance on the quoted language from *Powell* is misplaced, as the Pennsylvania Supreme Court went on to conclude that that such rules did ***not*** apply to taxes on ***unseated*** land because "there was no personal responsibility on the owner therefor." *Powell*, 34 A. at 451. In other words, because "[t]he land alone was liable" for the tax, there was no personal duty to pay the tax and, consequently, there was nothing "in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale." *Id. Accord Herder Spring*, 143 A.3d at 367, 375.

may, at some point after the tax sale, elect to purchase the property, with a washed title, from the purchaser at the tax sale. *See Arthurs v. King*, 95 Pa. 167 (Pa. 1880).

Of course, it was also possible for the owner of unseated property to "redeem" the *existing* title to the land rather than purchase the land at, or following, a tax sale with the washed title. *See Rogers v. Johnson*, 70 Pa. 224 (Pa. 1871). Pursuant to the 1815 Act, the landowner had two years from the date of the tax sale to redeem title. Until the redemption period passes, the purchaser at the tax sale held an inchoate title which was subject to nullification by redemption. The material difference between a redemption and purchase by the landowner is that a redemption nullifies the tax sale and restores the landowner's title as it existed prior to the tax sale thus saving preexisting reservations of rights that would have otherwise been washed off by the tax sale. *See Yocum v. Zahner*, 162 Pa. 468, 475 (Pa. 1894) (redemption operated to set aside sale and left title as though sale had not been made).

The Trusts contend that the because McCauley was purportedly an agent of CPLC at the time of the tax sale, that it *must be* treated as a redemption by CPLC rather than a purchase by McCauley. That contention is materially flawed. First, the Trusts rely upon a rule that governs when the person who acquires the property at the tax sale had a *pre-existing obligation* to pay the delinquent taxes. *See* Doc. 160 at 5, 10, & 18 citing, *e.g.*, *Coxe v. Wolcott*, 27 Pa. 154 (Pa. 1856) and

10

*Bartholomew v. Leach*, 7 Watts 472 (Pa. 1938). This might be the case if, for example, the purchaser at the tax sale *had expressly promised* the landowner that he would pay the taxes and protect the land from a tax sale. *See Coxe*, 27 Pa. at 159 (person bound by agreement with owner of land to pay taxes upon it cannot acquire by purchase of the land title adverse to that of owner); *Bartholomew*, 7 Watts at 772-773 (defendant's predecessor-in-interest, and purchaser of land at tax sale, was specifically employed by plaintiff's predecessor-in-interest to pay taxes and preserve the land from being sold).

There is, of course, no evidence that McCauley promised CPLC that he would pay the taxes and protect the land from tax sale. The foregoing rule, more importantly, does not apply to a person, including the owner or third party associated with the owner, who purchases unseated lands at a tax sale if the purchaser has not otherwise obligated himself to pay the taxes. *See Powell*, 34 A. at 451. That is because the "taxes under which the sale was made in this case were on unseated land, and there was no responsibility on the owner therefore; **the land alone was liable**." *Id*. (emphasis added). *See also* Doc. 155 at 66-69. In this case, the Trusts have provided no evidence that McCauley had a legal or moral obligation to pay taxes on unseated land owned by CPLC (a corporate entity).

Second, the Trusts are suggesting a dispositive rule of law – *i.e.*, if a purported agent of a property owner buys unseated land at a tax sale, then the sale *must* be

11

treated as a redemption by the property owner. But, in the cases in which a redemption has been found, the evidence established a redemption as a matter of fact, not as a matter of law. *See*, *e.g.*, *Coxe v. Sartwell*, 21 Pa. 480, 486-87 (Pa. 1853) ("The money was paid and received [by the tax sale purchaser] under a claim of [a] right to redeem"); *Philadelphia v. Miller*, 192 Pa. Super. 239, 242 (Pa. Super. 1956) ("the lower court decided this matter in reliance upon … sworn admissions of a redemption").

Here, neither the public record at the time of the tax sale, nor the multitude of documents that the Trusts have dumped on this Court, provide any basis for inferring that McCauley intended to, or did, redeem the Property for CPLC. McCauley did not "redeem" the Property; he purchased it, as an individual, at a public tax sale at which anyone, *including* Thomas E. Proctor, could have outbid them. Further, McCauley did not assign to CPLC his interests in the Property. Instead, joined by his wife, McCauley conveyed his interests in the Property to CPLC. There is, in sum, a complete lack of evidence necessary to overcome the presumption of regularity associated with, and the admissible facts recited in, the treasurer's deed to McCauley or to otherwise defeat a *prima facie* showing of a valid, final tax sale based on the public record. *See Herder Spring*, 143 A.3d at 365 (following 1815 Act, tax sales of unseated land presumed to be rightly done).

