**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,** : | **CIVIL ACTION NO. 1:12-CV-1567** |
| : | **(Chief Judge Conner)** |
| **Plaintiff** : | |
| v. : | |
| **THOMAS E. PROCTOR HEIRS TRUST and MARGARET PROCTOR TRUST,** : | |
| **Defendants** : | |

## MEMORANDUM

Millions of acres of Pennsylvania land are situated above the Marcellus Shale, an underground sedimentary rock formation spanning multiple states and containing massive reserves of natural gas. Experts conservatively value that gas in the hundreds of billions of dollars. Relatively new methods of drilling—most notably hydraulic fracturing or "fracking"—have unlocked the potential to tap these subsurface gas reserves. To no one's surprise, the ability to reach this lucrative natural resource has engendered heated ownership disputes like the one before this court.

Plaintiff, Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), claims that it owns both the surface and subsurface rights for numerous tracts of land in Sullivan and Bradford Counties in northeastern Pennsylvania. Defendants, Thomas E. Proctor Heirs Trust and Margaret O.F. Proctor Trust (collectively, "Proctor Trusts") disagree, contending that they hold

superior title to the subsurface estates underlying these tracts. A lengthy and complex legal battle has ensued, culminating in cross-motions for partial summary judgment regarding a bellwether tract of land in Bradford County. (Docs. 94, 123). Chief Magistrate Judge Susan E. Schwab issued an extensive report, (Doc. 155), recommending that the cross-motions for summary judgment be denied. Both parties have filed objections to Judge Schwab's report.

## I. **Factual Background and Procedural History**[1]

We need not repeat the comprehensive factual and procedural background Judge Schwab supplied, (see Doc. 155 at 1-10, 19-24), familiarity with which is presumed. The following is a consolidated version of undisputed facts most pertinent to the parties' objections and pending Rule 56 disputes. These factual details primarily relate to the Josiah Haines warrant—the bellwether tract that is the focus of cross-motions for partial summary judgment.

In 1893, Schrader Mining & Manufacturing Company conveyed the Josiah Haines warrant—located in LeRoy Township, Bradford County—to Thomas E. Proctor ("Proctor") and Jonathan A. Hill ("Hill"). (Doc. 95 ¶ 5). The following year,

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 95, 121, 125, 129). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

Proctor and Hill and their wives deeded the property to Union Tanning Company ("Union Tanning"), "reserving" the subsurface rights to minerals, oil, gas, coal, and petroleum (hereinafter "mineral rights" or "subsurface estate").[2] (Id. ¶¶ 8-9). This conveyance effectively severed the surface and subsurface estates of the Josiah Haines warrant, vesting those rights in separate owners. In 1903, Union Tanning conveyed its surface ownership interest in the Josiah Haines warrant to Central Pennsylvania Lumber Company ("CPLC"), excepting the rights to certain tree bark and conveying the property "subject to" all prior exceptions and reservations. (Id. ¶¶ 13-15). In June 1908, Calvin H. McCauley, Jr. ("McCauley"), purchased the Josiah Haines warrant at the Bradford County treasurer's sale (hereinafter "tax sale" or "treasurer's sale") when the property was sold to recover unpaid taxes for 1907. (Id. ¶¶ 23, 25). Exactly what interest—whether only surface rights or both the surface and subsurface estates—this 1908 tax sale conveyed is the gravamen of the instant dispute.

---

[2] Proctor and Hill used the term "reserving" in their 1894 deed to Union Tanning, but they should have used "excepting" with regard to their preservation of mineral rights. The terms "reservation" and "exception" have distinct legal meanings. A reservation in a deed creates a new right or interest in real property that did not previously exist at the time of the conveyance. See Lauderbach-Zerby Co. v. Lewis, 129 A. 83, 84 (Pa. 1925). A common example of a reservation is a newly created easement for the grantor in land conveyed, which right did not exist before the conveyance. See, e.g., Baptist Church in Great Valley v. Urquhart, 178 A.2d 583, 586 (Pa. 1962). An exception, on the other hand, retains for the grantor title to an existing interest excluded from the transfer. See Lauderbach-Zerby Co., 129 A. at 84; Ralston v. Ralston, 55 A.3d 736, 741-42 (Pa. Super. Ct. 2012). An exception "is always part of the thing granted, it is the whole of the part excepted" from the conveyance. Lauderbach-Zerby Co., 129 A. at 84. Hence, it is more accurate to state that Proctor and Hill "excepted" the mineral rights from their conveyance to Union Tanning.

In December 1910, McCauley and his wife—in consideration of a recited payment of $1.00—quitclaimed all interest in numerous properties, including the Josiah Haines warrant, to CPLC. (Id. ¶ 31). Finally, in 1920, CPLC conveyed its interest in the warrant to the Game Commission, "subject to" the prior 1894 Proctor and Hill mineral rights exception and any exceptions or reservations in the 1903 deed from Union Tanning to CPLC. (Id. ¶¶ 37-38).

Since 1980, Proctor's heirs, who comprise the Proctor Trusts, have been leasing the Josiah Haines warrant for oil and gas development. (Id. ¶¶ 46-47). The Proctor Trusts and the Game Commission now seek to quiet title to the subsurface estate of the warrant, asking the court to enter judgment as a matter of law as to ownership thereof.

## II.  Legal Standards

### A.  Review of a Magistrate Judge's Report and Recommendation

When a party objects to a magistrate judge's report and recommendation, the district court must review *de novo* the challenged portions of the report. 28 U.S.C. § 636(b)(1)(C); Brown v. Astrue, 649 F.3d 193, 195 (3d Cir. 2011); LOCAL RULE OF COURT 72.3. Uncontested portions of the report are reviewed for "clear error on the face of the record." Clouser v. Johnson, 40 F. Supp. 3d 425, 430 (M.D. Pa. 2014) (quoting Cruz v. Chater, 990 F. Supp. 375, 375-78 (M.D. Pa. 1998) (quoting FED. R. CIV. P. 72(b) advisory committee's note to 1983 amendment)).

**B.     Summary Judgment**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in a light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III. __Discussion__

The parties' numerous objections to Judge Schwab's report[3] can be distilled into several fundamental disagreements: *first*, whether Judge Schwab was correct in determining that there is a genuine dispute of material fact as to the character—seated or unseated—of the land constituting the Josiah Haines warrant when assessed in 1907 and sold at the 1908 tax sale; *second*, whether there is a material factual dispute regarding an agency relationship between the 1908 tax-sale purchaser (McCauley) and CPLC; *third*, whether language in the 1920 deed prevented the Game Commission from obtaining title to the subsurface estate; and

---

[3] The parties filed their cross-motions for partial summary judgment shortly after the Supreme Court of Pennsylvania issued its seminal decision in Herder Spring Hunting Club v. Keller, 143 A.3d 358 (Pa. 2016). Judge Schwab, aware of the importance of Herder Spring, provided a detailed recitation of the facts and holdings of that case. (See Doc. 155 at 4-8). Accordingly, we presume familiarity with Herder Spring and the "title wash" concept discussed at length therein. See Herder Spring, 143 A.3d at 366-68.

*fourth*, whether federal due process concerns affect the validity of the 1908 tax sale.[4]

We address these intricate disputes *seriatim*.

### A. Character of the Land

The Game Commission's claim to the subsurface estate underlying the Josiah Haines warrant relies entirely on the premise that the 1908 tax sale "washed" the title and rejoined the previously severed surface and subsurface estates, thereby giving good title to the entire warrant to McCauley, the tax-sale purchaser. According to the Game Commission, Herder Spring's endorsement of the title-wash phenomenon squarely answers the ownership claims in this case. The Game Commission contends that because the warrant was unseated and assessed as such, and because there is no evidence that Proctor and Hill reported their subsurface interest for separate assessment to the Bradford County commissioner, the warrant

---

[4] Judge Schwab also addresses the Proctor Trusts' motion to strike the Game Commission's expert evidence and recommends striking portions of that evidence. (See Doc. 155 at 11-17 & nn.8-9). The Game Commission objects to this recommendation, but after *de novo* review we are in complete agreement with Judge Schwab's analysis and conclusions, and we will adopt them as our own. In particular, we note that the Game Commission misapprehends Rule 56 standards and procedure when it repeatedly claims that the court is "the trier of fact." (See, e.g., Doc. 142 at 1, 5, 10; Doc. 158 at 17, 19). The court *is not* the trier of fact in this case. That task is the sole province of a jury, and indeed a jury trial has been demanded. (See Doc. 66 at 29). The court's role at summary judgment is to determine whether a genuine dispute of material fact exists such that trial is required. See Anderson, 477 U.S. at 249. We acknowledge the Game Commission's related assertion that its expert's report merely seeks to clarify the complex title-transfer issues in this case. Nevertheless, we agree with Judge Schwab that the conclusions set forth in the report regarding the legal effect of the 1908 tax sale and ownership of the disputed mineral rights impermissibly usurp the role of the court in this quiet title action.

was properly assessed as a whole in 1907 and sold as a whole at the 1908 treasurer's sale.

