## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,

Plaintiff,

v.

THOMAS E. PROCTOR HEIRS TRUST and
the MARGARET O.F. PROCTOR TRUST,

Defendants.

Case No. 1:12-CV-1567

Chief Judge Conner /
Chief Magistrate Judge Schwab

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION OF THE DECEMBER 18, 2019 ORDER

Paul K. Stockman
   Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

Laura A. Lange
   Pa. ID No. 310733
1670 Sturbridge Drive
Sewickley, PA 15143
lange@proctortrust.com

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................i

TABLE OF AUTHORITIES ............................................................ ii

REPLY ARGUMENT .........................................................................1

    I.    An Intervening *En Banc* Commonwealth Court Decision Against the PGC Is Fatal to the PGC's Position. .................................1

    II.    Principles of Law and Equity Barred CPLC From Acquiring the Subsurface Estate Through the Tax Sale. ...........................................2

        A.    The PGC Cannot Ignore CPLC's Duty to Pay Taxes...............6

        B.    Equity Lies with Proctor and Hill. ...........................................8

    III.    The Deed Reservation Language Controls. ......................................10

    IV.    McCauley's Agency Precludes Summary Judgment in Favor of the PGC. ..........................................................................................12

    V.    The Tax Sale Is Void Because Seated Land Could Not Be Sold in 1908. ..........................................................................................15

CONCLUSION ..................................................................................16

# TABLE OF AUTHORITIES

**Federal Cases:**

*New York State Nat. Gas Corp. v. Swan-Finch Gas Dev. Corp.*,
    173 F. Supp. 184 (W.D. Pa. 1959), *aff'd,* 278 F.2d 577 (3d Cir. 1960)..........2

**Pennsylvania Cases:**

*Babcock Lumber Co. v. Faust*, 39 A.2d 298 (Pa. Super. 1944)................................2

*Bartholomew v. Leach,* 7 Watts 472 (Pa. 1838) ............................................5

*Beaupland v. McKeen*, 28 Pa. 124 (Pa. 1857) ............................................9

*Breisch v. Coxe*, 81 Pa. 336 (1876)................................................8

*In re Brown's Estate*, 2 Pa. 463 (Pa. 1846)................................................13

*Burd v. Ramsay*, 9 Serg. & Rawle 109 (Pa. 1822)........................................6

*Com. of Pa., Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*,
    No. 493 M.D. 2017, mem. op. (Jan. 16, 2020)................................................1

*Coxe v. Wolcott*, 27 Pa. 154 (1856) ............................................5

*Elliott v. Moffett*, 74 A.2d 164 (Pa. 1950)........................................10, 12

*F.H. Rockwell & Co. v. Warren County*, 77 A. 665 (Pa. 1910) ........................2, 3, 8

*Herder Spring Hunting Club v. Keller*,
    143 A.3d 358 (Pa. 2016)............................................1, 3, 4, 5, 8, 12

*Huzzard v. Trego*, 35 Pa. 9 (1859) ............................................12

*Jedlicka v. Clemmer*, 677 A.2d 1232 (Pa. Super. 1996)........................................10

*Knupp v. Syms*, 50 A. 210 (Pa. 1901) ........................................14, 15

*Laird v. Hiester*, 24 Pa. 452 (Pa. 1855) ............................................14

*Lamb v. Irwin*, 69 Pa. 436 (1871) ............................................12

*Patterson v. Brindle*, 9 Watts 98 (Pa. 1839) ............................................................12

*Orr v. Cunningham*, 4 Watts & Serg. 294 (1842) ......................................................5

*Powell v. Lantzy,* 34 A. 450 (Pa. 1896) ...................................................... 5, 6, 7, 9\

*Reinboth v. Zerbe Run Imp. Co.*, 29 Pa. 139 (1858)..................................................5

*Scott v. Bell*, 25 A.2d 308 (Pa. 1942) .......................................................................15

*Simpson v. Meyers*, 47 A. 868 (Pa. 1901).................................................................16

*Sugden v. Rothschild*, 155 A. 864 (Pa. 1931) ..........................................................15

*Wheeler v. Knupp*, 55 A. 979 (Pa. 1903) ..................................................................14

**Constitutions, Statutes and Court Rules:**

Act of March 28, 1806, P.L. 644 .........................................................................4, 5, 8

Act of June 6, 1887, P.L. 363, No. 248 ......................................................................6

Act of June 4, 1901, P.L. 364 ....................................................................................15

