**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**HARRISBURG DIVISION**

```
COMMONWEALTH OF PENNSYLVANIA,    ) CASE NO.
PENNSYLVANIA GAME COMMISSION,    ) 1:15-CV-01567-CCC
                 Plaintiff      )
            vs.                 )
THOMAS E. PROCTOR HEIRS TRUST,  )
                 Defendant      )
_____)
```

**TRANSCRIPT OF ORAL ARGUMENT (VIA TELECONFERENCE)**
**BEFORE THE HONORABLE CHRISTOPHER C. CONNER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**1 APRIL 2020 - 1:30 P.M.**

APPEARANCES:

**For the Plaintiff**:

    Bradley C. Bechtel, Esq.
    Pennsylvania Game Commission.
    2001 Elmerton Avenue
    Harrisburg, PA 17110-9797
    (717) 783-6530

    William C Martson, Esq.
    Abom & Kutulakis, L.L.P.
    2 West High Street
    Carlisle, PA 17013
    (717) 249-0900

**For the Defendant**:

    Paul K. Stockman, Esq.
    Kazmarek, Mowrey, Cloud & Laseter, L.L.P.
    One PPG Place, Suite 3100
    Pittsburgh, PA 15222
    (404) 333-0752

    Laura A. Lange, Esq.
    1670 Sturbridge Drive
    Sewickley, PA 15143
    (847) 800-8334

**U.S. District Court, Middle District of PA**

1   **APPEARANCES (Continued)**

2

3

4   **Court Reporter**:

5       Wesley J. Armstrong, RMR
        Official Court Reporter
6       U.S. Courthouse & Federal Building
        228 Walnut Street
7       Harrisburg, PA 17101
        (717) 542-5569

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25       Proceedings recorded by machine shorthand; transcript
    produced by computer aided transcription.

# P R O C E E D I N G S

THE COURT: This is the time and place for an oral argument on the motion for reconsideration that has been filed by the Proctor Trust in long standing litigation at docket number 12-CV-1567.  The court issued a memorandum opinion and order in December.

Subsequent to the filing of the court's opinion the Proctor Trust filed a motion for reconsideration, which has been fully briefed, and now is the time for oral argument on that motion for reconsideration. I issued an order with respect to oral argument that requested some specific issues or brought to the attention of counsel specific issues that I would like to have addressed.

Let me start with Mr. Stockman as the moving party here.  If you would please speak to the act of June 6th, 1887 and the issue of whether you have discovered any relevant legislative history, treatise discussions, other interpretive guidance dance concerning the statute. According to my research the statute is cited in only one case, Ellis v. Houseknecht, which is a 1914 Pennsylvania Superior Court decision dealing with past payment timing issues and I think largely irrelevant to our dispute.

So I'm not aware of any other informative case law that would help us interpret the language of that statute, and I would like you to speak to how that impacts on the court's

opinion, particularly in light of <u>Powell v. Lantzy</u>, which I

quoted at page 29 of the opinion indicating that, "One cannot

purchase at a tax sale caused by his failure to pay taxes which

he owed to state or which he was otherwise legally or morally

bound to pay, acquire a better title, or a title adverse to

that of other parties to interests."

MR. STOCKMAN: Thank you, Your Honor.  Wes, this is

Paul Stockman.  Initially Your Honor's research corresponds

precisely with ours, did not find anything to cast any

particular light on that statute.  We'd agree that does not

really aid our interpretive task here today.  We believe that

that is probably because the Act of June 6th, 1887 is not only

unambiguous, but is, as we have noted elsewhere in our papers,

was entirely consistent with Pennsylvania common law as it

existed before then.

We cited <u>Breisch</u>, B-R-E-I-S-C-H, <u>vs. Coxe</u>, C-O-X-E,

to the court for the notion that that, the payment of taxes is

a duty and a failure to perform it is the fault of the owner.

There's also an 1855 Pennsylvania Supreme Court decision, <u>Mayor</u>

<u>of Philadelphia vs. Riddle</u>, which is 25 Pennsylvania 259, that

reiterates that it's an owner's duty to pay taxes.

We believe that this establishes a legal duty on the

part of an unseated landowner to pay taxes and prevents that

landowner, except in very limited circumstances, from using the

landowner's own default to obtain something that the landowner

1    didn't already own.  We believe that Powell vs. Lantzy is

2    wholly consistent with that proposition, as Your Honor pointed

3    out, and that Powell indeed specifically stated that the

4    parties in possession of the land where the tax was assessed

01:34PM  5    upon that ground was chargeable with its payment.

6         That's 34 Atlantic Reporter at page 451.  Now, in

7    Powell that principle didn't come into play because neither

8    Powell nor Lantzy owned the property at the time of the

9    assessment and so did not breach any duties to pay the

01:34PM 10    defaulted taxes. That duty belonged to Irvin, who was the owner

11    when the taxes were assessed in 1882 or 1883, and Powell, the

12    decision in Powell states that neither had a duty to pay

13    because the whole was subject to a claim for taxes which

14    existed before they acquired title and which neither was under

01:34PM 15    any obligation to the state to pay.

