## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,** | : : : : | **CIVIL ACTION NO. 1:12-CV-1567** **(Chief Judge Conner)** |
| **Plaintiff** | : : | |
| **v.** | : : | |
| **THOMAS E. PROCTOR HEIRS TRUST and MARGARET PROCTOR TRUST,** | : : : : | |
| **Defendants** | : : | |

### MEMORANDUM[1]

Millions of acres of Pennsylvania land are situated above the Marcellus Shale, an underground sedimentary rock formation spanning multiple states and containing massive reserves of natural gas.  Experts conservatively value that gas in the hundreds of billions of dollars.  Relatively new methods of drilling—most notably hydraulic fracturing or "fracking"—have unlocked the potential to tap these subsurface gas reserves.  To no one's surprise, the ability to reach this lucrative natural resource has engendered sophisticated ownership disputes like the one before this court.

---

[1] This memorandum is issued in accordance with the court's order (Doc. 182) of April 21, 2020, granting defendants' motion for reconsideration.  This memorandum supersedes the court's vacated memorandum (Doc. 165) of December 18, 2019, in all respects.

Plaintiff, Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), claims that it owns both the surface and subsurface rights for numerous tracts of land in Sullivan and Bradford Counties in northeastern Pennsylvania.  Defendants, Thomas E. Proctor Heirs Trust and Margaret O.F. Proctor Trust (collectively, "Proctor Trusts") disagree, contending that they hold superior title to the subsurface estates underlying these tracts.  A lengthy and complex legal battle has ensued, culminating in cross-motions for partial summary judgment regarding a bellwether tract of land in Bradford County.  (Docs. 94, 123).  Chief Magistrate Judge Susan E. Schwab issued an extensive report, (Doc. 155), recommending that the cross-motions for summary judgment be denied.  Both parties have filed objections to Judge Schwab's report.

## I.   **Factual Background and Procedural History**[2]

We need not repeat the comprehensive factual and procedural background Judge Schwab supplied, (see Doc. 155 at 1-10, 19-24), familiarity with which is presumed.  The following is a consolidated version of undisputed facts most pertinent to the parties' objections and pending Rule 56 disputes.  These factual

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 95, 121, 125, 129).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

details primarily relate to the Josiah Haines warrant—the bellwether tract that is the focus of cross-motions for partial summary judgment.

In 1893, Schrader Mining & Manufacturing Company conveyed the Josiah Haines warrant—located in LeRoy Township, Bradford County—to Thomas E. Proctor ("Proctor") and Jonathan A. Hill ("Hill").  (Doc. 95 ¶ 5).  The following year, Proctor and Hill and their wives deeded the property to Union Tanning Company ("Union Tanning"), "reserving" the subsurface rights to minerals, oil, gas, coal, and petroleum (hereinafter "mineral rights" or "subsurface estate").[3]  (Id. ¶¶ 8-9).  This conveyance effectively severed the surface and subsurface estates of the Josiah Haines warrant, vesting those rights in separate owners.  In 1903, Union Tanning conveyed its surface ownership interest in the Josiah Haines warrant to Central Pennsylvania Lumber Company ("CPLC"), excepting the rights to certain tree bark and conveying the property "subject to" all prior exceptions and reservations.  (Id. ¶¶ 13-15).  In June 1908, Calvin H. McCauley, Jr. ("McCauley"), purchased the

---

[3] Proctor and Hill used the term "reserving" in their 1894 deed to Union Tanning, but they should have used "excepting" with regard to their preservation of mineral rights.  The terms "reservation" and "exception" have distinct legal meanings.  A reservation in a deed creates a new right or interest in real property that did not previously exist at the time of the conveyance.  See Lauderbach-Zerby Co. v. Lewis, 129 A. 83, 84 (Pa. 1925).  A common example of a reservation is a newly created easement for the grantor in land conveyed, which right did not exist before the conveyance.  See, e.g., Baptist Church in Great Valley v. Urquhart, 178 A.2d 583, 586 (Pa. 1962).  An exception, on the other hand, retains for the grantor title to an existing interest excluded from the transfer.  See Lauderbach-Zerby Co., 129 A. at 84; Ralston v. Ralston, 55 A.3d 736, 741-42 (Pa. Super. Ct. 2012).  An exception "is always part of the thing granted, it is the whole of the part excepted" from the conveyance.  Lauderbach-Zerby Co., 129 A. at 84.  Hence, it is more accurate to state that Proctor and Hill "excepted" the mineral rights from their conveyance to Union Tanning.

Josiah Haines warrant at the Bradford County treasurer's sale (hereinafter "tax sale" or "treasurer's sale") when the property was sold to recover unpaid taxes for 1907. (Id. ¶¶ 23, 25). Exactly what interest—whether only surface rights or both the surface and subsurface estates—this 1908 tax sale conveyed is the gravamen of the instant dispute.

In December 1910, McCauley and his wife—in consideration of a recited payment of $1.00—quitclaimed all interest in numerous properties, including the Josiah Haines warrant, to CPLC. (Id. ¶ 31). Finally, in 1920, CPLC conveyed its interest in the warrant to the Game Commission, "subject to" the prior 1894 Proctor and Hill mineral rights exception and any exceptions or reservations in the 1903 deed from Union Tanning to CPLC. (Id. ¶¶ 37-38).

Since 1980, Proctor's heirs, who comprise the Proctor Trusts, have been leasing the Josiah Haines warrant for oil and gas development. (Id. ¶¶ 46-47). The Proctor Trusts and the Game Commission now seek to quiet title to the subsurface estate of the warrant, asking the court to enter judgment as a matter of law as to ownership thereof.

## II.  Legal Standards

### A.  Review of a Magistrate Judge's Report and Recommendation

When a party objects to a magistrate judge's report and recommendation, the district court must review *de novo* the challenged portions of the report. 28 U.S.C. § 636(b)(1)(C); Brown v. Astrue, 649 F.3d 193, 195 (3d Cir. 2011); LOCAL RULE OF COURT 72.3. Uncontested portions of the report are reviewed for "clear error on the face of the record." Clouser v. Johnson, 40 F. Supp. 3d 425, 430 (M.D. Pa. 2014)

(quoting <u>Cruz v. Chater</u>, 990 F. Supp. 375, 375-78 (M.D. Pa. 1998) (quoting FED. R. CIV. P. 72(b) advisory committee's note to 1983 amendment)).

## B.    Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  <u>See</u> <u>Lawrence v. City of Philadelphia</u>, 527 F.3d 299, 310 (3d Cir. 2008); <u>see</u> <u>also</u> <u>Johnson v. Fed. Express Corp.</u>, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in a light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56;

Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III. Discussion

The parties' numerous objections to Judge Schwab's report[4] can be distilled into several fundamental disagreements: *first*, whether Judge Schwab was correct in determining that there is a genuine dispute of material fact as to the character—seated or unseated—of the land constituting the Josiah Haines warrant when assessed in 1907 and sold at the 1908 tax sale; *second*, whether there is a material factual dispute regarding an agency relationship between the 1908 tax-sale purchaser (McCauley) and CPLC; *third*, whether language in the 1920 deed prevented the Game Commission from obtaining title to the subsurface estate; and

---

[4] The parties filed their cross-motions for partial summary judgment shortly after the Supreme Court of Pennsylvania issued its seminal decision in Herder Spring Hunting Club v. Keller, 143 A.3d 358 (Pa. 2016). Judge Schwab, aware of the importance of Herder Spring, provided a detailed recitation of the facts and holdings of that case. (See Doc. 155 at 4-8). Accordingly, we presume familiarity with Herder Spring and the "title wash" concept discussed at length therein. See Herder Spring, 143 A.3d at 366-68.

*fourth*, whether federal due process concerns affect the validity of the 1908 tax sale.[5]

We address these intricate disputes *seriatim*.

### A.       Character of the Land

The Game Commission's claim to the subsurface estate underlying the Josiah Haines warrant relies entirely on the premise that the 1908 tax sale "washed" the title and rejoined the previously severed surface and subsurface estates, thereby giving good title to the entire warrant to McCauley, the tax-sale purchaser. According to the Game Commission, Herder Spring's endorsement of the title-wash phenomenon squarely answers the ownership claims in this case. The Game Commission contends that because the warrant was unseated and assessed as such, and because there is no evidence that Proctor and Hill reported their subsurface interest for separate assessment to the Bradford County commissioner, the warrant

---

[5] Judge Schwab also addresses the Proctor Trusts' motion to strike the Game Commission's expert evidence and recommends striking portions of that evidence. (See Doc. 155 at 11-17 & nn.8-9). The Game Commission objects to this recommendation, but after *de novo* review we are in complete agreement with Judge Schwab's analysis and conclusions, and we will adopt them as our own. In particular, we note that the Game Commission misapprehends Rule 56 standards and procedure when it repeatedly claims that the court is "the trier of fact." (See, e.g., Doc. 142 at 1, 5, 10; Doc. 158 at 17, 19). The court *is not* the trier of fact in this case. That task is the sole province of a jury, and indeed a jury trial has been demanded. (See Doc. 66 at 29). The court's role at summary judgment is to determine whether a genuine dispute of material fact exists such that trial is required. See Anderson, 477 U.S. at 249. We acknowledge the Game Commission's related assertion that its expert's report merely seeks to clarify the complex title-transfer issues in this case. Nevertheless, we agree with Judge Schwab that the conclusions set forth in the report regarding the legal effect of the 1908 tax sale and ownership of the disputed mineral rights impermissibly usurp the role of the court in this quiet title action.

was properly assessed as a whole in 1907 and sold as a whole at the 1908 treasurer's sale.

The Proctor Trusts counter that there is ample evidence that the Josiah Haines warrant was actually seated in character when it was assessed for 1907 taxes. Thus, it was improperly sold as unseated at the 1908 treasurer's sale. According to the Proctor Trusts, the 1908 treasurer's sale was void because of this error, and the sale did not divest Proctor and Hill of their subsurface rights. Judge Schwab found that there is a genuine dispute of material fact regarding the character of the land when classified as unseated by the county assessor in 1907, precluding summary judgment.

