## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,

    Plaintiff,

    v.

THOMAS E. PROCTOR HEIRS TRUST,

    Defendant.

Case No. 1:12-CV-1567

Judge Christopher C. Conner

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, the Thomas E. Proctor Heirs Trust (the "Proctor Trust"), hereby submits the following Proposed Findings of Fact and Conclusions of Law with respect to the April 27, 2021 bench trial in this action:

## I.   INTRODUCTION

This action involves a dispute over who owns the oil, gas, and mineral rights associated with numerous tracts of land in Bradford and Sullivan Counties in northeastern Pennsylvania.  The Court issued a Memorandum Opinion in connection with the parties' cross-motions for partial summary judgment regarding a bellwether tract of land – the Josiah Haines Warrant – in Bradford County.  In that Memorandum, the Court identified two factual issues to be resolved at trial: (1) the scope of the 1907 assessment and 1908 tax sale and (2) whether Calvin H. McCauley, Jr. ("McCauley Jr."), the tax sale purchaser, was an agent of Central

1

Pennsylvania Lumber Company ("CPLC"), the defaulting surface owner.  The Court convened a bench trial to address these issues on April 27, 2021.

The facts show that severance of the subsurface estate was reported to the County Commissioners and therefore the tax assessment and resulting tax sale did not encompass the subsurface estate.  In addition, the facts show that McCauley Jr. was a long-standing agent of CPLC. The Pennsylvania Game Commission did not introduce any evidence that he renounced his agency prior to the sale and for good reason. The facts show the opposite - he continued to represent CPLC through at least 1917.  McCauley's Jr's agency is consistent with, and the only logical explanation for, CPLC's payment of taxes for the Josiah Haines Warrant *after* McCauley Jr. purchased it and his conveyance of that warrant back to CPLC for $1.  As a result, the title to the oil, gas, and minerals of the Josiah Haines Warrant remains with the Proctor Trust and the heirs of Jonathan A. Hill.

## II.   PROPOSED FINDINGS OF FACT

### A.   The Parties and Jurisdiction

1.     The Commonwealth of Pennsylvania, Pennsylvania Game Commission (the "PGC") is an independent state administrative agency with its principal office located at 2001 Elmerton Avenue, Harrisburg, PA 17110.  (Sec. Am. Compl., ECF No. 40, ¶ 1).

2.     The Thomas E. Proctor Heirs Trust (the "Proctor Trust"), is a

Massachusetts trust, whose trustees and beneficiaries are not citizens of Pennsylvania.  (Sec. Am. Compl. ¶ 2-3).  The Proctor Trust is comprised of the heirs of Thomas E. Proctor and/or successors to his interest in the Josiah Haines Warrant.  (Stipulation of Facts ("Stip."), ECF No. 205, ¶ 10).

3.      The amount in controversy exceeds $75,000.  (Sec. Am. Compl. ¶ 3).

**B.      The Josiah Haines Warrant**

4.      By warrant dated January 22, 1793, the Commonwealth of Pennsylvania warranted a tract of land located in what was then Northumberland County to Josiah Haines (the "Josiah Haines Warrant").  (Stip. ¶ 1).

5.      By patent dated June 27, 1794, the Commonwealth subsequently conveyed the Josiah Haines Warrant (also known as "Trap"), patented at 407¾ acres, to Daniel Brodhead. (Stip. ¶ 2).

6.      The Josiah Haines Warrant is located in what is now LeRoy Township, Bradford County. (Stip. ¶ 3).

7.      Through a series of conveyances, Schrader Mining & Manufacturing Co. acquired ownership of the Josiah Haines Warrant along with 44 other warrants in Bradford and Sullivan Counties. (Stip. ¶ 4; J3).

8.      By deed dated June 5, 1893, Schrader Mining & Manufacturing Co. conveyed a total of forty-five tracts (collectively, the "Schrader Lands"), including the Josiah Haines Warrant, to Thomas E. Proctor and Jonathan A. Hill ("Proctor &

Hill"). (Stip. ¶ 5; J3; *see also* D9.007).

9.      The Bradford County assessment records reflect Proctor & Hill's ownership of the Schrader Lands through notations referencing acreage adjustments resulting from the "Gen. Hill Map" and "Proctor & Hill Map" of the Schrader Lands.  (D51.001-004; Gass Tr. at J31.034:5-37:5).

10.     The Bradford County Historical Society has the map of the Schrader Lands, which contains references to Proctor & Hill.  (D49; Gass Tr. at J31.039:24-41:9).

### C.     The Proctor Reservation

11.     By deed dated October 27, 1894 (the "Union Tanning Deed"), Thomas E. Proctor and his wife Emma H. Proctor, and Jonathan A. Hill and his wife Lucy M. Hill, conveyed the surface estate of 39[1] of the 45 tracts contained within the Schrader Lands, including the Josiah Haines Warrant, along with the bark rights for four tracts within the Schrader Lands and other tracts in Sullivan County to Union Tanning Co. (collectively, the "Union Tanning Lands") (Stip. ¶ 6; J4).

12.     Proctor & Hill reserved "all the minerals, coal, oil, gas, or petroleum"

---

[1] The first set of lands in the deed recites 38 tracts of land and 4 tracts of bark rights.  The Richard Fullerton warrant, which derives from the same source deed from Schrader Mining and Manufacturing, is conveyed later within the Union Tanning Deed.  (J4.009-11.)

(the "Subsurface Estate") from the lands conveyed to Union Tanning.  (J4.013).

