## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,** | : : : : | **CIVIL ACTION NO. 1:12-CV-1567** **(Judge Conner)** |
| **Plaintiff** | : : | |
| **v.** | : : | |
| **THOMAS E. PROCTOR HEIRS TRUST,** | : : : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Plaintiff, Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), claims it owns both the surface and subsurface rights for numerous tracts of land in Sullivan and Bradford Counties in northeastern Pennsylvania.  Defendant, Thomas E. Proctor Heirs Trust[1] ("Proctor Trust" or "the Trust"), disagrees, contending it holds superior title to the subsurface estates underlying these tracts.  A lengthy and complex legal battle has ensued, culminating in a bench trial regarding subsurface ownership of the Josiah Haines warrant—a bellwether tract of land in LeRoy Township, Bradford County.  As we explain in further detail herein, the court finds in favor of Proctor Trust.

---

[1] The Margaret O.F. Proctor Trust was also a named defendant in this action until April 13, 2021, when the court granted Proctor Trust's concurred-in motion to dismiss that entity.  (<u>See</u> Docs. 212, 213).

I.   **Procedural History**

The Game Commission initially filed this action in August 2012.  Following several rounds of Rule 12 motion practice, the Game Commission eventually filed the operative second amended complaint in December 2014 seeking to quiet title to 2,481 acres in Sullivan and Bradford Counties in northeastern Pennsylvania.  The Trust counterclaimed, also seeking to quiet title and adding claims for conversion and unjust enrichment.  The Game Commission subsequently filed a counterclaim for tortious interference.  This protracted procedural history is outlined in a February 2019 report and recommendation from Magistrate Judge Susan E. Schwab, familiarity with which is presumed.  (See Doc. 183 at 2 (citing Doc. 155 at 1-10)).

Following a period of discovery, both parties moved for partial summary judgment, seeking to quiet title to the subsurface estate of a single tract, the bellwether 410-acre Josiah Haines warrant.  The court denied summary judgment based on material factual disputes regarding two issues: (1) whether the scope of the 1907 assessment leading to the 1908 tax sale of the Josiah Haines warrant included the subsurface estate, and (2) whether Calvin H. McCauley, Jr.,[2] who purchased the Josiah Haines warrant at the 1908 tax sale, was acting as an agent of the Central Pennsylvania Lumber Company ("CPLC").  The court convened a one-day bench trial in April 2021 to determine ownership of the subsurface estate of the

---

[2] We refer to Calvin H. McCauley, Jr., as "McCauley" throughout this opinion. We note, however, that several items in evidence also refer to his father, Calvin H. McCauley.  Where necessary, we use the appropriate suffix to differentiate between father and son.

Josiah Haines warrant.  After trial, the parties submitted proposed findings of fact and conclusions of law.  We now resolve outstanding evidentiary objections and set forth our findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  See FED. R. CIV. P. 52(a).

## II.     Outstanding Evidentiary Objections[3]

During the April 2021 bench trial, the court admitted Joint Exhibits 2 through 29 without objection.  (See 4/27/21 Tr. 9:13-20, 10:15-16; Joint Exs. 2-29).  Plaintiff's Exhibits 3 through 35 were admitted without objection.  (See 4/27/21 Tr. 133:22-135:5).  Defense Exhibits 39, 40, and 42 were not admitted.  (See id. at 115:18-116:15).  In addition to the objections raised in its pretrial brief, the Game Commission reserved an objection to Joint Exhibits 30, 31, and 32 on grounds of relevance, and possibly authenticity and hearsay, depending on their use at trial.  (See id. at 9:23-10:14).  We consider the remaining evidentiary objections seriatim.

---

[3] The court's resolution of evidentiary objections is based on the parties' pretrial exhibit list and briefing as well as argument during the April 2021 bench trial.  (See Docs. 204, 206, 214, 218).  The factual narrative in Section III represents the court's findings of fact as derived from the record.  Citations thereto include the transcript of the bench trial convened on April 27, 2021, ("4/27/21 Tr. [page:line]"), as well as stipulated facts, (Doc. 205 ¶ __), and exhibits introduced by both parties, ("Joint Ex. __," "Pl. Ex. __," and "Def. Ex. __").

### A.      Proctor Trust's Objections

Proctor Trust contends several pages of the parties' first joint exhibit, as well as two of the Game Commission's exhibits, contain inadmissible expert legal conclusions.  (See Doc. 206 at 1-3; Joint Ex. 1 at 1-6; Pl. Exs. 1, 2).

Admissibility of expert testimony is governed by Federal Rule of Evidence 702.  See FED. R. EVID. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).  The Third Circuit Court of Appeals has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).  For expert testimony to "fit," it must be "sufficiently tied to the facts of the case, so that it 'fits' the dispute and will assist the trier of fact."  UGI Sunbury, LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation marks omitted).

According to Rule 704, an expert's opinion "is not objectionable just because it embraces an ultimate issue."  See FED. R. EVID. 704.  But an opinion on the ultimate issue is not admissible if the opinion "would merely tell the [factfinder] what result to reach."  See id. advisory committee's notes to 1971 amendment.  Rule 704 must also "be read in conjunction with Rule 702, which requires opinion evidence to be helpful to the jury."  See Collie v. Wal-Mart Stores E., L.P., No. 1:16-CV-227, 2017 WL 2264351, at *1 (M.D. Pa. May 24, 2017) (Conner, C.J.).  Our court of appeals further cautions that experts may not "testify as to the governing law of the case."  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).  They also may not provide opinions "about the ultimate legal conclusion."  Patrick

v. Moorman, 536 F. App'x 255, 258 (3d Cir. 2013) (nonprecedential) (citing

Berckeley, 455 F.3d at 217; United States v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)).

Allowing an expert to so testify effectively usurps the court's role.  Berckeley, 455

F.3d at 217.

### 1. *Wilkinson Report*

The Game Commission obtained a declaration and title report from J.C.

Wilkinson, III, an attorney with experience in "oil and natural gas title issues in

Pennsylvania."  (See Pl. Ex. 1 at 2).  Wilkinson provides an expert opinion on the

scope of the 1908 tax sale to McCauley and the ownership of the subsurface estate of

the Josiah Haines warrant.  (See id. at 3-7).  The Trust continues to object to the

Wilkinson report, arguing it contains "legal opinion testimony."  (See Doc. 206 at 1-

4).

In a February 2019 report and recommendation, Magistrate Judge Susan E.

Schwab partially granted Proctor Trust's motion to strike the Wilkinson report and

recommended striking portions of that evidence, reasoning that such testimony is

"not helpful to the court or factfinder."  (See Doc. 155 at 11-17 & nn.8-9).  In our

April 2020 opinion, we expressed "complete agreement with Judge Schwab's

analysis and conclusions" on the Wilkinson report and adopted them as our own.

(See Doc. 187 at 7 n.5).  We continue to agree that the conclusions set forth in the

Wilkinson report regarding the legal effect of the 1908 tax sale and ownership of the

disputed subsurface rights impermissibly usurp our role in this quiet title action.

See Berckeley, 455 F.3d at 217.  To reiterate Judge Schwab, we will not consider

Wilkinson's discussion of the "governing law" as it pertains to the Pennsylvania

Supreme Court's opinion in <u>Herder Spring Hunting Club v. Keller,</u> 143 A.3d 358,

364 (Pa. 2016).  We also will not consider Wilkinson's legal conclusions (1) that the

Proctor Trusts do not have an interest in the subsurface estate; (2) that the

Commonwealth has title to the subsurface estate; (3) that 100% of both the surface

estate and the subsurface estate is vested in the Commonwealth; (4) that the 1908

tax sale resulted in a "Title Wash" that extinguished the prior reservation of oil, gas,

and mineral rights; and (5) that the 1920 deed from the CPLC to the Commonwealth

does not contain clear language of reservation in favor of CPLC.  (<u>See</u> Doc. 155 at

16).  We will not strike the other portions of the report.  (<u>See</u> <u>id.</u> at 16-17).

### 2.    *Percheron Title Abstract*

The parties submitted a joint exhibit comprised of several hundred pages

that begins with a six-page abstract by Percheron Title.  (<u>See</u> Joint Ex. 1 at 1-6).

The other pages consist of, *inter alia*, maps, deeds, and unseated land books.  (<u>See</u>

<u>id.</u> at 7-615).  The Trust objects to only the first six pages of the exhibit for the same

reason it objects to the Wilkinson report, arguing it contains inadmissible legal

conclusions.  (<u>See</u> Doc. 206 at 2-3).  We agree with the Trust, as these pages also

contain conclusions about the effect of the 1908 tax sale and whether it effected a

title wash on the subsurface estate—a dispute that is at the heart of this quiet title

action.  Percheron Title's rendering of an opinion on this matter usurps the court's

role.  See Berckeley, 455 F.3d at 217.  We will not consider the first six pages of the parties' first joint exhibit.  (See Joint Ex. 1 at 1-6).