The case of *Knupp v. Syms*, 50 A. 210 (Pa. 1901), relied upon by the Trusts, is, as found by the Report, distinguishable.  *See* Doc. 155 at 64-65.  In *Knupp*, it appeared from entries in books in the treasurer's office – *i.e.*, the public record – that H., to whom lands were sold in 1848 for taxes, acted as agent of the owners for the lands from 1840 to 1852, and that thereafter, before expiration of time for redemption, H. paid and the treasurer received the defaulted taxes on which the treasurer's deed to H. was based.  It was presumed, based on those public records, that he purchased in trust for his principals, and his payment was deemed a redemption.

Quite unlike *Knupp*, the purported relationship of McCauley to CPLC is not proven by probative evidence, is belied by what evidence exists in the public record, and does not change the nature of the transactions.  There is no basis for asserting, and the Trusts have provided no evidence to suggest, that McCauley had a preexisting obligation to pay the delinquent taxes, or legal or moral obligation to pay taxes on the subject *unseated* land owned by CPLC (a corporate entity).  And, whether McCauley purchased the Property on his own or at the behest of CPLC, the legal effect is the same.  The *whole* of the unseated Property was sold, including any reserved interest not separately assessed.

13

**F.      The Commission Is Not Estopped From Claiming Title To The Subsurface.**

The Trusts assert that the Report should have disposed of the Commission's motion because, after the 1908 tax sale, the deeds for the Property in the Commission's chain continue to reference the Proctor Reservation. *See* Doc. 160 at 20-24. The Trusts, citing *Herder Spring*, claim that the specific reference to the Proctor Reservation is a recognition that the tax sale had no impact on the Proctor Reservation and, consequently, that the Commission is estopped from claiming otherwise. *Id*. This argument, as found by the Report, lacks merit for several reasons.

First, *Herder Spring* flatly **rejected** the very argument, being advanced anew by the Trusts here, as "meritless." *Herder Spring*, 143 A.3d at 378. In that case, the Keller Heirs asserted, as the Trusts do here, that a deed providing that the conveyance was made subject to a prior reservation of the subsurface rights estopped Herder Spring from asserting a claim to the subsurface rights. *Id*. The Pennsylvania Supreme Court, however, after acknowledging the general rule that "one claiming under a deed is bound by any recognition it contains of title in another," *rejected* its application where the cited reservation had been "extinguished" by the 1935 tax sale. *Id*. (rejecting application of general rule in *Elliott v. Moffett*, 365 Pa. 247, 74 A.2d 164 (Pa. 1950), where tax sale of unseated land had extinguished the subject reservation). *See also* Doc. 155 at 84-87 (distinguishing *Elliot* and rejecting the

14

Trusts' estoppel-by-deed arguments). In other words, the Pennsylvania Supreme Court *agreed* with the Superior Court's conclusion that the proposition that such general language acknowledging the possibility of exceptions or reservation serves to re-sever that which had been united by a valid tax sale. *Id. See also Herder Spring v. Keller*, 93 A.3d 465, 473 (Pa. Super. 2014) (although deed made mention of conveyance being subject to all exceptions and reservations as are contained in chain of title, there were no active exceptions or reservations in chain of title, the horizontal severance having been extinguished by tax sale more than one decade earlier).

Here, as in *Herder Spring*, at the time of the 1920 deed from CPLC to the Commission, there was no Proctor Reservation contained in the title because the 1908 tax sale extinguished the prior reservation of the subsurface estate. *See Herder Spring*, 143 A.3d at 378. Thus, that the 1920 CPLC general warranty deed to the Commission states that the property is "subject to" the extinguished Proctor Reservation is not binding on the Commission because no such reservation was legally in existence at the time of the conveyance. That is, the provision in the CPLC's deed to the Commission to does not operate to undo the effect of the 1908 tax sale on the Proctor Reservation or to "revive" that extinguished reservation as to the property conveyed. *Id. See also Procto*r, 166 F. Supp. at 476-477 (rejecting Proctor's "estoppel" argument where deed was made "subject to" prior reservation extinguished by tax sale of unseated land and contained no separate reservation).

15

Second, the 1920 CPLC deed does not contain any language of reservation *in favor of* CPLC. If CPLC had desired to reserve the oil and gas in the 1920 deed it could have by employing standard reservation language as follows: "EXCEPTING and RESERVING unto the grantor, its successors and assigns, all minerals, oil and gas in and under the above conveyed land." CPLC did not do so, and instead conveyed "subject to" prior reservations, including the prior Proctor Reservation, which was extinguished by the 1908 tax sale. *See Herder Spring*, *supra*.