The Proctor Trusts counter that there is ample evidence that the Josiah Haines warrant was actually seated in character when it was assessed for 1907 taxes. Thus, it was improperly sold as unseated at the 1908 treasurer's sale. According to the Proctor Trusts, the 1908 treasurer's sale was void because of this error, and the sale did not divest Proctor and Hill of their subsurface rights. Judge Schwab found that there is a genuine dispute of material fact regarding the character of the land when classified as unseated by the county assessor in 1907, precluding summary judgment.

Our analysis of this classification dispute is informed by Pennsylvania's historical treatment of land as seated and unseated. Prior to 1947, Pennsylvania's real property taxing practices varied depending on whether land was noticeably occupied or developed ("seated") or wild and undeveloped ("unseated"). Herder Spring, 143 A.3d at 363-64. This distinction directly impacted the parcel owner's potential tax liability. Owners of seated land could be held personally liable for the taxes assessed on their plot. Id. at 364. Because unseated land was deemed to be in its natural condition and owners often resided in another county or state, taxes for unseated lands were "imposed on the land itself"; owners were not held personally responsible. Id.; Northumberland County v. Phila. & Reading Coal & Iron Co., 131 F.2d 562, 565-66 (3d Cir. 1942). The county in which the unseated land was located, consequently, could sell that land at a treasurer's sale to recover any unpaid taxes— "the logical method of collection." See Northumberland County, 131 F.2d at 565-66.

County land assessors were responsible for "travers[ing] the county" to determine whether land was seated or unseated and for reporting such distinctions to the county commissioner for taxation purposes. Herder Spring, 143 A.3d at 364; see also McCall v. Lorimer, 4 Watts 351, 353 (Pa. 1835). It was the duty of the assessor to designate the land as seated if the assessor found "such permanent improvements as indicate a personal responsibility for the taxes," and, if no such improvements were evident, to designate the land as "unseated." Hutchinson v. Kline, 49 A. 312, 313 (Pa. 1901) (*per curiam*); Dolph v. Everhart, 19 A. 431, 432-33 (Pa. 1890). Hence, the distinction between seated and unseated land was in the "eye of the assessor." Hutchinson, 49 A. at 313; Stoetzel v. Jackson, 105 Pa. 562, 567 (1884).

To prompt a "seated" designation, the appearance of the land itself must have indicated a visible "substantial occupancy." See Rosenburger v. Schull, 7 Watts 390, 394 (Pa. 1838). Substantial occupancy was evidenced by regular and continuous use of the land. Watson v. Davidson, 87 Pa. 270, 270 (1878); see George v. Messinger, 73 Pa. 418, 422-23 (1873). Importantly, neither actual residence nor developments made to increase the value of the land were prerequisites to seating a tract. Watson, 87 Pa. at 271, 274. Land could be seated if the property was used for resource-extraction endeavors like lumbering or mining, so long as the landowner or agent "carrie[d] on the business for so long a time and in such a manner continuously, from year to year, as to show an actual and permanent occupancy of the tract." Id. at 274; see Herder Spring, 143 A.3d at 363 (citing Robert Grey Bushong, *Pennsylvania Land Law*, Vol. 1 § 469(II) at 500-01 (1938)).

## 1. *Game Commission's Objection*

The Game Commission objects to Judge Schwab's determination that a genuine dispute of material fact exists as to the character of the land for the 1907 assessment. The Game Commission contends that evidence offered by the Proctor Trusts is insufficient as a matter of law to find the Josiah Haines warrant seated in 1907, and that Judge Schwab erred by holding otherwise. We disagree.

As Judge Schwab noted, the Proctor Trusts have proffered competent evidence that significant bark-peeling and lumbering activities occurred on the Josiah Haines warrant in 1905, 1906, and 1907. In 1905, tanbark[5] was harvested from 60 acres of the warrant, yielding 300,900 net tons of bark and 189,500 feet of hemlock lumber. (Doc. 95 ¶ 18). The following year, tanbark was harvested from 201 acres, producing 1,000,000 net tons of bark. (Id. ¶ 19). Finally, in 1907, tanbark was harvested from 149.5 acres, yielding 104,300 net tons of bark. (Id. ¶ 20).

What both parties fail to observe is that, when these annual bark-peeling figures are added together, they equal 410.5 acres—the exact acreage of the Josiah Haines warrant. (See, e.g., Doc. 97-1 at 43; Doc. 98-1 at 70, 71, 92, 101). In other words, by 1907, CPLC had stripped the *entire* Josiah Haines warrant—section by section—of all its hemlock bark. This conclusion is buttressed by CPLC's plat

---

[5] The bark from hemlock, which contains high levels of tannin, was utilized extensively in the tanning industry in northeastern United States in the 1800s and early 1900s. For an expansive discussion of this process, see Hugh O. Canham, *Hemlock and Hide: The Tanbark Industry in Old New York*, NORTHERN WOODLANDS, Summer 2011, https://northernwoodlands.org/articles/article/hemlock-and-hide-the-tanbark-industry-in-old-new-york.

"No. 15," which divides the warrant into three distinct sections and indicates that a different portion was "peeled as of" 1905, 1906, and 1907, resulting in the whole warrant being peeled by 1907. (See Doc. 104-7 at 2). It is likewise corroborated by the December 9, 1920 affidavit of A.R. Spicer, "First Vice President" and "General Land & Timber Superintendent" of CPLC, who averred that "all of the Hemlock bark has been removed from" the "410.5" acres comprising the Josiah Haines warrant. (Doc. 98-1 at 100-01).

It is true that the Proctor Trusts have provided little in the way of describing how the land may have appeared to an assessor following CPLC's bark-peeling activities. Nonetheless, scholars have indicated that hemlock peeling could have substantial effects on the character of the land. As explained by Hugh O. Canham, emeritus professor of forest and resource economics at the S.U.N.Y. College of Environmental Science and Forestry, the common method of harvesting tanbark was to cut down the hemlock trees, strip their bark, and leave the wood—which was less desirable than pine—to "rot in the forest." Canham, *Hemlock and Hide: The Tanbark Industry in Old New York*, *supra* note 5. This process resulted in "clearcut" hemlock forests and "denuded hillsides, with rotting hemlock trees stripped of their bark[.]" Id. "Each acre of these woods produced only twelve cords of bark, meaning that the average tannery consumed more than one hundred acres each year. Immense waste resulted, as the strippers took only the bark, leaving the bared logs to rot in the woods." Robert Kuhn McGregor, *Changing Technologies and Forest Consumption in the Upper Delaware Valley, 1790-1880*, 32 J. FOREST HIST. 69, 77 (1988). Indeed, tanneries' extensive hemlock-bark consumption "devastated

large portions of the region's forests." Id. Additionally, due to the dusk-to-dawn nature of peeling work, bark peelers would "set up camps in the forest" during the peeling season, harvesting tanbark and sending it off to tanneries via horse-drawn wagons or sleds. Canham, *Hemlock and Hide: The Tanbark Industry in Old New York*, *supra* note 5.[6]

We have little doubt that a reasonable juror could find that when the Josiah Haines warrant was assessed for taxes in 1907, the appearance of the land to the eye of the assessor would have implicated a "seated" designation. There is significant evidence regarding "actual and permanent occupancy of the tract, with the use thereof," such that the assessor's classification of the tract as unseated could reasonably be questioned. See Watson, 87 Pa. at 270, 274. The Game Commission's argument that the facts in this case differ from those in Messinger and Watson is unavailing. Under Pennsylvania law, what matters is not the type of improvement or business being carried on, but "the permanent occupancy and possession with the means afforded thereon for the collection of taxes." Id. at 274. We cannot say that timber removal coupled with sustained and comprehensive bark-peeling activities on the Josiah Haines warrant would be insufficient to seat the land. Judge Schwab's determination on this account is not erroneous.