Act of May 21, 1913, P.L. 285 ..................................................................................15

**Other Authorities:**

Henry Campbell Black, A TREATISE ON THE LAW OF
     TAX TITLES (1893)......................................................................6, 12, 13, 14

Robert Grey Bushong, PENNSYLVANIA LAND LAW (1938) ......................................15

**REPLY ARGUMENT**

**I.    An Intervening *En Banc* Commonwealth Court Decision Against the PGC Is Fatal to the PGC's Position.**

The PGC's opposition to the Trusts' motion for reconsideration (ECF No. 173) is most notable not for what it says, but for what it omits:  On January 16, the Commonwealth Court, *en banc*, unanimously ruled against the PGC in a virtually-identical case.  The Court held that questions of fact – specifically, whether the Proctor severance was reported and whether McCauley's relationship with CPLC prevented his tax sale "purchase" from altering the *status quo* – precluded summary judgment in favor of the PGC and against the Trusts with respect to similarly-situated tracts in State Game Land 133.  *See Commonwealth of Pennsylvania, Pennsylvania Game Commission v. Thomas E. Proctor Heirs Trust et al.*, No. 493 M.D. 2017, mem. op. at 10, 15, 18 (Jan. 16, 2020), Exhibit 1 hereto. The court noted – construing essentially the same facts and evidence before the Court here – that "there are still many uncertainties in this case that were not present in *Herder Spring*," *id.* at 19, uncertainties that led the Court to deny the PGC a quick victory.  The Court necessarily held that these issues of reporting and agency are material, and that a finding on either would compel the conclusion that the tax sales had no effect on title to the subsurface.

Despite this decision's obvious relevance, the PGC fails even to mention it. That is not surprising: the Commonwealth Court's decision, coupled with the determinations that this Court has already made in its Memorandum Opinion (ECF

1

No. 165), are fatal to the PGC's position, and together establish that this Court should grant reconsideration and deny the PGC's motion for summary judgment.

## II.    Principles of Law and Equity Barred CPLC From Acquiring the Subsurface Estate Through the Tax Sale.

### A.    CPLC's Reporting Determined the Scope of the Tax Sale.

The bulk of the PGC's response is an effort to controvert this Court's conclusion (based on documentary evidence of unchallenged authenticity) that CPLC "properly reported" its interest in the Josiah Haines Warrant.  *See* Opp'n, ECF No. 173, at 2-3 (disputing that CPLC reported its unseated interest in the Josiah Haines warrant).  By so focusing its argument, the PGC tacitly concedes that such a determination necessarily means that the tax sale could encompass only CPLC's surface estate.  Beyond that, the PGC contends that (*if* CPLC did report its interest in the Josiah Haines Warrant) the Trusts' challenge is a belated attack on the assessment's propriety.

The latter contention is simply not accurate – the assessors had every right to assess the Josiah Haines Warrant, and – by identifying ***CPLC*** as the owner of the tract – were properly assessing ***CPLC's interest*** in the land.  *See Babcock Lumber Co. v. Faust*, 39 A.2d 298, 302 (Pa. Super. 1944) ("The lien for unpaid taxes attaches only to the estate assessed, and that estate, but no more, passes at a public sale").  Indeed, the assessor could not assess a severed subsurface estate unless there was actual development to justify the assessed value.  *F.H. Rockwell & Co. v. Warren County*, 77 A. 665, 666 (Pa. 1910); *New York State Nat. Gas Corp. v. Swan-Finch Gas Dev. Corp.*, 173 F. Supp. 184, 193 (W.D. Pa. 1959), *aff'd,* 278

F.2d 577 (3d Cir. 1960).[1]  Bradford County's assessors were merely complying with the law by not assessing the Subsurface Estate.

It is clear that the assessments in CPLC's name applied only to its surface interest, when considered in the light of assessment records for warrants in which there was a separate subsurface assessment.  For example, in 1907, Proctor's heirs were assessed on the subsurface estate of 22 warrants that were producing coal in McIntyre Township.  ECF No. 131-1 at 17-18.  The same 22 warrants were assessed in the name of CPLC, but there is no "surface only" designation in the assessment records, even though those assessments could have applied only to the surface estate.  *Id.* at 10-12.  If assessments in CPLC's name encompassed the subsurface estate, that would constitute an improper double assessment; the only reasonable inference is thus that the identification of CPLC as owner of the assessed land connotes that the assessment encompassed only ***CPLC's*** interest. After all, assessments are rebuttably presumed to have been "rightly done." *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 365 (Pa. 2016).  Further,