16         Now, Your Honor also asked about what effect Herder

17    Spring had on this principle, and, to be direct, Herder Spring

18    is not at all inconsistent with the principle that Your Honor

19    just cited a moment ago.  Initially Herder Spring never

01:35PM 20    discusses the statute or the broader principle that one can't

21    benefit from one's own default, and I have gone back and looked

22    through the record in Herder Spring and I see no indication

23    that either the statute or the concept were ever brought to the

24    court's attention.

01:35PM 25         That's not surprising, Your Honor, because there the

tax sale purchaser was an unrelated third party who would make

the bona fide purchase, so were is no circumstances under which

that purchaser could have violated some preexisting duty to pay

the defaulted taxes.

01:36PM      THE COURT: Right.  Of course.

MR. STOCKMAN: Now, I think there is some passing

language in both Powell and in Herder Spring, but we would

submit that the court has to be careful not to read too much

into that.  I mean for example both cases state in passing that

01:36PM the owner of the unseated land was not personally responsible

for the payment of the taxes and they were imposed on the land

itself, but that doesn't mean that no one has the duty to pay.

I think --

THE COURT: But you're making the distinction between

01:36PM some sort of contractual or statutory duty to pay and personal

liability, those two different concepts, correct?

MR. STOCKMAN: That's exactly right, Your Honor, and

that I would refer the court to the preeminent treatise at the

time, which is *Black On Tax Titles* and we cited that in our

01:37PM reply brief at pages 6 to 7, and *Black* simply makes clear that

saying that the land itself was liable is a shorthand way to

refer to the principle, as Your Honor just said, that this tax

can only be recovered by condemning and selling the property,

and conversely that unseated taxes couldn't be collected by

01:37PM pursuers of personal assets of the owner, and in that respect

1  it was distinct from seated land taxes, where the owner was

2  personally liable and where tax authorities could and did

3  proceed *in personam*. Because obviously Josiah Haines Warrant

4  couldn't physically rip itself out of the surface of the earth

01:37PM 5  and stroll down to Towanda to pay these taxes.

6          Also in this regard, Your Honor, I would like to

7  caution the court to read too much into the decision or into

8  the quotation from Coxe vs. Gibson, C-O-X-E, that there is

9  nothing to prevent the holder of an expected title from

01:38PM 10  purchasing a better one at a tax sale.  There are a couple of

11  reasons why that statement can't be taken out of context.

12          THE COURT: Number one doesn't that also, doesn't that

13  also predate the statute?

14          MR. STOCKMAN: It certainly predates the statute, Your

01:38PM 15  Honor, and also if we go back to the first principle, the

16  notion that one cannot profit from his or her own wrongdoing as

17  an equitable principle, and in Coxe and in the Reinboth vs.

18  Zerbe Run Improvement case, and Wes, that's R-E-I-N-B-O-T-H and

19  Z-E-R-B-E, Run, in those cases the equity granted in favor of

01:39PM 20  the tax purchaser based on those particular circumstances, Coxe

21  vs. Gibson in particular was the culmination of a whole series

22  of cases involving a fraudulent scheme, and the tax sale and

23  purchase at issue in Coxe vs. Gibson was undertaken on behalf

24  of a subsequent owner who was not a party to the fraud but

01:39PM 25  whose title because of the fraud was seriously clouded.  That

owner wanted to be able to convey good title in a subsequent

bona fide sale and so defaulted on the property there, and in

<u>Reinboth</u> similarly there were competing claims against the

property that the tax sale purchaser was trying to clear.

01:39PM          Your Honor in fact recognized it at page 32 of your

opinion that these cases don't mirror the circumstance here,

and there's nothing in either case that stands for the

proposition that a landowner such as CPLC could use its own

default to acquire an entirely different tract of land to which

01:40PM it otherwise didn't have any legitimate claim and dispossessing

an owner who otherwise complied with the law, and in fact going

back to my favorite treatise, *Black On Tax Title*, *Black* makes

it clear reading this context of the rest of Pennsylvania's

jurisprudence that Gibson needs only that a claimant with

01:40PM voidable or radically defective title can purchase the land.

That's Section 274 of Black's treatise.

          And I think that it sort of highlights the caution

in, you know, in relying on some of these cases that goes

through a hundred or more years of precedent kind of picking

01:41PM out sound bites cafeteria style, particularly in an area of law

that is complex and often as inconsistent as this is.

          The last thing I would like to say on this subject,

Your Honor, is of course that we shouldn't overlook the fact

that here CPLC not only had a legal duty to pay the tax, but

01:41PM they also had a contractual duty to do so by virtue of the deed

that they accepted from Union Tanning, and you can find that

reference at page 64 of ECF number 97-1.

THE COURT: Okay. All right.  I would like you to

pivot for me a bit and let's talk, I'll ask you to speak on

01:41PM that evidence and the importance of the evidence of what was

sold at the 1908 tax sale.  You proffered various after the

fact evidence that the only, that only the surface estate was

assessed and sold at the 1908 tax sale, and your evidence

includes the specific reference to the Proctor and Hill

01:42PM assessment in the deed to the Game Commission later in the

negotiations with McCauley to acquire subsurface estate in

Bradford County following tax sales, and an exception in the

Game Commission's deed for a railroad right of way to access

Proctor and Hill mines.

01:42PM My question for you is what makes this evidence

legally relevant to the 1907 assessment and the 1908 tax sale?