Our analysis of this classification dispute is informed by Pennsylvania's historical treatment of land as seated and unseated. Prior to 1947, Pennsylvania's real property taxing practices varied depending on whether land was noticeably occupied or developed ("seated") or wild and undeveloped ("unseated"). Herder Spring, 143 A.3d at 363-64. This distinction directly impacted the parcel owner's potential tax liability. Owners of seated land could be held personally liable for the taxes assessed on their plot. Id. at 364. Because unseated land was deemed to be in its natural condition and owners often resided in another county or state, taxes for unseated lands were "imposed on the land itself"; owners were not held personally responsible. Id.; Northumberland County v. Phila. & Reading Coal & Iron Co., 131 F.2d 562, 565-66 (3d Cir. 1942). The county in which the unseated land was located, consequently, could sell that land at a treasurer's sale to recover any unpaid taxes— "the logical method of collection." See Northumberland County, 131 F.2d at 565-66.

County land assessors were responsible for "travers[ing] the county" to determine whether land was seated or unseated and for reporting such distinctions to the county commissioners for taxation purposes.  Herder Spring, 143 A.3d at 364; see also McCall v. Lorimer, 4 Watts 351, 353 (Pa. 1835).  It was the duty of the assessor to designate the land as seated if the assessor found "such permanent improvements as indicate a personal responsibility for the taxes," and, if no such improvements were evident, to designate the land as "unseated."  Hutchinson v. Kline, 49 A. 312, 313 (Pa. 1901) (per curiam); Dolph v. Everhart, 19 A. 431, 432-33 (Pa. 1890).  Hence, the distinction between seated and unseated land was in the "eye of the assessor."  Hutchinson, 49 A. at 313; Stoetzel v. Jackson, 105 Pa. 562, 567 (1884).

To prompt a "seated" designation, the appearance of the land itself must have indicated a visible "substantial occupancy."  See Rosenburger v. Schull, 7 Watts 390, 394 (Pa. 1838).  Substantial occupancy was evidenced by regular and continuous use of the land.  Watson v. Davidson, 87 Pa. 270, 270 (1878); see George v. Messinger, 73 Pa. 418, 422-23 (1873).  Importantly, neither actual residence nor developments made to increase the value of the land were prerequisites to seating a tract.  Watson, 87 Pa. at 271, 274.  Land could be seated if the property was used for resource-extraction endeavors like lumbering or mining, so long as the landowner or agent "carrie[d] on the business for so long a time and in such a manner continuously, from year to year, as to show an actual and permanent occupancy of the tract."  Id. at 274; see Herder Spring, 143 A.3d at 363 (citing Robert Grey Bushong, Pennsylvania Land Law, Vol. 1 § 469(II) at 500-01 (1938)).

1.      *Game Commission's Objection*

The Game Commission objects to Judge Schwab's determination that a genuine dispute of material fact exists as to the character of the land for the 1907 assessment.  The Game Commission contends that evidence offered by the Proctor Trusts is insufficient as a matter of law to find the Josiah Haines warrant seated in 1907, and that Judge Schwab erred by holding otherwise.  We disagree.

As Judge Schwab noted, the Proctor Trusts have proffered competent evidence that significant bark-peeling and lumbering activities occurred on the Josiah Haines warrant in 1905, 1906, and 1907.  In 1905, tanbark[6] was harvested from 60 acres of the warrant, yielding 300,900 net tons of bark and 189,500 feet of hemlock lumber.  (Doc. 95 ¶ 18).  The following year, tanbark was harvested from 201 acres, producing 1,000,000 net tons of bark.  (Id. ¶ 19).  Finally, in 1907, tanbark was harvested from 149.5 acres, yielding 104,300 net tons of bark.  (Id. ¶ 20).

What both parties fail to observe is that, when these annual bark-peeling figures are added together, they equal 410.5 acres—the exact acreage of the Josiah Haines warrant.  (See, e.g., Doc. 97-1 at 43; Doc. 98-1 at 70, 71, 92, 101).  In other words, by 1907, CPLC had stripped the *entire* Josiah Haines warrant—section by section—of all its hemlock bark.  This conclusion is buttressed by CPLC's plat

---

[6] The bark from hemlock, which contains high levels of tannin, was utilized extensively in the tanning industry in northeastern United States in the 1800s and early 1900s.  For an expansive discussion of this process, see Hugh O. Canham, *Hemlock and Hide: The Tanbark Industry in Old New York*, NORTHERN WOODLANDS, Summer 2011, https://northernwoodlands.org/articles/article/hemlock-and-hide-the-tanbark-industry-in-old-new-york.

"No. 15," which divides the warrant into three distinct sections and indicates that a different portion was "peeled as of" 1905, 1906, and 1907, resulting in the whole warrant being peeled by 1907. (See Doc. 104-7 at 2). It is likewise corroborated by the December 9, 1920 affidavit of A.R. Spicer, "First Vice President" and "General Land & Timber Superintendent" of CPLC, who averred that "all of the Hemlock bark has been removed from" the "410.5" acres comprising the Josiah Haines warrant. (Doc. 98-1 at 100-01).

It is true that the Proctor Trusts have provided little in the way of describing how the land may have appeared to an assessor following CPLC's bark-peeling activities. Nonetheless, scholars have indicated that hemlock peeling could have substantial effects on the character of the land. As explained by Hugh O. Canham, emeritus professor of forest and resource economics at the S.U.N.Y. College of Environmental Science and Forestry, the common method of harvesting tanbark was to cut down the hemlock trees, strip their bark, and leave the wood—which was less desirable than pine—to "rot in the forest." Canham, *Hemlock and Hide: The Tanbark Industry in Old New York*, *supra* note 6. This process resulted in "clearcut" hemlock forests and "denuded hillsides, with rotting hemlock trees stripped of their bark[.]" Id. "Each acre of these woods produced only twelve cords of bark, meaning that the average tannery consumed more than one hundred acres each year. Immense waste resulted, as the strippers took only the bark, leaving the bared logs to rot in the woods." Robert Kuhn McGregor, *Changing Technologies and Forest Consumption in the Upper Delaware Valley, 1790-1880*, 32 J. FOREST HIST. 69, 77 (1988). Indeed, tanneries' extensive hemlock-bark consumption "devastated

large portions of the region's forests." Id.  Additionally, due to the dusk-to-dawn nature of peeling work, bark peelers would "set up camps in the forest" during the peeling season, harvesting tanbark and sending it off to tanneries via horse-drawn wagons or sleds.  Canham, *Hemlock and Hide: The Tanbark Industry in Old New York*, *supra* note 6.[7]

We have little doubt that a reasonable juror could find that when the Josiah Haines warrant was assessed for taxes in 1907, the appearance of the land to the eye of the assessor could have implicated a "seated" designation.  There is significant evidence regarding "actual and permanent occupancy of the tract, with the use thereof," such that the assessor's classification of the tract as unseated could reasonably be questioned.  See Watson, 87 Pa. at 270, 274.  The Game Commission's argument that the facts in this case differ from those in Messinger and Watson is unavailing.  Under Pennsylvania law, what matters is not the type of improvement or business being carried on, but "the permanent occupancy and possession with the means afforded thereon for the collection of taxes." Id. at 274.  We cannot say that timber removal coupled with sustained and comprehensive bark-peeling activities on the Josiah Haines warrant would be insufficient to seat the land.  Judge Schwab's determination on this account is not erroneous.

---

[7] We do not rely on the cited scholarly articles as evidence in this case.  We provide this information simply to demonstrate that, were we to "give [the Proctor Trusts] an opportunity to properly support or address" the bark-peeling process and its effects on the land, such evidence could be supplemented.  See FED. R. CIV. P. 56(e)(1).  We need not take this step, however, because of our conclusion in Section III(A)(2), *infra*.

## 2.   *Permissibility of the Classification Challenge*

Whether the Proctor Trusts can assert this argument to attack the 1908 treasurer's deed over a century after the assessment and tax sale is a different matter.  After exhaustive review of relevant state and federal cases, as well as the legislative history of the applicable statute, we conclude that the Proctor Trusts' challenge is foreclosed by law.

Our starting point is the critical statute at issue, the Act of June 3, 1885 ("Act of 1885 or "the Act"), P.L. 71, § 1, which provides:

> All sales of seated or unseated lands within this commonwealth which shall hereafter be made for arrearages of taxes due thereon, shall be held, deemed and taken to be valid and effective irrespective of the fact whether such lands were seated or unseated at the time of the assessment of such taxes.  Provided, That nothing in this act contained shall validate or authorize the sale of any land which was in fact seated at the time of the assessment of the taxes thereon, in any case where there was sufficient personal property on the premises to pay all the taxes assessed thereon, liable under the laws of this commonwealth to have been seized therefor.

72 PA. STAT. AND CONS. STAT. ANN. § 5933.  The first sentence of the Act generally puts an end to attacking the validity of tax sales based on "the fact" of whether the land was really seated or unseated at the time of its assessment.  Its phrasing is clear and unambiguous.  However, the second sentence—the exception to the general rule—has injected needless confusion into state and federal jurisprudence.