13.     Specifically, the Union Tanning Deed provides that:

> And the same grantors herein Thomas E. Proctor and Jonathan A. Hill hereby expressly reserve, and save to themselves their heirs and assigns, all the minerals, coal, oil, gas, or petroleum found now or hereafter, on or under the surface of any or all of the lands described in each of the above mentioned parts or divisions, and conveyed by this Indenture, together with the right and privilege of ingress, egress, and regress upon said lands for the purpose of operating or developing, working, or removing the same.

(J4.013).

14.     Additionally, Proctor & Hill retained the fee less bark rights of the Henry Beck, John Graff, Thomas Dundas and James Biddle warrants (collectively, the "Proctor & Hill Retained Lands").  (J4.002).

## D.     The Transaction Severing the Subsurface Was Reported

15.     The transaction involving the conveyance of lands from Proctor & Hill to Union Tanning was reported to the Bradford County Commissioners.

16.     Reporting was performed at the county level, but the County Commissioners would enlist assessors for each township to assess the taxable persons and properties within each township.  The County Commissioners would send a letter or a recapitulation statement along with an assessment book to the township assessors.  (D50; D1-3).  The recapitulation statement provided instructions to the assessors.  (D50).  The township assessors would return the

township books to the County Commissioners, who would then compile the County Assessment book from the information received from each township.  (J8-11, D47).

17.     Beginning in 1894, the Bradford County Assessment records reflect that the taxes on the Schrader Lands were paid by Union Tanning Co. (J8.009-12). The assessment of one warrant in Barclay township states "Union Tanning Co. Claims No Such Land," which demonstrates that Union Tanning reported its ownership interests to the County Commissioners.  (D51.007).

18.     The 1894 Bradford County Assessment records for LeRoy township cross out the road taxes for the Schrader Lands and contain a notation that the "Road taxes worked out by Proctor and Hill."  (D51.009).

19.     The 1896 LeRoy Township Assessment records contain a handwritten note stating "The figures in pencil are the latest Survey of land belonging to the Union Tanning Co. and Proctor and Hill."  (D1.001).  Below the note, "U.T. Co." is listed in the "Remarks" column adjacent to the warrant names.  *Id.*

20.     Following the entries for Union Tanning, the 1896 LeRoy Township Assessment records list "Proctor and Hill" in the "Remarks" column adjacent to the Henry Beck, John Graff, Thomas Dundas and James Biddle warrants – the Proctor & Hill Retained Lands reserved in the Union Tanning Deed.  (D1.004).

21.     The Barclay Township assessment records contain notations of

6

"Union Tanning Co" in "Remarks" column for the Union Tanning Lands and "P &

Hill" in the "Remarks" column for the Proctor & Hill Retained Lands. (D2.012-

038).

22.     The 1898 LeRoy Township assessment records make clear that the

references to "U.T. Co." reflected ownership because the warrants, including

Josiah Haines (listed as Joseph Hines),[2] are under the heading "Unseated Lands in

Warrant names assed to the Union Tanning Company." (D1.005).  Similarly, the

Proctor & Hill Retained Lands are listed under a heading "Unseated Lands assed.

to Proctor & Hill."  (D1.008).

23.     The 1899 LeRoy Township assessment records list the Union Tanning

Lands under the heading "Unseated Lands in Warrantee Names assessed to Union

Tanning Co."  (D1.009).  Again, the Proctor & Hill Retained Lands are listed

under a heading "Unseated Lands assessed to Proctor & Hill."  (D1.010).

24.     Additional years show adjustments made by the County

Commissioners for Proctor & Hill Retained Lands (D2.001-006, D3.001-003).  For

instance, in 1896, the Barclay Township records make an adjustment to the acreage

---

[2] The Josiah Haines warrant is identified as Joseph Hines for a period of
years between 1897 and 1906, but the identification of the warrant acreage remains
410 acres throughout that period.  In addition, the County Assessment records
mirror the Township Assessment records in the changes between Josiah Haines
and Joseph Hines.  (*See, e.g.,* D1.005 (Joseph Hines), D1.021 (Josiah Haines);
J10.005 (Joseph Hines), J11.005 (Josiah Haines).)

of the Thomas Dundas warrant because of the Proctor & Hill survey.  (D2.006).  In 1897, the acreage on Proctor & Hill Retained Lands was adjusted to account for seated assessments of Proctor & Hill.  (D2.011).  These records reflect communication between Proctor & Hill and the County Commissioners regarding their property ownership.

25.     In addition, the county assessment records show the reported ownership.  The 1900 Bradford County Assessment records for LeRoy Township contain notations adjacent to the warrants in the township column noting "UT Co" for the properties owned by Union Tanning and "P&H" for the Proctor & Hill Retained Lands reserved by Proctor and Hill in the Union Tanning Deed. (D51.011).  The taxes for the "UT Co" lands were paid by Union Tanning and the taxes for the "P&H" lands were paid by "J.A. Hill."  (*Id*.).

26.     The 1902 Bradford County Assessment records for Overton Township contain a notation adjacent to the first Union Tanning property listed stating "UT Co.  Ridgway Pa   S A Rote."  (D51.013).  SA Rote was the tax agent for Union Tanning and Elk Tanning.  (D4.007 & D53.001).  The same column notes a transfer of the George Moore warrant from "T. Rouse to UT Co. 1902" – demonstrating that the notations within the township column reflect the reported ownership.  (D53.013).

### E.    CPLC Reported Its Interest in the Surface Estate

27.    In 1903, CPLC was formed to take over the land and lumber interests of the Penn, Elk and Union Tanning companies, which comprised several hundred thousand acres.  (D53.001-02).

28.    By deed dated May 25, 1903 (the "Union-CPLC Deed"), Union Tanning conveyed all of its lands owned in Bradford and Sullivan Counties, including the Josiah Haines Warrant, to CPLC.  (Stip. ¶ 11; J5).  Union Tanning retained the bark rights and the deed was made subject to the Proctor & Hill reservation.  (J5.004, J5.006).