### 3. *Sullivan County Title Report*

The Game Commission submitted an exhibit related to the Commonwealth's purchase of numerous land tracts, including the Josiah Haines warrant, from CPLC.  (See Pl. Ex. 2 at 1).  The Trust summarily contends "substantial portions" of this exhibit are legal conclusions from the Game Commission's title examiner, and the other portions are not relevant to ownership of the Josiah Haines subsurface estate.  (See Doc. 206 at 3 n.2).  The Trust does not, however, provide excerpts or even pagination for the portions it considers "legal conclusions" from this 100-page exhibit.  (See id.)  We "decline to root through the record" and make the Trust's argument for it, see Zimmermann v. NLRB, 749 F. App'x 148, 150 (3d Cir. 2019) (nonprecedential) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)), and therefore will deny the Trust's objection.  We will consider the exhibit to the extent it contains relevant information about either the 1907 assessment or McCauley's status as an agent of CPLC.

### B. Game Commission's Collateral Estoppel Arguments

The Game Commission contends that Proctor Trust is collaterally estopped from relitigating the issues currently before the undersigned due to two state-level cases involving the Trust as a party, one of which also involves the Game Commission.  (See Doc. 214 at 1-3).  The doctrine of collateral estoppel dictates that "a question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the

same parties or their privies." <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979). Collateral estoppel specifically bars relitigation of an issue that was conclusively determined in a prior adjudication and that was essential to the original judgment. <u>Witkowski v. Welch</u>, 173 F.3d 192, 198 (3d Cir. 1999); <u>Venuto v. Witco Corp.</u>, 117 F.3d 754, 758 (3d Cir. 1997). Collateral estoppel promotes fairness and certainty, while preventing wasteful expenditure of resources on issues already resolved through adversarial proceedings. <u>See Allen v. McCurry</u>, 449 U.S. 90, 94 (1980); <u>Montana</u>, 440 U.S. at 153–54; <u>Witkowski</u>, 173 F.3d at 198-99.

A federal court sitting in diversity in Pennsylvania must apply Pennsylvania law with respect to issue preclusion. <u>See Witkowski</u>, 173 F.3d at 199. Pennsylvania courts apply a four-part test derived from Section 27 of the Restatement (Second) of Judgments to determine whether collateral estoppel bars a potential claim. <u>Witkowski</u>, 173 F.3d at 199 (citing <u>Pa. State Univ. v. County of Centre</u>, 615 A.2d 303, 306 (Pa. 1992)). Relevant here, Pennsylvania courts have explained that when the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments," collateral estoppel may not be warranted. <u>See Off. of Disciplinary Couns. v. Kiesewetter</u>, 889 A.2d 47, 52 (Pa. 2005) (citing <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 330 (1979)).

We reject the Game Commission's collateral estoppel arguments related to <u>Keta Gas & Oil Co. v. Proctor</u>, No. 1975 MDA 2018, 2019 WL 6652174 (Pa. Super. Ct. Dec. 6, 2019), as well as <u>Commonwealth v. Thomas E. Proctor Heirs Tr.</u>, No. 493 M.D. 2017, 2020 WL 256984 (Pa. Commw. Ct. Jan. 16, 2020). The <u>Keta</u> decision affirmed a trial court's decision on summary judgment where the trial court found

no genuine issues of material fact for trial on, *inter alia*, whether certain subsurface reservations had been reported.  See <u>Keta</u>, 2019 WL 6652174, at *3.  This court, however, already concluded in April 2020 that Proctor Trust has "proffered competent evidence that Union Tanning and CPLC reported their unseated surface interest to Bradford County Commissioners."  (<u>See</u> Doc. 183 at 27).  We thus do not consider the <u>Keta</u> decision preclusive because, unlike the trial court, we did not and do not consider the Trust's evidence speculative.  <u>Cf.</u> <u>Keta</u>, 2019 WL 6652174, at *5.  Nor do we consider the 2021 Commonwealth Court opinion preclusive, as the Pennsylvania Supreme Court has vacated that decision and remanded the case for further proceedings.  See <u>Pennsylvania Game Comm'n v. Thomas E. Proctor Heirs Tr.</u>, No. 12 MAP 2021, 2021 WL 5346728, at *1 (Pa. Nov. 17, 2021); (<u>see also</u> Doc. 221).  These opinions are "inconsistent with" our previous summary judgment opinion providing the applicable law for trial, and preclusive effect is not warranted.  See <u>Kieswetter</u>, 889 A.2d at 52.

## C.   Game Commission's Objections

### 1.   *Relevance Objections*

"Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, and the fact is of consequence in determining the action."  FED. R. EVID. 401.  Evidence is relevant unless it has "*no* tendency to prove [a consequential] fact."  <u>Spain v. Gallegos</u>, 26 F.3d 439, 452 (3d Cir. 1994) (citation omitted).  Relevance is a low bar.  See <u>Forrest v. Parry</u>, 930 F.3d 93, 114 (3d Cir. 2019).

The Game Commission asserts a general relevance objection to all of the Trust's exhibits, claiming "these misperceived factual disputes are irrelevant and immaterial as a matter of law."  (See Doc. 214 at 8).  The Game Commission has further lodged objections to nearly all of the 53 exhibits from the Trust on the parties' final joint exhibit list.  (See Doc. 204; Doc. 214 at 9-37).  We consider these objections in several groupings depending on the substance of the evidence offered, its purpose, the objection, and our ruling.  If we do not rule on a particular evidentiary item, we have not considered it in our analysis.

### a.    General Relevance

We overrule the Game Commission's general objection for the reasons stated in our summary judgment opinion, which sets forth the factual disputes to be resolved at trial.  As noted in that opinion, disputes regarding the scope of the 1907 assessment of the Josiah Haines warrant, as well as McCauley's status as an agent of CPLC, are both relevant and material to determining the current legal owner of the subsurface estate.  (See Doc. 183 at 23-43).  The Game Commission's objection is preserved for appellate review.  (See 4/27/21 Tr. 26:19-27:2).

### b.    Exhibits Offered in Relation to CPLC's Reporting Practices

The Trust has offered over a dozen exhibits in relation to the issue of whether Union Tanning Company ("Union Tanning") or CPLC properly reported their surface interest in the Josiah Haines warrant pursuant to the Act of 1806, P.L. 644, 4 Sm. L. 346, § 1, repealed and replaced by 72 PA. STAT. AND CONS. STAT. ANN. § 5020-409.  (See Def. Exs. 2-9, 44-47, 49-51).  The Game Commission argues these

exhibits are irrelevant and immaterial.  (See Doc. 214 at 13-37).[4]  As explained in our summary judgment opinion, evidence concerning Union Tanning's and CPLC's reporting practices are relevant to the instant dispute.  (See Doc. 183 at 29-31).  We will summarize each documentary exhibit offered by the Trust, and the Game Commission's objection, in turn.

Exhibits 1, 2, 3, 8, and 47 are excerpts from land assessment books within Bradford County, covering a range of years from 1895 to 1930.  (See Def. Exs. 1-3, 8, 47).  Exhibits 1 and 8 provide records from Leroy Township; Exhibit 2 from Barclay Township; and Exhibit 3 from Overton Township.  (See Def. Ex. 1-3).  Exhibit 47 contains records from each of these townships.  (See Def. Ex. 47).  Exhibit 50 is a recapitulation statement from the county commissioners to the Barclay Township assessors in 1894, instructing assessors to return a list of, inter alia, "all property taxable by law."  (See Def. Ex. 50 at 2).  The Game Commission objects to Exhibits 2 and 3 because the Josiah Haines warrant is not located within those townships, to Exhibit 8 because it concerns seated land, to Exhibit 47 because it contains information after the tax sale occurred in 1908, and to Exhibit 50 because it does not explain the 1908 tax sale.  (See Doc. 214 at 13, 16, 32, 34).

We will overrule the objection to these exhibits.  When land was still assessed as seated and unseated in Pennsylvania, county land assessors were responsible for

---

[4] Although the Game Commission initially objected to Exhibit 51 from the Trust, (see Doc. 214 at 34), it withdrew this objection during trial, (see 4/27/21 Tr. 118:16-19).  Exhibit 51 is a demonstrative exhibit which contains magnifications of certain pages from the parties' joint exhibits.  (See Def. Ex. 51).  We will admit this exhibit to the extent it aids in reading these notations.

"travers[ing] the county" to determine whether land was seated or unseated and for reporting such distinctions to the county commissioners for taxation purposes. Herder Spring Hunting Club v. Keller, 143 A.3d 358, 364 (Pa. 2016); see McCall v. Lorimer, 4 Watts 351, 353 (Pa. 1835). The Trust has offered these exhibits to demonstrate reporting practices and payment at the county level. (See 4/27/21 Tr. 30:14-32:11). We consider reporting practices within Bradford County, of both seated and unseated lands, and the recapitulation statements used to assess property, to be relevant to our resolution of this matter. We also do not consider Exhibit 47 outside the relevant time period because we consider tax-payment activity occurring on the Josiah Haines warrant in 1909 and 1910 to be relevant to our analysis. (See also Doc. 183 at 28, 32-34).