For the reasons above, the Proctor Reservation as it pertains to the oil, gas and minerals in and under the Property could not be "revived" by the exception and reservation language quoted above. Additionally, the Trusts' argument runs afoul of the common law rule against reservations in favor of strangers to the conveyance – *i.e.*, that in a deed, neither a reservation nor an exception in favor of a stranger to the instrument can, by force of ordinary words of exception or reservation, create in the stranger any title, right, or interest in or respecting the land conveyed. That common law rule was reaffirmed by the Commonwealth Court in *In Re Condemnation by County of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Properties*, 719 A.2d 1, 3 (Pa. Cmwlth. 1998) ("We agree that the common law rule is that generally a reservation/exception of rights in a stranger to a deed is ineffective to transfer any interests to the stranger."). In that case, the Commonwealth Court held that a reservation of mineral rights to a non-party to the

16

deed was void. *Id.* Here, Thomas E. Proctor was a non-party – *i.e.*, a stranger – to the 1920 CPLC deed. That deed, thus, was not effective to except or reserve any interest to Thomas E. Proctor, his heirs or assigns. *Id.* *See also* Doc. 155 at 88-90 (if tax sale resulted in title wash extinguishing Proctor Reservation, McCauley became the first link in a new chain of title, and Thomas Proctor and his heirs were strangers to the CPLC-Commonwealth Deed, which was ineffective in reserving subsurface estate to the Proctor heirs).

The Trusts attempt to side step application of the common law rule by contending that Thomas E. Proctor was not a "stranger" because he was in the chain of title. *See* Doc. 160 at 22. But that argument fails, as Thomas E. Proctor was clearly a "stranger" to the 1920 CPLC conveyance of the Property, as he was not a party to the deed and the Proctor Reservation had been extinguished by the 1908 tax sale. *See* Doc. 155 at 88-90.

Third, it is not at all uncommon for warranty deeds, like the CPLC deed here, to recite prior reservations, even if extinguished. The inclusion of language indicating that a conveyance is made subject to a prior reservation served a very practical and precautionary, not "estopping," purpose. *See Burns v. Baumgardner,* 449 A.2d 590, 593 (Pa. Super. 1982). *See also* Doc. 155 at 95-96. Conveyances subject to restrictions give notice that such restrictions are of record; they are not an acknowledgement of the validity of such restrictions. *Burns,* 449 A.2d at 593. Thus,

17

reference to prior reservations in deed will not, without more, make such restrictions applicable to the deeded property if, as a matter of law or fact, they are otherwise inapplicable. *Id.* Indeed, as recognized by the court in *Burns*, it is not at all unusual for warranty conveyances (like the CPLC deed here) to be made subject to all recorded covenants, easements and restrictions, without specific enumeration, and it would be inappropriate, to say the least, to infer restrictions because it may subsequently turn out that none then applied to the property. *See* Doc. 155 at 93-96.

Finally, although the Trusts point to other purported evidence in support of their contention that CPLC did not intend to transfer the subsurface estate to the Commonwealth, *see* Doc. 160 at 23, the Trusts do not allege fraud, accident, or mistake in connection with the deed. Parol evidence is only admissible if the deed in question in ambiguous, *see Starling v. Lake Meade Prop. Owners Ass'n, Inc.*, 162 A.3d 327, 341 (Pa. 2017), and the Trusts themselves assert the that the deed is "unambiguous." Doc. 138 at 31. *See also* Doc. 155 at 93.

### G. The 1908 Tax Sale Did Not Deprive the Trusts of Due Process.

While the Commission disagrees with the Report's departure from *Herder Spring*, the court concluded, correctly, that the 1908 tax sale was not void because the tax authority provided notice of the tax sale by publication only. Doc. 155 at 58. But the Court never should have reached the *merits* of the Trusts' due process

challenge to the sale, as the Trusts have no viable due process claim. *See* Commission's Objections (Doc. 158) at 8-14.

## III.    CONCLUSION.

For these reasons, the Commission urges this Court to reject the Trusts' objections to the Report and enter partial summary judgment for the Commission (Doc. 123).

Respectfully submitted,

PENNSYLVANIA GAME COMMISSION


DATE:  March 21, 2019             s/Bradley C. Bechtel_____
                                  Bradley C. Bechtel, Chief Counsel
                                  PA No. 49681
                                  W. Creigh Martson, Assistant Counsel
                                  PA No. 94759
                                  2001 Elmerton Ave
                                  Harrisburg, PA 17110-9797
                                  (717) 783-6530
                                  brbechtel@pa.gov
                                  wmartson@pa.gov
                                  *Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Brief contains less than 5,000 words as calculated by the word count feature on the word processing program used to prepare this Brief and, therefore, complies with M.D. Local Rule 7.8.

<u>s/Bradley C. Bechtel</u>
Bradley C. Bechtel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 21, 2019, a true and correct copy of the foregoing PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATION was filed electronically by way of the Court's CM/ECF system, which will send notice to all registered users, including the following:

Chief Magistrate Judge Susan E. Schwab
U.S. District Court
Middle District of Pennsylvania
228 Walnut Street,
P.O. Box 983
Harrisburg, PA 17108

Paul K. Stockman
Kazmarek Mowrey Cloud Laseter LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222

Laura A. Lange
Courtney S. Schorr
McGuireWoods LLP
Tower 260
260 Forbes Avenue, Suite 1800
Pittsburgh, Pennsylvania 15222


s/Bradley C. Bechtel
Bradley C. Bechtel