---

[6] We do not rely on the cited scholarly articles as evidence in this case. We provide this information simply to demonstrate that, were we to "give [the Proctor Trusts] an opportunity to properly support or address" the bark-peeling process and its effects on the land, such evidence could be supplemented. See FED. R. CIV. P. 56(e)(1). We need not take this step, however, because of our conclusion in Section III(A)(2), *infra*.

## 2. *Permissibility of the Classification Challenge*

Whether the Proctor Trusts can assert this argument to attack the 1908 treasurer's deed over a century after the assessment and tax sale is a different matter. After exhaustive review of relevant state and federal cases, as well as the legislative history of the applicable statute, we conclude that the Proctor Trusts' challenge is foreclosed by law.

Our starting point is the critical statute at issue, the Act of June 3, 1885 ("Act of 1885" or "the Act"), which provides:

> All sales of seated or unseated lands within this commonwealth which shall hereafter be made for arrearages of taxes due thereon, shall be held, deemed and taken to be valid and effective irrespective of the fact whether such lands were seated or unseated at the time of the assessment of such taxes. Provided, That nothing in this act contained shall validate or authorize the sale of any land which was in fact seated at the time of the assessment of the taxes thereon, in any case where there was sufficient personal property on the premises to pay all the taxes assessed thereon, liable under the laws of this commonwealth to have been seized therefor.

72 PA. STAT. AND CONS. STAT. ANN. § 5933. The first sentence of the Act generally puts an end to attacking the validity of tax sales based on "the fact" of whether the land was really seated or unseated at the time of its assessment. Its phrasing is clear and unambiguous. However, the second sentence—the exception to the general rule—has injected needless confusion into state and federal jurisprudence.

In Northumberland County v. Philadelphia and Reading Coal & Iron Co., 131 F.2d 562 (3d Cir. 1942), the court of appeals examined this exception in the context of a corporate-reorganization bankruptcy appeal; the case did not involve

validity of a tax-sale title. The debtor coal company claimed that, because land which it had owned but had failed to pay taxes on for years 1937 and 1938 had been assessed as unseated, it was not liable for those taxes and was not obligated to pay them as an administrative expense. Northumberland County, 131 F.2d at 563-64. The county rejoined that, although placed on the unseated list, the land was "in fact seated" and the county had evidence to prove it; thus, the coal company was obligated to pay the county approximately $174,000 in overdue taxes. Id. at 564. The court described the question before it as "whether there is personal liability on the part of the owner for taxes assessed upon Pennsylvania land which has been assessed as unseated but which was at the time of assessment in fact seated." Id.

After a lengthy recitation of tax treatment of unseated land in Pennsylvania, the court agreed with the county. Id. at 564-66. It explained that the Act of 1885, "while validating sales of lands as seated or unseated which were not so in fact, made it clear that the validation did not extend to lands which were in fact seated if there was sufficient personal property on the premises liable to pay the taxes." Id. at 567. The court then broadly pronounced, "The act . . . clearly contemplated that *the true character of the land as seated should always be open to inquiry* in determining the validity of proceedings taken to collect the taxes upon it." Id. (emphasis added). The court thus held that it was error to reject "evidence as to the actual character of the land" at the time of assessment and remanded the case for a

further hearing to "determine whether the lands here in controversy were in fact seated or unseated." Id. at 568.[7]

Conspicuously absent from the Northumberland County decision is any discussion of Pennsylvania cases which interpreted and applied the Act. See id. at 564-68 & nn.12-15 (citing Pennsylvania cases dating from 1822 to 1869). The Northumberland County court mentions only a single Pennsylvania case postdating the Act: Dolph v. Everhart, 19 A. 431 (Pa. 1890). See id. at 566, 568 n.19. But Dolph is cited merely to describe how a tract is determined to be seated or unseated, not when or how challenges to such a determination can be asserted following a tax sale of the land, as informed by the Act of 1885. See id.

This omission is a glaring one. Multiple Pennsylvania appellate court cases have directly addressed ramifications of the Act of 1885 on assessor classifications of land as well as the validity of subsequent tax-collection proceedings. Most notably, eight months *before* the Third Circuit decided Northumberland County, the Pennsylvania Supreme Court analyzed these salient issues in Scott v. Bell, 25 A.2d 308 (Pa. 1942). Scott is directly on point and it controls our determination in the instant case.

---

[7] The Northumberland County court's reliance on numerous Pennsylvania cases predating the Act of 1885 undoubtedly informed this conclusion. See id. at 564-68 & nn.12-15 (citing Pennsylvania cases spanning from 1822 to 1869). Those decisions, which permitted fact-intensive challenges to assessors' classification of land (and often resulted in tax titles being invalidated), were part of the impetus for the Act. See Scott v. Bell, 25 A.2d 308, 309, 310 (Pa. 1942).

In Scott, the state supreme court considered whether the deed from a treasurer's sale of unseated land could be attacked as invalid by proffering evidence that "the lots when assessed were in fact seated land." Scott, 25 A.2d at 309. The trial judge had considered evidence of the land's appearance and found, as a fact, that the land was unseated in character. Id. Based on this factual finding, the trial court held that the treasurer's sale passed good title to the tax-sale purchaser. Id.

The supreme court concluded that such factual findings were unnecessary because the Act of 1885 controlled and validated the treasurer's deed. Id. The court first observed that, prior to the Act's passage, "the sale of land as unseated when it was in fact seated, or the converse, passed no title[.]" Id. (citations omitted). But by enacting this statute,

> the legislature in effect provided . . . that where land was "regularly assessed, either as seated or unseated, and where the procedure leading up to the sale was regular and *followed the assessment*, then the sale so made should be valid and effective, 'irrespective of the fact whether such lands were seated or unseated at the time of the assessment;' in other words, *irrespective of whether the assessor, in determining the status of the property made a mistake or not.*" That act made an important change in the law by validating sales *which followed the assessment* and it furnished some protection to purchases at tax sales by *foreclosing litigation as to whether the assessor had erred in determining whether the land was in fact seated or unseated*, a question which was often close and technical.

Id. (emphasis added) (quoting Pittsburgh Hunting Club v. Snyder, 51 Pa. Super. 174, 182 (1912)). Prior to the Act of 1885, the court explained, determining whether land was seated or unseated in character was "highly technical" and often created an issue of fact for the jury, which "led to so much litigation that the tax titles were

looked on with suspicion and the collection of taxes was made difficult." Id. The

Act of 1885 was intended to address these concerns and to "declare that . . . it

should not be necessary or material to go behind the assessment and inquire into its

correctness." Id. at 310 (alteration in original) (quoting Snyder, 51 Pa. Super. at

181).

Scott provides insight not only into the legislative intent behind the Act of

1885, but also as to what its exception means. Scott implies that the exception

operated to invalidate tax sales in the rare situation where land was regularly

assessed as seated or unseated but then sold at a tax sale as the opposite, failing to

"follow" its assessment. See id. at 309 (citing Snyder, 51 Pa. Super. at 182). A

perfect illustration of these circumstances is provided in Snyder, the Pennsylvania

Superior Court case cited extensively by Scott.

In Snyder, the land at issue had been regularly assessed as seated from 1894

to 1900 and the hunting club owners had paid the taxes levied on them each year.

Snyder, 51 Pa. Super. at 178. In 1900, although the land was again assessed as

seated and placed on the seated list, the county supervisor, "either by mistake or

ignorance of his proper function," returned the land as unseated to the county

treasurer for an unpaid road tax. Id. The property was then sold as unseated for

unpaid 1900 taxes by the county treasurer at a 1902 tax sale, and the hunting club

owners challenged the validity of that sale. Id. at 176, 178.

In holding that the treasurer's deed did not pass title to the tax-sale

purchaser, the Snyder court was careful to explain why the Act of 1885 did not

validate the sale. See id. at 180-83. Prior to passage of the Act, the court noted,

"there naturally arose many contests as to whether or not a tract assessed, returned and sold as unseated, was in point of fact seated land, or vice versa." Id. at 181.  The court then reviewed the statute and its effect on such disputes, explaining that, except in "the single instance covered" by the Act's exception, "it should not be necessary or material *to go behind the assessment and inquire into its correctness*." Id. at 181-82 (emphasis added).  The court reasoned that when land is regularly assessed as seated or unseated, and "where the procedure leading up to the sale was regular and followed the assessment," the tax sale would be valid and effective "*irrespective of whether the assessor, in determining the status of the property made a mistake or not*." Id. (emphasis added).  The case before the Snyder court was one of those rare situations where the treasurer's sale was invalid, despite the Act of 1885, because the property at issue had been "suddenly shifted from its assessed class to the other[.]" Id. at 182.  That is, the land had been regularly characterized and assessed as seated, but then suddenly sold by the county treasurer as unseated.  Because the sale did not follow the assessment, it was void.  Id.