---

[1] The PGC reasserts its misunderstanding of *Rockwell* and *Herder Spring*'s analysis of *Rockwell*.  The Court in *Herder Spring* only rejected the argument a subsurface estate could ***never*** be conveyed in a tax sale because it had no assessable value.  143 A.3d at 373.  The Court did not suggest that *Rockwell* was bad law when it was rendered, or that *Rockwell* did not represent the governing legal rule at the time.  Here, *Rockwell* simply shows that the absence of a separate subsurface assessment has no evidentiary value on the question whether the severance was reported, because a reported subsurface interest could not, under prevailing law, be assessed for taxation absent some basis for valuing it.  The assessments in the record make that clear: assessments of CPLC's interest are identical whether or not the Proctor severed subsurface rights are separately assessed, as discussed *infra*.

Bradford County did assess Proctor & Hill subsurface estates, where there were coal mining operations, on the seated list. *See* ECF No. 130-1 at ¶ 8. Thus, the assessment's identification of the owners demonstrates what interest county officials sought to assess, and that could be conveyed in any ensuing tax sale.

The remainder of the PGC's argument on this issue focuses on its contention that this Court was wrong in determining that CPLC "properly reported" its interest, by contending that there was no evidence that the severance was reported. However, as the Trusts have explained, there are only two possible scenarios with regard to CPLC's reporting under the Act of 1806: either (1) CPLC properly reported its interest in only the surface estate, or (2) CPLC falsely reported its ownership by stating that it owned the entire property.[2] Under either circumstance, CPLC could not acquire the subsurface estate through the tax sale.

The PGC's only response to this contention is the inaccurate claim that CPLC had no duty to report under the Act of 1806. But the statute and *Herder Spring* could not be clearer – the party "***becoming*** a holder of unseated land" had to report, providing an accurate description of the tract of land it acquired. Act of 1806, 72 P.S. § 5020-409 (emphasis added); *Herder Spring*, 143 A.3d at 368-69 (holding that "the obligation" to report was on the "subsequent owners to inform

---

[2] The PGC argues both that there is no evidence that CPLC reported and that there is no evidence that it falsely reported. That is logically inconsistent: either CPLC complied with the Act of 1806 or it did not. There is no other alternative. As this Court correctly held, the identification of CPLC as the owner of the lands demonstrates that it did report its interest. (As an aside, CPLC's post-tax sale conduct and subsequent acknowledgement of the subsurface reservation strongly suggest that it ***did*** accurately report.)

the commissioners of the land owned to allow the commissioners to impose an appropriate tax.").  The Court only held that no such duty was imposed on the holder of the reserved interest.  *Id.* at 360.  Thus, Proctor and Hill had no duty to report the severance, but ***CPLC did***.

The PGC next claims, without explanation (and by citing to inapplicable case law), that even if CPLC did owe the duty, its "dereliction of that duty would not be grounds to void the tax sale."  However, the Trusts in this regard are not contending that the tax sale was void;[3] rather, the Trusts contend only that the effect of the tax sale is that CPLC could not acquire the severed subsurface estate through its "own neglect of duty."  *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896).

Under *Herder Spring* – and as recently recognized by the Commonwealth Court – the fact and nature of reporting under the Act of 1806 conclusively determines the scope of the assessment and the effect of an ensuing tax sale.  This Court's conclusion that CPLC properly reported its interest is decisive, and justifies reconsideration of the Court's holding on the ultimate question.

---

[3] The PGC's continual reference to the time limitation on challenges to the assessment and sale is misplaced.  None of the Trusts' challenges are to the regularity of the assessment, and they are not subject to the statutory limitation.  Instead, the determination of the ***scope of the assessment*** and ***effect of the tax sale*** is always open to review, especially when the assertion that the tax sale encompassed the subsurface estate is being made for the first time more than 100 years after the fact.  *See, e.g., Reinboth v. Zerbe Run Imp. Co.*, 29 Pa. 139 (1858) (challenging the effect of tax sales 30 years and 15 years before); *Coxe v. Wolcott*, 27 Pa. 154, 158-59 (1856) (challenge to the effect of a tax sale more than ten years afterward); *Orr v. Cunningham*, 4 Watts & Serg. 294 (Pa. 1842) (challenge 16 years after the tax sale); *Bartholomew v. Leach*, 7 Watts 472 (Pa. 1838) (challenge to agent's purchase six years after the tax sale).