In other words, couldn't this evidence exist and yet still have

no legal significance if the 1908 tax sale in fact washed the

title and rejoined the previously severed estate?

01:43PM MR. STOCKMAN: Your Honor, I have a two-part answer to

that question.  The first part of my answer would be to cite to

the Jedlicka vs. Clemmer case.  That's J-E-D-L-I-C-K-A, v.

Clemmer, C-L-E-M-M-E-R, and that states that, "All acts and

declarations of the owner of land made during the continuation

01:43PM of his interest tending to show the character or extent of his

possessions or interest are of competent evidence," and I
believe in this case that is certainly the case and more
broadly any circumstantial evidence reflecting the
understanding of the actual parties to the transaction
certainly is competent evidence to shed light of what actually
was assessed and sold.

Now, to be perfectly candid, Your Honor, if that was
the only evidence we had I think this would be a much more
challenging case, but I think we are fortunate in this respect
that there is plenty of additional evidence showing that Union
Tanning and Central Pennsylvania Lumber Company both reported
their interest in paid taxes and that Proctor and Hill did as
well, and Your Honor pointed out in the footnote to your most
recent order there's also no, there's nothing to suggest that
they did not do so properly, and some of the evidence we
compiled and submitted to Kate earlier I guess late last week,
and we can start with the assessment record from Bradford
County, you know, an exhibit which was what we compiled as
Exhibit C.

The ECF headers on these pages are microscopic, but
essentially the first page, which is page 8 of ECF 99-1 shows
Proctor and Hill paying taxes in 1893 on a variety of land.
Moving to the second page, the second and third pages, which
are pages 11 and 12 of ECF 100-1, those are taxes for 1898
shows Union Tanning paying taxes on a number of properties and

1  Proctor and Hill making similar payments for other properties.

2          So Proctor and Hill were certainly complying with the

3  law there.  Their ownership interest at that point in those

4  properties was certainly well known to Bradford County

5  officials, and incidentally there's nothing to suggest that

6  that their retained holdings were not otherwise known to the

7  assessor.

8          Going to the fourth page of Exhibit C, which is page

9  19 of ECF 100-1, there one could see Union Tanning paying taxes

10  and J.A. Hill paying taxes, and what's interesting there is

11  Your Honor may recall the starting by virtue of the Act of 1897

12  that we cited in our papers the assessors were required to list

13  the owners, if known, and if Your Honor looks in the column

14  titled *Township* in the left margin of that column the court can

15  see pencil notations showing either P and H or UTCO for Union

16  Tanning.

17          And then of course the last page of Exhibit C, which

18  is for 1906, then goes on to show that Central Pennsylvania

19  Lumber Company pays taxes and is listed in the township column

20  as the owner.  So that's the first principle.  And then there

21  was, there is also in addition to the post hoc evidence from

22  the late teens and twenties there's other circumstantial

23  evidence showing that in fact the Proctor and Hill subsurface

24  interest was recorded and known to the assessors.  Starting

25  with what we compiled as Exhibit D, those reflect that where

01:48PM

there were properties that were the subject of acts of
production in Bradford County, they were separately assessed
as seated land.  And we've also shown the court the
circumstantial evidence showing how severed subsurface
interests were separately taxed in Lycoming County.

Like for example that's Exhibit E.  The first, the
second page of Exhibit E for example, the fourth line down
lists warrant number 419 as 289 acres which is the William
Chancellor warrant, owner listed as CPL Co., Central

01:49PM

Pennsylvania Lumber Company.

If you go to the next to last page of that exhibit
there's a statement, "The following tracts of land assessed to
the undersigned as owners of all coal, etc., including oil and
gas," and the first one there is the William Chancellor warrant

01:49PM

419, 289 acres, and it lists the Proctor heirs and it
specifically references the deed book by volume and page that
contains that reference.

Admittedly this is a different county, but we believe
that it's still competent evidence of Proctor's and Central

01:49PM

Pennsylvania Lumber Company's essential business practices, I
think it's also --

THE COURT: I think I understand that argument.  Let
me, let's get to, you know, sort of the heart of your argument
that if CPLC properly reported its surface interest, there is

01:50PM

no possible way that the 1908 tax sale could have included your

subsurface estate.  But isn't it also true you never reported

your, or there's no evidence that you reported your severed

subsurface ownership which never, you never had it separately

assessed, you paid separate taxes on it.  Isn't it reasonable

01:50PM that Bradford County could have concluded that the entire

warrant was to be assessed and sold from 1907 taxes?

MR. STOCKMAN: Okay, I'm going to try and break that

out, Your Honor, because I think there are three separate

things that I'd like to discuss in that context, and the first

01:51PM is respectfully I would like to take issue with the concept

that Proctors did not report their interest. I think the

evidence that we cited that I just discussed shows that the

Proctor family did so, and Proctor and Hill in this case.

There's correspondence showing the Proctors, you

01:51PM know, reaching out to officials to obtain tax payments, and

there's also another part, Your Honor, showing how the Hill

family who lived in Towanda acted as intermediaries in that

respect.  So then moving from that proposition, once there is a

proper recording in CPLC's deed page of their partial ownership

01:52PM in these warrants, of its surface only ownership, the law is

clear.  Herder Spring says under those circumstances that there

has to be separate inspection of the surface and subsurface.