In <u>Northumberland County v. Philadelphia and Reading Coal & Iron Co.</u>, 131 F.2d 562 (3d Cir. 1942), the court of appeals examined this exception in the context of a corporate-reorganization bankruptcy appeal; the case did not involve

validity of a tax-sale title.  The debtor coal company claimed that, because land which it had owned but had failed to pay taxes on for years 1937 and 1938 had been assessed as unseated, it was not liable for those taxes and was not obligated to pay them as an administrative expense.  <u>Northumberland County</u>, 131 F.2d at 563-64. The county rejoined that, although placed on the unseated list, the land was "in fact seated" and the county had evidence to prove it; thus, the coal company was obligated to pay the county approximately $174,000 in overdue taxes.  <u>Id.</u> at 564. The court described the question before it as "whether there is personal liability on the part of the owner for taxes assessed upon Pennsylvania land which has been assessed as unseated but which was at the time of assessment in fact seated."  <u>Id.</u>

After a lengthy recitation of tax treatment of unseated land in Pennsylvania, the court agreed with the county.  <u>Id.</u> at 564-66.  It explained that the Act of 1885, "while validating sales of lands as seated or unseated which were not so in fact, made it clear that the validation did not extend to lands which were in fact seated if there was sufficient personal property on the premises liable to pay the taxes."  <u>Id.</u> at 567.  The court then broadly pronounced, "The act . . . clearly contemplated that *the true character of the land as seated should always be open to inquiry* in determining the validity of proceedings taken to collect the taxes upon it."  <u>Id.</u> (emphasis added).  The court thus held that it was error to reject "evidence as to the actual character of the land" at the time of assessment and remanded the case for a

further hearing to "determine whether the lands here in controversy were in fact seated or unseated." <u>Id.</u> at 568.[8]

Conspicuously absent from the <u>Northumberland County</u> decision is any discussion of Pennsylvania cases which interpreted and applied the Act.  <u>See id.</u> at 564-68 & nn.12-15 (citing Pennsylvania cases dating from 1822 to 1869).  The <u>Northumberland County</u> court mentions only a single Pennsylvania case postdating the Act: <u>Dolph v. Everhart</u>, 19 A. 431 (Pa. 1890).  <u>See id.</u> at 566, 568 n.19.  But <u>Dolph</u> is cited merely to describe how a tract is determined to be seated or unseated, not when or how challenges to such a determination can be asserted following a tax sale of the land, as informed by the Act of 1885.  <u>See id.</u>

This omission is a glaring one.  Multiple Pennsylvania appellate court cases have directly addressed ramifications of the Act of 1885 on assessor classifications of land as well as the validity of subsequent tax-collection proceedings.  Most notably, eight months *before* the Third Circuit decided <u>Northumberland County</u>, the Pennsylvania Supreme Court analyzed these salient issues in <u>Scott v. Bell</u>, 25 A.2d 308 (Pa. 1942).  <u>Scott</u> is directly on point and it controls our determination in the instant case.

---

[8] The <u>Northumberland County</u> court's reliance on numerous Pennsylvania cases predating the Act of 1885 undoubtedly informed this conclusion.  <u>See id.</u> at 564-68 & nn.12-15 (citing Pennsylvania cases spanning from 1822 to 1869).  Those decisions, which permitted fact-intensive challenges to assessors' classification of land (and often resulted in tax titles being invalidated), were part of the impetus for the Act.  <u>See</u> <u>Scott v. Bell</u>, 25 A.2d 308, 309, 310 (Pa. 1942).

In <u>Scott</u>, the state supreme court considered whether the deed from a treasurer's sale of unseated land could be attacked as invalid by proffering evidence that "the lots when assessed were in fact seated land." <u>Scott</u>, 25 A.2d at 309.  The trial judge had considered evidence of the land's appearance and found, as a fact, that the land was unseated in character.  <u>Id.</u>  Based on this factual finding, the trial court held that the treasurer's sale passed good title to the tax-sale purchaser.  <u>Id.</u>

The supreme court concluded that such factual findings were unnecessary because the Act of 1885 controlled and validated the treasurer's deed.  <u>Id.</u>  The court first observed that, prior to the Act's passage, "the sale of land as unseated when it was in fact seated, or the converse, passed no title[.]"  <u>Id.</u> (citations omitted).  But by enacting this statute,

> the legislature in effect provided . . . that where land was "regularly assessed, either as seated or unseated, and where the procedure leading up to the sale was regular and *followed the assessment*, then the sale so made should be valid and effective, 'irrespective of the fact whether such lands were seated or unseated at the time of the assessment;' in other words, *irrespective of whether the assessor, in determining the status of the property made a mistake or not*."  That act made an important change in the law by validating sales *which followed the assessment* and it furnished some protection to purchases at tax sales by *foreclosing litigation as to whether the assessor had erred in determining whether the land was in fact seated or unseated*, a question which was often close and technical.

<u>Id.</u> (emphasis added) (quoting <u>Pittsburgh Hunting Club v. Snyder</u>, 51 Pa. Super. 174, 182 (1912)).  Prior to the Act of 1885, the court explained, determining whether land was seated or unseated in character was "highly technical" and often created an issue of fact for the jury, which "led to so much litigation that the tax titles were

looked on with suspicion and the collection of taxes was made difficult." Id. The

Act of 1885 was intended to address these concerns and to "declare that . . . it

should not be necessary or material to go behind the assessment and inquire into its

correctness." Id. at 310 (alteration in original) (quoting Snyder, 51 Pa. Super. at

181).

Scott provides insight not only into the legislative intent behind the Act of

1885, but also as to what its exception means. Scott implies that the exception

operated to invalidate tax sales in the rare situation where land was regularly

assessed as seated or unseated but then sold at a tax sale as the opposite, failing to

"follow" its assessment. See id. at 309 (citing Snyder, 51 Pa. Super. at 182). A

perfect illustration of these circumstances is provided in Snyder, the Pennsylvania

Superior Court case cited extensively by Scott.

In Snyder, the land at issue had been regularly assessed as seated from 1894

to 1900 and the hunting club owners had paid the taxes levied on them each year.

Snyder, 51 Pa. Super. at 178. In 1900, although the land was again assessed as

seated and placed on the seated list, the county supervisor, "either by mistake or

ignorance of his proper function," returned the land as unseated to the county

treasurer for an unpaid road tax. Id. The property was then sold as unseated for

unpaid 1900 taxes by the county treasurer at a 1902 tax sale, and the hunting club

owners challenged the validity of that sale. Id. at 176, 178.

In holding that the treasurer's deed did not pass title to the tax-sale

purchaser, the Snyder court was careful to explain why the Act of 1885 did not

validate the sale. See id. at 180-83. Prior to passage of the Act, the court noted,

"there naturally arose many contests as to whether or not a tract assessed, returned and sold as unseated, was in point of fact seated land, or vice versa." Id. at 181. The court then reviewed the statute and its effect on such disputes, explaining that, except in "the single instance covered" by the Act's exception, "it should not be necessary or material *to go behind the assessment and inquire into its correctness*." Id. at 181-82 (emphasis added). The court reasoned that when land is regularly assessed as seated or unseated, and "where the procedure leading up to the sale was regular and followed the assessment," the tax sale would be valid and effective "*irrespective of whether the assessor, in determining the status of the property made a mistake or not*." Id. (emphasis added). The case before the Snyder court was one of those rare situations where the treasurer's sale was invalid, despite the Act of 1885, because the property at issue had been "suddenly shifted from its assessed class to the other[.]" Id. at 182. That is, the land had been regularly characterized and assessed as seated, but then suddenly sold by the county treasurer as unseated. Because the sale did not follow the assessment, it was void. Id.

Similarly, in Weaver v. Meadville Lumber Manufacturing Co., 61 Pa. Super. 167 (1915), the court examined the validity of a tax sale for land assessed as seated but "improperly returned as unseated" and "placed on the unseated land tax return and sold as unseated land[.]" Weaver, 61 Pa. Super. at 169. The court found that such a sale was void. Id. at 171 (citing Snyder, 51 Pa. Super. 174). The Weaver court explained that the Act of 1885 "provided that the fact whether lands were seated or not at the time of assessment, should not invalidate the assessment, in other words, *when a sale followed the assessment it was valid whether the assessor*

*had correctly named the land or not*[.]" Id. at 170 (emphasis added).  The court

reasoned that "[w]hen the assessor has by virtue of his office stamped the land as

seated or unseated, that fixes the method to be employed thereafter in the collection

of taxes against it."  Id. at 171.  "[T]he class wherein [the land] was placed should be

consistently followed and . . . there could be no passage from one class to the other

or shifting from one class to the other" during tax-sale proceedings.  Id.  In

circumstances like Weaver and Snyder, where the tract was improperly shifted

from one classification to the other and did not follow the assessment, the

subsequent tax sale was not effective to pass title even when considering the Act of

1885.  See id. at 170-71.

Finally, in Blair v. Pennsylvania Turnpike Commission, 33 A.2d 490 (Pa.

Super. Ct. 1943), which postdates Northumberland County, the Superior Court

examined the same issue: whether land clearly characterized and assessed as

seated, which was later sold as unseated for unpaid taxes, could convey good title to

the tax-sale purchaser.  Blair, 33 A.2d at 493.  Relying on Scott, the court held that

such a sale was ineffective to pass title.  Id.  The court reasoned that the Act of 1885

generally validated tax sales "where the land is regularly assessed, either as seated

or unseated, and where the procedure leading up to the sale is regular and follows

the assessment . . . whether the land was seated or unseated at the time of the

assessment."  Id. (citing Scott, 25 A.2d 308).  The Blair court cautioned, however,

that "*the sale must follow the assessment in order to be valid*, and there can be no

valid sale of land for taxes on unseated land, where the assessment was on seated

land."  Id. (emphasis added).  The court further emphasized that there existed

"ample personal property" on the land in the form of cut stone to pay any taxes owed.  Id.

The only case we have uncovered reaching a different result is Bannard v. New York State Natural Gas Corp., 293 A.2d 41 (Pa. 1972).  Bannard is easily distinguishable.  In Bannard, a newly created subsurface estate—which had no development, improvement, or mineral extraction until 1957—was assessed and erroneously placed on the seated list in 1900.  Bannard, 293 A.2d at 44, 49-50.  The surface tract also appeared on the seated list that year.  Id. at 44.  In 1901, the seated list indicated that the mineral estate had been moved to the unseated list, but there is no evidence that this change in designation ever occurred.  Id.  Thus, from 1901 to 1915, the mineral estate continued to be assessed as seated and to appear on the seated list.  Id. at 44-45.

In 1916, the mineral tract was sold as unseated by the county treasurer for unpaid 1913 and 1914 taxes.  Id. at 45.  The Bannard court held that the mistaken placement of the undeveloped mineral tract on the seated list did not invalidate the treasurer's sale of the property as unseated, finding that "unseated" was the manner in which the mineral tract "should have been assessed for tax purposes." Id. at 50 (citing Act of 1885; Blair, 33 A.2d at 493; Scott, 25 A.2d 308).  The court concluded that "because of the [Act of 1885], the assessment of the tract on the seated list was not fatal to the title acquired" from the 1916 treasurer's sale.  Id. Blair, however, holds the opposite, to wit: "[T]he sale must follow the assessment in order to be valid, and there can be no valid sale of land for taxes on unseated land, where the assessment was on seated land."  Blair, 33 A.2d at 493; see also Snyder,

51 Pa. Super. at 182 (explaining that a tract cannot be "suddenly shifted from its

assessed class to the other" at a tax sale).  Because the mineral estate had unseated

characteristics and was supposed to be moved to the unseated list but erroneously

never was, the Bannard court found that such a minor error was not a fatal defect

to the treasurer's deed acquired by the tax-sale purchaser.  See Bannard, 293 A.2d

at 44, 50.  The facts of Bannard are obviously different from the case at bar, and we

do not waver in our application of Scott to the instant issue.  See infra pp. 22-23.