29.    Following CPLC's acquisition of Union Tanning's lands, CPLC is identified as the owner of the lands in the township and county assessment records. (D1.018-21, 23; D2.040-46; D3.007-11; D51.015-18).

30.    Specifically, the 1907 assessment for LeRoy Township lists "C.P.L.Co" in the remarks column for all the warrants owned by CPLC and previously owned by Union Tanning.  (D1.019).

31.    The 1907 Township assessment for the Josiah Haines Warrant (corrected from Joseph Hines) lists "C.P.L.Co." in the remarks column.  (D1.021).

32.    CPLC was identified as the reported owner of the Josiah Haines Warrant in the 1907 assessment, and that reported ownership is what was assessed. The 1907 County Assessment record for LeRoy Township lists ditto marks

adjacent to the Josiah Haines Warrant following the listing of "CPL" in the township column.  (D51.017-18).  One page earlier in the County Assessment records, a notation in the township column states that "CPL Co means Central Pennsylvania Lumber Co."  (D51.015-16).

33.    Between 1894 and 1907, none of the warrants conveyed to Union Tanning and CPLC, including the Josiah Haines Warrant, were ever assessed "four times the amount of tax to which such tract or tracts of land would otherwise have been liable" as was required if there was a failure to report ownership to the County Commissioners.  Thus, both Union Tanning and CPLC reported their ownership interests to the Bradford County Commissioners.

**F.    The Assessment Records Reflect the Reported Ownership and the Scope of the 1907 Tax Assessment and 1908 Tax Sale.**

34.    By deed dated December 14, 1920 (the "PGC Deed"), CPLC conveyed 19 Warrants, including the Josiah Haines Warrant, to the Pennsylvania Game Commission.  (Stip. ¶ 17; J6).

35.    Following this transaction, the PGC's title examiner sent a letter to the Bradford County Commissioners reporting the transaction in accordance with the Act of 1806.  (J2.131).  No record of this notice or any notice under the Act of 1806 exists with Bradford County, the Bradford County Historical Society or the Pennsylvania State Archives.  (D44-46).

36.    The only evidence of the PGC's reporting in the public records is the

notation in the assessment records – similar to the earlier notations of Union

Tanning and CPLC – identifying the Commonwealth as the owner of the lands in

1921.  (D1.028; D2.047).

37.     The reporting of the PGC Deed transaction demonstrates that the

notations in the assessment records identifying Union Tanning and CPLC reflect

the reporting of their transactions, including their surface-only interest in the lands.

(*See, e.g.,* D1.009 & D1.021).

38.     In addition, the Union Tanning and Elk Tanning companies and

Proctor heirs had a practice of reporting their interests in accordance with the Act

of 1806.  The testimony in *Gamble v. CPLC* explains how the tanning companies

reported their purchases from Proctor and show that the assessment records'

notations of ownership reflect reporting.  (D4.049-66).

39.     Correspondence from the Proctor heirs to county treasurers show that

the Proctor heirs had a practice of reporting their subsurface interests and paying

any taxes assessed against them.  (D5).

40.     Similarly, the assessment records for McIntyre Township, Lycoming

County show that Proctor and CPLC had a practice of reporting their interests.

McIntyre Township separately assessed subsurface rights that were being

developed on the unseated list.  (D6).

41.     For example, in 1907, the subsurface estate of the William Chancellor

and Michael Gratz warrants was separately assessed to the Proctor heirs during years of coal operations. (D6.016). That same year, the William Chancellor and Michael Gratz warrants were assessed to CPLC. (D6.012). These records show that the identification of CPLC limits the scope of the assessment to CPLC's surface estate interest.

42.     Although Bradford County did not assess coal operations on the unseated list, assessors were aware of coal operations on the Proctor & Hill subsurface estate and assessed those operations on the seated list. (D8; Gass Tr. J31 at 25:11-27:8). And the Proctor & Hill heirs paid mineral rights taxes in Bradford County. (D33.026).

43.     Proctor & Hill had coal operations on their Subsurface Estate as early as 1897. (D9.004).

44.     The 1897 Barclay Township assessment records assess Proctor & Hill and other coal land owners on the seated list. (D8; Gass Tr., J31 at 25:11-27:8).

45.     Gregory Gass, a professional land man, reviewed every page of the LeRoy Township assessment records from 1894 to 1931. (Gass Tr., J31 at 10:2-8). The recapitulation statement and letters from the County Commissioners which identify taxable items do not identify oil, gas, coal or minerals as taxable items. (Gass Tr., J31 at 10:12-11:7; D50 (recapitulation statement for Barclay Township); Gass Tr., J31 at 19:2-20:7). During the period 1894 to 1931, the records did not

contain any assessment of severed oil, gas, mineral or coal rights in Leroy Township.  (Gass Tr., J31 at 16:14-17).  Between 1890 and 1935, there were no separate assessments of severed oil, gas, coal or mineral rights in the Bradford County unseated land books.  (Gass Tr., J31 at 32:13-17).  Instead of assessing subsurface rights on the unseated list, the assessment records reflect that Bradford County assessed coal operators on the seated list. (Gass Tr., J31 at 25:11-22, 27:2-8).

46.     Indeed, the Proctor heirs paid $175.40 of taxes on their mineral rights in Bradford County in 1919 resulting from coal operations on some of their lands. (D33.026).