We do not, however, consider Exhibits 4, 5, 6, 7, 9, or 49 relevant to the instant dispute. (See Def. Exs. 4-7, 9, 49). Exhibit 4 is a Pennsylvania Supreme Court paper book from a state court case in 1907 involving CPLC. (See Def. Ex. 4 at 1, 2). The testimony to which the Trust refers relates to Lycoming County rather than Bradford County and does not reference the Josiah Haines warrant. (See id. at 49-59). So too for Exhibits 5 and 6, which are letters from Proctor's estate to the Lycoming County treasurers, and the assessment books for McIntyre Township in Lycoming County, respectively. (See Def. Exs. 5-6). Nor do we consider Exhibit 7, which depicts the Commonwealth's gas and oil development in 2007, to be relevant to our analysis. (See Def. Ex. 7). We also will not consider Exhibit 9, which is comprised of several news articles from the 1890s and early 1900s regarding planned or ongoing coal operations during that time period, on tracts of land

formerly owned by Proctor and Hill.  (<u>See</u> Def. Ex. 9 at 1, 7, 10).  The Trust has not proffered competent evidence that any coal mining occurred on the Josiah Haines warrant during the relevant period.  Finally, Exhibit 49 is a map of the "Schrader Lands."  (<u>See</u> Def. Ex. 49 at 1).  The parties do not dispute that Schrader Mining & Manufacturing owned the Josiah Haines warrant prior to Proctor and Hill, and we do not consider this map relevant to our analysis.  (<u>See</u> Doc. 205 ¶¶ 3, 4).

Exhibits 44, 45, and 46 are sworn declarations from three individuals who are custodians of different recordkeeping entities in the Commonwealth.  Exhibit 44 is from the Bradford County Historical Society; Exhibit 45 is from the office of the Recorder and Register of Deeds for Bradford County; and Exhibit 46 is from the Pennsylvania State Archives.  (<u>See</u> Def. Ex. 44 ¶¶ 3, 4; Def. Ex. 45 ¶¶ 3, 5; Def. Ex. 46 ¶¶ 3, 5).  Each exhibit attests to the same fact, *viz.*—that the entity "does not possess any notices to the Bradford County Board of Commissioners" from the 1890s through the 1920s.  (<u>See</u> Def. Ex. 44 ¶ 5; Def. Ex. 45 ¶ 6; Def. Ex. 46 ¶ 6).  The Game Commission objects that these declarations are irrelevant.  We disagree.  As noted in our summary judgment opinion, legal ownership of the Josiah Haines subsurface estate depends partially on whether certain interests were reported to the county commissioners in Bradford County.  (<u>See</u> Doc. 183 at 29-31).  This information is relevant to whether such records still exist or were retained by the entities that originally received them over a century ago.

### c.   <u>Exhibits Offered in Relation to McCauley</u>

The Trust has offered over 30 exhibits in relation to McCauley and whether he was acting as an agent for CPLC when he purchased the Josiah Haines warrant at a tax sale in June 1908.  The Game Commission argues these exhibits are irrelevant and immaterial.  (<u>See</u> Doc. 214 at 13-37).  As noted above, we consider McCauley's relationship to CPLC to be highly relevant and material to resolving this quiet title dispute.  (<u>See</u> Doc. 183 at 23-43).

Exhibits 10, 11, 21, 23, 25, and 26 are documents from two court cases that originated in the Potter County Court of Common Pleas.  (<u>See</u> Def. Exs. 10, 11, 21, 23, 25, 26).  Exhibits 12, 13, and 14 are CPLC's corporate documentation from its inception in 1903.  (<u>See</u> Def. Exs. 12, 13, 14).  Exhibits 15, 16, and 17 are letters to McCauley in 1904 and 1905.  (<u>See</u> Def. Exs. 15, 16, 17).  Exhibits 18, 19, 20, and 22 are *Boyd's Directory* excerpts from 1906 through 1909 that contain listings for CPLC and for McCauley.  (<u>See</u> Def. Exs. 18, 19, 20, 22).  Exhibit 24 is a page from the United States Census in 1910 listing McCauley as a "lawyer" for a "lumber co." (<u>See</u> Def. Ex. 24).  Exhibits 27 and 28 are copies of a notarized declaration by McCauley in 1914, stating that he was acting in trust for CPLC and using CPLC funds when he purchased six properties in Elk County from the county treasurer, and that his name on the deeds "is used only in trust for" CPLC.  (<u>See</u> Def. Exs. 27, 28).  Exhibit 29 consists of several deeds whereby McCauley quitclaims dozens of parcels of land (consisting of thousands of acres) to CPLC for $1.00.  (<u>See</u> Def. Ex. 29).  Exhibits 30 and 31 are letters from 1916 on CPLC "Legal Department" letterhead from McCauley.  (<u>See</u> Def. Exs. 30, 31).  Exhibit 32 contains two

newspaper articles that mention McCauley's positions within CPLC in 1913 and 1917.  (See Def. Ex. 32).  Exhibit 48 consists of two news articles from *The Williamsport Sun* in 1907 and 1908.  (See Def. Ex. 48).  One refers to "Calvin H. McCauley," who in 1908 was admitted to the Lycoming County bar and appointed "assistant general solicitor" for CPLC.  (See id. at 1, 2).[5]  The other names a "Calvin H. McCauley, Jr., of the Central Pennsylvania Lumber company," as a visitor to Ridgway, Pennsylvania in 1907.  (See id. at 3, 4).

The Game Commission objects to all these documents on the basis of relevance, arguing that they are not probative of McCauley's status as CPLC's agent.[6]  We overrule these objections, noting that an agency relationship does not require direct evidence "if it can be reasonably inferred from the circumstances of the case."  Scott v. Purcell, 415 A.2d 56, 61 n.8 (Pa. 1980) (citing Yezbak v. Croce, 88

---

[5] The Game Commission argues it would be improper to consider this article to pertain to McCauley, Jr., when the suffix "Jr." is not included and he had a father of the same name who also held a leadership position in CPLC.  (See Doc. 214 at 37; 4/27/21 Tr. 131:22-133:5).  However, the Trust proffered other evidence indicating McCauley, Sr., only ever held the position of "general solicitor" within the company.  (See Def. Ex. 53; 4/27/21 Tr. 136:24-137:21).  We agree with the Trust on this point.  It would be fanciful to infer that McCauley, Sr., who was appointed general solicitor when CPLC was formed in 1903, (see Def. Ex. 53 at 1, 2), and was further mentioned as its general solicitor in December 1907, (see id. at 3, 5), was demoted to *assistant* general solicitor less than two months later in February 1908, (see Def. Ex. 48 at 1, 2).  We find that defense Exhibit 48 refers to McCauley, Jr., and not his father.  We will also overrule the Game Commission's relevance objections to defense Exhibit 53.  (See Doc. 214 at 36-37).  This exhibit contains articles regarding McCauley, Sr. that rebut the inference the Game Commission would have us draw from the lack of a suffix in defense Exhibit 48.

[6] The Game Commission also considers Exhibits 10 and 11 irrelevant because, *inter alia*, they "do not mention McCauley, Jr."  (See Doc. 214 at 18-19).  This statement is incorrect—he is listed as an attorney of record for CPLC during the appeal.  (See Def. Ex. 11 at 2).

A.2d 80, 82 (Pa. 1952)).  Each of these documents demonstrates McCauley's association with CPLC in the years surrounding the tax sale in 1908 and are circumstantial evidence of his agency status.  We thus consider this evidence relevant to McCauley's relationship with CPLC.

We will sustain, however, the Game Commission's objections to some of the evidence adduced by the Trust on relevancy grounds.  Exhibit 33 is a collection of letters between Proctor's heirs and McCauley as well as others, and Exhibit 34 is a map referenced in some of the correspondence.  (See Def. Exs. 33, 34).  Exhibit 35 consists of more correspondence referring to coal leases between 1913 and 1921. (See Def. Ex. 35).  McCauley is mentioned but is neither an author nor recipient of any letter in this exhibit.  (See id. at 11).  Most of the letters in Exhibit 33 are handwritten and illegible, as are several in Exhibit 35.  (See Def. Ex. 33 at 1-16, 18-22, 30; Def. Ex. 35 at 1-6, 16).  The remaining letters, while typed and therefore legible, reference mineral rights in tracts other than the Josiah Haines warrant. (See e.g., Def. Ex. 33 at 24).

At trial, counsel for the Trust noted that the John Barron tract, referenced in Exhibit 33, was also subject to the 1908 tax sale, and argued this material is relevant to highlight the ongoing communications between McCauley and the Proctor heirs following the tax sale, as well as evidence that Proctor's heirs had active coal leases following CPLC's deed to the Game Commission.  (See 4/27/21 Tr. 63:11-67:3).  We make no determination whether this information is relevant to *other* tracts, but the Trust does not direct us to any letter where the Josiah Haines warrant is mentioned.  Furthermore, the maps in Exhibit 34 indicate that the area in which

coal was mined did not cover the Josiah Haines warrant.  (See Def. Ex. 34 at 9).  We will not consider Exhibits 33 through 35 as they are not relevant to our resolution of the instant dispute regarding the bellwether tract.

We will also not consider Exhibits 36, 37, 38, or 43 to the extent they contain legal opinions about the effect of the 1908 tax sale.  Two of these exhibits are 1931 letters from the Game Commission's title examiner John E. Potter, one is a response to Potter from A.F. Jones of CPLC, and one is a title examination excerpt regarding certain tracts of land in Lycoming County.  (See Def. Exs. 36, 37, 38, 43). The letters contain Potter's beliefs about the effect of a tax sale on tracts of land. (See Def. Ex. 36 at 3-4; Def. Ex. 37 at 11-12; Def. Ex. 38 at 2).  The title examination excerpt is likewise the examiner's belief about a purchase McCauley made.  (See Def. Ex. 43 at 8).  These opinions are not relevant to our determination of McCauley's agency status.