Similarly, in Weaver v. Meadville Lumber Manufacturing Co., 61 Pa. Super. 167 (1915), the court examined the validity of a tax sale for land assessed as seated but "improperly returned as unseated" and "placed on the unseated land tax return and sold as unseated land[.]" Weaver, 61 Pa. Super. at 169.  The court found that such a sale was void.  Id. at 171 (citing Snyder, 51 Pa. Super. 174).  The Weaver court explained that the Act of 1885 "provided that the fact whether lands were seated or not at the time of assessment, should not invalidate the assessment, in other words, *when a sale followed the assessment it was valid whether the assessor*

*had correctly named the land or not*[.]" Id. at 170 (emphasis added).  The court

reasoned that "[w]hen the assessor has by virtue of his office stamped the land as

seated or unseated, that fixes the method to be employed thereafter in the collection

of taxes against it."  Id. at 171.  "[T]he class wherein [the land] was placed should be

consistently followed and . . . there could be no passage from one class to the other

or shifting from one class to the other" during tax-sale proceedings.  Id.  In

circumstances like Weaver and Snyder, where the tract was improperly shifted

from one classification to the other and did not follow the assessment, the

subsequent tax sale was not effective to pass title even when considering the Act of

1885.  See id. at 170-71.

Finally, in Blair v. Pennsylvania Turnpike Commission, 33 A.2d 490 (Pa.

Super. Ct. 1943), which postdates Northumberland County, the Superior Court

examined the same issue: whether land clearly characterized and assessed as

seated, which was later sold as unseated for unpaid taxes, could convey good title to

the tax-sale purchaser.  Blair, 33 A.2d at 493.  Relying on Scott, the court held that

such a sale was ineffective to pass title.  Id.  The court reasoned that the Act of 1885

generally validated tax sales "where the land is regularly assessed, either as seated

or unseated, and where the procedure leading up to the sale is regular and follows

the assessment . . . whether the land was seated or unseated at the time of the

assessment."  Id. (citing Scott, 25 A.2d 308).  The Blair court cautioned, however,

that "*the sale must follow the assessment in order to be valid*, and there can be no

valid sale of land for taxes on unseated land, where the assessment was on seated

land."  Id. (emphasis added).  The court further emphasized that there existed

"ample personal property" on the land in the form of cut stone to pay any taxes owed.  Id.

The only case we have uncovered reaching a different result is Bannard v. New York State Natural Gas Corp., 293 A.2d 41 (Pa. 1972).  Bannard is easily distinguishable.  In Bannard, a newly created subsurface estate—which had no development, improvement, or mineral extraction until 1957—was assessed and erroneously placed on the seated list in 1900.  Bannard, 293 A.2d at 44, 49-50.  The surface tract also appeared on the seated list that year.  Id. at 44.  In 1901, the seated list indicated that the mineral estate had been moved to the unseated list, but there is no evidence that this change in designation ever occurred.  Id.  Thus, from 1901 to 1915, the mineral estate continued to be assessed as seated and to appear on the seated list.  Id. at 44-45.

In 1916, the mineral tract was sold as unseated by the county treasurer for unpaid 1913 and 1914 taxes.  Id. at 45.  The Bannard court held that the mistaken placement of the undeveloped mineral tract on the seated list did not invalidate the treasurer's sale of the property as unseated, finding that "unseated" was the manner in which the mineral tract "should have been assessed for tax purposes." Id. at 50 (citing Act of 1885; Blair, 33 A.2d at 493; Scott, 25 A.2d 308).  The court concluded that "because of the [Act of 1885], the assessment of the tract on the seated list was not fatal to the title acquired" from the 1916 treasurer's sale.  Id. Blair, however, holds the opposite, to wit: "[T]he sale must follow the assessment in order to be valid, and there can be no valid sale of land for taxes on unseated land, where the assessment was on seated land."  Blair, 33 A.2d at 493; see also Snyder,

51 Pa. Super. at 182 (explaining that a tract cannot be "suddenly shifted from its assessed class to the other" at a tax sale). Because the mineral estate had unseated characteristics and was supposed to be moved to the unseated list but erroneously never was, the <u>Bannard</u> court found that such a minor error was not a fatal defect to the treasurer's deed acquired by the tax-sale purchaser. <u>See</u> <u>Bannard</u>, 293 A.2d at 44, 50. The facts of <u>Bannard</u> are obviously different from the case at bar, and we do not waver in our application of <u>Scott</u> to the instant issue. <u>See</u> *infra* pp. 22-23.

Legislative history from the time of the Act's passage in the Pennsylvania Senate is consonant with our conclusions. When asked to explain the bill, Pennsylvania Senator James Wilson Lee provided the following synopsis:

> There is a division of lands in making assessments into seated and unseated. That distinction is very clear in the law, *but it is very little understood by assessors*. Very frequently land is assessed as seated when it is really unseated, and assessed as unseated when it is really seated. As every one knows who is acquainted with this law, if the land is sold as unseated when it is really seated, that is a defect in the title and no title is passed. In counties like Venango, tract numbers are not kept very distinctly, *there is a great deal of land that is not assessed properly, there is hardly one sale in ten that is valid, simply because of this defect in assessment.* The lands are sold as seated when they are actually unseated, and sold as unseated when they are actually seated. *That renders the treasurer's sale invalid. There is no reason why that sort of defect should render the sale invalid.* . . . It renders many treasurers' sales uncertain and, there should be some amendment provided.

Legis. Rec., S. 110th Assy., 1st Sess., at 2089 (Pa. May 28, 1885) (emphasis added). Senator Lee's remarks indicate that assessors frequently misclassified land and that these classification errors were creating numerous title defects, engendering

uncertainty in tax-sale titles. Hence, the backdrop of the Act of 1885 adds clarity to its purpose, namely: to remedy title-defect issues created by assessors' chronic misclassifications of land.

Pennsylvania cases, together with the Act's legislative history, counsel that assessor-classification mistakes, which occurred regularly, are irrelevant so long as the tax sale was regular and followed the assessment. The Act drastically reduces the need "to go behind the assessment and inquire into its correctness." Scott, 25 A.2d at 310 (quoting Snyder, 51 Pa. Super. at 181). In sum, it permits a challenge to the validity of tax-sale proceedings based on the land's classification only in rare circumstances where (1) land was characterized and assessed as seated and then improperly sold for unpaid taxes as unseated, or vice versa; and (2) in the case of seated land being sold as unseated, there was sufficient personal property on the land to pay the taxes.

The case *sub judice* is nearly identical to Scott, which compels our conclusion on this state-law issue. See West v. Am. Tel. & Tel. Co., 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law[.]"); Hunt v. U.S. Tobacco Co., 538 F.3d 217, 220 (3d Cir. 2008) ("[T]he state's highest court is the best authority on its own law." (citation omitted)). From 1895 to 1907, the Josiah Haines warrant was assessed as unseated and regularly appeared on the Bradford County unseated assessment books. (See Doc. 99-1 at 15; Doc. 100-1 at 3, 7, 11, 15, 19; Doc. 101-1 at 3, 6, 9, 12, 15; Doc. 102-1 at 3, 6). The property was then sold as unseated at the 1908 treasurer's sale for unpaid 1907 taxes, following its

regular unseated designation and assessment. The Proctor Trusts contend that the assessor's classification of the warrant in 1907 was a mistake because substantial bark-peeling and logging activities seated the land, and, consequently, the 1908 treasurer's sale of the land as unseated was void. This contention is the quintessential *post-hoc*, fact-intensive challenge to the assessor's classification (and validity of the subsequent tax sale) that is foreclosed by the Act of 1885 and <u>Scott</u>.

Even if the Bradford County assessor was mistaken about the character of the Josiah Haines warrant in 1907, the Proctor Trusts cannot challenge the validity of the treasurer's sale by proffering evidence that the assessor misclassified the tract. <u>See</u> <u>Scott</u>, 25 A.2d at 309; <u>Snyder</u>, 51 Pa. Super. at 182; <u>Keta Gas & Oil Co. v. Proctor</u>, No. 1975 MDA 2018, 2019 WL 6652174, at *3-4 (Pa. Super. Ct. Dec. 6, 2019) (nonprecedential) (citing <u>Scott</u>, 25 A.2d at 309). Permitting this specific method of collateral attack would ignite endless litigation concerning technical, fact-based determinations made by assessors in centuries past. <u>See</u> <u>Scott</u>, 25 A.2d at 309. It would concomitantly call into question the validity of innumerable tax-sale titles that followed such assessments. These are the precise problems the General Assembly endeavored to remedy by passing the Act of 1885. <u>See</u> <u>id.</u> at 309, 310.