### A.    The PGC Cannot Ignore CPLC's Duty to Pay Taxes.

The question posed by this Court in its Memorandum Opinion was whether CPLC had an "obligation" to pay the assessed taxes. ECF No. 165 at 35. The answer to that question is yes. CPLC bound itself to pay the assessed taxes in the deed through which it acquired the property. *See* ECF No. 97-1, at 64. Moreover, the Act of June 6, 1887, P.L. 363, No. 248, imposed a duty to pay taxes on the owners of unseated lands.

The PGC asks this Court to overlook the statute, arguing that the statute was effectively overruled by a passing reference in a later court decision to the effect that there was no "personal liability" on the owner of unseated lands. *See* Opp'n, ECF No. 173, at 16 (citing *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896)). *Powell* stands for nothing of the sort; in fact, *Powell* specifically observes that a party "in possession of the land when the tax was assessed... upon that ground was chargeable with its payment." 34 A. at 451.

Further, "personal liability" for taxes and the imposition of a duty to pay are distinct legal concepts. The "personal liability" language came from cases distinguishing how the treasurer could recover taxes on seated versus unseated lands. *See, e.g., Burd v. Ramsay*, 9 Serg. & Rawle 109, 114 (Pa. 1822) (explaining that taxes on seated land could be recovered in a lawsuit against the owner, but that no legal action could be brought against the owner of unseated lands); Henry Campbell Black, A TREATISE ON THE LAW OF TAX TITLES [hereinafter "TAX TITLES"] §167, at 211-12 (1893) ("[T]he land itself, being inanimate matter, cannot respond to a demand…. Hence the expression, frequently met with in the books,

6

that 'the land itself is liable,' means no more than that taxes assessed upon a specific parcel of real estate can only be collected by a process having for its object the condemnation and sale of the land.").

Critically, in *Powell*, the landowner's duty to pay taxes under the Act of 1887 was not at issue, because the defendant was not the owner at the time of the assessment. *See* Memorandum Opinion, ECF No. 165, at 32 ("in Powell v. Lantzy, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and through no fault of, the tax-sale purchaser."). *Powell* did not alter an owner's statutory duty to pay taxes assessed on unseated land, and did not overrule the legislature. Thus, the Court cannot simply ignore the landowner's duty, as the PGC asks.

The PGC also suggests that the Act of 1887 does not impose a binding "duty" because an owner can violate the law. That does not make sense: a party's ability to breach a duty does not mean that no duty ever existed in the first instance. For illustration, in every case involving estoppel, the estopped party breached the duty or obligation imposed by law (generally, by refusing to pay the taxes). Under the PGC's theory, these duties were not "absolute" because they could be breached. But that is the entire point of estoppel law – the estopped party "cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty." *Powell*, 34 A. at 451.[4]

---

[4] The PGC's argument, taken to its logical end, turns the law on its head: for example, under the PGC's logic, there can never be a negligent breach of a duty of care, because the ability to breach means that no duty existed in the first place.

In addition, the Court cannot ignore CPLC's contractual obligation to pay the taxes. Even if the Trusts are not seeking to bring a breach of contract claim against CPLC, CPLC's nonetheless was obliged to pay the taxes, a provision intended to protect Proctor's, Hill's and Elk's reserved interests. This precludes the PGC, as CPLC's successor, from benefiting from its breach of a duty that it undertook.

**B.    Equity Lies with Proctor and Hill.**

More broadly, the gist of the PGC's response is a request that the Court ignore the obligations imposed on CPLC, and an attempt to place non-existent obligations on Proctor and Hill. But the PGC's effort to argue that the Proctor heirs acted with "unclean hands" is based on legal and factual inaccuracies. As addressed above and in the Motion for Reconsideration, *Herder Spring* rejected the notion that a continuing holder of a reserved interest had any obligation to report its severance or seek out a separate assessment. *Herder Spring*, 143 A.3d at 360 (holding that the severed subsurface owners "were not required to report their reservation of rights under the reporting requirements of the Act of 1806.").