Herder Spring at 143 Atlantic 3rd at 364 quotes

Wilson for the proposition that where there is divided

01:52PM ownership of the land, there ought to be a divided taxation.

1    It goes on at page 372 to say, "If neither the tellers nor the

2    purchaser of the surface rights in 1899 reported the transfer,

3    then the Centre County commissioners would have assessed and

4    taxed the owners in the warrant in its entirety."  We

01:52PM  5    unequivocally stated in Hess, which is <u>Hess vs. Gephard</u>, that

6    the tax system relating to unseated land including the Acts of

7    1806 and 1815, treated unseated land entirely in reference to

8    the original warrant when not otherwise directed by the owner.

9         Here of course we believe that there's ample evidence

01:53PM  10    that the assessors were otherwise directed by the owners.  That

11    rule has been applied in other cases as well. I'd refer to

12    court to <u>Sanderson vs. City of Scranton</u>, which is 105 PA 469

13    from 1888.  Also City of Reading vs. Finney, 73 PA 467 472, and

14    of course under <u>Herder Spring</u> there is the presumption that

01:53PM  15    that the assessors in conducting their assessment did so

16    rightly, rightly done.  That's 143 Atlanta 3rd at 365.  Again

17    that's consistent with prior Pennsylvania law.

18         And I have two additional citations there.  The first

19    is <u>Beacom</u>, B-E-A-C-O-M, <u>vs. Robison</u>, 43 Atlantic 2nd 640, which

01:54PM  20    is a Superior Court case from 1945, and <u>McCoy vs. Michew</u>,

21    M-I-C-H-E-W, which is 7 Watson Sergeant 386, a Supreme Court

22    case from 1844.  And in fact if the assessors had intended to

23    assess the Josiah Haines warrant as a whole, even those there

24    has been reports identifying that it had been separated into

01:54PM  25    surface and subsurface interests, the assessment in fact would

1    have been void and the tax sale would have been null on that

2    ground, and in that respect I would like to cite Your Honor to

3    Fisk vs. Corey, C-O-R-E-Y, 21 Atlantic 594, which is a

4    Pennsylvania Supreme Court case from 1891, and McCormick vs.

01:55PM  5    Berkey, B-E-R-K-E-Y, which is a Supreme Court case from 1913

6    reported at 86 Atlantic 97.

7            There are other cases as well.  In that regard the

8    fact that there is no separate subsurface assessment of the

9    Josiah Haines warrant is as a matter of law irrelevant.  Under

01:55PM 10   the law that prevailed at the time subsurface estates could

11   only be assessed if there was actual production on the property

12   that would form a basis for valuing the property.

13           That's the Rockwell case that the parties have

14   discussed at length in their, in their papers.  And in these

01:56PM 15   cases where the properties have value it was assessed either on

16   the seated list or, as in Lycoming County, as a separate

17   minerals only assessment.  And I think what is interesting in

18   that respect is in that case the court found surface assessment

19   did not have any special notation or indication that this was a

01:56PM 20   surface only assessment.

21           Referring back to Exhibit E, we talked about the

22   William Chancellor warrant where there was a separate minerals

23   assessment, but if Your Honor goes to the surface assessment on

24   page 2 of Exhibit E, which is page 10 of ECF 131-1, the William

01:57PM 25   Chancellor warrant appears there with Central Pennsylvania

1   Lumber listed as the owner with nothing to indicate that it was

2   a surface only assessment even though that could have been only

3   the case under the circumstances given that there was a

4   separate minerals assessment.

01:57PM   5              (Brief pause.)

6              THE COURT: Okay.  I don't have any other questions or

7   concerns at this time, but I may in the event that something

8   comes up during your opponent's argument, and I would like to

9   ask Mr. Bechtel to weigh in on the issues that I discussed with

01:57PM   10  you, in particular does he have any relevant legislative

11  history treatise, discussion, or other interpretive guidance

12  regarding the Act of June 6th, 1887, and I mentioned previously

13  that that in particular seems to be a bit of a game changer in

14  terms of the obligation of -- strike that, I don't mean

01:58PM   15  obligation, I mean the redemption only argument that has been

16  raised by the Proctor trust, and Mr. Bechtel, maybe you can

17  speak to that.

18             MR. BECHTEL: Well, Your Honor, this is Brad Bechtel.

19  I have read the Act of June 6th, 1887.  I can't say that I have

01:58PM   20  anything that interprets it.  It seems a pretty simple act that

21  says the owner or owners have an obligation to pay taxes or the

22  property gets charged and sold.  I'm not sure why that has

23  anything to do with the redemption argument to the owners, but

24  it talks about it and the owner or owners in 1907 were Union

01:59PM   25  Tanning, Central Pennsylvania Lumber, and the Proctors.  A lot

of this seems to forget for some reason when we talk about
Central Pennsylvania lumber the Proctors are an owner also.

I mean when we talk -- well, I'll try not to jump
ahead, but just looking at that, you know, <u>Powell vs. Lantzy</u>,
01:59PM these are separate estates, each estate, including Union
Tanning, has an estate at that time, and any one of them could
have paid the tax.  This assessment is in fact, all the
wonderful arguments aside, the assessment, which is the most
competent evidence from the time of what was assessed says it's
01:59PM an unseated Josiah Haines warrant.