Legislative history from the time of the Act's passage in the Pennsylvania

Senate is consonant with our conclusions.  When asked to explain the bill,

Pennsylvania Senator James Wilson Lee provided the following synopsis:

> There is a division of lands in making assessments into
> seated and unseated.  That distinction is very clear in the
> law, *but it is very little understood by assessors*.  Very
> frequently land is assessed as seated when it is really
> unseated, and assessed as unseated when it is really
> seated.  As every one knows who is acquainted with this
> law, if the land is sold as unseated when it is really seated,
> that is a defect in the title and no title is passed.  In
> counties like Venango, tract numbers are not kept very
> distinctly, *there is a great deal of land that is not assessed
> properly, there is hardly one sale in ten that is valid, simply
> because of this defect in assessment*.  The lands are sold as
> seated when they are actually unseated, and sold as
> unseated when they are actually seated.  *That renders the
> treasurer's sale invalid.  There is no reason why that sort of
> defect should render the sale invalid*. . . .  It renders many
> treasurers' sales uncertain and, there should be some
> amendment provided.

Legis. Rec., S. 110th Assy., 1st Sess., at 2089 (Pa. May 28, 1885) (emphasis added).

Senator Lee's remarks indicate that assessors frequently misclassified land and that

these classification errors were creating numerous title defects, engendering

uncertainty in tax-sale titles.  Hence, the backdrop of the Act of 1885 adds clarity to its purpose, namely: to remedy title-defect issues created by assessors' chronic misclassifications of land.

Pennsylvania cases, together with the Act's legislative history, counsel that assessor-classification mistakes, which occurred regularly, are irrelevant so long as the tax sale was regular and followed the assessment.  The Act drastically reduces the need "to go behind the assessment and inquire into its correctness."  Scott, 25 A.2d at 310 (quoting Snyder, 51 Pa. Super. at 181).  In sum, it permits a challenge to the validity of tax-sale proceedings based on the land's classification only in rare circumstances where (1) land was characterized and assessed as seated and then improperly sold for unpaid taxes as unseated, or vice versa; and (2) in the case of seated land being sold as unseated, there was sufficient personal property on the land to pay the taxes.

The case *sub judice* is nearly identical to Scott, which compels our conclusion on this state-law issue.  See West v. Am. Tel. & Tel. Co., 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law[.]"); Hunt v. U.S. Tobacco Co., 538 F.3d 217, 220 (3d Cir. 2008) ("[T]he state's highest court is the best authority on its own law." (citation omitted)).  From 1895 to 1907, the Josiah Haines warrant was assessed as unseated and regularly appeared on the Bradford County unseated assessment books.  (See Doc. 99-1 at 15; Doc. 100-1 at 3, 7, 11, 15, 19; Doc. 101-1 at 3, 6, 9, 12, 15; Doc. 102-1 at 3, 6).  The property was then sold as unseated at the 1908 treasurer's sale for unpaid 1907 taxes, following its

regular unseated designation and assessment.  The Proctor Trusts contend that the

assessor's classification of the warrant in 1907 was a mistake because substantial

bark-peeling and logging activities seated the land, and, consequently, the 1908

treasurer's sale of the land as unseated was void.  This contention is the

quintessential *post-hoc*, fact-intensive challenge to the assessor's classification (and

validity of the subsequent tax sale) that is foreclosed by the Act of 1885 and Scott.

Even if the Bradford County assessor was mistaken about the character of

the Josiah Haines warrant in 1907, the Proctor Trusts cannot challenge the validity

of the treasurer's sale by proffering evidence that the assessor misclassified the

tract.  See Scott, 25 A.2d at 309; Snyder, 51 Pa. Super. at 182; Keta Gas & Oil Co.

v. Proctor, No. 1975 MDA 2018, 2019 WL 6652174, at *3-4 (Pa. Super. Ct. Dec. 6,

2019) (nonprecedential) (citing Scott, 25 A.2d at 309).  Permitting this specific

method of collateral attack would ignite endless litigation concerning technical,

fact-based determinations made by assessors in centuries past.  See Scott, 25 A.2d

at 309.  It would concomitantly call into question the validity of innumerable tax-

sale titles that followed such assessments.  These are the precise problems the

General Assembly endeavored to remedy by passing the Act of 1885.  See id. at 309,

310.

### B.    Agency and 1908 Treasurer's Sale

The parties' second fundamental point of contention involves the intricacies

of the 1908 tax sale.  The Proctor Trusts assert that McCauley, the tax-sale

purchaser, was acting as an agent for CPLC when he bought the Josiah Haines

warrant from the county treasurer.  They maintain that his purchase of the

property at the tax sale—for a sum that equaled the unpaid taxes and costs—amounted to nothing more than a redemption, giving CPLC exactly the same title it held prior to the treasurer's sale.[9]  In other words, CPLC, through McCauley, redeemed its surface interest only and did not divest Proctor and Hill of their subsurface rights.

Judge Schwab found that there is a genuine dispute of material fact as to McCauley's status as an agent for CPLC.  Judge Schwab also determined that if the land were unseated in character, it would not matter whether McCauley was an agent of CPLC; the 1908 tax sale was not a redemption because CPLC was not barred from acquiring both the surface and subsurface estates at the sale (whether directly or through an agent).

The Game Commission argues that Judge Schwab erred by concluding that there is a genuine factual dispute as to whether McCauley was acting as CPLC's agent.  The Proctor Trusts challenge Judge Schwab's conclusion that if the land were unseated, McCauley's status as an agent is irrelevant.

### 1.   *Question of Agency*

We begin with a brief recitation of the title-transfer details.  In 1894, the surface and subsurface estates of the Josiah Haines warrant were severed when Proctor and Hill conveyed the surface estate to Union Tanning and retained the mineral rights.  CPLC bought the surface estate from Union Tanning in 1903.

---

[9] A redemption operates to "set aside or annul" the tax sale, leaving the title "precisely as though the sale had not been made."  <u>Yocum v. Zahner</u>, 29 A. 778, 779 (Pa. 1894).

When taxes were not timely paid on the Josiah Haines warrant in 1907, the property[10] was sold by the county treasurer at the 1908 unseated-land tax sale for unpaid 1907 taxes.  McCauley purchased the property at that tax sale and, two years later, quitclaimed it to CPLC, who later conveyed it to the Game Commission.

The corresponding tax records from the Bradford County unseated land assessment books provide the following relevant information.  Each year from 1895 to 1902, Union Tanning paid taxes to Bradford County on the Josiah Haines warrant.[11]  (Doc. 99-1 at 15; Doc. 100-1 at 3, 7, 11, 15, 19; Doc. 101-1 at 3, 6).  Beginning in 1903 and continuing through 1906, CPLC regularly paid the taxes on the property.  (Doc. 101-1 at 9, 12, 15; Doc. 102-1 at 3).  For the 1907 tax year, the notation in the assessment books where tax-payment information was normally entered indicates that the property was "sold" on June 8, 1908, to "Calvin H. McCauley Jr."  (Doc. 102-1 at 6).  Thereafter, for tax years 1908 through 1910, taxes on the Josiah Haines warrant were once again regularly paid by CPLC.  (Doc. 102-1 at 10; Doc. 104-1 at 3, 6).

---

[10] As noted earlier, exactly what interest in the Josiah Haines warrant was conveyed at the 1908 tax sale is the ultimate issue in this case and is discussed in detail *infra*.

[11] For tax years 1895 and 1896, the Bradford County unseated land assessment books inadvertently referred to the 410-acre Josiah Haines warrant as the "Joseph Haines" warrant.  (See Doc. 99-1 at 15; Doc. 100-1 at 3).  That error was corrected in 1897, (see Doc. 100-1 at 7), and the entries remained accurate through 1901, (see id. at 11, 15, 19; Doc. 101-1 at 3).  Beginning in 1902 and continuing through 1906, the tract is again mislabeled as the "Joseph Haines" or "Joseph Hines" warrant in the unseated assessment books.  (See Doc. 101-1 at 6, 9, 12, 15; Doc. 102-1 at 3).  For tax years 1907 through 1910, the name is once more corrected to "Josiah Haines."  (See Doc. 102-1 at 6, 10; Doc. 104-1 at 3, 6).

The Game Commission posits that, because the evidence of McCauley's agency proffered by the Proctor Trusts was not "in the public record of Bradford County" and thus not available to a title examiner, it has no bearing whatsoever on the validity of the 1908 tax-sale title. (See Doc. 157 ¶¶ 30-34; Doc. 158 at 15). According to the Game Commission, the public record of Bradford County at the time of the 1908 tax sale "is the *only* relevant record," so there is no evidence probative of McCauley's purported agency. (Doc. 158 at 16). For this sweeping proposition, the Game Commission relies exclusively on Proctor v. Sagamore Big Game Club, 166 F. Supp. 465 (W.D. Pa. 1958), aff'd, 265 F.2d 196 (3d Cir. 1959). That reliance is misplaced.

We first note that Sagamore is a six-decades-old case from the Western District of Pennsylvania that is not binding on this court. More importantly, it is entirely inapposite. In Sagamore, following a 1914 tax sale at which McCauley purchased the at-issue property, he conveyed the parcel to *bona fide* third-party buyers, the Eisenhuths.[12] Sagamore, 166 F. Supp. at 479. He did not quitclaim the property back to CPLC following the two-year redemption period, as occurred in the case at bar.