47.     From 1911 to beyond 1921, the Proctor & Hill heirs leased their subsurface estate and obtained royalties from coal operations on their subsurface estate on lands that went through CPLC tax sales.  (D35).  For example, in 1917, the Proctor & Hill heirs leased their coal rights on the John Boyd warrant, which went through the same 1908 tax sale as the Josiah Haines Warrant.  (D34.009 and D52.007) (maps showing Sunfish Pond on John Boyd warrant); D29.009 (McCauley quitclaim deed including John Boyd warrant)).

48.     In addition, the Proctor heirs consulted with McCauley Jr. on selling the Proctor & Hill coal rights on lands that went through McCauley Jr. tax sales. (D33.024-25, 27, 31-32).

49.     The Proctor & Hill heirs executed coal leases and extensions in 1921, after the PGC acquired the surface estate from CPLC.  (D35.014-17).

**G.     The 1908 Tax Sale**

50.     Following its acquisition of the Josiah Haines Warrant, CPLC began paying the taxes on the Josiah Haines Warrant.  (J10.007-15; J11.002).  However, CPLC did not pay the 1907 taxes on the Josiah Haines Warrant and allowed the property to be sold at a tax sale in June 1908.  (J11.005).

51.     On June 8, 1908, McCauley Jr. purchased the Josiah Haines Warrant and 44 other warrants owned by CPLC at the tax sale.  (D29.009-10).

52.     McCauley Jr. paid $49.36 for the Josiah Haines Warrant, which amounted to the 1907 taxes ($44.28) plus interest ($1.33) and costs of the sale ($3.75).  (J2.072; J11.005).

53.     In the years immediately following the tax sale, CPLC continued to pay the taxes despite McCauley Jr.'s purported ownership of the Josiah Haines Warrant.  (J11.009 (1908 taxes) and D47.002 (1909 taxes)).

54.     In 1910, McCauley Jr. quitclaimed the Josiah Haines Warrant and 44 other warrants back to CPLC for $1 (D29.008) even though he paid over $500 for just 21 of the 44 warrants at the tax sale.  (J2.072 & J2.075).

### H.     McCauley Jr. Was a Long-standing Agent of CPLC

55.     McCauley Jr. was the son of C.H. McCauley, who was the General

Solicitor, a director, and the largest shareholder of CPLC at its inception in1903.

(P3.002; D53.007; D13.001; Stip. ¶¶ 21-25).

56.     From 1903 to 1917, McCauley Jr. held multiple roles with CPLC,

each with significant levels of responsibility.  At CPLC's inception in 1903, he was

its treasurer.  (D13.002, 005; D14.001).

57.     He also served as CPLC's real estate agent for several years from

1903 until 1908.  In December 1903, CPLC's First Annual Report identifies

McCauley Jr. as its Real Estate Agent.  (D12.003).  Correspondence from CPLC's

ledger books identify McCauley Jr. as CPLC's real estate agent in 1904 and 1905.

(D15-D17).  The Boyd's Directory of Williamsport lists McCauley Jr. as a real

estate agent with an address associated with CPLC (D18.001-4), and a 1907

newspaper article confirms McCauley Jr.'s association with CPLC (D48.004).

58.     In February 1908, mere months before the tax sale at issue, McCauley

Jr. was admitted to the bar of Lycoming County and appointed as CPLC's

Assistant General Solicitor.  (D48.002).

59.     The 1908 Boyd's Directory confirms this promotion by listing

McCauley Jr. as Assistant General Solicitor with an address associated with CPLC.

(D20.003-4).

60.     In the years following his promotion to Assistant General Solicitor, McCauley Jr. continued to represent CPLC in real estate matters.  (D23.002, D25 & D26.002) (1910 court records identifying McCauley Jr. as the attorney for CPLC in tax assessment appeals);

61.     In April 1913, McCauley Jr.'s relationship with CPLC culminated with his election to the board of directors while still continuing his role as Assistant General Solicitor.  (D32.002; D32.005 (1917 newspaper article identifying McCauley Jr. as assistant general solicitor and director of CPLC).

62.     There is no evidence that McCauley Jr. ever renounced his agency with CPLC prior to any tax sales.

## I.     McCauley Jr. Systematically Purchased CPLC's Property at Tax Sales Only to Quitclaim the Lands Back to CPLC

63.     Between 1904 and 1914, McCauley Jr. purchased at tax sales hundreds of properties, comprising hundreds of thousands of acres of land, owned by CPLC.  (D29).

64.     In 1904, McCauley Jr. purchased at a tax sale ten warrants owned by CPLC in Sullivan County.  (D29.012-13).

65.     In 1907, he quitclaimed those ten warrants back to CPLC for $1. (D29.012).

66.     In 1906, McCauley Jr. purchased at a tax sale 41 warrants owned by CPLC in Lycoming County.  (D29.05).

67.     In August 1908, McCauley Jr. quitclaimed those 41 warrants back to CPLC for $1.  (D29.04).

68.     In June 1908, McCauley Jr. purchased at a tax sale 56 warrants owned by CPLC in Lycoming County.  (D29.001-2).

69.     In 1910, he quitclaimed those 56 warrants back to CPLC for $1. (D29.001).

70.     With respect to the tax sale purchase of the Josiah Haines Warrant, McCauley Jr. purchased it along with 44 other tracts owned by CPLC in Bradford County at a tax sale.  (D29.008-9).

71.     In 1910, he quitclaimed all 45 tracts, including the Josiah Haines Warrant, back to CPLC for $1.  (D29.008).

72.     In 1914, McCauley Jr. signed a declaration explaining the process of his purchases of CPLC's lands at tax sales.  (D27-28).  In connection with the tax sale purchase in Elk County, McCauley Jr. stated that the funds he used for the tax sale purchase were "the proper money of the Central Pennsylvania Lumber Company...and that [McCauley Jr.'s] name in the said deeds is used only in trust for it, the said Central Pennsylvania Lumber Company…."  (D28.002).