### 2. *Authenticity Objections*

All admissible evidence must be authenticated.  FED. R. EVID. 901(a).  Similar to relevance, the standard for authentication is "slight."  United States v. Turner, 718 F.3d 226, 232 (3d Cir. 2013) (citation omitted).  An evidentiary item is authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is."  Id. at 232 (quoting FED. R. EVID. 901(a)).  Once the proponent makes a *prima facie* showing of authenticity, the evidence goes to the factfinder.  Id. (citation omitted).  The proponent can use circumstantial evidence, including the context in which the evidence was obtained and its contents, to authenticate evidence.  Id. at 232-33.

For ancient documents, Rule 901 provides an exemplar method for authentication if the proponent can adduce evidence that the ancient document "is in a condition that creates no suspicion about its authenticity; was in a place where, if authentic, it would likely be; and is at least 20 years old when offered." See FED. R. EVID. 901(b)(8).  In deciding authenticity, the court may also consider the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item."  FED R. EVID. 901(b)(4).

The Game Commission objects to the authenticity of a series of defense exhibits comprised of CPLC's ledger books and letters interwoven within the books that concern McCauley.  (See Doc. 214 at 10-13).  These ledger books and the letters within them are in the possession of nonparty Lauri Sekerak, who testified about her acquisition of the items.  (See Joint Ex. 30).  Sekerak, who worked as an abstractor in Pennsylvania, testified that she came into possession of the ledger books around 2005.  (See Joint Ex. 30, Sekerak Dep. 7:12-8:5, 11:5-8).  When Sekerak learned that a Warren County law firm was dissolving, she offered to take the ledger books from the firm's library after learning they would otherwise be thrown away.  (See id. at 8:6-10:19).  Proctor Trust proffered additional evidence in pretrial briefing to explain why the ledger books were located in a law firm Warren County, noting CPLC's headquarters moved to Sheffield, in Warren County, until it closed in 1941.  (See Docs. 206-1, 206-2).

The Proctor Trust produced the original CPLC ledger books during the April 2021 bench trial for examination, and the court inspected the books containing the letters at issue.  (See 4/27/21 Tr. 82:3-83:25).  The ledger books are organized by map

18

number into seven volumes.  (See Sekerak Dep. 7:22-8:8:5).  They contain maps for CPLC tracts and corresponding ledger information for the tracts from the early twentieth century.  (See id. at 13:21-14:21).  Relevant here, many tract pages contain letters that have been affixed on or between a particular tract's map and its ledger entries.  (See id. at 17:5-18:17).  Some of these letters, offered by the Trust into evidence, are dated between 1904 and 1916 and are either written by, or addressed to, "Calvin H. McCauley, Jr."  (See Def. Exs. 15, 16, 17, 30, 31).  Each letter had been affixed onto certain pages of the ledger books.  (See Sekerak Dep. 17:5-18 (Def. Ex. 15), 20:1-10 (Def. Ex. 16), 23:16-25 (Def. Ex. 17), 27:8-18 (Def. Ex. 30), 30:23-31:16 (Def. Ex. 31)).  One additional exhibit is an entry from the ledger book regarding the Josiah Haines warrant.  (See Def. Ex. 41).  The court confirmed during trial that this exhibit was also contained within the CPLC ledger books submitted for examination.  (See 4/27/21 Tr. 115:18-22).

During her deposition, Sekerak testified that each of the letter exhibits were located in the ledger books on the same page as lots or tracts mentioned in the letter.  Exhibit 15 is a 1904 letter to McCauley regarding a Lot 146 in Hamilton Township and was affixed in the CPLC ledger book on the page for Tract 146 in Hamilton Township, and the ledger page references the letter itself.  (See Sekerak Dep. 18:13-19:1).  Exhibit 16 is a 1905 letter to McCauley regarding the Alexander McMullen warrant and was affixed to the ledger's plat page for the Alexander McMullen warrant.  (See id. at 21:8-25).  Exhibit 17 is a 1905 letter to McCauley on CPLC letterhead regarding "warrant #5105" and is affixed to the ledger page on "tract 5105" in Forest County.  (See id. at 25:12-25).  Exhibit 30 is a 1916 letter from

McCauley regarding a Lot 578 in Warren County and is affixed on a ledger page regarding a "tract of land 578" in Warren County.  (See id. at 28:25-29:6).  Finally, Exhibit 31 is a 1916 letter from McCauley regarding "Warrant 4737" in Ulysses Township and is affixed on a ledger page regarding "tract 4737" in Ulysses Township.  (See id. at 32:13-17).

Based on Sekerak's deposition testimony, as well as the court's careful examination of the ledger books and the letters contained therein, we will overrule the Game Commission's authenticity objection.  Both the ledger books and the letters within them contain "distinctive characteristics" that support the Trust's claim that they are, in fact, CPLC ledgers as well as letters to and from McCauley during his tenure with CPLC.  See FED. R. EVID. 901(b)(4).  The letters were also located in a place where, if authentic, such documents would be.[7]  Each letter was carefully affixed and preserved within CPLC ledger books, and the ledger books were located in the same county in Pennsylvania that CPLC was headquartered until its closure.  (See Docs. 206-1, 206-2).  Finally, the ledger books and letters are over a century old.  The court's inspection of the ledger books and letters within them created no suspicion about their age or the circumstances in which they were located.  In sum, we find that the Trust has provided *prima facie* evidence to

---

[7] The Game Commission observes that the letters were "glued into" the ledger books and argues they should be considered with suspicion.  (See Doc. 214 at 15).  We disagree.  Neither the ledger books nor the letters were in a condition that creates suspicion about their authenticity.  Sekerak attested that each letter references a tract of land and is affixed to the ledger page matching that same tract. (See Sekerak Dep. 15:14-32:25).

authenticate Exhibits 15, 16, 17, 30, 31, and 41, and we will not exclude them on authenticity grounds.

### 3. *Hearsay Objections*

Hearsay is a "statement other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c).  Hearsay is inadmissible unless an exception enumerated in the Federal Rules of Evidence applies.  <u>Agere Sys., Inc. v. Advanced Env't Tech. Corp.</u>, 602 F.3d 204, 232 (3d Cir. 2010).

The Game Commission objects to several exhibits as hearsay because they are letters, newspaper articles, or other writings.  (<u>See</u> Doc. 214 at 9-10).  The Game Commission alludes to "double hearsay" in its briefing, but provides no further argument as to what statements within these documents it considers further hearsay, and we again decline to make the Game Commission's argument for it. <u>See</u> <u>Zimmermann</u>, 749 F. App'x at 150 (citation omitted).  The Trust responds that (1) all of the challenged exhibits qualify as ancient documents and are therefore excepted from the hearsay rule, and (2) the exhibits further qualify under other hearsay exceptions.  (<u>See</u> Doc. 206 at 8-9).

We agree with the Trust.  Exhibits 15, 16, 17, 30, 31, and 41 are the authenticated CPLC ledger book pages and letters affixed to them.  They are ancient documents and are excepted from the hearsay rule.  <u>See</u> FED. R. EVID. 803(16); <u>Langbord v. U.S. Dep't of Treasury</u>, 832 F.3d 170, 190 (3d Cir. 2016).

The Game Commission's remaining hearsay objections similarly fail.  Exhibit 12 is the First Annual Report of CPLC from 1903; it is also excepted as an ancient

document.  See FED. R. EVID. 803(16).  Exhibits 18, 19, 20, and 22 are excerpts from

*Boyd's Directory* in 1906 through 1909.  (See Def. Ex. 18-20, 22).  These exhibits

qualify as ancient documents, and also qualify as "directories" because they are

"compilations that are generally relied on by the public."  See FED. R. EVID. 803(16),

803(17); see also United States v. Woods, 321 F.3d 361, 364 (3d Cir. 2003) (explaining

rationale behind "directories" exception).  Exhibit 27 is a notarized declaration of

trust from 1914 signed by McCauley.  (See Def. Ex. 27).  This document is self-

authenticating as an acknowledged document, see FED. R. EVID. 902(8), and further

qualifies as an ancient document, see FED. R. EVID. 803(17).  Exhibits 32, 48, and 53

are various news articles from the early twentieth century.  (See Def. Ex. 32, 48, 53).

These documents are self-authenticating as newspapers or periodicals, see FED. R.

EVID. 902(6), and qualify as ancient documents, see FED. R. EVID. 803(17).  We will

not exclude these exhibits on the grounds of hearsay.

## III.   Findings of Fact

### A.   CPLC Reported Its Surface Estate in the Josiah Haines Warrant Prior to 1907

The Commonwealth of Pennsylvania warranted a tract of land to Josiah

Haines in 1793.[8]  (See Doc. 205 ¶ 1).  The land encompassing the Josiah Haines

warrant is located in what is now LeRoy Township, Bradford County.  (See id. ¶¶ 1,

3).  In 1893, then-owner Schrader Mining & Manufacturing Company conveyed the

Josiah Haines warrant, along with other tracts, to Thomas E. Proctor and Jonathan

---

[8] See Herder Spring, 143 A.3d at 360 n.3 (describing the warrant process by which land was conveyed in Pennsylvania).