**B.      Agency and 1908 Treasurer's Sale**

The parties' second major point of contention involves the intricacies of the 1908 tax sale. The Proctor Trusts assert that McCauley, the tax-sale purchaser, was acting as an agent for CPLC when he bought the Josiah Haines warrant from the county treasurer. They maintain that his purchase of the property at the tax sale—

for a sum that equaled the unpaid taxes and fees—amounted to nothing more than a redemption, giving CPLC exactly the same title it held prior to the treasurer's sale.[8]  In other words, CPLC, through McCauley, redeemed its surface interest only and did not divest Proctor and Hill of their subsurface rights.

Judge Schwab found that there is a genuine dispute of material fact as to McCauley's status as an agent for CPLC.  Judge Schwab also determined that if the land were actually unseated in character, it does not matter whether or not McCauley was an agent of CPLC; the 1908 tax sale was not a redemption because CPLC was not barred from acquiring both the surface and subsurface estates at the sale (whether directly or through an agent).

The Game Commission argues that Judge Schwab erred by concluding that there is a genuine factual dispute as to whether McCauley was acting as CPLC's agent.  The Proctor Trusts challenge Judge Schwab's conclusion that if the land were unseated, McCauley's status as an agent is irrelevant.  We find both objections to be without merit.

1.     *Question of Agency*

We begin with a brief reiteration of the title-transfer details.  In 1894, the surface and subsurface estates of the Josiah Haines warrant were severed when Proctor and Hill conveyed the surface estate to Union Tanning and retained the mineral rights.  CPLC bought the surface estate from Union Tanning in 1903.

---

[8] A redemption operates to "set aside or annul" the tax sale, leaving the title "precisely as though the sale had not been made."  <u>Yocum v. Zahner</u>, 29 A. 778, 779 (Pa. 1894).

When taxes were not timely paid on the Josiah Haines warrant in 1907, the entire property[9] was sold by the county treasurer at the 1908 unseated-land tax sale for unpaid 1907 taxes. McCauley purchased the property at that tax sale and, two years later, quitclaimed it to CPLC, who later conveyed it to the Game Commission.

The corresponding tax records from the Bradford County unseated-land assessment books provide the following relevant information. Each year from 1895 to 1902, Union Tanning paid taxes to Bradford County on the Josiah Haines warrant.[10] (Doc. 99-1 at 15; Doc. 100-1 at 3, 7, 11, 15, 19; Doc. 101-1 at 3, 6). Beginning in 1903 and continuing through 1906, CPLC regularly paid the taxes on the property. (Doc. 101-1 at 9, 12, 15; Doc. 102-1 at 3). For the 1907 tax year, the notation in the assessment books where tax-payment information was normally entered indicates that the property was "sold" on June 8, 1908, to "Calvin H. McCauley Jr." (Doc. 102-1 at 6). Thereafter, for tax years 1908 through 1910, taxes on the Josiah Haines warrant were once again regularly paid by CPLC. (Doc. 102-1 at 10; Doc. 104-1 at 3, 6).

---

[9] As previously mentioned, the parties dispute whether the entire warrant was sold at the 1908 tax sale. For the reasons appearing *infra*, we find that both the surface and subsurface estates were sold by the county treasurer in 1908.

[10] For tax years 1895 and 1896, the Bradford County unseated land assessment books inadvertently referred to the 410-acre Josiah Haines warrant as the "Joseph Haines" warrant. (See Doc. 99-1 at 15; Doc. 100-1 at 3). That error was corrected in 1897, (see Doc. 100-1 at 7), and the entries remained accurate through 1901, (see id. at 11, 15, 19; Doc. 101-1 at 3). Beginning in 1902 and continuing through 1906, the tract is again mislabeled as the "Joseph Haines" or "Joseph Hines" warrant in the unseated assessment books. (See Doc. 101-1 at 6, 9, 12, 15; Doc. 102-1 at 3). For tax years 1907 through 1910, the name is once more corrected to "Josiah Haines." (See Doc. 102-1 at 6, 10; Doc. 104-1 at 3, 6).

The Game Commission posits that, because the evidence of McCauley's agency proffered by the Proctor Trusts was not "in the public record of Bradford County" and thus not available to a title examiner, it has no bearing whatsoever on the validity of the 1908 tax-sale title. (See Doc. 157 ¶¶ 30-34; Doc. 158 at 15). According to the Game Commission, the public record of Bradford County at the time of the 1908 tax sale "is the *only* relevant record," so there is no evidence probative of McCauley's purported agency. (Doc. 158 at 16). For this sweeping proposition, the Game Commission relies exclusively on Proctor v. Sagamore Big Game Club, 166 F. Supp. 465 (W.D. Pa. 1958), aff'd, 265 F.2d 196 (3d Cir. 1959). That reliance is misplaced.

We first note that Sagamore is a six-decades-old case from the Western District of Pennsylvania that is not binding on this court. More importantly, it is entirely inapposite. In Sagamore, following a 1914 tax sale at which McCauley purchased the at-issue property, he conveyed the parcel to *bona fide* third-party buyers, the Eisenhuths.[11] Sagamore, 166 F. Supp. at 479. He did not quitclaim the property back to CPLC following the two-year redemption period, as occurred in the case at bar.

The Game Commission takes the Sagamore court's focus on the public record out of context. In Sagamore, the court was concerned with the contents of

---

[11] As in the case *sub judice*, CPLC was the record owner prior to the 1914 tax sale. See Sagamore, 166 F. Supp. at 479. We note that there was a prior tax sale of the property, see id. at 468-69, but this fact has no bearing on the Game Commission's "public record" argument.

the public record because the dispositive agency-related question was whether the Eisenhuths could have known of McCauley's alleged agency and any possible title defect it may have created.  See id. at 479-80.  Finding that the public record controlled, the court referenced cases addressing notice of title defects in relation to good-faith purchasers for value.  Id. (citing Pa. Range Boiler Co. v. City of Philadelphia, 23 A.2d 723 (Pa. 1942); Woods v. Farmere, 7 Watts 382, 385 (Pa. 1838)).  These cases are irrelevant to our analysis because there is no independent, third-party purchaser in the matter at bar.  McCauley quitclaimed the property back to CPLC for a recited payment of $1.00.  Consequently, and unlike the Eisenhuths in Sagamore, CPLC would have had *actual notice* of McCauley's agency if such a relationship existed.  The public record, therefore, is not "the only" relevant source of information or evidence on the question of agency.

We agree with Judge Schwab that the Proctor Trusts have put forth considerable evidence that McCauley was acting as an agent for CPLC when he bought the Josiah Haines warrant at the 1908 tax sale.  (See generally Doc. 95 ¶ 26).  For instance, from 1904 to 1916, McCauley purchased at tax sales more than 100 properties that were previously owned by CPLC and later quitclaimed those tracts back to CPLC.  (See id. ¶ 27).  CPLC's articles of incorporation and other internal documents, as well as additional historical records predating the tax sale, identify McCauley as CPLC's "Real Estate Agent."  (See id. ¶ 26(a)-(*i*); Doc. 121 ¶ 26(a)-(*i*)).  McCauley also appeared as an attorney for CPLC in state court proceedings shortly after the time of purchase.  (Doc. 95 ¶ 26(*l*)).  In 1914, McCauley even executed a notarized declaration stating that he was acting in trust for CPLC when he

purchased six properties in Elk County from the county treasurer using funds provided by CPLC. (Id. ¶ 26(o)). Perhaps most significantly, following McCauley's acquisition of the warrant at the 1908 tax sale, *CPLC*, not McCauley, paid the property taxes in 1908, 1909, and 1910. (Doc. 102-1 at 10; Doc. 104-1 at 3, 6). The Game Commission offers no explanation as to why a corporation would pay real estate taxes for a piece of land it purportedly did not own. The only logical conclusion is that McCauley was acting as CPLC's agent when he purchased the Josiah Haines warrant at the 1908 treasurer's sale. That such evidence was not recorded and publicly available to a title examiner is of no moment. CPLC— McCauley's alleged principal—bought the property from McCauley in 1910 and had actual notice of any purported agency that existed.[12]

The question becomes whether the existence of an agency relationship between McCauley and CPLC has any legal significance for the validity or scope of the 1908 treasurer's deed. We have already determined that the tract's unseated classification is not subject to the Proctor Trusts' specific collateral attack. After comprehensive review of the relevant law, we agree with Judge Schwab that even if

---

[12] We are unconcerned with notice to subsequent buyers, namely the Game Commission. The issue, as we discuss in more depth below, is what effect an agent's purchase may have on an unseated tax sale induced by his principal's default. Notice of a potential agency-related defect for later buyers is irrelevant here. If the tax sale acted as a redemption only, there would be no rejoined subsurface to convey to subsequent buyers. Proctor and Hill, moreover, recorded their mineral interest when it was severed. So, if the title were not washed but a later deed purported to convey the entire warrant, any buyer would have had record notice of the Proctor and Hill exception. See 21 PA. STAT. AND CONS. STAT. ANN. § 351.