Simply put, the Proctor heirs did everything that the law required. Notably, because no taxes were assessed on the subsurface of the Josiah Haines warrant (consistent with prevailing law, *see Rockwell,* 77 A. at 666, given the lack of a basis for valuing the holding) there were no taxes for Proctor and Hill to pay. Self-evidently, no tax can be paid where none is assessed. *See Breisch v. Coxe*, 81 Pa. 336, 346 (1876) (the owner "cannot assess himself, or know what is charged against him," but "must await the action of the agents of the law," and "cannot pay

8

until he is informed of what he is to pay"). The PGC overlooks separate assessments of the Proctor and Hill estate in Barclay Township, where there were active coal operations, and *those taxes were paid*. *See* ECF No. 129, ¶¶ 55-58; ECF No. 133-12 ("The taxes paid last year by Mr. George R. Hill on account of the Proctor & Hill interests in minerals amounted to $175.40.")[5]; *see generally* ECF Nos. 133-8 to 133-12 (correspondence involving the payment of taxes on subsurface interests). Rather than focusing on the law and the facts of record, demonstrating the Proctor heirs' adherence to the law, the PGC relies upon a *post hoc,* biased and speculative article by attorneys representing surface owners.

By contrast, there is no doubt that CPLC's intentional default caused the tax sale. Memorandum Opinion, ECF No. 165, at 31 ("CPLC intentionally failed to pay the assessed taxes" and "CPLC's default induced a treasurer's sale"). Thus, even absent its affirmative "legal" duty to pay taxes (by statute and contract), CPLC must bear the loss because its conduct led to default. *See Beaupland v. McKeen*, 28 Pa. 124, 131–32 (Pa. 1857) ("where a loss must necessarily fall on one of two innocent persons, it shall be borne by him whose act occasioned it"). The decision in *Powell* does not counsel otherwise. As this Court correctly observed, the tax purchaser in that case did not induce the treasurer's sale. Memorandum Opinion, ECF No. 165, at 32 ("in Powell…, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and *through no fault of*, the tax-sale purchaser") (emphasis added).

---

[5] Notably, that same year, CPLC paid only $355.40 in taxes on *all* of the unseated lands subject to the PGC deed. ECF No. 98-1 at 117 & 119.

Here, Proctor and Hill and their heirs did everything the law required. Only CPLC's default could have deprived them of their property, and CPLC (and its successor PGC) cannot be rewarded for its intentional breaches of duty.

## III.    The Deed Reservation Language Controls.

The PGC does not bother to address the application of *Elliott v. Moffett*, 74 A.2d 164, 167 (Pa. 1950), to its deed. Here, the Court's analysis began with the assumption that the "tax sale extinguished the mineral rights of Proctor and Hill" so "there was no subsurface reservation or exception to which the 1920 conveyance was subject." Memorandum Opinion (ECF No. 165), at 38; *see also* Report & Recommendation (ECF No. 155) at 87 ("If the 1908 tax sale resulted in a title wash, after the tax sale, there was no longer a reservation of the subsurface estate."). That presumption overlooks the reservation's significant, independent evidentiary value.

CPLC's explicit reference to the Proctor and Hill reservation, and its corresponding omission of its purported tax title, is compelling, contemporaneous evidence that the tax sale was not intended to and did not convey the subsurface. *See Jedlicka v. Clemmer*, 677 A.2d 1232, 1234–35 (Pa. Super. 1996) ("[A]ll acts and declarations of the owner of land made during the continuation of his interest tending to show the character or extent of his possession or interest… are competent evidence…."). After all, if CPLC did purport to acquire the subsurface through a tax sale, why would it omit the tax deed from its recited chain of title and explicitly acknowledge the continued rights of Proctor and Hill?

10

In fact, the deed reference to the subsisting reservation is merely part of a broader course of conduct in which both CPLC and the PGC recognized that Proctor and Hill retained title to the subsurface. For example, CPLC at the time was negotiating with Proctor and Hill to acquire the subsurface estate, *see* ECF No. 133-9 to 133-13, and it excepted and reserved from the PGC deed a railroad right of way to allow access to Proctor and Hill coal mines, *see* ECF No. 97-1 at 85) ("Also excepting and reserving unto the Grantor, its successors and assigns, a right of way of fifty (50) feet in width for railroad purposes from a point on the line of the Susquehanna and New York Railroad to any mine or mines on the said described lands…."). If the PGC was acquiring the Subsurface Estate, there would be no reason to create a reservation to access the mines. Indeed, the PGC's own title report notes that it was not purchasing the Subsurface Estate – the PGC's title examiner stated that he did not evaluate the ownership of the subsurface because it was excepted and reserved from the deed. *See* ECF No. 98-1 at 92-93) (reciting the reservation in favor of Proctor and Hill and stating "in the preparat[i]on of this report, therefore, no references are made to any exceptions, reservations or adverse conveyances which are included in the above exceptions contained in the agreement for sale.").[6]