Other warrants could be different.  Some could be
seated. Some could be separated and assessed separately.  Some
in other counties could be separated and assessed differently.
The warrant we're looking at is Josiah Haines.  There's a
02:00PM reservation, yes, because every warrant is different, as Judge
Schwab knew, as the plaintiff's counsel knows, that some
warrants aren't in this litigation.  That's because Proctors
owned some warrants, and they weren't lost at tax sale.

So those warrants subject to would operate
02:00PM differently.  To put all this together and say oh, it's all or
one when it's in my favor but they're all separate when it's
not ignore the realities.  And what was reported, I mean
Proctor bought this property at one point.  They say Proctor
reported something.  We don't know what reporting means.
02:01PM Doesn't say it has to be in writing.  Doesn't say it has to be

in oral.  Could be at the tavern, could be popular
understanding, we don't really know, but the fact of the matter
is there's an assessment, again the best competent evidence,
there's an assessment for an unseated warrant as a whole.

02:01PM    THE COURT: I'm sorry, Mr. Bechtel, can I interrupt
you for a second?

    MR. BECHTEL: Oh, you may.

    THE COURT: I'm not sure that I'm seeing the actual
assessment and I'm not aware that anyone has directly pointed
02:01PM  to it.  I know both parties have talked about it ad nauseam.
I'm not sure I have seen the assessment itself that you're
referring.

    MR. BECHTEL: I believe any assessment within the --
I mean, Mr. Stockman just talked about it, Exhibit B perhaps,
02:02PM  looked at the assessment books.  He actually looked at the
pencil notations to the side.

    THE COURT: Well, I'm wondering what you're referring
to as the assessment.  Just get --

    MR. BECHTEL: The assessment books and those are the
02:02PM  assessments.  I believe -- I believe, I mean they're in the
prior record.  I believe they're in this record.  I can't
easily open up his e-mail to see which exhibit it was, and I
don't have a printer here, so I can't print any of them, but I
believe they were, there's an exhibit and it shows the
02:02PM  assessment record and it says taxes paid by who, and I would

suggest that for presenting the assessor did this properly, he

did exactly what he said.  He listed who paid the taxes, not

who owned the property or owner or reputed owner or who owned

the surface or who owned the subsurface.  He told you who paid

02:03PM   the taxes, because that's what it says.

And on the left had said it'll say Josiah Haines,

it's an unseated list, Josiah Haines warrant.  It doesn't say

Josiah Haines surface.  It doesn't say Josiah Haines

subsurface.  It doesn't say Josiah Haines tan bark.  It says

02:03PM   Josiah Haines unseated.  There's no evidence that anybody told

anybody to do anything, but if they did, it started with the

Proctor.

When Union Tanning bought the property what did Union

Tanning tell the assessor.  Did they perhaps say we bought

02:03PM   Proctor's interest?  When CPLC bought the property did they

perhaps say oh, we bought Union Tanning's interest?  Is the

assessor not looking at the property and saying huh, is this

seated or unseated?  I don't know, looks unseated to me,

there's no permanent occupancy, which in fact there isn't, has

02:04PM   never been on this warrant, and he just said oh, I'm going to

tax it as unseated.

And for what it's worth, all this evidence that they

show that the Proctors routinely by business did these things,

yeah, until they didn't want to.  I mean, we've heard Paul's

02:04PM   story about these people and their businesses, and I haven't

told the story of the robber barons.  It's actually not
relevant at this point.  This is a motion for summary judgment,
take it as true, any you can recover.  We are on
reconsideration.  You've already made a decision, so we're
looking back saying oh, is that right or not, and I would
suggest that -- how do I want to say this?

If the facts come in for each and every parcel we can
talk about them, but they're just going to be argument.  You've
seen all the facts.  The facts are the facts. The relevant
isn't relevant. There was an unseated assessment.  We know
that.  It did not separate it.  It was not challenged while
Proctor was an owner.  It was not challenged while Union
Tanning was an owner.  It was not challenged while Central
Pennsylvania Lumber Company was an owner.

The mine, we don't even know if those mines existed,
and the letters that were attached as an exhibit that show oh,
look, there was, I think they said there were negotiations
about opening mines.  Those letters are never answered.  I
mean, I can't tell you how many times I get letters from people
who claim to own property that the Commonwealth owns.  Do I
always answer them?  No. I mean, sometimes you get tired of
answering them, too.

Wouldn't it be interesting to see what the answer was
to that letter, or if there was an answer at all? So when we
say oh, look, we obviously know, we don't know these things.

1   All we know is what the assessors told us, which is this is an

2   unseated parcel, we're selling it for taxes.  Nobody challenged

3   it. Here's where it went.  And Powell vs. Lantzy, I get it,

4   there's a phrase in there about wrongdoing.  Who says it's

02:06PM   5   wrongdoing?

6          I mean, a duty with no consequence is no duty at all.

7   A duty shared by everybody is not a duty.  I mean, the owner or

8   owners shall pay the taxes.  Powell vs. Lantzy speaks exactly

9   to that situation.  There's two different ownerships,

02:06PM  10   subsurface, surface, in this case even Tan Bark. Any one of

11   them could have paid those taxes to protect their interests,

12   any seated property, but not any one of them could have claimed

13   for any of that money back.