The Game Commission takes the Sagamore court's focus on the public record out of context. In Sagamore, the court was concerned with the contents of

---

[12] As in the case *sub judice*, CPLC was the record owner prior to the 1914 tax sale. See Sagamore, 166 F. Supp. at 479. We note that there was a prior tax sale of the property, see id. at 468-69, but this fact has no bearing on the Game Commission's "public record" argument.

the public record because the dispositive agency-related question was whether the Eisenhuths could have known of McCauley's alleged agency and any possible title defect it may have created.  See id. at 479-80.  Finding that the public record controlled, the court referenced cases addressing notice of title defects in relation to good-faith purchasers for value.  Id. (citing Pa. Range Boiler Co. v. City of Philadelphia, 23 A.2d 723 (Pa. 1942); Woods v. Farmere, 7 Watts 382, 385 (Pa. 1838)). Sagamore and the cases it cites are irrelevant to our analysis because there was no independent, third-party purchaser in the matter at bar.  McCauley quitclaimed the property back to CPLC for a recited payment of $1.00.  Consequently, and unlike the Eisenhuths in Sagamore, CPLC would have had *actual notice* of McCauley's agency if such a relationship existed.  The public record, therefore, is not "the only" relevant source of information or evidence on the question of agency.

We agree with Judge Schwab that the Proctor Trusts have put forth considerable evidence that McCauley was acting as an agent for CPLC when he bought the Josiah Haines warrant at the 1908 tax sale.  (See generally Doc. 95 ¶ 26). For instance, from 1904 to 1916, McCauley purchased at tax sales more than 100 properties that were previously owned by CPLC and later quitclaimed those tracts back to CPLC.  (See id. ¶ 27).  CPLC's articles of incorporation and other internal documents, as well as additional historical records predating the tax sale, identify McCauley as CPLC's "Real Estate Agent."  (See id. ¶ 26(a)-(*i*); Doc. 121 ¶ 26(a)-(*i*)). McCauley also appeared as an attorney for CPLC in state court proceedings shortly after the time of purchase.  (Doc. 95 ¶ 26(*l*)).  In 1914, McCauley even executed a notarized declaration stating that he was acting in trust for CPLC when he

purchased six properties in Elk County from the county treasurer using funds provided by CPLC.  (Id. ¶ 26(o)).  Perhaps most significantly, following McCauley's acquisition of the tract at the 1908 tax sale, *CPLC*, not McCauley, paid the property taxes in 1908, 1909, and 1910.  (Doc. 102-1 at 10; Doc. 104-1 at 3, 6).  The Game Commission proffers no reason why a corporation would pay real estate taxes for land it purportedly did not own.  That this foregoing evidence was not recorded and publicly available to a title examiner is of no moment.  CPLC—McCauley's alleged principal—bought the property from McCauley in 1910 and had actual notice of any purported agency that existed.[13]

### 2.   *Effect of Purported Agency*

The question becomes whether the existence of an agency relationship between McCauley and CPLC has any legal significance for the validity or scope of the 1908 treasurer's deed.  We have already determined that the tract's unseated classification is not subject to the Proctor Trusts' specific collateral attack, so our analysis is necessarily confined to unseated land only.  After comprehensive review of the relevant law, we conclude that—under the facts of this case—McCauley's

---

[13] We are unconcerned with notice to subsequent buyers, namely the Game Commission.  The issue, as we discuss in more depth below, is what effect an agent's purchase may have on an unseated tax sale induced by his principal's default.  Notice of a potential agency-related defect for later buyers is irrelevant under circumstances like those presented here.  If the tax sale acted as a redemption only, there would be no rejoined subsurface to convey to subsequent buyers.  Proctor and Hill, moreover, recorded their excepted mineral interest when it was originally severed.  (See Doc. 97-1 at 6 ("PGCP 013632")).  So, if the title were not washed but a later deed purported to convey the entire warrant, any buyer would have had record notice of the existing Proctor and Hill exception.  See 21 PA. STAT. AND CONS. STAT. ANN. § 351.

agency status is relevant and material to determining what interest in the Josiah

Haines warrant was conveyed by the 1908 tax sale.

### a.        Scope of the 1907 Assessment

Judge Schwab determined that the record is devoid of evidence showing that

the 1907 assessment encompassed anything but the entire Josiah Haines warrant.

(<u>See</u> Doc. 155 at 70-83).   Judge Schwab reasoned that there is no evidence that

Proctor and Hill ever separately reported their subsurface interest to the county

commissioners, that the mineral rights were ever independently assessed, that any

separate taxes were imposed or paid thereon, or that any challenge was raised to

the absence of a separate assessment.   (<u>See</u> <u>id.</u>)   Although we agree with these

findings, we conclude that other record evidence establishes a material factual

dispute as to the scope of the 1907 assessment and related 1908 tax sale.

Specifically, the Proctor Trusts have proffered competent evidence that

Union Tanning and CPLC reported their unseated surface interest to Bradford

County commissioners as required by the Act of March 28, 1806 ("Act of 1806"), P.L.

644, 4 Sm. L. 346, § 1, <u>repealed and replaced by</u> 72 Pa. Stat. and Cons. Stat. Ann.

§ 5020-409.[14]   That evidence consists primarily of numerous entries in the Bradford

County unseated land assessment books, which identify Union Tanning and CPLC

---

[14] For a thorough discussion of the Act of 1806's reporting requirements, see
<u>Herder Spring</u>, 143 A.3d at 368-69.   Notably, <u>Herder Spring</u> held that this statute
imposed a duty to report only on one "becoming a holder of unseated land"; thus,
unseated landowners who severed and conveyed a portion of their property had no
affirmative duty to report their remaining interest because they were not
"becoming" holders of unseated land.   <u>Id.</u> at 360, 368, 372 (quoting Act of 1806).

as the entities to which taxes were assessed and who subsequently paid those taxes.
See *supra* p. 25 and note 11.

The Game Commission has offered no alternative explanation as to how
Union Tanning and CPLC were named in the unseated assessment books and paid
assessed taxes if those entities had not reported their ownership interests to
Bradford County officials.  And the Game Commission concedes that there is no
evidence that Union Tanning or CPLC improperly reported owning more than the
surface estate.  (See Doc. 120 at 32; Doc. 162 at 7; Doc. 173 at 9).  The Game
Commission argues, nonetheless, that the pertinent inquiry is whether a
"severance" was reported to county commissioners, and that the Proctor Trusts
have proffered no such evidence.  (Doc. 120 at 26-29; Doc. 173 at 3-4).  We find this
argument to be one of semantics rather than substance.  Reporting a surface estate
for separate taxation or reporting a "severance" is a distinction without a
difference.

The facts in the instant case thus stand in sharp contrast to Herder Spring,
where there was "no evidence" that *either* party reported their respective unseated
interest to county commissioners following severance of the warrant at issue.  See
Herder Spring, 143 A.3d at 360.  Under such circumstances, the court concluded,
the warrant must have been assessed as a whole (and sold as a whole) because
county officials had never been directed otherwise.  Id. at 360, 372, 375.

The same conclusion cannot be reached in the case at bar because there *is*
evidence that Union Tanning and CPLC reported their unseated surface interest to
Bradford County commissioners.  In other words, there is record evidence that the

county commissioners were "otherwise directed by the owners" to assess separate estates rather than the entire Josiah Haines warrant. <u>Id.</u> at 372. Accordingly, and unlike <u>Herder Spring</u>, we cannot find as a matter of law that the 1907 assessment must have encompassed the entire warrant. There is a genuine dispute of material fact as to what was assessed in 1907 and sold in 1908.[15]

## b.   <u>Duty to Pay Taxes on Unseated Land</u>

Even if we could definitively conclude that the county treasurer properly offered the entire Josiah Haines warrant at the 1908 tax sale, what was *offered* for sale is not dispositive as to what interest this tax sale effectively conveyed. Pennsylvania law instructs that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest[.]" <u>Powell v. Lantzy</u>, 34 A. 450, 451 (Pa. 1896) (emphasis added)

---

[15] The Proctor Trusts argue that summary judgment must be granted in their favor because, under any set of facts surrounding CPLC's reporting, the law mandates that no title wash occurred at the 1908 tax sale. For example, if CPLC properly reported its surface interest, the law required the 1907 assessment to be limited to CPLC's surface estate; thus, any assessment and attempted sale of the whole warrant—which was severed and separately owned by different parties— would be invalid and transfer nothing at the tax sale. <u>See</u> <u>Fisk v. Corey</u>, 21 A. 594, 595 (Pa. 1891) ("A sale of several tracts of land, by the county treasurer, for the payment of taxes as one tract, and for a gross sum, will confer no title upon the purchaser; each tract must be sold separately."). Or, if CPLC improperly reported that it owned more than the surface, it would be equitably barred from gaining a better title at a tax sale caused by its failure to pay 1907 taxes. <u>See</u> *infra* Section III(B)(2)(b) (discussing <u>Powell v. Lantzy</u>, 34 A. 450 (Pa. 1896)). If CPLC failed to report at all, it would be in violation of the Act of 1806 and, again, would be precluded from improving its title at the 1908 tax sale. The problem with the Proctor Trusts' arguments is that they assume disputed factual predicates, such as McCauley's agency, which we cannot do at the Rule 56 stage of proceedings. <u>See</u> <u>id.</u>

(citing <u>Chambers v. Wilson</u>, 2 Watts 495 (Pa. 1834); <u>Coxe v. Wolcott</u>, 27 Pa. 154 (1856)).  This rule "rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty." <u>Id.</u>  Instead, such a purchase "operates as a payment only," *i.e.*, a redemption. <u>Id.</u> (citation omitted).  Application of this rule is limited to cases where the purchaser had some preexisting duty—arising by law, contract, or equity—to pay the taxes. <u>Id.</u>

The Proctor Trusts maintain that CPLC breached its duty to pay 1907 taxes on its land, caused the 1908 tax sale, and then used McCauley—its agent—to attempt to improve its title by purchasing the warrant at that tax sale with the subsurface purportedly rejoined.  They contend that <u>Powell</u> explicitly bars this practice, and therefore CPLC merely redeemed its surface interest at the tax sale.  The viability of this redemption-only argument hinges on whether CPLC had a duty to pay the 1907 taxes on its unseated surface estate.