73.     The evidence shows that McCauley Jr. was an agent of CPLC at the time of his tax sale purchase of the Josiah Haines Warrant.  There is no other plausible explanation why CPLC's Assistant General Solicitor would purchase

CPLC property, CPLC would pay the taxes for years *after* the sale, and McCauley Jr. would convey the property back to CPLC for $1.

>    **J.**    **The PGC Recognized CPLC's Practice of Having Its Agents Purchase Its Lands at Tax Sales.**

74.    In the early 1930s, the PGC's title examiner, John Potter, recognized CPLC's practice of letting its lands go to a tax sale and be purchased by attorneys of the corporation. (D36.003-4).

75.    The PGC's title examiner stated that he had been unwilling to recommend acceptance of title where the taxes were those of the corporation (CPLC) and the purchaser has been an attorney of CPLC (i.e. McCauley). (D36.004).

76.    PGC's examiner again recognized CPLC's practice in his August 19, 1931 letter to CPLC regarding a 1926 tax sale of properties in Sullivan and Wyoming County by CPLC's attorney. (D37.001). The PGC's title examiner concluded that CPLC did not own the oil, gas and mineral rights as a result of the 1926 tax sale because a purchase by the Company's attorney would not divest title of the mineral owner. (D37.012).

77.    Indeed, the PGC recognized McCauley Jr.'s agency with CPLC. In connection with a 1908 tax sale purchase and subsequent quitclaim by McCauley Jr. of property in Lycoming County, the PGC's title examiner referenced that he understood McCauley Jr. "was acting for the Central Pennsylvania Lumber

Company" in connection with the 1908 tax sale purchases. (D43.008).

**K.    The PGC Recognized that It Was Not Acquiring the Subsurface Estate**

78.    In 1920, the PGC and CPLC entered into an agreement for sale of 19 warrants, including the Josiah Haines Warrant.  The agreement for sale was made subject to the subsurface reservation in favor of Proctor & Hill. (J2.091).

79.    Indeed, the April 6, 1920 resolution from the CPLC Board to offer the tender to the PGC was made "subject to the reservations and conditions specified in said tender", with the "complete description of said lands together with all exceptions, covenants and stipulations to be embodied in said deed as follows: (J2.103) … RESERVING AND SAVING unto Thomas E. Proctor and Jonathan A. Hill…all the minerals, coal, oil, gas or petroleum…." (J2.108).

80.    PGC's title examiner recognized that the sale from CPLC to the PGC did not encompass the subsurface estate. (J2.092 and J2.119).

81.    In a November 22, 1920 letter from the PGC's title examiner, he highlighted that the Contract for Sale approved by the CPLC Board and the PGC was subject to the exception and reservation "RESERVING AND SAVING unto" Proctor & Hill the oil, gas and minerals.  (J2.091).  After reciting the exceptions and reservations, the PGC's title examiner stated that "[i]n the preparation of this report, therefore, no references are made to any exceptions, reservations or adverse conveyances which are included in the above exceptions contained in the

agreement for sale." (J2.092).

82.     In a January 11, 1921 letter to the Secretary of the PGC, the PGC's title examiner states that the land is "now vested in the said Central Pennsylvania Lumber Company in fee simple, free and clear of all encumbrances of record, *except the reservations expressly set forth in the Agreement for sale in this case*." (J2.119) (emphasis added).

83.     As a result, the 1920 CPLC-PGC deed was made "subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface or any or all of the lands…as fully as said minerals and mineral rights were excepted and reserved in deed…from Thomas E. Proctor et al." (J6.004-5).

84.     The CPLC-PGC deed was also "subject to all the reservations, exceptions, covenants and stipulations" in the Proctor-Union Tanning Deed which reserved "all the minerals, coal, oil, gas or petroleum…." (J6.005).

85.     CPLC also excepted and reserved the right of way for the SSNY Railroad to access "any mine or mines on said described lands" indicating that the PGC was not acquiring the subsurface rights. (J2.130).

86.     At the same time, CPLC was negotiating with the LeRoy Coal Company, the lessee of the Proctor & Hill coal interests in the lands, to build a spur track to the mines to transport the coal.  (D33.025 ("We would like to know what arrangement the LeRoy Coal Co. has made with the Lumber Co. and the

Susquehanna and New York R.R. Co."); D3.027 ("as they are building a spur track, the Central Penn. Lumber Company have a good idea of the property")).

87.   Approximately 50 years after its purchase, the PGC acknowledged that it did not own the subsurface of the Michael Gratz and John Boyd warrants, which have the identical title history as the Josiah Haines Warrant.  (D52).  In 1969, the PGC sold portions of those warrants reserving "all rights-of-way, minerals, coal, gas, petroleum, and oil, in, on, or underlying the premises hereinbefore described as *previously excepted and reserved in prior deeds of record*."  (D52.003) (emphasis added).  The deeds of record show that CPLC reserved the right-of-way and Proctor & Hill had the only subsurface reservation. (J2.065-70; J3-J6).

## III.  PROPOSED CONCLUSIONS OF LAW[3]

### A.  Jurisdiction, Venue and Applicable Law

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

2.  Venue is proper because a "substantial part of the events or omissions giving rise to the claim occurred" in this district.  28 U.S.C. § 1391(b)(2).

3.  The parties seek to quiet title and declare that they are the respective owners of the oil, gas and mineral rights associated with the Josiah Haines Warrant.  The Court has authority to issue a declaratory judgment under 28 U.S.C. § 2201.