A. Hill.  (See id. ¶¶ 4, 5; Joint Ex. 3).  The next year, Proctor and Hill and their wives conveyed the surface estate of the Josiah Haines warrant, along with other tracts, to Union Tanning.  (See Doc. 205 ¶ 6; Joint Ex. 4).  The 1894 deed to Union Tanning expressly "reserved" the subsurface rights to minerals, oil, gas, coal, and petroleum (hereinafter "mineral rights" or "subsurface estate") to the tracts contained in the deed.[9]  (See Joint Ex. 4 at 13; Doc. 205 ¶¶ 6, 7; Doc. 220 ¶ 13).  In the 1894 deed, Proctor and Hill also retained the land of several warrants less those warrants' "bark rights."  (See Joint Ex. 4 at 2; Doc. 220 ¶ 14).  The warrants retained by Proctor and Hill in the 1894 deed were the Henry Beck, John Graff, Thomas Dundas, and James Biddle warrants.  (See Doc. 220 ¶ 14).  Proctor died the same year and the defendant, Proctor Trust, is his successor in interest to the Josiah Haines warrant.  (See Doc. 205 ¶¶ 8-10).

LeRoy Township assessment records from 1896 through 1903 reflect Union Tanning's ownership in the Josiah Haines warrant.  (See Def. Ex. 1).  In 1896, the Josiah Haines warrant is assessed to "U.T. Co."  (See id. at 3).  In 1898, the Josiah Haines warrant is included under "unseated lands ass[']ed to the Union Tanning Company."  (See id. at 7).  LeRoy Township assessment records from this period also reflect the lands retained by Proctor in the 1894 deed.  (See Def. Ex. 1 at 8).

---

[9] As noted in our summary judgment opinion, it is more accurate to say Proctor and Hill "excepted" the mineral rights from their conveyance to Union Tanning, rather than that they "reserved" them.  (See Doc. 183 at 3 n.3 (citing Lauderbach-Zerby Co. v. Lewis, 129 A. 83, 84 (Pa. 1925))).

Namely, the Beck, Graff, Dundas, and Biddle warrants continued to be assessed for taxes to Proctor and Hill.  (See id. at 8, 10, 11, 12, 13).

In 1903, Union Tanning conveyed its surface ownership interest in the Josiah Haines warrant to CPLC, excepting the rights to certain tree bark and conveying the property "subject to" all prior exceptions and reservations.  (See Doc. 205 ¶¶ 11-12; Joint Ex. 5).  From 1894 through 1902, Union Tanning paid taxes on the Josiah Haines warrant, which was assessed as unseated in LeRoy Township.  (See Joint Ex. 8 at 10, 14; Joint Ex. 9 at 2, 6, 10, 14, 18; Joint Ex. 10 at 2, 5).  From 1903 through 1906, CPLC paid taxes on the same warrant.  (See Joint Ex. 10 at 8, 11, 14; Joint Ex. 11 at 2; see also Joint Ex. 11 at 1 ("C P L Co means Central Pennsylvania Lumber Co.")).  Taxes assessed against the Josiah Haines warrant for 1907 were not paid.  (See Doc. 205 ¶ 13; Joint Ex. 12 at 3).[10]

As the LeRoy Township assessment records attest, tax officials were aware of Union Tanning's surface interest created by the 1894 deed.  Starting in 1894, tax assessments on the Josiah Haines warrant were levied against, and paid by, Union Tanning.  (See Def. Ex. 1 at 7).  Meanwhile, the county commissioners continued to assess taxes on the lands that had been "retained" in the 1894 deed against Proctor

---

[10] For tax years 1895 and 1896, the Bradford County unseated land assessment books inadvertently referred to the 410-acre Josiah Haines warrant as the "Joseph Haines" warrant.  (See Joint Ex. 8 at 14; Joint Ex. 9 at 2).  That error was corrected in 1897, (see Joint Ex. 9 at 6), and the entries remained accurate through 1901, (see id. at 10, 14, 18; Joint Ex. 10 at 2).  Beginning in 1902 and continuing through 1906, the tract is again mislabeled as the "Joseph Haines" or "Joseph Hines" warrant in the unseated assessment books.  (See Joint Ex. 10 at 5, 8, 11, 14; Joint Ex. 11 at 2).  For tax years 1907 and 1908, the name is once more corrected to "Josiah Haines."  (See Joint Ex. 11 at 5, 9).

and Hill.  (See Def. Ex. 1 at 8, 10, 11, 12, 13).  After Union Tanning conveyed its

surface interest in the Josiah Haines warrant to CPLC in 1903, CPLC was then

assessed, and paid, taxes on the warrant from 1903 to 1906.  (See Joint Ex. 10 at 8,

11, 14; Joint Ex. 11 at 2).  The evidence of record therefore demonstrates that both

Union Tanning and CPLC reported their surface ownership interests in the Josiah

Haines warrant to county commissioners.  (See Doc. 220 ¶ 33).

**B.**     **Calvin H. McCauley, Jr., Had a Long-Time Association with CPLC**

On June 8, 1908, the Josiah Haines warrant was sold to Calvin H. McCauley,

Jr., to recover the unpaid 1907 taxes.  (See Doc. 205 ¶¶ 15-16; Joint Ex. 11 at 5).  In

December 1910, McCauley and his wife quitclaimed all interest in numerous

properties, including the Josiah Haines warrant, to CPLC for $1.00.  (See Doc. 205 ¶

16).  In 1920, CPLC conveyed its interest in the warrant, along with other

properties, to the Game Commission.  (Id. ¶¶ 17-18).

At CPLC's formation in 1903, corporate documentation listed McCauley as

the company's treasurer.  (See Def. Ex. 13 at 2; Def. Ex. 14 at 1).  CPLC's first annual

report lists McCauley as its real estate agent.  (See Def. Ex. 12 at 3).  In 1904 and

1905 correspondence contained in CPLC's ledger books, McCauley is addressed as

"R.E. Agt., C.P.L. Company."  (See Def. Ex. 15 at 1; Def. Ex. 16 at 1).  Internal

correspondence from CPLC's "Land and Timber" superintendent dated December

1905 is addressed to McCauley as a "real estate agent" and is stamped with a date of

receipt by "Central Penna Lum. Co. Real Estate Dept."  (See Def. Ex. 17 at 1).  The

CPLC ledger book, which contains the company's bark-peeling records on the

Josiah Haines warrant as well as its own internal record of "land sales," makes no

mention of McCauley's purported ownership of the tract; instead, it only lists the 1920 sale to the Commonwealth. (See Def. Ex. 41 at 1). Finally, an excerpt from the Game Commission's title abstract contains a schedule of taxes for the Josiah Haines warrant. (See Pl. Ex. 2 at 40-42). Its listing for 1907 associates McCauley with CPLC, listing both McCauley and CPLC as the warrant's "owner" in 1907 and in 1908, two and three years before McCauley quitclaimed the property back to CPLC. (See id. at 42).

Several public documents confirm McCauley's association with CPLC as well. For example, *Boyd's Directory* entries from 1906 through 1909 list McCauley as a real estate agent, assistant general solicitor, or attorney at the same address as CPLC. (See Def. Exs. 18, 19, 20, 22). The change in McCauley's title from attorney to assistant general solicitor in the 1908 *Boyd's* listing is supported by the February 1908 news article noting his appointment as "assistant general solicitor for the Central Pennsylvania Lumber Company." (See Def. Ex. 48 at 1). McCauley also appeared as an attorney for CPLC, and as a notary public for CPLC's president, in several state court proceedings from 1908 through 1910. (See Def. Ex. 11 at 2; Def. Ex. 21 at 7; Def. Ex. 23 at 2; Def. Ex. 25 at 1; Def. Ex. 26 at 1, 6). The 1910 United States census lists McCauley's occupation as "lawyer" for a "lumber co." (See Def. Ex. 24 at 1).

Other actions by McCauley demonstrate his affiliation with CPLC. From 1904 to 1916, McCauley purchased at tax sales more than 100 properties that were previously owned by CPLC and later quitclaimed those tracts back to CPLC, all in consideration for $1.00. (See Def. Ex. 29 at 1, 4, 12). The same 1910 sale at which

McCauley quitclaimed the Josiah Haines warrant included 44 additional tracts. (See id. at 8-11).  In 1914, McCauley executed a notarized declaration stating he was acting in trust for CPLC when he purchased six properties in Elk County from the county treasurer using funds provided by CPLC.  (See Def. Ex. 27 at 2).

After he quitclaimed the Josiah Haines warrant (and other tracts) to CPLC in 1910, McCauley continued to be associated with CPLC for several years.  For example, news articles in 1913 and 1917 note McCauley was elected to CPLC's Board of Directors.  (See Def. Ex. 32 at 2, 6).  The CPLC ledger books also contain correspondence on McCauley's personalized CPLC letterhead to an engineer in 1916.  (See Def. Ex. 30, 31).  We do not hesitate to find that McCauley had a long and well-documented employment with CPLC.