McCauley were CPLC's agent, that fact has no legal effect on the 1908 tax sale of the unseated Josiah Haines warrant.

## 2. *Effect of Purported Agency*

As an initial matter, we concur with Judge Schwab that the record is devoid of evidence tending to show that the 1907 assessment of the Josiah Haines warrant did not encompass the entire property. (<u>See</u> Doc. 155 at 70-83). There is simply no evidence that Proctor or Hill ever separately reported their subsurface interest to the county commissioner, that the mineral rights were ever independently assessed, that any separate taxes were imposed or paid thereon, or that any challenge was raised to the absence of a separate assessment. (<u>See</u> <u>id.</u>); <u>see also</u> <u>Herder Spring</u>, 143 A.3d at 368, 372-75; <u>Keta Gas & Oil Co.</u>, 2019 WL 6652174, at *4-5. In the absence of record evidence to the contrary, we are compelled to find as follows: what was offered for sale in 1908 by the Bradford County treasurer was the entire Josiah Haines warrant—both surface and subsurface.

What was *offered* for sale, however, is not dispositive as to what interest the tax sale effectively conveyed. Pennsylvania law instructs that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest[.]" <u>Powell v. Lantzy</u>, 34 A. 450, 451 (Pa. 1896) (emphasis added) (citing <u>Chambers v. Wilson</u>, 2 Watts 495 (Pa. 1834); <u>Coxe v. Wolcott</u>, 27 Pa. 154 (1856)). This rule "rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty." <u>Id.</u> Instead, such a purchase "operates as a payment only,"

*i.e.*, a redemption. Id. (citation omitted). The Powell court, however, limited application of this rule to cases where the purchaser had some duty to pay the tax. Id. This duty could arise by law, contract, or equity. Id. The Proctor Trusts' redemption-only argument, therefore, hinges on whether CPLC had any duty or obligation to pay the 1907 taxes on the warrant.

We reiterate the relevant title history. CPLC bought the surface rights from Union Tanning, which had purchased the newly created surface estate from Proctor and Hill. There is significant evidence that both Union Tanning and CPLC reported their unseated property interest to the Bradford County commissioner as required by the Act of 1806. Specifically, the Bradford County unseated-land assessment books show that, beginning in 1895 and continuing through 1906, taxes on the Josiah Haines warrant were regularly assessed to, and paid by, Union Tanning and CPLC. These records compel the conclusion that the companies properly reported their unseated interests to Bradford County. The Game Commission does not argue otherwise. (See Doc. 95 ¶¶ 11, 17; Doc. 121 ¶¶ 11, 17). It is also uncontested that in 1907, CPLC did not pay the taxes assessed on the warrant, causing the property to be sold by the Bradford County treasurer at the

1908 tax sale. And CPLC's failure to pay the 1907 taxes appears to have been an intentional and quite strategic act of default.[13]

Viewing the evidence in a light most favorable to the Proctor Trusts, as required at the Rule 56 stage, we are left with the following rendition of facts. CPLC, surface owner of the unseated Josiah Haines warrant, reported its interest and regularly paid assessed taxes from 1903 through 1906. In 1907, after stripping the warrant of its valuable tanbark, CPLC intentionally failed to pay the assessed taxes. CPLC's default induced a treasurer's sale of the land the following year. CPLC then employed McCauley, its agent, to (1) purchase that property, (2) hold it for the two-year redemption period, and then (3) quitclaim it back to CPLC. With the title ostensibly washed and the surface and subsurface rejoined, Proctor and Hill's mineral rights were extinguished and were now vested in CPLC. The entire warrant, *i.e.*, the reunited surface and subsurface estates, was subsequently conveyed to the Game Commission approximately ten years later.

---

[13] There is substantial evidence that CPLC deliberately defaulted on the 1907 taxes. In the early 1900s, CPLC owned vast amounts of land in Bradford County and beyond. (See, e.g., Docs. 99-1, 100-1, 101-1, 102-1, 104-1); Sagamore, 166 F. Supp. at 469; Cornwall Mountain Invs., L.P. v. Thomas E. Proctor Heirs Tr., 158 A.3d 148, 150-51 (Pa. Super. Ct. 2017). The corporation would fastidiously pay annual taxes assessed on its properties, but then suddenly fail to do so, causing a tax sale. (See Doc. 95 ¶ 16; Doc. 102-1 at 6; see generally Docs. 99-1, 100-1, 101-1, 102-1, 104-1). CPLC's president attested, as part of the Game Commission's purchase of other land, that CPLC "regularly and continuously paid all taxes assessed and payable." (Doc. 95 ¶ 16(e)). That is, of course, until it didn't. For the Josiah Haines warrant, default occurred in 1907, the *very same year* that CPLC completed its extensive bark-peeling activities on the tract. Even the Game Commission's title attorney asserted, in 1930s correspondence to CPLC, that CPLC's defaults were strategic. (See Doc. 153 ¶¶ 63, 65, 67).

It is generally true that the owner of a surface or subsurface estate is not barred from obtaining better title at a treasurer's sale.  See Herder Spring, 143 A.3d at 367 (quoting Powell, 34 A. at 451 (quoting Coxe v. Gibson, 27 Pa. 160 (1856))).  But the Game Commission has not identified, nor can the court identify, a case applying this proposition to circumstances mirroring those presented here.  No case squarely considers whether, under the foregoing facts, an agent who purchases at a tax sale induced by his principal takes good title to the entire property or simply redeems his principal's prior interest.

For example, in Powell v. Lantzy, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and through no fault of, the tax-sale purchaser.  See Powell, 34 A. at 451.  In Hutchinson, taxes on unseated lands went unpaid in 1890 and 1891, before any involvement or ownership by the eventual 1892 tax-sale purchaser.  Hutchinson, 49 A. at 317.  In Sagamore, delinquent taxes from 1892 induced the 1894 tax sale that divested Proctor of the interest he purchased in 1893.  Sagamore, 166 F. Supp. at 468-69, 476.

In Reinboth v. Zerbe Run Improvement Co., 29 Pa. 139 (1858), the circumstances were also different.  The 1840 tax-sale purchaser, Christopher Geiger ("Geiger"), held claim to the subject property based on prior conveyances, but there were other putative owners who claimed title to portions of that land.  Reinboth, 29 Pa. at 140, 144-45.  The property went through two tax sales, one in 1824 and another in 1840.  Id. at 144-45.  The 1824 tax-sale buyer was an unrelated third party who purchased in good faith, and in 1829, Geiger directed his attorney to purchase the property from the third-party buyer.  Id.  Geiger's attorney then sought a

treasurer's deed for the tract at the 1840 tax sale to eliminate any doubts as to superiority of Geiger's title.  See id. at 142, 145.  Reinboth is clearly distinguishable because the first tax-sale purchaser was an independent third party.

The most analogous situation appears to be Coxe v. Gibson, 27 Pa. 160 (1856), the case quoted by Powell for the proposition that "there [i]s nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale."  Powell, 34 A. at 451 (quoting Gibson, 27 Pa. at 160, 165).  In Gibson, William A. Williams ("Williams") bought the subject property at a tax sale in 1850 for unpaid 1848 and 1849 taxes.  Gibson, 27 Pa. at 160.  Williams made the tax-sale purchase at the direction of Eli Felt ("Felt"), who had privately purchased the same land in 1848 and conveyed it to defendants the following year.  Id. at 162.  Felt directed the tax-sale purchase to "confirm and strengthen" his own title, which he had already transferred to new buyers.  Id.  The Pennsylvania Supreme Court held that Felt was not prohibited by law or policy from "strengthening or perfecting his [1848] title," which Felt may have deemed "suspicious" and "defective" due to possible fraud by its grantor.  Id. at 165.  The court further highlighted that at least a "portion of the taxes for which [the land] was sold [at the tax sale] were assessed *before* Felt became the owner."  Id. (emphasis added).