---

[6] The PGC's title examiner did raise a concern regarding a prior contract with the Towanda Tanning Company relating to tanbark rights. *See* ECF No. 98-1 at 94. After CPLC furnished a satisfactory affidavit that the contract was transferred to Proctor and Hill, the examiner stated that "[t]he only defects referred to in this report are an outstanding contract and a possible adverse conveyance. Both of these questions have been satisfactorily disposed of by affidavits furnished." *Id.* at 132.

The deed language is evidence that CPLC did not own, and that the PGC was not acquiring, the Subsurface Estate.  The principle recognized in *Elliott* and *Herder Spring* simply extends this evidence into a binding admission when (as here) the reserved interest is specifically mentioned.  *Herder Spring*, 143 A.3d at 378.  At the very least, drawing inferences in favor of the Trusts, this precludes summary judgment in favor of the PGC.

## IV.   McCauley's Agency Precludes Summary Judgment in Favor of the PGC.

As noted above, the Commonwealth Court recently denied the PGC's motion for summary judgment on the grounds that McCauley's agency remained a question of fact material to the claims.  Thus, if he was an agent, regardless of whether he was acting at CPLC's direction or against CPLC, his purchase at a tax sale cannot alter the title to the land.  *See Lamb v. Irwin*, 69 Pa. 436, 442–43 (1871) ("The finding of the alleged agency would have vitiated the treasurer's sale").

Critically, McCauley's and CPLC's motives have nothing to do with whether McCauley's purchase operates as a redemption.  It is the ***fact*** that McCauley was CPLC's agent that results in the redemption.  *See Patterson v. Brindle*, 9 Watts 98, 101 (Pa. 1839) (the act of the agent is "deemed the act of the owner"); *Huzzard v. Trego*, 35 Pa. 9, 9 (1859) (holding that where an agent "procures from the purchaser at a treasurer's sale" the land is redeemed).[7]

---

[7] Contrary to the PGC's contention, no case has held that the assessed owner of non-defective title can be the tax sale purchaser.  The uniform principle of law is that an owner cannot be the tax sale purchaser.  Black, Tax Titles § 273.  As

The PGC mistakenly contends that McCauley's purchase could operate as a payment only if the terms of his agency explicitly imposed an obligation to pay delinquent taxes. The rule, however, is not so narrowly drawn: it is based on an agent's broad fiduciary obligations to his principal. *In re Brown's Estate*, 2 Pa. 463, 465–66 (Pa. 1846) ("Courts of justice exact the most scrupulous good faith from agents of every description during the continuance of the agency. To prevent fraud, they cannot purchase the estate of their principals for their own benefit, but in trust."). *See also* Black, TAX TITLES §287, at 359-60 (1893) (the rule that an agent's purchase operates as a *de facto* redemption does not rest on anything "peculiar to the nature or incidents of tax sales," but instead depends "upon the fiduciary relations of the parties.  It is indeed but a corollary from the general principle of agency which precludes any person who becomes interested for or in behalf of another in any subject of property, from acquiring rights antagonistic to those of his principal.").

The PGC's misapprehension appears to stem from the fact that the existence of an agency relationship in some tax cases was established through evidence that the agent had previously paid the taxes on behalf the owner.  But here, McCauley clearly was an agent of CPLC – he was CPLC's treasurer, its real estate agent and its attorney.  (A reasonable inference is that his role as real estate agent involved

---

noted in that treatise, Pennsylvania made an exception only for owners of "voidable or radically defective title." *Id.* at § 274.  Here, CPLC did not hold voidable or defective title prior to the tax sale.

the monitoring and payment of taxes. After all, he assisted the Proctor heirs in paying their taxes on their subsurface interests. *See* ECF No. 133-8.)