14          In this case all these guys looked at this 1907 and

02:07PM  15   they played bluff, who's going to pay first. Nobody paid.  The

16   property went to sale. Dawes and McCauley Junior bought it. We

17   can argue how and when he became an agent, if he became an

18   agent. Maybe he became after agent after he did his job.  He

19   was a real estate broker or agent or something, he became an

02:07PM  20   attorney.  Who knows?  Might have been a smart move on the part

21   of Central Pennsylvania Lumber to give him a job.  They figured

22   he bought this property.  We don't know.

23          It is irrelevant.  They are not the same estate.

24   They don't owe a duty to the Proctors to buy this back.  They

02:07PM  25   don't owe a duty to the state to buy this back.  They in fact

1   have law that tells them that they can let it go to tax sale

2   and buy it to clear the title. As we know, Union Tanning,

3   they're not going to pay the taxes.  They just strip bark from

4   the same, so what do they want it for?  So everybody played

02:08PM   5   bluff.  Somebody bought it in.  Nobody complained.  A hundred

6   and forty years later now someone's saying well, we didn't

7   really have to do anything.  We could just sit on it. We want

8   to up end, and here we keep saying all is said very well, this

9   isn't in accordance with the law.

02:08PM   10         Well, in fact if you look at the Pennsylvania law,

11   Herder Spring, Cornwall, Keta, you get down to this principle

12   has been upheld for a hundred and something years.  This is a

13   little longer than that.  There is not a new principle.

14   Everyone knows the second or whatever it is in June, second

02:08PM   15   Tuesday in June every two years you're having a tax sale.

16         I dare say Proctor and Hill bought property at tax

17   sale.  They all know.  They chose not to go for whatever

18   reason. Probably because it wasn't valuable.  And when it was

19   like in Lycoming, when it was like with an active mine, they

02:09PM   20   took care of it.  And when it wasn't, they didn't pay

21   attention.  And the consequence of that they didn't pay their

22   taxes any more than anybody else does, the unseated warrant got

23   sold.

24         I guess that's where I look at the Act of 1887 and I

02:09PM   25   think it tells me exactly what I know.  I mean, it tells me

what I understand.  Why we're saying it creates something I'm
not sure.  That's just what you do.  And when we say oh, well,
look at this second issue and how CPLC is profiting from
wrongdoing, I'm saying it's not wrongdoing.  It's not immoral.
It's a legal mechanism that the Commonwealth set up to clear
title for unseated warrants because they wanted people to start
paying taxes on them.

The whole reason of 1805, 1815, 1885, the whole
reason for these laws were people were trading these properties
like stock in large cities and not paying their taxes, and they
didn't know who they were and they wanted to find them and they
wanted to get them into the hands of people who would develop
the properties, make them seated, and pay taxes.  And in order
to do that they had to get clear title, because these stocks
were being traded, these properties were being traded, and
they're being split up all over the place and how in the world
is anybody going to invest money and do this if they could
possibly lose it a hundred and forty years later.  That just
doesn't seem right.

THE COURT: I'm sorry, Mr. Bechtel, let me just
interrupt you. Isn't it true that under Powell it is not a
legal mechanism if in fact CPLC defaulted on its taxes and
caused the tax sale?

MR. BECHTEL: I would disagree.  If you say CPLC
defaulted, did not the owner or owners default?  And are not

Union Tanning, CPLC, and Proctor and Hill owner or owners?
They're all owners.  And not joint owners.  Not joint tenants.
They're all owners.  If they didn't pay the taxes it went to
sale, and the other cases we've discussed have told us you can
as one of those people buy that property from sale, just like
anybody else.

It's not illegal.  It's not immoral.  It's a
consequence.  You're told pay your taxes or we're going to sell
it.  All of them were told, not just Central Pennsylvania
Lumber.  That law, 1887, it says owner or owners.  It's
anticipated there's going to be more than one owner.  Any of
the owners can pay the tax.  Powell anticipates that, because
any of them can pay it, and they can't seek contributions
after.

Right, I mean, that's been the law.  I don't know
exactly how else to say that.  I mean, I've grown up with this,
I've heard it, and this is how it's been interpreted, how it's
been interpreted in Herder Spring, how it's been interpreted in
Cornwall, how it's been interpreted in Keta.  We're turning it
on its head when we try to say oh, well, somebody individually
has a duty.

THE COURT: I understand your argument, Mr. Bechtel.
Proctor Trust is saying you can't get a better title, you being
CPLC, assuming McCauley is the agent, and you can't create a
better title by default and you're saying the default wasn't

just you defaulted or the agents defaulted or the prior owners

defaulted.  It was all the prior owners defaulted.  I

understand your argument.

MR. BECHTEL: Right.

THE COURT: Okay.

MR. BECHTEL: Right.

THE COURT: Well, a very interesting case, interesting

circumstances, and a very interesting procedural posture now

that we are on reconsideration.  I have, I have some things

that I'll need to research search a bit further. I'm going to

allow Mr. Armstrong to present the transcript to the parties

for purposes of adding to any additional arguments that you've

made orally.

If there are particular cases that you believe you

want to bring to my attention before, before I begin to write

on the motion for reconsideration, please do so within ten days

of your receipt of the transcript.  Is there anything else the

parties would like to present on the record before we go off

the record?