We briefly reiterate the relevant title history.  CPLC bought the surface rights from Union Tanning, which had purchased the newly created surface estate from Proctor and Hill.  There is competent evidence, primarily from the Bradford County unseated land assessment books, that both Union Tanning and CPLC properly reported their unseated surface interest to county commissioners as required by the Act of 1806.  It is also uncontested that in 1907, CPLC did not pay the assessed taxes "due and owing," thereby causing the property to be sold by the Bradford County treasurer at the 1908 tax sale.  (<u>See</u> Doc. 124 at 4; Doc. 125 ¶ 17).

We further observe that there is substantial evidence that CPLC deliberately and strategically defaulted on its 1907 taxes.  In the early 1900s, CPLC owned vast

32

amounts of land in Bradford County and beyond.  (See, e.g., Docs. 99-1, 100-1, 101-1,
102-1, 104-1); Sagamore, 166 F. Supp. at 469; Cornwall Mountain Invs., L.P.
v. Thomas E. Proctor Heirs Tr., 158 A.3d 148, 150-51 (Pa. Super. Ct. 2017).  The
corporation would fastidiously pay annual taxes assessed on its properties but then
suddenly fail to do so, causing a tax sale.  (See Doc. 95 ¶ 16; Doc. 102-1 at 6; see
generally Docs. 99-1, 100-1, 101-1, 102-1, 104-1).  CPLC's president attested, as part
of the Game Commission's purchase of other land, that CPLC "regularly and
continuously paid all taxes assessed and payable."  (Doc. 95 ¶ 16(e)).  That is, of
course, until it didn't.  For the Josiah Haines warrant, default occurred in 1907, the
*very same year* that CPLC completed its extensive bark-peeling activities on the
tract.  Even the Game Commission's title attorney, in 1930s correspondence to
CPLC, asserted that CPLC's defaults were strategic.  (See Doc. 153 ¶¶ 63, 65, 67).

Viewing this evidence in a light most favorable to the Proctor Trusts, as
required at the Rule 56 stage, we are left with the following rendition of facts.
CPLC, surface owner of the unseated Josiah Haines warrant, reported its surface
interest pursuant to the Act of 1806 and regularly paid assessed taxes from 1903
through 1906.  In 1907, after stripping the entire warrant of its valuable tanbark,
CPLC intentionally failed to pay the taxes assessed and due.  As expected, CPLC's
default induced a treasurer's sale of the land the following year.  CPLC then
employed McCauley, its agent, to (1) purchase that property, (2) hold it for the two-
year redemption period, and then (3) quitclaim it back to CPLC.  With the title
ostensibly washed and the surface and subsurface rejoined, Proctor and Hill's
mineral rights were extinguished and were now vested in CPLC.  The entire

warrant, *i.e.*, the reunited surface and subsurface, was subsequently conveyed to the Game Commission approximately ten years later.

It is generally true that the owner of a surface or subsurface estate is not barred from obtaining better title at a treasurer's sale.  See Herder Spring, 143 A.3d at 367 (quoting Powell, 34 A. at 451 (quoting Coxe v. Gibson, 27 Pa. 160 (1856))).  But the Game Commission has not identified, and the court has not found, a case applying this proposition to circumstances mirroring those presented here.  No case squarely considers whether, under the foregoing facts, an agent who purchases at a tax sale induced by his principal's default takes good title to the entire property or simply redeems his principal's prior interest.

For example, in Powell, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and through no fault of, the tax-sale purchaser who owned the surface estate at the time of the sale.  See Powell, 34 A. at 451, 452. Neither the surface nor the subsurface owner had a legal duty to pay the overdue taxes, which had accrued on the land prior to severance during ownership by a different individual.  Id.  In Hutchinson, taxes on unseated lands went unpaid in 1890 and 1891, before any involvement or ownership by the eventual 1892 tax-sale purchaser.  Hutchinson, 49 A. at 317.  In Sagamore, delinquent taxes from 1892 induced the 1894 tax sale that divested Proctor of the interest he purchased in 1893. Sagamore, 166 F. Supp. at 468-69, 476.  And in Herder Spring, a *bona fide* third party bought the entire warrant from the county, which the county had acquired in fee simple at a tax sale after the prior surface and subsurface owners failed to report their separate interests or pay taxes thereon.  Herder Spring, 143 A.3d at 360-61.

Reinboth v. Zerbe Run Improvement Co., 29 Pa. 139 (1858), also presents materially different circumstances.  There, the 1840 tax-sale purchaser, Christopher Geiger, held claim to the subject property based on prior conveyances, but there were other putative owners who claimed title to portions of that land.  Reinboth, 29 Pa. at 140, 144-45.  The property went through two tax sales, one in 1824 and another in 1840.  Id. at 144-45.  The 1824 tax-sale buyer was an unrelated third party who purchased in good faith, and in 1829, Geiger directed his attorney to purchase the property from the third-party buyer.  Id.  Geiger's attorney then sought a treasurer's deed for the tract at the 1840 tax sale to eliminate any doubts as to superiority of Geiger's title.  See id. at 142, 145.  Reinboth is clearly distinguishable because the first tax-sale purchaser was an independent third party.

A final case requiring consideration is Coxe v. Gibson, 27 Pa. 160 (1856), the decision quoted by Powell for the proposition that "there [i]s nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale."  Powell, 34 A. at 451 (quoting Gibson, 27 Pa. at 160, 165).  In Gibson, William A. Williams bought the subject property at a tax sale in 1850 for unpaid 1848 and 1849 taxes.  Gibson, 27 Pa. at 160.  Williams made the tax-sale purchase at the direction of Eli Felt, who had privately purchased the same land in August 1848 and conveyed it to the defendants early the following year.  Id. at 162.  Felt directed the tax-sale purchase to "confirm and strengthen" his own title, which he had already transferred to new buyers.  Id.  The Pennsylvania Supreme Court held that Felt was not prohibited from perfecting, at a treasurer's sale, his 1848 title, which he may have deemed "suspicious" and "defective" due to possible fraud by its grantor.  Id.

at 165.  But again, Gibson is materially different because the unpaid taxes at least

partially accrued when Felt was not the owner, and because the tax-sale purchase

was intended to cure any title defects caused by potential fraud of a prior owner.

Finding no case on point, we revert to the original question raised by Powell:

whether CPLC owed any duty to pay the 1907 taxes such that McCauley's

purchase—if he were an agent of CPLC—acted merely as a redemption.  This issue

is purely a matter of state law, and we believe it has ramifications for other pending

and future real property disputes in the Commonwealth.  In the absence of

controlling precedent, it is our task to predict how Pennsylvania courts would rule

if confronted with this issue.  After careful consideration, we conclude that CPLC

owed a legal duty to pay taxes on its unseated surface estate; hence, CPLC could

not use an agent to "acquire a better title, or a title adverse to that of other parties

in interest," at a tax sale prompted by its own default.  Powell, 34 A. at 451.

It is beyond peradventure that unseated landowners faced no *personal*

*liability* for failing to pay taxes assessed on unseated land.  Pennsylvania's highest

court has repeatedly affirmed this legal principle for nearly 200 years.  As early as

1822, the Pennsylvania Supreme Court acknowledged that "taxes on unseated

lands[] have never . . . been considered a charge on the person of the owner."  Burd

v. Ramsay, 9 Serg. & Rawle 109, 114 (Pa. 1822).  In 1841, the court explained that

"the land itself, and not the owner of it, is debtor for the public charge," and is

looked to for any overdue payment.  Strauch v. Shoemaker, 1 Watts & Serg. 166, 175

(Pa. 1841) (quoting Fager v. Campbell, 5 Watts 287, 288 (Pa. 1836)).  Fifty-five years

later, the Powell court reiterated that when taxes were assessed on unseated land,

"there was no personal responsibility on the owner therefor.  The land alone was liable."  Powell, 34 A. at 451 (citing Hunter v. Cochran, 3 Pa. 105 (1846) (*per curiam*); Russel v. Werntz, 24 Pa. 337 (1855); Logan v. Washington County, 29 Pa. 373 (1857)). In 1972, the Bannard court explained that, as to unseated land, "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes."  Bannard, 293 A.2d at 49.  Herder Spring recently reaffirmed this premise, stating that "tax on unseated land was the liability of the land rather than the owners."  Herder Spring, 143 A.3d at 375 (citations omitted).

Personal liability, however, is quite different than a duty to pay taxes. Personal liability is a potential *consequence* for breaching a duty, such as failing to pay taxes on seated land.  See id. at 364 (citation omitted).  Simply because the Commonwealth imposed no personal liability or "personal responsibility" (as it was sometimes referred to) on unseated landowners for failure to pay assessed taxes does not mean that those owners had no duty to pay taxes in the first place.

To the contrary, courts in the Commonwealth have long recognized an unseated landowner's duty to pay taxes.  In Herder Spring, the Pennsylvania Supreme Court reaffirmed that, while the tax-sale regime for unseated land may have appeared "harsh and severe" for landowners, "[a] vigilant owner has nothing to fear.  All he has to do is to pay his taxes, and *this he is bound to do upon every principle of equality and justice*."  Herder Spring, 143 A.3d at 366 (emphasis added) (quoting Strauch, 1 Watts & Serg. at 176).  The Herder Spring court likewise quoted M'Coy v. Michew, 7 Watts & Serg. 386 (Pa. 1844), for similar reasoning: "If there be

hardship, it is one which can easily be avoided by performing the *duty* which the law imposes upon [the owner], to return the land and *pay his taxes*." Id. at 369 (emphasis added) (alteration in original) (quoting M'Coy, 7 Watts & Serg. at 391). And in Breisch v. Coxe, another case involving taxation of unseated land, the court explicitly stated that "*the payment of taxes is a duty*, and a failure to perform it is the fault of the *owner*." Breisch v. Coxe, 81 Pa. 336, 346 (1876) (emphasis added); see also Mayor of Philadelphia v. Riddle, 25 Pa. 259, 263 (1855) (noting that "it is an owner's duty to pay taxes" and failure to do so results in a tax sale of owner's land).