4.  Because this case arises under the Court's diversity jurisdiction, this Court applies Pennsylvania substantive law.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

---

[3] The Court thoroughly examined the law applicable to the sale of unseated lands for unpaid taxes in the Memorandum Opinion on the parties' cross-motions for summary judgment ("*Memorandum*").  *Memorandum*, ECF No. 183, *reported at* 455 F.Supp.3d 127 (2020).  The *Memorandum* settled several legal issues in this case, including the applicable duties of Union Tanning and CPLC to report and pay taxes on their unseated lands and the prohibition against an unseated landowner from acquiring better title due to its own neglect of its duties.  Therefore, the Proctor Trust does not restate the full legal support for the proposed conclusions of law, but relies primarily on this Court's prior determinations set forth in the *Memorandum*.

5.     In an action to quiet title, the plaintiff bears the burden of proof to establish title by a fair preponderance of the evidence. *Long Run Timber Co. v. Dep't of Conservation & Nat. Res*., 145 A.3d 1217, 1228 (Pa. Commw. 2016); *see also Montgomery Cty., Pa. v. MERSCORP Inc*., 795 F.3d 372, 375 n.2 (3d Cir. 2015) (applying Pennsylvania law); 22 Standard Pennsylvania Practice 2d § 120:181.

**B.     The Scope of the 1907 Tax Assessment and 1908 Tax Sale Encompassed Only CPLC's Surface Interest and Did Not Include the Subsurface Estate.**

6.     Under the Act of March 28, 1806 ("Act of 1806"), P.L. 644, 4 Sm. L. 346, § 1, repealed and replaced by 72 Pa.C.S.A. § 5020-409, the party "becoming a holder of unseated land" had the duty to report his ownership interest to the county commissioners for tax purposes. *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 368 (Pa. 2016).

7.     If the grantee failed to provide this information within one year of the conveyance, the commissioners were obligated to impose a penalty equal to "four times the amount of tax to which such tract or tracts of land would otherwise have been liable." *Id.*

8.     Reporting under the Act of 1806 is critical to determine what estate was assessed and sold "because the county commissioners were tasked with assessing unseated property for taxation purposes based on what was reported by

the owners." *Id.* at 360.

9.      In *Herder Spring*, the Pennsylvania Supreme Court held that where a party severs the surface from the subsurface in a deed, conveying only the surface and retaining the subsurface, the grantee in the deed has the obligation to report its acquisition of the surface estate. *Id.* at 372.

10.      Thus, in this case, both Union Tanning and CPLC had the affirmative duty to report their ownership of the severed surface estate to the Bradford County Commissioners.

11.      After a severance is reported, the county commissioners must assess and tax the severed estates separately. *Id.* at 364 (quoting *Wilson v. A. Cook Sons Co.*, 148 A. 63, 64 (Pa. 1929)); *see also Sanderson v. City of Scranton*, 105 Pa. 469, 469 (1888) ("Where the surface of lands and the minerals in place thereunder have been severed by the agreement or conveyance of the owner, and the respective divisions have become vested in different owners, the municipal authorities are bound to levy their taxes according to the ownership and value of these divisions. And each owner can be made responsible only for the tax on his interest, whether underlying strata or surface.").

12.      As set forth above in the Proposed Findings of Fact, the evidence establishes that both Union Tanning and CPLC reported their acquisitions of the surface estate of the Josiah Haines Warrant to the Bradford County

Commissioners.[4]

13.     Because CPLC properly reported its surface-only interest in the Josiah
Haines Warrant, the 1907 assessment and 1908 tax sale encompassed only CPLC's
surface estate of the Josiah Haines Warrant, and did not include the subsurface
estate. *See Herder Spring*, 143 A.3d at 360; *New York State Nat. Gas Corp. v.
Swan-Finch Gas Dev. Corp.*, 278 F.2d 577, 579 (3d Cir. 1960) ("a tax deed
conveys only such interest as was actually assessed to the defaulting taxpayer.").[5]

14.     Accordingly, the 1908 tax sale did not alter the title to the subsurface

---

[4] The PGC has not presented any evidence that CPLC falsely reported that it
owned the entirety of the warrant (surface and subsurface estates), nor would such
a showing aid the PGC.  If CPLC improperly reported that it owned more than the
surface, it would be equitably barred from gaining a better title following a tax sale
caused by its failure to pay 1907 taxes.  *Powell v. Lantzy*, 34 A. 450, 451 (Pa.
1896); *Coxe v. Wolcott*, 27 Pa. 154, 159 (1856); *Chambers v. Wilson*, 2 Watts 495,
502 (Pa. 1834) ("It would be a fraud to permit her to gain a title by the non-
performance of a duty which the law throws upon her."); *Elliott v. Moffett*, 74 A.2d
164, 168 (Pa. 1950) (an owner "cannot take advantage of his violation of that duty
by purchasing the property at a tax sale occasioned by his own default.").

[5] The PGC places great weight on the absence of a separate assessment of
the severed subsurface estate on the unseated list; however, the absence of such an
assessment does not aid the PGC because CPLC had the duty to report.  *See
Memorandum*, 455 F. Supp. 3d at 150 (explaining that the absence of assessments
of the severed subsurface on the unseated list is irrelevant because "*Powell's*
rule—barring the breaching party from acquiring better title—appertains only to
the Game Commission, not the Proctor Trusts.").  Moreover, Bradford County
assessed subsurface rights only where actual production occurred, placing them on
the list of "seated" lands.  (D8; Gass Tr., J31 at 25:11-27:8; D33.026).  Thus, the
PGC's argument is without merit.

estate associated with the Josiah Haines Warrant and the Thomas E. Proctor Heirs

Trust and the heirs of Jonathan A. Hill are the owners of the subsurface estate of

the Josiah Haines Warrant in LeRoy Township, Bradford County.