## IV.   Conclusions of Law

The plaintiff in a quiet title action must recover on the strength of its own title, not the weakness of the defendant's title.  See Herder Spring, 143 A.3d at 372 (citing Albert v. Lehigh Coal & Navigation Co., 246 A.2d 840, 843 (Pa. 1968)).  The plaintiff has the burden to prove title by a preponderance of the evidence.  See Montgomery County v. MERSCORP Inc., 795 F.3d 372, 374 n.2 (3d Cir. 2015) (citing Moore v. Dep't of Env't Res., 566 A.2d 905, 907 (Pa. Commw. Ct. 1989)).

### A.   CPLC Complied with the Act of 1806

Under Pennsylvania law, "there may be three separate estates in land: the surface, the right of support, and the subsurface mineral rights."  United States v. 3,218.9 Acres of Land, More or Less, Situated in Warren Cnty., 619 F.2d 288, 291 (3d Cir. 1980) (citing Pa. Bank & Tr. Co. v. Dickey, 335 A.2d 483, 485 (Pa. Super. Ct.

1975); <u>Smith v. Glen Alden Coal Co.</u>, 32 A.2d 227, 234 (Pa. 1943)).  Thus, a single

tract of land can be "severed and owned by different persons."  <u>3,218.9 Acres of</u>

<u>Land</u>, 619 F.2d at 291.  Prior to 1947, Pennsylvania's real property taxing practices

varied depending on whether land was noticeably occupied or developed ("seated")

or wild and undeveloped ("unseated").  <u>Herder Spring</u>, 143 A.3d at 363-64.

Although unseated land was considered "wild," it could still be "severed into

surface and subsurface estates."  <u>Id.</u> at 364 (citation omitted).

　　　　Pennsylvania distinguished between seated and unseated land for tax-

collection purposes.  <u>See id.</u> at 363.  County land assessors determined whether land

was seated or unseated and then reported that determination to the county

commissioners for appropriate taxation.  <u>Id.</u> at 364; <u>see</u> <u>McCall</u>, 4 Watts at 353.

Owners of land designated as seated could be held personally liable for the taxes

assessed on their plot.  <u>Herder Spring</u>, 143 A.3d at 364.  If land was deemed

unseated, taxes were "imposed on the land itself," and owners were not held

personally liable if they failed to pay the taxes owed.  <u>Id.</u>; <u>Northumberland County</u>

<u>v. Phila. & Reading Coal & Iron Co.</u>, 131 F.2d 562, 565-66 (3d Cir. 1942).

　　　　In the early 1800s, many unseated landowners failed to pay the taxes due on

their land.  <u>See</u> <u>Herder Spring</u>, 143 A.3d at 354.  Instead of trying to impose personal

liability for unpaid taxes on these unseated lands, Pennsylvania enacted statutes

whereby the unseated land could simply be sold to pay the delinquent taxes.  <u>Id.</u> at

365.  We review the Act of 1804 and the Act of 1806 as relevant to the case at bar.

The Act of 1804 constitutes the origin of tax-sale "title-washing."  See id. at

366.  According to Section 5:

> [S]ales of unseated land, for taxes that are now due ...
> shall be in law and equity valid and effectual, to all intents
> and purposes, to vest in the purchaser or purchasers of
> lands sold as aforesaid, all the estate and interest therein,
> that the real owner or owners thereof had at the time of
> such sale, although the land may not have been taxed or
> sold in the name of the real owner.

Id. at 366 (quoting Act of 1804, April 3, P.L. 517, 4 Sm. L. 201, § 5).  This allowed a

tax sale to "extinguish[] all previous titles" to the land that was assessed and sold

for delinquent taxes.  See id. at 366 (quoting Reinboth v. Zerbe Run Improvement

Co., 29 Pa. 139, 145 (Pa. 1858)).  When unseated land was severed into surface and

subsurface estates, those separate estates "could be separately assessed, taxed, and,

if necessary, sold at tax sale."  Id. at 364 (citing F. H. Rockwell & Co. v. Warren

County, 77 A. 665, 666 (Pa. 1910)).

The Act of 1806 imposed a reporting requirement in connection with

unseated land, stating "it shall be the duty of every holder of unseated lands" to

provide the county commissioners with a signed statement describing the tract of

land and "the name of the person or persons to whom the original title from the

commonwealth passed, and the nature, number, and date of such original title."  Id.

at 368 (quoting Act of March 28, 1806 ("Act of 1806"), P.L. 644, 4 Sm. L. 346, § 1,

repealed and replaced by 72 PA. STAT. AND CONS. STAT. ANN. § 5020-409).  For those

transfers occurring after the law's passage, a person "becoming a holder of

unseated land" was required to "furnish a like statement, together with the date of

the conveyance to such holder, and the name of the grantor, with in one year."  See

id. Failure to comply with this reporting requirement resulted in a penalty equal to "four times the amount of tax" owed on the land. See id. at 368. The Act of 1806 obligated then-current unseated landowners to provide the commissioners with information about their property. See id. The Act of 1806 also required subsequent owners of unseated land to provide information about newly acquired property interests. See id. To state the obvious, the statutory purpose was "to allow the commissioners to impose an appropriate tax." Id. at 369. Owners were also responsible for reporting a severance of the original warrant or a division due to such severance, because "assessors would treat unseated lands 'entirely in reference to the original warrants, when not otherwise directed by the owners.'" Id. at 370 (quoting Hutchinson v. Kline, 49 A. 312 (Pa. 1901) (per curiam)). In other words, unseated land, while severable, was "assessed and taxed as a whole" unless owners informed the commissioners differently. Id. If the owners did report a severance, assessors could then separately assess and tax the subsurface estate if it had value. See id. at 368.

We have already found as a matter of fact that CPLC reported its interest in the surface estate of the Josiah Haines warrant. We conclude as a matter of law that CPLC complied with the Act of 1806 by "inform[ing] the commissioners of the land owned to allow the commissioners to impose an appropriate tax." See Herder Spring, 143 A.3d at 369. According to the statute, one who is "becoming a holder of unseated land" must report his interest. Herder Spring, 143 A.3d at 368 (citation omitted). In Herder Spring, the record contained "no evidence" that the previous surface or subsurface owner reported their respective unseated interest to county

commissioners following severance of the warrant at issue.  See id. at 360.  Under such circumstances, the court concluded, the warrant must have been assessed as a whole (and sold as a whole) because county officials had never been directed otherwise.  Id. at 360, 372, 375.  In stark contrast, the tax assessment records in this matter are competent evidence establishing CPLC's compliance with the Act of 1806.  Cf. Herder Spring, 143 A.3d at 360.  Thus, CPLC's compliance with the reporting requirements of the Act of 1806 meant that the commissioners of Bradford County were "otherwise directed" to assess the surface and subsurface estates of the Josiah Haines warrant separately.  See Herder Spring, 143 A.3d at 370 (quoting Hutchinson, 49 A. 312).  This critical deviation from the facts of Herder Spring forecloses the argument that the 1908 tax sale at issue must have included the whole warrant.

The Game Commission contends that there is "no evidence establishing that the severance was ever reported to Bradford County Commissioners."  (See Doc. 219 ¶ 20).  As we stated in our summary judgment opinion, this argument is merely semantics; reporting a surface estate for separate taxation and reporting a "severance" is a distinction without a difference.  (See Doc. 183 at 30).  The assessment books make clear that Union Tanning and CPLC were assessed taxes on the Josiah Haines warrant and paid those taxes.  The Game Commission still offers no alternative explanation as to how Union Tanning and CPLC were named in the unseated assessment books and paid assessed taxes if those entities had not reported their ownership interests to Bradford County officials.  The Trust has provided declarations from various records custodians confirming that the initial

correspondence that served as notice to the County Commissioners cannot be located in various archives.  (See Def. Exs. 44, 45, 46).

The assessment books and the notations contained within them are likely the only remaining public records of any notification to county commissioners.  (See 4/27/21 Tr. 50:10-51:20).  Although the Game Commission underscores the absence of tax levies on the Josiah Haines subsurface estate during Union Tanning's and CPLC's ownership of the surface estate, this fact has very limited evidentiary value. In Herder Spring, the state supreme court observed that subsurface estates were not taxed unless they were determined to have distinct and cognizable tax value; if they "had no value," they were not subject to levy.  See Herder Spring, 143 A.3d at 368.  Furthermore, the Trust correctly points out that the assessment books contain no indication that either Union Tanning or CPLC was ever assessed a four-fold penalty for failing to report.  (See Doc. 220 ¶ 33); Herder Spring, 143 A.3d at 368. Finally, we have received no evidence that Union Tanning or CPLC improperly reported owning *more* than the surface estate.  We conclude that Union Tanning and CPLC properly reported their interest in the surface estate of the Josiah Haines warrant, thus complying with the Act of 1806.

To be clear, however, we do not find as a matter of law that only the surface estate was assessed in 1907 or offered for sale by the treasurer in 1908.  The record is unclear on the parameters of the 1907 assessment and the 1908 sale.  It is conceivable that the Proctor heirs also defaulted, or the treasurer erroneously offered the entire warrant at the 1908 tax sale.  Our conclusion on this issue merely serves to reinforce the distinction between the facts of this case and those in Herder

Spring.  Nevertheless, as noted in our summary judgment opinion: "Even if we could definitively conclude that the county treasurer properly offered the entire Josiah Haines warrant at the 1908 tax sale, what was *offered* for sale is not dispositive as to what interest this tax sale effectively conveyed."  (See Doc. 183 at 31).  As we conclude below, CPLC's compliance with the Act of 1806, combined with McCauley's status as an agent of CPLC, as well as CPLC's breach of its duty to pay 1907 taxes on the Josiah Haines warrant, rendered McCauley's 1908 purchase a mere redemption.