We find none of these cases on point.  Accordingly, we revert to the original question raised in Powell: whether CPLC owed any duty to pay the 1907 taxes such that McCauley's purchase acted merely as a redemption.  This issue is purely a matter of state law, and we believe it has ramifications for other pending and future real property disputes in the Commonwealth.  In the absence of controlling

precedent, it is our task to predict how Pennsylvania courts would rule if confronted with this issue. After careful consideration, we predict that the state supreme court would find no such duty, and conclude that McCauley's purchase did not act as a constructive redemption.[14]

Pennsylvania courts have repeatedly held that owners of unseated land had no duty or responsibility to pay the taxes assessed thereon. Certainly, those owners faced consequences if they did not pay, but we can find no case that equates the need to pay taxes (to avoid a tax sale) and a *legal duty* or *responsibility* to do so. We provide just a few examples. In 1841, the Pennsylvania Supreme Court explained that "the land itself, and not the owner of it, is debtor for the public charge," and is looked to for any overdue payment. Strauch v. Shoemaker, 1 Watts & Serg. 166, 175 (Pa. 1841) (quoting Fager v. Campbell, 5 Watts 287, 288 (Pa. 1836)). In Gibson, the court noted that the unseated land in question was sold for unpaid taxes, which neither Felt nor his subsequent buyers "were bound to pay," even though Felt was the owner when overdue taxes accrued. Gibson, 27 Pa. at 165. Forty years later, the Powell court reiterated that when taxes were assessed on unseated land, "there

---

[14] We find no merit in the Proctor Trusts' argument that, because the price McCauley paid at the tax sale was equal to the unpaid taxes and costs owed, his purchase was intended to be a redemption. (See Doc. 160 at 19 & n.4; Doc. 98-1 at 73). Not "every transfer of a treasurer's deed made before the expiration of [the redemption period] constitutes a redemption." Gibson, 27 Pa. at 162. The relevant statute mandated that, to redeem, the delinquent owner must pay the back taxes, costs, *and* an additional percentage penalty. See id. at 163; 72 PA. STAT. AND CONS. STAT. ANN. § 6091. McCauley's purchase price did not equal the redemption money and could not be considered a redemption on such grounds. See Gibson, 27 Pa. at 162-63.

was no personal responsibility on the owner" to pay them. <u>Powell</u>, 34 A. at 451 (citing <u>Hunter v. Cochran</u>, 3 Pa. 105 (1846) (*per curiam*); <u>Russel v. Werntz</u>, 24 Pa. 337 (1855); <u>Logan v. Washington County</u>, 29 Pa. 373 (1857)). The <u>Herder Spring</u> court reaffirmed this premise over a century later, stating that "tax on unseated land was the liability of the land rather than the owners." <u>Herder Spring</u>, 143 A.3d at 364, 372 (citations omitted).

Mere ownership of the unseated land created no obligation on CPLC to pay the assessed taxes. Thus, to succeed on their redemption-only argument, the Proctor Trusts must establish that CPLC had some other legal or moral duty to pay the taxes. <u>See</u> <u>Powell</u>, 34 A. at 451. Neither party has suggested that a "community of interest" or fiduciary relationship existed between Proctor and Hill and CPLC that would give "rise to a duty"; each owned a separate estate unconnected by joint tenancy or tenancy in common. <u>See</u> <u>id.</u> at 451-52. There likewise was no contract or other agreement obligating CPLC to pay the taxes.[15] In sum, we can ascertain no duty—legal, contractual, equitable, or otherwise—obligating CPLC to pay the 1907 taxes that would transform its 1908 tax-sale purchase through McCauley into a redemption.

---

[15] The absence of any contract or agreement renders the Proctor Trusts' reliance on <u>Coxe v. Wolcott</u> unavailing. (<u>See</u>, <u>e.g.</u>, Doc. 160 at 10, 20 n.5). In <u>Wolcott</u>, the eventual beneficiary of the tax-sale title wash (Brewster Freeman) was under a clear contractual duty: an "express promise" in writing to pay taxes on the unseated land and to prevent a tax sale. <u>Wolcott</u>, 27 Pa. at 159. The Proctor Trusts identify no such promise or agreement by CPLC regarding the Josiah Haines warrant.

Finally, it does not appear that Pennsylvania prohibited the intentional use of a tax sale to clear and to perfect titles. We observe that in <u>Reinboth</u>, the second tax sale in 1840 was likely induced by Geiger's attorney as "a measure of professional precaution" to ensure that Geiger had good title to the entire property. <u>See</u> <u>Reinboth</u>, 29 Pa. at 142, 145. This practice did not strike the Pennsylvania Supreme Court as improper or even unusual. <u>See</u> <u>id.</u> at 145. Likewise, in <u>Gibson</u>, the court remarked that purchasing a better title at a treasurer's sale was "a very common remedy for defective titles." <u>Gibson</u>, 27 Pa. at 165. The court explained that when a party with some claim to the land was "in default," nothing prevented another party in interest from purchasing the property at a tax sale to strengthen or improve its title. <u>Id.</u> Proscribing this practice, the court reasoned, "would involve the absurdity that each claimant would have a claim on his adversary to keep the taxes paid, and failing to do so, acquire no title at a sale for their non-payment." <u>Id.</u>

As applied to the instant case, CPLC had no obligation to ensure that Proctor and Hill reported their mineral estate for separate assessment or paid taxes on that interest. And because Proctor and Hill could have been deemed "in default" for failing to report their severed estate and potentially pay taxes thereon, CPLC was not barred from strengthening or perfecting its title by causing the 1908 tax sale and purchasing the entire property at that sale. <u>See</u> <u>Gibson</u>, 27 Pa. at 165; <u>Reinboth</u>, 29 Pa. at 145. Consequently, it does not matter whether McCauley was acting as CPLC's agent. The Josiah Haines warrant was assessed as a whole and sold as a whole; nothing in law prevented the surface owner, CPLC, from buying the entire warrant at the 1908 tax sale, even if CPLC intentionally induced that sale.

## C.    Other Objections

The parties raise several additional objections to the report, but we find them meritless.  After *de novo* review, we agree with Judge Schwab's outcomes on these issues.  We briefly set forth the objections and why we are overruling them.

### 1.    *Deed Language Identifying Proctor and Hill Exception*

The Proctor Trusts maintain that the 1920 deed from CPLC to the Game Commission specifically identifies the 1894 Proctor and Hill mineral estate exception, thereby estopping the Game Commission from claiming that the subsurface estate was conveyed in this sale.  (See Doc. 160 at 20-25 (citing and distinguishing, *inter alia*, Herder Spring, 143 A.3d at 378)).  Judge Schwab rejected this argument.  (See Doc. 155 at 83-96).

We need not duplicate Judge Schwab's excellent analysis, but instead hit the high notes.  The 1920 deed uses the words "subject to" before describing the Proctor and Hill exception.  (See Doc. 95 ¶ 38).  We find that this unambiguous language represents a protective measure taken by the grantor to guard against breach-of-warranty claims.  See Burns v. Baumgardner, 449 A.2d 590, 593 (Pa. Super. Ct. 1982) (collecting cases); W. W. Allen, Annotation, *Conveyance "subject to" restrictions set forth in a recorded or other indicated instrument as imposing the restrictions on the land conveyed*, 84 A.L.R. Fed. 2d 780 § 2 (2011).  It does not, as the Proctor Trusts maintain, express an intent to limit the conveyance or reinvigorate the Proctor and Hill subsurface interest.  See Burns, 449 A.2d at 593.  We recognize that the agreement of sale utilizes different wording, which is more likely to demonstrate an intent to create a new exception in Proctor and Hill.  (See Doc. 95

¶ 35).  However, the unambiguous language of the deed controls, not parol evidence from the contract of sale.  See Starling v. Lake Meade Prop. Owners Ass'n, 162 A.3d 327, 341 (Pa. 2017).[16]

The 1908 tax sale extinguished the mineral rights of Proctor and Hill. Accordingly, there was no subsurface reservation or exception to which the 1920 conveyance was subject, regardless of the fact that the Proctor and Hill exception was explicitly named.  The tax sale rendered the "subject to" language in the 1920 deed identifying prior exceptions surplusage, representing nothing more than "a wise precaution on the part of the grantor."  See Burns, 449 A.2d at 593 (citation omitted); Herder Spring, 143 A.3d at 378.  Hence, the 1920 deed conveyed the entire warrant to the Game Commission, including the subsurface estate.