Finally, the only distinction that Magistrate Judge Schwab discerned between this case and *Knupp v. Syms*, 50 A. 210, 212 (Pa. 1901), was the belief that there was no evidence that McCauley paid the amount of the taxes. *See* Report & Recommendation (ECF No. 155) at 65 ("there is no evidence that…McCauley paid the taxes on which the tax sale was based"). The Trusts directed the Court to evidence that established that his purchase price constituted the payment of the taxes owed because under the statute, the purchase price must cover the unpaid tax plus the "costs necessarily accruing by reason of such delinquency." Act of Mar. 13, 1815, P.L. 177, Sec. 1.[8]

"The unseated land laws are intended to enforce the payment of taxes, and their purpose is fulfilled when the duty is performed." *Laird v. Hiester*, 24 Pa. 452, 464 (Pa. 1855). Here, the payment of taxes was fulfilled with McCauley's payment of the purchase price. *Knupp*, 50 A. at 212; *see also Wheeler v. Knupp*, 55 A. 979, 979 (Pa. 1903) (explaining that in *Knupp v. Syms*, because the tax "had been in fact paid before the maturity of the treasurer's deed [two years after the sale]…this was equivalent to a redemption"); Black, Tax Titles, § 273 ("his purchase is deemed merely a mode of paying the taxes and leaves the title in precisely the position it would have occupied if the payment had been made before

---

[8] The commissioners' public records reflect that the unpaid tax amounted to $44.36 and McCauley paid $49.36, which included the unpaid tax and the costs for the sale. *See* ECF No. 97-1 at 74.

instead of after the land was put up for sale. This rule rests on such obvious principles as to require no justification.") (citations and footnote omitted).

Here, the evidence reveals that McCauley's purchase money was a payment on behalf of CPLC.  McCauley attested that his purchase money for similar tax sales was CPLC's money and his name in the tax deeds was "only held in trust for" CPLC.  (ECF No. 109-9 and 109-10).  Accordingly, Pennsylvania law treats McCauley's "purchase" as a payment of overdue tax on CPLC's behalf, and thus as "equivalent to a redemption."  *Knupp,* 50 A. at 212.

## V.    The Tax Sale Is Void Because Seated Land Could Not Be Sold in 1908.

Finally, the Pennsylvania Supreme Court concluded that the "Act of June 4, 1901, P. L. 364, since it furnished a complete and exclusive system for the recovery of taxes from the seated lands… actually or impliedly repealed all earlier statutes bearing on the subject," including a prior law permitting the sale of seated land for non-payment of taxes.  *See Sugden v. Rothschild*, 155 A. 864, 865 (Pa. 1931); *see also* Robert Grey Bushong, PENNSYLVANIA LAND LAW, §479, at 515 (1938) ("any attempt to sell seated land" after 1901 was "absolutely void," and "this rule continued to be the law" until 1913; "during this period there could be no valid sale of seated land" except under limited circumstances inapplicable here). After the sales of seated lands were restored, the repeal was no longer in effect. *Scott v. Bell*, 25 A.2d 308, 310 (Pa. 1942) (noting the Act of May 21, 1913, P.L. 285, restored the sales of seated lands).

Because the Act of 1901 eliminated the treasurer's authority to sell seated land, the requirement that the land be *in fact* unseated was a jurisdictional

prerequisite to a valid tax sale from 1901 to 1913. *See Simpson v. Meyers*, 47 A. 868, 870–71 (Pa. 1901) (permitting a tax sale without jurisdiction "would be to deprive the appellee of his land without legal authority, and to forfeit it through the unauthorized act of the treasurer").  Because the Court properly held that the evidence showed that the land was in fact seated, the 1908 tax sale was without authority and thereby void.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the Trusts' memoranda in support of their motions for partial summary judgment and for reconsideration, the Trusts respectfully request that the Court grant reconsideration and enter an order denying the Game Commission's Motion for Partial Summary Judgment and granting the Trusts' Motion for Partial Summary Judgment.

Dated: January 29, 2020

Respectfully submitted,

/s/ *Paul K. Stockman*
Paul K. Stockman
   Pa. ID No. 66951
KAZMAREK MOWREY CLOUD LASETER LLP
One PPG Place, Suite 3100
Pittsburgh, PA 15222
pstockman@kmcllaw.com

Laura A. Lange
   Pa. ID No. 310733
1670 Sturbridge Drive
Sewickley, PA 15143
lange@proctortrust.com

*Counsel for Defendants*

16

## CERTIFICATE OF COMPLIANCE:

I hereby certify that the foregoing brief complies with the 5,000-word word-count limit, in that it contains 4,620 words, computed using the word count feature of Microsoft Word.

Dated:  January 29, 2020          /s/ *Paul K. Stockman*

## NOTE RE: CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), no certificate of service is required for documents electronically filed with via the Court's CM/ECF system.

17