MR. STOCKMAN: Your Honor, this is Paul Stockman.  If

I might respond very briefly to a couple of the things that my

counterpart said?

THE COURT: I'll allow that.  But, Mr. Bechtel, I'm

going to give you the final word.  And do the parties want the

exhibits admitted into the record? The exhibits that were

attached I believe to, I have the docket in front of me and

it's daunting to determine which exhibits were already part of

the record and which may have just been presented recently.

MR. STOCKMAN: Your Honor, this is Paul Stockman.

02:15PM Of the Exhibits A through H that we presented, all are in the

record except Exhibit H, which is an excerpt of two newspaper

accounts, and Exhibit B, which is some additional assessment

records that we came across after briefing was complete on this

motion.

02:15PM I believe both would be subject to judicial notice

and we can certainly present the request for judicial notice to

the court in that respect and also direct the court to where in

the record the specific exhibits are to the extent they're in

the record.  Would that be the court's preferred way to

02:16PM proceed, or would the court prefer just to submit everything at

once?

THE COURT: Well, let me first find out if Mr. Bechtel

has any objection considering that this is simply going, there

are a lot of issues to the weight of any of this evidence.

02:16PM But, Mr. Bechtel, do you have any objections with respect to

the admissibility of any of these matters for the purposes of

the court's ruling on the motion for reconsideration?

MR. BECHTEL: This is Brad Bechtel. I appreciate, Your

Honor, subject to the argument as to the weight of the

02:16PM information, I have no objection to you seeing them or having

them for consideration on this particular motion for
reconsideration.

THE COURT: Okay.  Then they are admitted and the
court will determine the significance or relevance of the
materials presented that were not previously provided to the
court, and I'll make that clear in terms of any decision that's
rendered.  All right, Mr. Stockman, you have my attention.  You
may speak in rebuttal.

MR. STOCKMAN: Okay.  Thank you, Your Honor.  I will
do my best to minimally occupy your remaining time.  I would
like to start with the generalized observation that with all
due respect to my colleague, a lot of what we heard was
speculation.  Speculation about what the legislature intended,
speculation about what the owners intended.  Everybody played
bluff.  People chose not to go.

There was a suspicion that, that the Proctors
reported their subsurface interest selectively, and I would
submit to Your Honor that that's speculation, certainly is not
sufficient to entitle the Game Commission to a judgment in its
favor.

Taking the issue of selective reporting, I think the
McIntyre Township assessment puts a lie to that supposition.
What that reflects is first of all the McIntyre Township
assessment reflects reporting made to Lycoming County, because
the reporting under the Act of 1806 is made purely on a county

02:19PM

level, and the county then transmitted that information to township.  And so what the McIntyre Township assessments show is that the Proctors took their deed showing the reserve subsurface interest to the county commissioners, and in order for there to be selective reporting, that would have to assume that the county commissioners looked at the list of dozens of separate tracts and said well, we're going to pass up the opportunity to tax these and we're only going to write down these two, which is not an inference that comports with what we would expect tax authority to do when presented with a list of properties for potential assessment and taxation.

The second point I'd like to make is when Mr. Bechtel says the owners defaulted, including CPLC, Union Tanning as the holder of bark rights, and the Proctor and Hill interest as the subsurface owners, that overlooks the fact that under Herder Spring and Wilson and Sanderson and the other cases we've cited to Your Honor, that once separate interests in a property are reported and whether it's surface or subsurface, or whether a property's and seat was subdivided down the middle half and half, once there is that reporting they are separate estates for tax purposes and the assessors are obligated to assess them separately.

So it essentially begs the question that the owners defaulted, that because these interests were reported Central Pennsylvania Lumber Company alone had the obligation to pay

02:21PM

1  taxes on its separate surface interest.  The next point I would

2  like to make is Mr. Bechtel, talking about what kind of

3  reporting was made, he said well, maybe Union Tanning said we

4  bought Proctor's interest or CPLC said we bought Union

5  Tanning's interest. I think that's the issue that Your Honor

6  has already grappled with.

7        If that's the case, then those entities failed to

8  comply with the Act of 1806 because they didn't accurately

9  report the unseated lands to which they became a holder, and

10  when they inaccurately reported the sale to comply with the Act

11  of 1806 that default, in addition to the default on paying

12  taxes, further prevents them from using that breach to improve

13  their title and to effectively seize someone else's property.

14        The last comment I'll make very briefly is that in

15  Powell, the reason that Powell and Lantzy did not have an

16  obligation to pay each other's taxes was because there was a

17  cotenancy situation.  With all of that I'm going to stop

18  talking.

19        I thank you for the opportunity to talk about these

20  issues and we especially appreciate Your Honor letting us know

21  what specific issues were on your mind.  It's a rare and

22  wonderful thing to know what the court is thinking before you

23  walk into court. Thank you, Your Honor.

24        THE COURT: All right. Thank you, Mr. Stockman,

25  Mr. Bechtel, I'm happy to hear from you, and you have the last

word.

MR. BECHTEL: Thank you, Your Honor.  This is Brad Bechtel.  I will endeavor to be likewise brief.  I'd just like to say I don't believe that a lot of what I said was speculation as much as description, and that's really what we're dealing with.