The legal duty of owners to pay taxes on unseated land, which was firmly established in the common law, was subsequently codified by statute. In 1887, Pennsylvania's General Assembly passed the Act of June 6, 1887, which mandates:

> That after June first, [1888], *all taxes levied upon unseated lands*, within the counties of this Commonwealth, *shall be paid by the owner or owners of such unseated lands* within the year for which the same are levied; and in case of the refusal or failure of any person or persons, companies or bodies corporate, owner or owners of such unseated lands to pay the taxes so levied within the year for which the same are levied and collectible, then interest at the rate of six per centum, per annum, is to be charged upon the amount of said taxes, or any part thereof, remaining due and unpaid from and after the first day of the year following that for which said taxes were levied until the same has been paid in full, *or the land sold as now provided by law for the sale of unseated lands*: Provided, No interest shall be charged upon taxes levied for the years [1886] and [1887].

Act of 6 June, 1887, P.L. 363, No. 248, § 1 (codified at 72 PA. STAT. AND CONS. STAT. ANN. § 5781) (emphasis added). The plain language of this statute unambiguously obligates unseated landowners to pay assessed taxes within a year of levy. Id.

We acknowledge that, at several points in the <u>Herder Spring</u> decision, the court uses language—albeit in *dicta*—which could be read to infer that there was no duty to pay taxes on unseated land.  Nevertheless, when put in proper context, we do not believe that such remarks were meant to contradict longstanding legislation or state court precedent.

For instance, the <u>Herder Spring</u> court states that "[t]he owner of unseated land . . . was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original warrant had been issued."  <u>Herder Spring</u>, 143 A.3d at 364.  However, this statement is followed by multiple citations to state supreme court decisions indicating that there was no personal *liability* for taxes on unseated land.  <u>See</u> <u>id.</u> (citing <u>Strauch</u>, 1 Watts & Serg. at 175; <u>Bannard</u>, 293 A.2d at 49).  As explained by a prominent treatise on tax titles, the idea of taxes being "imposed on" or "against" the land, or that the land alone was liable for taxes, "means no more than that taxes assessed upon a specific parcel of real estate can only be collected by a process having for its object the condemnation and sale of the land."  HENRY CAMPBELL BLACK, A TREATISE ON THE LAW OF TAX TITLES: THEIR CREATION, INCIDENTS, EVIDENCE, AND LEGAL CRITERIA § 167 (2d ed. 1893).  Later in the opinion, the <u>Herder Spring</u> court notes that the <u>Powell</u> decision "explained the duty, or lack thereof, of landowners to pay taxes[.]"  <u>Herder Spring</u>, 143 A.3d at 367.  Although this language appears broad at first blush, it relates directly to the facts of <u>Powell v. Lantzy</u>, where neither the surface nor the subsurface owner had any obligation to pay

overdue taxes that had accrued on the property when owned in whole by a different individual.  Id. (quoting Powell, 34 A. at 451).

In sum, we read this *dicta* within its context and find that it does not represent a reversal of precedent or an abrogation of the Act of 1887.[16]  Had the Herder Spring court intended such drastic outcomes, it would have made its holdings clear and explicit.  Instead, these statements simply affirm the noncontroversial axiom that there was no personal liability on unseated landowners who failed to pay taxes.

The Game Commission's arguments against the existence of a legal duty to pay taxes on unseated land are unpersuasive.  It posits that neither CPLC nor McCauley had a duty to pay taxes on the Proctor and Hill subsurface estate to keep it from being sold at a tax sale.  This is true, of course, because after severance, the surface and subsurface of the Josiah Haines warrant were separate estates subject to separate taxation.  See Herder Spring, 143 A.3d at 364, 369; Powell, 34 A. at 451-52.  But this sleight-of-hand argument ignores the critical fact that CPLC held its

---

[16] This is especially true when, in the same opinion, the court explicitly states that unseated landowners were bound to pay their taxes "upon every principle of equality and justice," id. at 366 (quoting Strauch, 1 Watts & Serg. at 176), and could avoid the loss of their land at tax sales by performing the "duty" imposed by the law on unseated landowners: "to return the land and pay the taxes," id. at 369 (quoting M'Coy, 7 Watts & Serg. at 391).

*own* surface interest for which it *was* legally bound to pay taxes—an estate which the Game Commission claims was also sold at the 1908 tax sale.[17]

That CPLC had no duty to pay taxes on a separate estate it did not own does not render the Powell rule irrelevant.  In Powell, the tax-sale purchaser had no other option to protect his surface interest except to buy the entire property at the tax sale.  See Powell, 34 A. at 452 ("Lantzy was in a position in which he was obliged to pay a claim which he did not personally owe, and which was, in part, a charge upon the land of another, from whom he could not require repayment, or to buy or lose his title.").  That is simply not the situation here.  All CPLC had to do to protect its surface interest was pay its taxes.  If Bradford County incorrectly assessed the entire warrant in 1907, rather than separate estates, CPLC could have challenged that assessment prior to the tax sale or following the sale during the statutory redemption period.  See Herder Spring, 143 A.3d at 366.  What CPLC could not do is utilize its own default to gain a better title at a tax sale, *i.e.*, "build up or acquire a title founded upon [its] own neglect of duty."  Powell, 34 A. at 451.

---

[17] It bears repeating that, in Powell, the surface owner bought the entire property at a tax sale induced by default of a *prior owner* who had failed to pay taxes assessed on the tract as a whole.  Powell, 34 A. at 451, 452.  And in Herder Spring, the buyer was a *bona fide* third party who purchased the entire warrant because none of the prior surface or subsurface owners had reported their separate interest to county commissioners or paid the taxes owed, thus causing a tax sale of the entire property.  Herder Spring, 143 A.3d at 360-61.  Neither tax-sale buyer was under *any* obligation to pay the overdue taxes that caused the treasurer's sales in those cases, so the Powell rule did not apply.  The Game Commission's repeated reliance on the outcome in Powell and Herder Spring, therefore, is misplaced because the facts of the case at bar are entirely different.

The Game Commission also maintains that if CPLC violated its statutory duty to pay taxes on unseated land, then so did Proctor and Hill.  There are two problems with this argument.  First, unlike the extensive tax-assessment and tax-payment documentation that exists for CPLC, there is no record evidence that taxes were ever assessed or went unpaid on the Proctor and Hill mineral estate.  As the court in <u>Breisch</u> explained, while the landowner has a duty to pay taxes, he cannot perform this duty unless he is informed by taxing authorities of what payment is owed.  <u>Breisch</u>, 81 Pa. at 346.  The absence of a separate subsurface assessment may be because Proctor and Hill never reported their severed mineral interest to county officials (although not statutorily required), or it may be because there was nothing of value to assess.  Regardless, and even if Proctor and Hill were deemed to have violated their duty to pay subsurface taxes, there is another critical flaw with the Game Commission's finger-pointing argument: only the Game Commission, as CPLC's successor-in-interest, is claiming to have acquired a better title at a tax sale induced by CPLC's breach.  In other words, <u>Powell</u>'s rule—barring the breaching party from acquiring better title—appertains only to the Game Commission, not the Proctor Trusts.

Finally, the Game Commission contends that the Act of 1887 did not impose an "absolute 'duty'" to pay taxes on unseated land because landowners could refuse to pay and would only be subject to a charge of interest or sale of their land.  (Doc. 173 at 12).  This argument conflates duty with consequence.  The mere fact that unseated landowners who refused to pay taxes faced no personal liability for their breach does *not* mean that the duty to pay taxes never existed.

We conclude that unseated landowners had a legal duty to pay taxes on their land.  Because CPLC was the undisputed surface owner of the Josiah Haines warrant prior to the 1908 tax sale and had an affirmative duty to pay taxes on its interest, the rule set forth in <u>Powell</u> potentially applies.[18]  Hence, the question of McCauley's agency (or lack thereof) is highly relevant and material.  If McCauley were acting as CPLC's agent at the 1908 tax sale, which was induced by CPLC's failure to pay 1907 taxes, CPLC's purchase through McCauley effectuated nothing more than a redemption of its surface interest.  <u>See</u> <u>Powell</u>, 34 A. at 451.  However, whether McCauley was acting as CPLC's agent is a question of fact, not a question of law, and must be resolved by a jury.  <u>See</u> <u>Ellison v. Hosie</u>, 23 A. 455, 455 (Pa. 1892) (*per curiam*); <u>Walton v. Johnson</u>, 66 A.3d 782, 787 (Pa. Super. Ct. 2013) (citing <u>Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.</u>, 602 A.2d 1348, 1351 (Pa. Super. Ct. 1992)).  We thus find that material factual disputes regarding (1) the scope of the 1907 assessment and (2) McCauley's alleged agency compel denial of the parties' Rule 56 motions.

## C.    Other Objections

The parties raise several additional objections to the report, but we find them meritless.  After *de novo* review, we generally agree with Judge Schwab's outcomes

---

[18] Because we find that there was a legal duty to pay taxes on unseated land, we need not discuss the Proctor Trusts' related argument that a contractual duty to pay taxes arose from the deed between Union Tanning and CPLC.  (<u>See</u> <u>generally</u> Doc. 171 at 9-10).

on these issues.  We briefly set forth the parties' objections and why we are
overruling them.

### 1. *Deed Language Identifying Proctor and Hill Exception*

The Proctor Trusts maintain that the 1920 deed from CPLC to the Game
Commission specifically identifies the 1894 Proctor and Hill mineral estate
exception, thereby estopping the Game Commission from claiming that the
subsurface estate was conveyed in the 1920 transfer.  (See Doc. 160 at 20-25 (citing
and distinguishing, *inter alia*, Herder Spring, 143 A.3d at 378)).  Judge Schwab
rejected this argument.  (See Doc. 155 at 83-96).