### C. CPLC's Duty To Report Its Ownership Interest and To Pay Taxes Precludes It From Acquiring the Subsurface Estate Through Its Own Default.

15.     Pennsylvania law instructs that "one cannot, by a purchase at a tax

sale caused by his failure to pay taxes which he owed the state, or which he was

otherwise legally or morally bound to pay, acquire a better title, or a title adverse to

that of other parties in interest." *Powell v. Lantzy*, 173 Pa. 543, 34 A. 450, 451

(1896) (citing *Chambers v. Wilson*, 2 Watts 495 (Pa. 1834); *Coxe v. Wolcott*, 27

Pa. 154 (1856)).

16.     As explained by this Court, "[t]his rule 'rests upon the principle that

one cannot profit by his own wrong, and build up or acquire a title founded upon

his own neglect of duty.'  Instead, such a purchase 'operates as a payment only,'

*i.e.*, a redemption." *Memorandum*, 455 F. Supp. 3d at 145 (quoting *Powell*, 34 A.

at 451) (citation omitted)).

17.     As discussed at length in the *Memorandum*, unseated landowners,

such as CPLC, had the duty to pay taxes.  *Memorandum*, 455 F. Supp. 3d at 147-

48; *see also* Act of 6 June, 1887, P.L. 363, No. 248, § 1 (codified at 72 Pa.C.S.A. §

5781); *Breisch v. Coxe*, 81 Pa. 336, 346 (1876) ("the payment of taxes is a duty,

and a failure to perform it is the fault of the owner"); *see also Mayor of*

*Philadelphia v. Riddle*, 25 Pa. 259, 263 (1855) ("it is an owner's duty to pay

taxes").

18.     Thus, CPLC could not "utilize its own default to gain a better title at a

tax sale, i.e., 'build up or acquire a title founded upon [its] own neglect of duty.'"

*Memorandum*, 455 F. Supp. 3d at 150 (quoting *Powell*, 34 A. at 451).

19.     Because CPLC's failure to pay the tax assessed on its unseated land

led to the tax sale, it could not acquire title to the subsurface estate as a result of the

1908 tax sale.

### D.     Because Calvin H. McCauley Jr. Was An Agent of CPLC, His Tax Sale "Purchase" Operated as a Redemption.

20.     In the *Memorandum*, the Court concluded that "CPLC owed a legal

duty to pay taxes on its unseated surface estate; hence, CPLC could not use an

agent to 'acquire a better title, or a title adverse to that of other parties in interest,'

at a tax sale prompted by its own default."  *Memorandum*, 455 F. Supp. 3d at 147

(quoting *Powell*, 34 A. at 451).

21.     Because McCauley Jr. was CPLC's agent, his tax sale purchase

operated as payment of the defaulted taxes, operating as the "equivalent to a

redemption" and keeping the title to the subsurface estate in Proctor & Hill.  *See,*

*e.g., Knupp v. Syms*, 50 A. 210, 212 (Pa. 1901).

27

22.     A redemption operates to "set aside or annul" the tax sale, leaving the title "precisely as though the sale had not been made." *Yocum v. Zahner*, 29 A. 778, 779 (Pa. 1894).

23.     McCauley Jr.'s agency status with CPLC was confirmed with the filing of CPLC's articles of incorporation, which designated him the treasurer of the company, his later position as real estate agent, and then – at the time of the sale – Assistant General Solicitor.  The PGC has not proffered any evidence that McCauley Jr. ever renounced his agency with CPLC prior to the 1908 tax sale (and the overwhelming evidence is just the opposite).  Therefore, his "purchase" can only be deemed to have been a payment on CPLC's behalf.  *Bartholomew v. Leech*, 7 Watts 472, 473-74 (Pa. 1838) (explaining that an agent cannot purchase his principal's property at a tax sale, unless he "explicitly resigned his trust").

24.     Thus, under settled law, an agent's purchase at a tax sale operates as a redemption, rendering the sale ineffective to alter title.  *Lamb v. Irwin*, 69 Pa. 436, 442–43 (Pa. 1871) ("The finding of the alleged agency would have vitiated the treasurer's sale").

25.     Indeed, the PGC's title examiner admitted that purchases by CPLC's attorneys and officers would not "have any greater effect than that of redemption, in which case the title to the oil, gas and minerals would not be divested…." (D37.012).  This is because an agent's payment of the tax sale purchase price is

treated as payment of the underlying assessed taxes. *Knupp*, 50 A. at 212; *see also* Black, Tax Titles, § 273 (purchase on owner's behalf "is deemed merely a mode of paying the taxes and leaves the title in precisely the position it would have occupied if the payment had been made before instead of after the land was put up for sale. This rule rests on such obvious principles as to require no justification.") (citations and footnote omitted).

26.     "[T]he purpose of tax sales is not to strip the taxpayer of his property but to insure the collection of taxes." *Hess v. Westerwick*, 76 A.2d 745, 748 (Pa. 1950).  Here, McCauley Jr.'s purchase operated as payment of the underlying taxes on CPLC's behalf.

27.     Because McCauley Jr. was CPLC's agent at the time of the 1908 tax sale, "CPLC's purchase through McCauley effectuated nothing more than a redemption of its surface interest." *Memorandum*, 455 F. Supp. 3d at 151.

28.     Accordingly, McCauley Jr.'s purchase left title to the oil, gas and minerals "precisely as though the sale had not been made." *Yocum*, 29 A. at 779. That is, title the oil, gas and minerals remained in the Proctor & Hill heirs.