### B.     McCauley Acted as CPLC's Agent During the 1908 Tax Sale

The existence of a principal-agent relationship is a question for the factfinder.  See Walton v. Johnson, 66 A.3d 782, 787 (Pa. Super. Ct. 2013) (citing Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co., 602 A.2d 1348, 1351 (Pa. Super. Ct. 1992)).  Such a relationship "results from the consent of one [] that another may act on his behalf."  Lincoln Ave. Indus. Park v. Norley, 677 A.2d 1219, 1222 (Pa. Super. Ct. 1996) (citing Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1970)).  The agency relationship "requires no special formalities."  McIlwain v. Saber Healthcare Grp., Inc., 208 A.3d 478, 485 (Pa. Super. Ct. 2019).  Nor must it be in writing.  See Falconer v. Mazess, 168 A.2d 558, 560 (Pa. 1961).  An agency relationship's existence need not be proven by direct evidence "if it can be reasonably inferred from the circumstances of the case."  See Scott v. Purcell, 415 A.2d 56, 61 n.8 (Pa. 1980) (citing Yezbak v. Croce, 88 A.2d 80, 82 (Pa. 1952)).

We find that McCauley acted as an agent of CPLC in the 1908 tax sale of the Josiah Haines warrant.  See Lincoln Ave., 677 A.2d at 1222 (citing Smalich, 269 A.2d

at 480).   The evidence offered by the Trust allows us to "reasonably infer" an agency relationship from the unique circumstances of this case, where the individuals with personal knowledge of an agency relationship agency are no longer living.  See Scott, 415 A.2d at 61 n.8 (citation omitted).

Principally, we emphasize an undisputed fact: after McCauley purchased the Josiah Haines warrant at a June 1908 tax sale, CPLC—*not McCauley*—paid taxes on the Josiah Haines warrant in 1908 and 1909.  (See Joint Ex. 11 at 9; Def. Ex. 47 at 2). Other record evidence originating with CPLC confirms this conclusion, including CPLC's corporate documentation naming McCauley in its leadership, CPLC's ledger books that conspicuously lack any record of the purported sale to McCauley, and CPLC internal correspondence to and from McCauley while he worked for the company.  (See Def. Exs. 12-17, 30-32, 41).  We further note that public documents, including *Boyd's Directory* excerpts, court filings, newspaper articles, and McCauley's own notarized declaration reinforce our conclusion.  (See Def. Exs. 11, 18-23, 25-27, 48).  In much the same way McCauley declared he was acting "in trust for" CPLC when he made tax purchases in Elk County, we conclude he was acting on behalf of CPLC when purchasing the Josiah Haines warrant in Bradford County. (See Def. Ex. 27 at 2).

### C.    Because CPLC Breached Its Duty to Pay 1907 Taxes, McCauley's Purchased as CPLC's Agent Effected Only a Redemption

It is uncontested that in 1907, CPLC did not pay the assessed taxes on the Josiah Haines warrant, thereby causing the property to be sold by the Bradford County treasurer at the 1908 tax sale.  (See Doc. 205 ¶¶ 13, 15).  Default occurred in

1907, the very same year that CPLC records indicate the company completed its bark-peeling activities on the tract.  (See Def. Ex. 41 at 1).  In June 1908, McCauley purchased the Josiah Haines warrant for $49.36, an amount equal to the delinquent taxes for 1907.  (See Doc. 205 ¶ 16; Joint Ex. 2 at 72).

We held in our summary judgment opinion that CPLC had a duty to pay taxes on its surface interest in the unseated Josiah Haines warrant in 1907.  (See Doc. 183 at 31-43).  We restate the bulk of our previous legal analysis herein, as it undergirds our current findings.

Pennsylvania law instructs that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest[.]"  Powell v. Lantzy, 34 A. 450, 451 (Pa. 1896) (citing Chambers v. Wilson, 2 Watts 495 (Pa. 1834); Coxe v. Wolcott, 27 Pa. 154 (1856)).  This rule "rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty."  Id.  Instead, such a purchase "operates as a payment only," i.e., a redemption.  Id. (citation omitted). Application of this rule is limited to cases where the purchaser had some preexisting duty—arising by law, contract, or equity—to pay the taxes.  Id.

There is no case precedent which considers whether, under the foregoing facts, an agent who purchases at a tax sale induced by his principal's default takes good title to the entire property or simply redeems his principal's prior interest. For example, in Powell, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and through no fault of, the tax-sale purchaser who

35

currently owned the surface estate.  <u>See</u> <u>Powell</u>, 34 A. at 451, 452.  Neither the

surface nor the subsurface owner had a legal duty to pay the overdue taxes, which

had accrued on the land prior to severance during ownership by a different

individual.  <u>Id.</u>  In <u>Hutchinson</u>, taxes on unseated lands went unpaid in 1890 and

1891, before any involvement or ownership by the eventual 1892 tax-sale purchaser.

<u>Hutchinson</u>, 49 A. at 317.  In <u>Sagamore</u>, delinquent taxes from 1892 induced the

1894 tax sale that divested Proctor of the interest he purchased in 1893.  <u>Sagamore</u>,

166 F. Supp. at 468-69, 476.  And in <u>Herder Spring</u>, a *bona fide* third party bought

the entire warrant from the county, which the county had acquired in fee simple at

a tax sale after the prior surface and subsurface owners failed to report their

separate interests or pay taxes thereon.  <u>Herder Spring</u>, 143 A.3d at 360-61.

    <u>Reinboth</u> also presents materially different circumstances.  There, the 1840

tax-sale purchaser, Christopher Geiger, held claim to the subject property based on

prior conveyances, but there were other putative owners who claimed title to

portions of that land.  <u>Reinboth</u>, 29 Pa. at 140, 144-45.  The property went through

two tax sales, one in 1824 and another in 1840.  <u>Id.</u> at 144-45.  The 1824 tax-sale

buyer was an unrelated third party who purchased in good faith, and in 1829,

Geiger directed his attorney to purchase the property from the third-party buyer.

<u>Id.</u>  Geiger's attorney then sought a treasurer's deed for the tract at the 1840 tax sale

to eliminate any doubts as to superiority of Geiger's title.  <u>See</u> <u>id.</u> at 142, 145.

<u>Reinboth</u> is clearly distinguishable because the first tax-sale purchaser was an

independent third party.

A final case requiring consideration is <u>Gibson</u>, the decision quoted by <u>Powell</u> for the proposition that "there [i]s nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale." <u>Powell</u>, 34 A. at 451 (quoting <u>Gibson</u>, 27 Pa. at 160, 165). In <u>Gibson</u>, William A. Williams bought the subject property at a tax sale in 1850 for unpaid 1848 and 1849 taxes. <u>Gibson</u>, 27 Pa. at 160. Williams made the tax-sale purchase at the direction of Eli Felt, who had privately purchased the same land in August 1848 and conveyed it to the defendants early the following year. <u>Id.</u> at 162. Felt directed the tax-sale purchase to "confirm and strengthen" his own title, which he had already transferred to new buyers. <u>Id.</u> The Pennsylvania Supreme Court held Felt was not prohibited from perfecting, at a treasurer's sale, his 1848 title, which he may have deemed "suspicious" and "defective" due to possible fraud by its grantor. <u>Id.</u> at 165. But again, <u>Gibson</u> is materially different because the unpaid taxes at least partially accrued when Felt was not the owner, and because the tax-sale purchase was intended to cure any title defects caused by potential fraud of a prior owner.

Finding no case on point, we revert to the original question raised by <u>Powell</u>: whether CPLC owed any duty to pay the 1907 taxes such that McCauley's purchase—since he was an agent of CPLC—acted merely as a redemption. This issue is purely a matter of state law, and we believe it has ramifications for other pending and future real property disputes in the Commonwealth. In the absence of controlling precedent, it is our task to predict how Pennsylvania courts would rule if confronted with this issue. After careful consideration, we conclude that CPLC owed a legal duty to pay taxes on its unseated surface estate; hence, CPLC could

not use an agent to "acquire a better title, or a title adverse to that of other parties in interest," at a tax sale prompted by its own default.  Powell, 34 A. at 451.

It is beyond peradventure that unseated landowners faced no *personal liability* for failing to pay taxes assessed on unseated land.  Pennsylvania's highest court has repeatedly affirmed this legal principle for nearly 200 years.  As early as 1822, the Pennsylvania Supreme Court acknowledged that "taxes on unseated lands[] have never . . . been considered a charge on the person of the owner."  Burd v. Ramsay, 9 Serg. & Rawle 109, 114 (Pa. 1822).  In 1841, the court explained that "the land itself, and not the owner of it, is debtor for the public charge," and is looked to for any overdue payment.  Strauch v. Shoemaker, 1 Watts & Serg. 166, 175 (Pa. 1841) (quoting Fager v. Campbell, 5 Watts 287, 288 (Pa. 1836)).  Fifty-five years later, the Powell court reiterated that when taxes were assessed on unseated land, "there was no personal responsibility on the owner therefor.  The land alone was liable."  Powell, 34 A. at 451 (citing Hunter v. Cochran, 3 Pa. 105 (1846) (*per curiam*); Russel v. Werntz, 24 Pa. 337 (1855); Logan v. Washington County, 29 Pa. 373 (1857)).  In 1972, the Bannard court explained that, as to unseated land, "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes."  Bannard, 293 A.2d at 49.  Herder Spring recently reaffirmed this premise, stating that "tax on unseated land was the liability of the land rather than the owners."  Herder Spring, 143 A.3d at 375 (citations omitted).