### 2. *Due Process*

The Proctor Trusts insist that Judge Schwab erred when concluding that notice by publication of the 1908 tax sale satisfied federal procedural due process requirements.  This constructive notice, as Judge Schwab explained, conformed to the prevailing practice and statutory requirements of the time.  (See Doc. 155 at 54 & n.14); 72 PA. STAT. AND CONS. STAT. ANN. §§ 6001, 6002 (repealed in part by Act of March 9, 1847, Pub. L. 278 § 1); Herder Spring, 143 A.3d at 365, 376, 377.

---

[16] We additionally observe that creation of a new exception of the mineral estate in Proctor and Hill in the 1920 deed is untenable because Proctor and Hill were not parties to the conveyance and had become strangers to the title following the 1908 tax sale.  See In re Condemnation by Cty. of Allegheny of Certain Coal, Oil, Gas, Limestone, Mineral Props., 719 A.2d 1, 3-4 (Pa. Commw. Ct. 1998).  When a deed attempts to reserve or except some interest in a third party, Pennsylvania courts have held that the interest remains with the grantor.  See id. at 4.

At the outset, we reject the Game Commission's contentions that the Proctor Trusts' due process claim arises under 42 U.S.C. § 1983 or is barred by the statute of limitations in the Act of 1815. As part of their quite title action, the Proctor Trusts assert that the lack of adequate notice (*i.e.*, due process) rendered the 1908 tax sale void *ab initio*, which is a jurisdictional defect immune to statute-of-limitations challenges. (See Doc. 155 at 44-49); Benoit v. Panthaky, 780 F.2d 336, 338-39 (3d Cir. 1985); Kendall v. Lancaster Expl. & Dev. Co., 323 F. Supp. 3d 664, 681 (M.D. Pa. 2018) (citing Kean v. Forman, 752 A.2d 906, 908 (Pa. Super. Ct. 2000)). The Proctor Trusts' due process claim is not grounded in Section 1983 and is not barred by any limitations period invoked by the Game Commission.

As to the merits of the claim, we find that notice by publication was constitutionally adequate under the unique circumstances of this case. The Proctor Trusts rely heavily on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), and Mennonite Board of Missions v. Adams, 462 U.S. 791 (1983), to support their due process challenge. Yet Mullane acknowledges that notice by publication is constitutionally permissible when "it is not reasonably possible or practicable to give more adequate warning." Mullane, 339 U.S. at 317; see also Greene v. Lindsey, 456 U.S. 444, 449 (1982). Mennonite explains that constructive notice is sufficient if the interested party "is not reasonably identifiable." Mennonite, 462 U.S. at 798. Such a situation could occur when persons whose property rights may be affected are "missing or unknown," and in those situations, use of an "indirect and even a probably futile means of notification" is all that is possible and required. Mullane, 339 U.S. at 317 (citations omitted). Ultimately, notice is constitutional when, "with

due regard for the practicalities and peculiarities of the case," the notice provided reasonably conveys the necessary information and affords "a reasonable time for those interested to make their appearance." Id. at 314-15.

It is crucial to bear in mind the circumstances surrounding the 1908 tax sale, because procedural due process questions are necessarily fact specific. See Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 484 (1988); Wright v. Corning, 679 F.3d 101, 108 (3d Cir. 2012) (citation omitted). At the time of sale, unseated land was treated much differently than its seated counterpart. When unseated land was sold for unpaid taxes, identification of the current owner or owners was irrelevant, because unseated land was typically described in reference to its original warrantee. See Herder Spring, 143 A.3d at 364; Heft v. Gephart, 65 Pa. 510, 516 (1870); Strauch, 1 Watts & Serg. at 175. "[I]t is immaterial, at the moment of sale, what may be the state of the ownership [of the unseated land], or how many derivative interests may have been carved out of it. With these the public has no concern." Strauch, 1 Watts & Serg. at 175. The identity of owners was often unknown as well. See Morton v. Harris, 9 Watts 319, 325 (Pa. 1840) (noting that "assessors and commissioners cannot know of all the transfers of title [of unseated land] which take place"); Herder Spring, 143 A.3d at 378. County taxing authorities instead relied on reporting by unseated landowners to determine how taxes were assessed and how property was advertised for sale when those taxes went unpaid. See Herder Spring, 143 A.3d at 368 (citing Act of 1804 and Act of 1806); Heft, 65 Pa. at 516-17. Accordingly, when tax payment lapsed on unseated land, the county treasurer had *no reason or obligation* to search public records for ownership

interests in the parcel to be sold.  See Herder Spring, 143 A.3d at 368-69 (citing

Stoetzel, 105 Pa. at 567).  Unseated tax-sale procedures, moreover, were well

established by 1908.  For nearly a century, unseated land had been regularly sold

for delinquent taxes by county treasurers through identical methods and at the

same time of year, the second Monday in June on even-numbered years.  Id. at 365;

72 PA. STAT. AND CONS. STAT. ANN. § 5981.

This antiquated process no longer exists; nevertheless, it was the system in

place at the time of the tax sale and the reasons for that system are relevant to the

adequacy of the notice provided.  Pennsylvania's historical treatment of unseated

land reflects "the practicalities and peculiarities" of the situation and informs

whether the notice given conveyed the required information to Proctor such that he

could make his appearance.  Mullane, 339 U.S. at 314-15.  In conducting a due

process assessment, courts must "look to the realities of the case" presented, and

the effect of notice "must be judged in light of its practical application to the affairs

of men as they are ordinarily conducted."  Greene, 456 U.S. at 450-51.

Notice by publication here—while not the best possible notice—was

constitutionally sufficient.  Proctor was not a real estate novice.  *Per contra*, he

owned and regularly conveyed vast amounts of real property in Pennsylvania.[17]

---

[17] See, e.g., Herder Spring, 143 A.3d at 367 n.10; Cornwall Mountain, 158 A.3d
at 150-51; N. Forests II, Inc. v. Keta Realty Co., 130 A.3d 19, 25 n.4 (Pa. Super. Ct.
2015); Sw. Energy Prod. Co. v. Forest Res., LLC, 83 A.3d 177, 180 & n.3 (Pa. Super.
Ct. 2013); Sagamore, 265 F.2d at 201-02; Sagamore, 166 F. Supp. at 475, 477; Lester
L. Greevy Jr. & John A. Shoemaker, *Shale Gas Ownership—Tax-Sale Titles: An
Historical Perspective of the Pennsylvania Title Wash*, 85 PA. B. ASS'N Q. 106, 111, 112
(2014); (Doc. 95 ¶ 6).

There can be no doubt that Proctor was aware of the tax treatment of unseated land and how unseated land ordinarily was assessed, taxed, advertised, described, and disposed of by county treasurers for unpaid taxes. (See, e.g., Doc. 95 ¶ 6(a), (d)). The United States Supreme Court has noted that individual characteristics of the intended notice recipient may be relevant to the due process analysis. See Jones v. Flowers, 547 U.S. 220, 230 (2006) (citations omitted). Even less sophisticated unseated landowners were likely aware of these well-established procedures. Furthermore, the advertisements placed in Bradford County newspapers for the sale of the Josiah Haines warrant followed customary practice and provided the date, time, and place of sale. (See Doc. 95 ¶ 24 & citations). Advertisements ran weekly from the beginning of April through the first week in June, giving Proctor more than adequate time to appear and to raise any objection he may have had to the sale. (See id.); 72 PA. STAT. AND CONS. STAT. ANN. §§ 6001, 6002.

For treasurers' sales in the 1800s and early 1900s, it was "not reasonably . . . practicable to give more adequate warning" to unseated property owners. Mullane, 339 U.S. at 317. Notice by publication was the type of notice required, expected, and relied upon at the time, and for good reason. Such notice was "reasonably calculated to apprise interested" unseated landowners of the pending tax sale and "afford them an opportunity to present their objections." Id. at 314 (citations omitted). Stated differently, notice by publication was "reasonably certain to inform those affected." Dusenbery v. United States, 534 U.S. 161, 170 (2002) (quoting Mullane, 339 U.S. at 315). We hold that, under all the circumstances, the

42

constructive notice provided in this case satisfies the procedural due process requirements of the Fourteenth Amendment.

IV.    **Conclusion**

For these reasons, the court finds that the Proctor Trusts' challenges to the 1908 tax sale and subsequent conveyances are without merit.  The court will grant the Game Commission's motion (Doc. 123) for partial summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    December 18, 2019