We have a certain set of facts and we have attorneys describe them in the way that is preferable for our client. There was a statement that McIntyre Township puts the lie to the fact that there was no reporting.  I would suggest it's the opposite. Bradford County's assessment that don't include separate assessment puts the lie to the idea that they always did it this way.

I would like to go to Herder Spring is because there was reported, there's no real evidence that anything was reported to Bradford County, because Bradford County assessed this property as an unseated Josiah Haines as a whole.  There's nothing showing, no letters, nothing.

And Herder Spring said once there's a severance it ought to be reported. I don't believe it said it had to be.  In fact, it wasn't.  It's nice that we say what ought to be or what should have been. We're looking at the fact one hundred forty years ago of what did happen, and what did happen was that Josiah Haines was assessed as a whole.

Let me just bring it up to ask, if Proctor and Hill

1  had paid the taxes in 1907 would it only have been on their

2  subsurface estate?  Of course not.  The warrant wouldn't have

3  gone to tax sale.  The whole warrant.  If Union Tanning had

4  paid the taxes in 1907, if they had come in and paid them,

02:24PM  5  would it only have been the bark rights that didn't get sold?

6  Of course not.

7          The whole warrant would not have been sold.  Likewise

8  when no one pays the taxes it's not just a piece of the warrant

9  that's sold.  It's the whole warrant that's sold.  The logic,

02:24PM 10  it's there.  This is how it was assessed.  Therefore that's how

11  it has to be sold.  And how is it inaccurate, how would it be

12  inaccurate for Central Pennsylvania Lumber to say we bought

13  what Union Tanning had?

14          That's not inaccurate.  Maybe that's not the way

02:25PM 15  Mr. Stockman would like it to be reported, but it's not

16  inaccurate, and it could very well be we still don't know how

17  Proctor and Hill reported it and what they told somebody.  So

18  for us to sit and say well, this is what did or didn't happen

19  and therefore it must be wrong or it must be right, that's

02:25PM 20  truly speculation.

21          All we know is this is what was reported.  Josiah

22  Haines unseated, here's the assessment, pay the taxes.  You

23  don't pay it, it goes to sale.  All right, I won't belabor

24  that.  I appreciate your time, Your Honor.

02:25PM 25          THE COURT:  Thank you, Mr. Bechtel.  I appreciate the

information that both parties have supplied both in writing and today orally.  I did want to address one additional matter before we go off the record, and I hope that this is clear, but I was a bit concerned with some of the language I heard in the, or read in the briefing regarding the factual statements that were made in the court's December opinion.

In fact there was I think in the Proctor Trust memoranda assertions that the court conclusively found, an let me just identify them, one, McCauley was acting as an agent of CPLC at the 1908 tax sale; two, the Josiah Haines warrant was seated in character at the time of the 1907 assessment; three, CPLC properly reported its surface only unseated interest pursuant to the Act of 1806; and four, that CPLC's default on the 1907 taxes was intentional.

We made no such definitive factual findings.  I simply construed the record facts in a light most favorable to nonmovant, the Proctor Trust, as required by Rule 56 and applied that version of facts to the law.  That's not to say there isn't record evidence of some of those findings, but a final determination on factual issues is necessary for the resolution of this case.

When they're in dispute they're obviously reserved for a jury, so please keep that in mind.  And I hope that it was clear why we consistently qualified our conclusions on these issues with Rule 56 language or explained that certain

findings were either assumed for argument's sake or considered

in the alternative, but the way the presentations were made in

advance of this oral argument it led me to believe that there

may have been some misconceptions about what specifically we

02:28PM 5 determined in our December 2019 opinion.  So I wanted that to

be very clear to both parties.  All right, is there anything

else that the parties would like me to hear on the record

before we close the record?

9           MR. STOCKMAN: Your Honor, this is Paul Stockman.

02:28PM 10 Nothing else from the Trust.  I apologize if we overstated the

court's conclusions.  It's human nature, you read sometimes

what you want to read, and given that we believed, you know,

in the presence of cross motions that judgment was supportable

in our favor, I think we probably were wearing our rose colored

02:29PM 15 glasses a bit, but we understand your position and what you

said.

17          THE COURT: All right. Very good.

18          MR. BECHTEL: This is Brad Bechtel.  I have nothing

further.  Thank you.

02:29PM 20          THE COURT: All right.  Thank you.  Let's move off the

record to determine when the transcript may be made available

to the parties.

23          (Hearing concluded at 2:30 p.m.)

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3      Commonwealth of PA, PA Game Commission vs. Thomas Proctor

 4                      1:12-CV-01567-CCC

 5                  Oral Argument Teleconference

 6                        1 April 2020

 7

 8          I, Wesley J. Armstrong, Federal Official Court

 9   Reporter, in and for the United States District Court for

10   the Middle District of Pennsylvania, do hereby certify that

11   pursuant to Section 753, Title 28, United States Code that

12   the foregoing is a true and correct transcript of the

13   stenographically reported proceedings held in the

14   above-entitled matter and that the transcript page format is

15   in conformance with the regulations of the Judicial Conference

16   of the United States.

17

18                  Dated this 3rd day of April 2018

19

20

21

22              /s/ Wesley J. Armstrong

23              _____

24              Wesley J. Armstrong

25              Registered Merit Reporter
```

U.S. District Court, Middle District of PA