We need not duplicate Judge Schwab's excellent analysis, but instead hit the
high notes.  The 1920 deed uses the words "subject to" before describing the
Proctor and Hill exception.  (See Doc. 95 ¶ 38).  We find that this unambiguous
language represents a protective measure taken by the grantor to guard against
breach-of-warranty claims.  See Burns v. Baumgardner, 449 A.2d 590, 593 (Pa.
Super. Ct. 1982) (collecting cases); W. W. Allen, Annotation, *Conveyance "subject to"*
*restrictions set forth in a recorded or other indicated instrument as imposing the*
*restrictions on the land conveyed*, 84 A.L.R. Fed. 2d 780 § 2 (2011).  It does not, as the
Proctor Trusts maintain, express an intent to limit the conveyance or reinvigorate
the Proctor and Hill subsurface interest.  See Burns, 449 A.2d at 593.  We recognize
that the agreement of sale utilizes different wording, which is more likely to
demonstrate an intent to create a new exception in Proctor and Hill.  (See Doc. 95
¶ 35).  However, the unambiguous language of the deed controls, not parol evidence

from the contract of sale.  See Starling v. Lake Meade Prop. Owners Ass'n, 162 A.3d

327, 341 (Pa. 2017).[19]

If the 1908 tax sale extinguished the mineral rights of Proctor and Hill, there

was no subsurface reservation or exception to which the 1920 conveyance was

subject.  Specifically naming the 1894 Proctor and Hill exception would not alter

this outcome.  A title wash would render surplusage the "subject to" language in the

1920 deed identifying exceptions or reservations predating the tax sale,

representing nothing more than "a wise precaution on the part of the grantor."  See

Burns, 449 A.2d at 593 (citation omitted); Herder Spring, 143 A.3d at 378.  If,

however, no title wash occurred, the subsurface estate never vested in CPLC and

could not be transferred by the 1920 deed to the Game Commission.  See supra p. 28

note 13.

## 2.   *Due Process*

The Proctor Trusts insist that Judge Schwab erred when concluding that

notice by publication of the 1908 tax sale satisfied federal procedural due process

requirements.  This constructive notice, as Judge Schwab explained, conformed to

the prevailing practice and statutory requirements of the time.  (See Doc. 155 at 54

---

[19] We additionally observe that creation of a new exception of mineral rights
in Proctor and Hill in the 1920 deed is untenable.  Proctor and Hill were not parties
to that conveyance and, if there had been a title wash, became strangers to the title
following the 1908 tax sale.  See In re Condemnation by Cty. of Allegheny of Certain
Coal, Oil, Gas, Limestone, Mineral Props., 719 A.2d 1, 3-4 (Pa. Commw. Ct. 1998).
When a deed attempts to reserve or except some interest in a third party, at least
one Pennsylvania appellate court has held that the interest remains with the
grantor.  See id. at 4.

& n.14); 72 PA. STAT. AND CONS. STAT. ANN. §§ 6001, 6002 (repealed in part by Act of March 9, 1847, P.L. 278 § 1); Herder Spring, 143 A.3d at 365, 376, 377.

At the outset, we reject the Game Commission's contentions that the Proctor Trusts' due process claim arises under 42 U.S.C. § 1983 or is barred by the statute of limitations in the Act of 1815.  As part of their quite title action, the Proctor Trusts assert that the lack of adequate notice (*i.e.*, due process) rendered the 1908 tax sale void *ab initio*, which is a jurisdictional defect immune to statute-of-limitations challenges.  (See Doc. 155 at 44-49); Benoit v. Panthaky, 780 F.2d 336, 338-39 (3d Cir. 1985); Kendall v. Lancaster Expl. & Dev. Co., 323 F. Supp. 3d 664, 681 (M.D. Pa. 2018) (citing Kean v. Forman, 752 A.2d 906, 908 (Pa. Super. Ct. 2000)).  The Proctor Trusts' due process claim is not grounded in Section 1983 and is not barred by any limitations period invoked by the Game Commission.

As to the merits of the claim, we find that notice by publication was constitutionally adequate under the unique circumstances of this case.  The Proctor Trusts rely heavily on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), and Mennonite Board of Missions v. Adams, 462 U.S. 791 (1983), to support their due process challenge.  Yet Mullane acknowledges that notice by publication is constitutionally permissible when "it is not reasonably possible or practicable to give more adequate warning."  Mullane, 339 U.S. at 317; see also Greene v. Lindsey, 456 U.S. 444, 449 (1982).  Mennonite explains that constructive notice is sufficient if the interested party "is not reasonably identifiable."  Mennonite, 462 U.S. at 798. Such a situation could occur when persons whose property rights may be affected are "missing or unknown," and in those situations, use of an "indirect and even a

probably futile means of notification" is all that is possible and required.  Mullane, 339 U.S. at 317 (citations omitted).  Ultimately, notice is constitutional when, "with due regard for the practicalities and peculiarities of the case," the notice provided reasonably conveys the necessary information and affords "a reasonable time for those interested to make their appearance."  Id. at 314-15.

It is crucial to bear in mind the circumstances surrounding the 1908 tax sale, because procedural due process questions are necessarily fact specific.  See Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 484 (1988); Wright v. Corning, 679 F.3d 101, 108 (3d Cir. 2012) (citation omitted).  At the time of sale, unseated land was treated much differently than its seated counterpart.  When unseated land was sold for unpaid taxes, identification of the current owner or owners was irrelevant, because unseated land was typically described in reference to its original warrantee.  See Herder Spring, 143 A.3d at 364; Heft v. Gephart, 65 Pa. 510, 516 (1870); Strauch, 1 Watts & Serg. at 175.  "[I]t is immaterial, at the moment of sale, what may be the state of the ownership [of the unseated land], or how many derivative interests may have been carved out of it.  With these the public has no concern."  Strauch, 1 Watts & Serg. at 175.  The identity of owners was often unknown as well.  See Morton v. Harris, 9 Watts 319, 325 (Pa. 1840) (noting that "assessors and commissioners cannot know of all the transfers of title [of unseated land] which take place"); Herder Spring, 143 A.3d at 365-66, 378.  County taxing authorities instead relied on reporting by unseated landowners to determine how taxes were assessed and how property was advertised for sale when those taxes went unpaid.  See Herder Spring, 143 A.3d at 368 (citing Act of 1804 and Act of

1806); Heft, 65 Pa. at 516-17.  Accordingly, when tax payment lapsed on unseated land, the county treasurer had *no reason or obligation* to search public records for ownership interests in the parcel to be sold.  See Herder Spring, 143 A.3d at 368-69 (citing Stoetzel, 105 Pa. at 567).  Unseated tax-sale procedures, moreover, were well established by 1908.  For nearly a century, unseated land had been regularly sold for delinquent taxes by county treasurers through identical methods and at the same time of year, the second Monday in June on even-numbered years.  Id. at 365; 72 PA. STAT. AND CONS. STAT. ANN. § 5981.

This antiquated process no longer exists; nevertheless, it was the system in place at the time of the tax sale and the reasons for that system are relevant to the adequacy of the notice provided.  Pennsylvania's historical treatment of unseated land reflects "the practicalities and peculiarities" of the situation and informs whether the notice given conveyed the required information to Proctor such that he could make his appearance.  Mullane, 339 U.S. at 314-15.  In conducting a due process assessment, courts must "look to the realities of the case" presented, and the effect of notice "must be judged in light of its practical application to the affairs of men as they are ordinarily conducted."  Greene, 456 U.S. at 450-51.

Notice by publication here—while not the best possible notice—was constitutionally sufficient.  Proctor was not a real estate novice.  *Per contra*, he

owned and regularly conveyed vast amounts of real property in Pennsylvania.[20]
There can be no doubt that Proctor was aware of the tax treatment of unseated land
and how unseated land ordinarily was assessed, taxed, advertised, described, and
disposed of by county treasurers for unpaid taxes.  (See, e.g., Doc. 95 ¶ 6(a), (d)).
The United States Supreme Court has noted that individual characteristics of the
intended notice recipient may be relevant to the due process analysis.  See Jones
v. Flowers, 547 U.S. 220, 230 (2006) (citations omitted).  Even less sophisticated
unseated landowners were likely aware of these well-established procedures.
Furthermore, the advertisements placed in Bradford County newspapers for the
sale of the Josiah Haines warrant followed customary practice and provided the
date, time, and place of sale.  (See Doc. 95 ¶ 24 & citations).  Advertisements ran
weekly from the beginning of April through the first week in June, giving Proctor
more than adequate time to appear and to raise any objection he may have had to
the sale.  (See id.); 72 PA. STAT. AND CONS. STAT. ANN. §§ 6001, 6002.

　　　For treasurers' sales in the 1800s and early 1900s, it was "not reasonably . . .
practicable to give more adequate warning" to unseated property owners.  Mullane,
339 U.S. at 317.  Notice by publication was the type of notice required, expected,
and relied upon at the time, and for good reason.  Such notice was "reasonably

---

[20] See, e.g., Herder Spring, 143 A.3d at 367 n.10; Cornwall Mountain, 158 A.3d
at 150-51; N. Forests II, Inc. v. Keta Realty Co., 130 A.3d 19, 25 n.4 (Pa. Super. Ct.
2015); Sw. Energy Prod. Co. v. Forest Res., LLC, 83 A.3d 177, 180 & n.3 (Pa. Super.
Ct. 2013); Sagamore, 265 F.2d at 201-02; Sagamore, 166 F. Supp. at 475, 477; Lester
L. Greevy Jr. & John A. Shoemaker, Shale Gas Ownership—Tax-Sale Titles: An
Historical Perspective of the Pennsylvania Title Wash, 85 PA. B. ASS'N Q. 106, 111, 112
(2014); (Doc. 95 ¶ 6).

calculated to apprise interested" unseated landowners of the pending tax sale and "afford them an opportunity to present their objections."  Id. at 314 (citations omitted).  Stated differently, notice by publication was "reasonably certain to inform those affected."  Dusenbery v. United States, 534 U.S. 161, 170 (2002) (quoting Mullane, 339 U.S. at 315).  We hold that, under the totality of the circumstances, the constructive notice provided in this case satisfies the procedural due process requirements of the Fourteenth Amendment.  Thus, if the subsurface estate was properly sold at the 1908 tax sale, the Proctor Trusts cannot attack that sale on due process grounds.

## IV.  Conclusion

For these reasons, the court finds that there are genuine disputes of material fact that preclude summary judgment for either party.  These disputes include what interest was assessed in 1907 and sold at the 1908 tax sale, as well as whether McCauley was acting as CPLC's agent at that sale.  Accordingly, we will deny the parties' cross-motions for partial summary judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    April 21, 2020