### E.     Collateral Estoppel Does Not Apply to this Action

29.     On the eve of trial, the PGC argued for the first time in an evidentiary submission that the Superior Court's 2019 nonprecedential decision in *Keta Oil Keta Gas & Oil Co. v. Proctor*, No. 1975 MDA 2018, 2019 WL 6652174, at *3-4

(Pa. Super. Ct. Dec. 6, 2019) and Judge Ceisler's January 2021 decision in the parties' action before the Commonwealth Court should be given preclusive effect to the issues of CPLC's duty to pay taxes and McCauley Jr.'s agency.[6]  Although, as this Court noted during the trial, "there are some significant differences" between the cases (Tr. at 74:17-19), the PGC's attempt to apply collateral estoppel is precluded on several legal grounds.

30.     As an initial matter, collateral estoppel does not apply to pure questions of law, which the PGC seeks here.  *Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 52 (Pa. 2005) (citing *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 329–331 (1979)); *Henglein v. Colt Indus. Operating Corp*., 260 F.3d 201, 212 (3d Cir. 2001); *see also* Restatement (Second) of Judgments § 28. Instead, the rule of preclusion is superseded by the less limiting principle of stare decisis.  Restatement (Second) of Judgments § 29 cmt. i.  A review of the "conclusions" the PGC listed in its filing and the cases on which they are based shows that they are simply legal conclusions.

31.     In addition, those legal conclusions are inconsistent with this Court's *Memorandum* and the *en banc* Commonwealth Court's decision.  Where a ruling is

---

[6] Notably, the PGC's collateral estoppel argument does not apply to the issue of the scope of the tax assessments in this case.  Therefore, regardless of its application, collateral estoppel cannot salvage the PGC's claims as set forth under Section III.B *supra*.

inconsistent with other determinations, collateral estoppel is inappropriate.

Restatement (Second) of Judgments § 29(4) & cmt. f (1982); *ADP, LLC v. Rafferty*, 923 F.3d 113, 124 n.10 (3d Cir. 2019) (holding that collateral estoppel is inappropriate where the court cannot be confident in the judgment given inconsistent determinations).  Indeed, the *Keta* decision rested on the belief that the presented evidence was speculative, but both this Court and the *en banc* Commonwealth Court disagreed with that determination.  Ironically, Judge Ceisler departed from the *en banc* decision by relying upon this Court's vacated opinion, meaning that the PGC seeks to turn the vacated opinion into binding law for this Court.  Clearly, collateral estoppel is not intended to have such a consequence.[7]

32.     As the Restatement explains, the foundation for the doctrine of collateral estoppel is not justified as "merely avoiding further costs of litigation but also by underlying confidence that the result reached is substantially correct. Where a determination relied on as preclusive is itself inconsistent with some other adjudication of the same issue, that confidence is generally unwarranted."

---

[7] Indeed, this Court's *Memorandum* settling the applicable law was "sufficiently firm" to be afforded finality on the legal issues prior to Judge Ceisler's opinion to avoid collateral estoppel. *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 358 (3d Cir. 1999) (analyzing "sufficiently firm" factors under the Restatement); *Burlington Northern R.R. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1233 n. 8 (3d Cir. 1995) (holding a denial of summary judgment sufficiently final to justify issue preclusion in a subsequent action even though it was not immediately appealable as a matter of law).

Restatement (Second) of Judgments § 29 cmt. f (1982); *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 358 (U.S. 2016) ("Where circumstances suggest that an issue was resolved on erroneous considerations, 'taking the prior determination at face value for purposes of the second action would [impermissibly] extend the ... imperfections in the adjudicative process.'") (quoting Restatement § 29, Comment *g*). Thus, the inconsistent decisions cannot be afforded preclusive effect.

33.    Finally, the purpose of collateral estoppel is to save the parties' and Court's time and resources; that purpose is undermined where trial has already occurred and the second court has the benefit of evidence not reviewed by the prior courts. Indeed, by waiting until the eve of trial to raise the issue and failing even to file a motion, the PGC waived collateral estoppel. *Kopsie v. Dep't of Pub. Welfare*, No. 203 C.D. 2011, 2011 WL 10819928, at *4 n.8 (Pa. Commw. Ct. Oct. 13, 2011) (holding that collateral estoppel is waived where the party fails "to raise it at the earliest opportunity.").

34.    Accordingly, PGC's collateral estoppel argument fails.

**F.    The Thomas E. Proctor Heirs Trust and the Heirs of Jonathan A. Hill Are the Owners of the Subsurface Estate of the Josiah Haines Warrant.**

35.    Based on the foregoing, the 1908 tax sale did not alter the title to the subsurface estate reserved by Proctor & Hill in their 1894 deed to Union Tanning.

36.    Therefore, the Thomas E. Proctor Heirs Trust and the heirs of

Jonathan A. Hill are the owners of all the minerals, coal, oil, gas, or petroleum on

or under the surface of the Josiah Haines Warrant in LeRoy Township, Bradford

County.

 Dated: July 6, 2021

Respectfully submitted,

/s/ *Laura A. Lange*
Laura A. Lange (PA 310733)
1670 Sturbridge Drive
Sewickley, PA 15143
lange@proctortrust.com

Justin G. Weber (PA 89266)
TROUTMAN PEPPER
Suite 200, 100 Market Street
P.O. Box 1181
Harrisburg, PA 17108-1181
717.255.1155
717.238.0575 (fax)
Justin.Weber@troutman.com

*Attorneys for the Thomas E. Proctor*
*Heirs Trust*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was electronically filed with the Clerk of Court today via the Court's CM/ECF, and that, pursuant to Local Civil Rule 5.7, participants in the case who are registered ECF users will be served by the ECF system.


Dated:  July 6, 2021                       /s/ *Laura A. Lange*