Personal liability, however, is quite different than a duty to pay taxes. Personal liability is a potential *consequence* for breaching a duty, such as failing to

pay taxes on seated land.  See id. at 364 (citation omitted).  Simply because the Commonwealth imposed no personal liability or "personal responsibility" (as it was sometimes referred to) on unseated landowners for failure to pay assessed taxes does not mean that those owners had no duty to pay taxes in the first place.

To the contrary, courts in the Commonwealth have long recognized an unseated landowner's duty to pay taxes.  In Herder Spring, the Pennsylvania Supreme Court reaffirmed that, while the tax-sale regime for unseated land may have appeared "harsh and severe" for landowners, "[a] vigilant owner has nothing to fear.  All he has to do is to pay his taxes, and *this he is bound to do upon every principle of equality and justice*."  Herder Spring, 143 A.3d at 366 (emphasis added) (quoting Strauch, 1 Watts & Serg. at 176).  The Herder Spring court likewise quoted M'Coy v. Michew, 7 Watts & Serg. 386 (Pa. 1844), for similar reasoning: "If there be hardship, it is one which can easily be avoided by performing the *duty* which the law imposes upon [the owner], to return the land and *pay his taxes*."  Id. at 369 (emphasis added) (alteration in original) (quoting M'Coy, 7 Watts & Serg. at 391).  And in Breisch v. Coxe, another case involving taxation of unseated land, the court explicitly stated that "*the payment of taxes is a duty*, and a failure to perform it is the fault of the *owner*."  Breisch v. Coxe, 81 Pa. 336, 346 (1876) (emphasis added); see also Mayor of Phila. v. Riddle, 25 Pa. 259, 263 (1855) (noting that "it is an owner's duty to pay taxes" and failure to do so results in tax sale of owner's land).

The legal duty of owners to pay taxes on unseated land, which was firmly established in the common law, was subsequently codified by statute.  In 1887, Pennsylvania's General Assembly passed the Act of June 6, 1887, which mandates:

> That after June first, [1888], *all taxes levied upon unseated lands*, within the counties of this Commonwealth, *shall be paid by the owner or owners of such unseated lands* within the year for which the same are levied; and in case of the refusal or failure of any person or persons, companies or bodies corporate, owner or owners of such unseated lands to pay the taxes so levied within the year for which the same are levied and collectible, then interest at the rate of six per centum, per annum, is to be charged upon the amount of said taxes, or any part thereof, remaining due and unpaid from and after the first day of the year following that for which said taxes were levied until the same has been paid in full, *or the land sold as now provided by law for the sale of unseated lands*: Provided, No interest shall be charged upon taxes levied for the years [1886] and [1887].

Act of June 6, 1887, P.L. 363, No. 248, § 1 (codified at 72 PA. STAT. AND CONS. STAT. ANN. § 5781) (emphasis added).  The plain language of this statute unambiguously obligates unseated landowners to pay assessed taxes within a year of levy.  Id.

We acknowledge that, at several points in the Herder Spring decision, the court uses language—albeit in *dicta*—which could be read to infer that there was no duty to pay taxes on unseated land.  Nevertheless, when put in proper context, we do not believe that such remarks were meant to contradict longstanding legislation or state supreme court precedent.

For instance, the Herder Spring court states that "[t]he owner of unseated land . . . was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original

warrant had been issued." Herder Spring, 143 A.3d at 364.  However, this statement is followed by multiple citations to state supreme court decisions indicating that there was no personal *liability* for taxes on unseated land.  See id. (citing Strauch, 1 Watts & Serg. at 175; Bannard, 293 A.2d at 49).  As noted by a prominent treatise on tax titles, the idea of taxes being "imposed on" or "against" the land, or that the land alone was liable for taxes, "means no more than that taxes assessed upon a specific parcel of real estate can only be collected by a process having for its object the condemnation and sale of the land."  HENRY CAMPBELL BLACK, A TREATISE ON THE LAW OF TAX TITLES: THEIR CREATION, INCIDENTS, EVIDENCE, AND LEGAL CRITERIA § 167 (2d ed. 1893).  Later in the opinion, the Herder Spring court notes that the Powell decision "explained the duty, or lack thereof, of landowners to pay taxes[.]"  Herder Spring, 143 A.3d at 367.  Although this language appears broad at first blush, it relates directly to the facts of Powell, where neither the surface nor the subsurface owner had any obligation to pay overdue taxes that had accrued on the property when owned in whole by a different individual.  Id. (quoting Powell, 34 A. at 451).

In sum, we read this *dicta* within its context and find that it does not represent a reversal of precedent or an abrogation of the Act of 1887.[11]  Had the Herder Spring court intended such drastic outcomes, it would have made its

---

[11] This is especially true when, in the same opinion, the court explicitly states that unseated landowners were bound to pay their taxes "upon every principle of equality and justice," id. at 366 (quoting Strauch, 1 Watts & Serg. at 176), and could avoid the loss of their land at tax sales by performing the "duty" imposed by the law on unseated landowners: "to return the land and pay the taxes," id. at 369 (quoting McCoy, 7 Watts & Serg. at 391).

holdings clear and explicit. Instead, these statements simply affirm the noncontroversial axiom that there was no personal liability on unseated landowners who failed to pay taxes.

We find unpersuasive the Game Commission's arguments against the existence of a legal duty to pay taxes on unseated land, as reiterated in its bench trial memorandum. (See Doc. 219 at 17-25). The Game Commission argues that we have misinterpreted the Powell case. (See id. at 17-21). It bears repeating that, in Powell, the surface owner bought the entire property at a tax sale induced by default of a *prior owner* who had failed to pay taxes assessed on the tract as a whole. Powell, 34 A. at 451, 452. And in Herder Spring, the buyer was a *bona fide* third party who purchased the entire warrant because none of the prior surface or subsurface owners had reported their separate interest to county commissioners or paid the taxes owed, thus causing a tax sale of the entire property. Herder Spring, 143 A.3d at 360-61. Neither tax-sale buyer was under *any* obligation to pay the overdue taxes that caused the treasurer's sales in those cases, so the Powell rule did not apply. The Game Commission's repeated reliance on the outcome in Powell and Herder Spring, therefore, is misplaced because the facts of the case at bar are entirely different.

Furthermore, the fact that CPLC had no duty to pay taxes on the subsurface estate it did not own does not render the Powell rule irrelevant. In Powell, the tax-sale purchaser had no other option to protect his surface interest except to buy the entire property at the tax sale. See Powell, 34 A. at 452 ("Lantzy was in a position in which he was obliged to pay a claim which he did not personally owe, and which

was, in part, a charge upon the land of another, from whom he could not require repayment, or to buy or lose his title."). That is simply not the situation here. All CPLC had to do to protect its surface interest was pay its taxes. If Bradford County incorrectly assessed the entire warrant in 1907, rather than separate estates, CPLC could have challenged that assessment prior to the tax sale or following the sale during the statutory redemption period. See Herder Spring, 143 A.3d at 366. What CPLC could not do is utilize its own default to gain a better title at a tax sale, *i.e.*, "build up or acquire a title founded upon [its] own neglect of duty." Powell, 34 A. at 451. We therefore conclude, as we did in our summary judgment opinion, that CPLC as an unseated landowner had a legal duty to pay taxes assessed on its land.

In the matter *sub judice*, CPLC was the undisputed surface owner of the Josiah Haines warrant prior to the 1908 tax sale. (See Doc. 205 ¶ 11). Thus, CPLC had an affirmative duty to pay taxes assessed on its interest in the surface estate, and breached its duty by failing to pay those taxes in 1907. (See id. ¶ 13). We reiterate that CPLC could not use an agent to "acquire a better title, or a title adverse to that of other parties in interest," at a tax sale prompted by its own default. See Powell, 34 A. at 451. McCauley was acting as CPLC's agent at the 1908 tax sale, and therefore the rule set forth in Powell applies here. CPLC's purchase through McCauley effectuated nothing more than a redemption of its surface interest. See id. A redemption operates to "set aside or annul" the tax sale, leaving the title "precisely as though the sale had not been made." Yocum v. Zahner, 29 A. 778, 779 (Pa. 1894). Since McCauley's purchase acted as a redemption, it left the title as it stood before the sale was made. See id. at 779. Thus, Proctor's subsurface

interest in the Josiah Haines warrant was not extinguished at the tax sale, and the Proctor Trust continues to hold its interest in the subsurface estate.

## V.   __Conclusion__

We find in favor of Proctor Trust on the issue of ownership of the subsurface estate of the Josiah Haines warrant.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    December 3, 2021